Robert B. Carey (011186)
Leonard W. Aragon (020977)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
rob@hbsslaw.com
leonard@hbsslaw.com

Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| John Doe, a single man,<br><br>Plaintiff,<br><br>v.<br><br>The Arizona Board of Regents, governing body of Arizona State University, an agent of the State of Arizona; James Rund; Craig Allen; Tara Davis; Kendra Hunter; Kathleen Lamp; And Andrew Waldron,<br><br>Defendants. | Case No.: 2:18-cv-01623-DWL<br><br>**FIRST AMENDED COMPLAINT**<br><br>**(JURY TRIAL REQUESTED)**<br><br>(Assigned to the Honorable Dominic W. Lanza) |

## TABLE OF CONTENTS

**Page**


I. INTRODUCTION ........ 1

II. PARTIES ........ 6

III. JURSDICTION AND VENUE ........ 7

IV. STATEMENT OF FACTS ........ 8

A. University Policies and Procedures ........ 8

B. Title IX at the University ........ 16

C. The Incident ........ 28

D. The Police Investigation ........ 33

E. The University's Investigation and Initial Finding of Responsibility ........ 37

F. The Hearing and the UHB's Disciplinary Recommendations ........ 43

G. Rund's Disciplinary Decisions ........ 49

V. CAUSES OF ACTION ........ 52

COUNT I FEDERAL CIVIL RIGHTS ACT, 42 U.S.C. § 1983, VIOLATION OF THE DUE PROCESS, CONFRONTATION, AND EQUAL PROTECTION CLAUSES OF THE ARIZONA AND U.S. CONSTITUTIONS ........ 52

COUNT II VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681, *et seq*. ........ 61

A. ASU's Actions Resulted in An Erroneous Outcome Finding ........ 63

B. ASU's Actions and Penalties Were Also Affected by Plaintiff's Gender ........ 66

COUNT III BREACH OF CONTRACT ........ 69

A. Incapacity ........ 70

B. Force by Sexual Violence ........ 72

C. The Hearing ........ 72

D. Investigation ........ 73
COUNT IV GROSS NEGLIGENCE ........ 74
COUNT V INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS .. 76
COUNT VI FALSE LIGHT ........ 78
COUNT VII INJUNCTIVE RELIEF AND DECLARATORY JUDGMENT ........ 79
VI. PRAYER FOR RELIEF ........ 79
VII. JURY DEMAND ........ 80

## I. INTRODUCTION

1. In handling student conduct issues, Arizona State University ("ASU" or "University") has a duty to treat its students equitably and fairly. Where the University promises to investigate and adjudicate disciplinary matters, it must do so in accordance with its own policies and procedures, and in a way that is fair to students and comports with federal and state law.

2. Here, ASU's disciplinary process went awry.

3. On April 2, 2016, John Doe—then a junior at ASU—attended a small get-together at an off-campus residence, where he, his non-student friend ("Witness 1"), and Jane Roe ("Roe" or "Complainant"), an ASU student, had consensual three-way sex. The next day, Roe went to the Tempe Police Department ("Tempe PD") and claimed she did not consent to the sexual acts. Tempe PD immediately investigated; the Maricopa County District Attorney's Office never brought any charges against Doe.

4. Months after the incident, Roe notified ASU and alleged that, due to intoxication, she did not consent to the sex. Doe was immediately suspended and later expelled.

5. ASU failed to investigate and collect the facts, leaving that task to the Complainant, Roe, despite promising Doe it would gather evidence in a fair and impartial manner. It then, without notice, found Doe guilty of "sexual violence" against Roe—even though she repeatedly denied that any force or violence was used.

6. The University also failed to properly apply its own Student Code of Conduct in finding that Roe was "incapacitated" at the time of the sex. ASU's standard of "incapacitated" is, purportedly, an inability to make rational and informed decisions and judgments. The evidence shows, and as the University's own board found after hearing live testimony,

Complainant was intoxicated but able to make rational, reasonable decisions at the time of the sex.

7. The events underlying this complaint arose when Roe joined Doe at a gathering of friends for a pre-party before heading out to a different, larger party. The get-together occurred at a friend of Doe's house. The guests, including Doe, Roe, and Witness 1, decided to play a drinking game. At some point, Roe invited her friend, Witness 2, to join her at the party and she did, arriving a little over an hour after Roe. At the get-together, Roe drank, conversed, and interacted normally and coherently with all the partygoers. She danced with Doe and Witness 1, kissing each while walking back and forth between the two, as they talked with others.

8. After the dancing ended, Witness 2 and another partygoer (Witness 3) left for a bedroom, and just after that Roe led Doe and Witness 1 into the bedroom. Another partygoer, Witness 4, who was sober the entire night, never saw Roe appear out of control or incoherent at any point during the night.

9. Before entering the room, others at the party say Roe consumed at most 5 shots of the host's low-proof "UV Blue" vodka, while she claims to have had 7. This converts to a range of approximately 3.5 to 5.25 ounces of alcohol using a standard 80-proof vodka scale.

10. Once inside the room, Roe kissed Witness 1, at which point Doe offered to leave. Roe told him to stay. Witness 1 then offered to leave. Roe told him to stay. Roe then undressed herself, and engaged in, according to her own statements to the police, a "threesome."

11. For approximately 25 minutes, Roe was an active participant in the sex, positioning herself in several ways to accommodate sex. She was on all fours for a significant amount of time. She described her acts as "fucking" Doe and giving "blow jobs" to both males. After approximately

25 minutes, the unprotected, unlubricated sex began to hurt, and she told the males to stop. They immediately stopped. Roe admitted that she was in control enough to stop either male from ejaculating in her effort to avoid an unwanted pregnancy.

12. Without Doe's or Roe's consent, Witness 1 took out his cell-phone camera at the end of the sex and began recording. Not wanting to be filmed, Roe questioned him, caught him falsely denying he was recording, and verbally instructed him to stop. Witness 1 stopped filming, dressed, and left the room.

13. Roe and Doe then argued, with Doe calling Roe dramatic and each calling the other an asshole. Roe then dressed herself and left the room to find her friend, Witness 2, whom she found in another room. Roe told Witness 2 she wanted to go home and left the residence under her own power. Outside, she contacted another friend she knew was nearby and would be up at that time of night (shortly after midnight on April 3, 2016) to take her home. While outside, she talked with Witnesses 2 and 3, telling Witness 2 what had happened inside the bedroom and saying Doe was upset with her because she "wouldn't have sex with him [anymore]." Roe did all of this just moments after being "incapacitated."

14. Evidently regretting the consensual threesome, Roe contacted the Tempe PD the next day and claimed she drank too much to consent to sex with Doe and Witness 1. Tempe PD immediately and thoroughly investigated her claims. Doe was never charged with any crime.

15. Six months later, in September 2016, Doe was just 15 credits shy of earning his degree and looking forward to graduating. At that time, Roe notified the University of the incident and repeated her allegation that she drank too much to consent to the sex.

16. The University promised and owed Doe a complete, thorough, unbiased investigation. But unbeknownst to Doe, the University never intended to gather evidence in a neutral or reasonable way. It was going to leave the investigating to Roe, the complainant, which meant exculpatory evidence was omitted, ignored, or never sought—even though the University was aware it existed.

17. Doe was found responsible by ASU's Dean of Students for sexually engaging Roe while she was "incapacitated" and for violating the University's alcohol policies by providing alcohol to Roe, a minor at the time.

18. Doe did not purchase or contribute toward the purchase of the alcohol consumed. Nor was he a host or occupant of the house where it was served, though ASU assumed he was and charged him with an alcohol violation.

19. Doe was expelled from ASU and banned from all educational institutions operated by the Arizona Board of Regents (ABOR), including the University of Arizona and Northern Arizona University.

20. Doe appealed the discipline, and an evidentiary hearing was held before ASU's University Hearing Board (UHB) on May 23, 2017. After testimony from Roe, Doe, and others, the UHB, finding Roe "lucid and able to verbally communicate," concluded ASU failed to establish incapacitation by a preponderance of the evidence.

21. Instead, the UHB found Doe used "force" during the encounter, although force was never alleged, charged, or litigated at the hearing. In her various statements, Roe confirmed she was not alleging force or sexual violence of any type. Roe's sole contention was she was too drunk to consent to sex, not that she was forcibly raped. The University officials

presenting ASU's case at the hearing confirmed this, disclaiming force as a basis for their prosecution.

22. The UHB recommended expulsion based on "sexual violence . . . attempted [by] physical sexual acts perpetrated against a person by force," and referred the case to ASU's Senior Vice President for Educational Outreach and Student Services for a final ruling. On June 27, 2017, the Senior Vice President, who did not attend the hearing or observe the testimony, affirmed without comment the UHB's finding on force; reversed the UHB's finding on incapacity, finding that Roe was incapacitated at the time of the sex; and upheld the expulsion.

23. Doe moved for Review and Rehearing on August 2, 2017, which the Senior Vice President denied on August 30, 2017. In this ruling, the Senior Vice President elaborated on his incapacitation findings; summarily re-affirmed the force finding; and expelled Doe from any institution governed by the ABOR.

24. Doe appealed the Senior Vice President's final decision pursuant to A.R.S. § 12-901, *et seq*. On November 3, 2018, the Maricopa County Superior Court affirmed the University's disciplinary decisions and sanction. Doe filed a timely appeal to the Arizona Court of Appeals, and briefing should be complete by early summer 2019.

25. At this time, Doe remains short of the credits needed for graduation—which has been delayed over two years—and his reputation and economic interests have been forever tarnished for the University's actions.

26. Because of ASU's unlawful and unfair conduct, Plaintiff files this action for violation of his educational and civil rights, under 42 U.S.C. § 1983 and 20 U.S.C. § 1681 (commonly known as Title IX), the Arizona Constitution, Art. 2, §§ 4, 13, and 36 and Art. 11, § 6, his rights to due

process and equal protection under the U. S. and Arizona Constitutions, breach of contract, gross negligence, defamation, false light, and intentional infliction of emotional distress. Plaintiff also seeks punitive damages.

## II. PARTIES

27. Plaintiff John Doe is an Arizona resident and was a student at ASU in Maricopa County, Arizona. By September 2016, Doe was a single semester shy of completing his degree. He was unable to complete his degree and continue his collegiate athletic career due to the disciplinary proceeding at issue in this suit. He was barred from ASU's campus in September 2016; expelled in December 2016; and his appeals under ASU's Student Disciplinary Procedures were denied in August 2017.

28. The ABOR is the governing body of ASU. The ABOR is a jural entity that may be sued.

29. Defendant JAMES RUND is an Arizona resident, and was at all relevant times Senior Vice President of Educational Outreach and Student Services for ASU in Maricopa County, Arizona. He makes final decisions for ASU and the ABOR in administrative matters concerning alleged violations of the Student Code of Conduct.

30. Defendant CRAIG ALLEN is an Arizona resident, and was at all relevant times the Chair of the UHB at ASU in Maricopa County, Arizona. He, along with other UHB panel members, hears student appeals of disciplinary decisions and sanctions issued by ASU's Dean's Review Committee and makes findings of fact and formulates disciplinary recommendations for RUND.

31. Defendant KATHLEEN LAMP is an Arizona resident, and was at all relevant times a Professor of English at ASU. She was a member of

the UHB panel that heard Plaintiff's appeal of the disciplinary decisions and sanctions issued by the Dean's Review Committee and made findings of fact and formulated disciplinary recommendations for RUND.

32. Defendant ANDREW WALDRON is an Arizona resident, and was at all relevant times a graduate student at ASU. He was a member of the UHB panel that heard Plaintiff's appeal of the disciplinary decisions and sanctions issued by the Dean's Review Committee and made findings of fact and formulated disciplinary recommendations for RUND.

33. Defendant KENDRA HUNTER is an Arizona resident, and was at all relevant times Senior Associate Dean of Students at ASU in Maricopa County, Arizona. She was a member of the Dean's Review Committee that issued the disciplinary decisions and sanctions on appeal before the UHB and RUND. She also oversaw the investigation into Doe's alleged violations of ASU's Student Code of Conduct.

34. Defendant TARA DAVIS is an Arizona resident, and was at all relevant times a Senior Coordinator in the Office of Student Rights and Responsibilities at ASU in Maricopa County, Arizona. She investigated the Student Code of Conduct violations allegedly committed by Plaintiff and submitted an investigatory report to HUNTER and the Dean's Review Committee.

## III. <u>JURSDICTION AND VENUE</u>

35. This action arises under 42 U.S.C. § 1983, 20 U.S.C. §1681(a) and the U.S. Constitution. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331.

36. This Court has supplemental jurisdiction over the state tort claims under 28 U.S.C. § 1367 because those claims are directly related to his federal law claims and arise from the same case or controversy under Article III of the United States Constitution.

37. Venue is proper in this District under 28 U.S.C. § 1391(b). The acts or omissions giving rise to this suit occurred in this District.

38. A timely notice of claim under A.R.S. § 12-821.01 was filed and served on each defendant as required by Arizona law.

## IV. STATEMENT OF FACTS

### A. University Policies and Procedures

39. In the fall of 2014, when Doe matriculated at the University, Doe received a copy of ASU's Student Disciplinary Procedures (the "Procedures," *see* https://eoss.asu.edu/sites/default/files/StudentDisciplinaryProcedures.pdf), and the Student Code of Conduct (the "Code," *see* https://public.azregents.edu/Policy Manual/5-308-Student Code of Conduct.pdf - https://public.azregents.edu/Policy%2520Manual/5-308-Student%2520Code%2520of%2520Conduct.pdf). The Procedures and the Code established the University's standards for acceptable conduct and describe the procedures by which the University would investigate and adjudicate alleged violations of its standards.

40. Upon information and belief, ABOR has reviewed and approved the Procedures and Code. The UHB, its panelists, and RUND enforce the Procedures and apply the Code provisions to the cases before it.

41. In consideration for his tuition and attendance at the University, Doe received and was given assurances by the University that it would follow and comply with numerous policies and procedures adopted and promulgated by the school, including the Procedures and the Code.

42. The Procedures, Code, and other statements by the University about the matters contained therein are binding terms in the contractual relationship between the University and Doe.

