**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Unknown Party, | No. CV-18-01623-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Arizona Board of Regents, et al., | |
| Defendants. | |

The Arizona Board of Regents ("ABOR"), along with Arizona State University's ("ASU") Senior Vice President of Educational Outreach and Student Services James Rund, Chair of the University Hearing Board ("UHB") Craig Allen, UHB members Kathleen Lamp and Andrew Waldron, Senior Associate Dean of Students and Dean's Review Committee member Kendra Hunter, and Office of Student Rights and Responsibilities Senior Coordinator Tara Davis (collectively, "Defendants"), move to dismiss plaintiff John Doe's first amended complaint ("FAC"). Doe filed this action after being expelled for violating certain provisions of the ASU Student Code of Conduct (the "Code"), including provisions related to sexual misconduct. For the following reasons, the motion will be granted in part and denied in part.

## BACKGROUND

The facts alleged in the FAC (Doc. 37), which the Court presumes to be true for purposes of the motion to dismiss, are as follows.

…

I.    The Underlying Incident

On March 31, 2016, Doe and a fellow ASU student, Jane Roe, went on a dinner date and then engaged in consensual sexual activity in Roe's apartment.  (*Id.* ¶ 109.)

On April 2, 2016, Doe and Roe attended the same off-campus party.  (*Id.* ¶ 110.) During the party, Roe (who was under 21 years old at the time, and thus not legally allowed to drink alcohol) drank several shots of low-proof vodka.  (*Id.* ¶¶ 7, 9, 17, 111-15.)  Roe also danced provocatively with Doe and another male attendee, Witness 1, and kissed both men in the view of other partygoers.  (*Id.* ¶¶ 7, 118.)  Eventually, Roe led both men into a bedroom by the hand.  (*Id.* ¶¶ 8, 121.)  After the trio entered the bedroom, Roe kissed Witness 1, prompting Doe to ask Roe if he should leave.  (*Id.* ¶¶ 10, 122.)  Roe told Doe to stay and then verbally consented to sex.  (*Id.*)  Roe, Doe, and Witness 1 then undressed and engaged in a "threesome" for approximately 25 minutes, during which "Roe was an active participant in the sex, moving her hips appropriately, manipulating Doe's genitals to facilitate sex, and making moaning sounds indicative of pleasure."  (*Id.* ¶¶ 10-11, 122-23.)  After 25 minutes, Roe reported vaginal pain and asked the men to stop.  (*Id.* ¶¶ 11, 125.)  Both complied with this request.  (*Id.*)

After the threesome ended, Roe continued manipulating Doe's genitals by hand. (*Id.* ¶ 126.)  While this was occurring, Witness 1 surreptitiously began video-recording the encounter on his cellphone, which revealed "consensual" sexual conduct by Roe.  (*Id.* ¶¶ 12, 126-27.)  When Roe realized she was being filmed, she told Witness 1 to stop and became upset.  (*Id.* ¶¶ 12, 126, 128.)  After Witness 1 left, Doe asked Roe why she was being "dramatic."  (*Id.* ¶¶ 13, 128.)  This comment further angered Roe and precipitated an argument between Doe and Roe in which both called the other "an asshole."  (*Id.*)  Roe then left the room, found a friend, and left the party.  (*Id.*)

II.   The Criminal Investigation By The Tempe Police Department

On April 3, 2016 (the next day), Roe contacted the Tempe Police Department to report that that "she drank too much to consent to sex with Doe and Witness 1."  (*Id.* ¶¶ 14, 131.)  However, during the interview process, Roe "reported that she was coherent when

entering the bedroom, understood what was occurring throughout the sexual encounter, and told the males to stop when the sex began to hurt." (*Id.* ¶ 133.) Roe also stated, falsely, that she had never engaged in sexual conduct with Doe before the party. (*Id.* ¶ 131.) As part of the ensuing investigation, a Tempe police detective obtained and viewed a copy of the cellphone video that Witness 1 had taken. (*Id.* ¶ 142.) After the Tempe Police Department completed its "thorough[]" investigation of Roe's allegations, the Maricopa County Attorney's Office declined the case, meaning that Doe "was never charged with any crime." (*Id.* ¶¶ 14, 143.)

III. <u>Title IX Developments At ASU</u>

The FAC alleges that, between 2001 and 2011, universities such as ASU followed Title IX guidance materials promulgated by the United States Department of Education's Office of Civil Rights ("OCR"), which generally required schools to provide certain "procedural guarantees" to students accused of sexual harassment and other misconduct and to accord "due process to both parties involved." (*Id.* ¶¶ 80-83.) However, in 2011, OCR issued a "significant guidance document" commonly referred to as the "Dear Colleague" letter. (*Id.* ¶ 84.) This letter advanced a "gendered view" of sexual violence "that saw men as paradigmatic perpetrators of that violence and heterosexual women as its paradigmatic targets." (*Id.*) Among other things, the letter forbade universities from employing a clear-and-convincing-evidence standard during sexual misconduct proceedings and required them to employ a lesser preponderance-of-the-evidence standard. (*Id.* ¶ 87.) OCR also issued a later guidance document that "strongly implied that allowing an accused student to cross-examine his accuser could create a 'hostile environment' and put a college or university in violation of Title IX." (*Id.* ¶ 92.) OCR explicitly threatened universities with the withdrawal of federal funding if they failed to comply with these mandates. (*Id.* ¶¶ 89, 95.)

The head of OCR also advanced a "gendered view" of Title IX enforcement through interviews and press releases. (*Id.* ¶¶ 85-86.) During one interview, the head of OCR stated "she couldn't help but to think about the women who are suffering every day." (*Id.*

¶ 85.)  During another event, the head of OCR sought to "highlight men's role in preventing sexual violence."  (*Id.* ¶ 86.)

In May 2014, as part of an effort to follow-up on the issuance of the "Dear Colleague" letter, OCR published a list of 55 universities that were under investigation for Title IX violations.  (*Id.* ¶ 94.)  ASU was one of the universities named on this list.  (*Id.*)  OCR officials visited ASU in 2012 and 2013 to "gather information" about ASU's processes for investigating sexual assault complaints.  (*Id.* ¶ 98.)  Following these visits, ASU was "subjected to extraordinary pressure," including two additional OCR complaints "that were filed as [Doe's] case was ongoing."  (*Id.*)

IV.    The Initial Investigation By ASU

In September 2016 (about six months after the incident), Roe reported the incident to ASU.  (*Id.* ¶¶ 15, 144.)  After Hunter received a report concerning the investigation, she sent an email to her colleagues "indicat[ing] that action had to be taken quickly because [Doe] was a male athlete—a collegiate wrestler."  (*Id.* ¶ 254.)[1]

On September 19, 2016, ASU initiated its investigation and interviewed Roe.  (*Id.* ¶ 144.)  During this meeting, Davis told Roe that "'as soon as I have the green light, I will charge' Doe with sexual misconduct," even though Davis had not yet interviewed Doe or collected any corroborating information.  (*Id.* ¶ 150.)  Davis also explained that she would not "go get" evidence and that it was instead up to Roe "to provide us with whatever documentation you think is relevant."  (*Id.* at 148.)

On September 22, 2016 (three days later), ASU notified Doe that he was being investigated for violations of the Code related to alcohol, sexual misconduct, and surreptitious recording.  (*Id.* ¶ 145.)

---

[1]    A different section of the FAC characterizes Hunter's email as follows: "After receiving the report from ASU's police department, [Hunter] wrote in an email to her colleagues that she 'wanted to figure out what to do with [Doe]' and 'clearly we would want to move swiftly' due to his status as a student-athlete . . . ."  (Doc. 37 ¶ 144.)  In other words, although paragraph 254 alleges that Hunter identified Doe's gender ("male athlete") as a reason for prompt action, paragraph 144 does not allege that Hunter specifically referred to Doe's gender.  During oral argument, Doe's counsel clarified that although Hunter's email didn't actually use the word "male," it included other information that would make clear to any reasonable reader that it was referring to a male athlete.

1    On September 23, 2016 (the next day), Doe met with Davis.  (*Id.* ¶ 148.)  Davis

2    informed Doe that she would handle ASU's investigation, acting as "a neutral, third party

3    investigator," and that her job was to "collect information—anything I can get."  (*Id.*)  This

4    was different from what Davis had told Roe three days earlier when describing her role.

5    (*Id.* ¶ 149.)  Davis further told Doe that the Dean's Review Committee ("the Committee")

6    would determine whether Doe violated the Code "based on whatever (information) is

7    available to them."  (*Id.* ¶ 148.)  Then, without prior notice, Davis asked Doe for a statement

8    about the incident.  (*Id.*)  On advice of counsel, Doe ended the meeting.  (*Id.*)

9    Davis continued with the investigation.  (*Id.* ¶¶ 152-57.)  Among other things, she

10   asked Roe to produce the Tempe Police Department report of the incident, as well as a

11   video of the incident recorded by a Witness 1.  (*Id.* ¶ 154.)  Although Roe provided the

12   police report, it was missing "key, exculpatory sections, including [a] screenshot of the

13   video . . . and the [Sexual Assault Nurse Examination ('SANE')] results."  (*Id.*)  In fact,

14   during the SANE exam, Roe had disclaimed the use of force in the incident.  (*Id.*)  Doe

15   was interviewed twice more and provided two written responses.  (*Id.* ¶ 155.)

