1
2
3
4
5
6                    **IN THE UNITED STATES DISTRICT COURT**
7                       **FOR THE DISTRICT OF ARIZONA**
8
9   Unknown Party,                            No. CV-18-01623-PHX-DWL
10                  Plaintiff,                 **ORDER**
11  v.
12  Arizona Board of Regents, et al.,
13                  Defendants.
14

15          In advance of the hearing on May 11, 2021, the Court wishes to provide the parties

16  with its tentative ruling on the Individual Defendants' motion for summary judgment (Doc.

17  94) and on Doe's motions to seal and for Rule 56(d) relief (Docs. 113, 115).  This is, to be

18  clear, only a tentative ruling.  The point of providing it beforehand is to allow the parties

19  to focus their argument on the issues that seem salient to the Court and to maximize their

20  ability to address any perceived errors in the Court's logic.  This is not an invitation to

21  submit additional evidence or briefing.

22          Dated this 30th day of April, 2021.

23

24

25                                                      Dominic W. Lanza
                                                   United States District Judge
26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>TENTATIVE RULING</u>

**INTRODUCTION**

In 2017, Plaintiff John Doe ("Doe") was expelled from Arizona State University ("ASU") for violating certain provisions of the ASU Code of Conduct, including provisions related to sexual misconduct.  Doe then filed two lawsuits in an effort to challenge and otherwise seek redress for the expulsion decision.

In this action, Doe has asserted federal and state-law claims for monetary damages against the Arizona Board of Regents ("ABOR") and various ASU employees and students (together, "the Individual Defendants") who participated in the investigative and disciplinary processes that led to his expulsion.  (Doc. 37.)  In a December 2019 order, the Court dismissed some of those claims.  (Doc. 66.)  Afterward, only two claims remained: (1) Doe's claim against ABOR for violating Title IX, and (2) Doe's state-law claim against the Individual Defendants for gross negligence.  (*Id.*)

The other lawsuit was a state-court administrative law action in which Doe sought reversal of ASU's expulsion decision.  In December 2019, the Arizona Court of Appeals ruled in Doe's favor in significant part, holding that ASU's "findings concerning force and incapacitation [were] not supported by substantial evidence" and thus "vacat[ing] the superior court's judgment upholding [Doe's] expulsion from ASU and remand[ing] to ASU to redetermine the appropriate sanction for [Doe's] sole remaining Code violation" related to alcohol.  *Doe v. Ariz. Bd. of Regents*, 2019 WL 7174525, *9 (Ariz. Ct. App. 2019).

Fact discovery in this action has now closed and three motions are now pending before the Court: (1) the Individual Defendants' motion for summary judgment (Doc. 94); (2) Doe's motion to seal certain exhibits filed as attachments to his opposition to the Individual Defendants' summary judgment motion (Doc. 113); and (3) Doe's Rule 56(d) motion for permission to pursue additional discovery needed to fully respond to the Individual Defendants' summary judgment motion (Doc. 115).  For the following reasons, the first and second motions are granted and the third is denied.  This means that the only remaining claim in this action is Doe's Title IX claim against ABOR, as to which summary judgment motions have not yet been filed.

## RELEVANT BACKGROUND

On May 29, 2018, Doe initiated this action.  (Doc. 1.)

On February 15, 2019, Doe filed his operative pleading, the first amended complaint ("FAC").  (Doc. 37.)

On December 27, 2019, the Court issued an order granting in part, and denying in part, ABOR's and the Individual Defendants' motion to dismiss the FAC.  (Doc. 66.) Following the issuance of that order, two claims remain: (1) Doe's Title IX claim against ABOR and (2) Doe's gross negligence claim against the Individual Defendants.  (*Id.*)

That same day, the Court issued the Rule 16 scheduling order.  (Doc. 67.)  It set a fact discovery deadline of June 12, 2020 and a dispositive motions deadline of September 11, 2020.  (*Id.*)  These deadlines were subsequently extended at the request of the parties due to complications arising from the COVID-19 pandemic.  (Docs. 74, 75, 82, 83, 90, 91, 122, 123.)  The fact discovery deadline was ultimately extended to March 15, 2021.  (Doc. 91.)

On December 11, 2020—that is, about three months before the close of fact discovery—the Individual Defendants filed a motion for summary judgment as to the gross negligence claim.  (Doc. 94.)

On March 15, 2021, after obtaining an extension, Doe filed his response to the Individual Defendants' summary judgment motion.  (Doc. 112.)  Doe argues that each of the Individual Defendants' summary judgment arguments fails on the merits but also contends, in the alternative, that he should be allowed, under Rule 56(d), to pursue additional discovery before responding to one of those arguments.  (*Id.*)  In support of his response, Doe filed various exhibits.  (Doc. 112-1.)  Doe also lodged, under seal, certain exhibits.  (Doc. 114.)  In an accompanying motion, Doe argues he should be allowed to file the lodged exhibits under seal.  (Doc. 113.)

On March 16, 2021, Doe filed a formal Rule 56(d) motion and supporting declaration from counsel.  (Docs. 115, 115-1.)

On March 30, 2021, the Individual Defendants filed an opposition to the Rule 56(d)

1    motion.  (Doc. 118.)

2          On April 6, 2021, Doe filed a reply in support of his Rule 56(d) motion.  (Doc. 124.)

3          On April 9, 2021, the Individual Defendants filed a reply in support of their

4    summary judgment motion.  (Doc. 125.)

5          On April 30, 2021, the Court issued a tentative ruling addressing the Individual

6    Defendants' summary judgment motion, Doe's motion to seal, and Doe's Rule 56(d)

7    motion.  (Doc. 130.)

