**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Unknown Party, | No. CV-18-01623-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Arizona Board of Regents, et al., | |
| Defendants. | |

## INTRODUCTION

In 2017, Plaintiff John Doe ("Doe") was expelled from Arizona State University ("ASU") for violating certain provisions of the ASU Code of Conduct, including provisions related to sexual misconduct.  Afterward, Doe filed three lawsuits in an effort to challenge and otherwise seek redress for the expulsion decision.

In this action, Doe has asserted federal and state-law claims for monetary damages against the Arizona Board of Regents ("ABOR") and various ASU employees and students (together, "the Individual Defendants") who participated in the investigative and disciplinary processes that led to his expulsion.  (Doc. 37.)  In a December 2019 order, the Court dismissed some of those claims.  (Doc. 66.)  Only two claims now remain: (1) Doe's claim against ABOR for violating Title IX, and (2) Doe's state-law claim against the Individual Defendants for gross negligence.  (*Id.*)

The second lawsuit was a state-court administrative law action in which Doe sought reversal of ASU's expulsion decision.  In December 2019, the Arizona Court of Appeals

ruled in Doe's favor in significant part, holding that ASU's "findings concerning force and incapacitation [were] not supported by substantial evidence" and thus "vacat[ing] the superior court's judgment upholding [Doe's] expulsion from ASU and remand[ing] to ASU to redetermine the appropriate sanction for [Doe's] sole remaining Code violation" related to alcohol. *Doe v. Ariz. Bd. of Regents*, 2019 WL 7174525, *9 (Ariz. Ct. App. 2019).

In the third lawsuit, filed in January 2020, Doe sued ABOR in Maricopa County Superior Court. *See Doe v. Arizona Board of Regents*, CV2020-001383.[1]  There, Doe has asserted a tort claim against ABOR for gross negligence—the same tort claim he has asserted in this action against the Individual Defendants—as well as a breach-of-contract claim.  In an October 2020 minute entry, the superior court granted ABOR's motion to dismiss the gross negligence claim, denied ABOR's motion to dismiss the contract claim, and then stayed the case pending the resolution of this action.[2]

Returning to this action, fact discovery has now essentially closed[3] and three motions are now pending before the Court: (1) the Individual Defendants' motion for summary judgment (Doc. 94); (2) Doe's motion to seal certain exhibits filed as attachments to his opposition to the Individual Defendants' summary judgment motion (Doc. 113); and (3) Doe's Rule 56(d) motion for permission to pursue additional discovery needed to fully respond to the Individual Defendants' summary judgment motion (Doc. 115).  For the following reasons, the first and second motions are granted and the third is denied.  This means that the only remaining claim in this action is Doe's Title IX claim against ABOR, as to which summary judgment motions have not yet been filed.

---

[1]     The existence and details of this lawsuit are properly subject to judicial notice. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record.").  The details of this lawsuit were also addressed in one of the Individual Defendants' briefs (Doc. 125 at 10 n.16) and during oral argument.

[2]     *See* http://www.courtminutes.maricopa.gov/viewerME.asp?fn=Civil/102020/m9329219.pdf (last accessed May 11, 2021).

[3]     All that remains is ABOR's Rule 30(b)(6) deposition.  (Docs. 133, 137.)

**RELEVANT BACKGROUND**

On May 29, 2018, Doe initiated this action.  (Doc. 1.)

On February 15, 2019, Doe filed his operative pleading, the first amended complaint ("FAC").  (Doc. 37.)

On December 27, 2019, the Court issued an order granting in part, and denying in part, ABOR's and the Individual Defendants' motion to dismiss the FAC.  (Doc. 66.) Following the issuance of that order, two claims remain: (1) Doe's Title IX claim against ABOR; and (2) Doe's gross negligence claim against the Individual Defendants.  (*Id.*)

That same day, the Court issued the Rule 16 scheduling order.  (Doc. 67.)  It set a fact discovery deadline of June 12, 2020 and a dispositive motions deadline of September 11, 2020.  (*Id.*)  These deadlines were later extended at the request of the parties due to complications arising from the COVID-19 pandemic.  (Docs. 74, 75, 82, 83, 90, 91, 122, 123.)  The fact discovery deadline was ultimately extended to March 15, 2021.  (Doc. 91.)

On December 11, 2020—that is, about three months before the close of fact discovery—the Individual Defendants filed a motion for summary judgment as to the gross negligence claim.  (Doc. 94.)

On March 15, 2021, after obtaining an extension, Doe filed his response to the Individual Defendants' summary judgment motion.  (Doc. 112.)  Doe argues that each of the Individual Defendants' summary judgment arguments fails on the merits but also contends, in the alternative, that he should be allowed, under Rule 56(d), to pursue additional discovery before responding to one of those arguments.  (*Id.*)  In support of his response, Doe filed various exhibits.  (Doc. 112-1.)  Doe also lodged, under seal, certain exhibits.  (Doc. 114.)  In an accompanying motion, Doe argues he should be allowed to file the lodged exhibits under seal.  (Doc. 113.)

On March 16, 2021, Doe filed a formal Rule 56(d) motion and supporting declaration from counsel.  (Docs. 115, 115-1).

On March 30, 2021, the Individual Defendants filed an opposition to the Rule 56(d) motion.  (Doc. 118.)

1    On April 6, 2021, Doe filed a reply in support of his Rule 56(d) motion.  (Doc. 124.)

2    On April 9, 2021, the Individual Defendants filed a reply in support of their

3    summary judgment motion.  (Doc. 125.)

4    On April 30, 2021, the Court issued a tentative ruling addressing the Individual

5    Defendants' summary judgment motion, Doe's motion to seal, and Doe's Rule 56(d)

6    motion.  (Doc. 130.)

7    On May 11, 2021, the Court heard oral argument.  (Doc. 138.)

8    **DISCUSSION**

9    I.    Doe Motion To Seal (Doc. 113)

10    As noted, Doe has moved to seal the unredacted versions of some of the exhibits he

11    filed in support of his response to the Individual Defendants' summary judgment motion.

