COHEN DOWD QUIGLEY
The Camelback Esplanade One
2425 East Camelback Road, Suite 1100
Phoenix, Arizona 85016
Telephone 602•252•8400

Daniel G. Dowd (012115)
Email: ddowd@CDQLaw.com
Betsy J. Lamm (025587)
Email: blamm@CDQLaw.com
Rebecca van Doren (019379)
Email: rvandoren@CDQLaw.com
Attorneys for Defendants

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

John Doe,

Plaintiff,

vs.

The Arizona Board of Regents; James Rund; Craig Allen; Tara Davis; Kendra Hunter; Kathleen Lamp; and Andrew Waldron,

Defendants.

Case No: 2:18-cv-01623-DWL

**ARIZONA BOARD OF REGENTS' MOTION FOR SUMMARY JUDGMENT**

(Assigned to the Honorable Dominic W. Lanza)

**Oral Argument Requested**

Pursuant to Fed. R. Civ. P. 56, the Arizona Board of Regents ("ABOR") requests judgment in its favor on Plaintiff John Doe's sole remaining claim alleging violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* In ruling on ABOR's Motion to Dismiss, which Doe narrowly surmounted, the Court remarked that it was a very "close call" whether Doe had pled allegations sufficient to state a Title IX claim. [Doc. 66, pp. 20–21.] Now, after full discovery, the issue is no longer close. Doe cannot come forward with actual evidence showing that the disciplinary decision against him was infected by anti-male gender bias. His Title IX claim fails as a matter of law.

**1. Relevant Factual Background.**

On September 17, 2016, Arizona State University's ("ASU's") Office of Student Rights and Responsibilities ("SRR") was notified of an alleged off-campus sexual assault perpetrated by Doe and another man against an ASU student ("Ms. Roe"). [Ex. 1 at 2–3 & Ex. 2 at 117–19, 179.] SRR initiated an investigation of possible violations of ABOR's Student Code of Conduct ("Code") pursuant to ASU's Student Disciplinary Procedures ("Procedures"). [Ex. 3 & Ex. 4 at 38–39; Ex. 5 & Ex. 2 at 99–102.] Over a period of three months, SRR investigator Tara Davis interviewed Doe and Ms. Roe multiple times, gathered available documents, and interviewed witnesses identified by the parties. [Ex. 3 at 14–17.] Ms. Davis documented the information she gathered in an investigative report. [*Id.*] Consistent with the Procedures, before concluding the investigation and finalizing the report, Ms. Davis met with Doe and with Ms. Roe multiple times to provide them the opportunity to review, respond to, and comment on the investigative materials. [*Id.*] The investigation concluded on December 21, 2016. [Ex. 2 at 222–23.]

As required by the Procedures, ASU's Dean of Students, Dr. Jennifer Hightower, reviewed the investigative materials. [Ex. 2 at 224.] She determined more likely than not that Doe had violated Section F(15) of the Code by providing alcohol to Ms. Roe, who was under 21, and violated Section F(23) of the Code by engaging in sex acts with Ms. Roe without her consent. [Ex. 6 & Ex. 2 at 219–20.] Dr. Hightower further determined, based on the totality of the information, that Doe should be expelled. [*Id.*] Dr. Hightower notified



COHEN DOWD QUIGLEY

COHEN DOWD QUIGLEY

Doe in writing of her decision on December 22, 2016. [*Id.*] Doe appealed the decision to the University Hearing Board ("UHB"). [Ex. 9 at 221.]

The UHB conducted a full day hearing on Doe's appeal on May 23, 2017. [Ex. 7.] Prior to the hearing, Doe and the Dean of Students' Office ("DSO"), which presented the case supporting Dean Hightower's decision, exchanged voluminous documents and witness lists. [Ex. 8 & Ex. 9 at 245–46; Ex. 10 & Ex. 11 at 231–37.] At the hearing, Doe's counsel made opening statements and closing arguments, presented evidence, cross-examined DSO witnesses, and called witnesses to testify on Doe's behalf, including an expert. [Ex. 9 at 246–49; *see generally* Ex. 7.] On May 30, 2017, the UHB issued its Findings and Recommendation to ASU's Senior Vice President of Educational Outreach and Student Services, Dr. James Rund. [Ex. 12.] The UHB recommended that Dr. Rund uphold the expulsion decision based on evidence that Doe (i) provided alcohol to Ms. Roe and (ii) committed sexual misconduct (*i.e.* nonconsensual sexual contact) by using force to perpetrate sex acts with Ms. Roe. [Ex. 12 & Ex. 13 at 179–80.] In his final decision, Dr. Rund adopted the UHB's alcohol and force findings without comment, and also found Doe's expulsion warranted by evidence in the record demonstrating that Ms. Roe was incapacitated by alcohol consumption at the time of the incident and unable to consent to sexual activity. [Ex. 14 & Ex. 11 at 238–39.] On August 30, 2017, Dr. Rund denied Doe's Request for Review and Rehearing and reaffirmed the expulsion decision. [Ex. 15 & Ex. 11 at 221–23.]

