**COHEN DOWD QUIGLEY**
The Camelback Esplanade One
2425 East Camelback Road, Suite 1100
Phoenix, Arizona 85016
Telephone 602•252•8400

Daniel G. Dowd (012115)
Email: ddowd@CDQLaw.com
Betsy J. Lamm (025587)
Email: blamm@CDQLaw.com
Rebecca van Doren (019379)
Email: rvandoren@CDQLaw.com
   Attorneys for Defendants

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| John Doe,<br><br>Plaintiff,<br><br>vs.<br><br>The Arizona Board of Regents; James Rund; Craig Allen; Tara Davis; Kendra Hunter; Kathleen Lamp; and Andrew Waldron,<br><br>Defendants. | Case No: 2:18-cv-01623-DWL<br><br>**ARIZONA BOARD OF REGENTS' MOTION TO EXCLUDE TESTIMONY AND OPINIONS OF LANCE KAUFMAN**<br><br>(Assigned to the Honorable Dominic W. Lanza)<br><br>**Oral Argument Requested** |

Pursuant to Federal Rule of Evidence ("Rule") 702 and the December 27, 2019 Case Management Order (Doc. 67) (as amended), ¶ 6(j), the Arizona Board of Regents ("ABOR") respectfully moves the Court for an order excluding from trial, and for all other purposes, the opinions, testimony and reports of Plaintiff John Doe's proposed statistics and damages expert, Dr. Lance Kaufman.  As detailed below, Dr. Kaufman's opinions lack an adequate factual foundation, a reliable methodology and pertain to issues that are not relevant to the one remaining claim in this action.  Specifically, Dr. Kaufman's opinions purport to analyze sanctions imposed against male and female students for violations of the ABOR Student Code of Conduct (ABOR Policy 5-308) (the "Code"), but Dr. Kaufman fails to consider – at all – the many and varying types and severity of actions which gave rise to a finding of sexual

misconduct and the imposition of sanctions. Dr. Kaufman further opines on Doe's purported damages without a reliable factual foundation to support either Doe's projected career progression or the salaries associated with the positions Dr. Kaufman assumes Doe will attain. Dr. Kaufman's proposed opinions and testimony are inadmissible under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

**1.      Controlling Legal Standards.**

Doe "bears the burden of establishing the pertinent admissibility requirements [of Rule 702] are met by a preponderance of the evidence." *See, e.g., Cloud v. Pfizer Inc.*, 198 F. Supp. 1118, 1129 (D. Ariz. 2001) (citation omitted); *Krause v. Cnty. of Mohave*, 459 F. Supp. 3d 1258, 1263–64 (D. Ariz. 2020) ("The proponent of expert testimony bears the burden of showing that the proposed testimony is admissible under Rule 702." (*citing Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007)). "When a party fails to carry this burden, their expert's opinions are not admissible." *Krause*, 459 F. Supp. 3d at 1264 (citation omitted).

In applying Rule 702, trial courts "act as a gatekeeper" in considering the admissibility of expert witness testimony that involves "scientific, technical, or other specialized knowledge." *Allen v. American Capital Limited*, 287 F. Supp. 3d 763, 776 (D. Ariz. 2017) (*citing* Fed. R. Evid. 702(a); Fed. R. Evid. 104(a); *Daubert*, 509 U.S. at 597; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)). In exercising its gatekeeper function, a trial court must engage in a three-step analysis before admitting expert testimony. It must determine whether: (1) the witness is qualified; (2) the expert's methodology is reliable; and (3) the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. *Id.* (citation omitted).

"It is well settled that bare qualifications alone cannot establish the admissibility of … expert testimony," and that Rule 702 further requires expert testimony "be both relevant and reliable." *Ollier v. Sweetwater Union High School Sch. Dist.*, 768 F. 3d 843, 860 (9th Cir. 2014); *see also Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1313 (11th Cir. 1999) ("The judge's role is to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of



COHEN DOWD QUIGLEY

probative value."). Proposed expert testimony is reliable "if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *See Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), *as amended* (Apr. 27, 2010). To determine whether an expert opinion is reliable courts "almost exclusively" look at the expert's decision making process. *See Allen*, 287 F. Supp. 3d at 777; *see also Ollier*, 768 F.3d at 860 (requiring courts to "to assess 'whether the reasoning or methodology underlying the testimony' is valid and 'whether that reasoning or methodology properly can be applied to the facts in issue.'" (*quoting Daubert*, 509 U.S. at 592–93)); *Colby v. Newman*, 2012 WL 12885118, at *6 (C.D. Cal. Nov. 20, 2012) ("In determining the reliability of proffered expert testimony, the district court's task 'is to analyze not what the experts say, but what basis they have for saying it.'" (*quoting Daubert v. Merrell Dow Pharm., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1316 (9th Cir. 1995)). Finally, proposed expert testimony is relevant "if the knowledge underlying it has a valid connection to the pertinent inquiry" and the testimony "logically advances a material aspect of [Doe's] case." *Primiano*, 598 F.3d at 565; *Cooper*, 510 F.3d at 942.

