Robert B. Carey (011186)
Leonard W. Aragon (020977)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
rob@hbsslaw.com
leonard@hbsslaw.com

Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| John Doe, a single man, | Case No.: 2:18-cv-01623-DWL |
| Plaintiff, | |
| v. | **PLAINTIFF'S OPPOSITION TO ARIZONA BOARD OF REGENTS' MOTION FOR SUMMARY JUDGMENT** |
| The Arizona Board of Regents, et al., | |
| Defendants. | **(Oral Argument Requested)** |
| | (Assigned to the Honorable Dominic W. Lanza) |

Plaintiff John Doe ("Doe") files the following response to the Arizona Board of Regents' ("ABOR" or "University") Motion for Summary Judgment.

## I. Summary of Argument

As expected, no ASU official admitted to violating federal law by intentionally discriminating against Doe based on his sex. As such, this case involves indirect proof. "Where a Title IX plaintiff relies on indirect proof of discrimination, [courts] apply the three-part burden-shifting framework announced in *McDonnell Douglas*. *Doe v. Univ. of Denver*, 1 F.4th 822, 829 (10th Cir. 2021) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Cf. Austin v. Univ. of Oregon*, 925 F.3d 1133, 1136-37 (9th Cir. 2019) (rejecting application of *McDonnell Douglas* in Title IX cases at pleading stage, but confirming it is proper when considering summary judgment); *Ly v. Paragon Tech. & Dev. Inc.*, CV-18-02465-PHX-DWL, 2019 WL 4394536, at *3 (D. Ariz. Sept. 13, 2019) (J. Lanza) (relying on *Austin*, *supra*, to apply *McDonnell Douglass* framework when considering Title VII summary judgment motion).

Under *McDonnell Douglass*, Doe has the burden of showing that his sex was a motivating factor in the school's investigation and disciplinary decision." *Doe v. Univ. of Denver*, 1 F.4th at 829. Once he clears that hurdle, the burden shifts to the University to articulate a legitimate, nondiscriminatory reason for its decision. *Id.* If the University is successful, the burden shifts back to Doe to show "a genuine issue of material fact as to whether the proffered reason is pretextual." *Id.* "To prove pretext, Doe must produce evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [University's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the [University] did not act for the asserted nondiscriminatory reasons." *Id.* (citation omitted).

The University, however, ignores *McDonnell Douglass*; instead, arguing that: "Regardless of the standard applied here, gender bias is a required element." Mot. at 3, fn. 2. As such, the only issue for the Court is whether there is a contested issue of fact regarding gender bias, and undisputedly there are at least three reasons to deny the motion. *Id.*

First, the Arizona Court of Appeals has already found that there was no factual basis for the University's determination that Roe was incapacitated, and Doe engaged in sex by force. A reasonable jury can infer sex bias based on a university finding a male guilty of sex by force without evidence. And a reasonable jury can infer sex bias based on a university finding, without evidence, that Doe engaged in sex with a female who was incapacitated. The University has not offered a non-pretextual basis for these determinations. But even if the University claims that it relied on evidence (there was none) and acted in good faith in finding Doe guilty and Roe incapacitated, whether these reasons are pretextual is a contested issue of fact precluding summary judgment.

Second, there is substantial evidence of irregularities in the disciplinary process that a jury can rely on to infer gender bias—at least ten issues identified by the Court of Appeals and six others based on evidence produced by ABOR, including: (1) there was no basis for Doe's interim suspension; (2) the University found Doe guilty of sex by force without informing him of the charge, investigating the charge, or presenting the issue at trial, (3) the University, a supposed neutral entity, advocated for Roe, (4) the University never addressed inconsistencies in Roe's testimony, and (5) the University failed to allow Doe to respond to the allegations against him until forced to comply by an attorney, and then ignored the evidence exonerating Doe.

Last, the University's actions must be viewed in connection with the Dear Colleague Letter, Start by Believing guidelines adopted by ASU (investigative guidelines now universally repudiated as biased), and statistical evidence presented by Doe (based on ABOR's own records) showing disparate treatment of males by the University. When viewed in its totality, as is required, a reasonable jury can infer sex bias based on the University's actions, and any justification it can present merely presents issues of contested fact precluding summary judgment. *See, e.g.*, *Mansourian v. Regents of Univ. of California*, 602 F.3d 957, 969 (9th Cir. 2010) (considering entire record presented when determining whether to grant summary judgment on Title IX claim).

