# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

John Doe, a single man, )
Plaintiff, ) Case No. 2:18-cv-01623-DWL
vs. )
The Arizona Board of Regents, et al, )
Defendants. )

CONFIDENTIAL

VIDEOCONFERENCE DEPOSITION OF

TARA DAVIS

MARCH 9, 2021

9:00 A.M.

PHOENIX, ARIZONA

REPORTED BY:
Sommer E. Greene, RMR, CRR
Certified Court Reporter
Certificate No. 50622

JOB NO. 190226

her, How are you able to tell these young men that you don't want that or you don't want to be filmed or you don't want to be photographed and yet you're incapacitated?

MR. DOWD: Object to the form of the question.

THE WITNESS: She indicated that she was not aware of what was going on until she saw a flash and that the flash triggered something for her to respond to.

Q. BY MR. ARAGON: Okay. And I understand that. But at that point in time, she was able to make, at least possibly, an informed and rationale decision not to -- to ask someone not to be filmed while she was naked having sex?

MR. DOWD: Object to the form of the question.

THE WITNESS: I believe that perceiving that a flash does not necessarily indicate capacitation or incapacitation.

Q. BY MR. ARAGON: Okay. But she did tell them, I don't want that, I don't want to be filmed or photographed. Right?

MR. DOWD: Object to the form of the question.

THE WITNESS: Correct.

Q. BY MR. ARAGON: Okay. So my question is, if that's possibly an informed rationale judgment, how can you be incapacitated afterwards? Because I believe you said she was incapacitated as well, coming out of the room, or you at least believed her that she may be.

How would she be incapacitated coming out of the room when she was able to make, at least possibly, an informed, rationale judgment inside the room?

MR. DOWD: Object to the form of the question.

THE WITNESS: So when we're looking at incapacitation, we're not looking at one thing in isolation, we are looking at the totality. So being able to perceive a flash may or may not be indicative of whether someone has capacity. We're going to look at all signs to determine if someone was incapacitated.

Q. BY MR. ARAGON: And is it your understanding that you looked at all signs to determine whether or not Ms. Roe [redacted] was incapacitated during your investigation?

A. I believe I took down all facts to describe

possession, but I'll direct your attention to -- I'll avow to you this is the first page of handwritten notes in this document beginning at page 81 in the upper right-hand corner, Bates number DOE1405. Do these look like your notes?

A. Yes.

Q. Okay. And there are quite a few in here. I'll just thumb through. You could let me know if these aren't the notes. And if they aren't, I don't believe I have any other ones that were disclosed, but I'll try to find them. But I'll let you review these notes and review Ms. Roe [redacted] s testimony and then I'll have some questions for you, okay?

So why don't we come back in a half an hour, at 2:45, and let me know if you need less or more time. I'll be here on my e-mail. Okay?

(A recess was held off the record.)

Q. BY MR. ARAGON: Ms. Davis, did you have an opportunity to review your notes?

A. Yes.

Q. Okay. Did you have an opportunity to review the transcript of your conversation with Witness 2 [redacted]

A. Yes.

Q. Did you have sufficient time to review both

of those documents?

A. I could have spent more time, but I have a refresher.

Q. I understand.

You know, to make it easier, I'm going to pop it up on the screen here. And you were reviewing an unredacted version, but I'm going to show you a redacted version, which your counsel pointed out is Exhibit 63 to a prior deposition.

So here are -- let me pop it up here so in case you want to review anything and look at it.

You have a hard copy in front of you as well?

A. Yes.

Q. Okay. And for the record, if you could just tell me what page you're on with the little Bates number in the lower right-hand corner of this one that begins with Doe.

A. DOE001405.

Q. Okay. I'll try to track. If you go through your notes, I'll try to track what you're saying and follow along here with what's on the screen, in case anybody looks at this in the future.

So I believe, before we took a break, you testified that you compared the police reports to the

various interviews you had with the parties and witnesses to identify any inconsistencies there might be between the two. Correct?

A. Yes.

Q. Okay. And you stated that your notes would help you identify inconsistencies that you found, if any, with Ms. Roe s testimony. Right?

A. Yes.

Q. And we just went over -- you had an opportunity to review your notes. Right?

A. Yes.

Q. What inconsistencies -- well, let me ask you this: Did that refresh your recollection as to what inconsistencies you identified during your investigation regarding statements made by Ms. Roe to the police and those made to you?

A. I would say at least some of them.

Q. Okay. Can you identify them for me? And if you're referencing your notes, do you mind telling us where in your notes you're looking at and I'll try to track your testimony here on the screen?

A. Sure. So in the binder that you had sent me, in the investigation findings, in the findings of facts section.

Q. Can you give us a Bates number?

A. DOE001360.
Q. Okay.
A. Are you ready?
Q. Yeah, I'm ready.
A. Okay. Under the bullet points in which I discussed alcohol, the first dark bullet point, the third sub-bullet point, references what I found in the police report as compared to their statement. In the third dark bullet point, the sub-bullet point also referenced what the police report states.
Q. Wait, I'm sorry. Which --
A. And then --
Q. Where was that one?
A. The third dark bullet point, the two sub-bullet points that are not filled in circles.
Q. Do they begin with "John Doe reports" and "Jane Roe reports"?
A. From the middle of the page, the third dark bullet point says, "Both John Doe and Jane Roe agree that sex occurred."
Q. Yes.
A. The two sub-bullet points underneath that reference information that I found in the police report.
Q. Okay.

A. And then on this second page that's attaching itself to the last of the dark bullet points, on the bottom of page 18, regarding the sexual encounter being recorded by Cordova, I noted how the police report describes the five-second video.

Q. So you're referencing the bullet points that begins "The police report addresses"?

A. Yes.

Q. Okay.

A. So those would have been the notes.

Q. Those would have been the three inconsistent statements that you identified based on your review -- your comparison of the police report statements to statements made to you?

A. Those are the ones that were material to the findings of fact.

Q. Okay. So let's go to the first one. Can you read the first bullet point that you identified as a material inconsistent statement?

A. Sure. So it says, "Both John Doe and Jane Roe admit to drinking alcohol and being aware that the other party was drinking alcohol as well. How much alcohol was consumed is inconsistent in the statements received."

I note, "Witness 2 provided text messages from the night in question in which Jane Roe reports of consumed five shots of alcohol prior to witness arrival. Both John Doe and Jane Roe agree that alcohol was consumed prior to and after, whom we believe, Witness 2's arrival."

And then I noted that, "Police reports transcription of the confrontation call John Doe states the following: 'You went into the room, I would have not done anything if you didn't want to. Why did I do it when you were so drunk? I was really drunk too. That's what happens when two drunk people hang out. That's what happens.'"

Q. Okay. What's the inconsistent statement though?

A. This one is about how much alcohol was consumed.

Q. Yeah, I understand that. But what's inconsistent between what was told to you and what was stated in the police report?

A. How much alcohol was consumed. This is the information that I found in the police report that was the statement from -- that Doe [redacted], as I recall, during my second meeting with him, he kept wanting to refer to the police report, since he had no idea how

much was consumed. He kept saying, or his parents kept saying, look at the police report, look at the police report.

Q. Okay.

A. So this is what I found in relation to intoxication. That's the statement from [redacted]. And I believe that's because, as I recall, [redacted] never provided direct information to the police. So the only statement I had from him, that I can recall, to the police would have been found in the confrontation call.

Q. Okay. But what inconsistent statement did Mr. [redacted] make to you that was inconsistent with what he said to the police?

A. It's not inconsistent necessarily between his statement to the police and his statement to me, as it is between the facts of what the students have been stating. So one student would have reported five shots before, [redacted] said that he didn't know, he wanted to refer to the police report.

Q. Okay.

A. He knew that there was consumption before and after.

Q. Okay.

A. And so then I went to the police report.

As I recall, I did not find any interviews with him; I only found a confrontation call. So I could take this and the confrontation call as the only reference to alcohol in which would direct me to the police reports, in which I found only this.

Q. Okay. Are there any other inconsistent statements that you found regarding the consumption of alcohol?

A. There was inconsistencies on the amount of alcohol consumed, the level of intoxication. For instance, you -- Witness 2 had stated that she was, quote, gone. Here Doe is stating that she was -- "you were so drunk." So they were using different phrases to describe her level of incapacitation.

Q. Okay. So I apologize, maybe I didn't state my question correctly.

My question is, what inconsistent statements did you find made by one witness who made a statement to you during your interview when compared to a statement that same witness made to the police?

A. I don't recall any.

Q. Okay. So you don't recall -- well, let me back up.

You compared the statements that the

witnesses made to you versus the statements that the witnesses made to the police. Is that correct?
A. Yes.
Q. Okay. And did you compare the statements that the parties gave to you versus the statements the parties gave to the police?
A. Well, I did not find any statements from the parties; I only found statements from Roe [redacted] The information I had from Doe [redacted] in the police report was only from the confrontation call, as best as I recall.
Q. That's fair. And so did you compare the statements that Ms. Roe [redacted] made to you to the statements she made to the police?
A. Yes.
Q. Did you compare those two statements, the statements made by Roe [redacted] to you and the statements made by Ms. Roe [redacted] to the police, to determine whether there were any inconsistencies between those two statements?
A. I was looking for material inconsistencies.
Q. Okay. Did you review the statement she made to you and the statement she made to the police to determine whether there were any material inconsistencies between the two statements that were

made?

A. Yes.

Q. Okay. What were those inconsistencies?

A. I did not find anything material.

Q. Okay. How do you define material?

A. Something that would have impacted the investigation; a significant difference.

Q. And you were unable to identify any inconsistent statements that would impact the investigation?

A. Correct.

Q. And you were unable to find any significant differences between the statements made to you and the statements made to the police by Ms. Roe [redacted]?

A. Excuse me. Can you repeat that, please?

Q. Yes. You were unable to find any significant differences between the statements made to you during your investigation and the statements made to the police by Ms. Roe [redacted]?

A. Correct. I did not find material inconsistencies.

Q. Oh, you did identify one material inconsistency earlier that you found with respect to Mr. Witness 4 [redacted]. Correct?

A. Correct.

# EXHIBIT B

Message

**From:** William Kennedy [wkennedy@asu.edu]
**Sent:** 9/21/2016 2:05:21 PM
**To:** 'tdavis19@asu.edu' [tdavis19@asu.edu]
**Subject:** RE: Meeting with the Office of Student Rights and Responsibilities

Thank you.

**From:** tdavis19@asu.edu [mailto:tdavis19@asu.edu]
**Sent:** Wednesday, September 21, 2016 2:02 PM
**To:** William Kennedy <wkennedy@asu.edu>
**Subject:** Meeting with the Office of Student Rights and Responsibilities

September 21, 2016

John Doe
Redacted PII

Redacted PII
United States

John Doe

The Office of Student Rights and Responsibilities has received a report that on or around April 2, 2016, you provided alcohol to a minor female student of ASU. After she became heavily intoxicated, you and another male took her to a room in your off-campus house where you engaged in oral and vaginal sex without her consent. Reportedly, a camera was used to record the sexual acts and the female did not consent to the recording.

Due to the serious nature of this situation, you are placed on **interim suspension effective immediately.** This action is being taken due to the concern for your safety and/or the safety of the campus community. Interim suspension is defined in the Arizona Board of Regents Student Code of Conduct as follows:

*The Dean may impose restrictions on a student or suspend a student for an interim period prior to resolution of the disciplinary proceeding*

If true, the behavior stated above would be in violation of the Arizona Board of Regents (ABOR) Student Code of Conduct, pertinent parts of which are stated below:

*5-308 F-15 Violation of the Board or university rules or applicable laws governing alcohol, including consumption, distribution, unauthorized sale, or possession of alcoholic beverages.*

*5-308 F-23 Sexual Misconduct a. Sexual violence and other non-consensual sexual contact – actual or attempted physical sexual acts perpetrated against a person by force or without consent; or b. Sexual harassment – unwelcome conduct of a sexual nature that is sufficiently severe or pervasive as to create an intimidating, hostile, or offensive environment; or c. Other unwanted or non-consensual sexual conduct including but not limited to indecent exposure, sexual exploitation or voyeurism, or non-consensual*

*photographing or audio-recording or video-recording or another in a state of full or partial undress or while engaged in sexual activity, or publishing or disseminating such materials. "Consent" in the context of sexual activity means informed and freely given words or actions that indicate a willingness to participate in mutually agreed upon sexual activity. Consent may not be inferred from: 1) silence, passivity or lack of resistance, 2) a current or previous dating or sexual relationship, 3) acceptance or provision of gifts, meals, drinks, or other items, or 4) previous consent to sexual activity. Consent may be withdrawn during sexual activity, consent to one form of consensual sexual activity does not imply consent to any other form of sexual activity. Consent may not be obtained through physical force, violence, duress, intimidation, coercion, or an express or implied threat of injury. Consent may never be given by a person who is: incapacitated (by drugs, alcohol or otherwise), unconscious, asleep, or otherwise physically or mentally unable to make informed, rational judgments. The use of alcohol or drugs does not diminish one's responsibility to obtain consent and does not excuse conduct that violates this Student Code of Conduct. Consent cannot be given by someone who, by virtue of age, circumstances or other factors, is deemed by law to be incapable of giving consent.*

*5-308 F-25 Photographing, videotaping, filming, digitally recording, or by any other means secretly viewing, with or without a device, another person without that person's consent in any location where the person has a reasonable expectation of privacy, or in a manner that violates a reasonable expectation of privacy. This section does not apply to lawful security or surveillance filming or recording that is authorized by law enforcement or authorized university officials.*

Although you are on interim suspension, **you must attend a meeting with Student Rights and Responsibilities staff.** This meeting is to ensure that you are connected to the proper resources to best support you.

For this reason, an appointment has been scheduled for you to discuss this matter with Tara Davis, Assistant Director of Student Rights and Responsibilities. The meeting will be held on

• **September 22, 2016 1:00 PM**, Student Services Building (SSV), Suite # 263

At this meeting, the next step in this process will be determined, including whether the interim suspension is removed. To assist your understanding, attached is a copy of the ABOR Student Code of Conduct and Student Disciplinary Procedures, which is also available at https://eoss.asu.edu/dos/srr/codeofconduct.

Please be advised that Bill Kennedy, Associate Athletic Director, is aware of this matter and is copied on this communication.

If you have questions, please contact the Office of Student Rights and Responsibilities at (480)965-6547.

