1

2

3

4

5

6               **IN THE UNITED STATES DISTRICT COURT**

7                   **FOR THE DISTRICT OF ARIZONA**

8

9   Unknown Party,                          No. CV-18-01623-PHX-DWL

10                Plaintiff,                **ORDER**

11   v.

12   Arizona Board of Regents, et al.,

13                Defendants.

14

15          In advance of the motion hearing on August 17, 2022, the Court wishes to provide

16   the parties with its tentative ruling.  This is, to be clear, only a tentative ruling.  The point

17   of providing it beforehand is to allow the parties to focus their argument on the issues that

18   seem salient to the Court and to maximize their ability to address any perceived errors in

19   the Court's logic.  This is not an invitation to submit additional briefing.

20          Dated this 12th day of July, 2022.

21

22

23                                    _____

24                                    Dominic W. Lanza
                                     United States District Judge

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>TENTATIVE RULING</u>

**INTRODUCTION**

In April 2016, Plaintiff John Doe, then a student-athlete at Arizona State University ("ASU"), and another man had a three-way sexual encounter with ASU student Jane Roe at an off-campus party.  Roe immediately reported the incident to the police, who declined to pursue criminal charges against Doe after reviewing videotape footage of the incident (which the other male participant had surreptitiously created).  Several months later, Roe reported the incident to ASU, claiming she had been too intoxicated to consent.  Doe was suspended by ASU and, after an investigation, expelled for violating various provisions of the ASU Student Code of Conduct ("the Code"), including provisions related to sexual misconduct.

In this action, Doe sued various ASU employees and students ("Individual Defendants") and the Arizona Board of Regents ("ABOR").  Doe initially asserted federal claims under 42 U.S.C. § 1983 and Title IX of the Education Amendments of 1972 ("Title IX") as well as state-law claims for breach of contract, gross negligence, intentional infliction of emotional distress, and false light invasion of privacy.  However, during earlier stages of the case, the Court dismissed (Doc. 40) or granted summary judgment in favor of the applicable defendants (Doc. 139) on all of Doe's claims except his Title IX claim against ABOR.

Additionally, as this case was proceeding, Doe prevailed in a separate state-court action in which he sought review of ASU's expulsion decision.  There, the Arizona Court of Appeals held that the sexual misconduct findings against Doe were "not supported by substantial evidence" and thus vacated the expulsion order.  *Doe v. Ariz. Bd. of Regents*, 2019 WL 7174525, *9 (Ariz. Ct. App. 2019).

Against this backdrop, ABOR now moves for summary judgment on Doe's Title IX claim.  (Doc. 155.)  For the following reasons, the motion is denied.

**BACKGROUND**

The background facts below are taken from the parties' summary judgment submissions and are uncontroverted unless otherwise noted.  Additional facts bearing on

the parties' specific summary judgment arguments are addressed in the Discussion portion of this order.

I.      The Incident

On the evening of April 2, 2016, Doe and Roe attended the same off-campus party. (Doc. 189-2 at 16, 43.) During the party, Roe (who was 19 years old at the time, and thus not legally allowed to drink alcohol) drank several shots of vodka. (Doc. 155-3 at 10; Doc. 189-2 at 43-44.) Roe also danced in a sexual manner with Doe and another male attendee, Witness 1, and kissed both of them. (Doc. 155-4 at 1.) According to a sober eyewitness, Roe did not appear to be intoxicated or incapacitated as she was dancing with and kissing Doe and Witness 1. (*Id.*)

Roe went into a bedroom with Doe and Witness 1, where they engaged in group sexual activity.[1] (Doc. 189-2 at 44.) At one point in the encounter, Witness 1 surreptitiously took out his cell phone and videotaped Roe and Doe. (*Id.* at 45.) Roe ended the encounter after complaining of pain. (Doc. 155-4 at 110.) Roe eventually left the room, found a friend, and left the party. (Doc. 189-2 at 45.)

II.     The Criminal Investigation By The Tempe Police Department

On April 3, 2016 (the next day), Roe contacted the Tempe Police Department to report that "she was so intoxicated that she was not able to move or try to physically prevent the incident while it was occurring" and that "she never gave consent for the sexual intercourse with [Witness 1] or [Doe] and that she did not want it to happen." (Doc. 189-2 at 44-45.) Roe also reported that "[s]he could still remember most things" and "told [the males] to stop because [the sex] was hurting." (*Id.* at 48-49.)

A police officer transported Roe to the Mesa Family Advocacy Center for a forensics exam ("SANE exam"). (Doc. 155-4 at 108.) A forensics nurse reported that Roe suffered "numerous genital tears" and "bruises on both her legs." (*Id.*)

As part of the ensuing investigation, a police detective obtained and viewed a copy

---

[1]    To the extent there are lingering factual disputes about the specifics of Doe's encounter with Roe and Witness 1, they are not material to the resolution of Doe's Title IX claim.

1    of the cellphone video that Witness 1 had taken.  (Doc. 155-3 at 25.)  After the Tempe

2    Police Department completed its investigation of Roe's allegations, "criminal charges were

3    not pursued against" Doe.  (Doc. 155-10 at 67.)

4    III.   Title IX Developments At ASU

5           A.   **The "Dear Colleague" Letter**

6           In 2011, the United States Department of Education's ("DOE") Office of Civil

7    Rights ("OCR") issued a document known as the "Dear Colleague" letter.  (Doc. 155-6 at

8    2-20.)  The letter began by noting that "[s]exual harassment of students, which includes

9    acts of sexual violence, is a form of sex discrimination prohibited by Title IX" and

10   explaining that the purpose of the letter was "to assist recipients, which include school

11   districts, colleges, and universities . . . in meeting [their Title IX] obligations" by "lay[ing]

12   out the specific Title IX requirements applicable to sexual violence."  (*Id.* at 2.)

13          As for those requirements, the letter stated that "in order for a school's grievance

14   procedures to be consistent with Title IX standards, the school must use a preponderance

15   of the evidence standard . . . .  The 'clear and convincing' standard . . . is a higher standard

16   of proof [that is] not equitable under Title IX."  (*Id.* at 12.)  The letter also stated that "OCR

17   strongly discourages schools from allowing the parties personally to question or cross-

18   examine each other . . . .  Allowing an alleged perpetrator to question an alleged victim

19   directly may . . . perpetuat[e] a hostile environment."  (*Id.* at 13.)  Although the letter stated

20   that "[p]ublic and state-supported schools must provide due process to the alleged

21   perpetrator," it emphasized that "schools should ensure that steps taken to accord due

22   process rights to the alleged perpetrator do not restrict or unnecessarily delay the Title IX

23   protections for the complainant."  (*Id.*)  Finally, the letter stated that "[w]hen conducting

24   Title IX enforcement activities, OCR seeks to obtain voluntary compliance from recipients.

25   When a recipient does not come into compliance voluntarily, OCR may initiate

26   proceedings to withdraw Federal funding by the Department [of Education] or refer the

27   case to the U.S. Department of Justice for litigation."  (*Id.* at 17.)

28          …

- 5 -

B.      **The "Start By Believing" Campaign**

On April 4, 2016, ASU President Michael Crow, ASU Executive Vice President Dr. Morgan R. Olson, and ASU Chief of Police Michael Thompson signed a proclamation supporting the "Start By Believing" public awareness campaign.  (Doc. 189-2 at 100.) ASU Title IX Coordinator Jodi Preudhomme attested to the proclamation.   (*Id.*)     The proclamation reads:

> Whereas, Arizona State University shares a critical concern for victims of sexual violence and a desire to support their needs for justice and healing; and
>
> Whereas, research estimates that as many as 1 in 5 women and 1 in 71 men are the victim of sexual assault in their lifetimes . . . yet most will not report the crime to law enforcement . . . and
>
> Whereas, research documents that victims are far more likely to disclose their sexual assault to a friend or family member, and when these loved ones respond with doubt, shame, or blame, victims suffer additional negative effects on their physical and psychological well-being; and
>
> Whereas, the Start by Believing public awareness campaign is designed to improve the responses of friends, family members, and community professionals, so they can help victims to access supportive resources and engage the criminal justice system;
>
> NOW, THEREFORE, I, Michael M. Crow, President of Arizona State University, do hereby proclaim, in concert with Arizona State University Police Department, the first Wednesday of April each year as "Start By Believing" Day to show our commitment to the awareness of, prevention and response to sexual violence.

(*Id.*)

C.      **OCR's Title IX Investigation Of ASU**

In October 2016, ASU received a complaint from a male student ("Complainant") accusing another male student ("Respondent") of sexual misconduct.  (Doc. 189-2 at 86.) After an investigation, ASU concluded there was insufficient evidence to establish, by a preponderance of the evidence, that Respondent engaged in sexual misconduct.  (*Id.* at 91.)

Afterward, OCR investigated ASU's rejection of Complainant's complaint to determine whether ASU had complied with Title IX.  In a letter to an OCR representative

dated December 1, 2017, ASU's associate general counsel provided a detailed summary of ASU's underlying investigation. (*Id.* at 86-98.)  In the final paragraph of this letter, ASU's representative wrote: "ASU complied with the requirements of Title IX, as well as its own polices, when responding to [Complainant's] initial complaint and the related complaints that followed. . . .  ASU looks forward to a prompt and favorable resolution of this investigation." (*Id.* at 98.)   The ASU recipients copied on the letter included Dr. James Rund. (*Id.*)  The record does not reveal how or when OCR concluded its investigation.

IV.    The Initial Investigation Of Roe's Complaint By ASU

On September 16, 2016, Roe reported the incident to ASU's police department. (Doc. 155-1 at 7.)  This was a little over five months after the incident. (*Id.*)

On September 17, 2016, Dr. Kendra Hunter, ASU's associate dean of students, received a corresponding report that identified Doe and Witness 1 as "ASU wrestling students." (*Id.* at 6-8.)  The report stated that Witness 1 was "no longer an ASU student but is going to school somewhere in Colorado.  [Roe] thinks that [Doe] may still be a student at ASU." (*Id.* at 8.)  Dr. Hunter soon forwarded the report to her colleagues, stating: "See below.  I would like for us to engage [Roe] from advocacy today to share resources and options for moving forward . . . in hopes that Carla can meet with her today and take her statement so we can figure out what to do with the male.  He is a wrestler, so clearly we would want to move swiftly, but not before we engage [Roe]." (*Id.* at 7.)

On September 19, 2016, Roe was interviewed by Tara Davis, a member of ASU's Office of Student Rights and Responsibilities ("SRR"), which "investigates any alleged violation of the student code of conduct." (Doc. 155-7 at 50-77.)  The interview was recorded and transcribed. (*Id.*)  Davis explained that an administrative investigation is distinct from a criminal investigation in at least two important respects: first, administrative investigations are subject to a "more likely than not" standard rather than the criminal "reasonable doubt" standard (*id.* at 55), and second, "because we are not law enforcement, we cannot subpoena information.  That means it's going to be up to you to provide us with whatever information you feel is relevant; provide us with names of witnesses; provide

your own statements.  It's going to have to be, unfortunately, on your shoulders to determine what it is that you feel like you want me to know." (*Id.* at 56.)

Davis noted that Doe "also will have an opportunity to come in and provide information just like you, and at the end of the investigation I'll prepare a report and you will know exactly what I've been able to collect because throughout this process my job is just to be that neutral third-party investigator, not the decider." (*Id.* at 63-64.)

Davis further explained that "I also don't call the police.  [However,] I'm going to coordinate with the police, which means before they have an opportunity to confront [Doe], I don't want to get out in front of him and blow whatever processes they may be having . . . .  They often call them confrontation calls. . . .  So, I, at the end of this, will want your detective's information so I can contact your detective and make sure they don't need any more confrontation calls because it would be disruptive to their processes if I was . . . to call them first, you know.  So it's going to be important that I coordinate.  So you may see that I don't respond on this today.  It may take me a few days before the police give me the green light to contact [Doe].  So I—I want to give you a heads-up.  That doesn't mean that we're ignoring you; it means we have to work with the police department on our timing.  Okay?" (*Id.* at 57-58.)

Finally, at the end of Roe's interview, Davis mentioned that "[b]ecause like we talked about earlier about coordinating our efforts, now that there's a legal case I also don't want to interfere with any motions they may be having or things like that. . . .  So I'll wait to—you know, to move forward, especially because they have pending charges.  Okay? . . . But I will ask [Roe's detective liaison] if he feels that it would be possible for me to go ahead and charge the student now." (*Id.* at 72-73.)  After summarizing "next steps," Davis repeated that "I'm going to reach out to the [detective], and I'm going to ask the detective about what would be the appropriate timing for me, and then I will let you know. . . .  As soon as I have the green light, I will charge both of them. . . .  It's just I have to defer to the police first. . . .  Okay?  I have to let them take the lead." (*Id.* at 75-76.)

On September 21, 2016, Doe was informed via email that he was being placed on

interim suspension.  (Doc. 189-2 at 16.)   The email stated that the basis for the suspension was Roe's report that Doe "provided alcohol to a minor female student of ASU.  After she became heavily intoxicated, you and another male took her to a room in your off-campus house where you engaged in oral and vaginal sex without her consent.  Reportedly, a camera was used to record the sexual acts and the female did not consent to the recording." (*Id.*)  The letter informed Doe that, if true, his behavior would violate sections F-15, F-23, and F-25 of the Code, which set forth the university's alcohol policy, sexual misconduct policy, and surreptitious recording policy.  (*Id.* at 16-17.)  The letter further explained that sexual misconduct is defined by ASU policy as including "Sexual violence and other non-consensual sexual contact—actual or attempted physical sexual acts perpetrated against a person by force or without consent."  (*Id.* at 16.)

On September 22, 2016, Davis met with Doe.  (Doc. 155-8 at 2-28.)  That meeting was also recorded and transcribed.  (*Id.*)  Davis notified Doe that he was being investigated for violations of the Code related to alcohol, sexual misconduct, and surreptitious recording.  (*Id.* at 10-12.)  Davis further informed Doe that she would handle ASU's investigation, acting as "a neutral third party investigator," and that her job was to "collect information, anything I can get, by speaking to people, by collecting documentation that may be available, and then I just compile a report."  (*Id.* at 7.)  Davis also explained the "more likely than not" standard and how it differed from the criminal "beyond a reasonable doubt" standard.  (*Id.* at 8.)  She listed "resources we have available" for Doe, including a confidential counseling resource in case "you'll be up at 3:00 in the morning and unable to sleep or maybe you get some anxiety and want someone to talk to."  (*Id.* at 13.)  Davis explained that she would not ask Doe to make a statement and he did not have to answer any questions, and in fact he could choose "not to come in at all at any point."  (*Id.* at 16-17.)   However, Davis also warned Doe that the Dean's Review Committee ("the Committee") would determine whether Doe violated the Code "based on whatever (information) is available to them.  So if there is a wealth of information from [Roe's] side, that will be all that is considered.  And so you respond in the way that you feel is best that

your attorney will advise you. . . .  You can come back next week and still not say anything, and that's okay . . . .  Just know that there would be an absence of information, and so when a decision is made, it would wind up being only from one side that information would be had." (*Id.* at 17-18.)

Following this meeting, Davis continued with the investigation, ultimately meeting with Doe three more times: on September 26, 2016 (*id.* at 31-65), November 18, 2016 (*id.* at 67-83), and December 21, 2016 (Doc. 155-9 at 2-19).