43. The University owes a duty of good faith and fair dealing in creating and enforcing standards of conduct.

44. When Roe and Doe had sex in April 2016, the Code prohibited certain conduct by students at the University. *See* Ex. 1. The Code prohibits "sexual misconduct" (F-23) which it defines (E-19) as:

> a) Sexual violence and other non-consensual sexual contact—actual or attempted physical sexual acts perpetrated against a person by force or without consent; or
>
> b) Sexual harassment–unwelcome conduct of a sexual nature that is sufficiently severe or pervasive as to create an intimidating, hostile, or offensive environment; or
>
> c) Other unwanted or non-consensual sexual conduct including but not limited to indecent exposure, sexual exploitation or voyeurism, or non-consensual photographing or audio-recording or video-recording of another in a state of full or partial undress or while engaged in sexual activity, or publishing or disseminating such materials.

45. The Code further provides that "[c]onsent may never be given by a person who is: incapacitated (by drugs, alcohol or otherwise), unconscious, asleep, or otherwise physically or mentally unable to make informed, rational judgments." Although the Code does not define "incapacitated," HUNTER explained at the UHB hearing that incapacity is "the inability to make rational and informed decisions and judgments."

46. ASU does not have a written standard or definition of incapacity. At the hearing, for the first time, HUNTER described the standard as the inability to make rational and informed decisions and judgments. She also stated ASU adheres to and is guided by the guidelines

set forth by the Association of Title IX Administrators ("ATIXA"), which includes an incapacitation standard.

47. Likewise, "force" is not defined by the Code. According to materials provided by ATIXA, which ASU admittedly follows, it is "the use of physical violence and/or imposing on someone physically to gain sexual access" and includes physical force, threats, coercion, and intimidation.

48. Under the Code, ASU first determines whether force, in any of its forms, was used during a sexual encounter, and only if force is ruled out does the analysis turn to incapacity. That is, if ATIXA is adhered to, a finding of incapacity means force has been repudiated.

49. Under Section F-15, the Code also prohibits violations of the Board or university rules or applicable laws governing alcohol, including consumption, distribution, unauthorized sale, or possession of alcoholic beverages.

50. Under Section F-25 of the Code, "Photographing, videotaping, filming, digitally recording, or by any other means secretly viewing, with or without a device, another person without that person's consent in any location where the person has a reasonable expectation of privacy, or in a manner that violates a reasonable expectation of privacy" are prohibited.

51. The Procedures prescribe the process the University must follow when investigating and adjudicating claims of misconduct.

52. The Procedures, which promise "a fair and impartial administrative process," establish a tiered system of resolution for claims of sexual assault. The Dean of Students can initiate an investigation "based on receipt of information from any source that a student may have violated the Student Code of Conduct." Generally, the process begins when someone makes a formal complaint.

53. Upon receipt of information regarding possible misconduct, the Dean of Students office "may initiate an investigation." Then, "[i]f the Dean of Students believes that there is a sufficient basis to believe that a violation of the Student Code of Conduct may have occurred the Dean will notify the student in writing of the alleged violation and initiate the investigative process."

54. During the investigation, both complainant and respondent are to be provided with:

- an explanation of the charges;
- a summary of the information gathered;
- a reasonable opportunity for the student to reflect upon and respond on his own behalf to the charges; and
- an explanation of the applicable disciplinary procedures, including the parties' right to request a hearing before a University Hearing Board if suspension, expulsion, or degree revocation is imposed.

55. Before investigations are closed, involved parties also have the right to "respond to all investigative materials."

56. During the investigation, the Dean of Students may take interim action, including issuing provisional suspensions, if it becomes "aware of information that supports a misconduct allegation and believes that the student poses a threat of harm or substantial disruption." Should interim discipline be imposed, "the information upon which the (decision) is based will be communicated in writing to all parties."

57. After the investigation is completed, the investigator's report, which includes interview summaries, documentation received and reviewed, a timeline of the investigation, and findings of fact, is forwarded

to the Dean's Review Committee. Upon information and belief, the Dean's Review Committee is comprised of administrators in the ASU Dean of Student's Office. Upon receipt of the investigator's report, the Dean's Review Committee has five business days to issue a written decision determining "whether it is more likely than not that a violation of the Student Code of Conduct has occurred and, if so, the appropriate disciplinary sanction to apply." The written decision of the Committee must include "a statement of the charges, the determination, and the sanction to be imposed, if any."

58. The Dean's Review Committee does not conduct a hearing, and student respondents cannot ascertain who sits on the Committee prior to its deliberations or challenge the participation of a Committee member on grounds of bias or other conflicts. In Plaintiff's case, a member of the Dean's Review Committee, HUNTER, oversaw his investigation, communicated often with the investigator, DAVIS, and testified on the University's behalf at the hearing before the UHB.

59. For cases of alleged sexual misconduct, the investigation and determination of responsibility are to be completed within 60 days. "If a determination cannot be made within sixty (60) days the Dean shall document the reasons."

60. Decisions of the Dean's Review Committee are final but appealable (if requested by any party within 5 days of the Committee's written decision). The UHB, whose role is advisory, hears appeals and "provides a recommendation to the Senior Vice President for Educational Outreach and Student Services [RUND] who will make the final decision." RUND was not present at Doe's UHB hearing.

61. The UHB, who at the time of Plaintiff's case was chaired by ALLEN, is "comprised of three members. One member must be a student

and one of the other members will act as Hearing Board Chair." UHB panelists receive "annual training on the issues related to dating violence, domestic violence, sexual assault and stalking and how to conduct an investigation and hearing process that ***protects the safety of victims and promotes accountability***."

62. The UHB may be accompanied, at both the hearing at its deliberations, by legal counsel. In Plaintiff's case, the UHB's counsel was Lisa Hudson, Associate General Counsel, ASU.

63. The UHB can request or direct the cooperation and/or participation of "[m]embers of the University community" "in connection with a disciplinary proceeding." This necessarily includes the ability to compel members of the University community to produce probative evidence. If the accuser does not cooperate in securing probative evidence, nothing prevents the UHB from dismissing the case, sanctioning the accuser, or creating an adverse inference that the undisclosed evidence supports the accused's case.

64. Parties to UHB proceedings are given an opportunity to challenge the members of their hearing panels for personal bias "by submitting a written statement to the Hearing Board Chair setting forth the basis for the challenge no later than five (5) business days before the hearing. The Chair will determine whether to sustain or deny the challenge." Upon information and belief, no person has been excluded for bias in a sexual misconduct case in the year before Doe's disciplinary hearing.

65. All factual issues, including whether a student is responsible for the charges against him or her, are resolved based on a preponderance of the evidence standard.

66. In cases involving sexual misconduct, "the student and complainant may not directly question one another." However, the University representative presenting the complainant's case may directly question the respondent. Counsel for respondents may not directly question complainants and must instead funnel their questions through the UHB Chair, who can decide whether to ask any of the questions.

67. Hearings before the UHB proceed as follows:

- Each party may present an opening statement, which summarizes what information is expected to be presented.
- Each party will call witnesses to provide statements under oath.
- At the end of each witness's statement, he or she may be questioned by the other party.
- The Hearing Board may ask further questions of each witness.
- Rebuttal witnesses may be called to refute statements made by any party.
- Each party may present a closing statement which summarizes the information presented.

(*Id.*)

68. After the hearing is concluded, the UHB deliberates and "discuss[es] the information that has been presented and the reasonable inferences to be drawn from it." The UHB may consider but is not bound by the facts adduced during the investigation or the investigator's opinion(s), including on witness credibility.

69. Then, based "solely upon the information presented," the UHB issues a written recommendation "to the Senior Vice President for Educational Outreach and Student Services as to whether the student

more likely than not violated the Student Code of Conduct and the appropriate sanction. Recommendations must be supported by a simple majority of the board." This written recommendation is distributed to the parties "no later than three (3) business days following the conclusion of the hearing."

70. The Senior Vice President for Education Outreach and Student Services (RUND) is the final arbiter. Upon receipt of the UHB's recommendations, he "render[s] a written decision which affirms, denies, or accepts the Hearing Board's recommendation with modifications." Where the decision of the Senior Vice President departs from the UHB's recommendations, "the Senior Vice President will explain any variance from the recommendation in the final decision."

71. Under ASU's approach, the Senior Vice President is bound neither by the factual findings or opinions of the University's investigator or the UHB, including on witness credibility. He can reach whatever conclusions desired, irrespective of witness credibility, the evidence adduced during the investigation and hearing, and the recommendations of the UHB.

72. Upon information and belief, the Senior Vice President is assisted by legal counsel when determining the outcome of cases before him. Upon information and belief, the Senior Vice President's counsel in Plaintiff's case was Lisa Hudson, who also acted as counsel to the UHB, including at the hearing.

73. Decisions of the Senior Vice President are final but reviewable. Parties may file requests for review and rehearing, also decided by the Senior Vice President, on one of these bases:

- irregularities in the proceedings, including but not limited to any abuse of discretion or misconduct by

the Hearing Board or by the Dean of Students, which has deprived the opportunity for a fair and impartial disciplinary process;

- newly discovered material evidence which could not have been presented during the fact-finding or hearing process;
- excessive severity of the sanction; or
- the decision is not reasonably justified by the evidence or is contrary to law.

74. Upon receipt of a request for review or rehearing, Senior Vice President may uphold or modify the previous decision or grant a rehearing on the issues raised by the request. (*Id.* at 8.) The decision of the Senior Vice President is final, with judicial review available under A.R.S. § 12-901, *et seq.*

**B. Title IX at the University**

75. The issue of sexual assaults on college and university campuses is, at the federal level, addressed by an act of Congress known as Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688.

76. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." Under U.S. Supreme Court precedent, Title IX allows private parties to sue educational institutions receiving federal funds for "intentional discrimination." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005).

77. The meaning of "discrimination" under Title IX is "differential treatment" or "less favorable treatment," and "covers a wide range of intentional unequal treatment." (*Id.* at 174-75.)

78. From Title IX's enactment in 1972 until 1997, the Department of Education ("Department") did not recognize sexual harassment (including sexual assault) as a form of sex discrimination in violation of Title IX. In 1997, however, the Department issued regulations that require colleges and universities receiving federal funds to establish policies and procedures to address sexual assault, including student-on-student complaints. (*See* 62 Fed. Reg. 12034.)

79. The guiding principle established by the Department's regulations is that grievance procedures to resolve such student complaints must be "***prompt and equitable***." (34 C.F.R. § 106.8(b)) (emphasis added). The procedures must assure that both sides in such proceedings are treated equally.

80. In 2001, the Department's Office of Civil Rights ("OCR") issued guidance after public notice and opportunity to comment in a document entitled "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" ("2001 Guidance"), available at http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf.

81. OCR's 2001 Guidance requires schools to provide these procedural guarantees:

- "***Notice to students . . . of the [school's] procedure***";
- "***Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence***";

- "***Designated and reasonably prompt time-frames for the major stages of the complaint process***." *Id.* at 20 (emphasis added).

82. OCR's 2001 Guidance further provides that "[***a***]***ccording due process to both parties involved***, will lead to sound and supportable decisions." (*Id.* at 22 (emphasis added).) Title IX's "due process" requirement applies to both state and private colleges and universities. (*Id.* at 2, 22.)

83. Colleges and universities also have the obligation under Title IX to "make sure that all designated employees have adequate training as to what constitutes sexual harassment and are able to explain how the grievance procedure operates." (*Id.* at 21.)

84. In April 2011, without public notice and comment, OCR issued a "significant guidance document" commonly referred to as the "Dear Colleague" Letter. (*See* "Dear Colleague" Letter, Apr. 4, 2011, available at http://www.2ed.gov/about/offices/list/ocr/letters/colleagues-201104.pdf). The "Dear Colleague" Letter dramatically rewrote the landscape of Title IX enforcement at colleges and universities. It came with a tsunami of publicly known investigations conducted by OCR into how colleges and universities handle allegations of sexual assault, and innumerable reports in the national media that suggested the pervasive nature of sexual assault committed by male students on college campuses throughout the nation. And the view of sexual violence OCR was enforcing was a gendered view that saw men as the paradigmatic perpetrators of that violence and heterosexual women as its paradigmatic targets.

85. Catherine E. Lhamon, then the Assistant Secretary of Education and head of OCR, made that gendered view clear on numerous

occasions. As one national media outlet reported in October 2016, in a story on OCR's Title IX campaign:

> Lhamon says she is frustrated. As she sat in her Washington, D.C. office during an interview with SI.com, she said she couldn't help but to think about the women who are suffering every day.[1]

86. Similarly, an OCR press release notified the public that, on May 1, 2014, Lhamon would be speaking at the culmination of an event titled, "Walk a Mile in Her Shoes," "an event that will raise awareness about sexual assault and highlight men's role in preventing sexual violence."[2] And in August 2015 she would tell a different national media publication, "'We don't treat rape and sexual assault as seriously as we should,'" citing a statistic about the rate of unwanted sexual activity experienced specifically by college women.[3]

87. Although the "Dear Colleague" Letter reaffirms OCR's 2001 Guidance requirement that both parties involved in sexual misconduct proceedings "must have an equal opportunity to present relevant witnesses and other evidence" (*id.* at 11), it stated that schools "must use a preponderance of the evidence standard (*i.e.*, it is more likely than not

---

[1] Scooby Axson, "Explaining Title IX and how sexual assaults are prosecuted on college campuses," SI.com (October 21, 2016), https://www.si.com/collegefootball/2016/10/20/title-ix-sexual-assault-explained (last accessed May 25, 2018).

[2] "U.S. Assistant Secretary for Civil Rights Catherine E. Lhamon to Visit Two California Universities to Highlight Successes in Addressing Community Responses to Sexual Assault" (available at https://www.ed.gov/news/media-advisories/us-assistant-secretary-civil-rightscatherine-e-lhamon-visit-two-califomia-uni versities-highlight-successes-addressing-c01mnunityresponses-sexual-assault, last accessed May 25, 2018).