16   On December 20, 2016, Davis informed Doe that she had sent her investigative

17   report to the Committee.  (*Id.* ¶ 158.)  At this point, Doe asked to see Roe's response to one

18   of his previous written submissions.  (*Id.*)  Davis responded by claiming that Roe's

19   response did not "provide[] any new evidence."  (*Id.*)  This claim was false—when Doe

20   was allowed to review Roe's response on December 21, 2016, he learned that "it contained

21   substantial new evidence."  (*Id.*)  "Within 24 hours," Doe submitted another letter that

22   attempted to address Roe's new, previously-undisclosed allegations.  (*Id.*)

23   V.    The Committee's Expulsion Decision

24   Unbeknownst to Doe, the Committee had already convened and decided to expel

25   him by the time he prepared this supplemental letter.  (*Id.* ¶ 159.)  By failing to consider

26   Doe's letter before rendering a decision, the Committee violated ASU's written manual of

27   Student Disciplinary Procedures.  (*Id.* ¶¶ 39, 159.)

28   The Committee's expulsion letter explained that it had determined Doe committed

two of the alleged Code violations (sexual misconduct and alcohol) but not the third alleged Code violation (surreptitious recording).  (*Id.* ¶ 160.)  With respect to the sexual misconduct charge, the Committee (1) concluded that Roe was incapacitated at the time of the sexual encounter and (2) further "concluded, without analysis, that Doe knew of Roe's incapacitation."  (*Id.*)  The Committee did not, in contrast, find that Doe had used "force" during the sexual encounter.  (*Id.* ¶ 162.)  With respect to the alcohol charge, the letter failed to provide any explanation, but Hunter subsequently informed Doe that he had violated the Code because (1) he "gave" alcohol to Roe, who was under 21, and also (2) he "received" alcohol "with the intent" to give it to Roe.  (*Id.* ¶¶ 160, 164.)

VI.   The UHB Hearing

Although Davis had "threatened" Doe with a "permanent notation on Doe's academic record" if he appealed the Committee's decision, Doe appealed anyway.  (*Id.* ¶ 165.)  A hearing before the UHB was originally scheduled for March 10, 2017.  (*Id.* 43-44.)  The notice of hearing stated that the focus would be on the two violations found by the Committee—specifically, that (1) Roe was incapacitated and incapable of consenting to sex and (2) Doe provided her with alcohol—and the sanctions imposed.  (*Id.*)  Although the hearing was supposed to be held within 90 days of the issuance of the Committee's letter, the meeting was postponed because a member of the UHB was unable to attend on March 10.  (*Id.*)  The hearing was rescheduled for May 23, 2017.  (*Id.*)

Before the hearing, Doe sought (1) an extension of the time allotted, (2) a clear definition of "incapacitation" under the Code, and (3) a request that Roe help obtain the video of the encounter.  (*Id.* ¶ 167.)  Allen denied the latter two requests but granted "several incremental extensions to the time allotted for the hearing." (*Id.* ¶¶ 168-70.)  Even with those extensions, "the UHB's time restraints ultimately prevented Doe from examining four key witnesses": specifically, Davis, two witnesses from the party, and Doe's "alcohol expert."  (*Id.* ¶ 170.)  Doe's time at the hearing was further constrained by the fact that he had to read into evidence portions of the police report and was not allowed to directly cross-examine Roe—instead, he had to direct his questions to Roe through

Allen.  (*Id.*)  A summary of what Doe's alcohol expert would have said was sent to the UHB after the hearing, but Allen refused to accept it.  (*Id.* ¶ 181.)

The UHB issued its findings and recommendations on May 30, 2017.  (*Id.* ¶ 182.) Those findings "could not determine by even a preponderance of the evidence whether Roe was incapacitated" and acknowledged that "[a]ccounts of the encounter provided by all parties indicate that [Roe] was lucid and able to verbally communicate."  (*Id.* ¶ 183.) Nevertheless, the UHB determined that Doe had used "impermissible force" in his encounter with Roe.  (*Id.* ¶ 184.)  Specifically, the UHB concluded that Doe had "committed 'sexual violence' by 'engag[ing] [Roe] by force' because of minor interior vaginal abrasions and knee bruising reported in Roe's SANE report and her statements about pain and crying."  (*Id.* ¶ 184.)  The UHB separately found Doe responsible for the alcohol charge because he "distributed" alcohol to Roe.  (*Id.* ¶ 186.)

The UHB's "impermissible force" finding was flawed for two reasons.  First, it was a "new basis for liability"—the Committee didn't charge Doe with using "impermissible force" against Roe or find him responsible under such a theory, the UHB's pre-hearing notices didn't focus on the "impermissible force" issue, and the UHB didn't add a "impermissible force" charge until after the close of evidence.  (*Id.* ¶¶ 162, 171, 184.) Second, the "impermissible force" finding was factually flawed because Roe told the Tempe Police Department investigator that no force was used and Doe's expert provided uncontradicted testimony during the hearing that Roe's injuries were only consistent with consensual sex.  (*Id.* ¶¶ 184-85.)

VII.    Rund's Review Of The UHB's Decision

The UHB's findings were given to Rund, ASU's final arbiter on student misconduct issues.  (*Id.* ¶ 187.)  Rund overruled the UHB's finding of no incapacitation, adopted the UHB's finding of impermissible force, and adopted the UHB's conclusion on the alcohol charge.  (*Id.* ¶¶ 187-91.)

On August 30, 2017, Rund denied Doe's motion for reconsideration of his ruling. (*Id.* ¶¶ 192-96.)  This constituted ASU's final administrative decision.  (*Id.* ¶ 197.)

VIII.   Doe's Appeal To The Maricopa County Superior Court

On October 2, 2017, Doe appealed ASU's decision to the Maricopa County Superior Court pursuant to A.R.S. § 12-901 *et seq.*  (Doc. 28 at 1.)

On October 29, 2018, the Maricopa County Superior Court issued a six-page order rejecting Doe's appeal.  (Doc. 40-1.)[2]  Specifically, the court concluded that Rund's incapacity, force, and alcohol-related determinations were "supported by substantial evidence" (*id.* at 5-7), that "Doe was not denied due process" (*id.* at 7), and that the penalty of expulsion was not excessive (*id.* at 7-8).

IX.   This Action

On May 29, 2018, Doe filed this action.  (Doc. 1.)  The initial complaint contained two federal claims—(1) a violation of Doe's constitutional rights to due process and equal protection, asserted via 42 U.S.C. § 1983, against the ASU officials in their official and individual capacities, and (2) a violation of Title IX (20 U.S.C. §§ 1681-88) against ABOR—as well as various state-law claims (breach of contract, defamation, gross negligence, intentional infliction of emotional distress, and false light) against some or all of the Defendants.  (Doc. 1 at 49, 56, 62, 65, 67, 69, 70.)  Doe sought monetary damages as well as injunctive and declaratory relief against ABOR.  (*Id.* Doc. 1 at 71.)

In September 2018, the parties filed a joint motion to stay proceedings pending the disposition of Doe's appeal to the Maricopa County Superior Court.  (Doc. 28.)  The request was granted, and the parties were instructed to notify the Court when the state court issued its decision.  (Doc. 29.)

As noted, the state court issued its decision on October 29, 2018.  (Doc. 40-1 at 1.)

Afterward, Doe asked for another stay pending his appeal to the Arizona Court of

---

[2]   The Court may consider the Maricopa County Superior Court's order, even though the order wasn't attached as an exhibit to the FAC, because the order is subject to judicial notice.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may . . . consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment."); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("[Courts] may take judicial notice of court filings and other matters of public record.") (citation omitted).

Appeals.  (Doc. 32 at 1.)  The Court denied this request, citing concerns with excessive delay and fairness to the Defendants.  (Doc. 35.)

Doe then submitted the FAC.  (Doc. 37.)  The factual allegations remain largely the same, but Doe (1) amended Count I (the § 1983 claim) to include ABOR as a Defendant and to make clear he was suing the ASU officials only in their individual capacities, and (2) removed Count IV (a state-law defamation claim).  (Doc. 36-1 at 54, 76.)

On November 18, 2019, the Court issued a tentative ruling on Defendants' motion to dismiss.  (Doc. 61.)

On December 18, 2019, the Court heard oral argument.