8          On May 11, 2021, the Court heard oral argument.

9                            **DISCUSSION**

10   I.     <u>Doe Motion To Seal (Doc. 113)</u>

11          As noted, Doe has moved to seal the unredacted versions of some of the exhibits he

12   filed in support of his response to the Individual Defendants' summary judgment motion.

13   (Doc. 113.)  Doe argues these materials are subject to sealing because they contain

14   confidential information, names and other information protected by the Family Educational

15   Records and Privacy Records Act of 1974, and/or his true name.  (*Id.*)

16          The public has a general right to inspect judicial records and documents, such that

17   a party seeking to seal a judicial record must overcome "a strong presumption in favor of

18   access."  *Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006)

19   (internal quotation marks omitted).  To do so, the party generally must "articulate

20   compelling reasons supported by specific factual findings that outweigh the general history

21   of access and the public policies favoring disclosure."  *Id.* at 1178-79 (cleaned up).  The

22   Court must then "conscientiously balance the competing interests of the public and the

23   party who seeks to keep certain judicial records secret."  *Id.* at 1179 (cleaned up).  "After

24   considering these interests, if the court decides to seal certain judicial records, it must base

25   its decision on a compelling reason and articulate the factual basis for its ruling, without

26   relying on hypothesis or conjecture."  *Id.* (internal quotation marks omitted).  The

27   "stringent" compelling reasons standard applies to all filed motions and their attachments

28   where the motion is "more than tangentially related to the merits of a case."  *Ctr. for Auto*

1   *Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096, 1101 (9th Cir. 2016).

2   Here, the Court is satisfied that compelling reasons support Doe's sealing request.

3   The Court previously granted Doe's motion to proceed pseudonymously (Doc. 58) and the

4   rationale underlying that order remains equally valid today.

5   II.   The Individual Defendants' Motion For Summary Judgment (Doc. 94)

6   A.   **Legal Standard**

7   "The court shall grant summary judgment if [a] movant shows that there is no

8   genuine dispute as to any material fact and the movant is entitled to judgment as a matter

9   of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it might affect the outcome of

10   the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue

11   in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d

12   1119, 1125 (9th Cir. 2014). The court "must view the evidence in the light most favorable

13   to the nonmoving party and draw all reasonable inference in the nonmoving party's favor."

14   *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is

15   improper where divergent ultimate inferences may reasonably be drawn from the

16   undisputed facts." *Fresno Motors*, 771 F.3d at 1125.

17   A party moving for summary judgment "bears the initial responsibility of informing

18   the district court of the basis for its motion, and identifying those portions of 'the pleadings,

19   depositions, answers to interrogatories, and admissions on file, together with the affidavits,

20   if any,' which it believes demonstrate the absence of a genuine issue of material fact."

21   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of

22   production, the moving party must either produce evidence negating an essential element

23   of the nonmoving party's claim or defense or show that the nonmoving party does not have

24   enough evidence of an essential element to carry its ultimate burden of persuasion at trial."

25   *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . .

26   [the] moving party carries its burden of production, the nonmoving party must produce

27   evidence to support its claim or defense." *Id.* at 1103.

28   "If the nonmoving party fails to produce enough evidence to create a genuine issue

of material fact, the moving party wins the motion for summary judgment." *Id.* There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50. At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

### B.   The Parties' Arguments

The Individual Defendants seeks summary judgment on Doe's gross negligence claim for an array of reasons. (Doc. 94.) Those reasons can be grouped into three general categories: *first*, the Individual Defendants dispute whether Doe properly and timely served a notice of claim on each of them, as required by Arizona law; *second*, the Individual Defendants argue that, as a matter of Arizona law, none of them owed a duty of care to Doe, so Doe cannot prevail on a negligence-based tort claim against them; and *third*, some of the Individual Defendants contend that, even assuming the notices of claim were properly served and a claim for gross negligence is otherwise cognizable, they are entitled to quasi-judicial immunity. (*Id.*) The Court will focus on the second argument—the cognizability of Doe's gross negligence claim—because, as discussed in Part II.C below, that argument is dispositive.

The Individual Defendants argue that Doe's gross negligence claim "fails because the Individual Defendants did not owe a duty to [Doe] arising in tort." (Doc. 94 at 12.) According to the Individual Defendants, Doe's claim against them is fundamentally a claim for breach of contract—that is, for failing to comply with the policies and procedures set forth in ASU's "Policy and Code." (*Id.*) The Individual Defendants contend this approach

is misplaced because, under Arizona law, a plaintiff "cannot create a tort claim or seek tort damages based on the breach of a duty imposed only by contract." (*Id.*)  The Individual Defendants further note that several courts outside Arizona have, in recent decisions, rejected the notion that university administrators owe a tort-based duty of care to students who are the subject of disciplinary proceedings. (*Id.* at 13-14.)  Finally, the Individual Defendants argue that, to the extent Doe's gross negligence claim is based on the premise that he has a property right to a public education, this premise is both inaccurate and irrelevant. (*Id.* at 14.)