12    (Doc. 113.)   Doe argues these materials are subject to sealing because they contain

13    confidential information, names and other information protected by the Family Educational

14    Records and Privacy Records Act of 1974, and/or his true name.  (*Id.*)

15    The public has a general right to inspect judicial records and documents, such that

16    a party seeking to seal a judicial record must overcome "a strong presumption in favor of

17    access."  *Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006)

18    (internal quotation marks omitted).   To do so, the party generally must "articulate

19    compelling reasons supported by specific factual findings that outweigh the general history

20    of access and the public policies favoring disclosure."  *Id.* at 1178-79 (cleaned up).  The

21    Court must then "conscientiously balance the competing interests of the public and the

22    party who seeks to keep certain judicial records secret."  *Id.* at 1179 (cleaned up).  "After

23    considering these interests, if the court decides to seal certain judicial records, it must base

24    its decision on a compelling reason and articulate the factual basis for its ruling, without

25    relying on hypothesis or conjecture."  *Id.* (internal quotation marks omitted).   The

26    "stringent" compelling reasons standard applies to all filed motions and their attachments

27    where the motion is "more than tangentially related to the merits of a case."  *Ctr. for Auto*

28    *Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096, 1101 (9th Cir. 2016).

1    Here, the Court is satisfied that compelling reasons support Doe's sealing request.

2    The Court previously granted Doe's motion to proceed pseudonymously (Doc. 58) and the

3    rationale underlying that order remains equally valid today.

4    II.    The Individual Defendants' Motion For Summary Judgment (Doc. 94)

5         A.    **Legal Standard**

6         "The court shall grant summary judgment if [a] movant shows that there is no

7    genuine dispute as to any material fact and the movant is entitled to judgment as a matter

8    of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of

9    the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue

10   in the non-movant's favor."  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d

11   1119, 1125 (9th Cir. 2014).  The court "must view the evidence in the light most favorable

12   to the nonmoving party and draw all reasonable inference in the nonmoving party's favor."

13   *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).  "Summary judgment is

14   improper where divergent ultimate inferences may reasonably be drawn from the

15   undisputed facts."  *Fresno Motors*, 771 F.3d at 1125.

16        A party moving for summary judgment "bears the initial responsibility of informing

17   the district court of the basis for its motion, and identifying those portions of 'the pleadings,

18   depositions, answers to interrogatories, and admissions on file, together with the affidavits,

19   if any,' which it believes demonstrate the absence of a genuine issue of material fact."

20   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "In order to carry its burden of

21   production, the moving party must either produce evidence negating an essential element

22   of the nonmoving party's claim or defense or show that the nonmoving party does not have

23   enough evidence of an essential element to carry its ultimate burden of persuasion at trial."

24   *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "If . . .

25   [the] moving party carries its burden of production, the nonmoving party must produce

26   evidence to support its claim or defense."  *Id.* at 1103.

27        "If the nonmoving party fails to produce enough evidence to create a genuine issue

28   of material fact, the moving party wins the motion for summary judgment."  *Id.*  There is

- 5 -

no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50. At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

### B.   **The Parties' Arguments**

The Individual Defendants seeks summary judgment on Doe's gross negligence claim for an array of reasons. (Doc. 94.) Those reasons can be grouped into three general categories: *first*, the Individual Defendants dispute whether Doe properly and timely served a notice of claim on each of them, as required by Arizona law; *second*, the Individual Defendants argue that, as a matter of Arizona law, none of them owed a duty of care to Doe, so Doe cannot prevail on a negligence-based tort claim against them; and *third*, some of the Individual Defendants contend that, even assuming the notices of claim were properly served and a claim for gross negligence is otherwise cognizable, they are entitled to quasi-judicial immunity. (*Id.*) The Court will focus on the second argument—the cognizability of Doe's gross negligence claim—because, as discussed in Part II.C below, that argument is dispositive.

The Individual Defendants argue that Doe's gross negligence claim "fails because the Individual Defendants did not owe a duty to [Doe] arising in tort." (Doc. 94 at 12.) According to the Individual Defendants, Doe's claim against them is fundamentally a claim for breach of contract—that is, for failing to comply with the policies and procedures set forth in ASU's "Policy and Code." (*Id.*) The Individual Defendants contend this approach is misplaced because, under Arizona law, a plaintiff "cannot create a tort claim or seek tort

damages based on the breach of a duty imposed only by contract." (*Id.*) The Individual Defendants further note that several courts outside Arizona have, in recent decisions, rejected the notion that university administrators owe a tort-based duty of care to students who are the subject of disciplinary proceedings. (*Id.* at 13-14.) Finally, the Individual Defendants argue that, to the extent Doe's gross negligence claim is based on the premise that he has a property right to a public education, this premise is both inaccurate and irrelevant. (*Id.* at 14.)

In response, Doe characterizes the Individual Defendants' discussion of contract law as a red herring, arguing that their "tort duties arise from Arizona law, not the contract." (Doc. 112 at 12.) As an initial matter, Doe argues that the Individual Defendants cannot invoke contract-law principles because they have denied, in their answer, that a contractual relationship even existed between Doe and ASU. (*Id.*) More fundamentally, Doe argues that, as a matter of Arizona law, "a college or university owes its students a duty of reasonable care for on-campus activities." (*Id.*, internal quotation marks omitted.) Doe cites three cases as recognizing the existence of this duty: *Jesik v. Maricopa County Community College District*, 611 P.2d 547 (Ariz. 1980), *Delbridge v. Maricopa County Community College District*, 893 P.2d 55 (Ariz. Ct. App. 1994), and *Boisson v. Arizona Board of Regents*, 343 P.3d 931 (Ariz. Ct. App. 2015). (*Id.*) Additionally or alternatively, Doe argues that "public policy considerations" support the imposition of a duty in this scenario, because "[w]here state actors elect to investigate and prosecute claims based on sexual assault and violence, expel students, and inflict harm . . . without evidence and outside their discretion, public policy requires those agents to use reasonable care to avoid or prevent injury." (*Id.* at 13.) Doe also argues that "even if there were not a duty imposed by law or public policy," two of the Individual Defendants (Davis and Hunter) may be held liable in tort because they voluntarily assumed certain duties during the course of the investigation. (*Id.* at 14.) Finally, Doe argues that the out-of-jurisdiction cases cited by the Individual Defendants are "irrelevant" because "they do not reflect Arizona law and are factually inapposite." (*Id.* at 14-15.)

1    In reply, the Individual Defendants reiterate their view that "Doe's gross negligence

2  claim is impermissibly based on alleged contract duties, not tort." (Doc. 125 at 8.)  They

3  argue that the factual allegations in the FAC underlying the gross negligence claim center

4  on "the contractual relationship" between Doe and ASU, so Doe's summary judgment

5  arguments to the contrary constitute an "effort to deny his own allegations." (*Id.* at 8-9.)