On May 29, 2018, Doe filed this lawsuit, asserting seven claims against ABOR and others under state and federal law. Doe filed his First Amended Complaint ("FAC") on February 15, 2019. [Doc. 37.] On December 27, 2019, on ABOR's Motion, this Court dismissed Doe's due process and breach of contract claims, leaving only the Title IX claim against ABOR.[1] [Doc. 66.] Voluminous discovery, disclosures, depositions, and expert witness work followed. Discovery is now closed. Still Doe has not come forward with evidence of gender bias, the critical element of his Title IX claim. Because the evidence does

---

[1] The Court has already dismissed or granted summary judgment on all claims against the other Defendants named in the FAC: James Rund, Craig Allen, Kathleen Lamp, Andrew Waldron, Kendra Hunter, and Tara Davis. [Docs. 66, 139.]

COHEN DOWD QUIGLEY

not support, and in fact disproves, the existence of gender bias, ABOR is entitled to judgment as a matter of law.

### 2. Under Title IX, Doe Must Show That Gender Bias Against Males Influenced The Disciplinary Decision.

Summary judgment serves several salient purposes, including to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial" and "to eliminate the waste of the time and the resources of litigants and the courts where it is shown there are no material issues of fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Mosher v. Saalfeld*, 589 F.2d 438, 442 (9th Cir. 1978); *accord FTC v. Elec. Payment Sols. of Am.*, 482 F. Supp. 3d 921, 926 (D. Ariz. 2020) ("A principal purpose of summary judgment is 'to isolate and dispose of factually unsupported claims.'" (citation omitted)). Granting summary judgment to a defendant is required where the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See FTC*, 482 F. Supp. 3d at 926 (quotation omitted). Under Title IX, Doe must establish that he was expelled from ASU because of his gender. *See* 20 U.S.C. § 1681(a); *see also Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 946–47 (9th Cir. 2020) (Title IX requires plaintiff to show exclusion from an educational program "on the basis of sex").[2]

To show a genuine issue of material fact for trial, Doe must supply evidence that gender bias influenced the outcome of his disciplinary proceedings, either through evidence of 1) gender bias on the part of the decision-maker or a pertinent ASU official; or 2) a pattern of gender-based discipline at ASU. *See, e.g., Rossley v. Drake Univ.*, 342 F. Supp. 3d 904, 924 (S.D. Iowa 2018), *aff'd*, 979 F.3d 1184 (8th Cir. 2020) (quotation and citation omitted)). Absent such evidence, ABOR is entitled to summary judgment. *See, e.g.*, *Doe v. Tr.*

---

[2] Doe alleges that ABOR's actions resulted in an erroneous outcome. [Doc. 37, ¶ 253.] At the pleading stage, this Title IX theory of liability requires him to demonstrate 1) actual innocence or articulable doubt as to the outcome of the disciplinary proceedings, and 2) that the outcome was the result of gender bias. *See Austin v. Univ. of Or.*, 925 F.3d 1133, 1138 (9th Cir. 2019). Regardless of the standard applied here, gender bias is a required element. This Motion establishes the lack of an issue of material fact as to that element.

*of Bos. Coll.*, 892 F.3d 67, 90–92 (1st Cir. 2018) (plaintiffs did not offer sufficient evidence that gender bias was a motivating factor in their discipline proceedings); *Rossley*, 342 F. Supp. 3d at 929-30 ("no reasonable jury" could find gender bias on the evidence presented); *Doe v. Marian Univ.*, 2019 WL 7370404, at *12 (E. D. Wis. Dec. 31, 2019) ("Doe has failed to combine his 'generalized allegations' of discrimination with 'facts particular to his case.'" (*quoting Doe v. Colum. Coll. Chi.*, 933 F.3d 849, 855 (7th Cir. 2019)); *Doe v. Case W. Rsrv. Univ.*, 2019 WL 1982266, at *12 (N.D. Ohio May 2, 2019), *aff'd*, 809 F. App'x 276 (6th Cir. 2020) ("There is no evidence that the University's sexual misconduct policy itself is discriminatory to males or that Dr. Milliken in particular, or any other University employee applied the Policy against Plaintiff in a biased or discriminatory way.").

In this case, Ms. Davis conducted the investigation. Dr. Hunter served on the review committee that assisted Dr. Hightower in evaluating Ms. Davis's investigative report and testified before the UHB. Dr. Allen, Dr. Lamp, and Dr. Waldron sat on the UHB. Dr. Rund made the final decision. The parties engaged in substantial discovery encompassing thousands of documents, dozens of written discovery requests and responses, and 13 depositions, including each of the above individuals and three ABOR Rule 30(b)(6) designees. This expansive discovery process did not produce evidence on which a reasonable jury could find that gender bias impacted Doe's disciplinary proceedings.

**3. <u>There Is No Genuine Issue Of Material Fact On The Issue Of Gender Bias</u>.**

ABOR has repeatedly requested that Doe identify the basis for the allegation in his FAC that the decision to expel him was based on an anti-male bias.[3] [Ex. 16.] Despite repeated promises, Doe never did so. [*Id.*, ¶ 18.] Doe's disclosures are limited to his MIDP Responses, which identify no evidence of gender bias, as minimally supplemented by his deposition. Doe cannot cure that deficiency. [Doc. 67, p. 2 n.1 ("Parties that fail to timely disclose relevant information will be precluded from using it in the case[.]").] Given Doe's failure to disclose support for his claim of anti-male bias, we demonstrate below the absence

---

[3] The Mandatory Initial Discovery Pilot Program ("MIDP"), General Order 17–08, required Doe to affirmatively disclose this information. [Doc. 11, § B(4).]