Doe cannot demonstrate the reliability <u>or</u> relevance of Dr. Kaufman's opinions. Dr. Kaufman's proposed expert opinions and testimony must be excluded. *See, e.g.*, *Cooper*, 510 F.3d at 943 ("If evidence lacks either reliability or relevance, it must be excluded.").

**2.      Dr. Kaufman's Statistical Analysis Is Not Supported By Sufficient Facts Or Data.**

Dr. Kaufman's Expert Report, produced by Plaintiff on July 2, 2021, purports to analyze "gender disparities" in Arizona State University's ("ASU") "prosecution" of certain Code violations.[1] [*See* Expert Report of Dr. Lance Kaufman, attached as Ex. 1, at 5; *see also* September 10, 2021 Expert Rebuttal Report of Dr. Lance Kaufman ("Rebuttal Report"), attached as Ex. 2, at 3–9.] To form his opinions, Dr. Kaufman relies on "summary records of SCC [Code] alcohol violations ('F-15') and sexual misconduct ('F-23') charges ('SCC Charge Data')." [*See* Ex. 1 at 5 (citing ABOR015941 and ABOR015942).] The documents

---

[1] ASU does not "prosecute." Rather, it oversees an administrative disciplinary process, which includes a respondent's right to appeal an expulsion or suspension decision.

3

Dr. Kaufman relies upon are summary spreadsheets produced by ABOR containing specific information regarding claims of sexual misconduct (F(23)) and alcohol violations (F(15)) against ASU students between 2012 and 2017. The spreadsheet for alleged alcohol violations contains the following fields of data:

- Student Involved (Respondent) – Gender
- Incident Report ("IR") Number
- Incident Type (e.g., "Housing")
- Date/Time of Incident
- Date IR Created
- Charges
- Dean of Students' Decision
- Sanctions
- Appeal to University Hearing Board ("UHB")
- UHB Recommendations
- Senior Vice President Decision

[*See* Ex. 3; *see also* Ex. 1 at 5–6.] In addition to the above fields, the spreadsheet for alleged sexual misconduct incidents includes the following information:

- Assigned To (SRR Staff)
- Athlete Status
- Complainants – Gender
- Date of Senior Vice President Decision
- Date of Decision on Request for Rehearing.

[*See* Ex. 4; *see also* Ex. 1 at 6.]

Based <u>exclusively</u> on these spreadsheets, Dr. Kaufman purports to have performed a comparison of the sanctions imposed against male and female students who were found responsible for violating sections F(15) or F(23) of the Code. [Ex. 1 at 4-5.] And, based on that lone comparison, Dr. Kaufman concludes (1) "[m]ales receive severe sanctions of expulsion and suspension at a higher rate than females charged with the same violations" and (2) "F-23 charges involving male complainants result in expulsion and suspension at a lower rate than charges involving female complainants." [*Id.* at 13.] Dr. Kaufman further opines that these "disparities" are "statistically significant." [*Id.*] However, as detailed below, Dr. Kaufman's methodology and analysis are fatally flawed, unreliable, and irrelevant.

4

**A.   Dr. Kaufman Has Insufficient Data To Compare Sexual Misconduct (F(23)) Findings Or Sanctions Against Male And Female Students.**

"[E]xpert testimony is admissible only if an expert knows of facts which enable him to express a reasonably accurate conclusion. Opinions derived from erroneous data are appropriately excluded." *Smith v. Pacific Bell Tel. Co.*, 662 F. Supp. 2d 1199, 1125–26 (E.D. Cal. 2009) (citations omitted). Through his analysis, Dr. Kaufman tries to show that similarly situated students (*i.e.,* those alleged to have violated F(23) of the Code) are treated differently based on their gender. [*See, e.g.*, Ex. 1 at 4 ("This report presents an analysis of statistical disparities in the treatment of males involved in sexual harassment complaints at Arizona State University[.]"), 10 ("The second analysis that I perform compares the rate of Severe Sanctions for males with Severe Sanctions for females."), 12 ("The fourth analysis that I perform compares the sanctions when F-23 complainants are male with sanctions when the F-23 complainants are female.").]