## II. Evidence of Sex Bias

The University argues this case turns on Doe's ability to show gender bias. Mot. at 3. This is partially correct. This motion turns on Doe's ability to present sufficient facts that would permit a reasonable jury to infer gender bias. *Id.* And when construing the evidence, all evidence must be construed in the light most favorable to Doe. *Id.* Doe satisfies his burden of showing sex was a motivating factor by pointing to facts a jury can use to infer the University discriminated against him on the basis of sex. *Doe v. Univ. of Denver*, 1 F.4th at 833 (citing *Doe v. Purdue Univ.*, 928 F.3d 652, 667-68 (7th Cir. 2019)); *Cf. Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 947 (9th Cir. 2020) (rejecting formulaic methodologies to prove Title IX violations).

**A.  A jury can infer gender bias based on the University's baseless finding that Doe engaged in sex by force.**

A plaintiff must generally show procedural irregularities and minimal evidence of sex-based pressure to establish sex-bias, but when there are "disturbing procedural irregularities" or a "perplexing basis" for a decision there is no need for additional evidence. *Doe v. Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019) (reasoning that a "perplexing" basis for a decision can support an inference of sex bias); *Doe v. Univ. of Denver*, 1 F.4th at 832, n. 8 (citing *Cf. Doe v. Oberlin Coll.*, 963 F.3d 580, 588 (6th Cir. 2020) ("[W]hen the degree of doubt [in disciplinary proceeding's outcome] passes from 'articulable' to grave, the merits of the decision itself, as a matter of common sense, can support an inference of sex bias.")); *Schwake v. Arizona Bd. of Regents*, 967 F.3d at 950 (recognizing that "procedural irregularities in the university's investigation and handling of a sexual assault complaint [can raise] an inference of bias.") (citing *Doe v. Columbia Univ.*, 831 F.3d 46, 56–57 (2nd Cir. 2016)).

Here, the Arizona Court of Appeals held on December 24, 2019, that there was no factual basis for the University's finding that Doe engaged in sexual misconduct. *Doe v. Arizona Bd. of Regents*, 1 CA-CV 18-0784, 2019 WL 7174525, at ¶¶ 31, 38 (Ariz. Ct. App. Dec. 24, 2019). The Court reviewed the entire administrative record (*see generally id.* at ¶¶ 1-7) and viewed the evidence in a "light most favorable" to upholding the University's decision. *Id.* at

¶ 1 (citing *Baca v. Ariz. Dep't of Econ. Sec.*, 191 Ariz. 43, 46 (App. 1997)). Despite this deferential standard, the court still held no "reasonable mind" could conclude that Roe was incapacitated.

> Based solely on undisputed accounts of the events that night and on statements by Complainant that are entirely inconsistent with those on which Rund[1] relied, we conclude the evidence at the hearing could not lead a reasonable mind to conclude ASU proved Complainant was unable to make "informed, rational judgments" on the night in question.

*Doe v. Arizona Bd. of Regents*, 2019 WL 7174525, at ¶ 31. And because there was no factual basis for finding that Roe was incapacitated, the Court reversed the University's finding that Doe violated the Student Code of Conduct ("Code") by engaging in sex with someone who was incapacitated. *Id.* at ¶ 31.

The appellate court also found—using the same deferential standard—that there was no factual basis for the University's finding that Doe had sex with Roe by force. *Id.* at ¶ 38. The court carefully analyzed the administrative record and rejected Rund's factual basis for his decision. *Id.* at ¶¶ 33-37; A.R.S. 12-910(E). The court found no "reasonable mind" could reach the conclusion that Doe engaged in sex by force and reversed the University's findings that Doe violated the Code. *Id.* at ¶¶ 33, 46.

Because the University found that Doe, a male, engaged in sex by force with Roe, a female, *without evidence*, a reasonable jury can infer the decision was influenced by sex bias. *See, e.g.*, *Doe v. Purdue Univ.*, 928 F.3d at 669 (reasoning that a "perplexing" basis for a decision can support an inference of sex bias). Similarly, a reasonable jury can infer sex bias based on the University's finding, *without evidence*, that Roe was incapacitated. *Id.* The University's findings are not merely "perplexing" or procedurally irregular, they are egregious findings with no basis in fact *or* reason.[2] *See, e.g.*, *id.* at ¶¶ 31, 33 (holding no "reasonable mind" could

---

[1] Dr. Rund is the Vice-President of Education Outreach and Student Affairs and the final decision maker in the University's administrative process.

[2] Unless otherwise indicated, all numeric exhibits numbers refer to Dkt. 155, the exhibits attached to Plaintiff's Opposition are alphabetical.

4

reach the conclusions the University reached).³ For these reasons, there are sufficient facts to infer sexual bias and the motion for summary judgment must be denied.