Sincerely,

Kendra Hunter

Sr. Associate Dean of Students

Arizona State University

# EXHIBIT C

ASU Arizona State University — ADVOCATE by symplicity

Thursday, February 16, 2017 | 11:27 am
**User:** Megan Thompson, Staff

## Incident

**IR#**
02464-001-2016

**Reported On**
September 17, 2016, 1:50 PM

**Reported By**
Carla Owen

**Incident Type**
Complaints

**Date/Time of Incident**
September 16, 2016 12:00 am

**Location of Incident**
Tempe Campus/Off Campus Tempe

**Additional Info**
Tempe PD took report. Number unknown.
ASU report number 2016-78539 ordered 9-17-16. dmr

**Students Involved**
John Doe ) ([redacted]

**Other Involved Individual(s)**
Adrian Alexander Cordova [redacted] from Gilbert (never admitted to ASU) and Adrian Cordova Y Quiroz from Scottsdale [redacted] (never attended ASU). cko

**Student Witness(es)**
[redacted]

**Other Witness(es)**
Officer Bryon Brunatti

**EMT Called**
No

**Police Called**
Yes

**Police Report #**
ASU 16-78539; TPD unknown

**Facilities Called**
No

**Alcohol Involved**
No

**Drugs Involved**
No

**Sexual Misconduct**
Yes

**Dating / Domestic Violence**
No

**Threats Involved**
No

**Weapons Involved**
No

**Incident Description**
Former Downtown student [redacted] went to ASU PD on 9/16/2016 to report that she was sexually assault off campus in April of 2016 by two wrestlers. She reported to Tempe PD and now wants ASU PD to be aware.

## Administrative Action

**Charges**
5-308 F-15 Alcohol Violations
5-308 F-23 Sexual Misconduct
5-308 F-25 Recording without Consent

**Part of Clery Reporting Act**
No

**Arson**
No

**Hate Crime**
No

**Responsible For**
5-308 F-15 Alcohol Violations
5-308 F-23 Sexual Misconduct

**Sanctions**
Expulsion

**Decision Date**
December 22, 2016

**Not Responsible For**
5-308 F-15 Alcohol Violations

## Meeting Information

**Meeting Type**
Meeting

**Student**
John Doe ( - ) [redacted]

**Date/Time of Meeting**
September 22, 2016 1:00 pm

**Original Meeting Date**
September 22, 2016

**Original Meeting Notification Date**
September 21, 2016

**Meeting Location**
Student Services Building (SSV), Suite # 263

**Notes**
provided alcohol to a minor female student of ASU. After she became heavily intoxicated, you and another male took her to a room in your off-campus house where you engaged in oral and vaginal sex without her consent. Reportedly, a camera was used to record the sexual acts and the female did not consent to the recording

# EXHIBIT D

# PDF TRANSCRIPT COVER PAGE

**Recorded Appeal Hearing,** John Doe [redacted]

**University Hearing Board Appeal**

**Date: 05/23/2017**

OTTMAR

Ottmar & Associates, Inc.
3770 N. 7th Street, Suite150
Phoenix, AZ 85014
T 602.485.1488
scheduling@ottmarassoc.com

**Court Reporters** **Videoconference** **Transcription**

Page 13

MR. MILLER: "Dot," [redacted], and that's spelled [redacted]

MS. DOUGHERTY: Okay. You'll get a copy of that now.

MR. MILLER: Thank you.

THE CHAIR: And I think we owe Tinkerbelle a tip of the hat. We got this request, like I say, at midnight last night and we've been working on it ever since. So, um, so Tinkerbelle's owed a thank you.

I have a couple other things here relating to the evidence. Because this hearing has been restarted, there could be some overlap or confusion on the evidence. And I want to just clarify a couple of things.

In the motion to strike matter, in looking at this last night, it looks like some of the pages, some of the passages and the page numbers don't correspond. There's this matter of page 79 in there, which is referred to one way and then when I looked it up it wasn't even that at all. So this is going to have to be dealt with because I'm not sure we have all the evidence in the totally correct order.

Okay. Now to the respondent. Is my understanding that the materials that you submitted

Page 14

for the last version of the hearing you're not submitting those now? Because I have a long list of exhibits from that previous thing here.

MR. MILLER: No. We are submitting those. In the updated notice of the hearing, we were told to only submit new documents and that's what we did.

THE CHAIR: Okay. All right. Because I have all that listed and I want to make sure that goes on the -- goes on the record here. This is the listing of exhibits that start out via e-mail to James Rund and then it continues, there's about 30 additional things here. There's CVs that you submitted, there's e-mails to various people, AZ Central article. This was in that binder from the previous hearing?

MR. MILLER: Yes, that's correct.

THE CHAIR: And you want all of those included?

MR. MILLER: Yes, I do.

THE CHAIR: Okay. All right. Let's go to the recent, the more recent submission that you made here. And to just clarify a couple of things out of this, you're aware that the table of contents to this submission doesn't conform to what you submitted?

Page 15

MR. MILLER: How so?

THE CHAIR: Okay. Let's see if I've got this listed here. The reason why it doesn't conform is you've listed things in the table of contents that don't appear in the submission, and what they are: ASU student-athlete Code of Conduct, ASU Scholarship Renewal Guide, [redacted] and partial floor plan [redacted] that's not in here.

MR. MILLER: Yes, I understand that. Those materials were previously submitted before the prior hearing, and, again, the notice of the hearing only said to submit new documents.

THE CHAIR: Okay. Even though in the new documents you've listed those.

MR. MILLER: We've listed them but they're in our previous submission.

THE CHAIR: Okay. You can understand how it's a little disconcerting to not know this?

Okay. Forget that. I've -- I've corrected this and I've dealt with it.

Okay. Now what I want to do is to ask you some things about this CD that you submitted and it has essentially to do with the same thing. You submitted this log of the CD. You're aware that this

Page 16

log doesn't even come close to what's actually on the CD. You've listed things in here. You know, among the more conspicuous things here is a video or that confrontation call.

Okay, just so you'll know, I've gone through and relogged this whole thing for you so the record is straight. I just want to call that to your attention.

Both sides appear to have some discrepancies in the evidence, you know, which I would attribute to the fact that we've restarted the hearing. But it really is important that we keep all this straight.

Okay. Are there further questions from any party before we begin?

Okay, Dean of Students, are you ready to proceed at this time?

MR. OSAYANDE: Yes, sir.

THE CHAIR: And respondent, are you ready to proceed?

Okay. Dean of Students, you may now present your opening statement.

MR. OSAYANDE: Thank you.

Good morning. April 3, 2016, 1452 hours.

Page 17

From Cordova: So are you going to call?

John Doe: No. They're saying it's a bad idea. I think we're all right.

From Cordova: I hope so, man.

John Doe: Dude, I hardly remember, expletive.

[redacted]: No rape charges?

John Doe Seriously, don't tell anyone.

Cordova: I'm not. I don't want to get in trouble.

John Dude, some real, expletive, went down.

[redacted] I heard, man.

John Doe Don't tell anyone, please.

John It's not over.

[redacted]: Wait, really?

[redacted] Are you all good?

John Doe I'm not sure. I can't remember much of last night.

More memories. That was an excerpt of text messages that were retrieved from John Doe phone by Tempe Police Department in the aftermath of the sexual misconduct incident that occurred April 2, 2016.

Page 18

What you heard was John Doe nvoking what's commonly known as the code of silence. The code of silence is attributed to organizations like policing, fraternal organizations, and even, yes, student-athletes. When someone or an entity has engaged in some type of misconduct of unethical behavior, the code of silence is invoked to hush everyone to prevent individuals from being in trouble.

This is important because John Doe adhered to the code of silence but yet he failed to adhere to the Student Code of Conduct. Also to the Student Code of Conduct for student-athletes here at the University.

The guiding principle of the Student Code of Conduct here at the University is in part this: The aim of education is to intellectual, personal, social, and ethical development of the individual. The educational process is ideally conducted in an environment that encourages reasonable discourse, intellectual honesty, openness to constructive change and respect for the rights of all individuals.

Self-discipline and a respect for the rights of others in the University community is necessary for the fulfillment of such goals. The

Page 19

University Student Code of Conduct is designed to promote this environment at each of the state university (verbatim). The Student Code of Conduct sets forth the standard of conduct expected of all students who choose to join the University community.

Students who violate these standards will be subject to disciplinary sanctions in order to promote their own personal development, to protect the University community, and to maintain order and stability on campus. So respect for the rights of the individuals, the standard of conduct expected of students and to protect the University community.

Today you will hear testimonies and evidence demonstrating that, based on a more likely than not standard of proof, in April of 2016 Mr. John Doe egregiously failed to uphold the respect for the rights of Ms. [redacted] and the standard of conduct expected of students.

In December 2016, the Dean of Students Office found John responsible for violating the Student Code of Conduct based on the more-likely-than-not standard. The Dean determined that on April 2, 2016 John nvited Ms. [redacted] to a house gathering where alcohol was present. At this gathering Ms. [redacted] consumed alcohol given to her by

Page 20

John Doe and others. Ms. [redacted] onsumed at least seven shots of UV Vodka within an hour to an hour and a half.

Ms. [redacted] became intoxicated by witness reports, including John Doe own witnesses. Later, while Ms. [redacted] was incapacitated due to alcohol John Doe and his friend Adrian Cordova inserted their penises into Ms. [redacted] mouth and engaged in oral sex with her.

Additionally, both males engaged in unprotected vaginal penile sexual intercourse with Ms. [redacted]

Additionally, it should be noted that there was a video that was recorded of the sexual act. Ms. [redacted] reported this matter to Tempe PD, ASU PD, and to the University. She participated in the Student Rights and Responsibilities investigation and she is here today.

Ms. [redacted] SANE report illustrates that she sustained injuries from the sexual misconduct incident involving John Doe Due to Ms. [redacted] intoxicated state, the Dean of Students believes that she did not have the capacity to give John Doe consent to engage in sexual activity.

Ultimately John Doe was charged with

# EXHIBIT E

# REPORTER'S TRANSCRIPT OF DIGITAL RECORDING

INTERVIEW OF JOHN DOE

September 26, 2016

Prepared by:
JANE M. DOYLE, RMR-CRR
Certified Reporter
Arizona Certificate #50112
CA CSR #8488
Registered Reporting Firm R1012

*JD REPORTING, INC.*
Certified Reporters
1934 East Camelback Road
No. 428
Phoenix, Arizona 85016
jdri@jdreporting.co

MS. DAVIS: All of the (inaudible). You talked to all of them?

JOHN DOE: Yeah.

MRS. DOE: We have, but even just as it's gone through the --

JOHN DOE: The whole thing of it. Yeah.

MRS. DOE: We were told, Bring -- come on down, the whole athletic department, sign, you know.

MS. DAVIS: Okay.

JOHN DOE: And the one that's been supporting the program for years.

JOHN DOE: Yeah, Art Martori.

MS. DAVIS: Say that again.

JOHN DOE: The one that he supports, like --

MR. DOE: He's Sunkist, Art Martori. They dropped the program some years back and then are --

MS. DAVIS: Right.

MR. DOE: -- okay.

MS. DAVIS: On visit?

JOHN DOE: Yeah, exactly.

MR. DOE: Yes.

MS. DAVIS: Do you want me to talk to him?

JOHN DOE: He --

MRS. DOE: Yeah, whatever helps.

JOHN DOE: Yeah.

MS. DAVIS: Okay. All right.
MRS. DOE: Don Waake (phonetic). Are we just --
JOHN DOE: Scotty Graham.
MRS. DOE: Yeah, Scotty Graham.
JOHN DOE: I keep saying Billy Graham.
MR. DOE: Religious.
JOHN DOE: And then Ray --
MRS. DOE: Ray.
MR. DOE: Is it Ray Miller? Or Ray --
MRS. DOE: I don't remember.
MR. DOE: The head athletic director.
MS. DAVIS: Anderson?
MRS. DOE: There you go.
(Inaudible).
MRS. DOE: I'm just hoping we're doing the right thing with the questions.
JOHN DOE: Yeah. It was good.
MR. DOE: It was good, Mrs. Doe.
JOHN DOE: You guys drive me nuts, though, so...
MS. DAVIS: That's what they're here for.
JOHN DOE: Yeah.
MS. DAVIS: They're parents. That's their job.

# EXHIBIT F

# REPORTER'S TRANSCRIPT OF DIGITAL RECORDING

INTERVIEW OF JANE ROE

October 27, 2016

Prepared By:

Annette Satterlee, RPR-CRC
Certified Reporter
Arizona Certificate #50179
Registered Reporting Firm R1012

*JD REPORTING, INC.*
Certified Reporters
1934 East Camelback Road
No. 428
Phoenix, Arizona 85016
jdri@jdreporting.co

PROCEEDINGS

MS. DAVIS: All right. So I've started the recording. So I wanted to meet with you today to provide you a little bit of an update because I know it's been a while since --

A. Yeah.

Q. -- we've talked.

There's been a couple things that I've been able to do. First off, we did charge him, as you know, and we've brought him in through our processes.

A. Okay.

Q. We've talked about the fact that he is on interim suspension, which means he is not allowed to come to campus. Right?

A. Right.

Q. For any reason.

A. Yeah.

Q. Then we've also had a chance to talk to all your witnesses and to all but one of his witnesses. The one that I have not spoken to yet is Adrian. Okay? And there's some complications. As you can appreciate, he's --

A. Yeah.

Q. -- no longer a student; has some legal things

A. Um, they kind of led me there.

Q. Okay. Before [redacted] went into the room, where was she?

A. Um, we were all out in the kitchen.

Q. Okay.

Okay. So if you were all in the kitchen and she goes from kitchen to room -- if you're all in the kitchen, how do you get to the hallway before going to the room?

A. It just (inaudible) it just, like, goes straight back.

Q. Okay. So who were you in the hallway with?

A. Adrian and -- Adrian and John.

Q. And what were you doing in the hall?

A. Um, I don't really remember, to be honest. I -- all I know is that I had to lean up against the wall because I couldn't (inaudible) walk.

Q. Okay. And why couldn't you walk?

A. Because I was really drunk.

Q. Okay. All right.

And I know this is difficult, so I, I appreciate everything that you're able to remember, okay?

When you're in the room, what is the first thing that happens?

A. Um, they turned on the light and they brought me to the bed and, like, I was standing next to the bed. And then one of them took my clothes off.

Q. Okay. Okay.

From the first statement you had said that -- going back to that -- one of them you were doing oral sex with and the other one was vaginal sex.

Do you remember who was first in which position?

A. No.

Q. Okay.

Okay. You said that you remembered flipping, that they were turning you. Can you tell me more about how they were flipping you.

A. Um, I don't really remember that.

Q. Okay.

A. I just remember that they -- I don't really remember how they did it.

Q. Okay. Can you tell me what you were saying at all at any of these points?

A. I remember telling them that I didn't want to do it. And then, when I was in court, I found out that there was a video that was saying that I didn't want to do (inaudible).

Q. Okay. When you say do it, what do you think

the "it" was?
A. Have sex.
Q. Okay. Okay. After you told them you didn't want to do it, did they stop?
A. No.
Q. Okay.
Okay. Do you know what happened after you said no and told them to stop?
A. Um, not really. I remember that Adrian brought out a camera. Or his phone. And I don't really remember what happened after that. Like I said, um, I don't know if we had sex again after the -- he brought out his phone. But I started to cry because they were hurting me and -- so that's when John said that they needed to stop.
Q. Okay. Okay. So -- and I know this may seem -- whatever. I'll just ask.
Can you tell me about what was hurting and describe what was hurting and how.
A. My vagina was hurting.
Q. Um-hum.
A. Because they weren't using anything and I was too drunk to have sex. And then --
Q. And when you say weren't using anything, what do you mean by "anything"?