Davis also met with Roe at least once more, on November 27, 2016.  (Doc. 189-2 at 39-41.)  During that meeting, Davis mentioned that a decision would be coming soon and reminded Roe that "if the decision is suspension or expulsion, there is a right to appeal . . . .  So even though you're asking, like, what's the timeline on this, know that if there is an appeal, it may continue." (*Id.* at 40.)  Roe asked, "What does it mean if there's an appeal?" (*Id.*)  Davis responded that "if the decision is suspension or expulsion, he has the right to say, I disagree and I want the investigation reheard," and explained the composition of the rehearing board.  (*Id.*)  Davis then explained that "the university would represent you and would say, We, as a university, suspended or expelled him because of all this information.  And they would present their case.  [Doe] would have an opportunity to [respond]." (*Id.* at 41.)

On December 20, 2016, Davis informed Doe's counsel via email that she had sent her investigative report to the Committee.  (*Id.* at 64.)  Doe's counsel responded: "Was there no additional input from [Roe]?  If additional facts were provided, we would like to know of those." (*Id.*)  Davis responded that Roe "did have the opportunity to respond to the information you provided.  Although she disagreed with statements in your letter, she did not offer any new evidence or witnesses.  I am happy to have you come in to view her responses." (*Id.* at 63.)  Doe's counsel asked: "Because the matter is already sent to the Dean, what would the point of review be?" (*Id.*)  Davis responded that "[w]e can . . . delay the outcome one day if you would like to see [Roe's input] before the Dean concludes the case." (*Id.* at 63.)

On December 21, 2016, after reviewing Roe's most recent statements, Doe submitted a letter to Davis stating that there was, "contrary to [Davis's] email, substantial new evidence, including statements about state of mind, relationships, changes in position, and other matters." (*Id.* at 52.)

V.   The Committee's Expulsion Decision

On December 21, 2016, before receiving Doe's supplemental letter, Dr. Jennifer Hightower, ASU's acting dean of students, determined that Doe had violated section F-15, the university's alcohol policy, and section F-23, the university's sexual misconduct policy. (Doc. 155-2 at 72-23.)   Doe was not found responsible for violating section F-25, the university's surreptitious recording policy. (*Id.* at 72.)

Dr. Hightower signed an initial expulsion letter that day. (Doc. 155-1 at 42.) Nevertheless, "[b]ecause Doe had submitted an additional response to the investigative material and the investigative report," Dr. Hightower "wanted to review that material, and so therefore she did.  And then after that made the determination and needed to resign a letter." (*Id.*)  The second expulsion letter was sent to Doe on December 22, 2016. (*Id.*)

VI.   The UHB Hearing

Doe appealed Dr. Hightower's decision to the University Hearing Board ("UHB"). (Doc. 155-4 at 46.)   Before the UHB hearing, Doe and the Dean of Students' Office ("DSO") exchanged documents and witness lists. (*Id.* at 12-15, 51, 60, 91-92.)

At the hearing, which took place on May 23, 2017, Doe's counsel made opening statements and closing arguments, presented evidence, cross-examined DSO witnesses, and called witnesses to testify on Doe's behalf. (Doc. 155-4 at 51-52.)  The chair of the UHB extended the length of the hearing multiple times at Doe's request, although the chair did not grant Doe's extension requests in full. (Doc. 155-4 at 190.)  Near the end of the hearing, the chair warned Doe that there were only 20 minutes remaining, and Doe's counsel responded: "We have two experts. . . . Cindi [Nanetti is] going to take a while and then I have one other witness [a toxicologist], but if I don't get to him, I don't get to him." (*Id.* at 4.)  Doe's counsel did not ultimately call his second witness.

The UHB issued its findings and recommendations on May 30, 2017.  (*Id.* at 100-16.)  First, the UHB found that Doe violated the portion of section F-23 that defines sexual misconduct as "sexual violence . . . attempted [by] physical sexual acts perpetrated against a person by force" because Doe had "engaged [Roe] by force."  (*Id.* at 110.)  On this point, the UHB was persuaded by (1) Roe's testimony that the sex caused her pain, (2) Witness 1's statements to the same effect when speaking to the Tempe Police Department, and (3) the results of the SANE exam, which revealed minor physical and genital injuries that were consistent with Roe's text messages, which complained of abrasions.  (*Id.* at 110-11.)  The UHB acknowledged that it had previously identified a different "rationale" for the section F-23 violation, which was that "the encounter was non-consensual," but concluded there was insufficient evidence to show that Roe refused consent or was too incapacitated to provide consent.  (*Id.* at 111-12.)  Nevertheless, the UHB deemed the absence of evidence on this point "peripheral" in light of the evidence of force that "justifies the F-23 violation."  (*Id.* at 112-13.)  Second, the UHB found that it was more likely than not that Doe violated section F-15, because Doe had "admit[ted] that he distributed alcohol to [Roe], who is underage."  (*Id.* at 113.)  The UHB thus upheld Doe's expulsion.  (*Id.*)

VII.   Dr. Rund's Review Of The UHB's Decision

The UHB's findings were given to Dr. Rund, ASU's final arbiter on student misconduct issues.  In a letter dated June 27, 2017, Dr. Rund overruled the UHB's finding of no incapacitation, adopted the UHB's finding of impermissible force, and adopted the UHB's conclusion on the alcohol charge.  (*Id.* at 183-84.)

In a letter dated August 30, 2017, Dr. Rund denied Doe's motion for reconsideration of his ruling.  (*Id.* at 186.)  Among other things, Dr. Rund explained his decision to overrule the UHB's finding of no incapacitation.  (*Id.* at 188.)  Dr. Rund noted that "[i]t is uncontroverted that [Doe] and [Roe] were drinking at the same event, so there is no question that [Doe] saw [Roe] drinking shots of vodka."  (*Id.*)  Dr. Rund also observed that "[d]uring the confrontation call, [Doe] acknowledged that [Roe] had previously told him that she was not going to have sex with him."  (*Id.*)  Dr. Rund stated that "[a] reasonable

person who had previously had this conversation, and who had then been with [Roe] while she was drinking, should have known that [Roe] was not in a position to make informed, rational judgments when she went into a bedroom with not just one, but two males.  At the very least, [Roe] was engaging in outrageous behavior evidencing her intoxication level." (*Id.*)  Dr. Rund also identified two other facts that "betray [Doe's] claim that he lacked knowledge of [Roe's] intoxication to the point of incapacity" and "reveal[] his awareness of [Roe's] incapacitation": first, that Doe "had no trouble believing that [Roe] had very little recollection of the encounter," and second, that after Roe "cried out" during the encounter, Doe "immediately said to [Witness 1] 'we should stop, we don't want her filing a report.'"  (*Id.* at 189.)  Dr. Rund stated that "[t]his is clear evidence that [Doe] knew what he was doing was wrong."  (*Id.*)

## VIII.   Doe's Appeal To The Maricopa County Superior Court

On October 2, 2017, Doe appealed ASU's expulsion decision to the Maricopa County Superior Court pursuant to A.R.S. § 12-901 *et seq.*  (Doc. 28 at 1.)

On October 29, 2018, the Maricopa County Superior Court issued a six-page order rejecting Doe's appeal.  (Doc. 40-1.)[2]  The court concluded that Dr. Rund's incapacity, force, and alcohol-related determinations were "supported by substantial evidence" (*id.* at 5-7), that "Doe was not denied due process" (*id.* at 7), and that the penalty of expulsion was not excessive (*id.* at 7-8).

## IX.   Doe's Appeal To The Arizona Court Of Appeals

Doe appealed to the Arizona Court of Appeals.  *Doe v. Arizona Bd. of Regents*, 2019 WL 7174525 (Ariz. Ct. App. 2019).  In a decision issued in December 2019, the appellate court affirmed in part and vacated in part.  First, the court held that evidence adduced at the hearing "could not lead a reasonable mind to conclude ASU proved [Roe]

---

[2]       The Court finds that both the Superior Court's order and Court of Appeals' opinion are subject to judicial notice.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may . . . consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice— without converting the motion to dismiss into a motion for summary judgment."); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("[Courts] may take judicial notice of court filings and other matters of public record.") (citation omitted).

was [incapacitated] on the night in question," and thus Dr. Rund's finding that Doe violated section F-23 because Roe was incapacitated was an abuse of discretion. *Id.* at *6. Second, the court held that a reasonable mind could not find that Doe engaged in sex with Roe by force, and thus Dr. Rund's finding that Doe violated section F-23 because he used force was an abuse of discretion. *Id.* at *7-8. Third, the court upheld Dr. Rund's finding that Doe provided alcohol to Roe when she was underage, violating section F-15. *Id.* at *8. The court declined to address Doe's remaining due-process arguments, vacated the expulsion order, and remanded to ASU to determine the appropriate sanction for a violation of section F-15. *Id.* at *9.

X.    This Action

On May 29, 2018, Doe filed this action. (Doc. 1.) The initial complaint asserted two federal claims—(1) a violation of Doe's constitutional rights to due process and equal protection, asserted via 42 U.S.C. § 1983, against the Individual Defendants in their official and individual capacities, and (2) a violation of Title IX against ABOR—as well as various state-law claims (breach of contract, defamation, gross negligence, intentional infliction of emotional distress, and false light). (*Id.*) Doe sought monetary damages as well as injunctive and declaratory relief against ABOR. (*Id.* at 71.)

In September 2018, the parties jointly moved to stay these proceedings pending the disposition of Doe's appeal to the Maricopa County Superior Court. (Doc. 28.) This request was granted. (Doc. 29.) After the Superior Court issued its decision on October 2, 2018 (Doc. 40-1 at 1), Doe requested another stay pending his appeal to the Arizona Court of Appeals (Doc. 32). That request was denied. (Doc. 35.)

On February 15, 2019, Doe filed his operative pleading, the First Amended Complaint ("FAC"). (Doc. 37.) The only changes of note from the original complaint were (1) to amend the § 1983 claim to include ABOR as a defendant and to make clear that Doe was suing the Individual Defendants only in their individual capacities, and (2) to remove the state-law defamation claim. (Doc. 36-1 at 54, 76.)

On December 27, 2019, the Court granted in part Defendants' motion to dismiss.

(Doc. 66.)  This order dismissed Doe's § 1983 claim and his state-law claims for breach of contract, intentional infliction of emotional distress, and false light invasion of privacy. (*Id.*)

On May 17, 2021, the Court granted Individual Defendants' motion for summary judgment.  (Doc. 139.)  This order disposed of the state-law gross negligence claim.  (*Id.*)

On October 12, 2021, ABOR filed the pending motion for summary judgment. (Doc. 155.)

On November 23, 2021, Doe filed a response.  (Doc. 189.)

On December 23, 2021, ABOR filed a reply.  (Doc. 201.)

Due to scheduling conflicts, oral argument on the summary judgment motion could not be held until August 17, 2022.  (Docs. 203, 204, 205.)  In advance of oral argument, the Court issued a tentative ruling.  (Doc. 206.)

**ANALYSIS**

I.   Legal Standards

A.   **Summary Judgment**

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor."  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).  The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).  "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts."  *Fresno Motors*, 771 F.3d at 1125.

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits,

if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50. At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

## B.  **Title IX**

Title IX prohibits discrimination on the basis of sex at all educational institutions receiving federal financial assistance. 20 U.S.C. § 1681(a). This prohibition extends to all operations of such an institution. *Id.* § 1687. "Title IX is enforceable through an implied right of action in which monetary damages are available." *Schwake v. Ariz. Bd. Of Regents*, 967 F.3d 940, 946 (9th Cir. 2020). Among other things, "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Id.* (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994)).

Since 2019, the Ninth Circuit has issued three published decisions in cases, similar to this one, in which a male college student who had been disciplined based on allegations of sexual misconduct by a female student asserted that the school's disciplinary process violated Title IX because it was tainted by anti-male gender bias.  Although all three cases arose in a different procedural posture than this case's current posture—each evaluated a challenge to the sufficiency of the complaint under Rule 12(b)(6), whereas the question here is whether Doe has adduced sufficient evidence to survive summary judgment—it is nevertheless helpful to begin by summarizing them.

First, in *Austin v. University of Oregon*, 925 F.3d 1133 (9th Cir. 2019), the plaintiffs—three male student-athletes at the University of Oregon—were accused by a female student of forcing her to engage in nonconsensual sex at an off-campus apartment. *Id.* at 1135.   Following a hearing, a university official "found the student athletes responsible for sexual misconduct because they had violated the Student Conduct Code by 'engaging in penetration without explicit consent.'  The University suspended the student athletes for at least four years and until the female student is no longer enrolled at the University (but not longer than ten years)." *Id.* at 1136.  Afterward, the plaintiffs sued the school under two different Title IX theories: a "selective enforcement" theory and an "erroneous outcome" theory.  *Id.* at 1137-38.[3]  The district court dismissed the plaintiffs' complaint for failure to state a claim and the Ninth Circuit affirmed.  As for the "selective enforcement" theory, the court acknowledged that the complaint "recites such facts as the content of the University president's speech and the campus protests" but held that there was no "plausible link connecting these events and the University's disciplinary actions to the fact that the student athletes are male." *Id.* at 1138.  The court also acknowledged that the plaintiffs alleged that "the University disciplines male students for sexual misconduct but never female students" but held that this allegation was, on its own, insufficient to raise a plausible claim of gender bias because "the complaint does not claim that any female

---

[3]      The plaintiffs also advanced a "deliberate indifference" theory, but the Ninth Circuit deemed it waived.  *Id.* at 1138.