[3] David G. Savage and Timothy M. Phelps, "How a little known education office has forced far-reaching changes to campus sexual assault investigations," Los Angeles Times (August 17, 2015), http://www.latimes.com/nation/la-na-campus-sexual-assault-20150817-story.html (last accessed May 25, 2018).

that sexual harassment or violence occurred)," and must not use the "clear and convincing standard (*i.e.*, it is highly probable or reasonably certain that the sexual harassment or violence occurred.)" (*Id.*)

88. Even though the "Dear Colleague" Letter merely offers guidance, OCR framed the use of the preponderance of the evidence standard as a requirement. OCR treated the "Dear Colleague" Letter as binding on regulated parties for all practical purposes and thus pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses. Lhamon stated at a Senate Hearing in June 2014 that "we do" expect institutions to comply with the "Dear Colleague" Letter.

89. Even more ominously, the "Dear Colleague" Letter contained an explicit threat to colleges and universities: "When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding by the Department or refer the case to the U.S. Department of Justice for litigation." (*Id.* at 16.) Lhamon left no doubt about the consequences schools faced if they failed to adequately heed OCR's mandates, telling a Senate Committee in June 2014: "If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the Department of Justice (DOJ) to file a lawsuit against the school."[4] She then told a group of university administrators in July 2014 to "not think [loss of funding is] an empty threat."[5] She

[4] United States Senate Committee on Health, Education, Labor, and Pensions, Hearing on "Sexual Assault on Campus: Working to Ensure Student Safety," (June 26, 2014), available at https://www.govinfo.gov/content/pkg/CHRG-113shrg22618/html/CHRG-113shrg22618.htm (last accessed February 13, 2019).

[5] *See, e.g.*, Rachel Axon, Feds Press Colleges on Handling of Sex Assault Complaints, USATODAY (July 14, 2014),

described that enforcement mechanism as part of a set of "very, very effective tools," adding that "[i]f a school refuses to comply with Title IX in any respect, I will enforce." Lhamon was quoted: "It's not surprising to me that we haven't gone to the last step. . . . It means that so far the process has been working."[6] "There is a 'need to push the country forward,'" she said in August 2015, echoing the same sentiment.[7] "It's nice when you carry the big stick of the federal government," she would say in October 2016 (as Plaintiff's case was being investigated), leaving no doubt that the threat of having one's federal funding yanked remained very real.[8]

90. The loss of funding threat contained in the "Dear Colleague" Letter has been described as the "first warning shot" that OCR intended

---

http://www.usatoday.com/story/sports/ncaaf/2014/07/14/collegesexual-assaults-dartmouth-smmnit/12654521/ (last accessed May 25, 2018); Robin Wilson, 2014 List: Enforcer, THE CHRON. OF HIGHER EDUCATION (Dec. 15, 2014), http://www.chronicle.com/article/Enforcer-Catherine-E-Lhamon/150837/ (last accessed May 25, 2018); Tyler Kingkade, Colleges Warned They Will Lose Federal Funding For Botching Campus Rape Cases, THEHUFFINGTONPOST (July 14, 2014), http://www.huffingtonpost.com/2014/07 / 14/funding-campus-rape-dartmouthsmmnit_n_5585654.html (last accessed May 25, 2018).

[6] Meredith Clark, "Official to colleges: Fix sexual assault or lose funding," MSNBC (July 15, 2014), http://www.msnbc.com/msnbc/campus-sexual-assaultconference-dartmouth-college#51832 (last accessed May 25, 2018).

[7] David G. Savage and Timothy M. Phelps, "How a little known education office has forced far-reaching changes to campus sexual assault investigations," LOS ANGELES TIMES (August 17, 2015), http://www.latimes.com/nation/la-na-campus-sexual-assault-20150817-story.html (last accessed May 25, 2018).

[8] Scooby Axson, "Explaining Title IX and how sexual assaults are prosecuted on college campuses," SI.com (October 21, 2016), https://www.si.com/collegefootball/2016/10/20/title-ix-sexual-assault-explained (last accessed May 25, 2018).

to punish any school that failed to handle sexual assault proceedings as OCR wanted.[9]

91. According to the Chronicle of Higher Education, college presidents suggested afterward that there were "crisp marching orders from Washington."[10]

92. In April 2014, OCR issued additional guidance, "Questions and Answers on Title IX and Sexual Violence." Although the Questions and Answers reiterated OCR's 2001 Guidance that compliance with Title IX requires procedures "for adequate, reliable, and impartial investigation of complaints, including the opportunity for both the complainant and alleged perpetrator to present witnesses and evidence," it strongly implied that allowing an accused student to cross-examine his accuser could create a "hostile environment" and put a college or university in violation of Title IX. (*See* https://www2.ed.gov/about/offices/list/ocr/.../qa-201404-title-ix.pdf, at 12, 25, 31).

93. The Questions and Answers clarified that a school's Title IX investigation is mandatory, not discretionary. (*Id.* at 2.)

94. On May 1, 2014, as part of its aggressive enforcement policies following the issuance of the "Dear Colleague" Letter, OCR published a complete list of 55 higher education institutions nationwide that were then under investigation for possible Title IX violations. ASU was on that list.

---

[9] Tovia Smith, "How Sexual Assaults Came to Command New Attention," NPR (Aug. 13, 2014), https://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention (last accessed May 25, 2018).

[10] Libby Sander, "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," Chronicle of Higher Education (Feb. 11, 2014), https://www.chronicle.com/article/Colleges-Are-Reminded-of/144703 (last accessed May 25, 2018).

95. Colleges and universities, including ASU, are fearful of and concerned about being investigated or sanctioned by the Department of Education and/or of potential Title IX lawsuits by the DOJ. The Obama Administration issued a report entitled "Not Alone" in April 2014, which included a warning that if the OCR finds a Title IX violation, the "school risks losing federal funds." It further advised that the DOJ shares authority with OCR for enforcing Title IX and may initiate an investigation or compliance review of schools. If a voluntary resolution cannot be reached, the DOJ may initiate litigation against the institution. In July 2016, Vice President Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding.[11]

96. To revoke federal funds—the ultimate penalty—is a powerful tool because institutions receive billions of dollars a year from the federal government. Anne Neal of the American Council of Trustees and Alumni said: "There is a certain hysteria in the air on this topic...It's really a surreal situation, I think." She explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due-process rights of defendants instead."[12]

97. The previous administration's DOJ and OCR have created significant pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt. The Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors

[11] Nick Visser, "Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault," Huffington Post (July 4, 2016), https://www.huffingtonpost.com/entry/college-sexual-assault-white-house_us_5779c6c2e4b0416464105ca7 ("The vice president said he'd like to take away federal funding from those universities.").

[12] Tovia Smith, "How Sexual Assaults Came to Command New Attention," NPR (Aug. 13, 2014), https://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention (last accessed May 25, 2018).

and the federal government to improve the campus climate."[13] In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent."[14] Robert Dana, Dean of Students at the University of Maine, believed that some rush to judgment was inevitable. "I expect that that can't help but be true," he said. "Colleges and universities are getting very jittery about it."[15]

98. The impact of OCR's new movement was felt almost immediately by ASU in 2012 and 2013, when the first complaint against the school was lodged with OCR and OCR officials visited ASU to gather information. And since then, it has been subjected to extraordinary pressure—from OCR complaints (including two that were filed as

[13] Robin Wilson, "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education (September 1, 2014), https://www.chronicle.com/article/Presumed-Guilty/148529 (last accessed May 25, 2018).

[14] *Id.*

[15] Tovia Smith, "Some Accused Of Sexual Assault On Campus Say System Works Against Them," NPR (September 3, 2014), https://www.npr.org/2014/09/03/345312997/some-accused-of-campus-assault-say-the-system-works-against-them (last accessed May 25, 2018).

Plaintiff's case was ongoing)[16], lawsuits, media coverage[17], and its own students[18]—to appear tough on allegations of sexual assault made by women against men, no matter their merit.

99. In December 2018 and January 2019, Doe submitted public records requests to ASU seeking data on the University's sexual misconduct caseload since 2011, including a gender break-down of students found responsible on sexual misconduct charges by the UHB and Senior Vice President. Doe also sought all training materials provided to the UHB. To date, ASU has not responded.

100. Numerous rights organizations have spoken out against the legal and financial pressure exerted by OCR to force colleges and universities to find accused students (who are overwhelming male) responsible, despite the evidence or the lack of evidence. (*See, e.g.*, Foundation for Individual Freedom in Higher Education ("FIRE"), Stop Abusive and Violent Environments ("SAVE"), Families Advocating for Campus Equality, and prominent Harvard and University of Pennsylvania Law School faculty members asserting that OCR's new rules violate the due-process rights of the accused).

---

[16] *See* Chronicle of Higher Education Database of OCR Title IX Investigations, available at https://projects.chronicle.com/titleix/campus/Arizona-State-University/?case=475 (last accessed May 25, 2018).

[17] *See, e.g.*, Anne Ryman, "Feds: ASU sex-assault probe ongoing," The Arizona Republic (July 10, 2014), https://www.azcentral.com/story/news/local/tempe/2014/07/10/asu-students-ask-feds-broaden-sexual-assault-probe/12491247/(last accessed May 25, 2018); Anne Ryman, "ASU sexual-assault cases: Few convictions," The Arizona Republic (Nov. 24, 2014), https://www.azcentral.com/story/news/local/tempe/2014/11/23/asu-sexual-assault-few-arrests-convictions/19286329/ (last accessed February 13, 2019).

[18] *See, e.g.*, https://sundevilsagainstsexualassault.wordpress.com (last accessed May 25, 2018).

101. Recognizing the harmful results of the "Dear Colleague" Letter, Secretary of Education Betsy DeVos observed in a speech on September 7, 2017 that "[n]o school or university should deprive any student of his or her ability to pursue their education because the school fears shaming by–or loss of funding from–Washington," and "no student should be forced to sue their way to due process," and that "[o]ne person denied due process is one too many." (*See Secretary DeVos Prepared Remarks on Title IX Enforcement*, https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement). Noting that "the era of 'rule by letter' is over" and that "[t]here must be a better way forward," the Education Secretary announced that the Department of Education would "launch a transparent notice-and-comment process to incorporate the insights of all parties" in an effort "to ensure that America's schools employ clear, equitable, just, and fair procedures that inspire trust and confidence[.]" (*Id.*)

102. Then, on September 22, 2017, the Department of Education announced that it was withdrawing the 2011 Dear Colleague Letter and the 2014 Questions & Answers, noting in part the criticism of those documents for placing "improper pressure upon universities to adopt procedures that do not afford fundamental fairness." (*See September 22, 2017 Dear Colleague Letter*, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf, at 1).

103. Citing, in part, the Open Letter from 28 members of Harvard Law School's faculty criticizing Harvard's sexual harassment policy, the Department of Education warned on September 22, 2017 that as a result of the 2011 Dear Colleague Letter and the 2014 Questions and Answers, "many schools have established procedures for resolving allegations that 'lack the most basic elements of fairness and due process, are

overwhelmingly stacked against the accused, and are in no way required by Title IX law or regulation.'" (*Id.*) The University's Procedures (which guides the University's disciplinary action against Plaintiff) is based on the University's interpretation of the now-rescinded 2011 Dear Colleague Letter and 2014 Questions and Answers.

104. The new guidance from the Department of Education reflects a return to the original principles of Title IX, stating that an "equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence–including both inculpatory and exculpatory evidence–and take into account the unique and complex circumstances of each case." (*See September 2017 Q&A on Campus Sexual Misconduct,* https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf, at 4).

105. The new guidance allowed institutions to use "either a preponderance of the evidence standard or a clear and convincing evidence standard" when adjudicating cases of sexual misconduct. In response to the possible use of a higher burden of proof, ALLEN, the Chair of the UHB, was quoted as saying: "Hypothetically speaking if that were to happen it would dramatically change disciplinary policy. There have been numerous cases that have been very close where both sides have come up with nearly equally persuasive arguments and under the 'preponderance of evidence' it's 50 percent and a feather, so all it would take would be a comma moved out of place or the shifting of one phrase and it could throw the decision one way or another."[19] "Allen said ***under***

[19] Stephanie Morse, "ASU maintains sexual assault policies after DeVos issues new guidance," Downtown Devil (October 10, 2017), https://downtowndevil.com/2017/10/10/87520/tuesday-asu-

***a standard like 'clear and convincing evidence' the university would have to go much further to prove sexual misconduct and the accused would have less difficulty defending themselves***."[20]

106. Despite the withdrawal of the problematic prior guidance, the Department's warning about the problems with that guidance, and the Department's issuance of guidance that better reflects the principles embedded in Title IX, ASU did nothing to repair its own flawed Procedures in effect since July 2016. In response to the Department's actions in September 2017, ASU clarified that it had "not changed its policies regarding the adjudication of sexual assault cases" and "[a]t no time" would "waiver in its commitment to maintaining a safe educational environment free of discrimination for all students."[21] In September 2018, ASU promulgated slightly revised Procedures that did not provide additional due process protections for the parties involved and maintained the use of the "more likely than not" (preponderance) standard for sexual misconduct cases.[22]

107. The harm caused by the 2011 "Dear Colleague" Letter and the University's response to it has affected Plaintiff by causing ASU to disadvantage him in its disciplinary process based on his gender.

**C. The Incident**

108. On April 2, 2016, Doe, a student-athlete at ASU, engaged in consensual sexual activity with Roe.

---

maintains-sexual-assault-policies-after-devos-issues-new-guidance/ (last accessed May 25, 2018).

[20] *Id.*

[21] *Id.*

[22] *See* *https://eoss.asu.edu/sites/default/files/Student_Code_of_Conduct_Procedures_sept_25_2018.pdf*.

109. Two days earlier, on March 31, Doe and Roe, who had been "talking" via social media and demonstrated an attraction to each other, met in person for the first time. On March 31, they went to dinner (with no drinking) and returned to Roe's apartment, where she voluntarily performed oral sex on Doe after telling him earlier she would not have sex with him that night.

110. Two days later (April 2), Doe invited Roe to an off-campus house for a small gathering that ultimately included six people. She agreed, arrived at 9:36 p.m., and joined a drinking game with Doe and two others, Witness 1 and Witness 3.