## ANALYSIS

In their motion to dismiss, Defendants argue (1) the Court lacks subject matter jurisdiction over this entire action under the *Rooker-Feldman* doctrine because granting the relief sought by Doe would effectively require this Court to review and reverse the decision of the Maricopa County Superior Court affirming ASU's expulsion decision, (2) the § 1983 claim (Count I) must be dismissed under Rule 12(b)(6) because ABOR is immune from § 1983 liability, the individual Defendants are entitled to qualified immunity, and the FAC doesn't plausibly allege a due process violation, (3) the Title IX claim (Count II) must be dismissed under Rule 12(b)(6) because the FAC "does not make a single factual allegation regarding gender bias that is specific to the disciplinary proceedings that led to [Doe's] expulsion," and (4) the state-law claims are subject to dismissal for a host of reasons, including Eleventh Circuit immunity, failure to comply with Arizona's notice-of-claim statute, and failure to state a claim.  (Doc. 40.)

I.   *Rooker-Feldman*

The *Rooker-Feldman* doctrine prohibits district courts from hearing "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review of those judgments."  *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283 (2005). The doctrine "exhibit[s] the limited circumstances in which [the U.S. Supreme Court's]

appellate jurisdiction over state-court judgments . . . precludes a United States district court from exercising subject-matter jurisdiction in an action it would otherwise be empowered to adjudicate." *Id.* at 291. *Rooker-Feldman* is not triggered simply because there is a pending, parallel state court action, even if the state court has already entered judgment in that action. *Id.* at 292. Indeed, although a parallel state court proceeding may result in other forms of preclusion, *Rooker-Feldman* is only triggered when a district court is called upon "to overturn an injurious state-court judgment." *Id.* at 291-92. Properly understood, then, *Rooker-Feldman* is itself a "fairly narrow preclusion doctrine," separate and distinct from claim and issue preclusion, that prohibits a district court from reviewing a state court's decision. *Carmona v. Carmona*, 603 F.3d 1041, 1050 (9th Cir. 2010).

In *Noel v. Hall*, 341 F.3d 1148 (9th Cir. 2003), the Ninth Circuit provided comprehensive guidance concerning *Rooker-Feldman* and its limited applicability. *Noel* arose from a failed agreement to train a racehorse. *Id.* at 1151. The demise of the relationship resulted in four different state court lawsuits. *Id.* at 1152-53. Eventually, the would-be trainer, Noel, filed suit in federal court, alleging a variety of federal and state-law claims, including a "fiduciary duty claim . . . which [was] essentially the same issue of fiduciary duty [that] was being litigated" in one of the state court actions. *Id.* at 1154. The district court dismissed that claim pursuant to *Rooker-Feldman* but the Ninth Circuit reversed. After thoroughly recounting the history of the *Rooker-Feldman* doctrine, the court announced the following "general formulation [that] describes the distinctive role of the *Rooker–Feldman* doctrine in our federal system":

> If a federal plaintiff asserts as a legal wrong an allegedly erroneous decision by a state court, and seeks relief from a state court judgment based on that decision, *Rooker–Feldman* bars subject matter jurisdiction in federal district court. If, on the other hand, a federal plaintiff asserts as a legal wrong an allegedly illegal act or omission by an adverse party, *Rooker–Feldman* does not bar jurisdiction. If there is simultaneously pending federal and state court litigation between the two parties dealing with the same or related issues, the federal district court in some circumstances may abstain or stay proceedings; or if there has been state court litigation that has already gone to judgment, the federal suit may be claim-precluded under [28 U.S.C.] § 1738. But in neither of these circumstances does *Rooker–Feldman* bar jurisdiction.

*Id.* at 1164. And in a subsequent case, the Ninth Circuit summarized the test even more succinctly, explaining that if a plaintiff in a federal case "sues . . . an adverse party[], not a state court," and "does not directly challenge a state court's factual or legal conclusion," then the federal lawsuit is "not a forbidden appeal under *Rooker-Feldman*." *Manufactured Home Cmtys. Inc. v. City of San Jose*, 420 F.3d 1022, 1030 (9th Cir. 2005).[3]

Application of *Rooker-Feldman* to the instant case is thus straightforward—the doctrine does not apply. As an initial matter, this action was filed before the Maricopa County Superior Court even rendered its decision. *Exxon Mobil*, 544 U.S. at 291 ("In both cases [in which *Rooker-Feldman* applied], the losing party in state court filed suit in federal court *after* the state proceedings ended . . .") (emphasis added). More important, under *Noel*, this is not the sort of case that triggers *Rooker-Feldman*. Doe isn't suing the Maricopa County Superior Court, isn't asking this Court to directly overturn any aspect of that court's October 29, 2018 decision, and is fundamentally complaining of injuries caused by adverse parties (ABOR and certain ASU officials), not by the Maricopa County Superior Court's decision to side with those parties in his state administrative appeal. If and when the state-court action becomes final, it may have some sort of preclusive effect here. *Exxon Mobil*, 544 U.S. at 293.[4] Until that point, though, Doe may maintain "overlapping, and even *identical* claims" in state and federal court. *Noel*, 341 F.3d at 1165.

Defendants' arguments to the contrary are unavailing. For example, they cite *Maple*

---

[3]     *See also GASH Associates v. Village of Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993) ("The *Rooker–Feldman* doctrine asks: is the federal plaintiff seeking to set aside a state judgment, or does he present some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party? If the former, then the district court lacks jurisdiction; if the latter, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion."). The Ninth Circuit has cited this passage with approval. *Noel*, 341 F.3d at 1164.

[4]     *See also Manufactured Home Cmtys.*, 420 F.3d at 1030 ("The relationship between [the pending federal claims] and the California state courts' legal and factual conclusions is best addressed under preclusion law."); *Noel*, 341 F.3d at 1163-64 ("If the federal plaintiff and the adverse party are simultaneously litigating the same or a similar dispute in state court, the federal suit may proceed under the long-standing rule permitting parallel state and federal litigation. Or if the federal plaintiff and the adverse party have already litigated the state court suit to judgment, the federal plaintiff may be precluded from relitigating that dispute under the interjurisdictional preclusion rule of 28 U.S.C. § 1738. In neither situation does *Rooker–Feldman* bar subject matter jurisdiction in federal district court . . . .") (internal citations omitted).

*Lanes v. Messer*, 186 F.3d 823 (7th Cir. 1999).  There, a defamation suit was deemed barred by *Rooker-Feldman* because it sought damages equal to the value of a lost liquor license, allegedly the result of the defamatory statement.  *Id.* at 825.  The loss of the license was an administrative action a state court had already upheld.  *Id.*  Because the state court had already finalized the loss of the license, the Seventh Circuit concluded that, should the federal plaintiff win, that outcome would effectively undo the state court decision.  *Id.*

The problem with *Maples Lanes*' reasoning is that the focus of *Rooker-Feldman* is not what the relief *is*, but what the relief is *from*.  *Noel*, 341 F.3d at 1164.  *See also Exxon Mobil*, 544 U.S. at 292.  *Maple Lanes* thus appears to be inconsistent with Ninth Circuit law, because it did not turn on whether the federal plaintiff was asserting a legal wrong resulting from a state court's erroneous decision.  *Carmona*, 603 F.3d at 1050 (citing *Noel*, 341 F.3d at 1164).  Other courts have similarly declined to follow *Maple Lanes*.  *See, e.g., In re Philadelphia Entertainment & Dev. Partners*, 879 F.3d 492, 502-503 (3rd Cir. 2018) ("*Maple Lanes* does not comport with the *Rooker-Feldman* doctrine as it is now understood.").

Accordingly, Defendants' motion, so far as it turns on Rule 12(b)(1), is denied.

II.    <u>42 U.S.C. § 1983</u>

Count I of the FAC arises under 42 U.S.C. § 1983.  That statute allows plaintiffs to assert claims against state officials, as individuals, for violations of federal rights committed under the color of state law.

A.    **Preliminary Matters**

As a threshold matter, it should be noted that all of the Defendants (including ABOR) are named as defendants in Count I of the FAC.  (Doc. 37 at 52.)  In their motion to dismiss, Defendants argue that ABOR, as an arm of the state, is immune from liability under § 1983 (Doc. 40 at 5), and Doe concedes the merit of this argument in his response (Doc. 47 at 19).  Accordingly, ABOR will be dismissed from Count I.  *See, e.g., Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64 (1989) ("For the reasons that follow, we reaffirm . . . that a State is not a person within the meaning of § 1983."); *Hale v. State of*

*Arizona*, 993 F.2d 1387, 1398 (9th Cir. 1993) ("[A] state is not 'person' within the meaning of § 1983.").