In response, Doe characterizes the Individual Defendants' discussion of contract law as a red herring, arguing that their "tort duties arise from Arizona law, not the contract." (Doc. 112 at 12.)  As an initial matter, Doe argues that the Individual Defendants cannot invoke contract-law principles because they have denied, in their answer, that a contractual relationship even existed between Doe and ASU. (*Id.*)  More fundamentally, Doe argues that, as a matter of Arizona law, "a college or university owes its students a duty of reasonable care for on-campus activities." (*Id.*, citation and internal quotation marks omitted.)  Doe cites three cases as recognizing the existence of this duty: *Jesik v. Maricopa Cty. Cmty. Coll. Dist.*, 611 P.2d 547 (Ariz. 1980), *Delbridge v. Maricopa Cty. Cmty. Coll. Dist.*, 893 P.2d 55 (Ariz. Ct. App. 1994), and *Boisson v. Arizona Bd. of Regents*, 343 P.3d 931 (Ariz. Ct. App. 2015). (*Id.*)  Additionally or alternatively, Doe argues that "public policy considerations" support the imposition of a duty in this scenario, because "[w]here state actors elect to investigate and prosecute claims based on sexual assault and violence, expel students, and inflict harm . . . without evidence and outside their discretion, public policy requires those agents to use reasonable care to avoid or prevent injury." (*Id.* at 13.)  Doe also argues that "even if there were not a duty imposed by law or public policy," two of the Individual Defendants (Davis and Hunter) may be held liable in tort because they voluntarily assumed certain duties during the course of the investigation. (*Id.* at 14.)  Finally, Doe argues that the out-of-jurisdiction cases cited by the Individual Defendants are "irrelevant" because "they do not reflect Arizona law and are factually inapposite." (*Id.*

at 14-15.)

In reply, the Individual Defendants reiterate their view that "Doe's gross negligence claim is impermissibly based on alleged contract duties, not tort." (Doc. 125 at 8.) They argue that the factual allegations in the FAC underlying the gross negligence claim center on "the contractual relationship" between Doe and ASU, so Doe's summary judgment arguments to the contrary constitute an "effort to deny his own allegations." (*Id.* at 8-9.) Next, the Individual Defendants argue that Doe's reliance on the *Jesik-Delbridge-Boisson* line of cases is misplaced because (1) they "arose in the personal injury context" and (2) they do not "support a duty owed to students by individual university employees rather than the university itself." (*Id.* at 9.) As for Doe's reliance on public policy considerations, the Individual Defendants argue that such considerations may give rise to a duty only under limited circumstances not present here. (*Id.* at 9-10.) Next, the Individual Defendants argue that Davis and Hunter did not voluntarily assume a duty of care because they were acting in the course and scope of their employment, not as volunteers. (*Id.* at 10.) Finally, the Individual Defendants argue that Doe has not properly distinguished the out-of-jurisdiction cases cited in their motion, which establish that no duty of care exists in this context. (*Id.*)

C.   **Analysis**

Under Arizona law, one of the essential elements of a claim for gross negligence is that the defendant owed a duty of care to the plaintiff. *See, e.g., Noriega v. Town of Miami*, 407 P.3d 92, 98 (Ariz. Ct. App. 2017) ("A negligence claim requires proof of four elements: (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages. A gross-negligence claim additionally requires a showing of gross, willful, or wanton conduct.") (citations, brackets, and internal quotation marks omitted). The existence or non-existence of this duty is "a threshold issue" that presents a pure "matter of law for the court to decide." *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007). "Thus, a conclusion that no duty exists is equivalent to a rule that, for

certain categories of cases, defendants may not be held accountable for damages they carelessly cause, no matter how unreasonable their conduct." *Id.* at 230-31. As explained below, these principles compel the entry of summary judgment in the Individual Defendants' favor on Doe's gross negligence claim—Doe has not met his burden of establishing that the Individual Defendants owed a duty of care to him related to their participation in the investigative and disciplinary processes that led to his expulsion, so Doe cannot sue them for negligently conducting those processes.

The analysis here is complicated, as an initial matter, by the fact that the parties disagree about the nature of Doe's theory of liability. According to the Individual Defendants, Doe's gross negligence claim is simply a breach-of-contract claim masquerading as a tort claim. The Court disagrees. Although the Individual Defendants are correct that, under Arizona law, a plaintiff cannot repackage the breach of a contractual term as a tort claim,[1] and although it is understandable how the Individual Defendants could have construed the FAC as alleging that the gross negligence claim was wholly premised on the existence of contractual breaches,[2] Doe has now clarified that he is not proffering

---

[1]    *See, e.g., Aspell v. Am. Contract Bridge League of Memphis, Tenn.*, 595 P.2d 191, 194 (Ariz. Ct. App. 1979) ("A breach of contract is not a tort unless the law imposes a duty on the relationship created by the contract which exists apart from the contract."); *Macy's Inc. v. H&M Const. Co. Inc.*, 2019 WL 11718898, *5 (D. Ariz. 2019), *aff'd*, 2021 WL 406625 (9th Cir. 2021) ("Where a claim is premised on the breach of an express provision in a contract, the claim may be brought as a breach of contract action. A tort claim is an entirely different animal, governed by different considerations and standards. . . . Tort liability does not arise whenever the defendant's conduct simply fell below the quality standards specified in the contract.") (citations, internal quotation marks, and brackets omitted).

[2]    The very first paragraph of the FAC alleges that when ASU "promises to investigate and adjudicate disciplinary matters, it must do so in accordance with its own policies and procedures, and in a way that is fair to students and comports with federal and state law." (Doc. 37 ¶ 1.)   The FAC then provides extensive factual allegations concerning these policies and procedures, which are set forth in written documents entitled "ASU's Student Disciplinary Procedures" and the "Student Code of Conduct." (*Id.* ¶¶ 39-74.)   According to the FAC, the Procedures and the Code together "establish[] the University's standards for acceptable conduct and describe the procedures why which the University would investigate and adjudicate alleged violations of its standards." (*Id.* ¶ 39.)   The FAC further alleges that "[t]he Procedures, Code, and other statements by the University about the matters contained herein *are binding terms in the contractual relationship between the University and Doe*." (*Id.* ¶ 42, emphasis added.)   The FAC is replete with allegations that the Individual Defendants failed to follow these contractual requirements when conducting the investigative and disciplinary processes that led to Doe's expulsion. For example, it repeatedly alleges that ASU "failed to properly apply its own Student Code of Conduct in

1    these alleged contractual breaches as the sole foundation for his gross negligence claim—

2    instead, he is proceeding under the theory that a duty of care also arose by operation of

3    other aspects of Arizona law.