6  Next, the Individual Defendants argue that Doe's reliance on the *Jesik-Delbridge-Boisson*

7  line of cases is misplaced because (1) they "arose in the personal injury context" and (2)

8  they do not "support a duty owed to students by individual university employees rather

9  than the university itself." (*Id.* at 9.)  As for Doe's reliance on public policy considerations,

10  the Individual Defendants argue that such considerations may give rise to a duty only under

11  limited circumstances not present here. (*Id.* at 9-10.)  Next, the Individual Defendants

12  argue that Davis and Hunter didn't voluntarily assume a duty of care because they were

13  acting in the course and scope of their employment, not as volunteers. (*Id.* at 10.)  Finally,

14  the Individual Defendants argue Doe has not properly distinguished the out-of-jurisdiction

15  cases cited in their motion, which establish that no duty of care exists in this context. (*Id.*)

16    C.    **Analysis**

17    Under Arizona law, one of the essential elements of a claim for gross negligence is

18  that the defendant owed a duty of care to the plaintiff. *See, e.g.*, *Noriega v. Town of Miami*,

19  407 P.3d 92, 98 (Ariz. Ct. App. 2017) ("A negligence claim requires proof of four elements:

20  (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by

21  the defendant of that standard; (3) a causal connection between the defendant's conduct

22  and the resulting injury; and (4) actual damages.  A gross-negligence claim additionally

23  requires a showing of gross, willful, or wanton conduct.") (cleaned up).  The existence or

24  non-existence of this duty is "a threshold issue" that presents a pure "matter of law for the

25  court to decide." *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007).  "Thus, a conclusion

26  that no duty exists is equivalent to a rule that, for certain categories of cases, defendants

27  may not be held accountable for damages they carelessly cause, no matter how

28  unreasonable their conduct." *Id.* at 230-31.  As explained below, these principles compel

1    the entry of summary judgment in the Individual Defendants' favor on Doe's gross

2    negligence claim—Doe has not met his burden of establishing that the Individual

3    Defendants owed a duty of care to him related to their participation in the investigative and

4    disciplinary processes that led to his expulsion, so Doe cannot sue them for negligently

5    conducting those processes.

6        The analysis here is complicated, as an initial matter, by the fact that the parties

7    disagree about the nature of Doe's theory of liability.   According to the Individual

8    Defendants, Doe's gross negligence claim is a breach-of-contract claim masquerading as a

9    tort claim.  The Court disagrees.  Although the Individual Defendants are correct that, under

10   Arizona law, a plaintiff cannot simply repackage the breach of a contractual term as a tort

11   claim,[4] and although it is understandable how the Individual Defendants could have

12   construed the FAC as alleging that the gross negligence claim was wholly premised on the

13   existence of contractual breaches,[5] Doe has now clarified that he is not proffering these

14

15   [4]      *See, e.g.*, *Aspell v. Am. Contract Bridge League of Memphis, Tenn.*, 595 P.2d 191,
     194 (Ariz. Ct. App. 1979) ("A breach of contract is not a tort unless the law imposes a duty
16   on the relationship created by the contract which exists apart from the contract."); *Macy's
     Inc. v. H&M Constr. Co. Inc.*, 2019 WL 11718898, *5 (D. Ariz. 2019), *aff'd*, 2021 WL
17   406625 (9th Cir. 2021) ("Where a claim is premised on the breach of an express provision
     in a contract, the claim may be brought as a breach of contract action.  A tort claim is an
18   entirely different animal, governed by different considerations and standards . . . .  Tort
     liability does not arise whenever the defendant's conduct simply fell below the quality
     standards specified in the contract . . . .") (cleaned up).

19   [5]      The very first paragraph of the FAC alleges that when ASU "promises to investigate
20   and adjudicate disciplinary matters, it must do so in accordance with its own policies and
     procedures, and in a way that is fair to students and comports with federal and state law."
21   (Doc. 37 ¶ 1.)  The FAC then provides extensive factual allegations concerning these
     policies and procedures, which are set forth in written documents entitled "ASU's Student
22   Disciplinary Procedures" and the "Student Code of Conduct."  (*Id.* ¶¶ 39-74.)  According
     to the FAC, the Procedures and the Code together "establish[] the University's standards
23   for acceptable conduct and describe the procedures by which the University would
     investigate and adjudicate alleged violations of its standards."  (*Id.* ¶ 39.)  The FAC further
24   alleges that "[t]he Procedures, Code, and other statements by the University about the
     matters contained therein *are binding terms in the contractual relationship between the
25   University and Doe.*"  (*Id.* ¶ 42, emphasis added.)  The FAC is replete with allegations that
     the Individual Defendants failed to follow these contractual requirements when conducting
26   the investigative and disciplinary processes that led to Doe's expulsion.  For example, it
     repeatedly alleges that ASU "failed to properly apply its own Student Code of Conduct in
27   finding that Roe was 'incapacitated' at the time of the sex."  (*Id.* ¶ 6.)  It further alleges
     that "RUND's disciplinary decisions reflect a failure to apply a burden of proof, which
28   requires a reasoned consideration of the evidence to reach a conclusion, and actually
     revealed the absence of a preponderance of evidence supporting the finding of a violation
     by Plaintiff."  (*Id.* ¶ 270.)  And it repeatedly alleges that "[t]he University failed to apply

alleged contractual breaches as the sole foundation for his gross negligence claim—instead, he is proceeding under the theory that a duty of care also arose by operation of other aspects of Arizona law.

Despite this clarification, Doe's claim fails because he has not established that Arizona law actually supports the recognition of a duty of care under these circumstances. Under Arizona law, "[d]uties of care may arise from special relationships based on contract, family relations, or conduct undertaken by the defendant," as well as "from the nature of the relationship between the parties." *Gipson*, 150 P.3d at 232. Here, Doe's first argument is that the *Jesik-Delbridge-Boisson* line of cases establishes that Arizona university officials can be sued, in tort, for negligent on-campus conduct. (Doc. 112 at 12.) Although this argument has surface appeal, a careful review of *Jesik*, *Delbridge*, and *Boisson* demonstrates that Doe's reliance on those cases is misplaced.