COHEN DOWD QUIGLEY

COHEN DOWD QUIGLEY

of evidence sufficient to create a genuine issue of material fact regarding the allegations on which the Court relied in declining to dismiss Doe's Title IX claim. [Doc. 66 at 20, 24 (finding certain comments by Dr. Hunter and Dr. Rund and alleged errors in the disciplinary process, against the "backdrop" of the April 2011 Dear Colleague Letter ("DCL") and Office of Civil Rights ("OCR") investigations of ASU, stated a claim at the 12(b)(6) stage).] Doe's allegations and conjecture regarding gender bias are not supported by evidence.

**A. The DCL And The OCR Investigations Were Not Founded On Gender Bias And Did Not Influence ABOR's Disciplinary Decision.**

Doe alleges that the DCL, combined with OCR's investigations of ASU following that letter, placed "pressure" on ASU to "to appear tough on allegations of sexual assault made by women against men, no matter their merit." [Doc. 37, ¶ 98.] The evidence, however, disproves the generalization that the DCL and the OCR investigations influenced anyone at ASU to discipline Doe based on his gender.

First, the DCL does not use gender-specific language in calling upon schools to address sexual violence. In its very first paragraph, the letter states:

> The U.S. Department of Education and its Office for Civil Rights (OCR) believe that providing **all students** with an educational environment free from discrimination is extremely important. The sexual harassment of **students**, including sexual violence, interferes with **students'** right to receive an education free from discrimination and, in the case of sexual violence, is a crime.

[Ex. 17 at 1 (emphasis added) & Ex. 18 at 31–32.] The DCL does not suggest only women are victims or only males are perpetrators, using "student" and phrases such as "he or she" to make clear that the guidance applies equally to all genders. [*E.g.*, Ex. 17 at 4.] The DCL addresses protection against sexual misconduct and sexual violence in general, not just in cases involving male respondents and female complainants. *See, e.g., Rossley*, 979 F.3d at 1196 (holding that plaintiff's argument about "pressure" from the DCL "ignores the letter's data that both men and women have been victims of campus sexual assault, as well as the letter's use of gender-neutral language"). Doe's failure to demonstrate how the DCL "reflects or espouses gender bias… necessarily dooms [his] argument[.]" *Tr. of Bos. Coll.*, 892 F.3d at 92–93 (alterations in original).

COHEN DOWD QUIGLEY

Second, there is no evidence that the DCL unfairly influenced any decision-maker in Doe's case or resulted in ABOR or ASU policies unfair to male respondents. Doe did not even ask Ms. Davis, Dr. Hunter, or Dr. Rund about the DCL. Dr. Waldron and Dr. Lamp both testified that they were not familiar with the letter. [Ex. 19 at 114–15; Ex. 20 at 90.] When asked about changes made to ASU's policies following the issuance of the DCL, Dr. Allen testified that he was not aware of any such changes other than the appointment of a Title IX Coordinator. [Ex. 13 at 101.] Dr. Allen and ASU's Title IX Coordinator, Jodi Preudhomme, testified that the DCL provides guidance to universities for <u>complying</u> with Title IX. [*Id.* at 98; Ex. 18 at 22.] Ms. Preudhomme further confirmed the DCL's recommendations were generally consistent with ABOR and ASU's existing policies, the revisions made in response to the DCL simply clarified those policies, and ABOR and ASU have no gender-based policies. [Ex. 18 at 30–31, 45-53, 169–70.] There is no evidence that remotely suggests any ASU decision-maker was influenced by the DCL to engage in gender bias in <u>violation</u> of Title IX. *See Doe v. Coll. of Wooster*, 243 F. Supp. 3d 875, 887 (N.D. Ohio 2017) ("[I]t stands to reason that evidence that a university has endeavored to comply with federal guidance on Title IX cannot support a violation of Title IX.").

Similarly, Doe cannot offer any evidence to show the OCR investigations impacted Doe's disciplinary proceedings or outcome. The OCR never found that ASU violated Title IX, ordered any policy changes, or otherwise influenced ASU's actions. [Ex. 18 at 128–29.][4] The evidence is uncontroverted that the relevant decision-makers did not consider, and were not influenced by, the OCR investigations. [Ex. 19 at 116; Ex. 20 at 93.] The DCL and the OCR investigations are not evidence of gender bias and are not even a supportive "backdrop" to Doe's claim.

**B. Dr. Hunter And Dr. Rund's Comments Do Not Evidence Gender Bias.**

Doe falsely alleges that when SRR first learned of Ms. Roe's allegations, Dr. Hunter "indicated that action had to be taken quickly because Doe was a male athlete—a collegiate

[4] The OCR did <u>recommend</u> that ASU permit <u>complainants</u> to appeal the outcome of a disciplinary hearing. ASU declined to make that change. [Ex. 18 at 129–30.]

wrestler." [Doc. 37, ¶ 254.] Dr. Hunter's email to SRR actually said:

> I would like for us to engage [Ms. Roe] from advocacy today to share resources and options for moving forward with SRR, in hopes that Carla can meet with her today and take her statement so we can figure out what to do with the male. He is a wrestler, so clearly we would want to move swiftly, but not before we engage [Ms. Roe].