Dr. Kaufman fails to appreciate or consider that, for the purposes of a gender discrimination claim, "similarly situated" means that the misconduct in which the comparators are alleged to have engaged was of "comparable seriousness." *See Farber v. City of Mesa*, 525 F. Appx. 619, 621 (9th Cir. 2013) ("We define 'similarly situated' employees to mean employees with 'similar jobs' who display 'conduct of comparable seriousness.'" (citations omitted)); *see also Wolff v. State Univ. of New York Coll. at Cortland*, 2016 WL 9022503, at *26 (N.D.N.Y. Feb. 5, 2016) ("In general, an individual is similarly situated if he or she is 'subject to the same performance evaluation and discipline standards' and 'engaged in comparable conduct.'") (*quoting Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000)).[2] Dr. Kaufman, however, admits that he did not consider or analyze sanctions imposed on male and female students who engaged in misconduct of "comparable seriousness." His report confesses that he did not receive the necessary information required to accurately perform such an analysis. [*See* Ex. 1 at 6, n.6 ("A number of these information fields are poorly identified. I understand that Defendants may supplement this data to clarify the

---

[2]   Courts often look to "Title VII interpretations of discrimination in illuminating Title IX." *See, e.g.*, *Emeldi v. Univ. of Oregon*, 698 F.3d 715, 725 (9th Cir. 2012).

5

interpretation of some fields sometime after this report is due and that I will have an opportunity to update my findings as necessary."), 12 n.14 ("The SCC Charge Data has missing values for the complainant gender in 62 percent of records."), 13 ("Defendants were asked to provide a sample of case files to develop additional controls, but Defendants declined to provide such data."); Ex. 2 at 6, n.1 ("I also note that counsel informed me that Defendants refuse to disclose further details regarding the severity of charges for each charge, including a refusal to produce a statistically significant random sample of cases that would allow [Doe] to obtain further details regarding the severity of charges.").]  Instead, Dr. Kaufman's opinion erroneously and impermissibly assumes that all F(23) sexual misconduct violations are comparable and does not account for the great disparity of actions that may constitute "sexual misconduct" under the Code.

The Code's definition of "sexual misconduct" includes actions ranging from "[s]exual violence" and forced "physical sexual acts" to sexual harassment and other unwanted and non-consensual conduct including non-contact offenses such as indecent exposure, voyeurism, or non-consensual photographing.  [*See* Student Code of Conduct, ABOR 5-308, ¶ E(17), attached at Exhibit 5 to ABOR's October 12, 2021 Motion for Summary Judgment ("MSJ") (Doc. 155-2 at pp. 48, 53).]  In view of the wide range of actions that fall within the definition of "sexual misconduct," a valid (reliable) comparison of sanctions given to male and female students found responsible for violating F-23 of the Code cannot be made without specific information as to the type of conduct at issue in each instance.  Dr. Kaufman's failure to review relevant records of the types of alleged misconduct at issue in cases involving male or female respondents renders his opinions unreliable.  *See, e.g.*, Fed. R. Evid. 702(b); *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998) ("An opinion based on such unsubstantiated and undocumented information is the antithesis of the scientifically reliable expert opinion admissible under *Daubert* and Rule 702."); *see also Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 252–53 (6th Cir. 2001) (holding that significant flaws in an expert's methodology, such as failing to account for other possibilities and reasons that could affect the analysis, renders an expert opinion unreliable and not scientifically valid); *Udd v. Cty. of*

6

1  *Phoenix*, 2021 WL1783192, at *5 (D. Ariz. May 5, 2021) (excluding an expert opinion as
2  unreliable where the expert failed to review and provide relevant evidence to establish his
3  opinion differentiating between the "levels of work-related stress that are tolerable and those
4  that are medically intolerable" and noting that "nothing in either *Daubert* or the Federal Rules
5  of Evidence requires a district court to admit opinion evidence that is connected to existing
6  data only by the *ipse dixit* of the expert." (alterations in original) (citations and quotations
7  omitted)); *Gopalratnam v. Hwelett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017) ("To be
8  qualitatively adequate, an expert must employ those kinds of facts or data on which experts
9  in the field would reasonably rely." (citation and quotation omitted)).

10  In addition, Dr. Kaufman's assertion that ABOR did not produce additional
11  information is also false.  ABOR did not "decline" to produce the requested information;
12  rather, this Court held that it was not obligated to undertake such a burdensome task.  [*See*
13  June 4, 2021 Order (Doc. 143), pp. 10–11.]  Moreover, while Dr. Kaufman attempts to fault
14  ABOR for not producing "a sample of case files to develop additional controls" [*See* Ex. 1 at
15  13; *see also* Ex. 2 at 6, n.1], the reality is that ABOR actually produced the information, but
16  Doe simply failed to provide it to Dr. Kaufman for analysis. [*See, e.g.*, Excerpts of Title IX
17  Tracking Report, attached at Ex. 14 to ABOR's May 21, 2021 Motion for Protective Order
18  (Doc. 141-2, pp. 42–50) and Ex. 23-F to ABOR's MSJ (Doc. 155-9, pp. 14-19).]  More than
19  one year ago, and long before Dr. Kaufman undertook his "analysis," ABOR produced to
20  Doe multiple versions of a "Title IX Case Tracking Report," maintained by ASU's Student
21  Rights and Responsibility Office ("SRR"), which detailed the particular allegations against
22  students alleged to have violated F(23) and other Code violations.  [*See* May 21, 2021
23  Declaration of Rebecca van Doren, ¶ 11, attached at Ex. A to ABOR's May 21, 2021 Motion
24  for Protective Order (Doc. 141-1, p. 7).]  By matching the cases by IR Number, Dr.
25  Kaufman could have identified and evaluated the wide variety of conduct alleged as F(23)
26  violations and the wide variety of conduct for which ASU's Dean of Students has found
27  students responsible under F(23).  By way of example, Dr. Kaufman characterized all cases
28  not resulting in suspension or expulsion as having "mild" sanctions, and all cases resulting in