**B.  Gender bias can be inferred by the University's abuse of discretion.**

"An abuse of discretion is 'discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" *Id.* (citing *Torres v. N. Am. Van Lines, Inc.*, 135 Ariz. 35, 40 (App. 1982)). Here, the Court of Appeals held the University abused its discretion when it found that Doe violated the Code by engaging in sex by force and Roe was incapacitated. *Id.* at ¶¶ 31, 38. A reasonable jury can infer that the University's manifestly unreasonable or untenable determinations that a male violated the Code without evidence are based on gender bias. A jury may not believe the determinations were due to gender bias, but Doe need not prove his case to defeat the summary judgment. He only needs to present facts that a reasonable jury can use to infer gender bias. *See, e.g.*, *Mansourian*, 602 F.3d at 969. The University's abuse of discretion in a sexual misconduct case is sufficient to meet this burden; the Motion must be denied.

**C.  The Court of Appeals identified specific facts that a jury can use to infer sex bias under Title IX, and those facts are law of the case.**

The appellate court's factual and legal findings are law of the case and cannot be disputed. *See* Sec. C(1), *infra*. In addition to finding the University's abused its direction and had no basis for its findings, the Court of Appeals identified at least ten reasons the outcome of the disciplinary proceedings was improper that a reasonable jury can infer were the result of gender bias. *See* Sec. C(2), *infra*.

>   **1.  The issues decided by the Arizona Court of Appeals are subject to issue preclusion under Arizona law.**

Issue preclusion, also known as collateral estoppel, applies when "(1) the issue is actually litigated in the previous proceeding; (2) there is a full and fair opportunity to litigate

---

³ The Court of Appeals' findings apply equally to the findings of the investigator, University Hearing Board, and Rund, as they all reviewed the same evidence and reached the same conclusions. Exs. 3, 12, 14, 15; Ex. B.

5

the issue; (3) resolution of such issue is essential to the decision; (4) there is a final and valid decision on the merits; and (5) there is a common identity of the parties." *Am. Family Mut. Ins. Co. v. Clancy*, 512 Fed. Appx. 674, 676 (9th Cir. 2013) (citing *Hawkins v. State, Dep't of Econ. Sec.,* 183 Ariz. 100, 900 P.2d 1236, 1239 (Ariz.Ct.App.1995)). Issue preclusion applies to state administrative decisions, except for narrow exceptions not applicable here. *Quade v. Arizona Bd. of Regents*, CV-15-00610-PHX-JJT, 2015 WL 10939902, at *4 (D. Ariz. Sept. 14, 2015), aff'd, 700 Fed. Appx. 623 (9th Cir. 2017) (applying preclusion doctrine to Title IX claims arising from university disciplinary action); *Hawkins v. State, Dep't of Econ. Sec.*, 900 P.2d 1236, 1239 (Ariz. Ct. App. 1995) (recognizing preclusion doctrines apply to administrative claims). "When a state agency "acting in a judicial capacity…resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's fact finding the same preclusive effect to which it would be entitled in the state courts." *Wehrli v. Cty. of Orange*, 175 F.3d 692, 694 (9th Cir. 1999) (citing *University of Tennessee v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986)) (cleaned up). And the "same principle applies to legal as well as factual ruling of an administrative body." *Id.* (citation omitted).

Here, the issues resolved in the Court of Appeals' Order are entitled to preclusive effect. *Id.* The University did not appeal the order and the University issued a final decision on September 4, 2020. Dkt. 178 at 92. *Hawkins v. State*, 183 Ariz. 100, 900 P.2d 1236, 1240 (Ct. App. 1995) ("[w]here a party does not appeal a final administrative decision [,] that decision becomes final….") The parties litigated the factual issues discussed by the Court of Appeals, and the University had a full opportunity to litigate the matter and actually did litigate the matter. *See Monteleone v. Univ. of Arizona Dean of Student's Office*, CV-20-00189, 2021 WL 120905, at *3 (D. Ariz. Jan. 11, 2021) (holding parties to student disciplinary proceeding at state University had adequate opportunity to litigate claims alleging violations of student code of conduct) (citing *Quade*, 700 F.App'x at 625) (reaching same conclusion); *see also* Dkt. 40 at 1-3 and Dkt. 53 at 1-3 (ABOR admitting claims were litigated during administrative process); Dkt. 66 at 10. (recognizing likely preclusive effect of state court decision) (citing

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293, 125 S. Ct. 1517, 1527 (2005)); *see also* 28 U.S.C. § 1738 (requiring full faith and credit of state judicial proceedings).