A. Like condoms or anything. They were (inaudible).

And then, um, when they, when they were having me do oral, I, I wasn't doing anything. They were basically moving me to do it. So they were, like, choking me. And I also felt like I had to throw up and I just couldn't because they were shoving themselves down me.

Q. Okay. So you said they were choking you. Can you describe that a little bit more?

A. Yeah. So they were basically just, like, pushing my head into them. And --

Q. Into them. You mean onto their?

A. Yeah. Um-hum.

Q. Can -- which part?

A. Onto their penis.

Q. Okay.

A. And then that was causing me to, like, gag and, like, choke.

Q. Okay. You said you wanted to throw up.

A. Yeah. I felt like I had to throw up.

Q. Why would that be?

A. Partially because I was drunk and partially because they were, like, pushing on my gag reflex, I guess.

Q. -- and then the encounter with John and Adrian in the room -- so that's three incidents -- were there any other incidences of sexual interaction between -- okay.

A. No.

Q. Okay. Is there anything else you think I need to know?

A. No. I think that's it.

Q. Okay. I appreciate that you came down and talked to me. All right. That will be it for me for today for questions.

A. Okay.

Q. But, hopefully, you're able to get the police report --

A. Right. Yeah, I'll get that. I'll let you know as soon as I get it.

Q. Perfect. And after I read the police report I might have questions for you, but I'll, I'll let you know if I do. It just -- it depends on what's in there. Obviously --

A. Okay.

Q. -- neither you nor I know at this point what it contains. So -- do you want any assistance getting the police report?

A. No. I, I went (inaudible) they said it takes

about two weeks. And then I called my detective and -- also, and he said it takes about four to three weeks depending how busy they are.

And today it has been two weeks, so I'll go ahead and give them a call today and see what they say.

Q. Okay. Remember that ASU has a victim advocate who -- in their police department. And, so, if you need any assistance obtaining the report, if they are unable to provide it to you today, that may be a resource for you where she may be able to take you down to the station and -- you know, whatever. I don't know what resources she may have.

A. Um-hum.

Q. But being that she is in the police department for ASU, she may have resources --

A. All right.

Q. -- to help you obtain that information.

A. Okay.

Q. Okay?

A. All right.

Q. Is there anything else that we can do for you today?

A. No.

Q. Okay. So just on a total side note here, like not -- outside of the investigation -- and you said

# EXHIBIT G

REPORTER'S TRANSCRIPT OF DIGITAL RECORDING

INTERVIEW OF JANE ROE

November 27, 2016

Prepared By:

Annette Satterlee, RPR-CRC
Certified Reporter
Arizona Certificate #50179
Registered Reporting Firm R1012

*JD REPORTING, INC.*
Certified Reporters
1934 East Camelback Road
No. 428
Phoenix, Arizona 85016
jdri@jdreporting.co

this conclusion section. If they feel he is not responsible, there will be no information here. If they feel he is responsible, they will issue a sanction here.

A. And how long does this usually take?

Q. I hope to have something by the end of this week. That's why it's important that you and I got to meet this week because it's last week of classes. So I'm trying to move this along. My goal is to move this as fast as possible.

What I will also remind you that if the decision -- and we can talk about this later if it becomes relevant in more detail. But I want to remind you here, again, if the decision is suspension or expulsion, there is the right to an appeal. Okay?

So even though you're asking, like, what's the timeline on this, know that if there is an appeal, it may continue. But it would not be an investigation anymore so you would not be required to come back in and meet with me anymore or --

A. What does it mean if there's an appeal?

Q. So if the decision is suspension or expulsion, he has the right to say, I disagree and I want the investigation reheard.

And the way that that works is that a member of our faculty, staff and student, so a professor and

someone who is on staff here -- so that could be like someone from Financial Aid or some other department here -- and then a student would rehear all the information. And the way that it works is assuming that we're hearing -- again, the only reason we would be there is as far as suspension or expulsion.

So the university would represent you and would say, We, as a university, suspended or expelled him because of all this information. And they would present their case. He would have an opportunity to say, I disagree with the outcome; here's all the reasons that I disagree.

And then the hearing board would make a recommendation; do they agree with him or do they feel that a modification needs to be made to the sanction. Okay? That recommendation goes up to the Senior Vice President of the university and -- excuse me. And the ultimate decision is made by the Senior Vice President. If he chooses to appeal.

A. Okay. And if he doesn't, then it just goes through the Dean's Committee?

Q. And that's it.

A. Okay.

Q. So either way, the Dean's Committee makes a determination. It's just if he disagrees.

# EXHIBIT H

# TEMPE POLICE DEPARTMENT

## General Offense Report

**GO# TE 2016-39277** **Operational Status: ADMINISTRATIVE**

**Related Text**

**Document:** ORIGINAL OFFICER NARRATIVE
**Author:** 22036 - TYRREL, KELLY
**Related Date/Time:** Apr-03-2016 (Sun.) 1808
**Subject:** SEXUAL ASSAULT

Between 04/02/16 at 2330 hours and 04/03/16 at 0013 hours at [redacted] Dr, Tempe, (V) [redacted] alleged that she was sexually assaulted by her friend (S1) John Doe and an acquaintance (S2) Adrian Cordova, after they both penetrated (V) [redacted] mouth and vagina with their penises without her consent. (V) [redacted] consented to and completed a forensic exam. At the time of this report, (S1) John Doe and (S2) Adrian had not been contacted, and no arrests were made.

***Pending***

On 04/03/16 at 1335 hours I was dispatched to 1855 E Apache Blvd, Tempe, in regards to a delayed sexual assault report. Comments on the call stated that the caller, (V) [redacted], wanted to report that she was sexually assaulted by two known males at an address located at [redacted] Tempe.

***Interview with (V) [redacted]***

Upon my arrival, I made contact with [redacted] and her friend [redacted] who came with [redacted], in the parking lot of 1855 E Apache Blvd, Tempe. I brought both [redacted] and [redacted] inside, and began to interview [redacted] The following is a summary of that interview: [redacted] said that she had received a text message from her friend, (S1) John Doe, at around 2100 hours asking her if she wanted to go over to his residence, [redacted] Tempe, for a "kickback". [redacted] agreed, and drove to the residence on Campus and arrived around 2100 hours.

[redacted] told me that a "kickback" was not a party, just a little get together to "chill". [redacted] also told me that she had met John Doe on social media applications such as Instagram, Facebook, and Snapchat, and that they had only met in person one time. [redacted] said she was not dating John Doe and had never had any type of sexual relationship with John Doe and knew that he was on the ASU wrestling team.

[redacted] said that when she arrived at John Doe residence, she began taking shots of an alcohol she described as UV which was blue in color, which John Doe and Adrian had given her. It was later found that UV is a type of Vodka, and the color is associated with the flavor. [redacted] said that John Doe's roomate, known only as "[redacted]" was also at the residence, along with John Doe's friend (S2) Adrian Cordova. [redacted] told me that she did not know and had never met "[redacted]" or Adrian before the party, but she found out that Adrian did not live with John Doe and that he also attended ASU.

# TEMPE POLICE DEPARTMENT

## General Offense Report

**GO# TE 2016-39277** **Operational Status: ADMINISTRATIVE**

[redacted] told me that [redacted], John Doe and Adrian were also drinking the blue UV liquor, and were very intoxicated.

[redacted] said that she only consumed the liquor, no other type of alcohol, and that she consumed 5 shots of UV blue when she received a text message from her friend, [redacted] who asked her what she was doing. [redacted] told [redacted] where she was, and told [redacted] to "come over and hang out". [redacted] said that after consuming the 5 shots, she was "extremely drunk", due to the fact that she does not drink alcohol regularly.

[redacted] said that [redacted] arrived at around 2230 hours, and they both continued to take shots of the blue UV liquor. [redacted] said that she did not know how many shots Witness 2 took, but that her, [redacted], John Doe [redacted] and Adrian were all "extremely drunk" and had began dancing to music together. [redacted] said that after the group was dancing, an unknown time, [redacted] went into a room with "[redacted]" and shut the door.

[redacted] said that immediately after [redacted] went into the other room, Adrian and John Doe "pushed" her into a separate bedroom and closed the door behind them. [redacted] clarified that by "pushed" she meant that both Adrian and John Doe held her hands and led her into the room. [redacted] said that she believed she consumed about 7 shots total, and at this point she was "so drunk" that she was coherent but she "didn't know what was going on", and just went with Adrian and John Doe

[redacted] said that when all three of them got inside the room and the door was shut, the lights were turned off and both Adrian and John Doe took [redacted] clothing off while she was standing. [redacted] said she didn't remember specifically who took what item of clothing off of her, only that both Adrian and John Doe took all of her clothes off, which left her naked. [redacted] said that after they undressed her, both Adrian and John Doe took their own clothes off and were both fully naked.

[redacted] said that Adrian and John Doe led her to the bed, and had her get on the bed on all four limbs, "doggie style", with her stomach facing the bed. [redacted] said that Adrian then had sexual intercourse with her vagina, while John Doe had oral sexual intercourse with her mouth. [redacted] stated that "sexual intercourse" meant that Adrian penetrated her vagina with his penis, and that John Doe penetrated her mouth with his penis. [redacted] was not able to tell me how long the incident lasted, but stated that Adrian and John Doe "switched off", meaning that John Doe penetrated her vagina with his penis and Adrian penetrated her mouth with his penis. [redacted] said they "switched a few times", however she could not remember how many times or how long the incident lasted. [redacted] said that neither Adrian nor John Doe were wearing a condom, and also that neither of them ejaculated at any time.

[redacted] continuously stated that she was so intoxicated that she was not able to move or try to physically prevent the incident while it was

# TEMPE POLICE DEPARTMENT

**General Offense Report**

**GO# TE 2016-39277** **Operational Status: ADMINISTRATIVE**

occurring, but said that she never gave consent for the sexual intercourse with Adrian or John Doe and that she did not want it to happen. [redacted] said at some point during the incident, she saw flashes from a camera, and noticed that Adrian was taking photos of the incident with a cell phone. [redacted] also said that she was in severe pain during the incident, that her vagina had a burning sensation, and that her throat was also burning and had a "gagging" sensation.

[redacted] said that at some point during the incident, she began crying, and at that time John Doe took his penis out of her mouth and said "we should stop, we don't want her filing a report". Adrian then stopped what he was doing, got dressed, and left the room. [redacted] said she stayed in the room continuing to cry, when John Doe told her to "stop being so dramatic". [redacted] replied by calling him an "asshole", then John Doe replied and said "No you're an asshole". At that point, [redacted] found all of her clothes, which consisted of a shirt, jean shorts, and underwear, got dressed, and left the room. [redacted] walked into the room where [redacted] was "passed out", woke [redacted] up, and told her that they needed to leave. [redacted] then left the residence, went outside and texted another friend who was not there to pick her up. [redacted] said that per her phone's timestamp, she texted her friend to pick her up at 0013 hours on 04/03/16.

[redacted] described the room the incident took place in. She stated the bed was in the far left corner, that it had a bedframe, there were clothes strewn everywhere, possibly a dresser, and that the sheets on the bed were brown. [redacted] could not describe where the room was located in the residence, or who's room it belonged to.

After several minutes of waiting outside, she and [redacted] were picked up by her friend [redacted] and driven to [redacted]'s residence where both her and [redacted] slept for the remainder of the morning. When they awoke, they discussed the incident, and decided to make a report.

[redacted] requested a forensic exam, which was later provided to her.

***Interview with [redacted]***

I made contact with [redacted], who told me the following: [redacted] said she received a text from [redacted] at around 2230 telling her to go to the party on Campus Dr. [redacted] said that when she arrived, she noticed that everyone was intoxicated, and said that she did not know anyone there except [redacted]. [redacted] also began drinking shots of the blue UV liquor, and also became extremely intoxicated, to the point that she went into a room with [redacted] and passed out on the bed. [redacted] said she awoke to [redacted] crying and telling her that she didn't want to be there anymore.

[redacted] said that when she fully awoke and went outside, she saw [redacted] crying and asked her what had happened, and at that time [redacted] told her

# TEMPE POLICE DEPARTMENT

**General Offense Report**

**GO# TE 2016-39277** **Operational Status: ADMINISTRATIVE**

what happened. [redacted] said that while they were outside waiting for [redacted]'s friend to pick them up, both Adrian and John Doe walked outside, told them that they were leaving to go to another party, and left. A few minutes later, [redacted] and [redacted] got into [redacted]'s vehicle and left to go to [redacted]'s residence, where [redacted] spent the night.

***Forensic Exam***

[redacted] was transported to the Forensic Exam located at 225 W 1st St, Mesa, by Care 7. [redacted] completed the exam, and gave the nurse the underwear that she was wearing at the time of the incident to the nurse for collection. It should be noted that the nurse told me that [redacted] did not want to give her the shorts or shirt she was wearing, since they were expensive and she did not want to get rid of them.

The forensic nurse advised me that [redacted] had "numerous genital tears" and "bruises on both of her legs". For more information, see the completed forensic report, which was later impounded.

After the exam, [redacted] was transported to Tempe HQ located at 120 E 5th St, where she was interviewed further by Det. Lucas. The recorded interview with [redacted] and [redacted] was recorded via BWC, and was later uploaded to Evidence.com.

This concludes my involvement in this investigation. For more information see Det. Lucas' supplement.

***Pending***

# EXHIBIT I

# TEMPE POLICE DEPARTMENT

## General Offense Report

| GO# TE 2016-39277 | Operational Status: ADMINISTRATIVE | |
|---|---|---|
| **Follow Up Report #1** | | |
| Assigned to:18204 - LUCAS, MARK | Assigned on: Apr-04-2016 (Mon.) 929 | Capacity:Lead Investigator |
| Completed:Yes | Approved on:05/11/2016 | Approved by:CLICK, KATHERINE A |
| **Narrative Text #1** | | |

Document: DETECTIVE NARRATIVE
Related Date/Time: May-10-2016 (Tue.) 1319

**Initial Review**

On 4-3-16 I was assigned this case and I learned the following from a short briefing by patrol officer Tyrrel. She told me that [redacted] reported to the police that on 4-2-16 she went to her friend Doe's residence at [redacted], Tempe to hang out with some friends. While at Doe's residence she consumed 7-8 shots of an unknown alcohol and she was intoxicated. While intoxicated [redacted] was led to a bedroom by Doe and a male she met that night named Adrian Cordova and they both had sex with her without her permission. [redacted] said she was too intoxicated to even try to fight them off or say no. [redacted] believes Cordova took photos of Doe having sex with her without her permission as she can remember the camera flash going off. She said the males eventually stopped having sex with her after she started crying and Doe said "we should stop, we don't want her filing a report". [redacted] left the residence and was able to text a friend to give her a ride home. The next morning [redacted] contacted the police and got a SANE exam. She is willing to aid in prosecution.

**Follow up interview with [redacted]**

On 4-3-16 I was able to speak to [redacted] at the Tempe Police station. This interview was recorded. A copy of the interview was later impounded as evidence. The following is a summary of my interview with [redacted]. For more details, see the original recording.