University students have been accused of comparable misconduct, and thus fails to allege that similarly situated students—those accused of sexual misconduct—are disciplined unequally." *Id.*  Finally, as for the "erroneous outcome" theory, the court held that it failed because "[e]ven if the outcome of the administrative conference procedure was erroneous, the complaint is missing any factual allegations that show that sex discrimination was the source of any error." *Id.*

Next, in *Schwake v. Arizona Board of Regents*, 967 F.3d 940 (9th Cir. 2020), a male graduate student at ASU was accused by a female graduate student of "engag[ing] in unwanted contact and sexual misconduct with her." *Id.* at 943.  Schwake's defense was that "the sexual activity o[n] the night of the accusation was consensual and that the two had a friendly and romantic relationship for several months afterwards." *Id.* at 944. Following an investigation, ASU "found [Schwake] responsible for the disciplinary charges" and ordered a suspension as punishment. *Id.* at 944.  Schwake then appealed, but before a hearing could be held, the punishment was changed "from suspension to certain campus restrictions" and an ASU official told Schwake that he was no longer entitled to a hearing and could face additional sanctions, including degree revocation, if he filed his own harassment complaint against his accuser. *Id.* at 945.  In the ensuing Title IX action, Schwake argued that ASU "discriminated against him on the basis of sex during the course of the disciplinary case." *Id.* at 943.  The district court dismissed Schwake's complaint for failure to state a claim but the Ninth Circuit reversed, holding that "Schwake plausibly alleged that the University discriminated against him on the basis of sex." *Id.*

In reaching this conclusion, the Ninth Circuit grouped Schwake's relevant allegations into two categories: "Background Indicia of Sex Discrimination" and "Schwake's Disciplinary Case." *Id.* at 948-51.  When discussing the first category, the court did not address whether the "Dear Colleague" letter might provide support for Schwake's Title IX claim because his complaint did not mention the letter. *Id.* at 948. Nevertheless, the court noted that Schwake's complaint contained two other sets of factual allegations intended to establish background indicia of sex discrimination: first, that the

U.S. Department of Education initiated an investigation of ASU in 2014 "for possible Title IX violations in the University's handling of sexual misconduct complaints"; and second, that ASU followed "a pattern of gender-based decisionmaking against male respondents in sexual misconduct disciplinary proceedings," including "invariably" finding against male respondents "regardless of the evidence or lack thereof." *Id.* at 948-49. The court concluded that "it is reasonable to infer that such a federal investigation placed tangible pressure on the University . . . [that] would affect how the University treated respondents in sexual misconduct disciplinary proceedings on the basis of sex" and that the allegations of gender-based decisionmaking provided further "background indicia of sex discrimination relevant to [Schwake's] Title IX claim." *Id.* Next, the court turned to the details of Schwake's disciplinary case, clarifying that those details were critical because background indicia of sex discrimination are alone insufficient to support a Title IX claim. *Id.* at 949 (citing *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 855 (7th Cir. 2019)). The court noted that Schwake had alleged that his case was marred by various "procedural irregularities"—including one ASU official's[4] efforts to "divulge[] confidential and privileged information about Schwake's disciplinary case" before the case was completed, ASU's efforts to foreclose Schwake from pursuing an appeal of the modified punishment or file his own harassment complaint against his accuser, and various aspects of the investigation that were "one-sided"—and held that such procedural irregularities "support an inference of gender bias." *Id.* at 949-51.[5] Thus, the court concluded that "[c]onsidering the combination of Schwake's allegations of background indicia of sex discrimination

---

[4] The court clarified that Schwake could rely on this ASU official's conduct, even though the official "was not a decisionmaker," because conduct "by 'pertinent university officials,' not just decisionmakers, can support an inference of gender bias." *Id.* at 950.

[5] *Schwake* repeatedly states that procedural irregularities may give rise to an inference of gender bias. *See also id.* at 950 ("Like the procedural irregularities some of our sister circuits have considered when faced with allegations of pressure, the violation of confidentiality by those involved in Schwake's disciplinary case supports an inference of gender bias when considered along with Schwake's allegations of background indicia of sex discrimination."); *id.* (citing *Doe v. Columbia Univ.*, 831 F.3d 46, 59 (2d Cir. 2016), for the proposition that "procedural irregularities in the university's investigation and handling of a sexual assault complaint raised an inference of bias"); *id.* at 951 ("Schwake's allegations of the University's one-sided investigation support an inference of gender bias.").

along with the allegations concerning his particular disciplinary case, we conclude that sex discrimination is a plausible explanation for the University's handling of the sexual misconduct disciplinary case against Schwake.  This is sufficient for Schwake's Title IX claim to proceed beyond the motion to dismiss stage."  *Id.* at 951.

Finally, in *Doe v. Regents of the University of California*, 23 F.4th 930 (9th Cir. 2022), a male graduate student at UCLA (Doe) and a female undergraduate student at UCLA (Roe) who had been engaged in a "long-term romantic relationship" broke up amid suspicions of infidelity.  *Id.* at 932.  Several months later, Roe "lodged a Title IX complaint with the University against Doe, alleging thirteen instances of misconduct, some dating back" more than three years.  *Id.* at 933.  Following an investigation, a UCLA representative determined that Doe was responsible for one of the alleged incidents and that his conduct violated various provisions of the university codes of conduct.  *Id.* at 933. Notably, "these violations were not contained in the joint amended Notice of Charges" that had been provided to Doe at the outset of the investigation.  *Id.*  The violation finding was later upheld by a UCLA dean and by the school's internal appeal body and Doe received a two-year suspension sanction.  *Id.* at 934.  Afterward, as in this case, Doe brought a Title IX action against the school in federal court and also sought review of the underlying disciplinary decision in state court.  *Id.* at 934.  As in this case, a state-court judge eventually reversed the school's disciplinary finding on the ground "that the evidence did not support the University's finding" and vacated the suspension.  *Id.*

As for the Title IX claim, the district court dismissed it under Rule 12(b)(6) but the Ninth Circuit reversed.  The court noted that Doe's allegations fell "into three categories: (1) allegations of external pressures, (2) allegations of an internal pattern and practice of bias, and (3) allegations of specific instances of bias in his case."  *Id.* at 936-37.  As for the first category (external pressures), Doe's allegations included both the "Dear Colleague" letter and that UCLA had been audited in 2013 following allegations "about a lack of response to sexual harassment claims."  *Id.* at 937-38.  The court held that it was "reasonable to infer" that such matters "would place 'tangible pressure' on the University"

and that, "[w]hen taken alongside Doe's other allegations discussed below, it is plausible that such pressure would affect how the University treated respondents in disciplinary proceedings on the basis of sex, even in 2017." *Id.* As for the second category (internal pattern and practice of bias), the court focused on Doe's allegations that "the respondents in Title IX complaints that UCLA decided to pursue from July 2016 to June 2018 were overwhelmingly male," that UCLA "doesn't report by gender the percentage of respondents found to have violated campus policy," and that UCLA "has never suspended a female for two years based upon these same circumstances, nor [has it] used the reasoning that two years is a minimum suspension when issuing a suspension to a female." *Id.* at 938. UCLA argued that these allegations were insufficient because "the gender breakdown of complainants and respondents could be attributed to numerous possible factors that are not gender bias" but the court disagreed, holding that such "asymmetrical enforcement allegations . . . can, and here do, lead to a plausible inference of discrimination on the basis of sex, at least when considered in conjunction with the other well-pleaded facts regarding external pressures and specific instances of bias in Doe's case." *Id.* at 938-39. Finally, as for the third category (specific instances of bias in Doe's case), the court noted that Doe made various "allegations of irregular proceedings," including that UCLA's investigator "made findings of violations of policy not included in the Joint Notice or Amended Joint Notice of Charges" and that a state-court judge ultimately "found that the evidence did not support the Regents' findings," and held that such "irregularities in Doe's proceedings . . . , while not dispositive on their own, support an inference of gender bias." *Id.* at 939-40.[6] Thus, the court concluded that, "[t]aken together, Doe's allegations of external pressures and an internal pattern and practice of bias, along with allegations concerning his particular disciplinary case, give rise to a plausible inference that the University discriminated against

---

[6]     *See also id.* at 940 ("Although the Regents contends that these allegations of procedural irregularities do not suggest that gender was the reason for the supposed errors, this Circuit, as well as the Seventh and Sixth Circuits, have found similar irregularities support an inference of gender bias, particularly when considered in combination with allegations of other specific instances of bias and background indicia of sex discrimination.").

Doe on the basis of sex.  The fact that sex discrimination is 'a plausible explanation' for the University's handling of the disciplinary case against Doe is sufficient for his Title IX claim to survive a motion to dismiss.  While Doe 'may face problems of proof, and the factfinder might not buy the inferences that he's selling,' his Title IX claim makes it past the pleading stage."  *Id.* at 941 (citations omitted).

## II.   Discussion

Doe contends that he has asserted a viable Title IX claim because he was "wrongfully found to have committed the alleged offenses related to sexually engaging an incapacitated person, forcible sexual contact, and alcohol violations and such decisions were motivated by gender bias because Plaintiff was a male athlete."  (Doc. 37 ¶ 253.)  Regardless of the precise standard,[7] the parties agree that to survive summary judgment, Doe must proffer evidence that would permit a reasonable jury to infer that his sex was a motivating factor in ASU's handling of his disciplinary proceeding.

In the December 2019 order denying ABOR's motion to dismiss the Title IX claim, the Court found that "[a]lthough this issue presents a close call, . . . the FAC contains just enough case-specific, non-conclusory allegations of gender bias (which, at this stage of the proceedings, the Court must assume to be true) to survive a motion to dismiss."  (Doc. 66 at 20.)  The Court identified three categories of well-pleaded allegations that, taken as true and in concert, gave it pause: (1) external pressure arising from the "Dear Colleague" letter and OCR's contemporaneous investigations of ASU (*id.* at 21-22); (2) statements made by representatives of ASU (*id.* at 22-23); and (3) an array of irregularities during the disciplinary proceedings.  (*Id.* at 23-24.)

Now that the case has progressed past the pleading stage, Doe must proffer evidence

---

[7]     Doe asserts that the three-part burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), should apply.  (Doc. 189 at 1.)  ABOR respond that "[t]he Ninth Circuit has not adopted the *McDonnell Douglas* standard in Title IX disciplinary cases."  (Doc. 201 at 2.)  It is unnecessary to resolve this dispute here because both parties agree that this Court need only determine "whether there is a contested issue of fact regarding gender bias" (Doc. 189 at 1; Doc. 201 at 1), and *McDonnell Douglas* itself requires an initial showing that sex was a motivating factor in the school's investigation and disciplinary decision.  *Doe v. Univ. of Denver*, 1 F.4th 822, 829 (10th Cir. 2021).

that would validate his allegations.  *Anderson*, 477 U.S. at 255.  Accordingly, the Court will begin by reassessing the allegations it found compelling at the motion-to-dismiss stage. Next, the Court will discuss new evidence and arguments raised during the summary judgment process.  Finally, the Court will weigh the allegations that have been validated by competent evidence and decide whether Doe has carried his burden of establishing the existence of a triable issue of fact.

    A.    **Issues Raised In The Motion To Dismiss**

        1.    <u>External Pressure</u>

When deciding the motion to dismiss, the Court noted that "the FAC—like many of the complaints in other recent Title IX cases brought by male university students who contend they were subjected to gender-biased disciplinary proceedings—contains an extensive discussion of the 'Dear Colleague' letter that was issued by OCR in 2011." (Doc. 66 at 21.)  The Court found that "the letter does not, on its own, get Doe over the plausibility line," but "'provides a backdrop that,' if combined with other evidence, 'may give rise to a plausible claim.'"  (*Id.*, quoting *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018).)

In the motion for summary judgment, ABOR argues that (1) "the DCL ['Dear Colleague' letter] does not use gender-specific language in calling upon schools to address sexual violence"; and (2) "there is no evidence that the DCL unfairly influenced any decision-maker in Doe's case or resulted in ABOR or ASU policies unfair to male respondents." (Doc. 155 at 5-6.)  Doe responds that "ASU incorporated the DCL into its training and manuals governing the disciplinary process," that the letter "mandated that ASU prioritize the investigation and resolution of harassment claims and defined 'sexual harassment' more broadly than in comparable contexts," and that the letter also threatened ASU with a loss of federal funding if it did not vigorously investigate and punish sexual misconduct.  (Doc. 189 at 15.)  In reply, ABOR argues that ASU's reliance on the "Dear Colleague" letter does "not controvert ABOR's evidence that the DCL did not cause a gender-biased outcome here." (Doc. 201 at 10.)  ABOR also noted that Doe's cited cases were decided at the motion-to-dismiss stage.  (*Id.* at 10.)

The Court agrees with ABOR that the "Dear Colleague" letter, standing alone, does not create a triable issue of fact as to whether ASU's disciplinary process was infected by gender bias.  In general, the "rationale for the letter's relevance is as follows: the letter applied government pressure and threatened financial punishment in a way that could lead colleges to discriminate against men in their sexual assault adjudication processes."  *Doe v. Coastal Carolina Univ.*, 522 F. Supp. 3d 173, 179 (D.S.C. 2021).  But as ABOR correctly notes, the difficulty with this chain of inferences is that the letter does not explicitly single out men as the perpetrators of sexual violence and women as the victims of sexual violence.  The letter uses the words "students" and "he or she" when referring to both victim and perpetrator.  (Doc. 155-6 at 2-20.)  Additionally, the letter provides statistics concerning the rates at which both female and male college students are the victims of sexual violence.  (*Id.* at 3 ["The statistics on sexual violence are both deeply troubling and a call to action for the nation.  A report prepared for the National Institute of Justice found that about 1 in 5 women are victims of completed or attempted sexual assault while in college.  The report also found that approximately 6.1 percent of males were victims of completed or attempted sexual assault during college."].)  Given this backdrop, the "Dear Colleague" letter could only serve as a probative "backdrop" to a gender bias claim if a plaintiff produced university-specific evidence suggesting that university officials interpreted the letter's mandate to protect "victims" from "perpetrators" as coded language ordering the university to protect "women" from "men."  Otherwise, the letter would simply serve as a directive to aggressively investigate and pursue accusations of sexual misconduct, irrespective of the gender of the accuser and accused.  *Cf. Bleiler v. Coll. Of Holy Cross*, 2013 WL 4714340, *12 (D. Mass. 2013) (bias "toward the rights of reporting complainants" is not the same as bias against male students).

This understanding of the "Dear Colleague" letter is consistent with the Ninth Circuit's recent decision in *Doe*.  As noted, *Doe* held that it was "reasonable to infer that the [letter], the threat of losing federal funding if sexual misconduct was not vigorously investigated, and the . . . audit regarding [UCLA's] 'lack of response to sexual harassment

claims' would place 'tangible pressure' on the University." 23 F.4th at 937.  But again, this pressure was to vigorously investigate sexual misconduct *claims*, which is not the same thing as pressure to discriminate against *men* accused of sexual misconduct.  The *Doe* court held that it was only when this pressure was "taken alongside Doe's other allegations" that it could be reasonably viewed as "affect[ing] how the University treated respondents in disciplinary proceedings on the basis of sex." *Id.*  Thus, the critical question here is whether Doe has adduced any evidence, apart from the "Dear Colleague" letter itself, from which a reasonable juror could infer that ASU officials interpreted the letter as a directive to discriminate against men during sexual misconduct-related disciplinary proceedings.

On this point, the Court noted during the motion-to-dismiss process that "the FAC alleges that, following the issuance of the letter, OCR specifically identified ASU as one of the universities whose Title IX processes were under investigation and sent investigators to the ASU campus to 'gather information' about those processes."  (Doc. 66 at 21-22.) The Court determined that these school-specific allegations of external pressure were "additional support for Doe's claim."  (*Id.*)

In the motion for summary judgment, ABOR argues that "Doe cannot offer any evidence to show the OCR investigations impacted Doe's disciplinary proceedings or outcome.  The OCR never found that ASU violated Title IX, ordered any policy changes, or otherwise influenced ASU's actions.  The evidence is uncontroverted that the relevant decision-makers did not consider, and were not influenced by, the OCR investigations." (Doc. 155 at 6.)  Doe responds that "[t]he University was being investigated by the Office of Civil Rights, a sub-agency of the Department of Education, during Doe's disciplinary proceedings." (Doc. 189 at 15.)  Doe argues that "a jury can infer the *pending* investigation unduly influenced the decision-making during Doe's proceedings."  (*Id.* at 16.)  ABOR replies that it would defy common sense and the law to conclude, as Doe urges the Court to do, that "OCR investigations did not influence the outcome, but . . . the jury can still infer that there was such influence."  (Doc. 201 at 10-11.)