111. Roe drank two shots of UV Blue during this game. UV Blue is reduced-alcohol (60-proof, 30 percent alcohol by volume) vodka.[23] There is no evidence that Doe provided or poured the shots Roe drank during the game.

112. In error-free text messages inviting her friend, Witness 2, to the residence, Roe claimed to have consumed five drinks. Witness 3 and Doe say Roe consumed 2-3 drinks before Witness 2 arrived.

113. Around 10:25 p.m., Witness 4, who remained sober the entire night, arrived. Shortly thereafter, he heard Roe say she would hold off on drinking until her friend (Witness 2) arrived. Roe's speech was clear and coherent and there is no indication she slurred at any point that night.

114. When Witness 2 arrived around 10:40 p.m., she noticed that Roe was only "a little bit buzzed."

115. After Witness 2 arrived, Roe consumed 1-2 additional shots of UV Blue. The high end of the observations is Roe's own estimate of seven UV Blue shots, which equates to 5.25 standard drinks because of the

[23] *See* https://www.uvvodka.com/products/blue.

reduced-alcohol content. Others (who were sober or don't claim to be incapacitated that night) say her total was 4-5 shots of UV Blue, which equates to 3 to 3.75 standard drinks. The range of consumption during the 2¾-hour event (9:36 p.m. arrival and 12:20 a.m. departure) is 3 to 5.25 standard drinks.

116. Roe never alleged that Doe poured or provided shots specifically for her and denied any influence or pressure to drink, admitting to Doe in the presence of a Tempe PD detective that no one forced her to drink.

117. After Witness 2 arrived, the group, by Roe's own account, was "having fun," conversing and posing for photos.

118. After the photos, everyone mingled or danced, which culminated with Roe "grinding" (back-to-front sexual dancing) "all over" Witness 1 and Doe. She moved easily between Witness 1 and Doe, in full view of Witness 4 and the others, without stumbling, vomiting, dry heaving, acting nonsensically, or exhibiting symptoms of incapacitation. Roe danced with the males for 25-30 minutes, kissing both as she went.

119. Afterward—around 11:30 p.m.—Roe, Doe, and Witness 1 talked in a hallway next to the area where the dancing and kissing occurred. Witnesses 2 and 3 walked passed the trio on their way to a bedroom, but neither reported any concerns about Roe. Witness 2, Roe's "best friend" at the time, told Tempe PD she never observed anyone at the residence have difficulty walking and saw nothing out of the ordinary.

120. Witness 4, the sober witness, never saw Roe stumble or act unsteady, even as she alternated dancing with and kissing the males. Roe's eyes were not bloodshot and there was no smell of alcohol on her breath. She never appeared out of control or unable to effectively communicate and control her movements or environment.

121. Roe was aware enough to know that "literally two minutes after" Witness 2 left with Witness 3 to a bedroom, she entered another bedroom with Doe and Witness 1. The sober witness, Witness 4, observed Roe leading the males into the room by the hand. He rated her as a three on a ten-point intoxication scale before entering the bedroom. At this point, Roe said she was "coherent."

122. The three entered the bedroom just after 11:30 p.m. Roe kissed Witness 1, causing Doe to offer to leave. Roe told Doe to stay. Witness 1 then offered to leave. Roe told him to stay. Before progressing further, Doe told Roe: "You don't have to do this." Witness 1 later told Roe that when he asked her whether she wanted to have sex, she said, "yes." After the parties removed their clothes individually, Doe laid against the bed's headboard, and Roe performed oral sex on him. Witness 1 engaged Roe from behind vaginally. At the request of Witness 1, the positions switched, with Roe performing oral sex on Witness 1 and Doe engaging her vaginally.

123. Roe described the event as a "threesome," and the action as "we (Roe and Doe) were fucking" and "[giving] blow jobs" to both males. Roe was an active participant in the sex, moving her hips appropriately, digitally manipulating Doe's genitals to facilitate sex, and making moaning sounds indicative of pleasure—all inside in a dark room.

124. By Roe's own account, she was never held down or threatened during the sex.

125. After approximately 25 minutes, Roe reported vaginal pain because neither male was using protection or lubrication. Roe then began crying because "my vagina was hurting because they weren't using [any condoms or lubricant]," so she asked the males to stop. Doe asked Roe if

Witness 1 could “finish” (ejaculate). Roe replied, “I don’t want to do this anymore. No. Stop,” at which point the intercourse ended.

126. They remained on the bed, with Roe manipulating Doe’s genitals by hand. Witness 1, without consent, began recording the encounter using his cellphone. After a light came on, Roe asked Witness 1 what he was doing. He denied taking pictures. Roe retorted, “But you are taking pictures.” Witness 1 told Roe not to worry about his recordings. Concerned the photos might be distributed on social media, Roe replied she did not want to be recorded.

127. Witness 1 recorded a five-second video of the encounter. The screenshot from the video shows Roe engaged in consensual manual manipulation of Doe’s genitals. Doe is reclined and holding hands with Roe as she engages in the act. At the hearing, Roe denied the screenshot shows a sex act, but the police officer reviewing the video confirms it as such and, on its face, it plainly depicts a sex act.

128. Next, Witness 1 turned on the lights and left the room, leaving the other two on the bed. Doe asked Roe, who appeared upset, what was wrong and why she was being so “dramatic.” Roe rebuffed his question, dressed herself, and the two engaged in brief argument in which both called the other an asshole. Roe left the room, found her friend, Witness 2, who was sleeping in another room, and told her she wanted to go home. Without difficulty, per Witness 4 (sober), Roe walked outside. Witness 2 followed. Roe told Witness 2 “what happened” inside the room and explained that Doe was mad because she (Roe) would not have sex with him. Roe called a friend, J.W., who she knew would be up and close by to give her and Witness 2 a ride home. Witness 3 also went outside to check on Roe. Roe asked Witness 3 if Doe and Witness 1 were leaving. Although upset, Roe communicated coherently.

129. Back home, Roe further described the events to Witness 2, including Witness 1's recording and that when she said stop, the sex ended. Roe never reported any physical acts or violence used by the males.

130. In the morning, Roe returned to the residence with two friends to search for a lost driver's license. One of Roe's friends of told Witnesses 3 and 4: "[Roe] almost got raped last night," but fortunately "nothing happened."

**D. The Police Investigation**

131. Later that afternoon, on April 3, Roe reported the sexual encounter to Tempe PD. Roe claimed she was intoxicated but coherent just before entering the bedroom. She also recounted when the encounter started; the order of the sexual positions; how long after Witnesses 2 and 3 went into a room together that she went into a room with Doe and Witness 1; and the bedroom's orientation, including the color of the sheets. Roe also told an officer (falsely) that before April 2, she had had no sexual contact with Doe. She never claimed that "force" (as that term is used by ABOR and ASU) led to the alleged misconduct or that Doe poured shots for her specifically or that she ever drank a shot poured by him.

132. During her Sexual Assault Nurse Examination (SANE), Roe disclaimed any use of threats or intimidation. When asked about force, her sole response was "I was really intoxicated." Roe recalled the sexual encounter starting at "1130ish" and that neither male ejaculated, wore a condom, or used lubricant. The SANE report noted minor genital abrasions and bruising around her knees. Roe's circumoral swabs revealed male DNA that was not Doe's or Witness 1's. Despite her claim

of being more drunk the night before than ever in life, her blood tests were negative for alcohol.

133. Detective Mark Lucas then interviewed Roe. She reported she was coherent when entering the bedroom, understood what was occurring throughout the sexual encounter, and told the males to stop when the sex began to hurt. She admitted dressing herself after the sex ended—something she claimed she could not do upon entering the bedroom. She recalled in detail the residence's layout and said she was not held down or forced to stay in the bedroom.

134. Roe later made a confrontation (one-party consent) call to Doe. Despite detailing to Detective Lucas the entire sexual encounter, Roe told Doe she had little memory of the night. She first said she was unaware of whether she and Doe had sex, which left him dumbstruck. Roe then inquired whether another male was present when the two had sex, despite telling Lucas about her sexual acts and conversations with Witness 1 before the call. These falsehoods unsettled Doe, because he knew (as she did) that she was a full, willing, and aware threesome participant, in word and deed. When she claimed not to remember anything, Doe (rattled by this bizarre claim) responded, "You don't?" When she asked whether "another guy" was in the room without her knowledge, Doe denied Witness 1's involvement to deflect something he didn't understand because he knew she knew two men were with her (and she knew this as well but was presenting a false narrative to Doe). Her story from the start was that she knew what was occurring, so her false narrative as a police officer watched is puzzling.

135. She also recounted their argument that occurred shortly after sex; denied insinuating that Doe raped her; and conceded that no one forced her to drink alcohol, much less Doe.

136. Roe never confronted Doe with anything that would support her claim of incapacity, such as that Doe knew or should have known she could not make rational and informed decisions and judgments. She never claimed she was, much less he knew she was, vomiting, in a stupor, incoherent, unable to reason, slurring, semi-conscious, physically unable to say “no”—the incapacitation “context clues” provided by ATIXA and referenced by the University at the UHB hearing.

137. To help understand incapacitation, ATIXA provides examples: It “might be met if someone is passing in and out of consciousness, and there is a high probability they could pass out again. Or, it might be met if someone is vomiting so violently and so often that they are simply in such bad shape that they cannot be said to have capacity.”

138. On the call, Roe never alleged or mentioned any physical, forceful, or violent acts committed against her by Doe the previous night.

139. Detective Lucas monitored the call, and provided notes containing topics and suggestions only. Roe conceded Detective Lucas “didn’t specifically tell [her] to lie about anything.” Based on the transcript, the call sought to confirm whether Doe had sex with Roe when she was so intoxicated as to be unaware there was another male involved. But this was false: Roe always knew another male participated. Before the call, she described in detail Witness 1’s involvement in the sex and discussions to an officer and a detective, and separately to Witness 2. Her actual claim was that she was coherent and understood what was occurring but could not consent because she could not muster the will to say no. Roe never claimed she was unconscious, blacked out, asleep, catatonic, non-responsive, incoherent, or unable to make rational decisions. Because she never alleged these things, she never alleged the males knew she was in an incapacitated state.

140. Roe made a similar call to Witness 1, again falsely claiming she was unaware he was in the room or involved in the sex. On the call, she demonstrated her awareness during the previous night, recounting how she played one game of beer pong with Doe and one with Witness 1; reported she consumed most of her drinks with Witness 1; identified the genre of music the group was dancing to before entering the bedroom; remembered seeing Witness 1's pink shirt as he walked out of the bedroom; recalled not allowing ejaculation by either male; and conceded that no one had forced her to drink alcohol. Roe confirmed it was the sex hurting her, never raising the theory that she became upset because only in the middle of the acts did she realize she was having sex or that her crying resulted from "force" committed against her (later raised by the University).

141. Again, Roe never alleged or mentioned any physical, forceful, or violent acts committed against her by Doe the previous night to Witness 1. Likewise, she never alleged that Doe provided or distributed alcohol to her specifically.

142. Detective Lucas also reviewed the five-second video. He concluded it showed a sex act, with Roe saying, "I don't want…," while looking to be tired or intoxicated based on the way her voice trailed off. As the UHB heard, Roe, a self-described "mumbler," has trouble finishing sentences. In describing this moment, Roe told ASU when she realized the encounter was being filmed, she told Witness 1 she "did not want to be recorded."

143. The Maricopa County Attorney's Office declined the case.

**E. The University's Investigation and Initial Finding of Responsibility**

144. Almost six months after the encounter, Roe reported the incident to ASU in September 2016. After receiving the report from ASU's police department, HUNTER wrote in an email to her colleagues that she "wanted to figure out what to do with [Doe]" and "clearly we would want to move swiftly" due his status as a student-athlete, but they had to speak with Roe first. ASU's Dean of Students Office, via its Office of Student Rights and Responsibilities, initiated an investigation on September 19, 2017, interviewing Roe that day.

145. Three days later, on September 22, 2016, ASU informed Doe via letter of Roe's report. The letter alleged violations of three Code sections: F-15 (alcohol violation), F-23(a) (sexual misconduct), and F-25 (surreptitious recording).

146. The only basis stated for F-15—which requires "a violation of the University's rules or applicable laws governing alcohol, including consumption, distribution, unauthorized sale, or possession of alcoholic beverages"—was that Doe allegedly "provided" alcohol to Roe, a minor. Under ASU's Code, a violation must arise under state law. The Code proscribes a student from possessing, producing, manufacturing, or distributing alcohol unless that conduct is not illegal under state law. ASU never sufficiently identified or explained the specific alcohol-related conduct at issue or what law was violated. In its initial letter, ASU alleged simply that Doe "provided" (despite that not being a term F-15 uses) alcohol to Roe. But Doe was a guest at the party and did not bring or pay for any of the alcohol. Despite numerous requests, ASU only explained the precise basis for the F-15 charge after the Dean's Review Committee's finding of responsibility, and even then, at the UHB hearing, it shifted the

basis for the charge. ASU changed its allegations throughout the process, arguing that Doe *provided*, *gave*, *distributed* or *received* alcohol, or *influenced* Roe's alcohol consumption. Ultimately, Doe was found responsible for *distributing* alcohol, despite HUNTER disclaiming that as a basis because it lacks statutory support and arguing that the allegation was that he *received* alcohol, as outlined in A.R.S. § 4-241(P).

147. F-23 prohibits "actual or attempted physical sexual acts perpetrated against a person by force or without consent," and ASU alleged Doe sexually engaged Roe "without her consent" after she became intoxicated. The letter cited the Code, which has two subparts for sexual misconduct: "sexual acts perpetrated against a person by force ***or*** without consent…." (emphasis added) The letter did not allege "force," only sex "without consent" stemming from Roe's intoxication. According to its analysis under the Code, ASU would never have reached the issue of incapacity had it not ruled out force. That is, the University, in its analytical framework, cannot make a simultaneous finding of force and incapacity. If force was used, then a person's capacity is not considered

148. In the initial notice, ASU also required that Doe attend a meeting the following day (September 23, 2016) to connect him to support resources. There, DAVIS told Doe she would be a "neutral, third party investigator." She said her job was to "collect information—anything I can get, speak to people, and collect documentation that may be available." She informed Doe that a Dean's Review Committee would determine whether he violated the Code "based on whatever (information) is available to them." Without notice, DAVIS then sought a statement from Doe on the underlying incident—depriving him of the opportunity to prepare, a right recognized by the Department of Education. Doe's former

counsel, participating in the meeting telephonically, ended the meeting because neither he nor Doe knew a statement would be taken.