It is also important to clarify which underlying statutes and constitutional provisions provide the foundation for Doe's § 1983 claim.  The FAC alleges that Defendants are subject to liability under § 1983 because they violated (1) Doe's rights under Title IX, (2) Doe's rights to due process, equal protection, a public education, and to be free from sexual discrimination under the Arizona Constitution, and (3) Doe's rights to due process and equal protection under the United States Constitution.  (Doc. 37 at 52 & ¶¶ 198-201.)  In their motion to dismiss, Defendants argue that § 1983 can't be used as a vehicle for asserting violations of Title IX (Doc. 40 at 6-7), and Doe doesn't address this argument in his response.  The Court construes this silence to be acquiescence, *see* LR Civ. 7.2(i), and further notes that, in Count II, Doe has asserted a stand-alone Title IX claim.  Accordingly, Doe cannot premise his § 1983 claim on alleged violations of Title IX.

Additionally, Doe cannot seek damages under § 1983 based on an alleged violation of the Arizona Constitution.  *Sweaney v. Ada County, Idaho*, 119 F.3d 1385, 1391 (9th Cir. 1997) (rejecting § 1983 claim premised on alleged violation of Idaho law because "Section 1983 . . . only creates a cause of action for violations of the federal 'Constitution and laws.' 'To the extent that the violation of a state law amounts to the deprivation of a state-created interest that reaches beyond that guaranteed by the federal Constitution, Section 1983 offers no redress.'") (citation omitted).  Thus, although Doe may (as discussed in Section II.B below) attempt to show that Arizona law creates certain property or liberty interests that, in turn, trigger a right to due process under the United States Constitution, he cannot premise his § 1983 claim solely on alleged violations of the Arizona Constitution.

With respect to Doe's claims under the United States Constitution, although the FAC asserts violation of both the Due Process and Equal Protection Clauses of the Fourteenth Amendment (Doc. 37 ¶ 199-200), Doe focuses solely on due process-based theories in his response to the motion to dismiss (Doc. 47 at 11-14).  Thus, the Court concludes that Doe has abandoned any equal protection claim.

Finally, as for Doe's due process claim, the rule in the Ninth Circuit is that a plaintiff asserting such a claim "must, as a threshold matter, identify a *liberty or property* interest protected by the Constitution." *United States v. Guillen-Cervantes*, 748 F.3d 870, 872 (9th Cir. 2014) (emphasis added). Here, Defendants addressed both potential theories in their motion to dismiss, arguing that neither provides a valid basis for liability (Doc. 40 at 6-8), and Doe responded by focusing solely on the viability of a property-based theory (Doc. 47 at 13-14). Accordingly, Defendants argued in their reply that Doe had abandoned any liberty-based claim. (Doc. 53 at 4 n.9.) Nevertheless, during oral argument, Doe asserted that he had preserved his liberty-based claim, albeit not very precisely, because some of the cases cited in his response include a discussion of liberty-based interests.

The Court agrees with Defendants that Doe forfeited any liberty-based claim by failing to properly raise it in his response. Thus, the Court construes Doe's § 1983 claim as premised solely on the theory that Defendants violated the United States Constitution by depriving him of a protected property interest without due process. Nevertheless, in an abundance of caution, this order also explains, in Part II.B.3 below, why Doe's liberty-based claim would fail even if it weren't forfeited.

B.   **Merits**

1.   Qualified Immunity Standard

Defendants' primary argument for dismissing Doe's § 1983 claim is that qualified immunity protects them from liability. (Doc. 40 at 7-9.)

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). A government official's conduct violates "clearly established" law when "'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Id.* at 741 (citation omitted). Although there need not be a "case directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* In

other words, the case law must "have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017). *See also Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) ("This Court has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (quotation omitted).

"Once the defense of qualified immunity is raised by the defendant, the plaintiff bears the burden of showing that the rights allegedly violated were 'clearly established.'" *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000). *See also Romero v. Kitsap Cty.*, 931 F.2d 624, 627 (9th Cir. 1991) ("The plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct.") (citation omitted). Although it "is often beneficial" to begin the qualified-immunity analysis by addressing whether a statutory or constitutional right has been violated, district courts are vested with discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Indeed, the Supreme Court has recognized that starting with the second prong may be particularly appropriate when addressing the first prong would require a district court to construe "uncertain" or "ambiguous" state law. *Id.* at 238.

Given these principles, the Court will begin its analysis by addressing the second prong of the qualified-immunity test—whether Doe has met his burden of showing that the case law in existence at the time of the challenged conduct (*i.e.,* September 2016 through August 2017) was "developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in [Defendants'] place," that they were violating Doe's due process rights under the United States Constitution. *Shafer,* 868 F.3d at 1117.

### 2. Property Interest

As noted, a plaintiff asserting a procedural due process claim "must, as a threshold

- 15 -

matter, identify a . . . property interest protected by the Constitution." *Guillen-Cervantes*, 748 F.3d at 872. However, "[t]he Constitution itself creates no property interests; rather, such interests are created . . . [by] state law." *Id.* (internal quotation marks omitted). *See also Portman v. Cty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993) ("The Due Process Clause does not create substantive rights in property; the property rights are defined by reference to state law."). Thus, to prevail on his claim, Doe must show he possessed a property right under Arizona law to attend and continue his education at ASU. *See also Wynar v. Douglas Cty. Sch. Dist.*, 728 F.3d 1062, 1072 (9th Cir. 2013) (looking to state law to determine if the plaintiff had "a property interest in his public education" that could provide the foundation for a due process-based § 1983 claim and concluding that the plaintiff possessed such a right under article 11, section 2 of the Nevada Constitution); *Plummer v. Univ. of Houston*, 860 F.3d 767, 773 (5th Cir. 2017) (university student who was expelled for sexual misconduct could assert a due process-based § 1983 claim concerning his disciplinary proceeding because Texas law specifically recognizes a liberty interest in higher education).[5]

In his response, Doe asserted that the Arizona Supreme Court's decision in *Shofstall v. Hollins*, 515 P.2d 590 (Ariz. 1973), establishes a fundamental right to an education in Arizona. (Doc. 47 at 13-14.) This argument is unavailing. Although *Shofstall* recognized that "education [is] a fundamental right of pupils between the ages of six and twenty-one years" and stated that "[t]he [Arizona] constitution, by its provisions, assures to every child a basic education," *id.* at 592, the Arizona Supreme Court clarified, in a decision issued only one year later, that "the basic education of which we spoke [in *Shofstall*] only extended to a uniform, free common school system." *Carpio v. Tucson High School Dist. No. 1*, 524

---

[5]     In *Austin v. University of Oregon*, 925 F.3d 1133 (9th Cir. 2019), the Ninth Circuit dismissed a due process-based § 1983 claim brought by three male student-athletes who had been suspended after the university determined, via a disciplinary proceeding, that they had engaged in sexual misconduct. The court did not, however, reach the issue whether the students had a protected property right under Oregon law to a university education—instead, it dismissed the § 1983 claim on other grounds. *Id.* at 1139 ("We assume, without deciding, that the student athletes have property and liberty interests in their education, scholarships, and reputation as alleged in the complaint. Nonetheless, they received 'the hallmarks of procedural due process': notice and a meaningful opportunity to be heard.").

P.2d 948, 951 (Ariz. 1974).  "Common school," in turn, "meant those grades between kindergarten and high school."  *Id.* at 949.  *See also id.* ("[C]ommon schools were specifically recognized as those from the first to the eighth grades and high schools as those grades from nine through twelve.").  Thus, *Shofstall*, with its guarantee of a basic education, only guaranteed a right to education through the eighth grade.  In light of *Carpio*, *Shofstall* does not clearly establish a right under Arizona law to attend ASU—it actually cuts in the opposite direction.

Nor does art. XI, § 6 of the Arizona Constitution clearly establish that Doe had a right to attend ASU.  That provision mandates that state educational institutions shall be coeducational—nowhere does it guarantee a right to attend one of the state's universities.  Further, Doe does not cite, nor has the Court found, a ruling from an Arizona court that art. XI, § 6 guarantees a right to a university education.  If such a right exists, the Arizona courts have yet to find it.

During oral argument, Doe suggested that *Goss v. Lopez*, 419 U.S. 565 (1975), creates a clearly established right upon which he can rely.  But in *Goss*, an Ohio state statute required free education for students between 5 and 21 and compelled those students' attendance.  *Id.* at 573.  Given those state-law entitlements, the Supreme Court concluded Ohio was required to provide constitutionally sufficient safeguards in school disciplinary proceedings: "*[O]n the basis of state law*, [the students] plainly had legitimate claims of entitlement to a public education."  *Id.* (citing Ohio Rev. Code Ann. §§ 3313.48 & 3313.64 (1972 and Supp. 1973)) (emphasis added).  In other words, the constitutional right to due process attached in *Goss* only because the state was "constrained to recognize a student's legitimate entitlement to public education as a property interest."  *Id.*  Thus, *Goss* does not support Doe's position—it says nothing at all about whether Arizona law creates a state-law entitlement to a college education.