4         Despite this clarification, Doe's claim fails because he has not established that

5    Arizona law actually supports the recognition of a duty of care under these circumstances.

6    Doe's first argument is that the *Jesik-Delbridge-Boisson* line of cases establishes that

7    Arizona university officials can be sued, in tort, for negligent on-campus conduct.

8    Although this argument has surface appeal, a careful review of *Jesik*, *Delbridge*, and

9    *Boisson* demonstrates that Doe's reliance on those cases is misplaced.

10        In *Jesik*, a student at Phoenix College, which is part of the Maricopa County

11   Community College District ("MCCCD"), got into an on-campus verbal altercation with

12   another student.  611 P.2d at 548.  The altercation ended with the other student threatening

13   to go home, get a gun, and return to campus to kill Jesik.  *Id.*  Jesik reported this threat to

14   one of the school's security guards, who made "assurances of help and protection" but then

15   failed to take any precautionary measures.  *Id.*  When the other student returned an hour

16   later with a briefcase, Jesik again asked the security guard for help and the security guard

17   again made false assurances of help and protection.  *Id.*  The other student later pulled a

18   gun out of the briefcase and fatally shot Jesik.  *Id.*  Afterward, Jesik's father brought a

19   negligence action against MCCCD (via its governing board) and an array of individual

20   MCCCD officials.  *Id.* at 549.  As for the individual officials, the Arizona Supreme Court

21   held that the negligence claim failed as a matter of law because they didn't owe a duty of

22   _____

23   finding that Roe was 'incapacitated' at the time of the sex." (*Id.* ¶ 6.)  It further alleges
     that "RUND's disciplinary decisions reflect a failure to apply a burden of proof, which
24   requires a reasoned consideration of the evidence to reach a conclusion, and actually
     revealed the absence of a preponderance of evidence supporting the finding of a violation
25   by Plaintiff." (*Id.* ¶ 270.)  And it repeatedly alleges that "[t]he University failed to apply
     the Code's requirement that physical acts or violence be used to gain access to sex to render
26   sexual activity nonconsensual due to 'force.'" (*Id.* ¶ 289.)  These allegations provide much
     of the foundation for the gross negligence claim, which is premised on the contention that
27   the Individual Defendants "owed [Doe] a duty to treat him fairly and in accordance with
     their responsibilities under the Code and Procedures" (*id.* ¶ 299) and violated this duty by
28   "misapply[ing] their own disciplinary standards," "abdicat[ing] the promulgated
     'incapacity' standard for [an] unannounced 'intoxication' standard," and "appl[ying] a
     'force' rule for which there is no promulgated standard or definition" (*id.* ¶ 305).

care to Jesik.  *Id.* at 549-50.  As for MCCCD, the court held that the claim could proceed in part because "the legislature has by statute[3] imposed upon school boards a specific duty of protection for students against torts" that extends to liability for third-party criminal acts if the school "realized or should have realized the likelihood that such a situation might be created."  *Id.* at 550 (citation and internal quotation marks omitted).  The court concluded that, because the security guard had specific and repeated notice of the potential harm, "the statutory duty of adequate supervision coupled with notice imposed a specific duty to exercise reasonable care to protect the decedent."  *Id.* at 551.

The differences between *Jesik* and this case are obvious.  There, the Arizona Supreme Court rejected an attempt to hold individual MCCCD officials liable in tort, holding that the only the MCCCD (via its governing board) owed a duty of care to the deceased student.  But here, Doe has not sued ABOR under a gross negligence theory— the only defendants named in Count Four are the Individual Defendants.  *Jesik*, if anything, undermines the notion that they owed individual duties of care to Doe.  Moreover, *Jesik*'s duty-of-care analysis concerning the MCCCD governing board turned on the existence of an Arizona statute that required governing boards to protect students against torts committed by third parties.  But here, Doe's theory isn't that the Individual Defendants failed to protect him from harm committed by others—it's that they affirmatively harmed him by botching his investigative and disciplinary process.  Although *Jesik* doesn't affirmatively foreclose the possibility that a duty of care could arise in that scenario, it doesn't support the recognition of a duty of care in that scenario, either—the question simply wasn't before the court.  *Jesik* thus provides an exceptionally shaky foundation for Doe's theory that, as a matter of Arizona law, university personnel who are involved in school-related investigative and disciplinary processes owe an individual duty of care to

---

[3]      The statute is A.R.S. § 15-341(A)(16).  It provides that "[t]he governing board shall . . . [p]rovide for adequate supervision over pupils in instructional and noninstructional activities by certificated or noncertificated personnel."  By its terms, this statute applies only to school district governing boards, but at the time *Jesik* was decided, it was also "applicable to the Maricopa County Community Governing Board by virtue of" other statutes that have since been repealed.  *Jesik*, 611 P.2d at 550 n.6.

students who are the subjects of those processes.