In *Jesik*, a student at Phoenix College, which is part of the Maricopa County Community College District ("MCCCD"), got into an on-campus verbal altercation with another student. 611 P.2d at 548. The altercation ended with the other student threatening to go home, get a gun, and return to campus to kill Jesik. *Id.* Jesik reported this threat to one of the school's security guards, who made "assurances of help and protection" but then failed to take any precautionary measures. *Id.* When the other student returned an hour later with a briefcase, Jesik again asked the security guard for help and the security guard again made false assurances of help and protection. *Id.* The other student later pulled a gun out of the briefcase and fatally shot Jesik. *Id.* Afterward, Jesik's father brought a negligence action against MCCCD (via its governing board) and an array of individual MCCCD officials, including the security guard. *Id.* at 548-49.

---

the Code's requirement that physical acts or violence be used to gain access to sex to render sexual activity nonconsensual due to 'force.'" (*Id.* ¶ 289.) These allegations provide much of the foundation for the gross negligence claim, which is premised on the contention that the Individual Defendants "owed [Doe] a duty to treat him fairly and in accordance with their responsibilities under the Code and Procedures" (*id.* ¶ 299) and violated this duty by "misappl[ying] their own disciplinary standards," "abdicat[ing] . . . the promulgated 'incapacity' standard for [an] unannounced 'intoxication' standard," and "appl[ying] a 'force' rule for which there is no promulgated standard or definition" (*id.* ¶ 305).

1
2
3
4
5
6
7
8
9
10
11

   The Arizona Supreme Court's opinion in *Jesik* does not address the propriety of the claim against the security guard.  *Id.* at 548 ("the security guard . . . is not a party to this appeal").  As for the remaining individual officials, the court held that the negligence claim failed as a matter of law because they didn't owe a duty of care to Jesik.  *Id.* at 549-50. Finally, as for MCCCD, the court held that the claim could proceed because, as a matter of Arizona common law, "schools have a duty to make the premises reasonably safe for [students'] use.  If a dangerous condition exists, the [student] must show that the employees of the school knew or created the condition at issue." *Id.* at 550.  Applying these principles, the court held that because the security guard had specific and repeated notice of the potential harm, such notice "imposed a specific duty" upon the school "to exercise reasonable care to protect the decedent." *Id.* at 551.[6]

12
13
14
15
16
17
18

   The differences between *Jesik* and this case are significant.  As an initial matter, *Jesik* rejected an attempt to hold individual MCCCD officials liable in tort, holding that only MCCCD (via its governing board) owed a duty of care to the deceased student.  But here, Doe has not sued ABOR under a gross negligence theory—the only defendants named in Count Four are the Individual Defendants.[7]  Thus, to the extent it sheds any light on the issue, *Jesik* tends to undermine the notion that the Individual Defendants owed individual duties of care to Doe.[8]  More important, *Jesik* addressed one specific type of

19
20
21
22

[6]      The tentative order stated that *Jesik*'s duty analysis was based in part on statutory considerations.  During oral argument, Doe's counsel correctly pointed out that, in a "Supplemental Opinion" issued after the main *Jesik* decision was issued, the Supreme Court disavowed this portion of its earlier analysis.  611 P.22d at 551 ("Any reference to a legislative duty existing by reason of the cited statute is stricken.").  This order has been changed accordingly.

23
24

[7]      Doe asserted a gross negligence claim against ABOR in his parallel state-court action, *Doe v. Arizona Board of Regents*, CV2020-001383, but that claim was dismissed in October 2020.

25
26
27
28

[8]      Admittedly, *Jesik* doesn't foreclose the possibility of tort liability against an individual university official in a different case because the security guard in *Jesik*—the MCCCD employee whose conduct was most intertwined with MCCCD's liability—wasn't a party to the appeal.  Additionally, the second-to-last paragraph of *Jesik* states that MCCCD could be held liable under *respondeat superior* principles for the security guard's conduct.  611 P.2d at 551.  Although this paragraph might be viewed as an implicit acknowledgement that the security guard was individually liable, the Court doesn't interpret it in that manner—the *Jesik* court said no such thing and the issue wasn't presented on appeal.

duty owed by schools to their students—the duty to protect them from known "dangerous conditions" that exist on campus.  This is akin to a theory of premises liability.  But here, Doe's theory isn't that the Individual Defendants failed to protect him from a "dangerous condition" on campus—it's that they affirmatively harmed him by botching his investigative and disciplinary processes.  Although *Jesik* doesn't affirmatively foreclose the possibility that a duty of care could arise in that scenario, it doesn't support the recognition of a duty of care in that scenario, either.  The question simply wasn't before the court.  As a result, *Jesik* provides a shaky foundation for Doe's theory that, as a matter of Arizona law, university personnel who are involved in school-related investigative and disciplinary processes owe an individual duty of care to students who are the subjects of those processes.

*Delbridge* does nothing to shore up this foundation.  There, a student at Rio Salado Community College (which is also part of MCCCD) suffered catastrophic injuries after falling during a required in-class climbing exercise.  893 P.2d at 56-57.  Afterward, the student brought a negligence action against MCCCD.  *Id.* at 57.  The trial court rejected this claim on the ground that MCCCD didn't owe him a duty of care but the Arizona Court of Appeals reversed, holding that the "teacher-student relationship is a special one, affording the student protection from unreasonable risks of harm," and that this relationship gives rise to a "school district's duty to provide a safe *in-class* environment for its students."  *Id.* at 58-59.  In reaching this conclusion, the court emphasized that "courts in a number of other jurisdictions have imposed liability on colleges and universities for injuries suffered while attending classes."  *Id.* at 59.

*Delbridge* is distinguishable for many of the same reasons as *Jesik*.  First, it does not hold (or even suggest) that individual university officials owe a duty of care to students, instead choosing to characterize the duty as one owed by the "school district."  Second, its narrow holding (*i.e.*, colleges have a duty to prevent students from being injured during in-class activities) addresses a far different issue than the issue presented here.

Doe's reliance on *Boisson* is misplaced for the same reasons.  There, a student at the

University of Arizona died from altitude sickness after attempting to climb Mount Everest as part of the school's study-abroad program in China. 343 P.3d at 933. Afterward, the decreased student's mother asserted a negligence claim against ABOR. The trial court dismissed the claim and the Arizona Court of Appeals affirmed, holding that ABOR owed no affirmative duty of care to the student while he was participating in the study-abroad program. Although the court recognized that, in general, "[t]he student-school relationship is one that can impose a duty within the context of the relationship," it also emphasized that the "scope of the duty imposed by the student-school relationship is not limitless." *Id.* at 622-23 (internal quotation marks omitted). In a related vein, although the court recognized that "a college or university does owe its students a duty of reasonable care for on-campus activities," it noted that "the Tibet trip was not an on-campus activity" and thus looked to the Restatement (Third) of Torts: Physical and Emotional Harm § 40 (2012) to address whether the on-campus duty of care should be extended "to off-campus activities." *Id.* at 935. The court found no support in the Restatement, or in Arizona law, for such an extension and emphasized that "[t]his lack of authority is significant given that [the plaintiff] has the burden to show the existence of the duty." *Id.* Finally, the court also rejected the plaintiff's argument that public policy considerations supported the recognition of a duty of care. *Id.* at 938.