[Ex. 1 at 2.] Dr. Hunter did not say she wanted the process to move quickly because Doe is male. During her deposition, Dr. Hunter explained that she referred to him being a wrestler to ensure that the ASU athletic department was notified, [Ex. 2 at 134–35], as that department has its own procedures relating to student misconduct, which may require an athlete's removal from his or her respective team during the pendency of an investigation. [Ex. 21 & Ex. 9 at 166–68.] This email does not indicate a bias against males or that Doe is responsible because he is male.

Doe further alleges that Dr. Rund stated in his August 30, 2017 decision that Ms. Roe's decision to engage in a threesome was "outrageous behavior," indicating "Rund's own sexual mores and gender bias." [Doc. 37, ¶ 289.] However, Dr. Rund made the statement after quoting from the confrontation call between Ms. Roe and Doe (played in its entirety during the UHB hearing), in which Doe admitted that Ms. Roe had told him earlier she was not going to have sex with him:

> Because I know we did -- we did, like, I know we talked, yeah, we weren't going to do that. We -- you don't roll that way. And you're, like, you don't have sex with guys (Indiscernible: 01:03:17). That said, you know I respect, like, yeah. That's fine.

[Ex. 15 at 3 (*quoting* Ex. 7 at 61–62).] Based on this evidence, Dr. Rund found:

> A reasonable person who had previously had this conversation, and who had then been with the Complainant while she was drinking, should have known that Complainant was not in a position to make informed, rational judgments when she went into a bedroom with not just one, but two males. At the very least, Complainant was engaging in outrageous behavior evidencing her intoxication level.

[Ex. 15 at 3.] Dr. Rund's comment was based on the evidence presented to him, and cannot be contorted to suggest or imply gender bias. Further, even assuming Dr. Rund's use of "outrageous" was a comment on sexual mores (it was <u>not</u>), Doe (again) cannot show the

characterization has anything to do with the gender of the participants in the sexual activity.

### C. The Disciplinary Process Was Fair And Free Of Procedural Error.

Doe cites supposed procedural "errors" to support his allegation of gender bias. However, procedural errors alone are insufficient to create an issue of fact for the jury on a Title IX claim. [Doc. 66, p. 24 ("alleged procedural errors also may not, standing alone, serve as plausible evidence of gender bias in a Title IX case") (citation omitted).] Doe cannot show error, let alone error suggesting gender bias.

The Procedures set forth the disciplinary process. [Ex. 5-C.] Doe was represented by counsel throughout the investigation, and was accompanied by either counsel or his parents during every interview with Ms. Davis. [Ex. 9 at 178–79, 188, 205; Ex. 23-B to E.] Ms. Davis asked Doe repeatedly if he had additional information he wanted her to consider. [Ex. 9 at 183–97; Ex. 23-B at 21; Ex. 23-C at 71–72; Ex. 23-D at 36–37.] Ms. Davis further cautioned Doe that the Dean would make her decision based on whatever information the parties provide. [Ex. 23-B at 19.] The limited information Doe provided was incorporated into the investigative report. [Ex. 3 at 18–19.] Ms. Davis interviewed the witnesses Doe identified, to the extent she was able to locate them. [Ex. 3 at 1.] Doe had multiple opportunities to review and comment on the information provided by Ms. Roe, and he did so, both during in-person meetings and through lengthy letters from his counsel, which were incorporated into the investigative report in their entirety. [Ex. 3; Ex. 23-E.]

During the appeal to the UHB, Doe presented evidence to the UHB that he failed (or refused) to provide to Ms. Davis, such as the report from the Tempe Police Department ("TPD"), audio and video recordings of TPD interviews with Ms. Roe and other witnesses, and excerpts from Ms. Roe's Sexual Assault Nurse Exam ("SANE").[5] [Ex. 12 at 3–7.] Doe

[5] Doe alleges the TPD recordings were "easily obtainable." [Doc. 37, ¶ 264.] However, Ms. Davis explained that when she requested information from the TPD, she was told it would not release any information to her because of the ongoing criminal investigation. [Ex. 4 at 223–24.] Moreover, if Doe was able to obtain the recordings before the conclusion of SRR's investigation, he did not provide them to Ms. Davis, just as he refused to provide Ms. Davis with the police report and SANE report he had obtained. [Ex. 9 at 192–93, 204–05; Ex. 24 at 43–45, 129–30.] All indications are that he or his counsel possessed the information, refused to provide it to Ms. Davis during the investigation, and now claim her inability to get the information was somehow motivated by her alleged anti-male bias.



COHEN DOWD QUIGLEY

had full opportunity to (and did) participate in the investigation and UHB hearing. Against the backdrop of the evidence (not the allegations), the "procedural errors" Doe claimed in his FAC, on which this Court relied in denying ABOR's Motion to Dismiss, are unfounded.

1. Ms. Davis's statement that SRR would "charge" Doe as soon as she had the "green light." As set forth in the Procedures, a "charge" is the notice provided to the respondent that an accusation has been made and an investigation has been initiated. [Ex. 5-C, ¶ C(4)(a); Ex. 22 at 78.] The notice includes a summary of the Code provisions alleged to have been violated. [Ex. 22 at 123.] Doe's assertion that Ms. Davis's use of the term "charge" indicates she had decided he was responsible before investigating is false. Nothing about sending a "charge" has anything to do with gender bias—it is the language used in notifying any respondent, male or female, alleged to have violated the Code.