suspension or expulsion as having "severe" sanctions. [Ex. 1 at 6.] Yet, as illustrated in the description of allegations in the Title IX Case Tracking Report, the <u>conduct</u> at issue in the "mild" cases was not comparable to the <u>conduct</u> at issue in the "severe" cases. Examples from the Title IX Case Tracking Report vividly illustrate this key point:

| IR # | Resp. Gender | Description of Allegations | Sanction |
|---|---|---|---|
| 2181-2016 | Male | "[Complainant] reported that she was at an off-campus party where all were swimming…. [respondent] was intoxicated so she helped him get to his house. As she was helping him get into bed, he vaginally sexually assaulted her. She tried to get up sevreal [sic] times, but [respondent] pushed her back down face first with his hand on her neck." | Expulsion |
| 01094-2017 | Female | "ASU PD received a call of a naked female walking down Apache…. she stated she consumed too much tequila and was unaware of any sexual activity happening to her…. [female] changed from reporting party to respondent." | Workshop, Paper, Warning |
| 00909-2017 | Male | Complainant "made out with [respondent] at a party. She was taken back to her residential hall by a friend who then took her to [respondent's] room. [Complainant] reported that at one point she was on the floor and told [respondent] to get off because of the pain on her vagina; after that she blacked out. The next vivid memory was of his penis being put in her mouth by him…she woke up with different clothes, her panties had blood on them, vomit all over…." | Expulsion |
| 00845-2017 | Female | "Faculty mentor [complainant] reported that [respondent] (a visiting doctoral student) was engaged in repeating and unwanted sexual communications towards him)." | Removal from program, Probation, No-contact directive |

[Ex. 5, rows 68, 105, 113, 122.] For IR Numbers 00845-2017 and 01094-2017, Dr. Kaufman deems the sanction "mild," as the cases did not result in expulsion or suspension, whereas Dr. Kaufman deems the sanctions in IR Numbers 2181-2016 and 00909-2017 "severe" because the cases resulted in suspension or expulsion. Despite the significantly material differences in the conduct at issue, Dr. Kaufman improperly and illogically treats these cases

8

as equivalent for purposes of his analysis. Yet, as the allegations in examples cited above illustrate, cases involving female respondents are not necessarily (and in this example not remotely) comparable to the cases involving male respondents. Dr. Kaufman's failure to consider the specific conduct at issue renders his sweeping assertions useless. The trial court must find that the proffered expert testimony "is properly grounded, well-reasoned, and not speculative before it can be admitted." *Udd*, 2021 WL1783192, at *3 (citation omitted). Dr. Kaufman's analysis fails all three requirements.

Similarly, Dr. Kaufman's methodology is unreliable because he does not account for the fact that many of the respondents charged with F(23) violations were also charged with other violations of the Code. *See Nelson*, 243 F.3d at 252–53; *Udd*, 2021 WL1783192, at *5; *Gopalratnam*, 877 F.3d at 781 (citation and quotation omitted). In the examples noted above, both of the male respondents were also charged with an F(2) violation, described in the Code as "[e]ndangering, threatening, or causing physical harm to any member of the university community or to oneself, causing reasonable apprehension of such harm or engaging in conduct or communications that a reasonable person would interpret as a serious expression of intent to harm." [Student Code of Conduct, ¶ F(2), attached at Exhibit 5 to ABOR's MSJ (Doc. 155-2 at p. 55); *see also* Ex. 5, rows 68, 113.] Neither female respondent was charged under F(2). [Ex. 5, rows 105, 122.] Certainly, a respondent (regardless of gender) found responsible for both F(23) and F(2) violations is likely to receive a more severe sanction, irrespective of gender. Yet Dr. Kaufman does not acknowledge or attempt to account for this obvious alternative explanation in his Report.