Because issue preclusion applies here, the University cannot relitigate the factual and legal issues decided by the state court, including factual determinations necessary to find there was no evidence to support a finding of incapacitation or that Doe engaged in sex by force. *Id.*; *see also Gorney v. Arizona Bd. of Regents*, 668 Fed. Appx. 725, 726 (9th Cir. 2016) (citation omitted) (claims or defenses that were raised or could have been raised in administrative hearing were barred in subsequent litigation). In short, if the University is arguing there is evidence to support a finding of sex by force or Roe was incapacitated, it cannot do so. *Id.* Nor can the University challenge the Court's factual and legal determinations necessary to support those findings. *Id.*

### 2. The finding that Doe engaged in sex by force and Roe was incapacitated was based on sex bias, not facts.

A jury can infer sex bias based on the following ten issues identified by the Court of Appeals.

First, the University noted that there was no evidence of incapacitation except Roe's own testimony, which was later discredited by her own testimony to the police and under oath. *Doe v. Arizona Board of Regents*, 2019 WL 7174525, at ¶¶ 19, 30-31. By ignoring all other witnesses—none of whom described Roe as incapacitated (*id.* ¶ 19)—and Roe's own admissions, a reasonable juror can infer that Rund's decision to credit only Roe was based on gender bias.[4]

Second, Rund ignored admissions by Roe that she had capacity during the encounter. *Id.* ¶ 17. Incapacitation means a person is unable to make rational and informed decisions. *Id.* ¶ 12. Here, Roe was asked if one of the young men could ejaculate, she responded "no." *Id.* When the sex became painful, she stopped it. *Id.* And when Roe and Doe were being

---

[4] *Doe v. Am. Univ.*, 19-CV-03097 (APM), 2020 WL 5593909, at *8 (D.D.C. Sept. 18, 2020) (finding female accuser credible despite inconsistencies and rejecting or failing to address credibility of other witnesses sufficient to infer sex bias).

7

photographed without their permission, she told the photographer to stop. *Id.* ¶ 25. Each decision is rational and informed, and a reasonable jury can infer sex bias based the University ignoring the female's admissions in order to find the male guilty.[5]

Third, Rund ignored Roe's conflicting testimony regarding her incapacitation. *Id.* ¶ 21. Roe, for example, claimed she did not know what was going on during the encounter, but the Board found that Roe "was lucid and able to verbally communicate." *Id.* She also admitted she was "coherent" when she entered the bedroom (*id.* at 26), and "recounted what happened in the bedroom in great detail to the police the next afternoon and again during the hearing." *Id.* A reasonable jury could infer that Rund's failure to address Roe's conflicting testimony was evidence of gender bias.

Fourth, Rund found Doe "has no credible explanation for why [Roe] ended [the encounter] abruptly, started crying, and left the room." *Id.* at n. 6. But Roe testified that the sex had become painful and "after she began to cry because of the pain, Doe behaved rudely—he called her 'dramatic' and they exchanged insults." *Id.* By ignoring Roe's testimony and instead assuming she cried and left the room because she had been assaulted, a reasonable jury can find the University's decision was based on gender bias.

Fifth, the court found Roe's statement that she was unable to ask the young men to stop having sex was baseless. *Id.* ¶¶ 22, 25. Roe admitted she was able to tell them to stop. *Id.* The court also pointed to uncontested expert testimony that sharply called into question Roe's inability to stop the encounter. *Id.* Rund, however, ignored the expert testimony and Roe's admission. *Id.* A reasonable jury can infer sex bias based on the University's finding that Roe was unable to stop the encounter despite her admission and uncontested expert testimony to the contrary.

Sixth, the court noted that the Rund "found it compelling" that Roe rejected an earlier attempt by Doe to have sex with her that evening. *Id.* ¶ 27. He found it implausible she would change her mind and have sex with him and another person later in the evening.

---

[5] *Doe v. Grinnell Coll.*, 473 F. Supp. at 927-930 (denying summary judgment because the university ignored exculpatory evidence).

8

*Id.* Rund reasoned that the only variable was that she became incapacitated. *Id.* But she admitted she had capacity throughout the encounter. *Id.* at ¶¶ 12, 25. A reasonable jury can infer gender bias based on the University's finding that the only way a woman would have sex after earlier saying she would not was due to incapacitation, not by choice.[6]

Seventh, Rund "characterized the three-way encounter in the bedroom on the night in question as "outrageous behavior," and from that concluded [Roe] would have participated only if she was incapacitated." *Id.* ¶ 29. But the University's witness testified that a reasonable person exercising free will could decide to participate in a "threesome" (*id.*), and Roe admitted she had capacity. *Id.* ¶¶ 12, 25. A reasonable jury can infer gender bias based on Rund's finding that a female was incapacitated due to her "outrageous behavior," when there is no reason to believe her behavior was unusual other than her sex.[7]