I began my interview by speaking to [redacted] about things she likes to do. She told me she is a Freshman at ASU and she is from Chandler, Arizona. She told me that she went to the same High School as Doe but they did not know each other when she was there. She met him mostly through social media. I told [redacted] that the most important thing she can do is to tell me the truth so I know how to proceed with the investigation. [redacted] told me she understood it was important to be truthful.

[redacted] told me she had been communicating with Doe through texting and he invited her to "hang out" over at his house during the evening on 4-2-16. She told me they were not dating and only hung out once before this night. [redacted] said she told Doe when she first met him that she was not interested in "hooking up" or having sex. She said she drove to Doe's house around 2130 hours on 4-2-16. She went alone but she was talking to her friend [redacted]. [redacted] also went to Doe's house and she got there around 2230 hours. [redacted] denied having any alcoholic drinks or consuming any recreational drugs before she went to the party. [redacted] explained that this wasn't really a party as there were only 6 total people there that evening (Doe Cordova, [redacted]?, [redacted]?, [redacted] and [redacted]). [redacted] said she was playing beer pong with the guys at the house. When she was playing beer pong, [redacted] said she consumed 5 shots of alcohol in the first hour and then 2 more shots after [redacted] got to the house. She told me that she is not a big drinker so 7 shots in the first 60-120 minutes was a lot for her. She thinks she was drinking "UV" Vodka shots. I asked [redacted] to gauge her level of intoxication after she took the shots and she said "I was on the verge of blacking out". On a 1-10 scale she was an 8/9 out of 10. She could still remember most things, but she was not stable on her feet.

# TEMPE POLICE DEPARTMENT

## General Offense Report

**GO# TE 2016-39277** | **Operational Status: ADMINISTRATIVE**

[redacted] said her friend [redacted] was spending time with [redacted] at the house when [redacted] said Doe and a male she met that night named Adrian Cordova led her to a bedroom. [redacted] said once inside the bedroom the males took off her clothes, turned off the lights and then placed her on all 4's on the bed. Then the males undressed and she thinks it was Cordova who went behind her and put his penis into her vagina. Doe put his penis into her mouth at the same time. Then after an unknown amount of time, the males switched and Cordova put his penis into her mouth and Doe put his penis into her vagina. [redacted] said they may have changed positions several times. At one point, [redacted] said she remembered Doe was having sex with her and she saw a camera flash and realized that Cordova was taking pictures of her. [redacted] said she started crying and she told them to stop because it was hurting. She remembers Doe saying something like, "We better stop before she reports this". [redacted] also remembers asking about the pictures that Cordova took and the males response was "don't worry about the pictures". When the males stopped, [redacted] got up and got dressed and she left the room. She found [redacted] and they exited the residence. An argument occurred between [redacted] and Doe and Cordova after [redacted] told [redacted] what happened. [redacted] called her friend [redacted] at 0012 hours and he came and picked her and [redacted] up and took them home. [redacted] said she, [redacted] and another friend went back to the residence at [redacted] on 4-3-16 in the morning as they could not find [redacted] drivers license and they thought she left it at the house. Neither Doe nor Cordova were at the residence but [redacted] was. [redacted] let them search the house but they did not find the drivers license so they left.

[redacted] said she did not want any of this to happen. [redacted] said she was too intoxicated to stop them physically or to even tell them to stop. [redacted] said she was not held down or threatened to stay in the room but she was simply too intoxicated and she was "trying hard to not back out". I asked her if she could remember any other sex acts occurring with the males. [redacted] said Cordova may have used his hands to touch her vagina but she is not certain. She does not think that either of the males wore a condom. [redacted] has not spoken to either of the males since she left Doe's house.

I then discussed the idea behind the one party consent call with [redacted]. She said she was willing to make the call to Doe

<u>One party Consent call to</u> Doe

On 4-3-16 at 1837 hours [redacted] used her cell phone to call Doe. Doe answered the phone after several rings and they spoke for approximately 19 minutes. During the call Doe said he was also intoxicated and he admitted that he and [redacted] had sex. Doe said the sex was consensual and he denied that anyone else was in the room. [redacted] told Doe that she remembered Cordova was also with them and doing sexual acts to her but Doe denied Doe was there. The following items are excerpts from the call and it is not a transcript. The entire call was recorded and a copy of the call was later impounded as evidence.

[redacted]: I was super drunk last night.
[redacted]: Did we have sex yesterday?
Doe Yea
[redacted]: Was anybody else there?
Doe What do you mean? No.

Doe I don't know what happened but you got really mad.
[redacted]: I don't remember anything. I was literally so drunk.
Doe I remember you saying stop stop. You were laying there crying. I don't remember exactly what you said but you ran out of the room crying.

# TEMPE POLICE DEPARTMENT
## General Offense Report

**GO# TE 2016-39277** | **Operational Status: ADMINISTRATIVE**

[redacted]: You knew I didn't want to have sex with you.
Doe You went into the room. I would not have done anything if you didn't want to.

Doe Why did I do it when you were so drunk? I was really drunk too. That's what happened when two drunk people hang out. That's what happens.
[redacted]: Was there another guy in the room or was I crazy?
Doe What? No. Not at all.
[redacted]: Are you sure?
Doe That never happened.
[redacted] I remember there was another guy in the room with us.

[redacted]: Why did you have sex with me? I was so drunk. I told you to stop. I didn't want it.
Doe What do you mean you didn't want it? You completely wanted it. At the time you wanted it. You think I raped you or something?
[redacted]: No, I am not saying that.
Doe Stop saying you didn't want it. You did it and you were doing it back.

[redacted] What made you stop having sex with me?
Doe Because you said stop. I remember so clearly.
[redacted]: What position were we in?
Doe Normal. I think it was doggy. Then you rolled over and started panting.
Doe Are you OK? You were silent. Then you started crying.
[redacted]: That is when I realized you were having sex with me. I could not comprehend what was happening to me.
Doe You could have said no. I did not force anything down your throat.
[redacted]: I know you weren't forcing them.
Doe You can't say things like that. I would never ever do that.
[redacted]: In my eyes that's what happened.

Doe That's just how it worked out. You were drinking. I was drinking and then we ended up hooking up. I don't know.
[redacted]: Yea with another guy. I swear to you there was another guy in the room.
Doe I don't remember any other guy in the room.
[redacted] I want you to tell me the truth.
Doe You were making out. You were also kissing Adrian (Cordova) that night.
[redacted]: Did Adrian come into the room that night?
Doe No. Adrian didn't do anything. Nothing else happened with him.
[redacted]: I kissed Adrian before we had sex?
Doe Yes. You were dancing on me and kissing Adrian.
Doe Nothing with Adrian happened with us.

During the one party consent call with Doe, he offered to give [redacted] Cordova's phone number. [redacted] said she did want his number so she can call him. After the call ended with Doe he did sent [redacted] a text with Cordova's phone number. I told [redacted] that I think we should call Cordova now and she agreed to call him.

**<u>One party Consent call to Adrian Cordova</u>**

# EXHIBIT J

T 602.840.5900 F 602.840.3012

HAGENS BERMAN

Robert B. Carey
HAGENS BERMAN SOBOL SHAPIRO LLP
11 WEST JEFFERSON STREET, SUITE 1000
PHOENIX, AZ 85003
www.hbsslaw.com
rob@hbsslaw.com

December 21, 2016

**VIA E-MAIL TO TARA DAVIS**

**Response to December 11, 2016, comments from Ms. [redacted]**

Preliminarily, we note that, per your email of December 20, you were going to submit your report to the Dean without giving Mr. Doe an opportunity to respond to Ms. [redacted] December 11 statements, despite our specific request, under the procedures, to do just that. Only after we inquired whether Ms. [redacted] commented were we told she did. We were informed there was no new evidence, but we could review her comments. We did so this morning with you. There was, contrary to the email, substantial new evidence, including statements about state of mind, relationships, changes in position, and other matters. We are not sure why we wouldn't get a review after our request, but we appreciate your effort and time this morning to review and comment. We just note this for the record and are glad we figured it out before official action was taken.

In her most recent comments, the primary point Ms. [redacted] makes about her conduct on April 2 was that she was so intoxicated she could not say "stop," resist, or understand what was happening in the bedroom.

Ignoring her own actions and words, she seeks support in ASU's policies about what can't prove consent—e.g., passivity, lack of resistance. But she misses the point: consent here derives from initiative, engagement, and words of permission. She says she

doesn't remember key acts. She claims she doesn't remember facilitating oral sex or moving her legs or inviting Doe and Cordova to stay in the room. To fill the void, she speculates that Doe and Cordova *could have* moved her legs to accommodate sex. But she never acknowledges that, moments after flirting, kissing, and pulling them (per [redacted]) into the bedroom, she could have willingly ***participated*** in sex. She doesn't reject it because she can't remember, but it is a likely byproduct based on what we know.

She claims a lack of awareness and inability to communicate. This is, however, belied by her own and others' words. As demonstrated in our earlier letter, she has a solid recollection of the room and certain events. But there is more. [redacted] said in her statement she passed [redacted] talking to Doe and Cordova on her way to the bedroom with [redacted] which would have been just before [redacted] Doe and Cordova went into the other bedroom. She remarks that [redacted] was talking, not that she was impaired, slurring, or incoherent.

[redacted] herself recalls that [redacted] was not around when she went into the bedroom and isn't sure where [redacted] was. This shows solid cognitive function and awareness. [redacted] also points to [redacted] in her December 11 statement to prove she was too intoxicated, but he says going in she was a 3/10, coming out a 6/10, and for the most part her issues arose from being upset, not from intoxication. He saw nothing resembling incoherence or inactivity. She ***initiated everything***, as far as he saw.

Post-bedroom, she admits calling Doe an asshole, but denies arguing with him. Semantics aside, there were words between the

two about how things were going. Some by Doe trying to comfort her, some words of displeasure by both. There was communication. [redacted] showed she had the ability. You don't have to take Cordova and Doe's word for it. Look at [redacted] statement that upon arriving back home that night [redacted] relayed the events to [redacted] at least until a roommate arrived home and to avoid the subject in front of that roommate, she stopped discussing it. Instead, they all ate. This is not the manner of a woman incapacitated an hour earlier.

[redacted] characterized the post-bedroom scene this way: Doe was upset because [redacted] wouldn't have sex with him. 0021. This simply would not be what was relayed to a police officer if rape was the contention. Not until [redacted] was telling others (third parties) the story later that night did it become about lack of consent.

[redacted] adds several new denials, all of which are contradicted by her previous statements.

- Denies being aware of video/photo being taken. Yet [redacted] statement acknowledges that [redacted], an hour after the sex, told her [redacted] knew someone was taking pictures, 0021. [redacted] also told police she asked Cordova and Doe about the pictures when in the bedroom. 0008. In her earlier statement to ASU, [redacted] noted she asked Doe and Cordova what the flash was and then said she did not want to be recorded, indicating both an ability to communicate and awareness of a recording device being used.
- Denies saying Doe pushed her head, but she said in her ASU interview that someone pushed her head onto a penis.

- Denies saying the "all-fours, two-male" sex continued after the photograph. However, she previously said that Doe and Cordova did not stop after the photograph was taken (ASU interview). Because the only sex she described was of such a nature, hence the only sex that could have continued would have been as described above. There can be no insinuation that Doe continued beyond a stop command or crying—[redacted] herself conceded as much several times.
- Denies she is holding Mr. Doe's penis in the screenshot. Police concluded otherwise: "[redacted]s left hand is on Doe's] penis," and, according to them, it appeared [redacted] was engaged in a sex act. Despite the snapshot and police statement, [redacted] claims her hand is empty.
- Denies [redacted] was looking out for her. Yet [redacted] tried to calm her down ([redacted]), check on her when he heard her crying, took her water, and offered to help. He also alerted [redacted] to [redacted] being upset, so she could help [redacted] ([redacted] ASU statement). He was sober, demonstrated concern for [redacted] throughout, and he characterized her impairment as a 3/10 going into the bedroom.
- Denies undressing herself in her December 11 statement, but previously said she was unaware how she got undressed (ASU statement).

Ms. [redacted] also changes her story dramatically on a key event. She claims she cried because of pain <u>and</u> because she did not

comprehend she was having sex with Doe [redacted] and Cordova.[1] This is a complete fabrication. First, [redacted] communicated the entire story to [redacted] including sexual positions by Doe [redacted] and Cordova, about an hour after the event. 0021. They were relayed as her memory of the events she experienced. That she comprehended sex with two males is further corroborated by her statements to the police (multiple statements) and to ASU. Finally, if one knows of photography/videography and has the presence of mind to say "please don't record me," that person would be aware he or she was engaged in sex.

[redacted] was confused about my statements regarding "switching positions." To clarify, and as explained today, our understanding of the facts was that she rotated once between the men, but Doe [redacted] and Cordova switched their positions (body postures) before/after she rotated between them.

[redacted] says she told police of the oral sex that occurred before April 2. This is wrong. She falsely denied any sexual relationship. 0003. The oral sex incident came out only because Mr. Cordova alluded to it during his pretext call.

Mr. Doe [redacted] is not, contrary to [redacted] assertion, noting that sex went on for 20-25 minutes to prove the sex was consensual. What proves it was consensual was her alert, coherent condition entering the room—making it unlikely, if not impossible, for her to become immediately unable to communicate or resist. The nature of the

---

[1] Interestingly, elsewhere in her comments she says she was told by police to say this falsehood, but here claims it is in fact true.

sex that occurred immediately after entering the bedroom proves the same, as it is far more likely to be as Doe and Cordova described than [redacted] somehow became utterly incapacitated upon stepping in the bedroom. Her own friend saw her talking as she walked to a bedroom moments before, and [redacted] said he was watching to ensure no one was too aggressive. [redacted] herself was certainly capable of doing something, given reports of her condition immediately before entering the bedroom. If you don't want to be on all fours or engaged, you collapse and stop. Instead of this, she said, "You don't have to leave" (words she does not recall but did not deny saying). Her participation in oral sex and in the screenshot bolster Doe and Cordova's claim that she gave verbal consent to stay. She told police that Doe had her "perform" oral sex, not that she was incapacitated and he going forward nonetheless. When they were invited to stay, sexual conduct had started and they were all naked. That [redacted] was incapable of uttering such a phrase, when minutes before [redacted] saw her talking to Doe and Cordova in the hallway and [redacted] called her a 3/10, is nonsensical. Such an invitation indicates consent.[2]

[redacted] claims she didn't tell the police about the earlier warning of "no sex" because her memory was repressed but later recovered. Yet there is no indication she informed the prosecutor or police officer of this new information, which she surely would have been requested to do.

---

[2] Surely if Doe and Cordova were going to fabricate something to establish consent, it would be stronger than this.