Doe cites "Exhibit M" to support his assertion that ASU was investigated by OCR

during his disciplinary proceedings.  Exhibit M, as discussed in the factual background, is a December 1, 2017 letter sent by an ASU representative to an OCR representative.  (Doc. 189-2 at 86-98.)  The letter summarizes ASU's investigation of a particular allegation of sexual misconduct, and its inclusion of the comment that "ASU complied with the requirements of Title IX . . . [and] looks forward to a prompt and favorable resolution of this investigation" suggests there was a contemporaneous OCR investigation into ASU's Title IX practices.

Exhibit M does not support Doe's position because it describes OCR's investigation into ASU's failure to sanction a male charged with sexually assaulting *another male*. Although the parties' names are redacted, contextual clues make readily apparent that both the victim and the perpetrator were male.  (Doc. 189-2 at 89 ["[Complainant] was working to obtain a medical compassionate withdrawal from some of his courses, and he contacted Claudia Morales . . . .  [Complainant] told Ms. Morales of the alleged assault and provided Mr. [Respondent]'s name."].)  It is unclear how OCR's investigation into ASU's alleged failure to protect a male victim of sexual assault could support Doe's theory that "OCR was enforcing was a gendered view that saw men as the paradigmatic perpetrators of that violence and heterosexual women as its paradigmatic targets" and that OCR was placing "extraordinary pressure" on ASU "to appear tough on allegations of sexual assault made by women against men, no matter their merit."  (Doc. 37 ¶¶ 84, 98.)  To the contrary, Exhibit M suggests that ASU would have interpreted the "Dear Colleague" letter as creating pressure to favor *accusers* during sexual misconduct proceedings, not women to the detriment of men.  *See also Doe v. Marian Univ.*, 2019 WL 7370404, *12 (E.D. Wisc. 2019) ("There is no evidence by which a reasonable juror could infer that Doe was treated a certain way because of his gender, rather than because he was accused of raping someone."); *Doe v. Fairfax Cty. Sch. Bd.*, 403 F. Supp. 3d 508, 519 (E.D. Va. 2019) ("[V]igilance in enforcing Title IX, even when it results in bias in favor of victims and against those accused of misconduct, is not evidence of anti-male bias.").

These details also distinguish this case from *Schwake*.  There, the plaintiff alleged

that "in April 2014 the DOE initiated an investigation of [ASU] for possible Title IX violations in the University's handling of sexual misconduct complaints" and the Ninth Circuit held that it was "'entirely plausible' that such pressure would affect how the University treated respondents in sexual misconduct disciplinary proceedings on the basis of sex." 967 F.3d at 948. But here, Doe provides no evidence of a 2014 investigation of ASU, let alone a 2014 investigation that was focused on male-against-female sexual violence. Instead, his sole evidence is Exhibit M, which discusses a 2017 investigation of ASU by OCR that was apparently focused on a single incident of male-against-male sexual violence.

For these reasons, no reasonable juror could view the "Dear Colleague" letter or the OCR investigation as evidence that ASU's handling of Doe's disciplinary proceeding was motivated by gender bias.

### 2. Statements Made By ASU Representatives

#### a. **Dr. Hunter's Statement**

When deciding the motion to dismiss, the Court noted "the FAC alleges that an ASU representative referred to Doe's male gender when explaining why prompt action was needed: 'When this case first came to the attention of ASU, [Dr. Hunter] indicated that action had to be taken quickly because [Doe] was a male athlete—a collegiate wrestler.'" (Doc. 66 at 22.) However, the Court also noted that another part of the FAC "characterizes [Dr.] Hunter's email as follows: 'After receiving the report from ASU's police department, [Dr. Hunter] wrote in an email to her colleagues that she 'wanted to figure out what to do with [Doe]' and 'clearly we would want to move swiftly' due to his status as a student-athlete . . . .'" (*Id.* at 4 n.1.) During oral argument, Doe's counsel clarified that Dr. Hunter's email would make clear to any reasonable reader that it was referring to a male athlete. (*Id.*) Taking Plaintiff's well-pleaded allegations as true, the Court concluded that Dr. Hunter's alleged reference to Doe's gender ("male athlete") as a reason for prompt action, paired with the fact that Dr. Hunter was alleged to have overseen the university's investigation into Doe and sat on the Dean's Review Committee, supported Doe's Title IX

claim.  (*Id.* at 4 n.1, 22.)

In the motion for summary judgment, ABOR argues that "Dr. Hunter did not say she wanted the process to move quickly because Doe is male. . . .  Dr. Hunter explained that she referred to him as being a wrestler to ensure that the ASU athletic department was notified . . . as that department has its own procedures relating to student misconduct, which may require an athlete's removal from his or her respective team during the pendency of an investigation."  (Doc. 155 at 6-7.)  Doe does not address this point or make any attempt to refute ABOR's position in his response.

The Court agrees with ABOR that Dr. Hunter's email does not support Doe's claim.  In the motion to dismiss, the Court was presented with Doe's *summary* of Dr. Hunter's email: "[Dr. Hunter] indicated that action had to be taken quickly because [Doe] was a male athlete—a collegiate wrestler."  (Doc. 66 at 22.)  This allegation arguably linked the university's action ("taken quickly") with ("because") Doe's gender ("male athlete").  The proffered email from Dr. Hunter does not bear out that characterization.

The email chain, described above in the statement of facts, arose after Dr. Hunter was forwarded a copy of Roe's police report by the ASU Police Department.  (Doc. 155-1 at 7-8.)  In the report, the police sergeant referred to both Doe and Witness 1, describing them as "ASU wrestling students," and explained that only Doe still attended ASU.  (*Id.*)  Dr. Hunter's forwarded message instructed her staff to engage with Roe today "so we can figure out what to do with the male.  He is a wrestler, so clearly we would want to move swiftly, but not before we engage [Roe.]"  (*Id.* at 7.)

Dr. Hunter's email cannot plausibly be construed as connecting Doe's gender with any university action.  Dr. Hunter stated that "[h]e is a wrestler, so clearly we would want to move swiftly."  The conjunction "so," which commonly means "and for this reason; therefore," connects Doe's status as a wrestler with Dr. Hunter's desire to move quickly.  Although the Court acknowledges Dr. Hunter's use of the words "he" and "the male," they are not syntactically connected to Dr. Hunter's instruction to move quickly.

More  important,  ABOR  proffers  undisputed  evidence  that  ASU's  athletic

department has its own procedures relating to student misconduct, which supports ABOR's contention that Dr. Hunter was preparing for the athletic department's imminent participation. (Doc. 155-1 at 24 ["I mentioned that he was a wrestler in the email so that [my staff] were aware that there were other entities who were notified and aware that the student was an athlete."]; Doc. 155-7 at 6 [ASU Student-Athlete Code Of Conduct: "When a student-athlete is determined to have committed a major offense, the [university] will prohibit the student athlete from participation in [athletics]."].)

ABOR has carried its burden of proffering evidence negating an essential element of Doe's claim, but Doe has not carried his responsive burden of proffering evidence to support his claim or defense. *Nissan Fire*, 210 F.3d at 1102. Nor has Doe provided an opposing view of how Dr. Hunter's email should be interpreted. Thus, no reasonable juror could view Dr. Hunter's statement as evidence that ASU's investigation into Doe was motivated by gender bias.

### b.    **Dr. Rund's Statement**

When deciding the motion to dismiss, the Court noted "the FAC identifies another instance where an ASU official [Dr. Rund] made statements that reflect gender bias—this time, implicit bias. . . . [Doe] alleges that [Dr.] Rund based his finding that Roe was 'incapacitated' during the sexual encounter in part on the nature of the encounter (a 'threesome'), which [Dr.] Rund characterized as 'outrageous behavior' that could not be the product of a rational, informed decision by an adult. This characterization, according to the FAC, reflects implicit gender bias and antiquated 'sexual mores' because [Dr.] Rund 'did not characterize the men's decision to engage in three-way sex as 'outrageous.'" (Doc. 66 at 22.) The Court noted that this "may not be Doe's strongest argument," because Dr. Rund "had no reason to opine on the reasonableness of the male participants' behavior [as] the narrow issue before him was whether Roe was incapacitated." (*Id.* at 23.) Even so, the Court found that "at the pleading stage and when viewed in the light most favorable to Doe, it provides a modest degree of additional support for his Title IX claim." (*Id.*)

In the motion for summary judgment, ABOR argues that "Dr. Rund's comment was

based on the evidence presented to him, and cannot be contorted to suggest or imply gender bias. Further, even assuming Dr. Rund's use of 'outrageous' was a comment on sexual mores (it was *not*), Doe (again) cannot show the characterization has anything to do with the gender of the participants in the sexual activity." (Doc. 155 at 8-9.) Doe responds[8] that "the University's witness testified that a reasonable person exercising free will could decide to participate in a threesome, and Roe admitted she had capacity[9]. . . . A reasonable jury can infer gender bias based on Rund's finding that a female was incapacitated due to her 'outrageous behavior,' when there is no reason to believe her behavior was unusual other than her sex." (Doc. 189 at 9.) In reply, ABOR offers a lengthy rebuttal of Doe's argument that the Arizona Court of Appeals' opinion should be entitled to some preclusive effect and also argues that "even if Doe were to show . . . that Dr. Rund favored Roe, Doe has no evidence of gender bias rather than, for example, sympathy for sexual assault victims regardless of sex." (Doc. 201 at 7.)

The Court again concludes, as it did at the motion-to-dismiss stage, that a reasonable juror could construe Dr. Rund's "outrageous" comment as some evidence of gender bias. Although ABOR offers a reasonable, bias-free interpretation of the comment in its motion papers—that, when viewed in proper context, Dr. Rund was merely stating that Doe should have viewed Roe's evolution from refusing to have sex with Doe to participating in a threesome with Doe and Witness 1 as "outrageous" behavior suggesting her incapacitation—this is not the only reasonable interpretation. In the relevant paragraph of the letter, Dr. Rund began by identifying various reasons why Doe "should have known that [Roe] was not in the position to make informed, rational judgments." (Doc. 155-4 at

---

[8]     Throughout his response to the motion for summary judgment, Doe asserts that certain issues discussed or decided in the Arizona Court of Appeals opinion are "law of the case and cannot be disputed." (Doc. 189 at 5.) Doe's argument about Dr. Rund thus mostly nods to the appellate court's analysis of purportedly relevant issues. Although the Court addresses Doe's "law of the case" theory below, for purposes of this issue, the Court addresses Doe's argument on its own merits.

[9]     Doe cites paragraphs 12 and 25 for the proposition that Roe "admitted" that she had capacity. Paragraph 12 sets forth the standard for incapacity. *Doe v. ABOR*, 2019 WL 7174525 at *3. Paragraph 25 states that the proffered evidence does not "support Rund's conclusion that [Roe] lacked the capacity to say no." *Id.* at *5. Nowhere does the opinion state that Roe admitted she had capacity.

- 30 -

188.)  In the very next sentence, Dr. Rund wrote: "At the very least, [Roe] was engaging in outrageous behavior evidencing her intoxication level." (*Id.*)  A reasonable juror could construe the transitional phrase "[a]t the very least" as suggesting that Dr. Rund was moving away from a discussion of Doe's knowledge of Roe's intoxication level and into a discussion of what he viewed as the outrageousness of Roe's decision to engage in the sexual act itself.

If the Court were acting as the factfinder here, it would probably opt for ABOR's disputed interpretation of the "outrageous" comment.  But that, of course, is not the Court's role at summary judgment.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment . . . .  The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.  Here, a reasonable juror could construe Dr. Rund's comment as a suggestion that a woman would only engage in a threesome if incapacitated.

Courts have recognized that when, as here, university representatives make comments during the course of disciplinary proceedings that reflect outdated or biased assumptions regarding the sexual preferences of men and women, such comments may serve as evidence that the proceedings were tainted by gender bias in violation of Title IX. For example, in *Doe v. Marymount University*, 297 F. Supp. 3d 573 (E.D. Va. 2018), an administrator presiding over the plaintiff's disciplinary proceeding had asked a male-student complainant in a different proceeding: "[W]ere you aroused' by this unwanted touching?"  *Id.* at 585-86.  "When the student responded, 'no,' [the administrator], in apparent disbelief, allegedly asked the male student again, 'not at all?'"  *Id.*  The court concluded this statement reflected that the administrator's "decision-making was infected with impermissible gender bias, namely [her] discriminatory view that males will always enjoy sexual contact even when that contact is not consensual," and that if the administrator in fact possessed such "outdated and discriminatory views of gender and sexuality," those "views would have naturally infected the outcome of [the plaintiff's] Title IX disciplinary

proceedings" and thus "create[d] an inference of gender discrimination in Marymount's disciplinary proceedings." *Id.*

Similarly, in *Doe v. Washington & Lee University*, 2021 WL 1520001 (W.D. Va. 2021), the hearing board credited the female complainant's "personal rule" that she would have oral sex with man regardless of whether he was interested in a relationship but would only have vaginal sex with a man who was interested in a relationship but concluded that the male respondent's statements to the same effect qualified "as a source of inconsistency and incredibility." *Id.* at *13. The district court denied the school's motion for summary judgment based in part on this evidence, holding that "a reasonable jury could . . . conclude" that the hearing "panel's differing treatment of Doe's and Roe's testimony . . . shows that gender bias impacted Doe's disciplinary proceeding" because it suggested that the "panel's determination of responsibility was predicated on biased assumptions regarding the sexual preferences of men and women." *Id.* at *13-14.

Finally, in *Doe*, the Ninth Circuit held that a university official's comment that the male respondent should have invited the female complainant into his office when she had shown up angry and unannounced "support[ed] an inference of gender bias" because it "at the very least raise[d] the question of whether, if the gender roles were reversed, [the official] would have made the same recommendation to a female approached by her angry, male ex-fiancé when he showed up unannounced to confront her at her place of employment." 23 F.4th at 939-40.

### 3.    Procedural Irregularities

As noted, the Ninth Circuit has repeatedly held that procedural irregularities during a disciplinary proceeding can give rise to an inference of gender bias. *See, e.g.*, *Schwake*, 967 F.3d at 950 ("[P]rocedural irregularities . . . support[] an inference of gender bias when considered along with Schwake's allegations of background indicia of sex discrimination."); *Doe*, 23 F.4th at 940 ("[I]rregularities in Doe's proceedings . . . , while not dispositive on their own, support an inference of gender bias."). When deciding the motion to dismiss, the Court noted that "the FAC alleges an array of irregularities during

1    the disciplinary proceedings." (Doc. 66 at 23.) The Court found that "[a]lthough these
2    alleged procedural errors may not, standing alone, serve as plausible evidence of gender
3    bias in a Title IX case . . .  taken together, these allegations are sufficient to survive a
4    motion to dismiss." (*Id.* at 24.)

5                    a.    **Davis's Promise To Bring "Charges"**

6           The first procedural irregularity discussed in the December 2019 order was the
7    FAC's allegation that "the lead investigator promised Roe she would attempt to bring
8    charges against Doe at the very outset of the investigation, before even interviewing Doe
9    or obtaining corroborating information." (Doc. 66 at 23.)