149. Doe was also unaware that, three days earlier, DAVIS told Roe the opposite of what she told him about her investigative obligations. She told Roe:

> It's going to be up to you to provide us with whatever documentation you think is relevant. Provide us names of witnesses, provide your own statements. It's going to have to be, unfortunately, on your shoulders to determine what it is you want me to know…It's going to be up to you to provide photos, text messages, receipts, or social media posts or whatever have you that you feel would be relevant for me know…It's going to be up to you to submit information instead of me being able to go get it.

150. DAVIS also told Roe that "as soon as I have the green light, I will charge" Doe with sexual misconduct—a promise made before anyone spoke to Doe or corroborated any of Roe's allegations.

151. As the investigation proceeded, Roe changed and added key details, including how her clothes were removed, how the sexual encounter ended, and how the sexual positions were switched. DAVIS never probed the numerous inconsistencies in Roe's statements.

152. ASU interviewed Roe twice more, including on October 27, 2016, wherein Roe added previously undisclosed information. In that interview, she finally disclosed her previous sexual encounter with Doe. Up until that point, she had falsely told the police officer she had never had relations with Doe prior to April 2, 2016, and never mentioned that fact to DAVIS. Roe even changed her story about how the sexual encounter ended, belatedly contending the males did not stop when she said no. Under oath at the hearing, however, she reverted to her initial statement

that the males stopped when she said, "stop." DAVIS never asked Roe to explain the inconsistencies in her story.

153. In all of her interviews with ASU, Roe never alleged that physical, forceful, or violent acts committed against her by Doe led to the alleged misconduct. Her claim, from the beginning, was that she was too intoxicated to consent to sex with Doe and Witness 1. Accordingly, DAVIS never pursued any evidence that would have substantiated a force violation.

154. During the investigation, DAVIS requested that Roe produce the Tempe Police Department's ("Tempe PD") report of her case and the video recorded by Witness 1. When Roe provided the police report, it was missing key, exculpatory sections, including the screenshot of the video (which shows Roe participating in a sex act) and the SANE results (wherein Roe disclaimed that any force was used and which, according to the only expert who testified in the case, revealed only minor injuries consistent with consensual sex). DAVIS never examined why or how this material went missing and never obtained an independent copy of the report. DAVIS also did not try to procure the video Witness 1 recorded, which Roe claimed showed her saying she did not want to have sex (notwithstanding Tempe PD's contrary description). DAVIS never requested Roe's text messages, despite requesting and receiving texts and electronic communications from other witnesses. Both DAVIS and her supervisor HUNTER knew hours of Tempe PD interview and call recordings existed and were available, but "did not take the time" to obtain them.

155. Doe was interviewed twice after his initial meeting and submitted two written responses to ASU. In the first response, Doe asked the investigator to clarify whether he "missed a basis for a violation of the Code of Conduct"—that is, whether the University's charges were cabined

to incapacity and the alcohol violations, or whether there were other bases for prosecution. No additional clarification was provided. Although Doe's first response mentioned force in passing, nowhere in any of its pre-hearing documents did the University allege that force was used and only charged or referenced incapacitation in all correspondence.

156. DAVIS further explained during the interviews that the University "recognize[d] the difference between drunk sex and incapacitated sex."

157. ASU failed to interview Witness 1, making no effort to obtain his contact information after Doe said he did not have it. DAVIS never contacted the individual (J.W.) who gave Roe and Witness 2 a ride home from the get-together, despite Roe telling DAVIS he would be reachable during the investigation. DAVIS failed to gather other basic, available, and exculpatory information. She never confirmed the alcohol content of the liquor Roe drank; never investigated the source of the unknown male DNA found inside Roe's mouth during the SANE; and never considered Roe's social and romantic situation at the time of the incident, even though fear of disapproval by friends or romantic interests are common reasons accusers might misrepresent events. Despite being asked to investigate these matters and provided at least one potential lead, DAVIS gathered nothing. Because Roe never alleged that "force," or physical acts of violence used to gain sexual access, was employed, DAVIS never sought or obtained any information related to "force."

158. On December 11, 2016, Roe, per the Procedures, reviewed and commented on a letter submitted by Doe's counsel on December 8, 2016. On December 20, DAVIS told Doe she had sent her investigative file to the Dean's Review Committee for review. Doe's counsel inquired whether Roe provided input on his letter, as counsel had asked to be notified if she did,

so he could respond. Under the Code, ASU was obligated to provide such an opportunity. DAVIS revealed Roe responded but denied she provided any new evidence. Doe nevertheless asked to see Roe's response. When ASU finally provided the response (via video conference, because ASU would not provide a written copy) early on December 21, he found that, contrary to the investigator's representations, Roe's response contained substantial new evidence. Within 24 hours, Doe responded with another letter, which was submitted with an understanding that ASU would consider the response before acting.

159. But by that time, the Dean's Review Committee had already decided to expel Doe. Emails sent on December 21 by HUNTER—a member of the Dean's Review Committee—reveal Doe's expulsion letter was signed on December 20, before Doe learned of Roe's December 11 comments. HUNTER, after learning of Doe's response, had the letter's date changed to the day after Doe's submission. No one on the Dean's Review Committee viewed the submission before finding against Doe and signing his expulsion letter. Contrary to the Procedures, Doe was denied the opportunity to respond to the information produced in the investigation before a disciplinary decision was rendered.

160. By December 20, 2016, the Dean's Review Committee—which included HUNTER, who was DAVIS' supervisor and oversaw the investigation—concluded that Doe violated Code sections F-15 (alcohol) and F-23 (sexual misconduct). Because it was determined that Doe did not record the encounter, he was found not responsible on the F-25 charge. The Committee's incapacitation finding was grounded in the Tempe PD report's description of the video and the screenshot, which states Roe could be tired or possibly intoxicated based on the way her voice trails off. ASU concluded, without analysis, that Doe knew of Roe's incapacitation

(such knowledge is required for a finding of responsibility under F-23). The expulsion letter also found Doe responsible for violating F-15 (alcohol) but, unlike the other charges, does so without explanation. ASU notified Doe by letter dated December 22 of the Committee's decision and sanction—irrevocable expulsion.

161. HUNTER made these decisions knowing that available, "helpful" material (*e.g.*, Tempe PD's investigative recordings) went uncollected and unconsidered.

162. Neither expulsion letter nor the Dean's Review Committee's analysis found that Doe used "force" in the sexual encounter with Roe and mentioned no allegation by Roe that "force" was used.

163. The Procedures did not allow for Doe to have a formal hearing before the Committee. Nor was he advised of the Committee's membership or provided the ability to challenge their participation on grounds of bias.

164. Two days ***after*** ASU's finding of responsibility, HUNTER finally provided the basis for the alcohol charge: "Referencing university policy SSM 106-03, ASU's alcohol policy prohibits giving alcohol to a person under the age of 21. Specifically, it states: 'No person or organization may sell, furnish, or give alcoholic beverages to any person under the age of 21, except as otherwise permitted by law.'" She noted that ASU found Doe "gave" Roe alcohol, and also concluded Doe "received liquor with the intent to give it to [Roe]," violating A.R.S. § 4-241(P).

**F. The Hearing and the UHB's Disciplinary Recommendations**

165. Before the Dean's Review Committee's decision, DAVIS threatened a permanent notation on Doe's academic record if he appealed his discipline—but said he could avoid this by voluntarily withdrawing from school. Doe proceeded with an appeal anyway, and a hearing was scheduled for March 10, 2017, before the three-member UHB, chaired by

ALLEN. The Notice of Hearing circulated to the parties on February 16, 2017, stated the proceedings would focus on the charges (that Roe was allegedly incapacitated during the sexual encounter with Doe and unable to consent; and the alleged alcohol violations) and sanctions imposed. When Doe arrived on March 10, UHB officials claimed that one of the Board members was not present, but offered to substitute that member with a student worker, possibly from the Dean of Students office. Unable to verify the replacement's identity or impartiality, Doe had no choice but to allow the UHB to continue the hearing despite the mandate to hold a hearing within 90 days.

166. A rescheduled hearing was set for May 23, 2017, with a similar Notice of Hearing sent May 1, 2017. Again, the Notice stated the hearing would focus on the charges (sex with an incapacitated person and alcohol violations) and penalties.

167. Before the hearing, Doe filed motions regarding three issues: The time allotted for the hearing; ASU's definition of "incapacitation"; and a request that Roe help obtain the video of the sexual encounter.

168. ALLEN refused to direct Roe to cooperate in obtaining the video evidence despite the "Procedures granting the UHB broad authority to issue "request[s] and directive[s]…[to members of the University community] in connection with a disciplinary proceeding." The UHB conceded the video contained materials that would assist in the Board's determinations and found that Roe had refused to cooperate with both the Dean of Students and Doe to obtain it. Roe declined several times to jointly petition the Maricopa County Attorney's Office for a protected release of the video, despite having offered to assist DAVIS in obtaining this evidence by asking the Maricopa County Attorney's Office or emailing her victim advocate. The UHB refused to sanction Roe or establish an adverse

inference based on her non-cooperation in attempts to obtain this objective evidence of her capacity during the sex.

169. Similarly, ALLEN failed to explain ASU's standard of "incapacitation," which is undefined in the Code. Doe only learned the standard—the inability to make rational and informed decisions and judgments—during the hearing, preventing him from collecting and presenting the most favorable evidence.

170. While ALLEN granted several incremental extensions to the time allotted for the hearing, the UHB's time restraints ultimately prevented Doe from examining four key witnesses: DAVIS, Witness 2, Witness 3, and his alcohol expert. Doe's attempt to supplement the record with his alcohol expert's written report—submitted before the start of the UHB's deliberations—was also denied. ALLEN's refusal to grant additional time was exacerbated by other issues, including that Doe spent substantial time moving key statements uncovered in Tempe PD's recordings (which ASU did not obtain) into the hearing record. Further, the Procedures required Doe's counsel to direct all questions for Roe through the UHB Chair. This meant Doe's counsel either whispered questions to ALLEN for him to relay to Roe or pointed to written questions for ALLEN to repeat. This inefficient and ineffective process, which only applied to Doe's cross-examination of Roe (ASU could directly cross-examine Doe), extended the length of Roe's examination significantly.

171. None of the pre-hearing proceedings focused on the "force" issue, because Doe was never charged with or found responsible by the Dean's Review Committee for using "force" against Roe.

172. The hearing was held on May 23, 2017.

173. The University official presenting ASU's case at the hearing confirmed the charges in his opening: "Due to [Roe's] intoxicated state,

[ASU] believes that she did not have the capacity to give [Doe] consent to engage in sexual activity." HUNTER did the same in her testimony, clarifying that Doe was charged only with engaging Roe without consent due to her alleged incapacity. Neither alleged, or even referenced, force. Nor did they mention facts indicating force when they placed Doe on interim suspension.

174. Although ASU disclosed DAVIS and Witness 2 as witnesses, it did not make either available for testimony. Unlike the authority given to the Dean of Students, the Procedures did not give Doe the right to compel testimony. The time constraints imposed by the UHB prevented Doe from calling Witness 3 or his alcohol expert. ALLEN did not continue the hearing even after recognizing that four disclosed witnesses could not testify under his original time constraints. Upon information and belief, ALLEN ended the hearing based on a UHB member's need to leave a certain time.

175. At the hearing, Roe's testimony was inconsistent with her earlier statements to the police and DAVIS. She denied telling DAVIS that she told Witness 1 that she did not want to be recorded inside the bedroom—despite the investigative report saying exactly that. Roe also denied that the screenshot from Witness 1's video showed her hand on or wrapped around Doe's penis, contradicting the detective's interpretation. Roe said that she "guess[ed]" that Doe poured shots for the group to consume, without ever testifying that she drank the specific shots he poured or if he poured them specifically for her. She also confirmed that she never told Tempe PD that either male used physical force during the encounter.

176. Doe testified that he never "force[d]" Roe to have sexual intercourse and did not grab her aggressively at any point during the sex.

From his perspective, Roe was "actively participating" in the sex. Roe herself never refuted these statements.

177. Witness 3 testified that he never saw Roe stumble, fall, use a wall for support while walking, or hear her slur her words at any point during the night.

178. HUNTER testified that "drunk sex" alone is not actionable under the Code and explained that Doe was charged only with engaging Roe while she was incapacitated, not for using physical violence against Roe to gain access to sex ("force"). HUNTER also stated that she had a "strong belief" in Roe's allegations, despite Roe's lies to the police, refusal to assist in the production of probative video evidence, and the undeniable signs of Roe's capacity inside the bedroom. HUNTER then explained the basis for the alcohol violation as Doe's receipt of alcohol from the owner of the residence, which he then allegedly gave to Roe.

179. Cindi Nannetti, Doe's sexual assault expert, testified that the injuries documented in Roe's SANE report did not indicate anything other than a consensual sexual encounter. She characterized Roe's injuries as "very, very minor" and stated that the bruising around Roe's knees was consistent with consensual sex in the positions Roe claims to have been in.

180. At the hearing, ASU argued, for the first time, that Doe had *influenced* Roe to consume alcohol, which would violate A.R.S. § 4-241(P) had he misrepresented her age. HUNTER could not provide a concrete definition what it meant to "provide" alcohol. When asked whether passing a beer from a refrigerator constituted a violation, she said it "depends on the situation."

181. The hearing concluded on May 23, 2017—the same day it began. Prior to its conclusion, ALLEN indicated that the UHB would begin

its deliberations at 2:00 p.m. on Friday, May 26. Before the Board's deliberations began, counsel for Doe emailed all parties a summary of the testimony his alcohol expert would have provided had he been given the chance. ALLEN refused to accept the expert's written testimony.