Doe's reliance on *Oyama v. Univ. of Hawaii*, 813 F.3d 850 (9th Cir. 2015) is similarly misplaced. There, the plaintiff's theory was that a Hawaii state university's "denial of his teaching application without a hearing violated his Due Process rights under

the Fourteenth Amendment." *Id.* at 874.  The Ninth Circuit began by expressing skepticism as to whether the plaintiff had a protected property interest under state law that might provide the foundation for such a claim.  *Id.* (analyzing the text of the school's handbook before concluding that "[t]his premise is questionable").  Next, after assuming for the sake of argument that the plaintiff did have a protected property interest, the court rejected his claim because he had received a constitutionally sufficient level of process.  *Id.* ("But even if we accept Oyama's argument that the University's decision deprived him of a constitutionally protected interest, the University provided him with adequate process.").  Although the court did go on to observe, in passing, that "[d]iscplinary dismissals, by contrast, may require more formal procedures," *id.* at 875, this observation does not suggest, let alone clearly establish, that Arizona law creates an affirmative right to a college education.

In a nutshell, it seems unlikely that a constitutional right to a university education exists under Arizona law.  And even if such a right does exist, it is not clearly established.  Thus, Defendants are entitled to qualified immunity with respect to Doe's § 1983 claim.

### 3. Liberty Interest

Finally, even if Doe hadn't forfeited his liberty-based theory by failing to raise it in his response brief, it would fail on the merits.  The liberty interests identified in the amended complaint pertain to Doe's "professional and personal reputation," his interest in "avoiding social stigma," and his interest in "occupational liberty."  (Doc. 37 ¶¶ 206-07.)  However, "injury to reputation standing alone does not violate the Due Process Clause of the Fourteenth Amendment; one's interest in reputation standing alone is neither liberty nor property guaranteed against state deprivation without due process of law."  *Wenger v. Monroe*, 282 F.3d 1068, 1074 (9th Cir. 2002) (citation and internal quotation marks omitted).  Instead, social stigma must be accompanied by, among other things, "the alteration of some right or status recognized by state law."  *Id. See also Krainski v. Bd. of Regents of Nev. Sys. of Higher Educ.*, 616 F.3d 963, 971 (9th Cir. 2010) (dismissing § 1983 claim against university officials, which was premised on the theory that the officials

"damaged [the plaintiff's] reputation by charging her with violations of the Student Conduct Code; finding her 'Responsible' of those charges; and 'tarnishing [her] educational transcript and record,'" because "[s]uch allegations amount to mere reputational injury . . . and, without more, do not rise to the level of a deprivation of a constitutionally protected liberty or property interest."). But as discussed above, Doe does not have a clearly established right, under Arizona law, to attend ASU. Moreover, although the Ninth Circuit has indicated that the stigma-plus test may apply in the university discipline context, *Krainski*, 616 F.3d at 971, it has not clarified what sort of harm would trigger constitutional protections. *Cf. Doe v. Purdue Univ.*, 928 F.3d 652, 665-66 (7th Cir. 2019) (university officials entitled to qualified immunity because it was the first application of the stigma-plus test in the university context). Thus, Defendants are also entitled to qualified immunity as to any § 1983 claim premised on a liberty theory.

III.    Title IX

   A.    **Legal Standard**

To survive a motion to dismiss under Rule 12(b)(6), "a party must allege 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 679-80. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

   B.    **Merits**

In Count II of the FAC, Doe alleges that ABOR, through the actions of the individual ASU Defendants, violated 20 U.S.C. §§ 1681-88, otherwise known as Title IX.

1   The crux of this claim is that "[a]n erroneous outcome occurred in this case because [Doe]

2   was wrongfully found to have committed the alleged offenses . . . and such decisions were

3   motivated by gender bias because [Doe] was a male athlete."  (Doc. 37 ¶ 253.)

4        Title IX prohibits discrimination on the basis of sex at all educational institutions

5   receiving federal financial assistance.  20 U.S.C. § 1681(a).  That prohibition extends to all

6   operations of such an institution.  *Id.* § 1687.  "Title IX is enforceable through a private

7   right of action for monetary damages as well as injunctive relief."  *Yusuf v. Vassar College*,

8   35 F.3d 709, 714 (2d Cir. 1994) (citation omitted).  Among other things, "Title IX bars the

9   imposition of university discipline where gender is a motivating factor in the decision to

10  discipline."  *Id.* at 715.  *See also Austin,* 925 F.3d at 1138-39 (citing *Yusuf* as authority for

11  this type of Title IX claim).  "Plaintiffs who claim that an erroneous outcome was reached

12  must allege particular facts sufficient to cast some articulable doubt on the accuracy of the

13  outcome."  *Yusuf*, 35 F.3d at 715.  They must also "articulate a basis to discern that the

14  administration of the disciplinary proceedings were flawed due to the" plaintiff's gender.

15  *Austin*, 925 F.3d at 1138.  "Just saying so is not enough."  *Id.*[6]

16       Here, Defendants don't challenge the sufficiency of the FAC's allegations

17  concerning the inaccuracy of Doe's disciplinary proceeding.  (Doc. 53 at 7 n.14.)  Instead,

18  they argue the FAC is deficient under Rule 12(b)(6) solely because it fails to "allege a

19  particularized causal connection between the allegedly flawed outcome . . . and gender

20  bias."  (*Id.* at 7.)

21       Although this issue presents a close call, the Court concludes the FAC contains just

22  enough case-specific, non-conclusory allegations of gender bias (which, at this stage of the

23  proceedings, the Court must assume to be true) to survive a motion to dismiss.  *Twombly*,

24  550 U.S. at 570 (motion to dismiss under Rule 12(b)(6) must be denied where the plaintiff

25  has included enough facts to "nudge [his] claims across the line from conceivable to

---

26  [6]      *Cf. Schwake v. Ariz. Bd. of Regents*, 2018 WL 1536388, *6 (D. Ariz. 2018), *appeal

27  pending* (dismissing Title IX claim brought by male ASU graduate student, who alleged
    that "ASU[] employees 'displayed a pro-female, anti-male bias'" when imposing discipline
28  against him for engaging in sexual misconduct, because the plaintiff's "allegations are
    conclusory and thus, insufficient to raise a plausible inference that gender bias motivated
    or impacted . . . ASU's actions").

plausible"). *See also Purdue Univ.*, 928 F.3d at 670 ("Taken together, John's allegations raise a plausible inference that he was denied an educational benefit on the basis of his sex. To be sure, John may face problems of proof, and the factfinder might not buy the inferences that he's selling. But his claim should have made it past the pleading stage, so we reverse the magistrate judge's premature dismissal of it.").

As an initial matter, the FAC—like many of the complaints in other recent Title IX cases brought by male university students who contend they were subjected to gender-biased disciplinary proceedings—contains an extensive discussion of the "Dear Colleague" letter that was issued by OCR in 2011. Most courts have concluded this letter does not, standing alone, create a plausible basis for alleging that a university disciplinary process was infected with gender bias. For example, in *Purdue University*, the Seventh Circuit stated that although "[o]ther circuits have treated the Dear Colleague letter as relevant in evaluating the plausibility of a Title IX claim . . . the letter, standing alone, is obviously not enough to get [a Title IX plaintiff] over the plausibility line." 928 F.3d at 668-69. Similarly, in *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018), the Sixth Circuit concluded that "all of this external pressure alone is not enough to state a claim that the university acted with bias in this particular case. Rather, it provides a backdrop that," if combined with other evidence, may "give[] rise to a plausible claim." *Id.* at 586. The Court agrees with these decisions and concludes that the letter does not, on its own, get Doe over the plausibility line.

Nevertheless, the FAC contains other allegations that provide additional support for Doe's claim. First, the FAC alleges that, following the issuance of the letter, OCR specifically identified ASU as one of the universities whose Title IX processes were under investigation and sent investigators to the ASU campus to "gather information" about those processes. (Doc. 37 ¶¶ 94, 98.) Although such school-specific allegations aren't alone sufficient in the Ninth Circuit to render a Title IX claim plausible, *see Austin*, 925 F.3d at 1138 (affirming rejection of male student-athletes' Title IX claim, even though the challenged disciplinary proceeding took place in the context of contemporaneous campus

protests), courts have suggested they may render a Title IX claim more plausible than a claim premised solely on the "Dear Colleague" letter.  *Doe v. Cummins*, 662 Fed. App'x 437, 453 (6th Cir. 2016) ("Nor do appellants allege that UC [University of Cincinnati] . . . was being investigated by the federal government for potential Title IX violations.  Instead, appellants allege more generally that the Department of Education's 'Dear Colleague Letter' induced UC to discriminate against males in sexual-assault investigations in order to preserve federal funding.  This conclusory allegation, without more, is insufficient to create a plausible claim of gender bias under Title IX.").[7]

Second, paragraph 254 of the FAC alleges that an ASU representative referred to Doe's male gender when explaining why prompt action was needed: "When this case first came to the attention of ASU, [Hunter] indicated that action had to be taken quickly because [Doe] was a male athlete—a collegiate wrestler."  (*But see* footnote 1 *supra*.) Although Defendants try to downplay this allegation by arguing that "Paragraph 254 does not mention disciplinary action" (Doc. 53 at 8), this argument overlooks that Hunter is alleged to have "overs[een] the investigation into Doe's alleged violations of [the Code]" and also "was a member of the Dean's Review Committee that issued the disciplinary decisions and sanctions on appeal and before the UHB and [Rund]."  (Doc. 37 ¶ 33.)