*Delbridge* does nothing to shore up this foundation.  There, a student at Rio Salado Community College (which is also part of the MCCCD) suffered catastrophic injuries after falling during a required in-class climbing exercise.  893 P.2d at 56-57.  Afterward, the student brought a negligence action against MCCCD.  *Id.* at 57.  The trial court rejected this claim on the ground that MCCCD didn't owe him a duty of care but the Arizona Court of Appeals reversed, holding that the "teacher-student relationship is a special one, affording the student protection from unreasonable risks of harm," and that this relationship gives rise to a "school district's duty to provide a safe *in-class* environment for its students."  *Id.* at 58-59 (emphasis in original).  In reaching this conclusion, the court emphasized that "courts in a number of other jurisdictions have imposed liability on colleges and universities for injuries suffered while attending classes."  *Id.* at 59.  *Delbridge* is thus distinguishable for many of the same reasons as *Jesik*—it did not recognize that individual university officials owe a duty of care to students and its narrow holding (*i.e.,* colleges have a duty to prevent students from being injured during in-class activities) addresses a far different issue than the issue presented here.

Doe's reliance on *Boisson* is misplaced for the same reasons.  There, a student at the University of Arizona died from altitude sickness after attempting to climb Mount Everest as part of the school's study-abroad program in China.  343 P.3d at 933.  Afterward, the decreased student's mother asserted a negligence claim against ABOR.  The trial court dismissed the claim and the Arizona Court of Appeals affirmed, holding that ABOR owed no affirmative duty of care to the student while he was participating in the study-abroad program.  Although the court recognized that, in general, "a college or university does owe its students a duty of reasonable care for on-campus activities," the court also noted that "the Tibet trip was not an on-campus activity" and thus looked to the Restatement (Third) of Torts: Physical and Emotional Harm § 40 (2012) to address whether the on-campus duty of care should be extended "to off-campus activities."  *Id.* at 935.  The court found no support in the Restatement (Third), or in Arizona law, for such an extension and

emphasized that "[t]his lack of authority is significant given that [the plaintiff] has the burden to show the existence of the duty." *Id.* The court also rejected the plaintiff's argument that public policy considerations supported the recognition of a duty of care. *Id.* at 938. As with the previous cases, *Boisson* says nothing about whether individual university officials owe duties of care to students and only addresses the dissimilar subject of whether universities have a duty to protect students from sustaining physical injury during on-campus activities.

The upshot of this discussion is that Doe has not identified any Arizona case holding, or even fairly suggesting, that the Individual Defendants owed him a duty of care related to their participation in the investigative and disciplinary processes that led to his expulsion. At most, he has identified Arizona cases that announce broad principles related to tort liability in the university setting that theoretically could be extended by a future Arizona court to apply to the circumstances presented here. But this Court's role, as a federal court exercising supplemental jurisdiction over a state-law claim, is not to be the first to extend Arizona law in this fashion. Instead, "[i]n determining the law of the state for purposes of diversity, a federal court is bound by the decisions of the highest state court. If the state's highest court has not decided an issue, it is the responsibility of the federal courts sitting in diversity to predict how the state high court would resolve it." *Albano v. Shea Homes Ltd. P'ship*, 634 F.3d 524, 530 (9th Cir. 2011) (citation and internal quotation marks omitted). "The decisions of the state's intermediate appellate courts are data that a federal court must consider in undertaking this analysis." *Air-Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 186 (9th Cir. 1989). Here, because Doe has not identified any Arizona appellate case recognizing (or even suggesting) that a duty of care arises in the context of university investigative and disciplinary processes, he has not met his burden with respect to his gross negligence claim. *See, e.g., Quiroz v. ALCOA Inc.*, 416 P.3d 824, 827 (Ariz. 2018) ("[D]uty is not presumed; in every negligence case, the plaintiff bears the burden of proving the existence of a duty."); *Boisson*, 343 P.3d at 935 (deeming it "significant" that the plaintiff had not identified any "Arizona case addressing whether a

1    college or university owes its students a duty of reasonable care" under analogous

2    circumstances "given that [the plaintiff] has the burden to show the existence of the duty").

3        This conclusion is bolstered by the line of recent decisions by courts in others

4    jurisdictions rejecting the exact sort of claim that Doe seeks to assert here—a negligence

5    claim by a college student who, after being expelled (or otherwise disciplined) for sexual

6    misconduct, sought to sue the university officials who participated in the underlying

7    investigatory and discipline processes.  For example, in *Doe v. Trustees of Boston College*,

8    892 F.3d 67 (1st Cir. 2018), the First Circuit affirmed the district court's dismissal of

9    students' negligence claims because "[w]e . . . do not find that [Boston College] or the

10   individual defendants owed the Does any independent duty of care in this context."  *Id.* at

11   93-94.  The court explained that, because the school's "Student Guide and the Conduct

12   Board Procedure . . . prescribe the disciplinary process . . . [a]ny remedy for a breach of

13   this contractual obligation must sound in contract, not in tort."  *Id.*  Similarly, in *Doe v.*

14   *University of Dayton*, 766 F. App'x 275 (6th Cir. 2019), the Sixth Circuit affirmed the

15   dismissal of the student's negligence claim because the "duties owed are found in the terms

16   of the Handbook and in Title IX itself" and thus could be actionable only "as potential

17   breaches of contract."  *Id.* at 289.  The court added that "[c]laimed violations of Title IX

18   have likewise been analyzed in their proper place, under recognized Title IX rubrics—not

19   as freestanding tort claims."  *Id.*  And again, in *Doe v. Syracuse University*, 440 F. Supp.