As with the previous cases, *Boisson* says nothing about whether individual university officials owe duties of care to students. If anything, it suggests that such duties are owed only by the school itself, pursuant to the "student-*school* relationship." Additionally, *Boisson* only addresses the dissimilar subject of whether universities have a duty to protect students from sustaining injury during on-campus activities.

The upshot of this discussion is that Doe has not identified any Arizona case holding, or even fairly suggesting, that the Individual Defendants owed him a duty of care related to their participation in the investigative and disciplinary processes that led to his expulsion. At most, he has identified Arizona cases that announce broad principles related to tort liability in the university setting that theoretically could be extended by a future

Arizona court to apply to the dissimilar circumstances presented here.  In effect, he is asking this Court to break new ground.  This request is problematic for a pair of interrelated reasons.  First, in *Boisson*, the court took pains to emphasize that the "scope of the duty imposed by the student-school relationship is not limitless," noted that "[n]o Arizona case has recognized a duty by a university or a college in any context comparable to this case," and ultimately declined to recognize a duty because the plaintiff couldn't identify a prior case recognizing a duty under analogous facts—an omission the court deemed "significant."  343 P.3d at 623 (internal quotation marks omitted).  That is essentially the state of affairs here.  Second, this Court, as a federal court exercising supplemental jurisdiction over a state-law claim, is particularly ill-suited to the task of extending Arizona law in new and unprecedented ways.  "In determining the law of the state for purposes of diversity, a federal court is bound by the decisions of the highest state court.  If the state's highest court has not decided an issue, it is the responsibility of the federal courts sitting in diversity to predict how the state high court would resolve it."  *Albano v. Shea Homes Ltd. P'ship*, 634 F.3d 524, 530 (9th Cir. 2011) (citation and internal quotation marks omitted).  "The decisions of the state's intermediate appellate courts are data that a federal court must consider in undertaking this analysis."  *Air-Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 186 (9th Cir. 1989).  Here, because Doe has not identified any Arizona appellate case recognizing (or suggesting) that individual university officials owe a duty of care in the context of university investigative and disciplinary processes, he has not met his burden with respect to his gross negligence claim.  *See, e.g.*, *Quiroz v. ALCOA Inc.*, 416 P.3d 824, 827 (Ariz. 2018) ("[D]uty is not presumed; in every negligence case, the plaintiff bears the burden of proving the existence of a duty."); *Boisson*, 343 P.3d at 935 ("No Arizona case has recognized a duty by a university or a college in any context comparable to this case.").

This conclusion is bolstered by the line of recent decisions by courts in others jurisdictions rejecting the exact sort of claim that Doe seeks to assert here—a negligence claim by a college student who, after being expelled (or otherwise disciplined) for sexual misconduct, sought to sue the university officials who participated in the underlying

investigatory and discipline processes.  For example, in *Doe v. Trustees of Boston College*, 892 F.3d 67 (1st Cir. 2018), the First Circuit affirmed the district court's dismissal of students' negligence claims because "[w]e . . . do not find that [Boston College] or the individual defendants owed the Does any independent duty of care in this context." *Id.* at 93-94.  The court explained that, because the school's "Student Guide and the Conduct Board Procedure . . . prescribe the disciplinary process," "[a]ny remedy for a breach of this contractual obligation must sound in contract, not in tort." *Id.*  Similarly, in *Doe v. University of Dayton*, 766 F. App'x 275 (6th Cir. 2019), the Sixth Circuit affirmed the dismissal of the student's negligence claim because the "duties owed are found in the terms of the Handbook and in Title IX itself" and thus could be actionable only "as potential breaches of contract." *Id.* at 289.  The court added that "[c]laimed violations of Title IX have likewise been analyzed in their proper place, under recognized Title IX rubrics—not as freestanding tort claims." *Id.*  In *Doe v. Amherst College*, 238 F. Supp. 3d 195 (D. Mass. 2017), the court rejected the student's negligence claim against "the Individual Defendants" because "[w]hile expectations of colleges and their administrators may be evolving, the court does not find that currently existing social values or customs are consistent with imposing a legal duty on college administrators, which would be owed directly to students, relating to the implementation of student disciplinary proceedings. This is especially true because the specific rules regarding student disciplinary proceedings are created by contractual relationships between students and colleges." *Id.* at 227-28.  And again, in *Doe v. Syracuse University*, 440 F. Supp. 3d 158 (N.D.N.Y. 2020), the court rejected the student's negligence claim because he "failed to establish that Syracuse owed [him] a duty of care in connection with its investigation." *Id.* at 181.  The court explained that, even crediting the student's allegations that university officials "dragg[ed] out the proceedings against him without cause, [provided] insufficient notice of the charges against him, fail[ed] to apply the preponderance standard, and fail[ed] to provide fair and unbiased proceedings," those "theories also underpin[ned] Plaintiff's breach of contract claim,"

1    which "cannot be transformed into a tort claim simply by alleging a duty of care." *Id.*[9]

2          Doe contends these cases are "irrelevant" because "they do not reflect Arizona law."

3    (Doc. 112 at 14.)   Although Doe is correct to a point—the other decisions are obviously

4    not binding here because they did not construe Arizona law, which has own rules governing

5    when to recognize a duty of care and when a tort claim may co-exist with a contract claim—

6    he goes too far in dismissing them as categorically irrelevant.   As the Ninth Circuit has

7    stated, "decisions from other jurisdictions" provide "guidance" to a federal court sitting in

8    diversity in the absence of a "decision of the highest state court."   *In re Kirkland*, 915 F.2d

9    1236, 1238-39 (9th Cir. 1990).   Additionally, in *Delbridge*, the Arizona Court of Appeals

10   expressly looked to decisions from "courts in a number of other jurisdictions" for guidance

11   in assessing the contours of the duty to care under Arizona law.   893 P.2d at 59.   Here, the

12   out-of-jurisdiction cases are helpful because they show that adopting Doe's position would

13   render Arizona an outlier relative to its sister states.   This provides further reason to be

14   skeptical that the Arizona Supreme Court would adopt that position.   *Cf. Quiroz*, 416 P.3d

15   at 835 ("Our determination that Reynolds owed no duty to Quiroz for secondary exposure

16   to asbestos is consistent with decisions in other jurisdictions.").