2. Ms. Davis's allegedly conflicting statements to Doe and Ms. Roe about her role. Doe severely mischaracterizes what actually happened in alleging that Ms. Davis used an unfair investigatory approach that was biased against Doe because he is male. The transcripts of Ms. Davis's interviews prove Doe is wrong. Ms. Davis told Ms. Roe and Doe the same thing: she did not have subpoena power and would rely on them to provide documentation and other information they wanted considered. [Ex. 23-A at 8 (telling Ms. Roe that "because we are not law enforcement, we cannot subpoena information. That means it's going to be up to you to provide us with whatever documentation you feel is relevant; provide us names of witnesses; provide your own statements."); Ex. 23-B at 21 (telling Doe "I can't subpoena information, so down here is an option for you to provide the names of any potential witnesses, people you want me to speak with, people you feel may have information that would be relevant to our case. Also, for you to provide any evidence you may have.").] The notion that Ms. Davis allowed Ms. Roe to control the investigation or dissuaded Doe from providing evidence is specious. Ms. Davis repeatedly asked Doe for information and documents. [*E.g.,* Ex. 9 at 183–85, 192–97, 216–17.] In response, Doe provided only a few screenshots from Ms. Roe's social media accounts and a single redacted screenshot from the criminal investigative materials (which Doe refused to provide in their



COHEN DOWD QUIGLEY

COHEN DOWD QUIGLEY

entirety). [*Id.* at 222.] Doe even refused to provide the TPD report and SANE exam on which he later relied to try to show Ms. Roe's "inconsistent" statements. [Ex. 24 at 74–77.]

3. Ms. Davis's statement to Doe that one of Ms. Roe's written submissions did not contain new evidence. At best, this assertion reflects a disagreement between Doe and Ms. Davis as to what constitutes "new evidence." Ms. Davis testified she did not consider repetitive or clarifying information from Ms. Roe that did not contain a "new fact" to be new evidence. [Ex. 4 at 243–44.] Moreover, as shown below, Doe received the opportunity to respond to all information provided by Ms. Roe and did provide lengthy responses, including on December 21, 2016. [Ex. 3 at 51–59; Ex. 23-E.]

4. The Dean of Students issued the expulsion letter without considering Doe's response to Ms. Roe's final submission. Doe alleges Dr. Hightower decided to expel him without reviewing his December 21, 2016 response to Ms. Roe's allegations. [Doc. 37, ¶¶ 158–59.] That is not what happened. Although Dr. Hightower originally signed an expulsion letter on December 21, 2016, she did not use that letter because she needed to, and did, review the additional material submitted by Doe that same day. [Ex. 2 at 222–23; Ex. 23-E at 10, 17.] Because the submission did not change Dr. Hightower's decision, she signed the same letter again on December 22, 2016. [Ex. 2 at 223.] These actions were consistent with the Procedures and have no plausible connection to Doe's gender.

5. ASU representatives failed to obtain key evidence or interview key witnesses. This repeated refrain falls apart upon review of the evidence. Ms. Davis undeniably asked both Ms. Roe and Doe for all evidence they believed relevant, including the video taken on the night of the incident by Mr. Cordova. [Ex. 4 at 98.] It is undisputed that the 5-second video—the subject of a protective order in a then-pending criminal action—was not available to Ms. Davis or Ms. Roe. [Ex. 4 at 98–99, 219, 223–24; Ex. 25 at 6–7; Ex. 26 at 85–92.] Ms. Davis did not have authority to compel Ms. Roe to try to obtain it. [Ex. 4 at 98–99, 106–10.] Similarly, Dr. Allen's refusal to order Ms. Roe to cooperate with Doe in seeking release of the video was not error. There is no evidence Doe and Ms. Roe could have obtained the video. Further, as Dr. Allen explained, it would have been inappropriate for the

UHB to force Ms. Roe to assist Doe in trying to obtain what he contended was exculpatory evidence. [Ex. 13 at 240–41.] These actions are not evidence of gender bias.

Doe's allegations that Ms. Davis should have interviewed Mr. Cordova, who along with Doe engaged in sexual intercourse with Ms. Roe on April 2, 2016, and the individual who drove Ms. Roe home after the incident [Doc. 37, ¶ 157] are misplaced. Ms. Davis could not reach Mr. Cordova at the phone number Doe provided. [Ex. 3 at 1.] Ms. Davis was also unable to locate him through ASU's student records because he was not an ASU student. [Ex. 4 at 43–44.] While Doe now contends Mr. Cordova was a critical witness, Doe made no effort to connect Ms. Davis with Mr. Cordova, despite their obvious friendship and being in direct contact with Mr. Cordova's family. [Ex. 9 at 194; Ex. 24 at 33–34, 81–82; Ex. 27 at 36, 64–67.] Instead, in response to Ms. Davis's direct request, Doe and his parents stated that Mr. Cordova had been advised by his attorney <u>not</u> to talk to Ms. Davis. [Ex. 9 at 206–07; Ex. 24 at 106–08; Ex. 27 at 64–65; Ex 23-D at 3–4; *cf.* Ex. 26 at 99–100 (testifying that Mr. Cordova "rebuffed" Doe's request that he testify at the hearing and that "I don't think his attorney would let him testify").] Mr. Cordova's statements to the police were also contained in the police report obtained by Ms. Davis. [Ex. 9 at 90–92.] Ms. Davis was also unable to reach the witness who drove Ms. Roe home because he had joined the military. [Ex. 3 at 1; Ex. 4 at 46–47.] Ms. Davis and ABOR are not responsible for the unavailability of these witnesses, and Ms. Davis's inability to interview them does not evidence gender bias.