Through his Rebuttal Report, Dr. Kaufman attempts to rehabilitate this failure by relying on the "Mantel Haenszel peer-group test." [*See* Ex. 2 at 5–6 ("The Kaufman Report also addresses Mr. Duncan's concern regarding other charges, such as physical harm, 'F-2, by reporting the results of the Mantel Haenszel peer-group test, which evaluates severity of sanction separately for each combination of [Code] charges.").] However, Dr. Kaufman's reliance on the peer-group test does not make his opinion reliable. Dr. Kaufman admits as much: "**Where possible my analysis controls for peer-groups by grouping**

1 **respondents according to charge or combination of chargers.  However, even within**
2 **combination of charges there may be non-gender factors that affect the severity of**
3 **sanctions**." [Ex. 1 at 8 (emphasis added).]  Moreover, Dr. Kaufman's opinions fail to
4 explain when he was and was not able to utilize "peer-groups."  Dr. Kaufman's failure or
5 inability to adequately explain the methodology underlying his opinions is grounds to
6 exclude them.  *See, e.g.*, *In re Canvas Specialty, Inc.*, 261 B.R. 12, 21 (Bankr. C.D. Cal. 2001)
7 ("Rule 702 requires an expert to articulate the principles and methods that the expert has
8 used.  If the expert does not disclose the principles and methods used, the court is unable to
9 determine whether the expert has utilized the correct principles and methods, or whether
10 they have been reliably applied in the particular case."); *Udd*, 2021 WL 1783192, at *4-5
11 (finding that expert's analysis failed "to explain why the additional stress caused by the
12 'events' in question . . . was the tipping point that triggered" the plaintiff's need to retire and
13 reasoning: "[t]hat sort of *ipse dixit* is insufficient to pass muster under Rule 702").

14     Finally, Dr. Kaufman's opinion must be excluded as unreliable because he
15 erroneously concludes "Male Complainants Do Not Result In Severe Sanctions." [Ex. 1 at
16 13, Table 5.]  Had Dr. Kaufman reviewed the readily available Title IX Case Tracking
17 Reports, he also would have seen information regarding the gender of complainants.  This
18 information not only would have enabled Dr. Kaufman to formulate reliable opinions, as the
19 current data set Dr. Kaufman relies on did not identify gender of the complainant 62% of
20 the time, it would also have alerted Dr. Kaufman that his present opinions are erroneous.
21 [*See* Ex. 5, row 250.]

22     Dr. Kaufman's failure to account for this additional information directly bearing on
23 the subject of his opinions further proves their unreliability.  *See Krause*, 459 F. Supp. 3d at
24 1267 ("Experts must base their opinions on specific facts…'When an expert opinion is not
25 supported by sufficient facts to validate it in the eyes of the law, or when indisputable record
26 facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's
27 verdict.'" (*quoting Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995); *Brooke*
28 *Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)).  "[T]here is simply

10

too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Admission of Dr. Kaufman's erroneous and unfounded opinions would only serve to confuse and mislead, and not assist, the jury, and should be excluded. *See, e.g., Hanna v. Reg'l Transportation Comm'n*, 2008 WL 11450865, at *4 (D. Nev. July 21, 2008) (excluding expert testimony that "fails to meet the threshold Rule 702 requirement of assisting the trier of fact because it is based upon a false factual assumption vital to the conclusion[.]").

### B. Dr. Kaufman's Opinions Regarding Sanctions Of Male And Female Students For Alcohol Violations (F(15)) Are Unreliable And Irrelevant.

Similar to F(23), ASU's policies define multiple types of actions as alcohol violations, including underage drinking, providing alcohol to a person who is underage, consuming alcohol while employed to serve or sell alcohol, serving or selling alcohol to an intoxicated person, and misrepresenting one's age for the purpose of obtaining alcohol. [*See* Student Code of Conduct, ¶ F(15), attached at Exhibit 5 to ABOR's MSJ (Doc. 155-2 at p. 56); Ex. 7; Ex. 8.] Dr. Kaufman states that he attempted to control for the "type" of violation by only including matters in which F(15) was the sole alleged violation.[3] [Ex. 1 at 11.] This "control," however, is a misnomer as it does not account for the wide variety of conduct that could constitute an F(15) violation.

More importantly, by applying such a limitation, Dr. Kaufman ensured his analysis has no relevance to this matter. *See Cooper*, 510 F.3d at 942 (expert opinion must "logically advance a material aspect of [party's] case"); *Primiano*, 598 F.3d at 565 (expert opinion must have "a valid connection to the pertinent inquiry"); *Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." (*quoting* 3 Weinstein & Berger ¶ 702[02], p. 702–18)); *Johnson v. Am. Honda Motor Co.*, 923 F. Supp. 2d 1269, 1278 (D. Mont. 2013) (excluding proposed expert testimony as irrelevant, as it "did not fit the facts as they were presented at trial" and "could have been of no help to the jury in deciding" the issues in dispute).