Eighth, the court found that Roe never asserted that Doe or Participant used "violence, threats, intimidation or weapons to compel her to have sex with them." *Id.* ¶ 33. Rund instead relied on statements that Roe wanted to "'throw-up [sic] because…they were pushing on her gag reflexes with their penises.'" *Id.* (ellipses in original). But this "statement does not demonstrate or even suggest that [Doe] forced [Roe] to have sex with him, and neither the Board nor [Rund] attempted to explain how it might evince the conclusion that the sex was forced rather than merely vigorous." *Id.* The Board also omitted "relevant words" from Roe's full statement, which states: "…she remembers wanting to throw-up [sic] because *she was drunk* and they were pushing on her gag reflexes with their penises." *Id.* A reasonable jury can infer gender bias based on Rund's finding that Doe engaged in sex by force because of a statement that does not evince sex by force and the Board's omission of dispositive language from their findings.

---

[6] *Doe v. Washington & Lee Univ.*, 6:19-CV-00023, 2021 WL 1520001, at *13 (W.D. Va. Apr. 17, 2021) (denying summary judgment in Title IX case based on biased assumptions regarding sexual preferences of men and women).

[7] *Id.*

9

Ninth, Rund relied on statements from Roe that the sex was painful. But "those statement do not suggest [Doe] forced [Roe] to have sex." *Id.* The evidence was that the pain was due to the failure to use condoms and lubrication, not force. *Id.* It is unreasonable to infer sex by force based on statements by the female accuser that the sex was uncomfortable or painful when she explained the basis for the pain. A reasonable jury can infer sex bias based on Rund ignoring Roe's testimony as to the causes of pain and inferring an assault.

Tenth, Rund relied on Roe's alleged injuries to find that Doe engaged in sex by force. But the undisputed expert testimony was that her minor injuries were consistent with a "consensual sexual encounter." The nurse's report confirmed that her injuries were minor, and the Court found that her injuries "do not evince a forcible sexual attack" and "cannot reasonably be a basis on which to conclude [Doe] used force to compel her to have sex." Roe also testified that her injuries were due to the prolonged sexual encounter. *Id.* A reasonable jury can infer sex bias based on Rund's baseless finding that minor injuries to a woman necessarily means the male engaged in sex by force.

The University's actions should not be viewed in isolation, but rather in totality and in connection with the statistical evidence and other evidence of sexual bias set forth below. Doe has easily satisfied his burden of presenting sufficient evidence for a jury to infer sex bias, the only issue before this Court.

**D.   The disciplinary process was replete with errors and the University was pressured to resolve claims of sexual bias resulting in a disparate impact on males.**

The University argues that procedural errors alone are "insufficient to create an issue of fact for the jury on a Title IX claim," and cites to this Court's 2019 decision. Mot. at 9. But the law has evolved (*see* Sec. II(A), *supra*), and when there are egregious irregularities, such as finding a male guilty of rape without evidence or believing a female's claim of incapacitation without evidence, a jury can infer sex bias without more. *See, e.g.*, *Doe v. Oberlin Coll.*, 963 F.3d at 588 ("[W]hen the degree of doubt [in disciplinary proceeding's outcome] passes from 'articulable' to grave, the merits of the decision itself, as a matter of common sense, can support an inference of sex bias."). But even if the law had not evolved, the

10

irregularities identified by the Court of Appeals and additional irregularities identified below, coupled with evidence of sex-based pressure on the University and statistical evidence of unfair treatment of men in disciplinary proceedings explained below, is sufficient to establish bias on account of sex." *See, e.g.*, *Schwake*, 967 F.3d at 950-951 (recognizing procedural irregularity coupled with minimal evidence of sex-based pressure on the university is sufficient to establish bias on account of sex).

### 1. There is additional evidence of egregious irregularities in the disciplinary proceedings.

**There was no basis for the interim suspension:** *Doe v. Columbia Univ.*, 1:20-CV-06770-GHW, 2021 WL 3292591, at *25-26 (S.D.N.Y. Aug. 1, 2021) (holding interim suspension based on suspect evidence supports inference of sex bias). During her initial interview, Roe never claims Doe engaged in sex by force. Ex. 3 at 2-3; Ex. 23-A. She also never describes being incapacitated, only drunk. Ex. 3 at 2-3. Roe also admitted she knew Participant was photographing her, and demanded he stop. *Id.* at 3. But Tara Davis, the investigator, ignored Roe's admission regarding capacity. *Id.* at 3-4; Ex. A at 77-78.[8] And the University immediately charged Doe with sexual misconduct for having sex with a person who was incapacitated and placed him on interim suspension, even though Davis had not interviewed Doe, collected corroborating information to confirm Roe's allegations, and Roe admitted she had capacity during the sex act. *See, e.g.*, Ex. A, B; Ex. 6; Ex. 3 at 3-4; Ex. 23-C at 5-6. The University also accuses Doe of filming Roe during the encounter even though Roe knew (and reported) that Participant filmed her, not Doe, and the pending criminal charge were only against Participant for surreptitious filming. Ex. 3 at 3. Indeed, Doe was a victim of surreptitious filming and yet Participant's criminal act was cited as a reason for his suspension. Ex. 6.