[redacted] reliance on her refusal to have intercourse on March 31 goes too far. According to Doe, because they just met and other factors (schedule/time), she offered to perform oral on him in lieu of intercourse. According to Doe, [redacted] position was not that she was against having intercourse, she just didn't want it at right then. To be clear, Doe is not relying on this to show consent on April 2; the consent that night came solely from her actions and statements. The point about omitting the sexual relationship had two purposes. She made a false statement to the police officer and that shows her lack of credibility. And, second, we raised it to rebut the contention that seeing Doe naked that night could shock her in such a way she could not function.

As for [redacted] comments about the pretext call, she exaggerates what the call proves. She claims it shows Doe knew she didn't want to have sex. But it doesn't show that. First, the call occurred after Ms. [redacted] friends went to Doe's home the following morning and accused Mr. Doe of "almost raping" [redacted] (to his friends), and his friends should punched Doe in the face. Mr. Doe knew of these allegations when the call was placed. On the call, when [redacted] raises her claim he knew she didn't want sex, he responded that your conduct said otherwise and you participated. She then says, "Why did you have sex with me? I was so drunk. I told you to stop. I didn't want it." Doe denies this, responding that she completely wanted it. He asks if she is saying he raped her and ***she rejects that he raped her***. Her claim she "told [Doe] to stop" is rebutted by her own words, including her December 11 comment she was too intoxicated to say stop. On a pretext call comprising three complete falsehoods—she wasn't aware that Cordova was in the room; she wasn't aware till she cried that she was engaged in sex; and she told Doe to stop—and after

the allegation of "almost raping" someone was relayed, it is plain Doe [redacted] was not confirming that he knew she didn't want sex. He says the opposite—that she wanted sex—and nothing should be drawn from him not detailing every affirmative act she did indicating consent. It would be a futile to try to disprove the three false claims on a pretext call or to itemize indicators of consent—his point was: we both know what happened and you were into the sex as much as I was.

She also now claims the police told her to employ the falsehoods used in the pretext calls. She claims the police told her to say "I told you to stop" having sex when she did not say it and denies saying it. She claims they asked her to say she wasn't aware she was engaged in sex until she cried. She was asked to communicate two falsehoods (both of which the police and [redacted] have first-hand knowledge) that distort the facts regarding consent? Implausible. These points so go to the core of the proof needed that their use renders the call unusable. On top of this, she claims to have been instructed to say she wasn't aware that Cordova was in the room. Under such a false pretense, a 21-year-old male, who before the call was confident that [redacted] knew Cordova was in the room, might not be sure what to say to such an absurd claim, especially after being accused of "nearly raping" her and with the two other falsehoods employed on the call. Regardless, though, [redacted] rejected the claim that Doe [redacted] raped her.

The investigation belatedly does a cursory, one-sided review of a question we raised about whether there is a man in the middle that might have motivated [redacted] to want to hide her participation in a threesome. It is incomplete. We are still missing key information about whether [redacted] feared that [redacted] would tell

someone about [redacted] threesome? The statements from [redacted] don't resolve this question. Just because the friction between [redacted] and [redacted] manifested in May doesn't mean that the fear of disclosure didn't exist in April or that she didn't have an eye on that person at that time.

We look forward to a fair assessment of our evidence and appreciate the opportunity to comment.

Sincerely,

HAGENS BERMAN SOBOL
SHAPIRO LLP

Robert B. Carey

# EXHIBIT K

Message

**From:** John Doe
**Sent:** 12/20/2016 4:38:25 PM
**To:** Robert Carey [rob@hbsslaw.com]; Tara Davis [tara.davis.24@asu.edu]
**Subject:** Re: Outcome meeting

Rob,
I am fine with having you reviewing the response without me. You can call me afterwards.
Thank you.
John Doe

---

**From:** Robert Carey <rob@hbsslaw.com>
**Sent:** Tuesday, December 20, 2016 4:33 PM
**To:** Tara Davis; John Doe
**Subject:** RE: Outcome meeting

Mine is trashpad1, and I just tried to add you as a contact. John Doe, you can join by skype if you want or I can call you afterward. rob

---

**From:** Tara Davis [mailto:Tara.Davis.24@asu.edu]
**Sent:** Tuesday, December 20, 2016 3:55 PM
**To:** Robert Carey <rob@hbsslaw.com>; John Doe
**Subject:** RE: Outcome meeting

Hi, Rob.

Any information you provide during our 8:00 a.m. Skype call tomorrow will be provided to the Dean.

What is your Skype username? Mine is srr_asu.

John Doe will you be joining in person or over Skype as well?

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**Tara Davis**
Office of Student Rights and Responsibilities
Arizona State University

Phone: 480.965.6547 | Fax: 480.965.9608
tdavis19@asu.edu

---

**From:** Robert Carey [mailto:rob@hbsslaw.com]
**Sent:** Tuesday, December 20, 2016 1:53 PM
**To:** Tara Davis <Tara.Davis.24@asu.edu>; John Doe
**Subject:** RE: Outcome meeting

Skype tomorrow at 8am is fine. Are you saying my response would then be provided to the Dean for assessment and reissuance of the decision? If not, we can proceed at 9am with the in-person meeting. rob

**From:** Tara Davis [mailto:Tara.Davis.24@asu.edu]
**Sent:** Tuesday, December 20, 2016 1:47 PM
**To:** Robert Carey <rob@hbsslaw.com>; John Doe
**Subject:** RE: Outcome meeting

Hi, Rob.

Certainly. We can provide you with an opportunity to review her responses and delay the outcome one day if you would like to see those before the Dean concludes the case.

We can meet tomorrow over Skype as the program does have document sharing capabilities. We will not be able to delay the case two weeks, so it is best that we make arrangements for a Skype call.

Please let me know if you are available to meet over Skype tomorrow at 8:00 a.m. (Arizona).

Regards,

.....................................

**Tara Davis**
Office of Student Rights and Responsibilities
Arizona State University

Phone: 480.965.6547 | Fax: 480.965.9608
tdavis19@asu.edu

**From:** Robert Carey [mailto:rob@hbsslaw.com]
**Sent:** Tuesday, December 20, 2016 12:38 PM
**To:** Tara Davis <Tara.Davis.24@asu.edu>; John Doe
**Subject:** RE: Outcome meeting

The problem is I am in Colorado until Jan 3. I don't know how her responses are incorporated or recorded—or how voluminous they are—but is it something that I can be provided? I assume I could see the comments in some fashion on Skype, but maybe not. Does Skype have some sort of document review feature?

Because the matter is already sent to the Dean, what would the point of review be? I can always review after Jan 3 if there is an appeal.

**From:** Tara Davis [mailto:Tara.Davis.24@asu.edu]
**Sent:** Tuesday, December 20, 2016 12:10 PM
**To:** Robert Carey <rob@hbsslaw.com>; John Doe
**Subject:** RE: Outcome meeting

Hi, Rob.

Ms. [redacted] did have the opportunity to respond to the information you provided. Although she disagreed with statements in your letter, she did not offer any new evidence or witnesses.

I am happy to have you come in to view her responses. I am not available at 9:00 a.m. tomorrow, but could do 8:00 a.m. tomorrow. Please let me know if 8:00 a.m. tomorrow will work.

My calendar is filling up quickly. I would like to schedule a second meeting with you on Thursday in anticipation of having the outcome ready by then. Please let me know a time on Thursday that you will be available.

Regards,

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**Tara Davis**
Office of Student Rights and Responsibilities
Arizona State University

Phone: 480.965.6547 | Fax: 480.965.9608
tdavis19@asu.edu

---

**From:** Robert Carey [mailto:rob@hbsslaw.com]
**Sent:** Tuesday, December 20, 2016 8:58 AM
**To:** Tara Davis <Tara.Davis.24@asu.edu>John Doe
**Subject:** RE: Outcome meeting

Tara, we will get back to you re times we are available. Was there no additional input from Ms. [redacted]? If additional facts were provided, we would like to know of those. rob

---

**From:** Tara Davis [mailto:Tara.Davis.24@asu.edu]
**Sent:** Tuesday, December 20, 2016 8:45 AM
**To** John Doe
**Cc:** Robert Carey <rob@hbsslaw.com>
**Subject:** Outcome meeting

John Doe

Thank you for meeting with me recently to review the final report.

The report has been sent to the Dean for review. I expect to be able to tell you the outcome of the case on Wednesday or Thursday.

Is there a time on either day that you are available? .Your attorney may join in person, phone or Skype as well.

These meetings typically take about 15 minutes, but we can plan for 30 minutes to ensure we have ample time.

Please let me know what day/time works for you.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Tara Davis
Student Rights and Responsibilities
Arizona State University

# EXHIBIT L

T 602.840.5900 F 602.840.3012

HAGENS BERMAN

Robert B. Carey
HAGENS BERMAN SOBOL SHAPIRO LLP
11 WEST JEFFERSON STREET, SUITE 1000
PHOENIX, AZ 85003
www.hbsslaw.com
rob@hbsslaw.com

December 8, 2016

**VIA E-MAIL TO TARA DAVIS**

**Response to Misconduct Allegations, as outlined in the September 21, 2016, notice, and as modified or explained by emails from Tara Davis, December 6 & 7, 2016.**

Below we address the three categories of misconduct, as we understand them based on our communications with you. If we missed a basis for a violation of the Code of Conduct, please let us know immediately. If you need clarification or help with a citation to the record, we would provide that upon request.

***1. Alcohol Charges***

On underage consumption, which is the basis for the allegation of misconduct relating to alcohol, Arizona law establishes,

> A person who is of legal drinking age and who is an occupant of unlicensed premises is guilty of a class 1 misdemeanor if both of the following apply:
> 1. The person knowingly allows a gathering on such unlicensed premises of two or more persons who are under the legal drinking age and who are neither:
> (a) Members of the immediate family of such person.
> (b) Permanently residing with the person.
> 2. The person knows or should know that one or more of the persons under the legal drinking age is in possession of or consuming spirituous liquor on the unlicensed premises.

> R. For purposes of subsection Q of this section, "occupant" means a person who has legal possession or the legal right to exclude others from the unlicensed premises.

ARIZ. REV. STAT. § 4-241(Q).

As relevant here, the underage consumption restrictions apply only to premises the accused legally possesses or for which he has the legal right to exclude others. Here, John Doe was not the occupant of the unlicensed premises, [redacted] Tempe, Arizona. 0103 & 0114 (establishing that [redacted] resides at [redacted] and that in the evening of April 2, 2016, Mr. John Doe was at [redacted]' not his home). He was a guest at the premises. He had no legal right to exclude another from the premises nor did he have legal possession. John Doe avers that he did not reside at [redacted] and had no legal right to control it or its guests. The University investigation confirmed this in [redacted] interview, where he noted the house is his.

As for University or Board rules, we requested the specifics of those policies and were repeatedly referred to http://azregents.asu.edu/rrc/Policy%20Manual/5-308-Student%20Code%20of%20Conduct.pdf, which sets forth no further or additional restrictions on consumption of alcohol by a minor. Assuming rules addressed the topic, there is no evidence that John Doe purchased alcohol or distributed it. The evidence is that he was a guest at the party and acted accordingly. There is no basis for a finding of misconduct on this issue.

### *2. Sexual Contact*

The stated basis for the allegation of misconduct for Sexual Contact stems from Paragraph F-23. Paragraph E-17 defines the term:

> Sexual Misconduct means...Sexual violence and other non-consensual sexual contact – actual or attempted physical sexual acts perpetrated against a person by force or without consent.

No force was used. Ms. [redacted] confirmed this in the one-party consent call. After John Doe said he forced nothing on her, she said, "I am not saying you did." 0009. John Doe also asked [redacted] to stop acting as if she "didn't want" to engage in the act because she did and she was "doing it back." *Id.* She did not contest or refute this point. *Id.* Both witnesses stated that she was involved and acted voluntarily, and that after kissing, dancing, and flirting with John Doe and the other boy moments before, she led them by the hands into the bedroom. 0016-17.

As for the claim that John Doe engaged in sexual acts with Ms. [redacted] without consent, the University must prove that Mr. John Doe *knew* that [redacted] was not consenting.

Arizona law requires this element to be read into the definition of Sexual Misconduct. A failure to do so would lead to constitutional issues regarding vagueness and also to concerns arising from the rule of lenity. *See State v. Kemper*, 229 Ariz. 105 (2011) (fundamental error not to advise the jury of the "knowing" state-of-mind requirement applicable to the "without consent" prong of sexual assault). If the University did not have to prove John Doe's

knowledge of the lack of consent, he could be held strictly liable—meaning even though the facts would lead a reasonable person to think the girl consented, the accused would be liable if she subjectively, in her mind and without acts to alert the other party, did not consent.

Construing the facts in Ms. [redacted] favor, there is no indication that John Doe knew during the sex acts she was incapable of consent. None of her statements or actions at the party suggest that knowledge. According to her statements to police, she understood what was occurring but could not react or do anything about it when it was occurring. 0099. She was, she testified, not able to move or try physically to prevent the incident. 0004. Too intoxicated to even say no or physically try to stop them. 0007. Her force and consent theory rests entirely on her intoxication, rather than any refusal, resistance, or apparent incapacity. 0099 and 0068 (description of "force" consists was "I was really intoxicated").

Ms. [redacted] descriptions comport with John Doe's statement on the one-party consent call wherein she did not contest she "did it" and was "doing it back." Her characterization of the sex act was that John Doe was "having her perform oral sex on him." 0084. She also characterized Cordova as taking pictures of "her performing the sex acts" on John Doe 0019. She does not claim she was forced, threatened, or deceived. 0008. Her allegation is that she actively performed oral sex on John Doe, but didn't want to be doing so because she was intoxicated, and was so intoxicated that she couldn't resist or say a word.

Beyond this, John Doe and Mr. Cordova will testify that [redacted] actively participated in the sexual contact. The signs of

participation are subtle but important, and manifested by her back arching at the right times, her legs spreading out to accommodate the vaginal sex, her hands manipulating things to facilitate oral sex, her sexual moaning, and her movement to reposition herself with the males, a move she initiated.

When she walked into the bedroom, she was chatty and dancing and did not appear unstable or sick. The same was true when she departed. After leaving the bedroom, she related her story to her friend, called for a ride, talked to the occupant of the home, accepted water from him, and argued with John Doe She characterized the episode to her friend: "John Doe is mad because I won't have sex with him." 0021. Her friend made no statement to the police suggesting that Ms. [redacted] blacked out, passed out, was unstable, vomiting, or dizzy, or unable to function after sex or during the 30 minutes she was in the room.

Under the Code, consent means "informed and freely given words or action that indicate a willingness to participate in a mutually agreed upon sexual activity."

Before entering the room, she was lucid and aware. While in the room, she was coherent and understood what was going on around her. She was in a foreign, dark room for the first time for a short period (thirty minutes). She alleges (1) a traumatic incident occurred, (2) she was on the verge of blacking out, and (3) she was engaged in sexual conduct with two others, yet she identified the layout and furnishings of the room, right down to the color of the sheets. 0005 & 0085. She knew that both John Doe and Mr. Cordova were in the room. 0003-0005. She was aware at the end of the bedroom phase that a photo of her and John Doe was taken, and she had the presence of mind to inquire about it. 0005. Her story of the sexual conduct defies credulity in saying she wasn't

participating. She was on all fours for some time with the two males switching positions repeatedly. 0003-0005. She never curled up or pushed back during a break. She never said or even tried to say “no,” “stop,” or any other word indicating a desire to stop or lack of consent.