10          In the motion for summary judgment, ABOR contends this statement does not
11   qualify as a procedural irregularity because, under the Student Disciplinary Procedures (the
12   "Procedures"), a "charge" is simply a notice provided to the respondent that an accusation
13   has been made and an investigation has begun. (Doc. 155 at 9 [citing Doc. 155-2 at 64;
14   Doc. 155-7 at 26].) Thus, ABOR contends that a "charge" does not suggest Doe was
15   accused of a violation in the same way a prosecutor's "charge" of a crime generally must
16   be founded on probable cause. (*Id.* at 9.) Doe does not directly respond to ABOR's
17   explanation. He does, however, mention Davis's alleged failure to investigate before
18   charging him when presenting a new procedural-irregularity argument related to his interim
19   suspension. (Doc. 189 at 11 ["There was no basis for the interim suspension . . . . [T]he
20   University immediately charged Doe with sexual misconduct for having sex with a person
21   who was incapacitated and placed him on interim suspension, even though Davis had not
22   interviewed Doe, collected corroborating information to confirm Roe's allegations, and
23   Roe admitted she had capacity during the sex act."].)

24          Because Doe does not dispute ABOR's explanation that a "charge" is not a
25   determination of guilt, but rather only ASU's declaration that an investigation has begun,
26   no reasonable juror could view Davis's promise to "charge" Doe as a procedural
27   irregularity. In later sections of this order, the Court addresses the merits of Doe's new
28   procedural-irregularity argument related to the interim suspension.

1

b.   **Davis's Statements About Her Role**

2          The second procedural irregularity discussed in the December 2019 order was the

3   FAC's allegation that "the lead investigator made conflicting statements to Doe and Roe

4   about the investigator's role."  (Doc. 66 at 23.)

5          In the motion for summary judgment, ABOR argues that "Doe severely

6   mischaracterized" Davis's statement to the parties.  (Doc. 155 at 9.)  ABOR asserts that

7   "Davis told Roe and Doe the same thing: she did not have subpoena power and would rely

8   on them to provide documentation and other information they wanted considered."  (*Id.* at

9   9.)  ABOR disputes Doe's "notion that Ms. Davis allowed Roe to control the investigation

10  or dissuaded Doe from providing evidence," notes that "Ms. Davis repeatedly asked Doe

11  for information and documents," and asserts that Doe, in fact, was uncooperative.  (*Id.* at

12  9-10.)  In response, Doe argues that "the University acted as Roe's advocate" and that "a

13  reasonable jury can infer gender bias based on the University's self-described advocacy for

14  the female, a role never afforded a male."  (Doc. 189 at 13.)  Relevant to the narrower

15  allegation addressed at the motion-to-dismiss stage, [10] Doe asserts that Davis described

16  herself to Doe as a "neutral third-party investigator," "half-heartedly" asked for

17  information, but also claimed that she would gather information herself.  (*Id.* at 13.)  Doe

18  argues that, in contrast, Davis told Roe that she was "her partner" and asked Roe to locate

19  specific information because "the onus was on her to prove her case."  (*Id.*)  In reply, ABOR

20  accuses Doe of raising his university-as-advocate theory "for the first time" and focuses on

21  rebutting that argument without relitigating the issue of Davis's description of her role.

22  (Doc. 201 at 9.)

23         The Court finds no evidence of a genuine dispute about Davis's characterization of

24  her own role to Roe and Doe.  Davis told Roe "it's going to be up to you to provide us with

25  whatever information you feel is relevant; provide us with names of witnesses; provide

26

27  _____
    [10]      Although Doe now raises a broader argument, this portion of the order only
28  addresses the well-pleaded allegations found to be compelling at the motion-to-dismiss
    stage.  Here, it is the FAC's allegation that "the lead investigator made conflicting
    statements to Doe and Roe about the investigator's role."  (Doc. 66 at 23.)

your own statements.  It's going to have to be, unfortunately, on your shoulders to determine what it is that you feel like you want me to know."  (Doc. 155-7 at 56.)  She clarified the sort of evidence Roe could provide: "It's going to be up to you to provide photos or text messages or receipts or social media posts or whatever have you that you feel would be relevant for me to know."  (*Id*.)  She explained to Roe "at the end of the investigation I'll prepare a report and you will know exactly what I've been able to collect because throughout this process my job is just to be that neutral third-party investigator, not the decider."  (*Id*. at 63-64.)

Davis told Doe that she would handle ASU's investigation, acting as "a neutral, third party investigator," and that her job was to "collect information, anything I can get, by speaking to people, by collecting documentation that may be available, and then I just compile a report."  (Doc. 155-8 at 7.)  Davis explained that she would not ask Doe to make a statement, that he did not have to answer any questions, and in fact he could choose "not to come in at all at any point."  (*Id*. at 16-17.)  But Davis warned Doe that the Dean's Review Committee would determine whether Doe violated the Code "based on whatever (information) is available to them.  So if there is a wealth of information from [Roe's] side, that will be all that is considered.  And so you respond in the way that you feel is best that your attorney will advise you. . . .  You can come back next week and still not say anything, and that's okay. . . .  Just know that there would be an absence of information, and so when a decision is made, it would wind up being only from one side that information would be had."  (*Id*. at 17.)  She concluded that "[w]hat I would encourage you to note is, like we talked about earlier, I can't subpoena information, so down here is an option for you to provide the names of any potential witnesses, people you want me to speak with, people you feel may have information that would be relevant to our case.  Also, for you to provide any evidence you may have.  So if you have receipts or phone logs or text messages or Snapchats or anything you feel that may help substantiate your statement, you can provide those to me.  Okay?"  (*Id*. at 19.)

In short, when speaking to both Roe and Doe, Davis described herself as a "neutral

third-party investigator" who was compiling a report that would go to decisionmakers.  She told both Roe and Doe that they would be responsible for building their own cases because Davis did not have the power to subpoena evidence, but she gave nearly identical examples ("photos or text messages or receipts or social media posts" to Roe, "receipts or phone logs or text messages or Snapchats" to Doe) of the sort of evidence they might wish to submit. Davis presented the explanation more carefully to Doe to emphasize that he should "respond [*i.e.*, present evidence] in the way that you feel is best that your attorney will advise you."  She was, however, clear that if Doe did not advocate for himself, the Dean's Review Committee would only be presented with evidence provided by Roe.

Without prejudging Doe's broader argument that Davis comported herself as an advocate for Roe *in practice*, there is no evidence[11] that she made "conflicting statements to Doe and Roe about the investigator's role." Thus, no reasonable juror could find a procedural irregularity arising from this narrow aspect of the disciplinary proceeding.

### c.   **Davis's Statement About Roe's "New Evidence" And Dr. Hightower's Signature Of Doe's Expulsion Letter**

The third procedural irregularity discussed in the December 2019 order was the FAC's allegation that "the lead investigator falsely told Doe that one of Roe's written submissions did not contain any new evidence." (Doc. 66 at 23.)  The fourth procedural irregularity was the FAC's allegation that "the Committee violated its own procedural rules by issuing the expulsion letter without considering Doe's response to the new evidence

---

[11]     Doe quotes a statement allegedly made to Roe by Davis: "my job [is] to be like a detective that you're working with and to gather evidence." (Doc. 189 at 13.)  Doe characterizes this statement as evidence that Davis was casting herself as a "partner" to Roe rather than a neutral fact finder.  But the quotation misstates Davis's choice of words and omits significant context.  Davis actually said, "So my job in this process is to be a neutral third-party investigator.  I am not the decider.  It's my job to be just like the detective that you're working with and to gather information." (Doc. 155-7 at 59-60.)  The actual sequence of Davis's conversation with Roe made clear that Davis was comparing herself to Roe's *actual police detective liaison*, "the detective," whom they had discussed seconds earlier, and explaining that she had an investigatory, not a deciding, role.  Even if Davis had indeed said, "like a detective that you're working with," it strains credulity to say this casts her as a "partner" when Davis had described herself as a "neutral third-party investigator" to Roe exactly two sentences earlier.  Nothing about Davis's presentation to Roe portrayed Davis as a "partner" to her, at least no more so than Davis's presentation to Doe portrayed Davis as a partner to him.

1    discussed in Roe's final written submission."  (*Id.* at 23.)

2        In the motion for summary judgment, ABOR contends that Doe's argument about

3    Roe's submission reflects "disagreement between Doe and Davis as to what constitutes

4    'new evidence.'   Davis testified that she did not consider repetitive or clarifying

5    information from Roe that did not contain a 'new fact' to be new evidence." (Doc. 155 at

6    10.)  ABOR also argues that although Dr. Hightower signed an initial expulsion letter

7    before receiving Doe's new submission, she signed a second expulsion letter after she

8    considered the submission and found that it did not change her decision.  (*Id.* at 11.)  Doe

9    responds that "a reasonable jury can infer gender bias based on the University's failure to

10   give the male accused an opportunity to review and comment on evidence and granting the

11   female accuser th[at] right, and by failing to address obvious and relevant issues in the draft

12   report before finding a male guilty of violating the Code."  (Doc. 189 at 15.)  More

13   specifically, Doe asserts that Davis "refused" to allow him to review Roe's new submission

14   until his lawyer intervened, and the submission contained new evidence despite Davis's

15   assurance otherwise.  (*Id.* at 14.)  Doe also asserts that his supplemental letter "was not

16   seriously considered (and certainly no substantive effort was made to examine or

17   corroborate the information) as the University issued its disciplinary decision the next day."

18   (*Id.*)   In reply, ABOR argues that Dr. Hightower received and reviewed all of Doe's

19   responses before issuing her final decision and that Doe cites no evidence supporting the

20   idea that his response was not "seriously considered."  (Doc. 201 at 10.)

21       Doe really raises three procedural allegations here: (1) Davis refused to let Doe

22   review Roe's letter until his attorney became involved, whereas Roe was always able to

23   review new evidence; (2) Davis lied or otherwise misrepresented the fact that there was

24   "substantive, new information presented by Roe" in the new letter; and (3) the University

25   did not take Doe's new submission seriously.  By contrast, Doe does not seem to argue that

26   Dr. Hightower's re-signing of the letter would be procedurally defective if she *had* taken

27   his new submission seriously.

28       Doe has the better side of some but not all of these arguments.  The letter from Doe's

1    counsel explicitly invoked "the procedures"[12] when requesting the opportunity to review

2    any new statements from Roe before the final report was submitted to the Committee, but

3    Davis submitted the report without informing Doe of Roe's most recent submission. (Doc.

4    189-2 at 52.) It is hard to understand this as a "refusal," per se, but it is some evidence of

5    a procedural irregularity that ABOR does not directly dispute.

6         Additionally, although Roe's actual submission to Davis is apparently not before

7    the Court, Doe's counsel's letter to Davis serves as some evidence of what Roe's

8    submission said (and suggests the submission contained new information not previously

9    disclosed to Doe). At any rate, ABOR does not argue that Doe lacks admissible evidence

10   as to the substance of Roe's submission, just that he is incorrect about his characterization

11   of that submission. ABOR describes a "disagreement between Doe and Davis as to what

12   constitutes 'new evidence'" and points to Davis's testimony that the submission did not

13   contain new evidence. (Doc. 155-2 at 30.) At summary judgment, this is a classic genuine

14   dispute of fact. The Court thus finds that Doe has proffered evidence of a genuine dispute

15   about whether Davis misrepresented Roe's new submission—which, in turn, would qualify

16   as a procedural irregularity.

17        In contrast, ABOR presents undisputed evidence that Dr. Hightower seriously

18   considered Doe's new submission and decided to expel him anyway. (Doc. 155-1 at 42.)

19   Doe cites no evidence to show that Hightower failed to seriously consider his submission.

20   The Court observes that thoughtful decisions are sometimes made quickly, just as

21   thoughtless decisions are sometimes made slowly. Speed, without more, is not evidence

22   of a lack of deliberation (although it might be different if Doe had evidence that Dr.

23   Hightower affirmed the decision 30 seconds after receiving his 100-page submission). Nor

24   does Doe argue that Dr. Hightower was administratively bound to consider new evidence

25   for a certain amount of time before ruling on it or to formally remark on new evidence in

26   her revised expulsion letter. There is thus no genuine dispute about whether Dr. Hightower

27

28   ────────────────
[12]    Section C(5) of the Procedures requires that "[b]efore concluding the investigation,
and upon request, the Dean of Students will provide the parties with an opportunity to
respond to all investigative materials." (Doc. 155-2 at 64.)

- 38 -

adequately considered Doe's new submission before expelling him.

For these reasons, Doe has adduced sufficient evidence to corroborate some, but not all, of the allegations in the FAC pertaining to procedural irregularities that occurred during the December 2016 portion of the disciplinary proceeding.

### d.   **ASU's Failure To Obtain Key Evidence**

The fifth procedural irregularity discussed in the December 2019 order was the FAC's allegation that "ASU representatives failed during various stages of the proceedings to take steps to obtain key evidence—among other things, they could have required Roe to obtain the cellphone video footage from the Tempe Police Department and simply chose not to do so."  (Doc. 66 at 23.)

In the motion for summary judgment, ABOR explains that (1) the video was unavailable to Davis and Roe and Davis could not compel Roe to obtain it, (2) Dr. Allen properly refused to order Roe to cooperate in Doe's pursuit of the video, and (3) Davis sought to contact Witness 1 and the individual who drove Roe home after the incident but was obstructed by Witness 1 and could not reach the driver.  (Doc. 155 at 10-11.)  Doe does not respond.[13]

Given Doe's failure to pursue this aspect of his claim at summary judgment, no reasonable juror could conclude that ASU's failure to obtain cellphone footage from the Tempe Police Department or testimony from Witness 1 or Roe's driver constituted a procedural irregularity.

### e.   **UHB's Refusal To Hear Toxicology Evidence**

The sixth procedural irregularity discussed in the December 2019 order was the FAC's allegation that "the UHB refused to consider Doe's proffer of the testimony his alcohol expert would have provided."  (Doc. 66 at 23.)

In the motion for summary judgment, ABOR argues that Doe's counsel made a strategic decision not to call his toxicology expert and instead offered a lengthy

---

[13]    Doe does assert, as part of his broader argument that Davis acted as an advocate for Roe, that Davis failed to interview certain individuals.  (Doc. 189 at 14.)   The Court will address that claim below.

presentation by Ms. Nanetti, his sexual assault expert.  (Doc. 155 at 12 n.6.)  ABOR asserts that the UHB's decision to reject Doe's proffer of a toxicology report "after the record closed, and well after the deadline in the Procedures," and with no opportunity for ASU to cross-examine the expert or offer a rebuttal, is not evidence of gender bias.  (*Id.* at 11.) Doe does not respond.

Given Doe's failure to pursue this aspect of his claim at summary judgment, no reasonable juror could conclude that the UHB's refusal to consider the report of Doe's toxicologist constituted a procedural irregularity.

f.    **UHB's Failure To Disclose "Impermissible Force" Theory**

The seventh procedural irregularity discussed in the December 2019 order was the FAC's allegation that "the UHB sustained the sexual misconduct finding under an 'impermissible force' theory, but this theory wasn't properly disclosed to Doe before the hearing and conflicted with Roe's statements to the police and with the uncontradicted testimony of Doe's expert."  (Doc. 66 at 23.)