182. The UHB released its findings and recommendations via email on May 30, 2017. The UHB's message was sent to Roe, Doe, Doe's counsel, and a group of University officials and employees, including:

- James Rund, Senior Vice President of Educational Outreach and Student Services
- Linda Quintero, Rund's secretary
- Nicole Taylor, Dean of Students official
- Lisa Hudson, University Counsel
- Becky Herbst, University Counsel
- Cassiemarie Sporrer, Hudson's secretary
- Tinkerbelle Dougherty, UHB secretary
- Jodi Preudhomme, University Title IX Coordinator

Some of these persons, particularly Quintero, Taylor, Sporrer, Dougherty, and Preudhomme, had peripheral, if any, involvement in Doe's disciplinary matter.

183. In its written recommendation to RUND, the UHB, after hearing from both Doe, Roe, Witness 4, and HUNTER, could not determine whether Roe was incapacitated by even a preponderance of the evidence, concluding: "Accounts of the encounter provided by all parties indicate that the [Roe] was lucid and able to verbally communicate."

184. However, the UHB added a new basis for liability—use of impermissible force—despite Doe not being charged with using force and doing so only after the close of evidence. The UHB concluded that Doe

committed "sexual violence" by "engag[ing] the Complaint by force" because of minor interior vaginal abrasions and knee bruising reported in Roe's SANE report and her statements about pain and crying. The UHB ignored that Roe disclaimed to Tempe PD that force was used, and repeatedly told both Tempe PD and DAVIS that her pain and crying resulted from unlubricated, unprotected sex.

185. Because force was not at issue at the hearing, evidence of force (as that term is construed in the Code) was not presented. Nor is there evidence tying the alleged abrasions to Doe or excluding Witness 1 or the male who left DNA on Roe's body, which was found the next day. The only testimony on these issues came from Doe's sexual assault expert, whose un-rebutted testimony was that Roe's injuries were only consistent with consensual sex.

186. Regarding the alcohol charge, the UHB found that Doe "distributed" alcohol to Roe in violation of University policies, even though HUNTER explained that the basis for the charge was Doe's receipt of alcohol from the homeowner and subsequently providing it to Roe (she never used the word "distributed").

**G. Rund's Disciplinary Decisions**

187. The UHB referred its recommendation to RUND, ASU's Senior Vice President for Educational Outreach and Student Services. RUND overruled the UHB's findings on incapacitation, relying on Roe's alleged alcohol consumption and her own claims of drunkenness to conclude she could not make rational judgments and informed decisions. Seven of the nine additional justifications Rund cited in support of his incapacity finding establish only that Complainant was intoxicated—not that she was unable to make rational and informed decisions and judgments. The other two—Complainant's uncorroborated, self-serving testimony "that she

needed the wall to walk" and "that during the incident she was immobile and unable to resist"—had no connection to Complainant's mental capacity at the time of the sex, which is, supposedly, the touchstone of ASU's incapacity analysis and which were rebutted by the Complainant herself in the same reports (e.g., she stated she knew what was going on, and just couldn't say anything).

188. Ignoring that the Procedures required him to explain any variance from the UHB's recommendation, RUND never addressed the UHB's conclusion that Roe was "lucid and able to verbally communicate." Nor did he mention anything relating to mental capacity at the time of the event or Roe's actions and behaviors evidencing awareness and mental capacity at the time of the sex.

189. Under ASU's standards, drunkenness does not equate to incapacitation. ASU acknowledges that drunken sex is not sexual misconduct and that other gradations on the alcohol consumption spectrum—influence, impairment, intoxication, and inebriation—cannot support sexual misconduct violations. Yet RUND based his reversal on estimates of alcohol consumption—and then, only those of the very person he concluded was incapacitated. From there, RUND inferred incapacitation.

190. RUND also adopted, without analysis or comment, the UHB's recommendation regarding force. ATIXA advises that the "literature of the field tells us that force is fairly uncommon in college investigations . . . it won't typically be an issue in your investigations, but when it is, it's the only construct that matters," and "usually, you can rule force in quickly, and focus on it, or rule it out and move on to the incapacity analysis." This is precisely what the Dean of Students did, as explained by HUNTER in her testimony at the hearing: "[W]e look at was there force? Was there

coercion? If neither of those are able to be determined, then we look at was there incapacitation? And in this case, [incapacitation] is the factor that we then looked at." Despite this, and the ATIXA standards eschewing review of incapacity if force is determined, RUND affirmed on force and returned to reverse the UHB's incapacitation finding. He upheld the UHB's recommended sanction of expulsion.

191. RUND adopted the UHB recommendation regarding the alcohol violation.

192. Doe moved for Review and Rehearing on August 2, 2017. RUND denied the motion on August 30, 2017, expanding on his analysis of Roe's alleged incapacitation. RUND again used Roe's alcohol consumption as a proxy for incapacitation, wrongly claiming that Roe's alcohol consumption was uncontroverted and ignoring other witnesses' conflicting testimony on her consumption. He was oblivious to the reduced-alcohol content of the vodka she consumed. He ignored Roe's concession during the hearing that she "recalled a lot about the night" and other evidence of mental capacity.

193. RUND erroneously concluded Roe cried in the bedroom because of the realization she was having sex with Doe and Witness 1. Roe herself told Tempe PD and DAVIS she cried because of the vaginal discomfort caused by the unprotected, unlubricated sex.

194. RUND's decision denying rehearing also relies on Witness 4's statement to Tempe PD regarding Roe's intoxication level upon leaving the house—without discussing his clarification that Roe only appeared more intoxicated because she seemed emotional and upset, not because she seemed more drunk or had consumed more alcohol.

195. Again, RUND never evaluated or even mentioned ATIXA's signs of incapacity (relied on by the University in determining incapacity), and

failed to consider the evidence demonstrating Roe's mental, physical, and verbal capabilities during the sexual encounter. Instead, he focused on Roe's alcohol consumption. His only attempt to assess Roe's ability to make reasoned, rational decisions was his statement on the threesome, which he found to be "outrageous behavior." RUND did not characterize the men's decision to engage in three-way sex as "outrageous," but indicated that Roe's decision to do so could only be the product of incapacitation rather than a rational, informed decision by an adult. On this point, contrary to the ATIXA guidelines followed by the University, RUND substituted his bias against men accused of sexual misconduct and his preferred sexual mores for Roe's, and used her participation in a threesome to support his inference she could not make informed judgments. RUND refused to address Doe's arguments about force, again upholding the UHB's recommendations. He again upheld the UHB finding on the alcohol charge.

196. RUND declined to review ASU's investigative failures, including the actions of DAVIS and HUNTER, finding neither issue sufficient for review or rehearing. But the Procedures provide that irregularities committed by the Dean of Students that impede or prevent a fair and impartial disciplinary process *are* proper ground for review or rehearing.

197. Rund's second written decision constituted ASU's final administrative decision, and the final decision appealable to the Superior Court under state law.

## V. <u>CAUSES OF ACTION</u>

### COUNT I

### FEDERAL CIVIL RIGHTS ACT, 42 U.S.C. § 1983, VIOLATION OF THE DUE PROCESS, CONFRONTATION, AND EQUAL PROTECTION CLAUSES OF THE ARIZONA AND U.S. CONSTITUTIONS

**(Against Defendants RUND, ALLEN, DAVIS, HUNTER, LAMP, AND WALDRON in their Individual Capacities and the ABOR)**

198. Doe incorporates the foregoing paragraphs as if set forth herein, and incorporates Count II, because the deprivation of rights under Title IX gives rise to a claim against officials in their individual capacities for violations of 42 U.S.C. § 1983.

199. The Fourteenth Amendment and Fifth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

200. The Fourteenth Amendment also prohibits the State from denying any person within its territory the equal protection of the laws.

201. The Arizona Constitution's Declaration of Rights similarly guarantees due process, equal protection, and prohibits sexual discrimination in public education. *See* Ariz. Const. Art. 2, §§ 4, 13, and 36. The Arizona Constitution also protects the fundamental right to a public education. *See* Ariz. Const. Art. 11, § 6.

202. At all times material to this Complaint, ASU, as a public University organized and operated by the State of Arizona, was a state actor.

203. At all times material to this Complaint, Defendants RUND, ALLEN, HUNTER, LAMP, and WALDRON were acting under color of Arizona state law.

204. Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

> Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

205. Doe was admitted to ASU, offered a scholarship, accepted the offer of admission and scholarship, gave up other offers of admission and scholarships, paid all tuition and fees owed, and completed all coursework while complying with ASU's Code. Doe therefore has a significant and substantial constitutional right to due process and equal protection in disciplinary proceedings that can result in a denial of his ability to complete his education at ASU, a public university, and to avoid arbitrary and capricious conduct that would deprive him of the ability to complete his education at ASU or any other public institution in this state.

206. Doe has a significant and substantial liberty and property interest in avoiding an unfair or erroneous disciplinary decision, in maintaining his excellent academic, professional and personal reputation, and in avoiding social stigma.

207. Doe has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

208. Plaintiff's constitutionally protected property interest in his continued enrollment at ASU and his right to complete his undergraduate degree at ASU was violated by Defendants' actions.

209. Plaintiff had a constitutional right to be free from arbitrary suspension, dismissal, or restrictions on his ability to enter the ASU campus.

210. Doe has a constitutionally protected right to confront his accuser and cross-examine her ***in front of*** a neutral fact-finder. Here, Doe was denied the ability to directly confront his accuser and directly cross-

examine her. He was forced to cross-examine the witness using the UHB Chair as an intermediary and the accuser, an adult, was shielded from view behind a partition. The cross-examination afforded Doe was before a fact finder—the UHB—and the UHB found Roe to be lucid. But because the Board is merely an advisory entity, the ultimate fact-finder, Defendant RUND, determined credibility, and he never saw the direct testimony or cross-examination. Nor is there any showing that he ever reviewed the record. And the Procedures provided Doe no opportunity to strike him for bias.

211. Plaintiff's constitutionally protected property interest in his right to continued enrollment at ASU also arises from the policies, courses of conduct, practices, and understandings established by the ABOR and ASU.

212. Plaintiff's constitutionally protected property interest further arises from the express and implied contractual relationship between ASU and Plaintiff.

213. It is well established that state and federal due process protections and equal protection rights are required in higher education disciplinary proceedings.

214. A person who has been admitted to a public university has a protected property interest in continuing his education at that university until he has completed his course of study. The state cannot deprive a person of this interest without due process.

215. As a result, if Plaintiff as an ASU student faced disciplinary action that included the possibility of suspension or dismissal if found responsible, then the relevant provisions of the Arizona and U.S. Constitutions described herein, as well as the protections afforded by Title IX, applied to the disciplinary process ASU utilized.

216. ASU, as a university established by the State of Arizona and governed by the ABOR, and the individual Defendants, as agents of ASU, have a duty to provide ASU's students equal protection and due process of law by and through any and all policies and procedures set forth by ABOR.

217. Plaintiff was entitled to notice, a meaningful opportunity to be heard, and process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. The allegations in this case resulted in a sanction that, whether legally invalidated or not, will have lifelong ramifications for Plaintiff.

218. Plaintiff was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged sexual misconduct and alcohol violations.

219. In the course of the University's investigation and adjudication, Defendants acted intentionally, willfully, recklessly or with callous and deliberate indifference to Doe's constitutional rights by employing a process in which they failed to: provide him with adequate notice of the charges against him, correctly apply the University's standard of incapacitation, conduct a fair and reliable investigation, hearing, and decision process regarding whether he used force during the sexual encounter with Roe, and whether he violated ASU's alcohol policies.

220. ASU, moreover, never set forth a standard or definition of incapacitation **or** force before Doe's disciplinary hearing and has yet to reduce those standards to writing or disseminate them to the student body. The incapacitation standard was established, for the first time, at the hearing in this matter. To this day, Doe does not know what the University's standard or definition of force it. The failure to set forth

standards on these rules deprived Plaintiff of due process and equal protection.

221. According to ASU, in order to be incapacitated under the Code, one must be unable to make rational and informed decisions and judgments. Defendants were obligated to faithfully apply this standard to the facts of Doe's case.

222. Defendants were aware of or should have become aware of overwhelming evidence that the Complainant made informed, rational judgments and decisions before, during, and after she had consensual sex with Doe on April 2, 2016. This includes Complainant's own descriptions of her conduct and the sexual encounter in general, which depict awareness of time and space; agency; physical coordination; foresight; active participation in the sexual acts; and other mental and physical faculties that an incapacitated person, by ASU's definition, does not and cannot possess.

223. The UHB, after having heard directly from Doe and Roe, correctly recognized that the weight of Complainant's self-reported lucidity and communicativeness precluded a finding of incapacity.

224. RUND, intent on ensuring that ASU appeared tough on males accused of sexual misconduct, reversed the UHB's finding by impermissibly relying on an *intoxication* analysis that focused on the amount of alcohol Complainant consumed and the accompanying physical symptoms – not *incapacity*, which assesses Complainant's reasoning capacity.

225. In ASU's incapacity analysis, the amount of alcohol consumed and the physical and psychological manifestations of alcohol consumption are irrelevant; what matters is how those impact the ability for rational, informed thoughts and actions. Although DAVIS and HUNTER both

acknowledged at various points during the disciplinary process that intoxication was insufficient for a finding of incapacity, RUND ignored ASU's own policies and procedures in rejecting the UHB's finding. RUND was, evidently, completely unaware that, under ASU's sexual misconduct analysis, a respondent cannot be found responsible for both use of force and having sex with an incapacitated person, because, as HUNTER testified, if force is determined, the analysis ends—there is no opportunity to even consider incapacity.

226. Defendants never alleged, investigated, charged, or litigated whether Doe forcibly engaged in sexual acts with Roe. In interviews with police and University investigator, Roe explicitly denied Doe used force when they engaged in sex.

227. University officials twice confirmed at the hearing that Doe was charged with having sex with Roe was she was incapacitated, not for use of force. Under the Code, ASU would not reach the question of incapacity without first having ruled out force.

228. It is undisputed that DAVIS never sought or collected information regarding the use of force and did not recommend or otherwise ask or instruct the Dean's Review Committee, UHB, or RUND to make a finding that Doe engaged in forcible sexual misconduct.