Doe also contends paragraph 195 of the FAC identifies another instance where an ASU official made statements that reflect gender bias—this time, implicit bias.  (Doc. 47 at 10.)  Paragraph 195 alleges that Rund based his finding that Roe was "incapacitated" during the sexual encounter in part on the nature of the encounter (a "threesome"), which Rund characterized as "outrageous behavior" that could not be the product of a rational, informed decision by an adult.  (Doc. 37 ¶ 195.)  This characterization, according to the FAC, reflects implicit gender bias and antiquated "sexual mores" because Rund "did not characterize the men's decision to engage in three-way sex as 'outrageous.'"  (*Id.*) Although this may not be Doe's strongest argument—as Defendants pointed out during

---

[7]     During oral argument, Defendants sought to minimize the relevance of the ASU-specific investigations by arguing they took place years before the challenged conduct in this case.  But paragraph 98 of the FAC specifically alleges that some of the OCR complaints "were filed as [Doe's] case was ongoing."

oral argument, Rund had no reason to opine on the reasonableness of the male participants' behavior (the narrow issue before him was whether Roe was incapacitated), so the statement shouldn't necessarily be viewed as reflecting disparate views of acceptable male and female sexual behavior—the Court concludes that, at the pleading stage and when viewed in the light most favorable to Doe, it provides a modest degree of additional support for his Title IX claim.

Third, and most important, the FAC alleges an array of irregularities during the disciplinary proceedings, including (1) the lead investigator promised Roe she would attempt to bring charges against Doe at the very outset of the investigation, before even interviewing Doe or obtaining corroborating information (*id.* ¶ 150), (2) the lead investigator made conflicting statements to Doe and Roe about the investigator's role (*id.* ¶ 255), (3) the lead investigator falsely told Doe that one of Roe's written submissions did not contain any new evidence (*id.* ¶ 158), (4) the Committee violated its own procedural rules by issuing the expulsion letter without considering Doe's response to the new evidence discussed in Roe's final written submission (*id.* ¶¶ 39, 159), (5) ASU representatives failed during various stages of the proceedings to take steps to obtain key evidence—among other things, they could have required Roe to obtain the cellphone video footage from the Tempe Police Department and simply chose not to do so (*id.* ¶¶ 154, 157), (6) the UHB refused to consider Doe's proffer of the testimony his alcohol expert would have provided (*id.* ¶ 181), and (7) the UHB sustained the sexual misconduct finding under an "impermissible force" theory, but this theory wasn't properly disclosed to Doe before the hearing and conflicted with Roe's statements to the police and with the uncontradicted testimony of Doe's expert (*id.* ¶¶ 162, 171, 184-85).

These alleged procedural irregularities provide the most significant basis for distinguishing this case from *Austin*. There, the Ninth Circuit affirmed the dismissal of a Title IX claim brought by three male student-athletes who had been determined, during a school-run disciplinary proceeding, to have engaged in sexual misconduct during an off-campus party. 925 F.3d at 1137-39. It is notable that the only two pieces of evidence the

plaintiffs proffered in support of their claim that the disciplinary proceeding was infected by gender bias were (1) the existence of contemporaneous campus protests and other outside pressure concerning the adequacy of school's response to incidents of sexual assault, and (2) an allegation that the school hadn't imposed sexual misconduct-related discipline against any female students (an allegation the Ninth Circuit deemed inadequate because "the complaint does not claim that any female University students have been accused of comparable misconduct, and thus fails to allege that similarly situated students . . . are disciplined unequally"). *Id.* In contrast, the students didn't appear to argue their disciplinary proceeding was procedurally irregular in any way, and indeed the Ninth Circuit affirmatively concluded, in a different portion of the opinion, that the procedures employed by the school during that proceeding were sound and complied with due process. *Id.* at 1139 ("Notice is not an issue here and nothing in the allegations supports a claim that the student athletes did not receive a meaningful hearing with the right to be heard."). Thus, the Court does not view *Austin* as foreclosing Doe's Title IX claim here—he is offering meaningfully different factual allegations.

Finally, although these alleged procedural errors also may not, standing alone, serve as plausible evidence of gender bias in a Title IX case,[8] it would be improper to consider them in a vacuum here. Instead, they must be considered in combination with all of the other allegations of gender bias contained in the FAC—specifically, the "Dear Colleague" letter, OCR's conduct specifically targeted toward ASU following the issuance of the letter, and the alleged comments by Hunter and Rund. The Court concludes that, taken together, those allegations are sufficient to survive a motion to dismiss.[9]

---

[8]    *See, e.g., Yusuf*, 35 F.3d at 715 ("However, allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss.").

[9]    *See also Purdue Univ.*, 928 F.3d at 667-70 (reversing dismissal of Title IX claim because allegations concerning the "Dear Colleague" letter, coupled with allegations of irregularities during the disciplinary proceeding, "[t]aken together . . . raise a plausible inference that [plaintiff] was denied an educational benefit on the basis of his sex"); *Baum*, 903 F.3d at 585-88 (reversing dismissal of Title IX claim because allegations of flawed procedures during disciplinary proceedings, a "specific allegation of adjudicator bias," and allegations of "external pressure facing the university" were, in combination, enough to

IV.     State-Law Claims

Doe also asserts claims for breach of contract (Count III), gross negligence (Count IV), intentional infliction of emotional distress ("IIED") (Count V), and false light invasion of privacy (Count VI). (Doc. 37 at 69, 74, 76, 78.)  The Court has jurisdiction over these claims, which all arise under state law, pursuant to the supplemental jurisdiction granted by 28 U.S.C. § 1367.  When exercising supplemental jurisdiction, a federal court "applies state law in the same manner it would if sitting in diversity."  *Media Rights Techs. V. Microsoft Corp.*, 922 F.3d 1014, 1026 (9th Cir. 2019).

A.     **Count III**

In his response to the motion to dismiss, Doe agreed to dismiss his state law claims, including Count III, against ABOR.  (Doc. 47 at 1).  Because ABOR is the only defendant named in Count III of the FAC, that claim is now without a defendant.  (Doc. 37 at 69.) Accordingly, Count III is dismissed.

B.     **Count IV**

In Count IV of the FAC, Doe alleges that Defendants' handling of his disciplinary proceedings was grossly negligent.  Among other things, he alleges that Defendants failed to satisfy "their responsibilities under the Code and Procedures," that Defendants "misapplied their own disciplinary standards," and that these and other "egregious actions and inactions created an unreasonable risk to Doe's fundamental rights, including his right to an education under the Arizona Constitution . . . ."  (Doc. 37 ¶¶ 299, 305, 307.)

Defendants argue the economic loss rule ("ELR") bars this claim because it arises from Doe's contractual relationship with ABOR.  (Doc. 40 at 15.)  In response, Doe argues this claim stems not from any contractual violation, but from the damage to his "constitutionally protected property right in a public education" and "emotional and reputational harms."  (Doc. 47 at 15.)

Count IV will be not be dismissed at this juncture.  The Arizona Supreme Court has described the ELR as "a common law rule limiting a contracting party to contractual
_____
"make[] Doe's claim plausible").

remedies for the recovery of economic losses unaccompanied by physical injury to persons or other property." *Flagstaff Affordable Hous. Ltd. P'ship v. Design All., Inc.*, 223 P.3d 664, 667 (Ariz. 2010). However, the ELR "may vary in its application depending on context-specific policy considerations." *Id.* at 669. Also, the ELR applies only "where there has been no injury besides that to the subject property" covered by the contract. *Cook v. Orkin Exterminating Co., Inc.*, 258 P.3d 149, 153 (Ariz. Ct. App. 2011).

Defendants' limited briefing concerning the ELR (which cites only two Arizona cases, *Flagstaff Affordable Housing* and *Cook*) fails to establish that Arizona courts would apply the ELR to bar Doe's gross negligence claim. First, this lawsuit does not involve a product liability claim, a construction defect claim, or a breach of fiduciary duty claim arising out of a pest inspection contract (which were the scenarios addressed in *Flagstaff Affordable Housing* and *Cook*), so it may raise different "context-specific policy considerations" than were present in those cases.

Second, Count IV doesn't appear to be based solely on Defendants' alleged breach of the contract between Doe and ABOR—the FAC also alleges that it arises in part from Defendants' constitutional (not contractual) obligation to provide a college education. (Doc. 37 ¶ 307.) Although, as discussed in Part II above, the Court is skeptical that the Arizona Constitution creates such a right, Defendants have not moved for dismissal of Count IV on this basis.