20   3d 158 (N.D.N.Y. 2020), the court rejected the plaintiff's negligence claim because he

21   "failed to establish that Syracuse owed [him] a duty of care in connection with its

22   investigation."  *Id.* at 181.  The court explained that, even crediting the plaintiff's

23   allegations that university officials "dragg[ed] out the proceedings against him without

24   cause, [provided] insufficient notice of the charges against him, fail[ed] to apply the

25   preponderance standard, and fail[ed] to provide fair and unbiased proceedings," those

26   "theories also underpin[ned] Plaintiff's breach of contract claim," which "cannot be

27   transformed into a tort claim simply by alleging a duty of care."  *Id.*[4]

28   _____
     [4]    *See also Doe v. Belmont Univ.*, 367 F. Supp. 3d 732, 764 (M.D. Tenn. 2019)
     ("Because Doe has not identified a source of duty outside the contractual relationship

Doe contends these cases are "irrelevant" because "they do not reflect Arizona law and are factually inapposite." (Doc. 112 at 14.) Although Doe is correct to a point—the other decisions are obviously not binding here because they did not construe Arizona law, which has own rules governing when to recognize a duty of care and when a tort claim may co-exist with a contract claim—he goes too far in dismissing them as categorically irrelevant. As the Ninth Circuit has stated, "decisions from other jurisdictions" provide "guidance" to a federal court sitting in diversity. *In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990). Additionally, in *Delbridge*, the Arizona Court of Appeals expressly looked to decisions from "courts in a number of other jurisdictions" for guidance in assessing the contours of the duty to care under Arizona law. 893 P.2d at 59. Here, the out-of-jurisdiction cases are helpful because they show that adopting Doe's position would render Arizona an outlier relative to its sister states. This provides further reason to be skeptical that the Arizona Supreme Court would adopt that position. *Cf. Quiroz*, 416 P.3d at 835 ("Our determination that Reynolds owed no duty to Quiroz for secondary exposure to asbestos is consistent with decisions in other jurisdictions.").

To the extent it is followed in Arizona, the Restatement (Third) of Torts: Physical and Emotional Harm § 40 (2012) provides further reason to be skeptical of Doe's position.[5]

---

established by the Bruin Guide and Sexual Misconduct Policy, his negligence and gross negligence claims are an impermissible attempt to recast his (dismissed) contractual claims in the language of tort."); *Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 196 (D.R.I. 2016) (same); *Faiaz v. Colgate Univ.*, 64 F. Supp. 3d 336, 362 (N.D.N.Y. 2014) ("Plaintiff's negligence claim is not sustainable because he has failed to allege facts showing that the University owed plaintiff a duty under the facts alleged."). The only potentially contrary case cited by the parties is *Doe v. Univ. of St. Thomas*, 368 F. Supp. 3d 1309 (D. Minn. 2019), but the district court in that case ultimately rejected the plaintiff's negligence claim on other grounds and the Eighth Circuit, in the process of affirming the rejection of the negligence claim, stated that the district court had "formulat[ed] a reasonable care standard that no Minnesota court has adopted." *Doe v. Univ. of St. Thomas*, 972 F.3d 1014, 1018 (8th Cir. 2020).

[5]     In *Boisson*, the Arizona Court of Appeals looked to § 40. *Boisson*, 343 P.3d at 935. However, in *Quiroz*, which was decided three years after *Boisson*, the Arizona Supreme Court "reject[ed] the duty framework contained in the Restatement (Third) of Torts: Liability for Physical and Emotional Harm." 416 P.3d at 827. Although the quoted statement suggests that the Arizona Supreme Court has rejected the Restatement (Third) in its entirety, other portions of *Quiroz* can be read as suggesting that the court was only expressing disagreement with certain portions of the Restatement (Third)—and, thus, was not necessarily rejecting § 40.

*Kirkland*, 915 F.2d at 1239 (noting that "restatements" provide a permissible form of "guidance" to federal courts sitting in diversity).  Section 40 is entitled "Duty Based on Special Relationship with Another."  Subdivision (a) provides that "[a]n actor in a special relationship with another owes the other a duty of reasonable care with regard to risks that arise within the scope of the relationship" and subsection (b) then specifies a list of "[s]pecial relationships giving rise to the duty provided in Subsection (a)."  One of the enumerated special relationships, set forth at subdivision (b)(5), is "a school with its students."  Notably, although comment (l) recognizes that "courts generally impose an affirmative duty on schools" with respect to minor children, it then clarifies that "[c]ourts are split on whether a college owes an affirmative duty to its students.  Some of the cases recognizing such a duty are less than ringing endorsements, often relying on other aspects of the relationship between the college and its student to justify imposing a duty."  Finally, Comment (l) provides a lengthy list of cases in which courts "impos[ed] a duty of reasonable care to protect students on the college's property."  Tellingly, all of those cases involved situations (like *Jesik*, *Delbridge*, and *Boisson*) where a college student suffered physical injury.  None, in contrast, authorized tort liability against a university (let alone an individual university official) based on the negligent handling of a school disciplinary process.  This is yet another sign that the Arizona Supreme Court would not adopt Doe's theory of liability.

Doe's second argument (apart from his theory that Arizona courts have already recognized a duty of care in this context) is that public policy considerations support the imposition of a duty of care.  (Doc. 112 at 13-14.)  These arguments fail because Doe does not identify any statute or other concrete manifestation of public policy that relates to the university setting (or to university disciplinary processes).  Instead, the public policy principle he seeks to invoke is the generic principle that those with power should not inflict harm on others.  The Arizona Supreme Court has specifically rejected the notion that a duty of care may arise based on such amorphous public policy considerations.  *Quiroz*, 416 P.3d at 830-31 ("The Family urges us to recognize a duty in this case by considering

various public policy grounds.  The Family does not, however, cite any state or federal statute giving rise to a duty in this case.  In Arizona, our primary source for identifying a duty based on public policy is our state statutes.  We have also recognized that local ordinances may give rise to a public policy duty. . . .  [E]ven in those cases where we have mentioned 'social concerns' in relation to tort duties, we have ultimately premised the existence of a duty on a statute or a recognized special relationship.") (citations and footnotes omitted).