17   _____

[9]       *See also Doe v. Belmont Univ.*, 367 F. Supp. 3d 732, 764 (M.D. Tenn. 2019)
18   ("Because Doe has not identified a source of duty outside the contractual relationship
     established by the Bruin Guide and Sexual Misconduct Policy, his negligence and gross
19   negligence claims are an impermissible attempt to recast his (dismissed) contractual claims
     in the language of tort."); *Doe v. Columbia College Chi.*, 299 F. Supp. 3d 939, 963 (N.D.
20   Ill. 2017) ("[I]in cases similar to this one, courts have also specifically rejected negligence
     claims by students claiming they were wrongly disciplined for sexual assault and that the
21   university did not properly apply its policies."); *Austin v. Univ. of Or.*, 205 F. Supp. 3d
     1214, 1228-29 (D. Or. 2016), *aff'd*, 925 F.3d 1133 (9th Cir. 2019) (dismissing negligence
22   claim because "courts finding special relationships [in the college context] have done so
     when the incident giving rise to the negligence claim occurred during a supervised school
23   practice or other event and arose out of an injury related thereto," whereas "the relationship
     between student athletes accused of sexual assault and a University rendering academic
24   code of conduct decisions can be characterized as little more than an arm's-length
     relationship intent on securing divergent rather than joint interests"); *Faiaz v. Colgate
25   Univ.*, 64 F. Supp. 3d 336, 362 (N.D.N.Y. 2014) ("Plaintiff's negligence claim is not
     sustainable because he has failed to allege facts showing that the University owed plaintiff
26   a duty under the facts alleged.").   The only potentially contrary case cited by the parties is
     *Doe v. University of St. Thomas*, 368 F. Supp. 3d 1309 (D. Minn. 2019), but the district
27   court in that case ultimately rejected the plaintiff's negligence claim on other grounds and
     the Eighth Circuit, in the process of affirming the rejection of the negligence claim, stated
28   that the district court had "formulat[ed] a reasonable care standard that no Minnesota court
     has adopted."   *Doe v. Univ. of St. Thomas*, 972 F.3d 1014, 1018 (8th Cir. 2020).

1      Doe also contends these cases are distinguishable because they are "factually

2  inapposite." (Doc. 112 at 14.)  During oral argument, Doe elaborated that the schools in

3  the other cases acknowledged that the student had an available remedy sounding in contract

4  law, because the student could assert a breach-of-contract claim premised on the school's

5  failure to follow the procedures set forth in its disciplinary manuals and handbooks,

6  whereas ABOR and the Individual Defendants in this case have denied that an enforceable

7  contract even exists.  This argument fails because it rests on a false premise.  During oral

8  argument, the Individual Defendants' counsel expressly acknowledged that ABOR's Code

9  and Procedures give rise to enforceable contractual duties and noted that ABOR has

10  acknowledged the same in Doe's parallel state-court action, in which he has asserted a

11  breach-of-contract claim against ABOR based on its failure to comply with the Code and

12  Procedures.

13      To the extent it is followed in Arizona, the Restatement (Third) of Torts: Physical

14  and Emotional Harm § 40 (2012) provides further reason to be skeptical of Doe's

15  position.[10]  *Kirkland*, 915 F.2d at 1239 (noting that "restatements" provide a permissible

16  form of "guidance" to federal courts sitting in diversity).  Section 40 is entitled "Duty Based

17  on Special Relationship with Another."  Subdivision (a) provides that "[a]n actor in a

18  special relationship with another owes the other a duty of reasonable care with regard to

19  risks that arise within the scope of the relationship" and subsection (b) then specifies a list

20  of "[s]pecial relationships giving rise to the duty provided in Subsection (a)."  One of the

21  enumerated special relationships, set forth at subdivision (b)(5), is "a school with its

22  students."  Notably, although the Reporters' Note to comment (l) recognizes that "courts

23  generally impose an affirmative duty on schools" with respect to minor children, it then

24

25  [10]      In *Boisson*, the Arizona Court of Appeals looked to § 40.  *Boisson*, 343 P.3d at 935.
    However, in *Quiroz*, which was decided three years after *Boisson*, the Arizona Supreme
26  Court "reject[ed] the duty framework contained in the Restatement (Third) of Torts:
    Liability for Physical and Emotional Harm."  416 P.3d at 827.  Although the quoted
27  statement suggests that the Arizona Supreme Court has rejected the Restatement (Third) in
    its entirety, other portions of *Quiroz* can be read as suggesting that the court was only
28  expressing disagreement with certain portions of the Restatement (Third)—and, thus, was
    not necessarily rejecting § 40.

clarifies that "[c]ourts are split on whether a college owes an affirmative duty to its students.  Some of the cases recognizing such a duty are less than ringing endorsements, often relying on other aspects of the relationship between the college and its student to justify imposing a duty."  Finally, the Reporters' Note to comment (l) provides a lengthy list of cases in which courts "impos[ed] a duty of reasonable care to protect students on the college's property, including on the basis that the college has a duty in its role as land occupier to student-entrants on the land."  But as discussed above, this case is far different from *Jesik* and other premises liability-type cases.  Tellingly, none of the cases identified in the Reporters' Note authorized tort liability against a university (let alone an individual university official) based on the negligent handling of a school disciplinary process.  This is yet another sign that the Arizona Supreme Court would not adopt Doe's theory of liability.

Doe's second argument (apart from his theory that Arizona courts have already recognized a duty of care in this context) is that public policy considerations support the imposition of a duty of care.  (Doc. 112 at 13-14.)  This argument fails because Doe does not identify any statute or other concrete manifestation of public policy that relates to the university setting (or to university disciplinary processes).  Instead, the public policy principle he seeks to invoke is the generic principle that those with power should not inflict harm on others.  The Arizona Supreme Court has specifically rejected the notion that a duty of care may arise based on such amorphous public policy considerations.  *Quiroz*, 416 P.3d at 830-31 ("The Family urges us to recognize a duty in this case by considering various public policy grounds.  The Family does not, however, cite any state or federal statute giving rise to a duty in this case.  In Arizona, our primary source for identifying a duty based on public policy is our state statutes.  We have also recognized that local ordinances may give rise to a public policy duty. . . .  [E]ven in those cases where we have mentioned 'social concerns' in relation to tort duties, we have ultimately premised the existence of a duty on a statute or a recognized special relationship.") (citations and footnote omitted).