6. <u>The UHB refused to consider the report of Doe's alcohol expert</u>. The Procedures require all documents a party wishes the UHB to consider to be submitted at least five business days before the hearing. [Ex. 5-C, ¶ E(3)(e).] Doe apparently intended to present testimony from an alcohol expert during the hearing, but did not do so. After the hearing, after the record closed, and well after the deadline in the Procedures, Doe sought to supplement the record with the expert's report. [Doc. 37, ¶ 170.] However, Doe had not disclosed the report prior to the hearing, did not call the toxicologist as a witness, and did not make a request to submit the report before the hearing closed. [Ex. 7; Ex.8.] The DSO had no opportunity to cross-examine the expert or offer rebuttal evidence. Moreover,



COHEN DOWD QUIGLEY

although Dr. Rund (the final administrative decision-maker) held that the UHB properly excluded the report, he also gave it "thoughtful consideration." [Ex. 15 at 5; Ex. 11 at 242.] Doe has no credible argument that the UHB excluded the late-disclosed report because of Doe's gender.[6]

7. The UHB found that Doe used force against Ms. Roe, a theory Doe claims was not disclosed to Doe or addressed at the hearing. Doe was charged with a violation of the Code under F(23) Sexual Misconduct, which encompasses "sexual violence and other non-consensual sexual contact" (*i.e.* nonconsensual sex by force or without consent), as well as other types of sexual misconduct. [Ex. 5-A, ¶¶ E(17) & F(23); Ex. 22 at 129–31.] The notice regarding the initiation of the investigation and Dr. Hightower's decision gave Doe notice of the potential for force to be considered, quoting in full the range of sexual misconduct subject to the Code. [Ex. 13 at 260–69 (testifying that the notice letter includes the entire definition of sexual misconduct, stating "he's not being held responsible for incapacitation. He's being held responsible for sexual misconduct, an act – a sexual act perpetrated against a person by force[.]").] Doe knew as much, as he specifically addressed the issue of force in communications with Ms. Davis and during the UHB hearing. [*See, e.g.*, Ex. 3 at 31 (alleging in a letter to Ms. Davis that "no force was used"); Ex. 7 at 133–34 (examining Ms. Roe on whether force was used), 268 (Doe testifying that he did not force Ms. Roe to engage in sexual intercourse), 381–82 (Doe's expert testifying whether the injuries Ms. Roe sustained "indicate anything other than a consensual sexual encounter").] Finally, the final expulsion decision did not rest solely on force, but also on Dr. Rund's

---

[6] The Chair extended the length of the hearing multiple times at Doe's request. [Ex. 15 at 5.] The Chair further warned Doe when there was 20 minutes remaining for the hearing. Counsel for Doe responded:

> I'm going to try to push through this. We have two experts. One I can do in literally five, ten minutes probably. And then Cindi's going to take a little while, and then I have one other witness, but if I don't get to him, I don't get to him.

[Ex. 7 at 365–66.] Doe then called Ms. Nannetti, his sexual assault expert (not the toxicologist), and chose, presumably for strategic reasons, to use the remainder of the hearing to examine that witness. Further, Doe did not object to the termination of the full day hearing and did not proffer the testimony of the uncalled witnesses before the record closed. Doe's mismanagement of his hearing time is not evidence of gender bias.



COHEN DOWD QUIGLEY

finding that Ms. Roe was incapacitated and unable to consent to the sex acts. [Exs. 14, 15.] There is no credible evidence that anti-male bias caused the UHB to consider the issue of force (a component of F(23)).

Doe has no evidence to controvert, let alone create a genuine issue of material fact, that he received a fair investigation and disciplinary process, including ample opportunity to present evidence, all of which was considered by the relevant decision-makers. Doe's allegations of procedural "error" are incorrect and do not establish gender bias.

**D. Doe's "Expert" Opinions Do Not Support His Title IX Claim.**

In refusing to respond to discovery responses regarding the factual and evidentiary basis for his gender bias allegations, Doe stated: "an expert will explain why Defendants' conduct amounted to gender bias." [Ex. 16, ¶ 10.] However, expert opinions devoid of supporting objective evidence are insufficient to create a genuine issue of material fact for trial. *See, e.g.*, *Tang v. Shell Chem. Co.*, 317 F. App'x 660, 662 (9th Cir. 2009) ("In the absence of any objective evidence of unreasonable behavior by Allstate, the conclusory assertions of Tang's expert, not supported by any specific evidence in the record, are not sufficient to create an issue of material fact on the issue of bad faith."). As we demonstrate below, Doe's expert opinions are based upon a flawed factual foundation and do not support his claim that gender bias motivated the disciplinary process.[7]

1. Cindi Nannetti.

Doe submitted the report of Cindi Nannetti, who also testified on his behalf during the UHB hearing as a "sexual assault expert." [Ex. 28.] Ms. Nannetti is a former prosecutor whose assignment here was to "opine as to whether: (1) the investigation into the sexual misconduct allegations levied against Doe was fair and impartial, (2) whether there were any errors or flaws in the investigation, and (3) whether the investigation appears to be impacted by the Start by Believing campaign at ASU." [Ex. 28 at 1.] Ms. Nannetti's opinions do not support gender bias, no less intentional gender bias.