---

[3] Dr. Kaufman failed to use this "control" in his flawed F(23) analysis.

11



COHEN DOWD QUIGLEY

Dr. Kaufman acknowledges Doe was not solely charged with an F(15) violation. [Ex. 1 at 4.] Rather, Doe was found to have violated both F(15) and F(23), as he was alleged to have served alcohol to an underage student and then had sexual intercourse with her. [*Id.*] There is no issue in this lawsuit about whether the sanctions imposed on students facing solely F(15) violations are harsher for females than they are for males. The sole issue is whether the sanction imposed against Doe, which was based on violations of both F(15) and F(23), was motivated by gender bias. Dr. Kaufman's decision to exclude information regarding F(23) violations renders the "comparators" not comparable and his opinion irrelevant. *Primiano*, 598 F.3d at 565; *Cooper*, 510 F.3d at 942; *Daubert*, 509 U.S. at 591; *Johnson*, 923 F. Supp. 2d at 1278.

**3.      Dr. Kaufman's Damage Analysis Is Based On Speculation and Guesswork.**

Beyond his profoundly flawed statistical analysis, Dr. Kaufman also purports to calculate the damages Doe allegedly sustained based on a delay in Doe's ability to pursue a career as a wrestling coach at an NCAA Division I college or university. [*See* Ex. 1 at 14–19.] Using "median" salary data retrieved from the internet and relying entirely on Doe's so-called wrestling expert's opinions as to Doe's likely career path, Dr. Kaufman renders multiple-choice damage opinions using multiple possible career progression scenarios. This results in a range of supposed damages between $631,490, and $5,543,579 (877% greater than the low end of range). [*Id.* at 19.] Dr. Kaufman's damages analysis is based on flawed and unreliable data and assumptions and must be excluded. *See, e.g., Cooper*, 510 F.3d at 943.

**A.      Dr. Kaufman's Assumptions Regarding Doe's Career Progression Are Unfounded and Unreliable.**

Dr. Kaufman bases his damage calculations on the following assumptions:

| Actual Career Path | But-for Career Path |
| --- | --- |
| Secondary Coach for 10 years, Recreational Coach for 10 years, Division II or III Coach for remaining career | Division II or III Coach for Full Career |
| Secondary Coach for 10 years, Recreational Coach for 10 years, Division II or III Coach for remaining career | Division II or III Coach for 15 Years, Division I Head Coach for remaining career |
| Secondary Coach for 10 years, Division II or III Coach for 10 years, Division I Head Coach for remaining career | Division II or III Coach for 15 Years, Division I Head Coach for remaining career |

12

[Ex. 1 at 17, Table 7.] However, there is no evidence to support any of these scenarios. *See, e.g.*, *Smith*, 662 F. Supp. 2d at 1125–26. The sum total of evidence of Doe's career aspirations and likely career progression consists only of Doe's own statements about his career goals, and the opinions of Curtis Owen, Doe's wrestling "expert."[4] This evidence is wholly insufficient to support Dr. Kaufman's assumptions.[5]

For example, Dr. Kaufman speculates under one "but-for" scenario that Doe would have become a Division II or Division III wrestling coach for his entire career. [Ex. 1 at 17, Table 7.] Yet Doe has never indicated any desire to coach at a Division II or Division III level. To the extent Doe expressed any interest in coaching, his interest was limited to Division I positions. [*See, e.g.*, Plaintiff's Second Supplemental MIDP Responses, p. 16, attached as Ex. 16-J of ABOR's MSJ (Doc. 155-5 at 101-102) ("Prior to expulsion, Doe was working on becoming an NCAA Division I wrestling coach."); Ex. 9 at 260–61.][6] Similarly,

---

[4] ABOR is separately moving to exclude the proposed expert opinions of Curtis Owen on the basis that Mr. Owen is not a qualified expert and his opinions are unreliable and irrelevant. [*See generally* ABOR's Motion to Exclude Testimony and Opinions of Curtis Owen.] As Mr. Owen's proposed opinions do not satisfy Rule 702 and must be excluded, Dr. Kaufman's opinions relying on Mr. Owen must similarly be excluded.

[5] Dr. Kaufman also appears to offer an opinion on Doe's wrestling qualifications. For example, Dr. Kaufman opines "In college, [Doe] was a Division One wrestler on his way to earning the title of All-American at nationals." [Ex. 1 at 14.] Similarly, Dr. Kaufman opines that Doe's career plan to transition to full time assistant coaching immediately following this conclusion of his graduate degree was "consistent with the career paths of other college wrestling coaches." [*Id.* at 15.] Dr. Kaufman is not qualified by knowledge, skill, experience, training or education to opine on Doe's wrestling qualifications or career path. These opinions by Dr. Kaufman must be excluded. *See Rowe v. DPI Specialty Foods, Inc.*, 727 Fed. Appx. 488, 501 n.11 (10th Cir. 2018) (holding District Court properly excluded expert as unqualified to opine on job qualifications, search efforts or prospects and concluding that "making assumptions based on facts in evidence, and asserting assumptions as uncontroverted facts or as expert opinions to the jury are two different things" and experts are not permitted to do the latter); *id.* at n.12 ("that Rasmussen 'reviewed agency data and researched occupational data for specialized recruits in the food industry, which informed' his opinions... is insufficient to render him a vocational expert to testify to these matters.").