There was also no reason to suspend Doe from campus. The interim suspension was

---

[8] Doe has replaced personal identifiers with pseudonyms in the attached exhibits to enable filing in the public record. Where text is redacted without a text overlay in Doe's exhibits, that is the form in which those documents were produced by ABOR.

11

ostensibly for the "safety of the campus community," but Roe never alleged Doe was a threat to her or the campus. Ex. B. Roe waited almost six months to report the incident to ASU and attended school with Doe after the incident. *Id.*; *see also* Ex. C at 2. The incident took place off-campus and while the participants were drinking. *Id.* The University had no reason to find Doe was a threat to campus safety except that he was a male *accused* of sexual misconduct—which the University knew, or should have known, was a false charge. Ex. B; Ex. 3 at 3. Based on the foregoing, a reasonable jury can find Doe's suspension was influenced by gender bias.

**The University found Doe guilty of a sex by force without informing Doe, investigating the charge, or presenting the issue at trial.** *Karasek v. Regents of Univ. of California*, 956 F.3d 1093, 1105 (9th Cir. 2020) (citation omitted) (holding students are not entitled to a particular disciplinary process, but the process must not be "unreasonable"). The Code requires the University to notify Doe of the charges again him. Ex. 5 at ABOR001589 at A(3). The information supporting the interim suspension, however, makes no mention of sex by force. Ex. B. It only states that Doe is accused of sex without consent due to the "minor female student of ASU" being heavily intoxicated. *Id.* And because Davis never said she was investigating a claim of force or that Roe claimed Doe engaged in sex by force, Doe had no reason to identify, locate, and submit evidence to defeat such as claim. *See, e.g.,* Ex. 3 at 5-8; Ex. 5 at 20 Ex. 3 at DOE001403-04; Ex. 23-C at 9-14. Even if there was a pending sex by force charge, Davis never competently investigated the charge, as the charge and evidence supporting it is not in her investigative report. *See, e.g.*, Ex. 3. And despite irrelevant mentions of sex by force in the University hearing, it was never substantively argued by either party. Ex. D at 16-19; Ex. 7 at 20-28, 392-400. The University points to hearing testimony mentioning the word force, but this testimony confirms that force was not an issue at the hearing and mentioned only in passing. Mot. at 12-13. A reasonable jury can infer the University wanted to convict males at any cost based on the University's failure to inform Doe he was charged with sex by force, the failure to investigate

sex by force, the failure to inform Doe he needed to produce evidence to defeat a sex by force charge, and the failure to support the charge at the hearing.

**The University acted as Roe's advocate.** When the investigator met with Doe, she described herself as a "neutral third-party investigator." Ex. 3 at 5, Ex. 23-B at 8. She half-heartedly asked Doe for information, but simultaneously claimed she would gather available information: "I just collect information, anything I can get, by speaking to people, by collecting documentation that may be available, and then I just compile a report." Ex. 23-B at 9:17-20. This was false. Davis, for example, agreed to interview Sunkist Wrestling supporter Art Martori, but never did. Ex. E at 73:7-74:1. Doe also asked Davis to interview witnesses in the athletic department but failed to do so. *Id.* at 74:2-17.

In contrast, the investigator informed Roe she was not just a neutral fact finder, but rather her partner: "…my job [is] to be like a *detective that you're working with and to gather information*…." Ex. 23-A at 11:23-12:4 (emphasis added). Davis asked Roe to locate and provide specific information to support Roe's case and explained the onus was on her to prove her case: "It's going to be up to you to provide photos or text messages or receipts or social media posts or whatever you have that you feel would be relevant for me to know." *Id.* at 8:10-19; *see also id.* at 9:2-3 ("It's going to be up to you to submit information instead of me being able to go get it."). Davis then directed Roe to an ASU sponsored advocate that could assist her in obtaining evidence to support her claims, an offer never afforded Doe. Ex. F at 20:22-21:18. The investigator also spoke to Roe's witnesses (including non-percipient witnesses) early in the investigation, and even agreed to represent Roe if there was an appeal even though there is nothing in the Code that would allow the University to represent her. Ex. G at 13:20-14:19; Ex. 5 at ABOR001561-96; Ex. 3 at 1 (listing non-percipient witness, Student 2). A reasonable jury can infer gender bias based on the University's self-described advocacy for the female, a role never afforded a male.