In reporting the alleged assault to the police, [redacted] told them she cried because the sex was painful, and when she later said “stop,” everything stopped.[1]

---

[1] Ms. [redacted] informed John Doe on the confrontation (aka pretext) call that she started crying because she, for the first time, realized she was having sex. 0009. This was a material lie that would have caused any reasonable listener to be fearful of a setup and serious consequences. Before the call, she told Detective Lucas, who set up the call for her, that she cried during sex because it started to hurt. 0011 (see also Cordova one-party call transcript at 0019); *accord* ASU interview (hurt from the lack of condoms or lube). She also told Detective Lucas that she knew she was engaged in sex with both John Doe and Mr. Cordova, *see, e.g.*, 0084, and that she didn’t even try to say anything because of her intoxication, 0007. Yet on the phone, she informed John Doe that she didn’t realize she was having sex until she cried, *as if she had blacked out*. 0009. Another disturbing misrepresentation. She admits that she knew what was going on the entire time. 0004 & 0084. She understood she was engaged in sex acts but claims she could not resist or even utter “no,” despite the demonstrated ability to do both immediately before and immediately after the consequential thirty-minute period. In pretext calls, it is acceptable to misrepresent certain facts (e.g., to deny calling the police if asked) because the point of the call is to solicit incriminating statements that arise out of the actual circumstances. A call that

After that, she argued with John Doe, calling him an asshole, told her friend her version of what happened, communicated with another friend to get a ride home, and communicated with the occupant of the home. She was proficient at communication *immediately* after coming out of the bedroom.

Besides having to prove that the accused knew of the lack of consent, the University must also produce credible evidence showing that, *at the time of the actual sex*, there was no consent. A lack of consent cannot be proven with evidence arising after the allegedly wrongful acts, or even before.

A very recent court of appeals decision addresses this issue. In *People v. Roldan*, 2015 IL App (1st) 131962, 397 Ill.Dec. 590, 42 N.E.3d 836 (2015), the court explained what evidence is required to prove lack of consent. There, no evidence existed that victim, at the time of the sexual encounter, blacked out or otherwise acted in a way (observable by the accused) suggesting that victim lacked the ability to give knowing consent. The alleged victim argued she was intoxicated, and the court held that proof of intoxication or consumption of alcohol is not enough.[2] To prove non-consensual

---

threatens the respondent with disquieting falsehoods has no value except to expose the weaknesses in the alleged victim's story.

[2] For unknown reasons, no blood was drawn from Ms. [redacted] during the sexual assault examination, which occurred within 17 hours of the event, leaving only the physical symptoms to assess the level of intoxication.

sexual contact, one needs evidence of incapacitation at the time of the act and evidence that the accused knew of this. The alleged victim in *Roldan* also testified that she could not recall large portions of the night, including having sex, and the court said the state still must produce credible evidence that defendant knew of victim's inability to consent to the sexual conduct *when the acts took place. Id.* at 596, 842. Because there was no evidence of this, the charges were dismissed.

What evidence is there here of Ms [redacted] level of intoxication during the sex acts? Pre- and post-bedroom inferences. The pre-bedroom behavior, which lasted about an hour and is universally reported as kissing, flirting, dancing, and walking hand-in-hand into the bedroom. The alleged victim is social, talkative, engaged, active, and aware, with no outward signs of dysfunction or disinterest in physical conduct. There is also the post-bedroom behavior, where Ms. [redacted] was talkative, engaged, coherent, self-reliant, and arguing with John Doe. The inferences that can be drawn from the pre- and post-bedroom behavior are devoid of any blackout or inability to communicate and suggest just the opposite.

The evidence of lack of consent in the bedroom falls into two categories, both leading to the same conclusion. First, you have undisputed statements from John Doe that [redacted] wanted it and was "doing it back," meaning participating in the sexual conduct, and that it was all consensual. Mr. Cordova says the acts were consensual, that he offered to leave but she encouraged him to stay (even though they were all naked at that point), and that Ms.

[redacted] "wanted to do this [meaning sex]."[3] Second, you have Ms. [redacted] testimony. She characterizes her participation not as an inanimate person being taken advantage of, but that John Doe was "having her perform oral sex." Ms. [redacted] claimed that, during this 30-minute bedroom period, she could not even try to say "no" or physically refrain from what she was doing. In her words and the words of others, she was participating in sexual conduct. She says she was not comprehending things, but she was admittedly engaged. Just yesterday, we learned that Ms. [redacted] alleged in her statements to the University many months after the incident that John Doe jumped on her earlier in the night and she pushed him off and said she would not have sex with him. Putting aside that no one else supports this claim, including the other two males at the house, Mr. [redacted] did not relay this point to the police officers who interviewed her. It is inconceivable that she would not include this critical fact in her recitation. John Doe when asked about it, flatly rejected that he pushed her on the bed and was told he would not get sex, and no one else has supported this never-before-mentioned, out-of-the-blue alleged warning. Even if true it does not alter things, because the essence of the alleged misconduct arises from [redacted] alleged incapacitation, not coercion or force, so it matters not because she concedes she knew what was happening but couldn't bring herself to say no until the very end. John Doe and Mr. Cordova avow that it was consensual and Ms. [redacted] fully participated, that she knew what was going on, knew what she was doing, undressed herself, and was involved in unequivocal ways in the sexual acts, as outlined above. It is

---

[3] John Doe also made the same offer to leave but was also told by [redacted] to stay.

unreasonable to believe that, after initiating kissing and sexually-suggestive teasing and dancing, and leading John Doe and Cordova into the bedroom (per [redacted]), she instantly became a non-functioning non-participant. [redacted] account (and [redacted], for the time he was there) belies that she was incapacitated and rejecting sexual conduct as she walked into the bedroom. Because the sex went on for over 20 minutes before there was a problem, and stopped when she asked them to stop, her story, then, hangs on the proposition that after the bedroom door closed she *immediately* transformed from uninhibited, sexy, aggressive, social, daring, and flirty to unwilling, asexual, disinterested, and catatonic.

Likewise, her claim that sex did not stop after she said "no" because the camera was brought out after her "no" is (1) a material fact not told to the police, (2) contrary to the information she provided the police (the males stopped when asked, and the photo occurred before things stopped), 0019, and (3) implausible under the circumstances—everyone agrees the camera appeared near the end, the position depicted in the screenshot contradicts the testimony about what everyone agreed happened (all-fours) and indicates things were winding down and a resumption of the behavior described by the parties seems unlikely since the photo has been taken and little time is left, especially after an unwanted photograph was just taken. [redacted] claim that the all-fours, two-male sex contact—the sole act alleged by any participant—resumed after the photo and the relaxed nature of the screenshot is not credible.

Ms. [redacted] neglected to mention to the police, among other things, that she was kissing, dancing, and acting suggestively to both Cordova and John Doe before they went in the bedroom. She

again tries, five months after the fact, to bolster her allegations by saying John Doe "pushed" her head down. Again, nowhere in her interviews does she relay this information. She says the opposite: she says she was not forced to do anything. Her belated, ambiguous attempt to insinuate that perhaps force was used or that she forewarned John Doe that night she would not have sex with him are discredited by her failure to disclose them when they mattered most—to the police—and that they contradict her earlier statements. Indeed, on the pretext call with John Doe she expressly *concedes* no force was used. 0009.

Just days before, meeting in person with John Doe for the first time (having met John Doe on social media), Ms. [redacted] performed oral sex on John Doe. She denied this to the police despite the detective counseling her on the importance of truth in her statements to them. This falsehood is offered not to prove consent, but to prove her lack of credibility and to undermine the argument that her inability to comprehend the situation was because John Doe took his clothes off around her or became intimate.

With threats and deception not alleged, the University must prove that it is more likely that she was no longer a free actor because of incapacitation. They have no such proof. [redacted] was fine before, fine after. She was talking and dancing and social. Not vomiting, not passing out, not slurring words, not falling over, not incoherent, not unable to walk without help, not frightened or shaking when recounting what happened—to the contrary, she characterized the episode as John Doe was mad because she wouldn't have sex with him. Ironically, the video taken by Mr. Cordova proves that Ms. [redacted] acts belie a lack of consent, as

she reaches up and behind to grab and curl her hand around Mr. John Doe's penis while he is reclined and plainly not forcing contact. *See* Exhibit 1, attached. She looks tired and intoxicated, as surely all of them were, but she admits she understood what was going on around her the entire time, and intoxication is not a defense absent signals or warning signs revealing an inability to consent.

Ms. [redacted] also asserts that the video proves she told John Doe and Cordova that she did not want to have sex. This is false. The audio, according to the police report, says only "I don't want....," and concludes that "then her voice trails off and you cannot understand anything else she said." 0112. [redacted] has not seen the video herself, so her statement is based on this report alone and yet she claims the video proves she said she didn't want sex. She misrepresented to ASU the police report's conclusions about the recording. This was not a slip of the tongue. She "reiterated" in a subsequent interview that the video proves she said no to sex.

What she objected to was the camera, a conclusion the facts make plain. [redacted] reported she was upset about the photos. During the sex, she followed up and asked if there were pictures of her. Her reports indicates she was agitated by the camera, and the video screenshot reveals [redacted], while saying "I don't want..." engaging in a "sex act," 0120, with one arm but using the other arm to shield her face, Exhibit 1.

Ignoring for the moment that the video does not support her claims, to accept her claim as true one must suspend reality and overlook she engaged in sex for some 28 minutes out of 30 (approximately) and then said *at the precise moment the video was being taken* "I don't want ...to have sex," while engaging in a sex

act.[4] As Occam's razor teaches, there is no reason to stretch so far when the simpler, more plausible explanation is that, after immediately objecting to being videotaped engaged in sex, she hid under one arm and said, as the video was being taken, "I don't want…*my picture taken.*" This explanation is contemporaneous (the objection occurred when the camera was spotted); reasonable (didn't engage in the objectionable conduct for a lengthy time before objecting); and not inconsistent with the screenshot (her hand grasping John Doe's penis as she says "I don't want to have sex" undercuts [redacted] claim whereas "I don't want to have my picture taken while I have sex" is not undercut by engaging in sex). [redacted] claim that the video proves she said "I don't want to have sex" is further devalued by John Doe's September 26, 2016, interview wherein, before the video statement is at issue, he states that [redacted] said after Cordova took the pictures, "I don't want ***my photo taken***."

The University must prove a lack of consent. But all the evidence points the other way—that the physical and verbal manifestations indicate she is coherent and understands things, and is willingly participating in the sexual acts. Nothing, not one thing, suggests that John Doe knew that she did not want to participate in the sexual activity before she said "stop," and when she did, everything stopped. Consent is not readily proven, so the little things prove a lot, and the little things here point to a young lady who, in her mind, was having difficulty with the final moments of the sex, but was knowingly, outwardly participating.

---

4 Detective Lucas's characterization of the screenshot was that [redacted] unpressured reach for John's penis reflected someone "engaging in a sex act." 0120

The focus should be on what the accused knew regarding an alleged victim's willingness or ability to give knowing consent. Punishment should be imposed only when the accused knew he should abstain and didn't. John Doe abstained the moment she said stop. Neither subjective belief nor intoxication can prove lack of consent. The constitutional obligation is to afford a person of ordinary intelligence a reasonable opportunity to know the victim did not consent to have sexual relations. *Cf. People v. Bowen*, 241 Ill. App. 3d 608, 617–18, 609 N.E.2d 346, 355 (1993). Rules and statutes must give a person of ordinary intelligence a reasonable opportunity to know what conduct is unlawful and provide standards to avoid arbitrary and discriminatory enforcement.

This is not a case where the victim claims to have actively resisted by trying to push the accused away or telling him "no," "leave," or "stop."

Nor is it a situation where the alleged victim was incapacitated or unconscious. She was an active participant who now claims that in her subjective consciousness she no longer wanted to participate but could not communicate that to John Doe—who moments earlier she was kissing and grinding on, and leading into the bedroom. This case lacks both elements crucial to this claim: There is no proof of a lack of consent during the sexual acts nor that Mr. John Doe knew that Ms. [redacted] was incapable of consenting.

Being so drunk one's judgment is impaired is not same as being so drunk one doesn't know what one is doing. To distinguish between the two, one must review the objective signs. Ms. [redacted] displayed none of the egregious behavior of someone incapacitated,

or nearly incapacitated, by alcohol. There is no evidence before the bedroom visit of any of the symptoms of severe impairment:

- sleeping,
- stumbling,
- slurred words,
- disorientation,
- dizziness,
- confusion,
- increased pain threshold,
- loss of motor control and balance,
- vomiting,
- inability to stand or walk straight,
- immobility, or
- a lack of response to stimuli.

Instead, the symptoms gleaned from the witnesses and circumstances indicate mild impairment: increased sociability, talkativeness, and self-confidence; reduced inhibitions; and relaxed control faculties. Her friend didn't worry about her. She was drunk and nothing else. Mr. [redacted] was sober and presents as a credible, straight-shooting witness. He said, on a 1 to 10 scale for alcohol impairment, she was a 3 before the bedroom and a 6 coming out of the bedroom. He noted that her issues seemed to arise more because she was upset than she was intoxicated. He called her in control, not stumbling, kissing both men, with everyone getting "intimate." He believes [redacted] initiated everything. (ASU report.) His opinion on her intoxication should control, as he was sober and because he demonstrated concern for the well-being of the [redacted] and [redacted] throughout.

The one-party consent call with John Doe is revealing because it proves there is no genuine dispute about the fact that John Doe did not force anything with [redacted]. She wanted the sex and "did it back," and on the pretext call she admitted no force was used. The only disputes on the phone involved facts Ms. [redacted] already knew to true, but misrepresented (*e.g.*, Ms. [redacted] falsely informed John Doe he had sex with her when she couldn't comprehend that she was engaged in sex.[5]).

A lack of evidence about either the knowledge of John Doe or the condition of the alleged victim at the time of the sexual contact precludes a finding of misconduct, and thus far no such evidence has been adduced.

***3. Sexual Conduct***

Mr. Cordova took the video at issue. John Doe had nothing to do with it, and Ms. [redacted] does not claim otherwise. 0005 & 0008. This charge is unfounded on the facts.

---

5 John Doe imprudently claimed on the pretext call that Mr. Cordova did not participate in the sex, but given that the call voiced two serious, material falsehoods (the crying claim, and that she was unsure whether another man participated in the sex) that, if either was true, would significantly increase the stakes, it is understandable that a 21-year-old might try to shirk responsibility.