In the motion for summary judgment, ABOR argues that "the notice regarding the initiation of the investigation and Hightower's decision gave Doe notice of the potential for force to be considered, quoting in full the range of sexual misconduct subject to the Code."  (Doc. 155 at 12.)  ABOR also points out that Doe "specifically addressed the issue of force in communications with Ms. Davis and during the UHB hearing."  (*Id.* at 12.) Finally, ABOR asserts that the final expulsion decision did not hinge on force, as Dr. Rund also found that Roe was incapacitated and unable to consent to the sex acts.  (*Id.* at 12-13.) In response, Doe argues that "the University found Doe guilty of . . . sex by force without informing Doe, investigating the charge, or presenting the issue at trial."  (Doc. 189 at 13.) He asserts that "a reasonable jury can infer the University wanted to convict males at any cost based on the University's failure to inform Doe he was charged with sex by force, the failure to investigate sex by force, the failure to inform Doe he needed to produce evidence by force charge, and the failure to support the charge at the hearing."  (*Id.* at 12-13.) Specifically, he argues that the information supporting the interim suspension makes no

mention of sex by force, Davis did not tell Doe that she was investigating a claim of sex by force, and thus Doe did not produce evidence to defeat such a claim, and that testimony at the UHB hearing makes clear sex by force was not an issue but was "mentioned only in passing." (*Id.* at 12.)  ABOR replies that "force was always at issue, Doe addressed it during the investigation and the UHB hearing, force was not the primary reason for his expulsion, and Doe cannot link the force finding to gender bias." (Doc. 201 at 8.)

A reasonable juror could conclude that the UHB's decision to find Doe responsible under a sex-by-force theory constituted a procedural irregularity.  It is undisputed that the Code requires ASU to notify students of charges against them.  (Doc. 155-2 at 64.)  The letter sent by Dr. Hunter on September 21, 2016 explained that Doe was accused of providing alcohol to a minor student, engaging in sex with her despite her intoxication and without her consent, and recording the sexual acts without her consent.  (Doc. 189-2 at 16.)  Although the letter cited section F-23, which identifies "sexual acts perpetrated . . . by force" as one of the many forms of conduct prohibited by section F-23, a reasonable juror could conclude that a passing citation to a broadly defined category of offenses does not qualify as an "explanation of the charges which have been made," as required by the Procedures.  (Doc. 155-2 at 64.)

At minimum, it seems that ASU never explicitly warned Doe that he was under investigation for sex by force, even as it was providing notice of the other specific charges he was facing.  A reasonable juror could conclude that ASU's enumeration of specific alleged violations (providing alcohol to a minor, sex without consent, illicit recording) implicitly suggested that ASU was not pursuing other, unnamed violations.  *Cf. N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017) (explaining that the interpretive canon of *expressio unius est exclusio alterius* applies when circumstances support a sensible inference that the statutory term left out must have been meant to be excluded).  Although ABOR correctly notes that Dr. Rund did not ultimately rely on the force finding to uphold the expulsion (Doc. 155 at 12-13), this is at most an argument about whether the procedural irregularity was harmless, not whether an irregularity occurred.  A reasonable juror could

conclude that a lack of notice as to a specific charge, when ASU's Code requires an explanation of the charges that have been made, qualifies as a procedural irregularity.  *See generally Doe*, 23 F.4th at 940 (where UCLA's investigator "made findings of violations of policy not included in the Joint Notice or Amended Joint Notice of Charges," this qualified as an "irregularit[y]").

### B.  **Issues Raised In The Motion For Summary Judgment**

#### 1.  The Arizona Court Of Appeals' Decision

In response to the motion for summary judgment, Doe advances various arguments based on the Arizona Court of Appeals' 2019 decision overturning his expulsion.  Doe makes three overarching points: (1) "a jury can infer gender bias based on the University's baseless finding that Doe engaged in sex by force" (Doc. 189 at 3-5); (2) "gender bias can be inferred by the University's abuse of discretion" (*id.* at 5); and (3) "the Court of Appeals identified specific facts that a jury can use to infer sex bias under Title IX, and those facts are law of the case" (*id.* at 5-10).

The Court views the first and second arguments as a matched set: Doe believes the appellate court's determination that Dr. Rund "convicted" him with insufficient evidence can, itself, be some evidence to support his overall argument that "the University wanted to convict males at any cost."  (*Id.* at 12.)  The third argument is that "the appellate court's factual and legal findings are law of the case and cannot be disputed" and "a jury can infer sex bias based on . . . ten issues identified by the Court of Appeals."  (*Id.* at 5, 7.)  Doe asserts that "the issues resolved in the Court of Appeals' Order are entitled to preclusive effect" and "the University cannot relitigate the factual and legal issues decided by the state court, including factual determinations necessary to find there was no evidence to support a finding of incapacitation or that Doe engaged in sex by force. . . .  In short, if the University is arguing that there is evidence to support a finding of sex by force or Roe was incapacitated, it cannot do so."  (*Id.* at 7.)  Doe then proceeds to identify ten "issues identified by the Court of Appeals."  (*Id.* at 7.)  In some instances, these "issues" appear to be Doe's understanding of evidentiary findings made by the appellate court from which,

1   in Doe's view, a juror might infer gender bias.  In some instances, the "issues" are simply

2   quotations from the appellate decision, which Doe combines with his own arguments and

3   blends into "law of the case."

4       In reply, ABOR makes the following arguments: (1) Doe waived his ability to rely

5   on the Arizona Court of Appeals' decision by not mentioning it in his disclosures pursuant

6   to the District of Arizona's Mandatory Initial Discovery Pilot Project ("MIDP"); (2) Doe

7   mischaracterizes the decision; (3) the decision does not have preclusive effect; (4) the

8   decision is not evidence that can go to the jury; and (5) the decision does not raise a fact

9   issue on *gender bias* because that was not at issue in the state-court proceedings.  (Doc.

10  201 at 2-7.)

11      The Court finds it unnecessary to resolve many of the complicated issues raised by

12  the parties' briefing on these points.  First, without taking any position on the admissibility

13  of the appellate decision, it seems this evidence would at most serve to establish the

14  existence of procedural irregularities, committed by Dr. Rund, that might allow a juror to

15  find gender bias.  Given that the Court has already found that Doe has proffered evidence

16  creating genuine disputes as to the existence of procedural irregularities during his

17  disciplinary proceeding, the addition of more procedural irregularities would not change

18  the summary-judgment analysis.  Similarly, insofar as Doe seeks to argue that the fact of

19  an erroneous outcome is some evidence of procedural irregularity—which is itself evidence

20  of gender bias—that proffer sits atop a pile of already-validated evidence of procedural

21  irregularities.

22      Second, without taking any position on the preclusive nature of the appellate

23  decision, Doe simply asks the Court to prevent ABOR from arguing that Dr. Rund correctly

24  found that Doe engaged in sex by force or that Roe was incapacitated.  But ABOR does

25  not make these arguments in its summary judgment briefing—to the contrary, when

26  discussing the "erroneous outcome" test that some courts[14] have applied in Title IX cases,

---

[14]     At the time Doe filed his operative complaint in February 2019, Ninth Circuit law seemed to suggest that a plaintiff asserting a Title IX claim could proceed under an array of different doctrinal theories, including "selective enforcement, erroneous outcome, and deliberate indifference."  *Austin*, 925 F.3d at 1138.  Accordingly, the FAC specifically

ABOR functionally concedes Doe's "actual innocence or articulable doubt as to the outcome of the disciplinary proceedings" in favor of disputing Doe's contention that "the outcome was the result of gender bias." (Doc. 155 at 3 n.2, citing *Austin*, 925 F.3d at 1138.) Given this backdrop, there is no need to decide, at least at this juncture, whether the appellate decision precludes ABOR from arguing that Doe actually committed the alleged violations.

2.      Additional[15] Assertions Of Procedural Irregularity

a.      **Davis's Advocacy For Roe**

As discussed above, no reasonable juror could find that Davis made "conflicting statements to Doe and Roe about the investigator's role," as Doe argued during the motion-to-dismiss stage of the case. However, Doe's arguments on that point are narrower than—and thus do not control the outcome of—his broader argument that Davis comported herself as an advocate for Roe *in practice*.

In his response to the motion for summary judgment, Doe argues that "[a] reasonable jury can infer gender bias based on the University's self-described advocacy for the female, a role never afforded a male." (Doc. 189 at 13.) Specifically, Doe points to (1) Davis's failure to interview Art Martori and other "witnesses in the athletic department," (2) Davis directing Roe to an ASU-sponsored advocate, to whom Doe was not given access, (3) Davis speaking to Roe's identified non-percipient witnesses early in the investigation, and (4) Davis's promise to represent Roe if there was an appeal. (*Id.*) In

---

identified "erroneous outcome" as one of Doe's theories of liability. (Doc. 37 ¶¶ 252-62.) However, the Ninth Circuit subsequently clarified in its July 2020 decision in *Schwake* that although several "sister circuits have fashioned doctrinal tests for sex discrimination claims in this context," including "the so-called 'erroneous outcome' and 'selective enforcement' tests," such "doctrinal tests" should be rejected in favor of a "far simpler standard for Title IX claims in this context"—namely, whether "the alleged facts, if true, raise a plausible inference that the university discriminated against the plaintiff on the basis of sex." 967 F.3d at 946-47 (cleaned up).

[15]      ABOR requests the opportunity to fully brief Doe's allegedly "previously undisclosed" arguments because "Doe never disclosed his arguments . . . as required by the MIDP." (Doc. 201 at 8 n.5.) The Court concludes that further briefing is unnecessary because Doe's additional assertions of procedural irregularity (which, for the sale of completeness, the Court analyzes below) are cumulative of the now-validated assertions as to which there is no disclosure objection.

- 44 -

1    reply, ABOR argues that "Doe now changes his position to argue (for the first time) that

2    Ms. Davis somehow acted as Roe's advocate."  (Doc. 201 at 9.)  ABOR contends that (1)

3    although Davis did not interview Martori and other witnesses in the athletic department,

4    Doe does not proffer evidence that they were material witnesses, (2) Davis offered

5    resources to both parties but referred Roe to a *victim* advocate, and Doe "was not an alleged

6    victim," (3) Davis spoke to a single non-percipient witness, but only after speaking to

7    Doe's two witnesses, and (4) Davis told Roe that if Doe appealed, "ASU would argue in

8    favor of that decision in an appeal, consistent with the Procedures.  ASU did not represent

9    Roe."  (Doc. 201 at 9.)

10       Doe's first and third alleged procedural defects are a logical pair, so they will be

11   addressed together.  ABOR concedes that Davis did not interview all of the witnesses

12   identified by Doe but argues that "Doe offers no evidence these witnesses had relevant

13   information."  (Doc. 201 at 9.)   However, given how ardently Davis explained that Doe

14   was responsible for leading her to any witnesses who might support his case, it is hard to

15   understand how Davis could fairly turn around and simply choose not to interview some

16   of Doe's proffered witnesses.[16]  At minimum, ABOR does not explain why Davis chose to

17   reject those witnesses.  Additionally, ABOR's argument about the importance of Doe's

18   witnesses (or lack thereof) seems to conflate distinct issues—the question here is whether

19   Davis's failure to interview the witnesses was procedurally irregular, not whether the

20   failure to interview them helped contribute to an erroneous outcome.

21       Doe also argues that Davis "spoke to Roe's witnesses (including non-percipient

22   witnesses) early in the investigation."  (Doc. 189 at 13.)  Presumably, this fact is meant to

23   suggest that Davis favored Roe by interviewing her non-essential witnesses while she

24   failed to interview his witnesses, and this procedural irregularity can be viewed as some

25   evidence of gender bias.  Indeed, Davis spoke to Student 2, a non-percipient witness, on

26   ───────────────

27   [16]    Even if Doe's request for Davis to interview "the whole athletic department" was
     too vague to pursue (Doc. 155-8 at 62), Doe's family specifically suggested that Davis
     interview "Art Martori . . . Don Waake (phonetic) . . . Scotty Graham . . . [and] Ray

28   [Anderson]."  (Doc. 189-2 at 27-28.)  It appears none of those witnesses were interviewed
     by Davis.

October 7, 2016.  (Doc. 155-1 at 77-78.)  ABOR argues the interview took place after Davis spoke to Doe's witnesses and Student 2 provided relevant information regarding the timing of Roe's report to ASU.  (Doc. 201 at 9.)  Nevertheless, a reasonable juror could view Davis's willingness to interview a non-percipient witness identified by Roe as helpful context when considering Davis's unwillingness to interview all of Doe's proposed witnesses.  The Court thus finds that Doe has proffered evidence of a genuine dispute about whether Davis's failure to interview all of his witnesses violated the bounds of her neutral role.

In contrast, no reasonable juror could view Davis's failure to direct Doe to the ASU police department's *victim* advocate as a procedural irregularity.  It is also notable that Davis did make sure to connect Doe with appropriate university resources.  As noted in the factual history, Davis showed concern for Doe's mental health and referred him to ASU resources that could assist him.  (Doc. 155-8 at 13 [referring Doe to a confidential counseling resource in case "you'll be up at 3:00 in the morning and unable to sleep or maybe you get some anxiety and want someone to talk to"].)

Nor is there any merit to Doe's contention that Davis acted in a procedurally irregular fashion by "agree[ing] to represent Roe if there was an appeal." (Doc. 189 at 13.)  As detailed in the factual background, Davis was preparing Roe for the possibility that the disciplinary proceedings might drag on before reaching a final resolution.  (Doc. 189-2 at 40.)  Roe asked Davis "What does it mean if there's an appeal?"  (*Id.*)  Davis explained "if the decision is suspension or expulsion, he has the right to say, I disagree and I want the investigation reheard," and then explained the composition of the UHB.  (*Id.* at 40-41.)  Davis then explained that "the university would represent you and would say, We, as a university, suspended or expelled him because of all this information.  And they would present their case.  [Doe] would have an opportunity to [respond]."  (*Id.* at 41.)

No reasonable juror could construe this exchange as an offer by Davis to represent Roe as a lawyer might represent a client.  Rather, Davis was simply describing ASU's standard practice of defending its administrative decisions on appeal.  ABOR points to

documentation establishing that ASU is in fact *required* to defend its proposed sanction before the UHB.  (Doc. 155-2 at 67 ["The university representative will have the burden of proving that the student more likely than not violated the Student Code of Conduct and the reason for the sanction."].)

Given that Davis was explaining ASU's administrative review policy exactly as set forth in the University's own guidelines, no reasonable juror could view her statement as a procedural irregularity.

### b. **The Interim Suspension**

In his response to the motion for summary judgment, Doe argues that "there was no basis for the interim suspension."  (Doc. 189 at 11.)  Doe argues that ASU lacked any reason to suspend him from campus during the pendency of its investigation because Roe did not allege force or incapacity during her initial report to ASU authorities and waited nearly six months after the incident to make the report.  (*Id.* at 11-12.)  Doe thus argues that ASU "had no reason to find [he] was a threat to campus safety except that he was a male *accused* of sexual misconduct—which the University knew, or should have known, as a false charge."  (*Id.*)  In support of this claim, Doe cites *Doe v. Columbia University*, 551 F. Supp. 3d 433 (S.D.N.Y. 2021).  ABOR replies that "Doe contends (for the first time) that there was 'no basis' for the interim suspension."  (Doc. 201 at 8.)  ABOR argues that ASU's Procedures provide for interim suspension if "the Dean is aware of information that supports a misconduct allegation and believes that the student poses a threat of harm or substantial disruption," that corroborating evidence is not required under the Procedures, and that Doe did not contest the suspension.  (*Id.* at 8.)