229. At all times, Roe claimed that she was intoxicated and therefore could not consent to sex, not that she was forcibly raped or that any force was used to gain sexual access.

230. Defendants, nonetheless, explicitly found and reported to a group of University officials and employees that Doe forcibly engaged in sexual conduct with Doe, resulting in significant harm to his property and liberty interests; damaging his reputation; and causing him to suffer humiliation, all without giving fair notice that he was accused for forcible

sexual contact, a fair and impartial investigation regarding the accusation, a fair and impartial hearing to determine his guilt or innocence, and without full consideration of the record.

231. In addition to never being accused of forcible sexual contact, the case presented by the University did not address or discuss forcible sexual conduct, no witness claimed force was used, and the uncontested expert witness disclaimed that sexual violence was used based on Roe's SANE report. And despite the lack of charges, investigation, evidence, or any basis whatsoever to support a finding of force, the Defendants found that Doe used force when he had sex with Roe that night.

232. Further, Defendants never provided Doe notice of the precise acts its alcohol charges were based on, variously arguing that he *provided*, *gave*, *distributed* or *received* alcohol, or *influenced* Roe's alcohol consumption. Ultimately, Doe was found responsible for *distributing* alcohol, even though a University official explained at the hearing that he was only alleged to have *received* alcohol, as outlined in A.R.S. § 4-241(P).

233. Moreover, ASU improperly employs a disciplinary process that fails to utilize mechanisms designed to ensure the parties involved receive fair and appropriate due process. For example, Defendants' failure to give or ensure that Plaintiff received notice of the force/sexual violence charge prevented Plaintiff from adequately preparing for, participating in, and properly defending himself in the proceedings.

234. Defendants' conduct in failing to give Plaintiff notice or ensure that he received proper notice of the force charge stemmed from a presumption that Roe's accusations were true and that Doe should be held responsible at any cost, whether it be on the incapacity charge, the alcohol charge, or the non-existent force charge.

235. The University's Code and Procedures, as written and as implemented in Doe's case, violate fundamental due process and equal protection requirements. The lack of due process infects the entire process, including wholly inadequate notice, investigation, hearing, and appeals procedures.

236. The Defendants deprived Plaintiff of his liberty and property interests without affording him basic due process, including, but not limited to, his right to receive fair and proper notice of the charges against him, a right to have the University's disciplinary standards fairly and faithfully applied, a right to a fair adjudication free of bias, his right to be innocent until shown to be responsible and not to be subjected to the burden of proving his innocence, his right to be heard by an impartial fact-finder, and his right to have his case decided by a unbiased decision-maker who reasonably considered all of the evidence before rendering a disciplinary decision with wide-ranging, life-long consequences.

237. As a result, the Defendants failed to provide Plaintiff with the basic due process protections that they are required to provide students accused of sexual misconduct at a state school.

238. The Defendants were acting under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

239. As a result of these due process violations, Plaintiff continues to suffer ongoing harm, including damages to his reputation, permanent loss of employment opportunities, and other economic and non-economic damages.

240. In particular, the discipline imposed by ASU has permanently damaged his career prospects, denied him the benefits of education at his chosen school, and damaged Plaintiff's academic and professional

reputation. Doe could not complete his education at ASU and participate in University-sponsored activities, including graduation and collegiate athletics. Doe suffered public humiliation and suffered significant embarrassment by being precluded from completing his degree and continuing his collegiate athletic career.

241. Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and to an injunction enjoining violations of the Arizona and U.S. constitution and Title IX process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's records, and requiring ASU to destroy all disciplinary records concerning Plaintiff.

242. Doe also is entitled to punitive damages because the Individual Defendants RUND, ALLEN, DAVIS, HUNTER, LAMP, and WALDRON conduct involved intentional, reckless or callous indifference to Doe's federally protected rights. Plaintiff is not seeking punitive damages against the Individual Defendants in their official capacities, only in their individual capacities.

243. Doe seeks injunctive relief against the ABOR as described below in Count VIII.

**COUNT II**

**VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681, *et seq.***

**(Against Defendant ABOR)**

244. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

245. Title IX states: "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance…" 20 U.S.C. § 1681(a).

"Discrimination means differential treatment" or "less favorable treatment."

246. ASU receives federal funding and must comply with the requirements of Title IX and those regulations promulgated by the Department of Education.

247. Under Title IX, ASU is prohibited from subjecting Doe to a process where his sex is a motivating factor in Defendants' decision to impose discipline. Under Title IX, ASU is also prohibited from providing a disciplinary proceeding that is not adequate, reliable, impartial, and equitable, and which allows Doe the equal opportunity to know what is being charged, conduct a fair and impartial investigation, and present witnesses and other evidence.

248. The ABOR, by and through ASU, violated Doe's right to be free from discrimination based on sex by subjecting him to an investigation and disciplinary proceeding marked by the substantive and procedural flaws described in the Complaint due to his sex.

249. The previous administration promulgated regulations under Title IX—in effect at the time of ASU's investigation here and the initial finding of responsibility against Doe—that required a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student… complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. Such prohibited actions include all forms of sexual misconduct. 34 C.F.R. § 106.8(b)

250. The previous administration ostensibly recognized that the procedures adopted by a school covered by Title IX (including ASU) must accord due process and equal protection to both parties involved.

251. Moreover, there must be "[a]dequate, reliable, and impartial investigation of complaints," and a school must, under Title IX, ensure

that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes alleged sexual assaults."

252. Challenges to university disciplinary proceedings for sex discrimination generally fall in two categories: (1) "erroneous outcome" cases which claim that plaintiff was innocent and wrongly found to have committed an offense with gender bias being a motivating factor in the erroneous findings; and (2) "severity of penalty/selective initiation" cases, in which the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

**A. ASU's Actions Resulted in An Erroneous Outcome Finding**

253. An erroneous outcome occurred in this case because Plaintiff was wrongfully found to have committed the alleged offenses related to sexually engaging an incapacitated person, forcible sexual contact, and alcohol violations and such decisions were motivated by gender bias because Plaintiff was a male athlete.

254. When this case first came to the attention of ASU, Defendant HUNTER indicated that action had to be taken quickly because Plaintiff was a male athlete—a collegiate wrestler.

255. DAVIS further displayed bias by telling Plaintiff she would act as a neutral fact-finder and would investigate the allegations by collecting reasonably available information to uncover the truth and informed Plaintiff that he did not need to do anything further. In contrast, DAVIS told the female accuser that it would be "on [Complainant]" to gather the information she (Complainant) felt helpful, allowing the Complainant to shape the investigation and permitting probative, exculpatory evidence to go uncollected. DAVIS essentially allowed Complainant to gather and

present only the evidence that supported her claims against the males while doing very little, if any, affirmative fact-finding herself.

256. The investigation played out exactly as ASU planned. The female accuser was given every opportunity to form her best case and gather only evidence she believed support her claims against the male accused while the male was deprived of a reasonable opportunity to gather available evidence due to false statements by ASU that it was not necessary for him to conduct an independent investigation because ASU would act as a neutral fact-finder. For example, ASU refused to gather smartphone information from the accuser. Instead, ASU allowed the accuser to selectively choose which texts, videos, photographs, and call logs she would turn over to investigators—a handful of texts. In contrast, the accused was able to procure and present detailed phone records from Doe.

257. ASU also failed to demand that the female accuser obtain the video of the incident even though she was the only person capable of obtaining the video (because it was in police custody) and Plaintiff maintained it proved his innocence. The female accuser, however, was permitted to block the video of the actual incident that was the subject of the investigation and alleged misconduct from ever coming into evidence.

258. ASU also failed to investigate the falling out Roe had with her "best friend," Witness 2, shortly after the night of the alleged incident. The two had a similar love interest, which could explain why Roe lied about the events that night. Roe may have wanted to avoid Witness 2 from telling her love interest that she had consensual sex with two men that night. Doe brought this information to ASU's attention, and it was ignored. And without the right to conduct discovery, Doe was powerless to investigate this claim. He tried to talk to Witness 2, through counsel, but she refused.

259. Evidence of the erroneous outcome based on sex is further reflected in the finding that Doe used impermissible "force"—or "sexual violence…attempted [by] physical sexual acts perpetrated against a person by force"—in the April 2, 2016 sexual encounter with Roe despite:

a. Roe never alleging that any force (physical acts/ violence used to gain access to sex) was used;

b. Doe never receiving notice that any "force" allegations and charges were lodged against him;

c. Two University officials explaining at the hearing that Doe was not being charged with using "force" against Roe and that the University never would have reached the issue of incapacity had it alleged "force";

d. The absence of any evidence tying Doe's actions to the minor injuries observed by the SANE nurse;

e. Unrebutted expert testimony that found that Roe's minor injuries inconsistent with forcible sex; and

f. The lack of any credible or substantial evidence that Roe was "forced" to engage in sexual intercourse with Doe.

260. Evidence of the erroneous outcome is also reflected in the finding that Doe violated ASU's alcohol policy despite:

a. The absence of any evidence or testimony that Roe drank alcohol poured by Doe specifically for her; and

b. The University's shifting basis for the alcohol violation, included various use the words *provided*, *gave*, *distributed*, *received*, and *influenced*, which deprived Doe of a meaningful opportunity to respond and defend against the allegations against him.

261. Additionally, Plaintiff sought through public records requests the University's own disciplinary data to show systemic bias against males, but the school has yet to turn the information over to Plaintiff. Similarly, Plaintiff sought the training materials provided to the UHB—which

evidently instruct UHB panelists to "protect[] the safety of victims and promote[] accountability." The University has not turned over these materials, either.

262. The foregoing shows the University employs policies and procedures designed to reach gender-specific outcomes. Specifically, male athletes are presumed guilty and are erroneously told that a neutral investigation will be conducted when in reality ASU allows female accusers to selectively gather information to support their case while ignoring highly probative and exculpatory evidence that is reasonably available.

**B. ASU's Actions and Penalties Were Also Affected by Plaintiff's Gender**

263. ABOR, by and through ASU and individual defendants, failed to conduct an adequate, reliable, and impartial investigation of Roe's allegations due to Plaintiff's sex.

264. For example, ABOR failed to seek or obtain easily obtainable, highly probative evidence (including police recordings and reports regarding the April 2 incident); abdicated its investigative responsibilities by asking the accuser to collect information regarding the allegations while falsely telling the Plaintiff that ASU would act as a neutral third-party investigator; refused to require the accuser to obtain exculpatory evidence that only she could procure—the video of the incident; and told the accuser that Doe would be charged before collecting all relevant, easily obtainable information or even interviewing Doe.

265. The Defendants' investigation was remarkably one-sided and deficient. Other than the Tempe PD report and various photos and electronic communications that were given to her, DAVIS did not procure a single piece of physical evidence.

266. Roe, and similarly situated female accusers, need only prove accusations by a preponderance of the evidence, and are presumed to be a "victim" and "survivor" merely for having brought a complaint. Doe and similarly situated male students, on the other hand, are presumed to be responsible for engaging in non-consensual sex and use of force when engaging in sex, and effectively must prove their innocence.

267. ABOR, by and through ASU and individual defendants, also failed to fairly adjudicate its case against Doe by finding that he used "force" when no notice of that charge was given and Roe disclaiming any use of force or sexual violence on multiple occasions.

268. The ABOR, by and through ASU and individual defendants, manifestly ignored Roe's statements to the police and DAVIS that no force was used during the sexual encounter and HUNTER'S testimony at the hearing that, under the Code, ASU would not have alleged incapacity had it not already ruled out force. In his decisions, RUND impermissibly found Doe responsible of both sexually engaging an allegedly incapacitated person *and* using sexual violence.

269. Both of RUND's disciplinary decisions also ignored the substantial evidence of Roe's capacity—ability to make rational and informed decisions and judgments—and instead focused on evidence of intoxication, even though "drunk sex" is not actionable under the Code.

270. RUND's disciplinary decisions reflect a failure to apply a burden of proof, which requires a reasoned consideration of the evidence to reach a conclusion, and actually revealed the absence of a preponderance of evidence supporting the finding of a violation by Plaintiff. RUND provided no explanation for his refusal to accept the UHB's conclusion that Roe was lucid and communicative, and accepted Roe's the credibility of testimony and rejected Doe's without having observed or

heard the testimony at the hearing. Only an anti-male bias to find for the female complainant and against the male respondent can explain RUND's findings.

271. RUND's bias is evidenced by his finding of responsibility based on the same set of facts that originally resulted in the UHB being unable to determine that Roe was incapacitated during the April 2, 2016 sexual encounter.

272. The Defendants' bias against male students like Doe was also evident in its finding of responsibility on the alcohol charge. The University's shifting terminology in describing Doe's allegedly wrongful conduct gave him no notice of what the actual basis for the violation, and he was found responsible for distributing alcohol even though Hunter testified that it was his receipt of alcohol which formed the basis of the charge. This finding was made despite any testimony or evidence that Roe drank a shot poured by Doe for her specifically. Only an anti-male bias to find for the female complainant and against the male respondent can account for the University's finding.

273. The totality of the circumstances establishes that Defendant was motivated by a gender bias in reaching the "erroneous outcome," and in its actions and penalties. ASU found Doe guilty of "sexual violence," despite a flagrant lack of notice and Roe denying on multiple occasions that any force was used; ignored evidence tending to exculpate the male Plaintiff on the force and incapacity issues; never provided the precise basis for the alcohol charge; and essentially allowed Roe to direct the course of the investigation and did not seek evidence or testimony that would have discredited her claims.

274. The totality of circumstances establishes that ASU has demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of misconduct.

275. Upon information and belief, all students that have been suspended or expelled from ASU for sexual misconduct have been male.

276. As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, emotional distress, loss of educational opportunities, economic injuries, and other direct and consequential damages, including physical, psychological, emotional and reputational damages.

277. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's records and requiring ASU to destroy all disciplinary records concerning Plaintiff.