Third, Doe contends Count IV isn't limited to a request for economic damages because he also seeks to recover for "emotional and reputational harms." (Doc. 47 at 15.) Although Defendants question the accuracy of this claim, arguing that "unlike his IIED and false light claims, [Doe] does not allege in his gross negligence claim [any categories of] damages that take it outside the reach of the [ELR]" (Doc. 53 at 9), this argument overlooks that the first paragraph in the FAC pertaining to Count IV (Doc. 37 ¶ 298) incorporates by reference all of the preceding paragraphs in the FAC and some of those paragraphs (*see, e.g., id.* ¶ 276) refer to emotional and reputational harms.

Accordingly, Count IV will not be dismissed at this stage.

C.     **Count V**

In Count V of the FAC, Doe alleges that "Defendants knew or should have known" that their actions in Doe's disciplinary proceedings would cause emotional harm and that their "objective was to either cause [Doe] emotional distress, or they were aware of and recklessly disregarded the likelihood that their actions would result in emotional distress." (Doc. 37 ¶¶ 315, 318.)

Defendants seek dismissal of the IIED claim on three grounds: (1) Doe did not properly serve notice of his IIED claim; (2) Doe's notice of claim was untimely; and (3) Doe has not sufficiently alleged his IIED claim.  (Doc. 40 at 13-16.)  Because the first argument is dispositive, the Court need not reach the other two.

Under Arizona law, claims against public employees, such as the individual Defendants here, must strictly comply with A.R.S. § 12-821.01, Arizona's notice of claim statute.  *Yahweh v. City of Phoenix*, 400 P.3d 445, 447 (Ariz. Ct. App. 2017).  To comply with that statute, a claimant must include "facts sufficient to permit the public entity, public school, or public employee to understand the basis on which liability is claimed."  A.R.S. § 12-821.01(A).  That requirement allows "the public entity to investigate and assess liability."  *Haab v. Cty. of Maricopa*, 191 P.3d 1025, 1028 (Ariz. Ct. App. 2008).  Absent "a statement of the facts that establish the basis for liability," a claim against a public entity is barred by § 12-821.01.

Here, Doe's notice provided "notices of claims for breach of contract, breach of the covenant of good faith and fair dealing, due process violations under the United States Constitution and Arizona Constitution, Title IX violations (20 U.S.C. §§ 1681-1688), defamation, and false light."  (Doc. 40-2 at 3.)  Conspicuously absent from this list is the tort of IIED.  Although Arizona courts have not directly ruled on whether a notice of claim must identify each theory of liability, *Mutschler v. City of Phoenix*, 129 P.3d 71, 74 n.4 (Ariz. Ct. App. 2006), there is some indication that a failure to include a theory in a notice bars its invocation at a subsequent trial.  *Brunso v. City of Prescott*, 2012 WL 6716457, *4 (Ariz. Ct. App. 2012) (affirming the dismissal of claims not included in notice).

Moreover, regardless of whether Doe's notice needed to specifically identify IIED as a theory of liability, the notice failed to allege "facts sufficient to permit the public entity . . . to understand the basis on which liability is claimed." A.R.S. § 12-821.01(A). To be liable for IIED under Arizona law, the challenged conduct must be extreme or outrageous, the defendant must intend to inflict emotional distress (or act with reckless disregard to the possibility), and severe emotional distress must occur as a result. The last element, severe emotional distress, requires "a showing of severity." *Pankratz v. Willis*, 744 P.2d 1182, 1190 (Ariz. Ct. App. 1987). "Severe emotional distress" requires some sort of manifestation of the distress, not mere discomfort. *Midas Muffler Shop v. Ellison*, 650 P.2d 496, 501 (Ariz. Ct. App. 1982) (gathering cases that linked emotional distress to physical manifestations such as heart attacks, hospitalizations, and "extreme shock and hysteria"). It appears the Arizona Supreme Court has never found severe emotional distress in the absence of physical harm. *Pierre-Canel v. American Airlines*, 375 F. Supp. 3d 1044, 1056 (D. Ariz. 2019). Although the Arizona Court of Appeals has suggested that a plaintiff need not suffer a "disabling response," there must be some specified harm resulting from the alleged emotional distress. *Pankratz*, 744 P.2d at 1191 (holding that anger and depression due to disappearance of child, coupled with headaches and hemorrhoids, constituted severe emotional distress).

In his notice, Doe did not claim he suffered severe emotional distress as a result of ASU's disciplinary process. To be sure, the challenged conduct in this case would be stressful. But the notice did not allege that Doe suffered from distress so severe there was some physical manifestation of it. Without such an allegation, the notice did not "permit the public entity to evaluate liability" on the IIED claim. *Backus v. State*, 203 P.3d 499, 502 (Ariz. 2009). Accordingly, Count V is dismissed.

### D.   **Count VI**

In Count VI, Doe asserts a claim for false light invasion of privacy. Doe alleges that "false impressions created about [Doe] . . . would be highly offensive to any reasonable person" and the Defendants recklessly made those statements "to the UHB staff and Board

members, University staff, and Roe, and upon information and belief, were thereby disseminated to Roe's friends and unknown other persons."  (Doc. 37 ¶¶ 323, 325.)  As they did with Count V, Defendants argue the notice of claim was untimely as to the false light claim.  Additionally, Defendants contend the FAC fails to allege a public disclosure of the statements about Doe, a key element of a false light claim.

### 1.   Timeliness

Defendants first argue that Doe did not provide a timely notice of claim as to his false light claim.  Relying on § 12-821.01(A)'s requirement that a notice of claim be submitted no later than 180 days after a claim accrues, Defendants point out that Rund rendered his first decision on June 27, 2017.  (Doc. 40 at 14-15.)  One hundred and eighty days after that date is December 24, 2017.  (*Id.*)  Doe did not provide a notice of claim until February 23, 2018, beyond the 180-day deadline.  (*Id.*)  Accordingly, Defendants argue, Doe's false light claim is time-barred.  (*Id.*)

A claim for false light invasion of privacy accrues on the date an allegedly outrageous falsehood is published.  *Bryant v. City of Goodyear*, 2013 WL 1897129, *8 (D. Ariz. 2013). *See also Watkins v. Arpaio*, 367 P.3d 72, 77 (Ariz. Ct. App. 2016).  "Each communication of a defamatory statement, even though identical in content, constitutes a separate publication, giving rise to a separate cause of action."  *State v. Superior Court In & For Maricopa Cty.*, 921 P.2d 697, 702 (Ariz. Ct. App. 1996).  Thus, each publication would start the clock on the 180-day window to submit a notice of claim—one cannot wait until the end of a series of torts to submit a notice of claim containing every instance of publication if some of those instances occurred outside the 180-day time bar.  *Watkins*, 367 P.3d at 75-77 (explaining the "continuous harm" doctrine and rejecting its application to false light claims).

Doe contends that ASU officials at virtually every stage of the disciplinary process published defamatory statements, yet he argues that he "would not have knowledge of facts underlying all elements . . . of his false light claim[] until after ASU officially concluded that he committed sexual violence."  (Doc. 47 at 18.)  But Section 12-821.01 does not

1   require that a plaintiff know *all* facts about a claim—a plaintiff need only "possess a

2   minimum requisite of knowledge sufficient to identify that a wrong occurred and caused

3   injury." *Thompson v. Pima Cty.*, 243 P.3d 1024, 1028 (Ariz. Ct. App. 2010). *See also*

4   *Viniegra v. Town of Parker Mun. Prop. Corp.*, 383 P.3d 665, 670 (Ariz. Ct. App. 2016).

5   Whether any of the Defendants published a defamatory statement is something that Doe

6   would know almost immediately because he was a recipient of the publications. (Doc. 37

7   ¶ 182.) Thus, there was no need to wait for Rund's final decision. Doe "knew or

8   reasonably should have known" at each publication that defamatory statements were being

9   made. *Watkins*, 367 P.3d at 76.

10      Doe's argument that his claim did not accrue until Rund's final decision is similar

11  to the plaintiff's argument in *Watkins*. There, the plaintiff argued that each day of an

12  unlawful investigation into his activities constituted a "continuing wrong" and that the

13  statute of limitations only began to run when the investigation ended. *Id.* at 75. The

14  Arizona Court of Appeals deemed that argument inconsistent with § 12-821.01. *Id.* at 76.

15  Instead, the plaintiff was bound by § 12-821.01's time bar, and any actionable claim had

16  to be pursued within the relevant statute of limitations. *Id.*

17      The same is true here. Doe maintained his innocence throughout the disciplinary

18  proceedings and thus should have perceived each publication of a decision-maker's

19  findings to be defamatory. The proceedings may have resulted in multiple instances of

20  false publications, but each publication was an independent cause of action—Doe could

21  not raise all of them in the same notice of claim to avoid the statute of limitations. *Cf.*

22  *Haab*, 191 P.3d at 1028-1030 (plaintiff was required to submit amended notices of claim

23  to include claims arising after the initial notice of claims was served).