Doe's final argument is that two of the Individual Defendants, Davis and Hunter, "voluntarily assumed" a duty of care.  Specifically, Doe contends that Davis voluntarily assumed a duty of care by promising to act neutrally and gather all available documentation during the investigation and that Hunter voluntarily assumed a duty of care by supervising Davis and being present at the meeting where Davis made the aforementioned promises. (Doc. 112 at 14.)

Under Arizona law,  "[w]hen a person voluntarily undertakes an act, even when there is no legal duty to do so, that person must perform the assumed duty with due care and is liable for any lack of due care in performing it." *Lloyd v. State Farm Mut. Auto. Ins. Co.*, 860 P.2d 1300, 1303 (Ariz. Ct. App. 1992).  "This doctrine is neither new nor unusual" and is based on § 323 of the Restatement (Second) of Torts. *Id.*[6]  It is sometimes called the "Good Samaritan" doctrine. *Steinberger v. McVey ex rel. County of Maricopa*, 318 P.3d 419, 431 (Ariz. Ct. App. 2014).[7]

---

[6]    Section 323 provides: "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking."

[7]    It should be noted that, "[i]n many states, courts apply the Good Samaritan Doctrine only to physical harms to person or property, not to pure economic harm." *Renteria v. United States*, 452 F. Supp. 2d 910, 920 (D. Ariz. 2006).  *See also Love v. United States*, 915 F.2d 1242, 1248 (9th Cir. 1989) (noting that "'[g]ood samaritan' cases have typically arisen where the negligently performed service is related to safety" and dismissing claim under Montana law because it was "for economic harm arising out of an alleged abuse of a contractual relationship" and "[p]hysical safety was not implicated").  However, Arizona does not apply that limitation. *See, e.g., Renteria*, 452 F. Supp. 2d at 913 ("[U]nder Arizona law, the Good Samaritan Doctrine is applicable to economic harm as well as physical

Assessing the applicability of the Good Samaritan doctrine here is complicated by the fact that neither side has cited any Arizona case applying it, or refusing to apply it, under remotely analogous facts.  The primary case on which Doe relies is *Knauss v. DND Neffson Co.*, 963 P.2d 271 (Ariz. Ct. App. 1997).  There, a shopping mall bookstore (Walden) arranged for a third-party company (RGIS) to perform an inventory after the store closed at 5:00 p.m.  *Id.* at 273.  One of RGIS's employees, Knauss, finished her inventory work just before midnight, by which point the mall's security guards had left for the evening.  *Id.*  Tragically, Knauss was abducted from the mall's parking lot by two men who raped and murdered her.  *Id.*  Afterward, Knauss's father asserted a negligence action against Walden under the theory that, by following a "regular practice" of "notify[ing] mall management whenever employees or others would be working in the store after hours," Walden had "voluntarily assumed and breached a duty to inform mall management that RGIS employees would be working after hours on mall premises, so the mall could make appropriate security arrangements."  *Id.* at 277.  The trial court granted summary judgment in Walden's favor and the Arizona Court of Appeals affirmed.  *Id.*  Notably, the appellate court did not address, in a reasoned manner, whether Walden actually voluntarily assumed a duty of care to Knauss through this course of conduct.  *Id.*  Instead, after summarizing Knauss's theory of liability, it held that the claim necessarily failed because "Plaintiff failed to present triable issues of fact concerning breach of duty or causation related to Walden."  *Id.*

Putting aside the superficial manner in which the *Knauss* court addressed whether the defendant had voluntarily assumed a duty of care, the bigger issue with Doe's reliance on *Knauss* is that it involved a much different set of facts than the facts presented here.  Walden had no independent obligation to notify mall management about the presence of individuals who were working late and simply chose, of its own volition, to embark of a

harm."); *Guerra v. State*, 348 P.3d 423, 425-26 (Ariz. 2015) (acknowledging that, as a textual matter, recovery under § 323 likely should be limited to cases involving physical harm but also noting that "[t]his Court . . . has extended the reach of Restatement § 323 to claims of economic as well as physical harm" despite this textual dissonance).

course of providing such notifications.  This is a quintessential example of conduct that might trigger the Good Samaritan doctrine—a party gratuitously volunteering to perform an act intended to protect a third party.  This case is much different.  Doe alleges that he had a preexisting contractual relationship with ABOR under which ABOR was required to follow certain procedures during its investigative and disciplinary processes.  Davis and Hunter are ABOR representatives who were acting in the scope of their duties when they engaged in the challenged conduct, which related to how they would carry out the procedures specified in the contract.  It is difficult to see how such conduct could be characterized as "voluntarily undertaking" an act—it was the performance of a contractual obligation by the contracting party's agents.

The other case cited by Doe, *Lloyd*, is distinguishable for similar reasons.  There, Lloyd suffered catastrophic injuries after being hit by a race car owned by Lane.  860 P.2d at 1301.  Although Lane owned a passenger car that was insured by State Farm, the race car wasn't insured.  *Id.*  Lloyd sued Lane for damages arising from the collision, and when Lane ignored the summons and complaint, Lloyd filed an application for default.  *Id.*  Upon receipt of the default application, Lane called State Farm.  *Id.*  Even though the race car wasn't insured by State Farm, a State Farm representative told Lane "that State Farm would 'take care of it," which Lane interpreted as an assurance that State Farm "would take care of the case."  *Id.*  In fact, State Farm did not provide a defense to Lane following this conversation, which enabled Lloyd to eventually obtain a $10 million default judgment against Lane.  *Id.* at 1302.  Afterward, State Farm was sued in negligence for failing to provide a defense to Lane during the underlying lawsuit.  *Id.* at 1303.[8]  The trial court dismissed this claim but the Arizona Court of Appeals reversed, holding that even though the "automobile policy did not in fact cover the accident which injured [Lloyd] . . . State Farm nonetheless assumed a duty to defend [Lane] when the unknown claims person in the State Farm office told Mr. Lane over the telephone that State Farm would 'take care of it.'"