1          Doe's final argument is that two of the Individual Defendants, Davis and Hunter,

2   "voluntarily assumed" a duty of care.  Specifically, Doe contends that Davis voluntarily

3   assumed a duty of care by promising to act neutrally and gather all available documentation

4   during the investigation and that Hunter voluntarily assumed a duty of care by supervising

5   Davis and being present at the meeting where Davis made the aforementioned promises.

6   (Doc. 112 at 14.)

7          Under Arizona law, "[w]hen a person voluntarily undertakes an act, even when there

8   is no legal duty to do so, that person must perform the assumed duty with due care and is

9   liable for any lack of due care in performing it."  *Lloyd v. State Farm Mut. Auto. Ins. Co.*,

10  860 P.2d 1300, 1303 (Ariz. Ct. App. 1992).  "This doctrine is neither new nor unusual"

11  and is based on § 323 of the Restatement (Second) of Torts.  *Id.*[11]  It is sometimes called

12  the "Good Samaritan" doctrine.  *Steinberger v. McVey ex rel. County of Maricopa*, 318

13  P.3d 419, 431 (Ariz. Ct. App. 2014).[12]

14         Assessing the applicability of the Good Samaritan doctrine here is complicated by

15  the fact that Doe has not cited any Arizona case applying it under remotely analogous facts.

16  The primary case on which Doe relies is *Knauss v. DND Neffson Co.*, 963 P.2d 271 (Ariz.

17  Ct. App. 1997).  There, a shopping mall bookstore (Walden) arranged for a third-party

18  company (RGIS) to perform an inventory after the store closed at 5:00 p.m.  *Id.* at 273.

---

19  [11]      Section 323 provides: "One who undertakes, gratuitously or for consideration, to
20  render services to another which he should recognize as necessary for the protection of the
    other's person or things, is subject to liability to the other for physical harm resulting from
21  his failure to exercise reasonable care to perform his undertaking, if (a) his failure to
    exercise such care increases the risk of such harm, or (b) the harm is suffered because of
22  the other's reliance upon the undertaking."

23  [12]      It should be noted that, "[i]n many states, courts apply the Good Samaritan Doctrine
    only to physical harms to person or property, not to pure economic harm."  *Renteria v.
24  United States*, 452 F. Supp. 2d 910, 920 (D. Ariz. 2006).  *See also Love v. United States*,
    915 F.2d 1242, 1248 (9th Cir. 1989) (noting that "'[g]ood samaritan' cases have typically
25  arisen where the negligently performed service is related to safety" and dismissing claim
    under Montana law because it was "for economic harm arising out of an alleged abuse of
26  a contractual relationship" and "[p]hysical safety was not implicated").  However, Arizona
    does not apply that limitation. *See, e.g.*, *Renteria*, 452 F. Supp. 2d at 913 ("[U]nder Arizona
27  law, the Good Samaritan Doctrine is applicable to economic harm as well as physical
    harm."); *Guerra v. State*, 348 P.3d 423, 425-26 (Ariz. 2015) (acknowledging that, as a
28  textual matter, recovery under § 323 likely should be limited to cases involving physical
    harm but also noting that "[t]his Court . . . has extended the reach of Restatement § 323 to
    claims of economic as well as physical harm" despite this textual dissonance).

One of RGIS's employees, Knauss, finished her inventory work just before midnight, by which point the mall's security guards had left for the evening. *Id.* Tragically, Knauss was abducted from the mall's parking lot by two men who raped and murdered her. *Id.* Afterward, Knauss's father asserted a negligence action against Walden under the theory that, by following a "regular practice" of "notify[ing] mall management whenever employees or others would be working in the store after hours," Walden had "voluntarily assumed and breached a duty to inform mall management that RGIS employees would be working after hours on mall premises, so the mall could make appropriate security arrangements." *Id.* at 277. The trial court granted summary judgment in Walden's favor and the Arizona Court of Appeals affirmed. *Id.* Notably, the appellate court did not address, in a reasoned manner, whether Walden actually voluntarily assumed a duty of care to Knauss through this course of conduct. *Id.* Instead, after summarizing Knauss's theory of liability, it held that the claim necessarily failed because "Plaintiff failed to present triable issues of fact concerning breach of duty or causation related to Walden." *Id.*

Putting aside the superficial manner in which the *Knauss* court addressed whether the defendant had voluntarily assumed a duty of care, the bigger issue with Doe's reliance on *Knauss* is that it involved a much different set of facts than the facts presented here. Walden had no independent obligation to notify mall management about the presence of individuals who were working late and simply chose, of its own volition, to embark on a course of providing such notifications. This is a quintessential example of conduct that might trigger the Good Samaritan doctrine—a party gratuitously volunteering to perform an act intended to protect a third party. This case is much different. Doe alleges that he had a preexisting contractual relationship with ABOR under which ABOR was required to follow certain procedures during the investigative and disciplinary processes. Davis and Hunter are ABOR representatives who were acting in the scope of their duties when they engaged in the challenged conduct, which related to how they would carry out the procedures specified in the contract. It is difficult to see how such conduct could be characterized as "voluntarily undertaking" an act—it was the performance of a contractual

1   obligation by the contracting party's agents.

2       The other case cited by Doe, *Lloyd*, is distinguishable for similar reasons.  There,

3   Lloyd suffered catastrophic injuries after being hit by a race car owned by Lane.  860 P.2d

4   at 1301.  Although Lane owned a passenger car that was insured by State Farm, the race

5   car wasn't insured.  *Id.*  Lloyd sued Lane for damages arising from the collision, and when

6   Lane ignored the summons and complaint, Lloyd filed an application for default.  *Id.*  Upon

7   receipt of the default application, Lane called State Farm.  *Id.*  Even though the race car

8   wasn't insured by State Farm, a State Farm representative told Lane "that State Farm would

9   'take care of it,'" which Lane interpreted as an assurance that State Farm "would take care

10  of the case."  *Id.*  In fact, State Farm did not provide a defense to Lane following this

11  conversation, which enabled Lloyd to eventually obtain a $10 million default judgment

12  against Lane.  *Id.* at 1302.  Afterward, State Farm was sued in negligence for failing to

13  provide a defense to Lane during the underlying lawsuit.  *Id.* at 1303.[13]  The trial court

14  dismissed this claim but the Arizona Court of Appeals reversed, holding that even though

15  the "automobile policy did not in fact cover the accident which injured [Lloyd] . . . State

16  Farm nonetheless assumed a duty to defend [Lane] when the unknown claims person in the

17  State Farm office told Mr. Lane over the telephone that State Farm would 'take care of it.'"

18  *Id.*  The court elaborated that "[n]o language in § 323 or elsewhere exempts an insurance

19  company from this standard doctrine regarding gratuitous assumption of duty."  *Id.*  Here,

20  in contrast, Davis and Hunter weren't "gratuitously" or voluntarily offering to perform

21  investigative steps on Doe's behalf even though there was no preexisting relationship that

22  would require them to perform such steps.