[7] ABOR will separately move under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), to exclude the opinions of certain of Doe's experts.



COHEN DOWD QUIGLEY

First, Ms. Nannetti confines her criticisms to Ms. Davis's investigation. However, Dr. Rund's decision was not based solely on the information Ms. Davis gathered. Rather, per the Procedures, Dr. Rund considered all evidence presented during the UHB hearing, including the substantial new evidence Doe presented (that he did not provide to Ms. Davis). [*See* Ex. 5-C, ¶ F(2); Ex. 11 at 23.] Many of the criticisms directed at Ms. Davis were negated or cured by Doe finally producing at the UHB hearing the very evidence he now excoriates Ms. Davis for not procuring. In addition, Doe challenged the investigation as insufficient. [Ex. 7 at 26–27; Ex 15 at 4–7.] Dr. Rund considered and rejected that contention. There is no evidence Dr. Rund's decisions were based on anything but the evidence presented by the parties during and after the UHB hearing—and certainly no evidence his decisions resulted from Ms. Davis's alleged anti-male gender bias in the investigative process. This dooms Doe's Title IX claim. *See Mondero v. Salt River Project*, 400 F.3d 1207, 1213 (9th Cir. 2005) (affirming summary judgment as plaintiff failed to show relevant decision makers "were influenced or even aware of the alleged gender bias of some of its agents").

Second, most of Ms. Nannetti's analysis is based on the demonstrably false assumption that SRR and Ms. Davis followed the "Start By Believing" ("SBB") approach in carrying out the investigation. [Ex. 28 at 3–10.] SBB was a campaign promoted by the ASU Police Department (not SRR) to eliminate the phenomenon of immediate disbelief that victims (male and female) of sexual assault often endure in connection with criminal investigations. [*Id.* at 3 (SBB "is a philosophy that should guide our responses to sexual assault. It 'flips the script' on the message victims have historically received from professionals and support people, which is 'how do I know you're not lying?[']") (*quoting* the SBB website).] Ms. Nannetti simply disregards uncontroverted evidence that SRR's investigators were specifically instructed not to apply the SBB philosophy in investigating allegations of sexual misconduct. [Ex. 29 & Ex. 18 at 98–101, 105–07, 112.] Doe has no evidence to the contrary. Ms. Nannetti's conclusion that the application of SBB resulted in a biased investigation of Doe is unfounded, unsupported by objective evidence and inadmissible. *See Tang*, 317 F. App'x at 662.



COHEN DOWD QUIGLEY

COHEN DOWD QUIGLEY

Third, Ms. Nannetti does not opine that SBB caused Ms. Davis to be biased against Doe based on his gender; to the contrary, Ms. Nannetti's references to "bias" almost uniformly refer to alleged bias in favor of a victim of sexual assault who, of course, can be male or female. [Ex. 28 at 13 ("Davis began her investigation believing the complainant and disbelieving the accused"), 15 ("[Ms. Davis's] bias to believe the victim, had already tipped the scale from a neutral fact finder, to favoring the victim."), 16 ("Throughout the process, Ms. Davis was focused on believing the victim.").] Ms. Nannetti does not opine that Ms. Davis was intent on believing the victim because the victim was female. Her opinions therefore do not support the existence of gender bias. *See, e.g., Doe v. Cummins*, 662 F. App'x 437, 453 (6th Cir. 2016) ("[A] disciplinary system that is biased in favor of alleged victims and against those accused of misconduct … does not equate to gender bias because sexual-assault victims can be both male and female."); *Doe v. Rollins Coll.*, 2020 WL 8409325, at *9 (M.D. Fla. July 13, 2020) ("[T]he inference of pro-victim bias is an obvious alternative explanation that overwhelms any potential of gender bias.") (quotation omitted); *Doe v. Univ. of Colo., Boulder*, 255 F. Supp. 3d 1064, 1074 (D. Colo. 2017) (holding that "pro-victim bias … does not equate to anti-male bias.").

Fourth, Ms. Nannetti purports to measure Ms. Davis's investigation against the standards set forth by a trade association, the Association of Title IX Administrators ("ATIXA"). [Ex. 28 at 15–16.] However, Doe was entitled to the process set forth in the Procedures, which were not modeled or based on ATIXA. [Ex. 18 at 75–76, 153–54.] Ms. Nannetti does not opine that Ms. Davis failed to comply with the Procedures. Whether Ms. Davis complied with inapplicable ATIXA commentary is irrelevant. Finally, Ms. Nannetti's multiple challenges to minute aspects of Ms. Davis's investigation should be disregarded. Doe was not entitled to a perfect investigation, only a fair and impartial one. [Ex. 5-C ("These procedures provide a fair and impartial administrative process.").] "Title IX does not require flawless investigations or perfect solutions." *See Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 170 (5th Cir. 2011) (citation omitted). Moreover, it is not a court's role to "advocate for best practices" in student disciplinary proceedings. *See Doe v.*

*Belmont Univ.*, 367 F. Supp. 3d 732, 755 (M.D. Tenn. 2019) (quotation omitted)). Absent evidence that Ms. Nannetti's concerns are plausibly linked to gender bias, they are irrelevant.