[6] Doe has not been consistent in his assertions about his planned career path. In his First Amended Complaint, Doe alleged that his "chosen occupation" was as a "youth wrestling coach." [Doc. 37, ¶ 77.]

13

Doe's wrestling expert (unqualified as he may be) never mentions the possibility of Doe obtaining a position at a Division II or III school. [*See* Ex. 10.]

In the other two "but-for" scenarios, Dr. Kaufman indicates that Doe would have worked as a Division II or III wrestling coach for 15 years before moving into a Division I head coach position. [Ex. 1 at 17, Table 7.] Again, Dr. Kaufman has no factual basis or data showing this would be the natural, expected or attainable career path for Doe in the very narrow and specialized field of wrestling.[7]  *See, e.g.*, *Rowe*, 727 Fed. Appx. at 501 n.11, n.12. To the contrary, according to ABOR's expert Jason Borelli (an NCAA Division I head coach), in the but-for world, Doe would most likely have obtained an <u>assistant</u> coaching position in a small Division I school, to give him the experience needed to ultimately move up to a head coach position. [*See* Ex. 11 at 9.] Dr. Kaufman's analysis does not contemplate that Doe would ever work as an entry-level assistant coach at the collegiate level—which defies common sense where Doe's only experience is as an assistant youth coach.

In each of the "actual" scenarios, Dr. Kaufman posits that Doe would work as a "secondary" coach for 10 years and a "recreational" coach for 10 years. [Ex. 1 at 17, Table 7.] Again, Dr. Kaufman has no evidentiary, experiential, or other factual support on which to base this assumption. *See, e.g.*, *Smith*, 662 F. Supp. 2d at 1125–26; *Rowe*, 727 Fed. Appx. at 501 n.11. Dr. Kaufman appears to have just made these scenarios up on his own, which is impermissible under Rule 702 and *Daubert*. *See, e.g., Buland v. NCL (Bahamas) Ltd*, 992 F.3d 1143, 1151 (11th Cir. 2021) (affirming exclusion of expert opinion where expert's "assumption that [plaintiff] did not have career opportunities more lucrative than working as a part-time university teacher or member of a corporate board was entirely speculative"); *Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 568 (D.C. Cir. 1993) (holding that district court should have excluded expert testimony that was based "on guesswork, speculation, and conjecture") (citation omitted).

. . .

---

[7] There are only 78 Division I head coach positions in the entire country. [*See* https://www.ncsasports.org/mens-wrestling/division-1-colleges.]

14

### B. Dr. Kaufman's Assumptions Regarding Projected Salary Data, Upon Which He Develops Doe's Damage Analysis, Are Both Inaccurate and Inapplicable To The Facts Of This Case.

Similar to Dr. Kaufman's unfounded assumptions regarding Doe's potential "career path," the salaries Dr. Kaufman applies to compute Doe's likely earnings are wholly disconnected from the facts of this case. *See, e.g., Ollier*, 768 F.3d at 861 (excluding expert opinion as unreliable when the opinion relied on unsupported facts); *I.V. v. Wenatchee Sch. Dist. No. 246*, 342 F. Supp. 3d 1083, 1092 (E.D. Wash. 2018) (granting defendants' motion to strike portions of plaintiff's expert opinions as the opinion at issue was speculative in nature and "not based on adequate information"). Dr. Kaufman gathered salary data from several sources, including the Bureau of Labor Statistics ("BLS") data (for "Secondary", "Recreational", and "Division II or III" coaching positions), a 2017 NCAA report of revenues and expenses of NCAA Division I Intercollegiate Athletics Programs (for "Division I Head Coach"), and the www.govsalaries.com website. This data is unreliable and insufficiently specific to be of any use here.[8]

First, Dr. Kaufman's work-papers suggest that in 2014, 2015 and 2016, assistant coaches earned as much or more than the head coaches in the same division. [*See* Ex. 1 at Attachment B, Work Paper entitled "Salaries And Benefits By Sport."] Dr. Kaufman ignored this counter-intuitive anomaly, reflecting a fundamental flaw in the data he relied upon from the ncaa.org website.