**The University never addresses inconsistencies in Roe's testimony.** *Doe v. Oberlin Coll.*, 963 F.3d at 587 (finding it "remarkable" that panel did not address inconsistencies in accusers' statements and holding such as failure supported a finding of sex

13

bias), *Doe v. Univ. of Denver*, 1 F.4th at 833 (holding inconsistent testimony that is not addressed in the final report supports a finding of a Title IX violation). Roe made several statements during her interviews with the University that were inconsistent with her statements to the police, earlier statements to the University, and statements that were logically inconsistent. *See, e.g.*, Ex. F at 9-12; Ex. 2 at 165-174; Ex. 3 at 3-5. Roe claimed, for example, she did not recall details of the incident. Ex. F at 10:14-11:15; Ex. 23-A at 17:10-18:7. To the police, however, she gave precise details of what happened in the room and was able to give similar details to the investigator during their first meeting. Ex. 3 at 3-6; Ex. H at 127-128. More importantly, the University never reconciled how Roe could have capacity to stop the sex, realize and stop surreptitious photographing, and stop Doe and Participant from ejaculating—based on her own statements—and still be incapacitated. Ex. 3 at 18, Ex. I at ABOR008299-300. Because the University never reconciled inconsistent statements by the female accuser, a reasonable jury can infer sex bias against a male accused.

**The University tried to keep Doe from responding to new evidence and ignored the response after receiving it.** *Doe v. Grinnell Coll.*, 473 F. Supp. 3d 909, 927-930 (S.D. Iowa 2019) (denying summary judgment because the university ignored exculpatory evidence); *Doe v. Univ. of Denver*, 1 F.4th at 833 (holding refusal to consider exculpatory evidence supports finding of procedural irregularities). Parties have the right to "respond to all investigative materials." Ex. 5 at 20. Here, Davis refused to grant Doe that right until he hired an attorney who secured the right. *See* Ex. J. The University claimed no substantive new information was provided (Ex. K at ABOR0006385), but Doe's attorney identified substantive, new information presented by Doe, and details the egregious flaws, inconsistencies, baseless conclusions, and legal infirmities with the draft report. Ex. K. The response, however, was not seriously considered (and certainly no substantive effort was made to examine or corroborate the information) as the University issued its disciplinary decision the next day. Dkt. 155, Ex. 6. The University claims it considered the letter but did nothing to change the draft report or disciplinary decision, or address the issues identified in the letter. *Id.*; Ex. 3; Ex. 6. In contrast, Roe was given every opportunity to review new

evidence. Ex. 3; Ex. K. A reasonable jury can infer gender bias based on the University's failure to give the male accused an opportunity to review and comment on evidence and granting the female accuser that right, and by failing to address obvious and relevant issues in the draft report before finding a male guilty of violating the Code.

### 2. The DCL, Office of Civil Rights investigation, and Start by Believing campaign supports an inference of sexual bias.

"It is precisely because procedural irregularity alone already suggests bias that even minimal evidence of sex-based pressure on the university is sufficient to establish bias on account of sex." *Menaker v. Hofstra Univ.*, 935 F.3d at 33, n. 48; *Schwake v. Arizona Bd. of Regents*, 967 F.3d at 950. Here, there are at least three facts showing sex-based pressure that a jury can infer sex bias. First, in 2011 the U.S. Department of Education issued its "Dear Colleague" letter to colleges and universities, including ASU. *See* Ex. 17. ASU incorporated the DCL into its training and manuals governing the disciplinary process. *Id.* The investigator, each UHB Board member, and Rund had a copy of the DCL. *Id.* The letter mandated that ASU prioritize the investigation and resolution of harassment claims and defined "sexual harassment" more broadly than in comparable contexts. *Id.* at DOE003175-76. The letter also warned schools that "[t]his Administration is committed to using all its tools to ensure that all schools comply with [T]itle IX so campuses will be safer for students across the country." Examining Sexual Assault on Campus, Focusing on Working to Ensure Student Safety, Hearing Before the S. Comm. on Health, Educ., Labor, and Pensions, 113th Cong. 7 (2014) (statement of Catherine Lhamon, Assistant Secretary for Civil Rights, U.S. Dep't of Educ.). "In other words, a school's federal funding was at risk if it could not show that it was vigorously investigating and punishing sexual misconduct," which a jury can infer led to decisions improperly influenced by sex bias. *Doe v. Purdue Univ.,* 928 F.3d 652, 668 (7th Cir. 2019) (C.J. Barrett).