### *4. Conclusion*

On [redacted] facts alone, there can be no showing by a preponderance of the evidence. The first and third categories are inapplicable to the facts before us. The second category, while more complicated, similarly lacks proof that John Doe knew that Ms. [redacted] was incapable of consenting.[6] The record also shows that immediately after the critical time, Ms. [redacted] had command of her faculties and could fully communicate about the episode, refuting the claim that during the sexual contact she was incapacitated. Tellingly, the Maricopa County Attorney's Office opted not to pursue charges relating to sexual assault. While their burden of proof is higher, convicting someone under the comparable statute requires proof of both the two elements addressed above, and the record here is devoid of evidence that Mr. John Doe knew Ms. [redacted] was incapable of consenting. The University's investigation discounts critical information. It, for

---

[6] Arizona RAJI (Criminal) STCI 14.01.05 (3rd ed.) handles the inability to consent due to alcohol-related reasons by defining, in relevant part, that "without consent" occurs when the alleged victim is (1) incapable of consenting because of alcohol (evidence shows no such inability) and establishes an obligation to prove that the accused knew or was on notice of the incapacity of the alleged victim (no evidence of this). Because Arizona's constitution protects the right to a higher education, the protections must be commensurate with those greater rights, and diluting the protections under a basis that was derived from Arizona state criminal statute seems unwise and problematic.

instance, never sought to ascertain if Ms. [redacted] was romantically involved on April 2, a well-known motivation for false accusations when the defense is consensual sexual conduct. Other known facts beg the question—such as whose DNA was on the circumoral swab the next morning, or who was the man between Ms. [redacted] and Ms [redacted] that damaged their relationship, a fact ASU learned in its investigation but did not pursue. Maybe Ms. [redacted] was interested already in [redacted] boyfriend and didn't want her consensual threesome to be known, and claimed she was too drunk to know how to fix the problem? We don't know the answer to this, and we don't have the power to investigate such matters. But this issue seems to be lurking below the surface based on the record, yet no one confirmed the source of the DNA, inquired whether [redacted] had a romantic interest on April 2, or investigated whether the boy who caused friction in [redacted] and [redacted] friendship may have caused [redacted] to want to hide from this unknown man that [redacted] participated in a threesome. Because of the lack of information, this is speculative but the motivation is quite common and the issue is certainly something that should have been investigated and ruled out.[7]

---

[7] This is unsurprising given that the investigation is facially biased. The University report noted, for example, that both John Doe and Cordova told falsehoods on their pretext calls, but omitted that [redacted] based her entire confrontation on falsehoods. Yet [redacted] broke the law by telling the police officer that she had never had a relationship with John Doe despite having performed oral sex on him a few days earlier, and this was not noted. The investigation is also procedurally inadequate. The idea that counsel for the respondent cannot confer without the University representative in the room—actively monitoring what is reviewed and discussed between client and counsel while the investigative findings are reviewed—does not further a legitimate interest. Similarly, no legitimate interest is served by requiring respondents to

Notwithstanding John Doe [redacted]'s compelling defenses and facts, Mr. John Doe [redacted] would stipulate to a probation term that would allow him to resume his education in January 2017, so long as it was grounded on the University or Board's alcohol policies or rules, not sexual conduct/contact.

Sincerely,

HAGENS BERMAN SOBOL
SHAPIRO LLP



Robert B. Carey

---

intelligently reply to a 20-page investigative report using only notes, a process that can only be justified as attempt to impede a thorough response.

# EXHIBIT M

ASU
ARIZONA STATE UNIVERSITY

December 1, 2017

Ginger Yee
United States Department of Education
Office for Civil Rights
1244 Speer Blvd. Suite 310
Denver, CO 80204-3582

Re: Arizona State University
OCR Case Number: 08-17-2037

Dear Ms. Yee:

This letter provides a narrative of Arizona State University's (ASU's) position regarding the allegations made by [redacted] D[redacted]. ASU has been informed that Mr. D[redacted] alleges that "the University failed to provide a prompt and equitable response, including failing to provide an appeal, to his complaint of sexual assault which occurred in September 2016."[1] I will continue to serve as the University's contact person regarding this matter.

**Summary**

ASU provided a prompt, effective and robust response to Mr. D[redacted]'s complaint of sexual misconduct. The complaint was received on October 4, 2016. Following an initial pause to allow the police to attempt to contact the Respondent, ASU's Office of Student Rights and Responsibilities notified the Respondent of the allegations on Friday, October 14, 2016 and put a "no contact" order in place. ASU completed its investigation and notified the parties on December 19, 2016. Prior to closing the investigation both parties were given equal and numerous opportunities to review the evidence collected and to provide additional information. Because ASU did not find a violation of the student code of conduct, (using the preponderance of evidence standard), no appeal was available to the parties. D[redacted] graduated from ASU in [redacted] and relocated out of state.

**Background and Policies**

As your office is aware, ASU is one of three state universities under the jurisdiction of the Arizona Board of Regents (ABOR), an entity established by the Arizona Constitution. ABOR has enacted policies that govern all state institutions. https://www.azregents.edu/board-committees/policy-manual. ABOR Policies relevant to this matter include:

[1] This submission also includes responses to questions posed in your November 7 email.

OFFICE OF GENERAL COUNSEL
300 East University Drive, Suite 335
PO Box 877405 Tempe, AZ 85287-7405
(480) 965-4550 Fax: (480) 965-0984

- Non-discrimination and anti-harassment
  https://public.azregents.edu/Policy%20Manual/1-119-Nondiscrimination%20and%20Anti-Harassment.pdf
- Code of Conduct, Jurisdiction, Philosophy and Limitations
  https://public.azregents.edu/Policy%20Manual/5-301-Code%20of%20Conduct%20-%20Jurisdiction,%20Philosophy,%20Purpose%20and%20Limitations.pdf
- Code of Conduct, Definitions
  https://public.azregents.edu/Policy%20Manual/5-302-Code%20of%20Conduct-Definitions.pdf
- Prohibited Conduct
  https://public.azregents.edu/Policy%20Manual/5-303-Prohibited%20Conduct.pdf
- Sanctions
  https://public.azregents.edu/Policy%20Manual/5-304-Sanctions.pdf
- Enforcement of the Code of Conduct
  https://public.azregents.edu/Policy%20Manual/5-306-Enforcement%20of%20the%20Code.pdf
- Miscellaneous Provisions
  https://public.azregents.edu/Policy%20Manual/5-307-Code%20of%20Conduct-Miscellaneous%20Provisions.pdf
- Student Code of Conduct
  https://public.azregents.edu/Policy%20Manual/5-308-Student%20Code%20of%20Conduct.pdf
- Student Disciplinary Procedures-General
  https://public.azregents.edu/Policy%20Manual/5-401-Student%20Disciplinary%20Procedures%20-%20General.pdf

At ASU responsibility for student conduct falls under the office of Educational Outreach and Student Services (EOSS), headed by Dr. James Rund, Senior Vice President for EOSS. Within EOSS, the Dean of Students has initial authority to sanction students for violations of the Student Code of Conduct. In this matter Jennifer Hightower, the Vice President of Student Services was acting as the Interim Dean of Students. (Leadership information-https://eoss.asu.edu/contact_us)

Individual reports of possible violations of the Student Code of Conduct are investigated by ASU's Office of Student Rights and Responsibilities (SRR). D[redacted]'s allegation of sexual misconduct against [redacted] R[redacted] was investigated by Tara Davis, an Assistant Director. ASU's policies applicable to student disciplinary matters (including sexual misconduct), are found at https://eoss.asu.edu/sites/default/files/StudentDisciplinaryProcedures.pdf.

ASU's Title IX Coordinator is and was Jodi Preudhomme. ASU's Title IX Statement and links to policies, resources and educational materials are found at https://www.asu.edu/titleIX/.

**Sexual Misconduct Investigation**

ASU has provided a copy of SRR's investigation of D[redacted]s complaint of sexual misconduct. (D[redacted]001-500) With this submission, ASU is also providing audio files of the investigation interviews.

**The alleged sexual misconduct:**

The *uncontested* underlying facts include the following:

- Complainant (D[redacted]) and Respondent (R[redacted] were both ASU students. They were involved in an intimate relationship (approximately two years) and were living together off campus. They had an "open relationship," meaning that both parties could have sexual contact with others.
- On September 18, 2016 D[redacted]reported that he had sex (off campus) with an individual (not an ASU student) he met through the social media application, "Grindr." D[redacted] became extremely upset during the sexual encounter when he realized that the individual was not using a condom as previously agreed. D[redacted]returned home after this encounter.
- D[redacted]and R[redacted]consensually began a sexual encounter after D[redacted]returned home. Both parties denied they were incapacitated by drugs or alcohol.
- D[redacted] and R[redacted]both agree that after the event that D[redacted]describes as a sexual assault, D[redacted] and R[redacted]talked in the living room of their home. Immediately following that discussion, they consensually continued their sexual encounter.
- D[redacted]and R[redacted]broke up the following week (September 29, 2016). Their parents and friends become involved in helping the couple move out of their home, separate belongings, etc.

D[redacted]and R[redacted]provided different accounts of their sexual encounter on September 18. *D*[redacted] contends:

- While R[redacted]was engaging in anal sex with D[redacted], D[redacted]began to feel pain and asked R[redacted]to stop.
- R[redacted]stopped for about five seconds but then continued against D[redacted]'s wishes.
- D[redacted]said he requested a break and R[redacted]let go of his hips 30-45 seconds later.
- D[redacted]started to pull away, at which point R[redacted]grabbed D[redacted]by the hips and said "don't pull away."
- R[redacted]then continued performing anal sex for 30-45 seconds. D[redacted]then got off of the bed and went into the living room and cried.
- After they talked, they returned to engaging in sexual contact, which D[redacted]agrees was consensual.

[redacted]'s version of the encounter is different.

- [redacted] reports that the sexual encounter involved a dildo, which [redacted] specifically requested.
- [redacted] requested a break at one point, and [redacted] paused for about 30 seconds, but then continued. This was consistent with communication they had during anal sex they had engaged in previously, both understanding that breaks were sometimes necessary to further relax the muscles. In addition, [redacted] explained that during anal sex, it is also necessary to pause and allow the other person to relax prior to removing any penetrating objects in order to prevent pain and possible damage.
- [redacted] agrees that [redacted] moved away but denies physically grabbing his hips.
- [redacted] did say "you're moving away," but in a playful way.
- [redacted] says that when they discussed this later, [redacted] acknowledged that they had miscommunicated about [redacted]'s desire to completely stop versus [redacted]'s understanding that [redacted] was just requesting a pause or break. When [redacted] ultimately said to "stop," [redacted] did stop.

**The breakup and police report**

The parties ended their relationship on September 29, 2016. After [redacted] told [redacted] he was ending the relationship, [redacted] threatened suicide and claimed to have taken pills. [redacted] assisted with efforts to have [redacted] involuntarily admitted to a health care facility. [redacted] told the investigator that "he told [redacted] he has a choice and that the choice was that if he called the police regarding [redacted]'s mental health, [redacted] would tell the police that [redacted] raped him." ([redacted]051)

**Contact with SRR**

SRR was notified of the alleged sexual misconduct by Michele Pfund, an Associate Dean in the W.P. Carey School of Business ([redacted]. [redacted] was working to obtain a medical compassionate withdrawal (received) from some of his courses, and he contacted Claudia Morales, a Student Services Assistant, on October 4, 2016. [redacted] told Ms. Morales of the alleged assault and provided Mr. [redacted]'s name. Ms. Morales reported the matter to Associate Dean Pfund, who immediately attempted telephone contact with SRR. She submitted the written Campus Community Incident Report on October 6.

**Services / Interim Measures extended to [redacted]**

ASU immediately reached out to [redacted] to provide additional services. In your email dated November 7, 2017, ASU was requested to provide information about those services.

- **Background.** Prior to these events [redacted] experienced health problems that caused him to miss class. [redacted] was therefore already engaged with Student Advocacy & Assistance

related to those issues. On September 20, 2016 Kaylen Cons, of Student Advocacy & Assistance, wrote to [redacted]s instructors informing them that [redacted] had been absent from his courses starting on September 8 through September 19 due to a medical emergency.

- **Student Advocacy & Assistance. (See [redacted]501-512)** Kaylen Cons reached out to [redacted] again on October 6, 2016 after learning about the possible sexual misconduct. Her message contained a comprehensive list of resources and encouraged [redacted] to contact her. ([redacted]502-503) An appointment time was reserved for him that day, but he did not talk to Cons until October 7.

- **Class Accommodations.** When Cons and [redacted] met the next day, they further discussed interim measures and ways that her office could assist. [redacted] brought up the possibility of finishing his last two courses remotely (anticipated graduation in December), and Cons agreed to try to facilitate that. [[redacted] moved to [redacted] on or about [redacted]2016, obviously making it impossible for him to attend classes on the ASU campus. (See [redacted] 091)]

- **No Contact order.** SRR issued a no contact order to [redacted] on October 14, 2016 ([redacted] 009-011) after working with the Phoenix Police Department to make sure that the police were able to interview him before he was contacted by SRR.

- **Moving class.** [redacted] adjusted classroom locations so that [redacted] and [redacted] would no longer have classrooms next to each other. This was obviously done to allow [redacted] to attend his class in person (rather than remotely) if he wanted to. ([redacted]080)

- **ASU Counseling Services.** [redacted] also accessed and used ASU Counseling Services following the events. [Any counseling or health records provided with this response were provided to SRR by [redacted] Counseling records are not otherwise shared with SRR.]

- **Access to Campus.** To be clear, ASU never barred [redacted] from campus. To the extent that [redacted] chose not to come on campus, that was his choice.[2] [redacted] did express frustration that ASU did not bar [redacted] from campus.

**SRR Sexual Misconduct Investigation, Chronology, and Conclusion**

A timeline of the investigation is contained in the Investigation Report at [redacted]075-094. The timeline demonstrates that the assigned investigator, Tara Davis, actively worked the case. As she was investigating the discreet allegation of sexual misconduct on September 18, the Complainant and Respondent were continuing the logistics of splitting up. That process was

---

[2] [redacted] was present on campus on October 28 to stage a protest (see footnote 5). ASU made no effort to remove him or to stop his protest.

extremely contentious. Both Complainant and Respondent accused each other of violating the mutual "no contact" directive. In addition a witness, [redacted], accused the Complainant of retaliating against him and sought assistance from SRR. Those matters were addressed in a separate investigation discussed below. Nevertheless, the continuing off campus issues between [redacted] and [redacted] complicated the sexual misconduct investigation.

With respect to the sexual misconduct, on December 18, Jennifer Hightower, acting as the Interim Dean of Students, reviewed the information collected during the investigation. ([redacted] 230) She concluded that there was not sufficient evidence to establish, by a preponderance of the evidence, that the Respondent engaged in sexual misconduct.

The parties were notified of the results of the investigation on December 19, 2016.

**Appeal**

ASU's student disciplinary procedures provide that an appeal to the University Hearing Board is available if the Dean of Students has found a student responsible for a violation of the student code of conduct and has issued a sanction of suspension or expulsion. Because no violation was found, no sanction was ordered and neither [redacted] nor [redacted] had the right to an appeal.

ASU's written appeal process was clearly available to [redacted] through the published Disciplinary Procedures. It was also explained to [redacted] approximately 5 minutes into his recorded initial meeting with Tara Davis.