The Procedures provide that, following initiation of an investigation, "[t]he Dean of Students may restrict or suspend a student for an interim period pending a disciplinary proceeding if [1] the Dean is aware of information that supports a misconduct allegation and [2] believes that the student poses a threat of harm or substantial disruption."  (Doc. 155-2 at 63.)  Here, Dr. Hightower became aware of information that supported a misconduct allegation at the moment she was presented with Roe's report.  Notably, the

Procedures do not require the Dean to validate the information or weigh it against other information.  Additionally, the Procedures only require that the Dean *believe* the student poses a threat of harm or substantial disruption.  Thus, to establish a procedural irregularity, Doe would have to proffer evidence that Dr. Hightower didn't subjectively believe Doe posed a threat of harm or substantial disruption.  Although Doe argues that "the University knew, or should have known, [Roe's allegation] was a false charge" (Doc. 189 at 12), neither of Doe's cited exhibits (*id.* at 16; Doc. 155-1 at 67) relate to Dr. Hightower's contemporaneous knowledge.  Additionally, although Doe focuses on whether Roe's initial report to ASU portrayed him as a threat of harm to others, Doe ignores that the Procedures also authorize an interim suspension if the dean believes the accused's continued presence of campus during the pendency of the investigation would result in substantial disruption.  A dean could reasonably conclude that on-campus interactions between a student accused of sexual misconduct and that student's accuser might result in substantial disruption, and Doe does not identify any evidence suggesting that Dr. Hightower held a different view.

*Doe v. Columbia University* does not compel a different result.  There, a plaintiff accused of Title IX violations was subjected to an interim suspension "without any prior notice and without any kind of prior hearing."  551 F. Supp. 3d at 468.  Although the decision is not entirely clear on this point, it appears that Columbia violated the procedures set forth in its "Gender-Based Misconduct Policy and Procedures" by imposing the interim suspension without notice or a hearing.  *Id.* at 467 (discussing the allegations that Columbia "ignores the text of its own policies" and that "[t]he interim suspension violates Columbia's policies and Columbia's representations to me as a student").  The plaintiff also argued that Columbia had relied on non-credible evidence when issuing the interim suspension.  *Id.* at 468.  The court found, at the motion-to-dismiss stage, that "Plaintiff has alleged procedural irregularities: namely, that Columbia imposed the suspension with no prior notice and no hearing.  Plaintiff also asserts that Columbia ignored evidence Plaintiff put forward . . . that, he alleges, contradicted [Jane Doe's] version of events."  *Id.* at 469.  The court concluded that these alleged procedural irregularities, when viewed in the light most

favorable to the plaintiff, supported an inference that Columbia was biased against the plaintiff. *Id.*

This case is distinguishable because ASU's Procedures, unlike Columbia's procedures, do not contemplate prior notice, a hearing, or an opportunity to submit exculpatory evidence in advance of an interim suspension decision. Instead, the Procedures authorize the dean to impose an interim suspension simply upon becoming "aware of information that supports a misconduct allegation" and forming the belief "that the student poses a threat of harm or substantial disruption." Whether ASU's approach is fair or wise is not the issue before the Court—Doe's narrow claim here is that "[t]here was no basis for the interim suspension." (Doc. 189 at 11.) This claim fails because the interim suspension was imposed in compliance with the Procedures. There was no procedural irregularity.

### c. **Failure To Address Roe's Inconsistent Testimony**

In his response to the motion for summary judgment, Doe argues that "[t]he University never addresses inconsistencies in Roe's testimony." (Doc. 189 at 13-14.) The first inconsistency pertains to Roe's memory. According to Doe, Roe was able to give "precise details of what happened in the room" during her interview with the Tempe police in April 2016 and with her first interview with ASU investigators but was unable to recall those details during later interviews. (*Id.*) The second inconsistency pertains to the finding of incapacity. According to Doe, "the University never reconciled how Roe could have the capacity to stop the sex, realize and stop surreptitious photographing and stop Doe and [Witness 1] from ejaculating—based on her own statements—and still be incapacitated." (*Id.*) Doe argues that "[b]ecause the University never reconciled inconsistent statements by the female accuser, a reasonable jury can infer sex bias against a male accused." (*Id.*) Doe also contends that the decisions in *Doe v. Oberlin College*, 963 F.3d 580 (6th Cir. 2020), and *Doe v. University of Denver*, 1 F. 4th 822 (10th Cir. 2021), support a finding of procedural irregularity under these circumstances. In reply, ABOR argues that this case is distinguishable from *University of Denver* in that Davis may have failed to investigate

inconsistent statements, but she did not make the disciplinary decision.  (Doc. 201 at 9.)  ABOR argues that, in *University of Denver*, the "investigators made the finding of responsibility, and plaintiff had no hearing or other opportunity to challenge complainant's statements."  (*Id.* at 10.)  By contrast, ABOR asserts that Davis merely performed the investigation, the Dean of Students made the decision, and Dr. Rund affirmed the decision on appeal after an evidentiary hearing where Doe had a full opportunity to address inconsistencies.  (*Id.* at 9-10.)

Doe has the better side of these issues.  Notably, ABOR does not dispute that Roe made inconsistent statements about the encounter or that Davis failed to address those inconsistent statements in her report.  Nor does ABOR make any attempt to address Doe's argument regarding the seeming incongruity between Roe's account of the incident (under which she maintained the ability to make verbal requests to Doe and Witness 1 and obtain compliance with those requests) and the ultimate finding of incapacitation.  Instead, ABOR's position appears to be that, even if a university's lead Title IX investigator fails to acknowledge inconsistent statements by the complainant and other inconsistencies in the investigation, a claim of procedural irregularity will not lie unless the investigator was the university's ultimate decisionmaker.

This argument is unavailing.  As the Ninth Circuit has recognized, "statements by pertinent university officials, not just decisionmakers, can support an inference of gender bias."  *Doe*, 23 F.4th at 939 (citation and internal quotation marks omitted).  Here, Davis was an ASU representative who played a key role in the disciplinary process.  In this respect, she was similar to the UCLA representative who "served as the 'Respondent Coordinator throughout the Title IX investigation" in *Doe*.  *Id.*  Although that official was "not a decisionmaker," he was "familiar with UCLA's Title IX process and the facts underlying Doe's case" and it was "therefore reasonable to infer that [his conduct] reflect[ed] the broader gender assumptions within UCLA's Title IX office during its investigation."  *Id.*  Here, too, to the extent Davis engaged in procedurally irregular conduct in the course of leading the first phase of the investigatory process, that conduct is properly

1    imputable to ABOR regardless of whether she was the ultimate decisionmaker.

2        This approach is consistent with *University of Denver*.  There, the Tenth Circuit

3    concluded that, under the *McConnell-Douglas* test, a university investigator's failure to

4    "mention . . . inconsistencies" within statements made by a female complainant raised a

5    plausible inference that the university discriminated against a male respondent on the basis

6    of his sex.  1 F.4th at 833-834.  Although ABOR is correct that the investigator in that case

7    happened to be vested with authority to make the final determination of responsibility,

8    nothing in *University of Denver* suggests the finding of procedural irregularity turned on

9    this feature of the university's disciplinary process.  Nor would such a distinction make

10   sense or be reconcilable with the Ninth Circuit's decision in *Doe*.

11       *Oberlin College* further supports the notion that a failure to reconcile inconsistent

12   statements by the female complainant is a procedural irregularity that may provide "strong

13   support" for a finding of sex discrimination.  963 F.3d at 587.  There, the Sixth Circuit

14   explained that disciplinary proceedings are a type of "proceeding in which the credibility

15   of accuser and accused [are] paramount" and found it "remarkable" that the hearing panel

16   failed to "even . . . comment on the flat contradiction" between the alleged victim's

17   testimony during investigation and at the hearing.  *Id.*

18       Here, Doe proffers at least one example of Roe's testimony that, taking all

19   inferences in his favor, changed between interviews.  During her April 3, 2016 report to

20   the Tempe police, Roe reported specific details of the sexual encounter.  (Doc. 189-2 at 43-

21   44.)  However, during her October 27, 2016 interview with Davis, Roe stated that she could

22   not remember any of those details.  (*Id.* at 33.)  Although this is hardly a "flat

23   contradiction," it is an "inconsistency" that Davis apparently failed to mention in her report.

24   Accordingly, Doe has proffered evidence of a genuine dispute as to yet another procedural

25   irregularity.

26           3.    Doe's Proffered Expert Opinions

27       In response to the motion for summary judgment, Doe identifies the reports of two

28   of his experts, Cindi Nannetti and Dr. Lance Kaufman.  (Doc. 189 at 16-17 & n.9.)

Nannetti's report (Doc. 161-1) addresses the "Start By Believing" campaign, which purportedly influenced Doe's disciplinary proceeding. (Doc. 189 at 16.) Dr. Kaufman's report (Doc. 159-1) identifies statistical evidence that allegedly "raise[s] a fair inference of anti-male bias" in ASU's disciplinary proceedings. (*Id.* at 17.) Although the parties have also brought dueling *Daubert* motions to exclude these and other experts (Docs. 158, 159, 161, 164-65), which will be addressed in due course, the Court now addresses Nannetti's and Dr. Kaufman's opinions insofar as they are proffered as summary judgment evidence.

a.    **The "Start By Believing" Campaign**

In the motion for summary judgment, ABOR argues that Nannetti's opinions do "not support gender bias, no less intentional gender bias." (Doc. 155 at 13.) First, ABOR explains that Nannetti's criticisms are "confine[d] . . . to Ms. Davis' investigations," but "Dr. Rund's decision was not based solely on the information Ms. Davis gathered . . . , [and] [t]here is no evidence Dr. Rund's decisions were based on anything but the evidence presented by the parties during and after the UHB hearing." (*Id.* at 14.) Second, ABOR asserts that it is "demonstrably false" that the SRR or Davis followed the "Start By Believing" campaign when carrying out the investigation. (*Id.* at 14.) Third, ABOR argues that Nannetti's opinion is that SBB caused Davis to be biased in favor of Roe as a victim, not against Doe as a man, and pro-victim bias is not gender bias. (*Id.* at 15.) Fourth, ABOR asserts that although Nannetti "purports to measure Ms. Davis's investigation against the standards set forth by a trade association, the Association of Title IX Administrators" ("ATIXA"), those standards are irrelevant because non-compliance would at most show that the investigation was imperfect, as opposed to being motivated by Doe's gender. (*Id.* at 15.) In response, Doe argues that "ASU was operating under the [Start By Believing] campaign during the disciplinary proceedings" and the campaign "assumes the accuser's accusations are true and acts accordingly." (Doc. 189 at 16.) Doe points to a proclamation "announcing the University's adherence to the policy" that was "signed by the University president and the Title IX coordinator." (*Id.*) Doe argues that although ABOR "claims the campaign is gender neutral because it is victim-focused . . . the number of female accusers

is higher than male accusers resulting in a strong bias in favor of female complainants and male accused." (*Id.*)   Moreover, Doe asserts that "law enforcement" has repudiated the Start By Believing campaign and considers it an improper investigative technique.  (*Id.*) "Based on this, Doe argues that a reasonable juror can find that the [Start By Believing] campaign influenced the decision to suspend a male accused without evidence." (*Id.*)  In reply, ABOR argues that "Doe mischaracterizes ABOR's position with respect to [Start By Believing].  ABOR does not contend that ASU rejected [Start By Believing].  Rather, the evidence establishes that [Start By Believing] was followed only by the ASU Police Department, which conducts criminal investigations, not by SRR, which investigates alleged violations of the Code pursuant to the Procedures.  Doe has no contrary evidence." (Doc. 201 at 11.)

Doe has proffered no evidence from which a reasonable juror could conclude that the Start By Believing campaign influenced his disciplinary proceeding.  The sole piece of evidence that is even tangential to Start By Believing is the April 4 Proclamation.  (Doc. 189-2 at 100.)   The Proclamation was signed by ASU's President, Executive Vice President, and the ASU Chief of Police.  (*Id.*)  It was only *attested to* by ASU's Title IX Coordinator Preudhomme.  Attestation is defined by Black's Law Dictionary as meaning "bear witness . . . affirm to be true or genuine; to authenticate by signing as a witness." *Attest*, Black's Law Dictionary (11th ed. 2019).  This makes logical sense because the Proclamation's text has no direct impact on ASU's Title IX system and requires no commitment from Preudhomme.

Rather, the Proclamation states that the Start By Believing campaign is "designed to improve responses of friends, family members, and community professions, so they can help victims to access supportive resources and engage the criminal justice system." (*Id.*) According to the Proclamation, this is necessary because victims are more likely to disclose sexual assault to a friend or family member, and when those loved ones respond with doubt, the victim experiences additional negative effects.  (*Id.*)  Consequently, the Proclamation stated that ASU was committing itself to celebrate April 4th of each year as "Start By

Believing Day" to show its commitment to awareness of, prevention of, and response to sexual violence. (*Id.*) Notably, the Proclamation makes no demands of any ASU institution beyond a commitment to publicize the Start By Believing campaign.[17] It places the onus on "loved ones" to start by believing victims of sexual violence rather than doubting them, in an effort to ensure that those victims will be connected with supportive resources and the criminal justice system. It also mentions that both women and men are victims of sexual violence. No reasonable juror could believe that a Proclamation that encourages friends and family to "start by believing" is evidence that ASU's Title IX department "adhered" to the policy, especially given that Preudhomme did not formally sign it.

Other pieces of "evidence" identified by Nanetti to prove ASU's "adherence" to Start By Believing are that Davis appeared to believe Roe's version of events and that Dr. Hunter stated, "I do have a strong belief in what she does say, yes" at the appeal hearing. (Doc. 161-1 at 11.) No reasonable juror could believe that use of the word "belief," or the act of believing, is evidence of adherence to the Start By Believing campaign.

By contrast, ABOR points to undisputed evidence that "SRR's investigators were specifically instructed not to apply the [Start By Believing] philosophy in investigating allegations of sexual misconduct." (Doc. 155-6 at 37-40 [Preudhomme testifying that SRR did not follow the policy]; Doc. 155-10 at 96 [Associate Dean Hicks informing Preudhomme by email in 2015 that "ASU is participating in this proclamation, however as investigators we are not to participate as we are neutral fact finders and are tasked with investigating"].) Preudhomme also testified that "the only information out there about the Start By Believing campaign in connection with ASU is the proclamation, which, as we've gone over, relate[s] to the criminal justice system." (*Id.* at 40.)

Accordingly, no reasonable juror could conclude that the Start By Believing

---

[17] ABOR concedes that the ASU Police Department "followed" the Start By Believing campaign (Doc. 201 at 11), and Preudhomme testified that "the proclamation supported the campaign issued by the ASU Police Department encouraging individuals to report crime." (Doc. 155-6 at 37.)

1    campaign influenced ASU's investigation of Doe.

2                    b.    **Statistical Anomalies**

3            During the discovery process, ABOR produced spreadsheets that summarized the

4    outcomes of disciplinary proceedings between 2012 and 2017 in which ASU students were

5    alleged to have violated section F-23 (sexual misconduct) and/or section F-15 (alcohol).