**COUNT III**

**BREACH OF CONTRACT**
**(Against Defendant ABOR)**

278. Doe incorporates by reference the preceding paragraphs as though set forth herein.

279. At all times relevant hereto, a contractual relationship existed between the ABOR, by and through ASU, and Doe.

280. The University's Policy and Code were a part of that contract. Under that contract, the University agreed to act in accordance with these publications in resolving complaints of misconduct, investigating complaints, adjudicating complaints, and resolving appeals.

281. Inherent in the University's contract with Doe was an implied covenant of good faith and fair dealing. That covenant required the University to exercise its discretion under the contract in a way that did not destroy or injure Doe's right to receive the benefits of the contract, including benefits related to the investigation and adjudication of claims of sexual misconduct.

282. The covenant required the University to implement the contractual provisions identified below in ways that were not arbitrary, capricious or without reasoned basis, that did not ignore evidence to the contrary, and that did not steer Doe's disciplinary proceeding to a predetermined conclusion.

283. The University breached its contract with Doe, and the covenant of good faith inherent in it, by violating the Procedures in at least these ways:

**A. Incapacity**

284. The University failed to apply its "incapacitation" standard in Plaintiff's case, opting instead to apply a far more lenient and never-before disclosed "intoxication" standard.

285. In order to be "incapacitated" under the Code, a person must (according to HUNTER) be unable to make rational and informed decisions and judgments. At the hearing, Doe presented overwhelming evidence of Complainant's ability to think and act reasonably and rationally. The evidence disproving Complainant's incapacity included her own statements demonstrating awareness, participation, and communicativeness before, during, and after the sexual encounter. Admittedly, Complainant knew the approximate time she entered the bedroom and who she was with; she characterized her participation in the sexual acts as her "fucking" Doe and giving blow jobs to both males; and

communicated with the males during the sex to indicate that she was experiencing discomfort and to tell Witness 1 to stop recording her. This evidence alone precludes a finding of incapacitation because it shows that, by Complainant's own admission, she made rational and informed decisions and judgments *during* the sex, the only relevant timeframe.

286. Recognizing the overwhelming evidence of Complainant's capacity for rational, informed thoughts and acts, the UHB rejected the University's contention that Complainant was incapacitated.

287. RUND reversed the UHB's finding by eschewing an incapacity analysis and instead turning to an intoxication analysis.

288. Seven of the nine additional justifications Rund cited in support of his incapacity finding establish only that Complainant was intoxicated—not that she was unable to make rational and informed decisions and judgments. The other two—Complainant's uncorroborated, self-serving testimony "that she needed the wall to walk" and "that during the incident she was immobile and unable to resist"—had no connection to Complainant's <u>mental capacity</u> at the time of the sex, which is, supposedly, the touchstone of ASU's incapacity analysis.

289. The closest Rund came to calling Complainant's ability to make rational and informed decisions and judgments into question was his discussion in his second and final decision of Complainant's decision to engage in a threesome. Rund characterized that decision as "not plausible" given Complainant's rejection of Appellant's alleged earlier overtures and later referred to it as "outrageous behavior." There was nothing but Rund's own sexual mores and gender bias to support the "outrageous behavior" assertion. And Rund was evidently unaware of the uncontroverted Tempe PD recording of the phone call between Complainant and Participant wherein Participant recalled in great detail how Complainant evidently

changed her mind about having sex when she led the two males into the bedroom, began kissing them, and affirmatively consented.

**B. Force by Sexual Violence**

289. The University failed to apply the Code's requirement that physical acts or violence be used to gain access to sex to render sexual activity nonconsensual due to "force."

290. There is no credible evidence in the record tending to show that Doe used "force" in the way contemplated by the Code. Throughout the investigations, Roe denied any use of force or violence, and did not allege forcible sex to either Tempe PD or ASU. Two University officials confirmed at the hearing that no force allegation was made. Nonetheless, the UHB relied on the "minor" injuries documented in Roe's SANE report and her reports of pain and crying to support its "force finding." The unrebutted expert testimony is that Roe's injuries are consistent with consensual sex in the position Roe reported being in. Further, ASU presented no evidence tying the physical observations to Doe, and not Witness 1. And Roe herself explained that her crying and pain was from the unlubricated sex—not the result of any force or violence being exerted against her.

291. In finding Doe responsible for sexual misconduct, the University failed to apply the Code requirement that required evidence of physical acts or violence used to gain access to sex. No such evidence exists, yet the UHB found Doe responsible for using "force" and thereby breached its contract with him by failing to follow the Code and the Procedures related to the Code.

**C. The Hearing**

292. As explained immediately above, the UHB did not hear or review evidence suggesting that Doe used physical acts or violence against Roe to gain access to sex. It *did* hear and review evidence from Roe showing

that she never made a claim of forcible sexual assault and did not connect her pain and crying to any physical violence or forceful acts committed by Doe specifically.

293. In finding that "force" was used despite the fact that (1) Roe never alleged that physical acts or violence were exerted to gain access to sex, (2) the sole expert testimony on Roe's SANE report is that the "minor" injuries noted therein were consistent with consensual sex in the position Roe was in, (3) the complete absence of evidence tying specific acts by Doe to those minor injuries, and (4) Roe's own explanation that her pain and crying—the underpinning of the UHB finding—were caused by issues other than force or physical acts, RUND found Doe responsible for sexual misconduct based on less than a preponderance of the evidence. The hearing and subsequent decision violated the covenant of good faith and fair dealing. ASU was tasked with creating a fair and impartial disciplinary process, but failed to do so.

**D. Investigation**

294. As explained herein, the University did not conduct the "fair and impartial" investigation required by the Procedures and promised to Plaintiff. Davis was not the neutral, third party fact-finder she promised to be, and instead allowed Roe to direct the course of the investigation to the detriment of Doe. These deficiencies were pervasive, but can be broadly categorized as a failure to gather evidence that would have cast doubt on Roe's incapacity allegations (e.g., the Tempe PD interview recordings, Witness 1's video, and testimony from Witness 1) or gather any evidence relating to the use of "force," which was, in fact, never alleged.

295. For all the reasons set forth above, ASU has materially breached its contracts with Doe by failing to comply with its obligations, standards, policies, and procedures set forth in the Procedures.

296. ASU has also breached its express promise to Plaintiff to conduct a fair, impartial investigation as a neutral third-party.

297. As a direct, proximate, and foreseeable consequence of ASU's numerous material breaches, Doe's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages. Because of the foregoing, Doe may recover damages in an amount to be determined plus prejudgment interest and attorneys' fees and costs.

**COUNT IV**

**GROSS NEGLIGENCE**

**(Against Defendants RUND, ALLEN, DAVIS, HUNTER, LAMP, AND WALDRON, in their Individual and Official Capacities)**

298. Plaintiff restates each of the foregoing paragraphs as if fully stated herein.

299. Defendants owed Plaintiff a duty to treat him fairly and in accordance with their responsibilities under the Code and Procedures.

300. Plaintiff's property right in his public education is also protected by the U.S. and Arizona Constitutions' guarantees of due process and equal protection under the law.

301. Defendants' disciplinary procedures described herein are egregious. For example, the accuser was tasked with identifying and presenting information whereas the accused is erroneously informed that ASU will act as a neutral, third-party investigator.

302. Basic exculpatory evidence that was known to exist was ignored, such as the video recording of the incident that Roe refused to produce. Other highly probative evidence, such as the police interviews and recordings, were also ignored and never gathered by the Defendants.

303. Defendants essentially reached a conclusion that Doe was guilty before the relevant evidence was identified, gathered, considered, or presented.

304. By finding that Doe forcibly engaged in sexual misconduct with Doe even though Doe was never charged with using force, the use of force was never investigated, no credible evidence of force was presented, and Roe explicitly denied that force was sued, Defendants' actions and inactions were made with a reckless indifference to the results and Doe's fundamental rights.

305. Similarly, by concluding that Doe sexually engaged Roe while she was incapacitated, Defendants misapplied their own disciplinary standards. Defendants' abdication of the promulgated "incapacity" standard for the unannounced "intoxication" standard in order to reach a finding of responsibility demonstrates reckless indifference to the results of the disciplinary process and Doe's fundamental rights. Defendants also applied a "force" rule for which there is no promulgated standard or definition.

306. Further, the finding that Doe violated ASU's alcohol policy even though the basis for the charge was explicitly disavowed at the hearing shows that Defendants' actions and inactions were made with a reckless indifference to the results and Doe's fundamental rights.

307. Defendants' egregious actions and inactions created an unreasonable risk to Doe's fundamental rights, including his right to an

education under the Arizona Constitution, current and future job prospects, and athletic career.

308. Defendants knew or should have known it was highly probable, if not inevitable, that their actions and inactions would harm Plaintiff by, among other things, denying him the opportunity to complete his degree, continue working in his chosen field, unduly interfere with his current and future job prospects, and completely decimate his collegiate athletic career.

309. Defendants' reckless, willful and wanton conduct was designed to reach a result—that Defendant Doe did something wrong that night even though the UHB found that there was insufficient evidence that she was incapacitated and there was no allegation, charge, or proof that force was used or ASU's alcohol policy was violated.

310. Because of ASU's conduct, Doe has been damaged in an amount to be proven at trial.

**COUNT V**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(Against Defendants RUND, ALLEN, LAMP, HUNTER, DAVIS, AND WALDRON, in their Individual and Official Capacities)**

311. Plaintiff incorporates each foregoing paragraph as if fully set forth herein.

312. Defendants conduct was extreme, outrageous and exceeded all possible bounds of decency.

313. Defendants' actions and inactions were reckless because the University never investigated any possible use of force, never presented credible evidence of force, and then found that Doe forcibly engaged in sexual misconduct with Doe—even though Doe was never charged with using force and Roe explicitly denied that force was used.

314. Knowingly finding a young male guilty of forcible sexual assault despite undisputed evidence to the contrary and no sufficient notice of such charges, particularly in the current sociocultural climate, exceeds all possible bounds of decency.

315. Defendants knew or should have known that a guilty finding, especially a finding of forcible sexual assault, has life-altering consequences: suspension or expulsion in an economy in which a college degree confers enormous earning potential, likely loss of any future job or appointment that uses a background check, and status as a social outcast among the student's former peers and a society that increasingly does not offer second chances for alleged sexual assailants. Indeed, Doe lost his job as a result of the suspension and has not been able to fully pursue his chosen occupation—youth wrestling coach—because the club he formerly worked with practices at ASU's wrestling facility (under the terms of his expulsion, Doe is banned from any ASU-owned property)

316. Defendants had no lawful purpose for their conduct and knew, or reasonably should have known, that their actions violated Plaintiff's civil rights, including his constitutional and contractual rights to due process and equal protection, and his right not to be painted in a false light and defamed.

317. Despite knowledge that their actions violated Plaintiff's civil rights, Defendants acted in a manner that deprived Plaintiff of his constitutionally protected rights.

318. Defendants' objective was to either cause Plaintiff emotional distress, or they were aware of and recklessly disregarded the likelihood that their actions would result in emotional distress.

319. As a direct and proximate result of Defendants' actions described in this complaint, Plaintiff suffered embarrassment,

humiliation, injury to reputation, mental anguish, and severe emotional distress.

**COUNT VI**

**FALSE LIGHT**

**(Against Defendants RUND, ALLEN, LAMP, AND WALDRON, in their Individual and Official Capacities)**

320. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

321. Defendants RUND, ALLEN, LAMP, and WALDRON made statements that were untrue and intended to misrepresent Plaintiff's character, history, and activities by publicly stating—without accusation, charge, investigation, fair adjudication, or evidence—that Plaintiff engaged in forcible sexual misconduct.

322. Defendants also made comments or suggestions that created a false impression about Plaintiff and constituted a major misrepresentation of his character, most notably that Plaintiff would engage a younger female student in forcible sexual conduct.

323. The false/misleading statements and false impressions created about Plaintiff described in this Complaint would be highly offensive to any reasonable person, and are not merely minor or unimportant inaccuracies.

324. These false and/or misleading statements were made to the UHB staff and Board members, University staff, Roe, and upon information and belief, were thereby disseminated to Roe's friends and unknown other persons.

325. Defendants knew or reasonably should have known that their statements regarding Plaintiff were false and/or represented him in a false light. Defendants nonetheless made the statements recklessly, by making them in conscious disregard for the truth.

326. Defendants' false and/or misleading misstatements damaged Plaintiff's reputation in the community, prevented Plaintiff from continuing his chosen career, impaired Plaintiff's ability to find future employment, and caused mental and emotional damages.

**COUNT VII**

**INJUNCTIVE RELIEF AND DECLARATORY JUDGMENT**

**(Against Defendant ABOR)**

327. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

328. The University has committed numerous violations of its contractual obligations and of federal and state law.

329. John Doe's educational and career opportunities have been severely damaged. Without appropriate redress, the unfair outcome to ASU's deeply flawed process will continue to label John Doe as a predatory sexual offender, destroying his future career and life prospects.

330. By reason of the foregoing, John Doe requests a declaration or injunction so that: (a) the findings and sanction against John Doe made by ASU be reversed; (b) John Doe's disciplinary record be expunged and removed from his education record at ASU; (c) ASU shall provide John Doe with a notarized letter confirming that the findings and sanction have been reversed and expunged from John Doe's records; (d) ASU shall make all reasonable efforts to restore John Doe's reputation; (e) ASU shall allow John Doe to continue and finish his education at ASU.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Doe respectfully requests that this Honorable Court grant him the following relief:

1. Enter the requested permanent injunction and declaratory judgment;

2. Award Plaintiff compensatory damages for each claim for relief, in an amount determined at trial;

3. Award Plaintiff punitive damages, in an amount determined at trial;

4. Attorneys' fees, costs and interest, and interest as provided by law; and

5. Grant such other relief as the Court deems just and equitable.

## VII. JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable.

RESPECTFULLY SUBMITTED this 15th day of February, 2019.

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By *s/ Robert Carey*

Robert B. Carey (011186)
Leonard W. Aragon (020977)
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003

Attorneys for Plaintiff John Doe

**CERTIFICATE OF SERVICE**

I hereby certify that on February 15, 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Daniel G. Dowd
ddowd@cdqlaw.com

Lisa O'Connor
loconnor@cdqlaw.com

Rebecca van Doren
rvandoren@cdqlaw.com

s/ Amy Nolan