24      As noted, Doe's notice is dated February 23, 2018. (Doc. 40-2.) One hundred and

25  eighty days before that date is August 27, 2017. The only event raised in the notice (as

26  well as the FAC) that falls within the 180-day window is the distribution of Rund's final

27  decision on August 30, 2017. Because the allegedly defamatory statements of the other

28  Defendants were published before August 27, 2017, they fall outside § 12-821.01's time

bar, and thus the notice as to those Defendants is untimely.  Accordingly, Count VI is dismissed as to all Defendants except Rund.

### 2.   Merits

Defendants also argue that Doe's false light claim is inadequately pleaded.  In their view, Doe has failed to identify a "public dissemination," an essential element of a false light claim.  (Doc. 40 at 16-17; Doc. 53 at 10.)  Doe counters that "when Defendants publicized the 'force' finding to Roe[,] it was substantially certain to become a matter of public knowledge because there was nothing in place to prevent Roe from publicizing or freely talking to others about Doe's penalty."  (Doc. 47 at 16.)

Under Arizona law, a false light invasion of privacy claim has two elements: (1) a "defendant, with knowledge of falsity or reckless disregard for the truth, gave publicity to information placing the plaintiff in a false light; and (2) the false light in which the plaintiff was placed would be highly offensive to a reasonable person in the plaintiff's position." *Desert Palm Surgical Grp., P.L.C. v. Petta*, 343 P.3d 438, 449-50 (Ariz. Ct. App. 2015). Here, the parties focus on the "publicity" requirement of the first element.

In the false light context, "publicity" differs from the mere "publishing" of a defamatory statement.  *Hart v. Seven Resorts, Inc.*, 947 P.3d 846, 854 (Ariz. Ct. App. 1997).  Publicity requires that "the matter is made public, by communicating it to the public at large, or to so many persons that a matter must be regarded substantially certain to become one of public knowledge."  *Id.* (quoting Restatement (Second) of Torts § 652D cmt. a. (1977)) (emphasis omitted).  Publicity requires more than communication to a single person or a small group of persons.  *Id.*  Rather, some sort of "wide-spread dissemination" is required.  *Advanced Cardiac Specialists, Chartered v. Tri-City Cardiology Consultants, P.C.*, 214 P.3d 1024, 1029 n.7 (Ariz. Ct. App. 2009).

As an initial matter, Doe has not alleged that Rund was responsible for any publication.  The FAC alleges that the UHB findings were released to Roe, Doe, Doe's counsel, and a variety of ASU officials and their assistants.  (Doc. 37 ¶ 182.)  The next few pages, detailing Rund's decision, do not mention that his decision was disseminated to the

same list of people, let alone to the public at large.  (*Id.* at 49-52).  Count VI of the FAC also does not specify the publication at issue.  (*Id.* at 78-79.)  The only mention of Rund's final decision being publicized is in a footnote in Doe's response to the motion to dismiss, which contends that Rund's final decision was "disseminated to Roe and several ASU employees."  (Doc. 47 at 16 n.4.)  The FAC itself, in other words, fails to allege any release of information by Rund.  That alone may warrant dismissal.

Even if the Court gives Doe the benefit of doubt and assumes that the *dissemination* of Rund's decision was alleged in the FAC, Doe has still failed to allege the *publicity* required to state a false light claim.  As noted, publicity requires that the defamatory statement be disclosed to the public at large, or to so many people that it is almost certain to become public.  Although Arizona courts have not provided much guidance concerning this requirement, the case law from other jurisdictions that apply the same rule makes clear that publication to a handful of people, as here, is not enough.  For example, false statements about a pastor's sexual orientation made to his congregation and to his church did not constitute publicity.  *Bilbrey v. Myers*, 91 So.3d 887, 889, 892 (Fla. Ct. App. 2012).  Nor did a "handful of letters" mailed to a "handful of employees" at a government agency.  *Armstrong v. Thompson*, 80 A.3d 177, 188-89 (D.C. Ct. App. 2013).  Even statements made to a plaintiff's neighbors, as well as two reports filed with the police, did not constitute publicity.  *Curry v. Whitaker*, 943 N.E.2d 354, 350-60 (Ind. Ct. App. 2011).  Instead, something more is needed, such as making the statements at a public hearing that is televised to the wider community.  *See, e.g., Holmes v. Town of East Lyme*, 866 F. Supp. 2d 108, 131-32 (D. Conn. 2012).

In a college setting, even dissemination of private information to twenty college students is not enough to satisfy the publicity requirement for a false light claim.  In *Leach v. Dist. Bd. of Trustees of Palm Beach*, 244 F. Supp. 3d 1334, 1336 (S.D. Fla. 2017), a former college student sued his former college for, among other things, false light.  The plaintiff alleged that he had a disability that made it difficult to read, yet his professor constantly forced him to read in front of the class, ultimately revealing the disability to "20

or more students." *Id.* at 1336, 39-40.  Beyond that, there were no allegations that the disability was disclosed to the general public.  *Id.* at 1340.  Although "[t]here is no precise number that constitutes a large number of persons," the court determined that a class of 20 was not enough.  *Id.* at 1339-40.  Even if "college students regularly engage in social media," which encourages the spread of information, the complaint was devoid of any allegation that students had or were likely to spread private information about the plaintiff through social media.  *Id.* at 1340.  Thus, the plaintiff had failed to raise an actionable false light claim.  *Id.*

The same is true here. Assuming the same individuals who received the UHB's recommendation also received Rund's final decision, that group includes those who were involved in the disciplinary proceedings, ASU's counsel, ASU's Title IX coordinator, secretaries for some of the officials, Roe, and Doe.  (Doc. 37 ¶ 182.)  This was not a statement made to the public at large, but rather to a small group of officials involved in the university's disciplinary process.   That does not rise to the level of public dissemination. *Cf. S.B. v. Saint James Sch.*, 959 So.2d 72, 91-92 (Ala. 2006) (holding that a dean's disclosure of private information to those involved in the investigatory process did not constitute publicity for purposes of a false light claim.)

The only potential link to public dissemination is Doe's allegation "upon information and belief" that Roe, after receiving Rund's findings, further disseminated those findings to her friends and other unknown persons.  That does not save Doe's claim. As noted, absent allegations that a false statement has actually spread to the public at large, the publicity element of false light has not been met. *Leach*, 244 F. Supp. 3d at 1340.  More fundamentally, there is no argument that Roe should have been deprived of the results of her complaint against Doe.  "What she chose to do with that information is irrelevant to whether [Doe] stated a claim" against Rund.  *Shepherd v. Costco Wholesale Corp.*, 441 P.3d 989, 995-96 (Ariz. Ct. App. 2019).

At bottom, Doe has not alleged that Rund released the results of Doe's disciplinary proceedings to the public at large.  Thus, Count VI is dismissed as to Rund.

V.    Count VII

Count VII of the FAC does not allege an independent cause of action.  (Doc. 37 at 79.)  Rather, it sets out the relief Doe seeks.  (*Id.*)  It functions not as an independent claim, then, but as an ancillary component of Doe's other claims (such as his Title IX claim).  There is, therefore, no need to analyze Count VII independent of Doe's other claims.

VI.   Leave To Amend

In the final sentence of his response to the motion to dismiss, Doe "requests leave to re-plead any count this Court deems insufficient."  (Doc. 47 at 19.)  Defendants do not address this request in their reply.

"Rule 15 advises the court that leave [to amend] shall be freely given when justice so requires."  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (quotation omitted).  "This policy is to be applied with extreme liberality."  *Id.* (quotation omitted).  Thus, leave to amend should be granted unless the proposed amendment "(1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile."  *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).

Here, the Court has determined that Counts I, III, V, and VI should be dismissed.  As for Count I (the § 1983 claim), it would be futile to grant leave to amend because no new factual allegations could save this claim—it is marred by a legal infirmity.  As for Count III (breach of contract), Doe has apparently abandoned this claim, so leave is not appropriate.  As for Count V (IIED), as well as Count VI (false light) as it pertains to all Defendants except Rund, amendment would be futile because the dismissal arises from Doe's failure to comply with Arizona's notice-of-claim statute, not from his failure to allege sufficient facts.

Finally, with respect to Count VI as it pertains to Rund, the Court stated in its tentative order that it was inclined to grant leave to amend because it might be possible for Doe to allege additional publicity-related facts.  (Doc. 61 at 33-34.)  However, during oral argument, Doe's counsel stated that, based on the current record, Doe would be unable to

offer such an amendment and thus agreed that Count VI could be dismissed in its entirety without leave to amend.

Accordingly, **IT IS ORDERED** that:

(1)     Defendants' motion to dismiss (Doc. 40) is **granted in part and denied in part**; and

(2)     Counts I, III, V, and VI are dismissed without leave to amend.

Dated this 26th day of December, 2019.

_____

Dominic W. Lanza
United States District Judge