---

[8]   The ensuing lawsuit was actually brought by Lloyd, via an assignment of rights from Lane.  *Id.* at 1302.

1    *Id.*  The court elaborated that "[n]o language in § 323 or elsewhere exempts an insurance

2    company from this standard doctrine regarding gratuitous assumption of duty."  *Id.*  Here,

3    in contrast, Davis and Hunter weren't "gratuitously" offering to perform investigative steps

4    on Doe's behalf even though there was no preexisting relationship that would require them

5    to perform such steps.

6          At bottom, Doe's position seems to be that if there is a contract between Party A

7    and Party B, the violation of which would otherwise give rise only to contract remedies

8    and not tort remedies, an employee of Party A nevertheless exposes herself to individual

9    tort liability simply by verifying her intent to perform the responsibilities set forth in the

10   contract—in Doe's view, such a promise constitutes the voluntary assumption of a duty of

11   care.  Although the Individual Defendants haven't cited any case holding that the "Good

12   Samaritan" doctrine can't apply in this circumstance, it would be anomalous if that were

13   the rule.  Moreover, the burden ultimately falls onto Doe to prove the existence of a duty

14   of care and the authorities cited in his brief are insufficient to meet that burden—he has

15   provided no reason to predict that the Arizona Supreme Court would recognize a duty of

16   care pursuant to the "Good Samaritan" doctrine under these circumstances.

17         For these reasons, the Individual Defendants are entitled to summary judgment on

18   Doe's claim for gross negligence.[9]

19   III.   Rule 56(d) Motion

20          A.   **The Parties' Arguments**

21          As noted, the Individual Defendants moved for summary judgment on the gross

22   negligence claim for several reasons.  (Doc. 94.)  One of those grounds was that Doe's

23   attempts to serve a notice of claim on three of the Individual Defendants (Rund, Hunter,

24

---

25   [9]     There is no tension between this outcome and the portion of the December 2019
     order denying the Individual Defendants' motion to dismiss the gross negligence claim.
26   (Doc. 66 at 25-26.)  At the Rule 12(b)(6) stage, the Individual Defendants' "limited
     briefing" didn't dispute the existence of a duty of care.  (*Id.*)  Instead, the Individual
27   Defendants only sought to invoke the economic loss rule ("ELR").  (*Id.*)  This order does
     not conclude that Doe's gross negligence claim is barred by the ELR.  Rather, the claim
28   fails because Doe hasn't met his burden of establishing that Arizona would recognize a
     duty of care under these circumstances.

and Davis) were ineffective because the individuals who accepted service were not authorized agents. (Doc. 94 at 9-11.) In response, Doe has moved, under Rule 56(d), for permission to conduct additional discovery. (Doc. 115.) "Specifically, Doe requests leave to (1) conduct the depositions of Susan Heydorn, Linda Hill, and a 30(b)(6) representative of Defendant ABOR who can discuss the policies and procedures related to service of process at ASU, and (2) to conduct document discovery regarding the appointment of Susan Heydorn or Linda Hill as authorized agents for Defendants Rund, Davis, and Hunter." (*Id.* at 2.) The Individual Defendants oppose this request, arguing that (1) Doe did not diligently pursue the discovery in question and (2) Doe cannot establish that the requested discovery would reveal sufficient facts to defeat summary judgment. (Doc. 118.) In reply, Doe faults the Individual Defendants for not producing the requested material at the outset of the case, pursuant to the Mandatory Initial Discovery Pilot Project ("MIDP"), and argues that he made diligent efforts to obtain it during the discovery process, only to be thwarted by the Individual Defendants. (Doc. 124.)

B.     **Analysis**

Rule 56(d) of the Federal Rules of Civil Procedure provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." A party seeking relief under Rule 56(d) "must make clear what information is sought and how it would preclude summary judgment." *Margolis v. Ryan*, 140 F.3d 850, 853 (9th Cir. 1998). Thus, if the party seeking relief would lose at summary judgment even after obtaining the information at issue, the Rule 56(d) request should be denied. *See, e.g., Midbrook Flowerbulbs Holland B.V. v. Holland Am. Bulb Farms, Inc.*, 874 F.3d 604, 619-20 (9th Cir. 2017) (affirming denial of Rule 56(d) motion because "the additional discovery that Holland America sought in its opposition to Midbrook's summary judgment motion" would "not preclude summary judgment") (internal quotation marks omitted); *Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1169 (9th Cir. 2011) (affirming denial

of Rule 56(d) motion in defamation action, which sought discovery concerning defendant's knowledge of the falsity of the challenged statement, because the district court rejected the claim on statute-of-limitations grounds and the requested evidence "would not affect the statute of limitations analysis").

As discussed in Part II above, the Individual Defendants are entitled to summary judgment on Doe's gross negligence claim for reasons unrelated to the sufficiency of Doe's efforts to serve Rund, Hunter, and Davis with a notice of claim. Accordingly, there is no reason to grant Doe leave, under Rule 56(d), to pursue additional discovery related to the service issue.

Accordingly, **IT IS ORDERED** that:

1. The Individual Defendants' motion for summary judgment (Doc. 94) is **granted**.

2. Doe's motion to seal (Doc. 113) is **granted**. The Clerk of Court shall file, under seal, the exhibits lodged at Doc. 114.

3. Doe's Rule 56(d) motion (Doc. 115) is **denied**.