23      At bottom, Doe's position seems to be that if there is a contract between Party A

24  and Party B, the violation of which would otherwise give rise only to contract remedies

25  and not tort remedies, an employee of Party A nevertheless exposes herself to individual

26  tort liability simply by verifying her intent to perform the responsibilities set forth in the

27

28  ───────────────
    [13]    The ensuing lawsuit was actually brought by Lloyd, via an assignment of rights from
    Lane.  *Id.* at 1302.

- 21 -

1    contract—in Doe's view, such a promise constitutes the voluntary assumption of a duty of

2    care.  It would be anomalous if that were the rule and courts outside Arizona have refused

3    to apply the Good Samaritan doctrine under analogous circumstances.  *Doe*, 892 F.3d at

4    94-95 (rejecting plaintiffs' argument that Boston College and individual university

5    administrators "voluntarily assumed" certain duties by agreeing to follow Title IX's

6    regulations regarding sexual assault because "there are specific rules governing student

7    disciplinary proceedings under the existing contractual relationship between Doe and

8    [Boston College], and given Massachusetts courts' narrow construction of the scope of a

9    university's voluntary assumption of care, expanding it here would be inappropriate").  At

10   any rate, the burden ultimately falls onto Doe to prove the existence of a duty of care and

11   the authorities cited in his brief are insufficient to meet that burden—he has provided no

12   reason to predict that the Arizona Supreme Court would recognize a duty of care pursuant

13   to the Good Samaritan doctrine under these circumstances.

14        For these reasons, the Individual Defendants are entitled to summary judgment on

15   Doe's claim for gross negligence.[14]

16   III.    Rule 56(d) Motion

17        A.    **The Parties' Arguments**

18        As noted, the Individual Defendants moved for summary judgment on the gross

19   negligence claim for several reasons.  (Doc. 94.)  One of those grounds was that Doe's

20   attempts to serve a notice of claim on three of the Individual Defendants (Rund, Hunter,

21   and Davis) were ineffective because the individuals who accepted service were not

22   authorized agents.  (Doc. 94 at 9-11.)  In response, Doe has moved, under Rule 56(d), for

23   permission to conduct additional discovery.  (Doc. 115.)  "Specifically, Doe requests leave

24

25   [14]    There is no tension between this outcome and the portion of the December 2019
     order denying the Individual Defendants' motion to dismiss the gross negligence claim.
26   (Doc. 66 at 25-26.)  At the Rule 12(b)(6) stage, the Individual Defendants' "limited
     briefing" didn't dispute the existence of a duty of care.  (*Id.*)  Instead, the Individual
27   Defendants only sought to invoke the economic loss rule ("ELR").  (*Id.*)  This order does
     not conclude that Doe's gross negligence claim is barred by the ELR.  Rather, the claim
28   fails because Doe hasn't met his burden of establishing that Arizona would recognize a
     duty of care under these circumstances.

to (1) conduct the depositions of Susan Heydorn, Linda Hill, and a 30(b)(6) representative of Defendant ABOR who can discuss the policies and procedures related to service of process at ASU, and (2) to conduct document discovery regarding the appointment of Susan Heydorn or Linda Hill as authorized agents for Defendants Rund, Davis, and Hunter." (*Id.* at 2.) The Individual Defendants oppose this request, arguing that (1) Doe did not diligently pursue the discovery in question and (2) Doe cannot establish that the requested discovery would reveal sufficient facts to defeat summary judgment. (Doc. 118.) In reply, Doe faults the Individual Defendants for not producing the requested material at the outset of the case, pursuant to the Mandatory Initial Discovery Pilot Project ("MIDP"), and argues that he made diligent efforts to obtain it during the discovery process, only to be thwarted by the Individual Defendants. (Doc. 124.)

B. **Analysis**

Rule 56(d) of the Federal Rules of Civil Procedure provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." A party seeking relief under Rule 56(d) "must make clear what information is sought and how it would preclude summary judgment." *Margolis v. Ryan*, 140 F.3d 850, 853 (9th Cir. 1998) (internal quotation marks omitted). Thus, if the party seeking relief would lose at summary judgment even after obtaining the information at issue, the Rule 56(d) request should be denied. *See, e.g.*, *Midbrook Flowerbulbs Holland B.V. v. Holland Am. Bulb Farms, Inc.*, 874 F.3d 604, 619-20 (9th Cir. 2017) (affirming denial of Rule 56(d) motion because "the additional discovery that Holland America sought in its opposition to Midbrook's summary judgment motion" would "not preclude summary judgment") (internal quotation marks omitted); *Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1169 (9th Cir. 2011) (affirming denial of Rule 56(d) motion in defamation action, which sought discovery concerning defendant's knowledge of the falsity of the challenged statement, because the district court rejected the claim on statute-of-limitations grounds

and the requested evidence "would not affect the statute of limitations analysis").

As discussed in Part II above, the Individual Defendants are entitled to summary judgment on Doe's gross negligence claim for reasons unrelated to the sufficiency of Doe's efforts to serve Rund, Hunter, and Davis with a notice of claim.  Accordingly, there is no reason to grant Doe leave, under Rule 56(d), to pursue additional discovery related to the service issue.

Accordingly, **IT IS ORDERED** that:

1.     The Individual Defendants' motion for summary judgment (Doc. 94) is **granted**.

2.     Doe's motion to seal (Doc. 113) is **granted**.  The Clerk of Court shall file, under seal, the exhibits lodged at Doc. 114.

3.     Doe's Rule 56(d) motion (Doc. 115) is **denied**.

Dated this 14th day of May, 2021.

Dominic W. Lanza
United States District Judge