2. Lance Kaufman.

Dr. Lance Kaufman, an economist, purports to have analyzed the rate at which ASU sanctions male students for violations of Section F(23) (sexual misconduct) and F(15) (alcohol) of the Code. [*See* Ex. 30.] Dr. Kaufman opines that male students are sanctioned at a higher rate than females charged with the same violations, and that the difference is "statistically significant." [Ex. 30 at 5.] At best, Dr. Kaufman's analysis appears intended to support a theory that Doe was treated more harshly than similarly situated females.[8] To be "similarly situated," however, the comparators must be similar in all material respects. *See Thomas v. Regents of Univ. of Cal.*, 2020 WL 1139595, at *3 (N.D. Cal. Mar. 9, 2020). "Although material characteristics vary from case to case, in termination and discipline cases, the Ninth Circuit looks to factors such as whether the proposed comparator and the plaintiff were subject to the same policies, worked at the same jobs, **committed similar violations**, and had **similar disciplinary records**." *Id.* (quotation omitted) (emphasis added)*; see also Swaso v. Onslow Cty. Bd. of Educ.*, 698 F. App'x 745, 748 (4th Cir. 2017), *as amended* (Aug. 11, 2017) ("Where a plaintiff attempts to rely on comparator evidence to establish circumstances giving rise to an inference of unlawful discrimination, however, '[t]he similarity between comparators ... must be clearly established in order to be meaningful.'") (quotation omitted); *Tempesta v. Motorola, Inc.*, 92 F. Supp. 2d 973, 980–81 (D. Ariz. 1999) ("[T]he Court has no basis for determining whether Plaintiff was passed over in favor of women who were similarly situated or whether the female applicants had superior qualifications" as plaintiff "has offered no information regarding their work experience or other qualifications."). This settled law exposes the fatal flaw in Dr. Kaufman's analysis and Doe's theory.

Dr. Kaufman compared all females charged with sexual misconduct against all males charged with sexual misconduct, concluding that "[m]ale Respondents are found 'guilty' of

[8] This theory is only mentioned in passing in the FAC, and was never developed or supported in any of Doe's discovery responses or disclosures.



COHEN DOWD QUIGLEY

F-23 and F-15 charges at a higher rate than other Respondents." [Ex. 30 at 9.] Yet "sexual misconduct" includes a variety of actions ranging from "[s]exual violence" and forced "physical sexual acts" to sexual harassment and other unwanted and non-consensual conduct including non-contact offenses such as indecent exposure, voyeurism, or non-consensual photographing. [Ex. 5-A at ¶ E(17).] As Dr. Kaufman acknowledges, the summary records on which he relied do not include information as to the <u>type</u> of misconduct that resulted in the disciplinary sanctions, such that gender bias cannot be found based on this data alone.[9] [*See* Ex. 30 at 13 ("even within combination of charges there may be non-gender factors that affect the severity of sanctions").] As Dr. Kaufman does not account for the wide variation of behavior that can be charged as an F(23) violation, he cannot establish that any of the charged females are similarly situated to any of the charged males, or, more importantly, to Doe. [*See* Ex. 31 at 8 (ABOR's expert opining that "Dr. Kaufman's failure to control for the severity of the violation prevents making a valid conclusion regarding the comparative likelihood of being issued a sanction.").] Dr. Kaufman's irrelevant analysis does not evidence or support even an inference of gender bias.

**5. <u>Conclusion</u>.**

Doe bears the burden of producing evidence from which a reasonable jury could fairly conclude that gender bias tainted his disciplinary proceedings or expulsion decision. Doe has spent years litigating this issue, at great expense to ABOR in defending against Doe's sweeping and meritless allegations. Despite full opportunity, Doe cannot come forward with actual evidence of gender bias and his suit must be dismissed. ABOR requests judgment in its favor as a matter of law. ABOR further requests an award of its attorneys' fees pursuant to 42 U.S.C. § 1988(b).

---

[9] ABOR produced spreadsheets detailing the type of conduct that resulted in sexual misconduct charges. [*See, e.g.*, Ex. 23-F.] These spreadsheets evidence the vast range of conduct that can form the basis of a sexual misconduct charge and the lack of a female respondent similarly situated to Doe. It appears Doe elected not to provide this information to his expert. Again, Doe and his counsel's strategic choices have consequences and cannot mask empty allegations of gender bias.



COHEN DOWD QUIGLEY

COHEN DOWD QUIGLEY

RESPECTFULLY SUBMITTED this 12th day of October, 2021.

COHEN DOWD QUIGLEY
The Camelback Esplanade One
2425 East Camelback Road, Suite 1100
Phoenix, Arizona 85016
Attorneys for Defendants

By: */s/ Daniel G. Dowd*
Daniel G. Dowd
Betsy J. Lamm
Rebecca van Doren