Second, the summary data Dr. Kaufman used provides no information as to what an entry-level coach with no prior college coaching experience—the only relevant salary data for Doe here—could realistically expect to earn. Reliance on blended data that includes salary information with coaches who are in no way comparable to Doe is inherently unreliable and not supported by the facts of this case. Dr. Kaufman's summary also does not analyze the salary data by the size of the school, the stature of its wrestling program, or the experience of the coach—all critical considerations to the salary a wrestling coach can

---

[8] Notably, Dr. Kaufman does not rely upon or even obtain wrestling compensation information from Doe's wrestling/vocational expert, Mr. Owen.

expect to earn. [*See* Ex. 11 at 7-8.] Instead, Dr. Kaufman's calculations begin with the proposition that Doe would start his coaching career with the "median" salary, which means that there are an equal number of both higher and lower salaries. [*See* Ex. 1 at 17 ("Income for each scenario is based on median wages for the corresponding career.").] Fatally, Dr. Kaufman provides no factual basis or reasoned analysis for his conclusion that Doe would have earned in his very first year a higher salary than 50 percent of the other college wrestling coaches (including head coaches) currently employed. Dr. Kaufman simply picked an arbitrary number from an inapposite data pool. Because Dr. Kaufman shows no connection between the salary he selected and the facts in this case, his opinion is unreliable and should be excluded. *See, e.g., U.S. ex rel. Barron v. Deloitte & Touche, LLP*, 2008 WL 7136869, at *4 (W.D. Tex. Sept. 26, 2008) (excluding expert where his "opinions as to the estimate of damages in this case is mere speculation 'connected to existing data only by the *ipse dixit* of the expert'") (*quoting Gen. Elec. Co.*, 522 U.S. at 151); *Martinez v. Rabbit Tanaka Corp., Ltd.*, 2006 WL 5100536, at *14 (S.D. Fla. Jan. 6, 2006) (holding that expert's "unsupported and unverified assumptions" rendered his opinion "the product of an unreliable and inadmissible methodology").

Finally, the salary data Dr. Kaufman gathered, attached to his Rebuttal Report, arbitrarily includes limited coaching salaries for certain years (spanning between 2018 and 2020 or, in some instances, not identifying a year) and contains multiple errors. For example, Dr. Kaufman included inaccurate salary data for the following coaches:

| Coach | School | Kaufman Identified Salary | Actual Salary |
|---|---|---|---|
| Greg Williams | Utah Valley | $144,067 (2019) | $79,939 (2019) |
| John Smith | Oklahoma State University | $480,675 (2020) | $474,393 (2020) |
| Jon Sioredas | Cal Poly | $129,974 (2019) | $129,947 (2019) |
| Brent Metcalf | Iowa State | $68,306 (2020) | $125,833 (2020) |
| Cody Caldwell | South Dakota State | $125,833 (2020) | $51,250 (2020) |
| Ian Miller | Oregon State | $51,250 (2020) | $85,008 (2020) |
| Kellen Russell | University of Michigan | $85,008 (2018) | $75,000 (2018) |

| Lee Roper | University of Northern Iowa | $75,000 (2020) | $75,575 (2020) |
| JM Lightner | University of Oklahoma | $75,575 | $102,500 (2020) |
| Mike DePalma | George Mason University | $102,500 (2020) | $42,000 (2020) |

[*Compare* Ex. 2, Attach. D at "Head Coach Sheet," "Assistant Coach Sheet" *with* Ex. 12; *see also* Declaration of Erik O'Malley, attached as Ex. 6.] Dr. Kaufman's appendage of more than 250 pages of random, disconnected coach biographies and salary data to his Rebuttal Report does not salvage his flawed opinions. [*See* Ex. 2, Attachments.] Dr. Kaufman fails to articulate how he reliably applied the confused mixture of print-outs from the internet to the facts of this case. *E.g.*, *In re Canvas Specialty*, 261 B.R. at 21–22 (excluding expert opinions, reasoning "Because the court in this case cannot determine what principles and methods [the expert] applied, it is also not able to determine whether he applied the appropriate principles and methods reliably.").

**4. <u>CONCLUSION</u>.**

Doe has not met his burden of establishing the admissibility of Dr. Kaufman's opinions. They are not based on sufficient and accurate facts or data, and are certainly not the product of a reliable application of principles and methods to the relevant facts and evidence in this case. Accordingly, the Court should exclude from evidence at trial, and for all other purposes, the opinions, testimony and reports of Dr. Kaufman.

RESPECTFULLY SUBMITTED this 22nd day of October, 2021.



        COHEN DOWD QUIGLEY
        The Camelback Esplanade One
        2425 East Camelback Road, Suite 1100
        Phoenix, Arizona 85016
          Attorneys for Defendant

        By: *Betsy J. Lamm*
            Daniel G. Dowd
            Betsy J. Lamm
            Rebecca van Doren