Second, The University was being investigated by the Office of Civil Rights, a sub-agency of the Department of Education, during Doe's disciplinary proceedings. *See, e.g.*, Ex. M. The University's Title IX coordinator claimed the investigations never "influenced ASU's

15

actions" and ASU was never found guilty of violating federal law, but the investigations were ongoing during Doe's disciplinary proceedings, and a jury can infer the *pending* investigation unduly influenced the decision-making during Doe's proceedings. *Id.*; *Miami Univ.*, 882 F.3d at 594 (recognizing that federal investigation into handling of sexual assault cases on college campus yield "a reasonable inference" of sex discrimination when combined with procedural irregularities); *Doe v. Oberlin Coll.*, 963 F.3d at 587 (same).

Third, ASU was operating under the SBB campaign during the disciplinary proceedings. Ex. N. The campaign assumes the accusers' accusations are true and acts accordingly. Dkt.161-1 (Nannetti Report at 1). The University claims it did not adopt the policy, but a proclamation announcing the University's adherence to the policy was signed by the University president and the Title IX coordinator. Ex. N. ABOR claims the campaign is gender neutral because it is victim-focused, but the number of female accusers is higher than male accusers resulting in a strong bias in favor of female complainants and male accused. *Id.*; *see also* Mot. at 16. The SBB, moreover, has been repudiated by law enforcement and is considered an improper investigative technique. Dkt. 161-1 at 48-50, 54-56. More importantly, as applied here, Doe was suspended immediately after the University met with Roe despite her admissions which undermined her claims and the lack of *any* corroborating evidence. Based on the foregoing, a jury can infer the SBB campaign influenced the decision to suspend a male accused without evidence.

The pressure to comply with the DCL, complete investigations, and resolve allegations of misconduct while being actively investigated by the OCR and following the SBB campaign, provides a backdrop, that, when combined with other circumstantial evidence of bias, provides additional facts for a jury to infer bias. *See, e.g., Doe v. Univ. of Denver*, 1 F.4th at 836 (holding substantively similar facts as here were sufficient to find sex was a motivating factor in the University's decision to expel); *Doe v. Univ. of Arkansas*, 974 F.3d 858, 865 (8th Cir. 2020) (concluding a "dubious [disciplinary] decision" and pressure on the University to demonstrate it was responsive to female complainants supports inference that a university is biased based on sex).

### 3. Unrefuted statistics show additional evidence of gender bias.

Statistical evidence in a Title IX case is persuasive when, as here, it identifies statistical anomalies that are not easily explained. *See Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56, 75 (1st Cir. 2019). *Id.*[9] Here, Dr. Lance Kaufman found four statistical anomalies that raise a fair inference of anti-male bias. *Id.* at 835. (1) F-23 incidents involving male complainants result in less severe sanctions; (2) males receive severe sanctions of expulsion and suspension at a higher rate than females charges with the same violations; (3) males are found to have violated F-15 and F-23 of the Code at a higher rate than females charged with F-15 and F-23 violations. Dkt. 159-1(Kaufman Report) at 5. These statistical anomalies cannot be explained by non-discriminatory possibilities, such as "male students commit more sexual assaults, the women are likelier to be the victims of those assaults, or that female victims are likelier than male victims to report sexual assault." *Doe v. Denver*, 1 F.4th at 835 (rejecting these justifications for disparate treatment when male was given different punishments for substantively similar charges). Further, there is no evidence for such non-discriminatory possibilities in the record here. Because a jury can infer sex bias based on evidence of a statistical disparity in the treatment of men and women by the University, the motion must be denied. *Cohen v. Brown Univ.*, 101 F.3d 155, 170–71 (1st Cir. 1996) ("Title IX, like other anti-discrimination schemes, permits an inference that a significant gender-based statistical disparity may indicate the existence of discrimination."); *Doe v. Denver*, 1 F.4th at 834 (same).

### III. Conclusion

For these reasons, the Motion for Summary Judgment should be denied.

---

[9] The University focuses unnecessarily on Nannetti's investigative report. Her opinions are admissible for the reasons set forth in Plaintiff's Response in Opposition to the ABOR's Motion to Exclude the Testimony and Opinions of Cindi Nannetti, which are incorporated herein. Plaintiff also incorporates Plaintiff's Response in Opposition to the ABOR's Motion to Exclude the Testimony and Opinions of Lance Kaufman.

RESPECTFULLY SUBMITTED this 23rd day of November, 2021.

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By s/ Leonard W. Aragon
  Robert B. Carey (011186)
  Leonard W. Aragon (020977)
  rob@hbsslaw.com
  leonard@hbsslaw.com

  Attorneys for Plaintiff John Doe