**SRR Investigation Related to No Contact Directives and Retaliation**

On November 7, 2017 ASU was asked to include the following information in this response: "Mr. [redacted]'s alleged reports of violations of the no contact order to the SRR, and ASU's response to those reports (including investigations, and the timeliness of ASU's response)."

During the course of the sexual misconduct investigation, there were numerous allegations of violations of the no contact order, as well as an allegation of retaliation. The reports started coming in (from [redacted]) on October 23, 2016. These matters were assigned to Mickey Kienast, who contacted [redacted] on October 31 to continue collecting information. As Kienast was investigating, other complaints came in and were merged into the investigation.[3] After reviewing all of the conflicting information regarding these numerous complaints, the Dean's Committee decided that no formal charges would be brought against any of the students. This decision was made on December 16, 2016.

---

[3] There are three largely identical files related to this investigation because a separate file is opened for each Complainant: [redacted], [redacted] and [redacted]

The initial no contact order directive issued to [redacted] on October 14 stated:

> Effective immediately, I am issuing you a no-contact directive for [redacted] You are to have absolutely no contact whatsoever with [redacted] This no-contact directive includes, but is not limited to, phone calls, e-mails, voicemails, text messages, letters, cards, gifts, social networking messages or any other types of correspondence. Additionally, this includes both direct communication and indirect communication, i.e. using other people or social networking sites as a means of communication. The exception is that your father [redacted] may continue to contact his father [redacted] to discuss matters related to lease and finances only. Be advised that failure to follow this no-contact directive could result in additional disciplinary action.

On November 9 and 10 Mickey Kienast issued additional mutual no contact directives which barred [redacted] from contacting [redacted] or [redacted] and barred [redacted] and [redacted] from contacting [redacted]

> This no-contact directive includes, but is not limited to phone calls, e-mails, voicemails, text, Facebook, Twitter, Instagram, Snapchat, letters cards, gifts or any other type of correspondence or social media platforms, and/or contact via friends or acquaintances. Be advised, failure to follow this no-contact directive will result in additional disciplinary action taken against you and may include suspension or expulsion from the university.

**[redacted] Incident Reports (See Investigation File [redacted] 746-865):**

- **Gmail (Report date October 19) ([redacted] 768-775)-** [redacted] alleged that his "personal gmail" account was accessed or "hacked" based on a notification email that he received stating that his account had been accessed from an unknown device. [redacted] alleged that he was able to determine, based on the IP address, that the computer belonged to [redacted]

  In fact, the information [redacted] provided established only the general location of the device. It did not establish that the device belonged to [redacted]

  [redacted] claimed that he accessed a shared email account ([redacted]@gmail.com) in an attempt to delete intimate emails and photographs. [redacted] was not able to get into the account because the password had been changed. [redacted] later said it was not this account, but an iCloud account, which [redacted] denied.

- **Social Media (Report date October 22) ([redacted] 782-783)-** [redacted] reported that he received a message from [redacted] on October 22nd stating "Can we stop this" via Tinder.

[redacted] contended that the message was sent after they broke up (September 29) but before the no contact order was issued (October 14). There are no date or time stamps on the printed message.

- **Contact between Fathers (Reported October 23) ([redacted] 776-781)**- [redacted] alleged that [redacted] violated the no contact directive when [redacted]'s father sent a text message to [redacted]'s father referencing a restraining order that had just been served on [redacted].

  [redacted] was not aware of the text until shown by the investigator. [redacted] later claimed that the text message provided by [redacted] had been altered. He provided a version of the text message that he said was captured from his father's phone. The message does not contain the language referenced in [redacted]'s complaint.

- **Following on highway (Reported October 24) ([redacted] 790-791)**- [redacted] alleged that [redacted] was following him in his car and was changing lanes behind him.

  [redacted] claimed that [redacted] was following him and then passed him before exiting the freeway. [redacted] provided a cell phone video to support his version of events. ([redacted] 814) [redacted] did not report this incident to SRR, because he could not prove that [redacted] was following him intentionally. The investigator told [redacted] that he did not need to file his own report regarding the incident. (Recorded interview) (This incident could thus be considered a mutual or cross-complaint.)

  [redacted] later provided the investigator with the closed police report regarding this incident. No charges were filed against either party.

- **Mother's Visit to the Residence (Reported October 25) ([redacted] 788-789)**- [redacted] alleges that [redacted] violated the no contact directive when [redacted]'s mother was at their home when neither [redacted] nor [redacted] were there.

  [redacted] reported that his mother was driving by the house they had rented (after the parties moved out but before the property was returned to the landlord) and saw all the lights on. [redacted] gave her the keys and authorized her to go check on the situation, because he did not think anyone would be there. [redacted] reported that his mother found all lights were on, all faucets were running, and the refrigerator and freezer were open and running. This occurred after [redacted] had been released from responsibility for the utility bills. [redacted] provided utility bills showing a large spike in electricity usage after [redacted]'s entry. [redacted] alleged that [redacted] did this intentionally.

  [redacted] reported that he was cleaning and making repairs to the home. He says that he left at about 9:45 p.m. and returned at 11:00 p.m. He admitted leaving the faucets running

and the lights on, but states that he did so because he had used Draino and was making repairs in the home.

[redacted] provided a Phoenix Police Department report, initiated by [redacted] which alleged that [redacted] had been on the property (which would have violated the order of protection). The report was closed based on the property manager saying that [redacted] had denied being on the property. [redacted] claimed that the Phoenix Police mischaracterized his report. ([redacted] 217)

- **Alleged death threat (Reported October 27) ([redacted] 792-793)**- [redacted] reported that he received a text message the day after a court hearing (on the mutual orders of protection) saying "YOURE A FUCKING LIAR!!!!! HOPE YOU BURN IN HELL." Per the police, the message was sent locally from an anonymous text messaging application, but they could not trace it more specifically.

  [redacted] strongly denied sending the message. He does not know anyone who would send the message, but does know that their group of mutual friends have been astonished by [redacted]'s behavior.[4]

- **Threats to [redacted] (Reported November 1) ([redacted] 794-799)**- A friend of [redacted] received a text message after posting a picture of [redacted]'s protest[5]. The text says "You know he's FUCKING LYING." A second text says "Just admit he's lying HE'S RUINING MY LIFE. He's going to burn in hell stupid motherfucker. Karma is a bitch."

  [redacted] denies any knowledge of this message, which was anonymous like the previous message.

- **Email to Sun Devils Against Sexual Assault** (not an ASU-recognized organization). An email was sent to this organization defending [redacted] [redacted] originally alleged that [redacted] originated the email, but admitted having no proof. [redacted] denied sending the email and SRR was unable to determine the source.

---

[4] After the parties were notified of the outcome of SRR's investigation, [redacted] reported to SRR that he received disturbing text messages in the same manner. ([redacted] 030-032)

[5] On October 28 [redacted] stood in a public area on campus holding a sign saying that he had been raped by an ASU student (photo at [redacted] 096). SRR Director Jennifer Stults and Student Advocate Kaylen Cons spoke to [redacted] and asked if he wanted to discuss anything with them. He declined and they again reminded him of the resources available to him. [redacted] continued his protest. ([redacted] 087) [redacted]'s picture holding his sign was posted on Facebook and Twitter. (See [redacted] 096 and 368)

**[redacted] Complaint against [redacted] (See Investigation File 513-632 and 633-745)**

- [redacted] is a mutual friend of both parties and was a graduate student at ASU. Both parties had confided in him about the matter. After [redacted] refused to tell [redacted] about [redacted]'s private conversation with [redacted], [redacted] reported [redacted] for allegedly violating ASU's duty to report policy. (Discussed further below.)

- [redacted] reported that on November 2, 2016 [redacted] text messaged him and said "I have a Title IX lawyer, you are not exempt." [redacted] told the investigator that he didn't know if [redacted] would try to contact him again. ([redacted] 91 and 834)

- [redacted] did not deny sending the message to [redacted] and apologized to him ([redacted] 599). At the time he sent the message, [redacted] was aware that ASU did not believe that [redacted] had violated ACD 401's Duty to Report requirement. (See [redacted] 089)

- A mutual no contact order was put in place on November 10. (See [redacted] 701-702)

**[redacted] Complaint against [redacted] ([redacted] 513-632)**

- **[redacted] threatening [redacted]'s father at his home.** On October 18, 2016 [redacted] went to [redacted]'s father's home and aggressively demanded the return of some property he alleged [redacted] had. [redacted] denied making threats and claimed that he only threatened legal action. [redacted] told the investigator that he didn't want anything bad to happen to [redacted] because he knew [redacted] was close to graduation. [redacted] was just concerned for his family and wanted the harassment to stop.

- **[redacted] showing up at [redacted]'s mother's home with police. (See [redacted] 630)** [redacted] alleged that on October 19 [redacted] inappropriately initiated a "civil standby" at [redacted]'s mother's house. [redacted] appeared at the home of [redacted]'s mother seeking access to [redacted]'s items so that he could look for items [redacted] claimed [redacted] had. The police had been asked to be present as a "civil standby." The police did not allow [redacted] access to [redacted]'s mother's home after learning that [redacted] had never lived there.

- **[redacted] intentionally ran up utility bills in their shared home. ([redacted] 840 & 856)** As noted above in connection to [redacted]'s allegation that [redacted] violated the no contact order by granting his mother permission to enter their former residence, [redacted] alleged that [redacted] was intentionally trying to increase the utility bills, having had himself removed from responsibility for the bills.

- D[redacted] **contacting** [redacted]. R[redacted] reported that members of an organization he has worked with, [redacted] had been contacted by D[redacted] and given false information about the case. (D[redacted] 840) This information was threatening R[redacted]'s participation in the organization.

SRR ultimately decided not to charge any of the students with violations of the Student Code of Conduct as a result of these allegations. The information presented by the parties was contradictory, and there was not enough evidence to substantiate a charge of a violation of the Code of Conduct.

**OEI Investigations Regarding Duty to Report**

In an email dated November 7, 2017 ASU was also asked to provide information regarding the following:

> Mr. [redacted]'s alleged report of the assault to two ASU employees, [redacted] on September 19, 2016, and [redacted] (Mr. D[redacted]'s academic advisor) on September 26, 2016, and, whether they were under a duty to report to ASU, and if so, whether they appropriately reported the alleged assault to ASU.

In short, [redacted]ad no duty to report information he obtained from D[redacted] [redacted]id have a duty to report, and he received corrective action as a result of his failure to do so. [redacted]s failure to report fortunately resulted in only a short delay.

The Office of Equity and Inclusion conducted investigations of two employees whom [redacted] D[redacted] accused of violating their duty to report. (Copies of the Investigation Reports and Determinations are included with this submission- D[redacted]866-880.) Pursuant to ACD 401 at the time:

> Unless a person is restricted by law from doing so, any employee who is informed of or has a reasonable basis to believe that sexual harassment has occurred, shall immediately report all information regarding the occurrence(s) to the Office of Equity and Inclusion/Title IX Coordinator. [6]

[6] The policy was later amended to include the following; "This mandatory reporting includes students who are also employed/appointed at the University with respect to information they learn as a result of their employment/appointment."

[redacted]

- [redacted] was a personal friend to both D[redacted] and R[redacted] [redacted] was also an ASU graduate student and held positions as a graduate intern and a teaching assistant.

- Despite his ASU affiliation, [redacted] had no academic contact with D[redacted] or R[redacted] He similarly had no authority over them.

- [redacted] earned about the incident involving D[redacted] and R[redacted] in his personal capacity as a mutual friend, not as a result of his position at ASU.

- The Office of Equity and Inclusion (OEI) investigated [redacted] (based on the complaint from D[redacted] to determine whether he violated ACD 401's duty to report requirement.

- Because [redacted] did not obtain the information about the alleged sexual misconduct as a result of his ASU employment, OEI did not find a policy violation. This was consistent with ASU's practice and interpretation of the policy, as well as the training that was provided to student employees. As noted in footnote 5, the policy was later amended to provide clarification.

- The Provost accepted OEI's report and issued a determination that there was no policy violation.

[redacted]

- [redacted] is an Academic Success Coordinator in the [redacted] and the [redacted]. D[redacted] was pursuing a double major in [redacted] a degree program within [redacted]

- D[redacted] met with [redacted] on September 26 to discuss dropping his major in [redacted], and instead pursue a minor. He told [redacted] that he had been sexually assaulted. D[redacted] was seeking a compassionate withdrawal from some of his classes as a result.

- [redacted] eferred D[redacted] elsewhere regarding the compassionate withdrawal.

- [redacted] did not report D[redacted]s allegations of sexual assault to anyone.

- As noted above, Michelle Pfund commenced the reporting process on October 4 and submitted a formal incident report on October 6.

- ASU's OEI investigated the issue of whether [redacted] violated ACD 401's duty to report provision. OEI found a policy violation, even though [redacted] contended that he failed to report because he believed it had already been reported.

- OEI's investigation was forwarded to the Provost, who accepted the investigation, issued a determination, and directed that [redacted] receive a Memorandum of Concern.

**Conclusion**

ASU complied with the requirements of Title IX, as well as its own policies, when responding to I[redacted]s initial complaint and the related complaints that followed. ASU took ample and reasonable efforts to protect the rights of both students and to ensure that both were able to continue pursuing their educational goals during a difficult time. ASU looks forward to a prompt and favorable resolution of this investigation. If further information is needed, please don't hesitate to contact me.

Sincerely,

Lisa K. Hudson
Associate General Counsel

cc: James Rund
Jodi Preudhomme
Rhoda Gutsche
John Fry

# EXHIBIT N



ASU
ARIZONA STATE UNIVERSITY

# Proclamation

Supporting the "Start By Believing" Public Awareness Campaign

Whereas, Arizona State University shares critical concern for victims of sexual violence and a desire to support their needs for justice and healing; and

Whereas, research estimates that as many as 1 in 5 women and 1 in 71 men are the victim of sexual assault in their lifetimes (Center for Disease Control, 2012 Summary Report), yet most will not report the crime to law enforcement (U.S. Department of Justice, Victimization Not Reported to the Police, 2006-2010); and

Whereas, research documents that victims are far more likely to disclose their sexual assault to a friend or family member, and when these loved ones respond with doubt, shame or blame, victims suffer additional negative effects on their physical and psychological well-being; and

Whereas, the "Start By Believing" public awareness campaign is designed to improve responses of friends, family members and community professions, so they can help victims to access supportive resources and engage the criminal justice system.

NOW, THEREFORE, I, Michael M. Crow, President of Arizona State University, do hereby proclaim, in concert with Arizona State University Police Department, the first Wednesday of April each year as "Start By Believing Day" to show our commitment to the awareness of, prevention and response to sexual violence.

Signed and attested to this 4th day of April 2016

Michael M. Crow, President
Arizona State University

Michael Thompson, Chief of Police
Arizona State University Police Department

Dr. Morgan R. Olsen
Executive Vice President, Treasurer and CFO
Office of Business and Finance

ATTEST:
Jodi Preudhomme
Title IX Coordinator