6    (Doc. 159-1 at 5-6.  *See also* Doc. 159 at 4.)  For the cases involving alleged violations of

7    section F-23, the spreadsheets contained sixteen data fields, including the gender of the

8    respondent, the gender of the complainant, the Dean of Students' decision, the sanction

9    imposed, the UHB's decision, and the university vice president's decision.  (*Id.*)  The

10   spreadsheets did not, however, provide a narrative description of the underlying conduct

11   that gave rise to the charge.  (*Id.*)

12           One of Doe's experts, Dr. Kaufman, performed four statistical analyses of the

13   information contained in these spreadsheets in an effort to determine whether there were

14   "statistical disparities in the treatment of males."  (Doc. 159-1 at 5.)  First, Dr. Kaufman

15   analyzed the overall rate at which ASU students were found "guilty" in a proceeding

16   involving an alleged violation of section F-23 and/or section F-15.  He determined that

17   male respondents were found "guilty" in 66% of such cases (3,927 out of 5,960) while

18   female respondents were found "guilty" in 62% of such cases (1,650 out of 2,661).  (*Id.* at

19   10-11.)  (*Id.*)  Dr. Kaufman also asserted, without providing any calculations or data, that

20   "[t]his gender disparity remains significant when performing a peer-group analysis of F-

21   15 and F-23 charges separately."  (*Id.*)  Second, Dr. Kaufman focused on the subset of

22   cases in which an ASU student was found "guilty" of a section F-23 violation and a

23   "significant" sanction (*i.e.,* "expulsions and degree revocations") was imposed.  (*Id.* at 11-

24   12.)  He determined that male respondents received a significant sanction in 50% of such

25   cases (81 out of 163) while female respondents received a significant sanction in 0% of

26   such cases (0 out of 10).  (*Id.*)  Third, Dr. Kaufman focused on the subset of cases in which

27   an ASU student was charged only with a section F-15 violation and some form of sanction,

28   beyond a warning, was imposed.  (*Id.* at 12-13.)  He determined that male respondents

received a sanction beyond a warning in 63% of such cases (747 out of 1,191) while female respondents received a sanction beyond a warning in 58% of such cases (421 out of 722). (*Id.*)  Fourth, Dr. Kaufman returned to the subset of cases in which an ASU student was found "guilty" of a section F-23 violation and a "significant" sanction (*i.e.,* "expulsions and degree revocations") was imposed.  (*Id.* at 13-14.)  He determined that a significant sanction was imposed in 0% of such cases in which the complainant was male (0 out of 11) while a significant sanction was imposed in 29% of such cases in which the complainant was female (28 out of 98).  (*Id.*)  According to Dr. Kaufman, all four variations are statistically significant.  (*Id.* at 10-14.)

In its motion for summary judgment, ABOR argues that, to the extent Doe is offering Dr. Kaufman's statistical analyses in an effort to show "that Doe was treated more harshly than similarly situated females," this attempt fails because Dr. Kaufman did "not account for the wide variation of behavior that can be charged as an F(23) violation."  (Doc. 155 at 16-17.)  ABOR contends that because section F-23 encompasses "a variety of actions ranging from '[s]exual violence' and forced 'physical sexual acts' to sexual harassment and other unwanted and non-consensual conduct including non-contact offenses such as indecent exposure, voyeurism, or non-consensual photographing," it was incumbent upon Dr. Kaufman to consider "the *type* of misconduct that resulted in the disciplinary sanctions."  (*Id.*)  ABOR also notes that it provided information "detailing the type of conduct that resulted in sexual misconduct charges" to Doe during the discovery process, but Doe "elected not to provide this information to his expert."  (*Id.* at 17 n.9.)  ABOR concludes that, because Dr. Kaufman failed to incorporate this information into his analysis, his opinions are "irrelevant" and do not "evidence or support even an inference of gender bias."  (*Id.* at 17.)

ABOR elaborates on some of these points in its *Daubert* motion related to Dr. Kaufman.  (Doc. 159.)  There, ABOR contends that Dr. Kaufman's analysis is flawed because he "erroneously and impermissibly assumes that all F(23) sexual misconduct violations are comparable" and that, "[i]n view of the wide range of actions that fall within

the definition of 'sexual misconduct,' a valid (reliable) comparison of sanctions given to male and female students found responsible for violating F-23 of the Code cannot be made without specific information as to the type of conduct at issue in each instance." (*Id.* at 6.) As an example, ABOR notes that two of the cases in which female respondents were found responsible for section F-23 violations but received only "mild" sanctions involved conduct (walking naked in public, sending unwanted sexual communications to a faculty mentor) that is not terribly serious but still qualifies as sexual misconduct under section F-23, whereas two of the cases in which male respondents were found responsible for section F-23 violations and received "severe" sanctions involved much more serious iterations of sexual misconduct under section F-23 (holding down the victim while "vaginally sexually assault[ing] her," having sexual intercourse with a passed-out female victim who was covered in blood and vomit). (*Id.* at 8-9.) ABOR contends that, "as the allegations in the examples cited above illustrate, cases involving female respondents are not necessarily (and in this case not remotely) comparable to cases involving male respondents," and "Dr. Kaufman's failure to consider the specific conduct at issue renders his sweeping assertions useless." (*Id.*)

In response to the summary judgment motion, Doe argues that Dr. Kaufman "found four statistical anomalies that raise a fair inference of anti-male bias." (Doc. 189 at 17.) Doe asserts that because these anomalies cannot be explained by nondiscriminatory possibilities, "a jury can infer sex bias based on evidence of a statistical disparity in the treatment of men and women by the University." (*Id.*) Additionally, in response to ABOR's *Daubert* motion, Doe identifies various reasons why Dr. Kaufman's statistical analysis remains relevant despite his failure to consider the individual factual circumstances of each case involving an alleged violation of section F-23, including that (1) "ABOR does not and cannot provide any support for its allegation that the various conduct constituting 'sexual misconduct' under its own Code is somehow 'less' serious than other harms"; (2) ABOR does not "endeavor to articulate which forms of conduct are allegedly less serious in the eyes of the University or that the 'seriousness' of the crimes is

not evenly distributed by gender"; and (3) any "similarly situated" threshold has been satisfied here because all of the cases that Dr. Kaufman considered involved violations of section F-23, "the same sexual misconduct violation under the Code," and any argument related to dissimilarity based on factual circumstances is an issue "for cross-examination," not exclusion." (Doc. 188 at 8-9.)

In its summary judgment reply, ABOR argues that Doe's response "does not mask the fact that Dr. Kaufman did not address other possible reasons for the alleged anomalies, even confessing in his report that they could be caused by 'non-gender factors.' . . . Further . . . statistics are useful only when they show disparate treatment for 'substantially similar charges' [and] Kaufman, however, admitted that he did not consider the underlying conduct in analyzing the outcomes of disciplinary proceedings." (Doc. 201 at 11.) And in its *Daubert* reply, ABOR elaborates that by "treating *all* alleged F-23 violations as equivalent, Dr. Kaufman ensured that his opinions would not be relevant to this matter. His conclusion that females are disciplined at a slightly lower rate for F-23 violations *in general*, even if accurate, simply ignores the relevant question for a discrimination claim, which is whether *similarly situated* female students received different treatment than Doe." (Doc. 196 at 4.)

Although it presents a close call, the Court agrees with Doe that Dr. Kaufman's statistical evidence is relevant and creates a genuine issue of material fact about whether ASU's Title IX disciplinary process was infected by gender bias. The starting point is the Ninth Circuit's decision in *Austin*. There, the plaintiffs sought to support their Title IX claim with evidence that "the University disciplines male students for sexual misconduct but never female students." 925 F.3d at 1138. However, the plaintiffs did "not claim that any female University students have been accused of comparable misconduct, and thus fail[ed] to allege that similarly situated students—those accused of sexual misconduct—are disciplined unequally." *Id.* Given this "lack of parallelism," the Ninth Circuit held that the plaintiffs had not established "that the male students were treated any differently than similarly situated students based on sex." *Id.*

Here, Doe has attempted to do what the plaintiffs in *Austin* failed to do—demonstrate that female students "accused of sexual misconduct" are disciplined less harshly than male students accused of sexual misconduct. And on its face, Dr. Kaufman's statistical analysis suggests that a gender-based disparity exists in this area. Among other things, Dr. Kaufman found that zero out of the 10 female ASU students found guilty of a "sexual misconduct" charge under section F-23 between 2012 and 2017 (that is, 0%) received a severe sanction of suspension or expulsion but 81 of the 163 male ASU students found guilty of such a charge (that is, 50%) received a severe sanction.

ABOR's response is that Dr. Kaufman's analysis is incomplete and misleading because he did not analyze the *facts* of the underlying cases to determine whether the instances of sexual misconduct that gave rise to the violations were similar to each other—and, without such a factual comparison, Dr. Kaufman's statistics cannot be proof that "similarly situated" students were treated differently based on their gender. On the one hand, this argument has intuitive appeal. Under section F-23, the term "sexual misconduct" is defined as follows:

> a. Sexual violence and other non-consensual sexual contact—actual or attempted physical sexual acts perpetrated against a person by force or without consent; or b. Sexual harassment—unwelcome conduct of a sexual nature that is sufficiently severe or pervasive as to create an intimidating, hostile, or offensive environment; or c. Other unwanted or non-consensual sexual conduct including but not limited to indecent exposure, sexual exploitation or voyeurism, or non-consensual photographing or audio-recording or video-recording or another in a state of full or partial undress or while engaged in sexual activity, or publishing or disseminating such materials.

(Doc. 189-2 at 16-17.) As ABOR correctly notes, this definition is quite broad and encompasses a wide range of conduct, from forcible sexual violence to indecent exposure. It is understandable why an ASU administrator might, for reasons unrelated to gender bias, impose a severe punishment against a male ASU student found responsible for the former but impose a less-severe punishment against a female ASU student found responsible for the latter.

On the other hand, the Court does not lightly disregard the passage in *Austin* that female students "accused of sexual misconduct" would qualify as "similarly situated students" who had "been accused of comparable misconduct" in a case involving a Title IX claim brought by a male student. 925 F.3d at 1138. Those are the precise circumstances here. Although *Austin* admittedly does not explain how the University of Oregon defined the term "sexual misconduct" under its disciplinary code,[18] and thus it is possible the definition there was narrower than ASU's definition, *Austin* still provides strong support for the conclusion that Dr. Kaufman's statistics qualify, at a minimum, as relevant evidence that a reasonable juror could construe as supporting Doe's Title IX claim.

The Tenth Circuit's decision in *University of Denver* further supports this conclusion. There, a male student seeking to avoid summary judgment on his Title IX claim proffered various statistics regarding the school's handling of sexual-misconduct complaints, including the following: (1) of the five complaints brought against female respondents between 2016 and 2018, the school formally investigated the one female-initiated complaint but didn't formally investigate any of the four male-initiated complaints; and (2) "a female student who was found guilty of non-consensual 'touching' was given a deferred suspension, whereas a male student found guilty of non-consensual 'touching/kissing' was fully suspended." 1 F.4th at 835. In addressing the relevance of this statistical evidence, the court acknowledged that, "[a]s a general rule, we and other courts have declined to infer anti-male bias from disparities in the gender makeup of sexual-misconduct complainants and sexual-misconduct respondents . . . because such disparities can readily be explained by an array of alternative nondiscriminatory possibilities, e.g., that male students commit more sexual assaults [or] that women are likelier to be the victims of those assaults." *Id.* at 834. Nevertheless, the court held that the plaintiff's statistics "raise[d] at least a fair inference of anti-male bias" because they

---

[18]   *Austin*, 925 F.3d at 1135 ("Central to this case is the University of Oregon Student Conduct Code in effect at the time, which defined 'sexual misconduct' to include penetration without explicit consent. (Other types of sexual activity contemplated by the Code are not at issue here.).")

did "not simply raise the disparity in the gender makeup of complainants and respondents" but instead "cast[] some doubt on the University's position that its practices were uniformly pro-complainant and anti-respondent." *Id.* at 835. This was true even though "we are dealing with very small sample sizes" and even though the university proffered gender-neutral factual reasons why it treated the four male-initiated complaints differently from the one female-initiated complaint. *Id.* Thus, the court reversed the district court's grant of summary judgment in favor of the university and remanded for further proceedings. *Id.* at 836.

Doe's statistical evidence resembles some of the evidence that was found indicative of gender bias in *University of Denver*. There, the plaintiff apparently did not provide any *factual* details about the cases in which a male and female respondent received disparate punishments for the offense of non-consensual "touching" or "touching/kissing," yet the court found that the imposition of disparate punishments for the same *category* of sexual misconduct was enough to raise an inference of bias. This was true even though the offense of non-consensual "touching" or "touching/kissing" presumably encompasses a wide array of conduct, ranging from non-consensual sexual intercourse to an unwanted kiss. By the same logic, Doe's statistical evidence regarding ASU's disparate punishment of male and female respondents found guilty of "sexual misconduct" under section F-23 also raises an inference of bias, even though Doe lacks details about the underlying facts of the incidents and even though the term "sexual misconduct" encompasses a wide range of conduct.

For these reasons, the Court concludes that at least one component of Dr. Kaufman's statistical evidence—the evidence showing that male respondents found guilty of a "sexual misconduct" violation under section F-23 received a severe sanction in 50% of cases but female respondents received a severe sanction in 0% of such cases—is relevant and admissible and raises an inference of gender bias. *See also Doe*, 23 F.4th at 938 (characterizing the plaintiff's allegation that UCLA "has never suspended a female for two years based upon these same circumstances" as one of several "facts which demonstrate an internal pattern of gender-based decisionmaking against male respondents"). To the extent

ABOR argues this statistic is misleading because it involves a comparison of episodes of "sexual misconduct" that may be factually dissimilar, and thus does not involve a comparison of similarly situated male and female students, this is an argument as to the weight of the evidence that ABOR can pursue at trial through cross-examination. *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."). *Cf. Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1113-16 (9th Cir. 2011) (explaining, in the context of an employment-discrimination claim where the plaintiff sought to establish "a triable issue of pretext through comparative evidence that the employer treated younger but otherwise similarly situated employees more favorably than the plaintiff," that the similarly-situated requirement "is not an unyielding, inflexible requirement . . . because one can always find distinctions in . . . the nature of the alleged transgressions" and that whether the violations were of "comparable seriousness" was a question of fact) (citations omitted).

Given this determination, it is unnecessary at this juncture to resolve ABOR's objections to other aspects of Dr. Kaufman's statistical analysis, which will be addressed in due course during the *Daubert* process.

## C. **Conclusion**

As discussed above, Doe's proffered evidence could lead a reasonable juror not only to conclude that his disciplinary proceeding was marred by an array of procedural irregularities, but also that an ASU representative made a comment during the course of the proceedings that was indicative of gender bias and that ASU's disciplinary process generates statistical anomalies that raise a further inference of gender bias. Given this backdrop, it is unnecessary to decide whether, as Doe argues (Doc. 189 at 3), the existence of "perplexing" procedural irregularities is alone enough to survive summary judgment in a Title IX case. As the Tenth Circuit concluded in *University of Denver*, "[w]hile a one-sided investigation, standing alone, might only raise a reasonable inference of anti-complainant bias, where there is a one-sided investigation *plus* some evidence that sex may

have played a role in a school's disciplinary decision, it should be up to a jury to determine whether the school's bias was based on a protected trait or merely a non-protected trait that breaks down across gender lines."  1 F.4th at 836.  Such is the case here.

Accordingly,

**IT IS ORDERED** that ABOR's motion for summary judgment (Doc. 155) is **denied**.