**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Unknown Party, | No. CV-18-01623-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Arizona Board of Regents, et al., | |
| Defendants. | |

## INTRODUCTION

In April 2016, Plaintiff John Doe, then a student-athlete at Arizona State University ("ASU"), and another male ASU student had a three-way sexual encounter with ASU student Jane Roe at an off-campus party. Roe immediately reported the incident to the police, who declined to pursue criminal charges against Doe after reviewing videotape footage of the incident (which the other male participant had surreptitiously created). Several months later, Roe reported the incident to ASU, claiming she had been too intoxicated to consent. Doe was suspended by ASU and, after an investigation, expelled for violating various provisions of the ASU Student Code of Conduct ("the Code"), including provisions related to sexual misconduct.

In this action, Doe sued various ASU employees and students ("Individual Defendants") and the Arizona Board of Regents ("ABOR"). Doe initially asserted federal claims under 42 U.S.C. § 1983 and Title IX of the Education Amendments of 1972 ("Title IX"), as well as state-law claims for breach of contract, gross negligence, intentional

1    infliction of emotional distress, and false light invasion of privacy.  However, during earlier

2    stages of the case, the Court dismissed (Doc. 40) or granted summary judgment in favor of

3    the applicable defendants (Doc. 139) on all of Doe's claims except his Title IX claim

4    against ABOR.

5          Additionally, as this case was proceeding, Doe prevailed in a separate state-court

6    action in which he sought review of ASU's expulsion decision.  There, the Arizona Court

7    of Appeals held that the sexual misconduct findings against Doe were "not supported by

8    substantial evidence" and thus vacated the expulsion order.  *Doe v. Ariz. Bd. of Regents*,

9    2019 WL 7174525, *9 (Ariz. Ct. App. 2019).

10         Against this backdrop, ABOR now moves for summary judgment on Doe's Title IX

11   claim.  (Doc. 155.)  For the following reasons, the motion is denied.

12                                    **BACKGROUND**

13         The  background  facts  below  are  taken  from  the  parties'  summary  judgment

14   submissions and other materials in the record and are uncontroverted unless otherwise

15   noted.  Additional facts bearing on the parties' specific summary judgment arguments are

16   addressed in the Discussion portion of this order.

17   I.    The Incident

18         On the evening of April 2, 2016, Doe and Roe attended the same off-campus party.

19   (Doc. 189-2 at 16, 43.) During the party, Roe (who was 19 years old at the time, and thus

20   not legally allowed to drink alcohol) drank several shots of vodka.  (Doc. 155-3 at 10; Doc.

21   189-2 at 43-44.)  Roe also danced in a sexual manner with Doe and another male attendee,

22   Witness 1, and kissed both of them.  (Doc. 155-4 at 1.)  According to a sober eyewitness,

23   Roe did not appear to be intoxicated or incapacitated as she was dancing with and kissing

24   Doe and Witness 1.  (*Id.*)

25         Roe went into a bedroom with Doe and Witness 1, where they engaged in group

26   sexual  activity.[1]   (Doc. 189-2 at 44.)    At one point in the encounter, Witness 1

---

[1]     To  the  extent  there  are  lingering  factual  disputes  about  the  specifics  of  Doe's
encounter  with  Roe  and  Witness  1,  they  are  not  material  to  the  resolution  of  ABOR's
summary judgment motion.

surreptitiously took out his cell phone and videotaped Roe and Doe.  (*Id.* at 45.)  The encounter ended after Roe complained of pain.  (Doc. 155-4 at 110.)  Roe eventually left the room, found a friend, and left the party.  (Doc. 189-2 at 45.)

II.    The Criminal Investigation By The Tempe Police Department

On April 3, 2016 (the next day), Roe contacted the Tempe Police Department to report that "she was so intoxicated that she was not able to move or try to physically prevent the incident while it was occurring" and that "she never gave consent for the sexual intercourse with [Witness 1] or [Doe] and that she did not want it to happen."  (Doc. 189-2 at 44-45.)  Roe also reported that "[s]he could still remember most things" and "told [the males] to stop because [the sex] was hurting."  (*Id.* at 48-49.)

A police officer transported Roe to the Mesa Family Advocacy Center for a forensics exam ("SANE exam").  (Doc. 155-4 at 108.)  A forensics nurse reported that Roe suffered "numerous genital tears" and "bruises on both her legs."  (*Id.*)

As part of the ensuing investigation, a police detective obtained and viewed a copy of the cellphone video that Witness 1 had taken.  (Doc. 155-3 at 25.) After the Tempe Police Department completed its investigation of Roe's allegations, "criminal charges were not pursued against" Doe.  (Doc. 155-10 at 67.)

III.   Title IX Developments At ASU

A.    **The "Dear Colleague" Letter**

In 2011, the United States Department of Education's ("DOE") Office of Civil Rights ("OCR") issued a document known as the "Dear Colleague" letter.  (Doc. 155-6 at 2-20.)  The letter began by noting that "[s]exual harassment of students, which includes acts of sexual violence, is a form of sex discrimination prohibited by Title IX" and explaining that the purpose of the letter was "to assist recipients, which include school districts, colleges, and universities . . . in meeting [their Title IX] obligations" by "lay[ing] out the specific Title IX requirements applicable to sexual violence."  (*Id.* at 2.)

As for those requirements, the letter stated that "in order for a school's grievance procedures to be consistent with Title IX standards, the school must use a preponderance

of the evidence standard . . . .  The 'clear and convincing' standard . . . is a higher standard of proof [that is] not equitable under Title IX."  (*Id.* at 12.)  The letter also stated that "OCR strongly discourages schools from allowing the parties personally to question or cross-examine each other . . . .  Allowing an alleged perpetrator to question an alleged victim directly may . . . perpetuat[e] a hostile environment."  (*Id.* at 13.)  Although the letter stated that "[p]ublic and state-supported schools must provide due process to the alleged perpetrator," it emphasized that "schools should ensure that steps taken to accord due process rights to the alleged perpetrator do not restrict or unnecessarily delay the Title IX protections for the complainant."  (*Id.*)  Finally, the letter stated that "[w]hen conducting Title IX enforcement activities, OCR seeks to obtain voluntary compliance from recipients. When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding by the Department [of Education] or refer the case to the U.S. Department of Justice for litigation."  (*Id.* at 17.)

### B.  The "Start By Believing" Campaign

On April 4, 2016, ASU President Michael Crow, ASU Executive Vice President Dr. Morgan R. Olson, and ASU Chief of Police Michael Thompson signed a proclamation supporting the "Start By Believing" public awareness campaign.  (Doc. 189-2 at 100.) ASU Title IX Coordinator Jodi Preudhomme attested to the proclamation.  (*Id.*)  The proclamation reads:

> Whereas, Arizona State University shares a critical concern for victims of sexual violence and a desire to support their needs for justice and healing; and
>
> Whereas, research estimates that as many as 1 in 5 women and 1 in 71 men are the victim of sexual assault in their lifetimes . . . yet most will not report the crime to law enforcement . . . and
>
> Whereas, research documents that victims are far more likely to disclose their sexual assault to a friend or family member, and when these loved ones respond with doubt, shame, or blame, victims suffer additional negative effects on their physical and psychological well-being; and
>
> Whereas, the Start by Believing public awareness campaign is designed to improve the responses of friends, family members, and community professionals, so they can help victims to access supportive resources and

engage the criminal justice system;

NOW, THEREFORE, I, Michael M. Crow, President of Arizona State University, do hereby proclaim, in concert with Arizona State University Police Department, the first Wednesday of April each year as "Start By Believing" Day to show our commitment to the awareness of, prevention and response to sexual violence.

(*Id.*)

## C.   OCR's Title IX Investigation Of ASU

In October 2016, ASU received a complaint from a male student ("Complainant") accusing another male student ("Respondent") of sexual misconduct.  (Doc. 189-2 at 86.) After an investigation, ASU concluded there was insufficient evidence to establish, by a preponderance of the evidence, that Respondent engaged in sexual misconduct.  (*Id.* at 91.)

Afterward, OCR investigated ASU's rejection of this complaint to determine whether ASU had complied with Title IX.  In a letter to an OCR representative dated December 1, 2017, ASU's associate general counsel provided a detailed summary of ASU's underlying investigation.  (*Id.* at 86-98.)  In the final paragraph of this letter, ASU's representative wrote: "ASU complied with the requirements of Title IX, as well as its own polices, when responding to [Complainant's] initial complaint and the related complaints that followed. . . .   ASU looks forward to a prompt and favorable resolution of this investigation."  (*Id.* at 98.)   The ASU recipients copied on the letter included Dr. James Rund.  (*Id.*)  The record does not reveal how or when OCR concluded its investigation.

## IV.   The Initial Investigation Of Roe's Complaint By ASU

On September 16, 2016, Roe reported the incident to ASU's police department. (Doc. 155-1 at 7.)  This was a little over five months after the incident.  (*Id.*)

On September 17, 2016, Dr. Kendra Hunter, ASU's associate dean of students, received a corresponding report that identified Doe and Witness 1 as "ASU wrestling students."  (*Id.* at 6-8.)  The report stated that Witness 1 was "no longer an ASU student but is going to school somewhere in Colorado.  [Roe] thinks that [Doe] may still be a student at ASU."  (*Id.* at 8.)  Dr. Hunter soon forwarded the report to her colleagues, stating:

"See below.  I would like for us to engage [Roe] from advocacy today to share resources and options for moving forward . . . in hopes that Carla can meet with her today and take her statement so we can figure out what to do with the male.  He is a wrestler, so clearly we would want to move swiftly, but not before we engage [Roe]."  (*Id.* at 7.)

On September 19, 2016, Roe was interviewed by Tara Davis, a member of ASU's Office of Student Rights and Responsibilities ("SRR"), which "investigates any alleged violation of the student code of conduct."  (Doc. 155-7 at 50-77.)  The interview was recorded and transcribed.  (*Id.*)  Davis explained that an administrative investigation is distinct from a criminal investigation in at least two important respects: first, administrative investigations are subject to a "more likely than not" standard rather than the criminal "reasonable doubt" standard (*id.* at 55), and second, "because we are not law enforcement, we cannot subpoena information.  That means it's going to be up to you to provide us with whatever information you feel is relevant; provide us with names of witnesses; provide your own statements.  It's going to have to be, unfortunately, on your shoulders to determine what it is that you feel like you want me to know."  (*Id.* at 56.)

Davis noted that Doe "also will have an opportunity to come in and provide information just like you, and at the end of the investigation I'll prepare a report and you will know exactly what I've been able to collect because throughout this process my job is just to be that neutral third-party investigator, not the decider."  (*Id.* at 63-64.)

Davis further explained that "I also don't call the police.  [However,] I'm going to coordinate with the police, which means before they have an opportunity to confront [Doe], I don't want to get out in front of him and blow whatever processes they may be having . . . .  They often call them confrontation calls. . . .  So, I, at the end of this, will want your detective's information so I can contact your detective and make sure they don't need any more confrontation calls because it would be disruptive to their processes if I was . . . to call them first, you know.  So it's going to be important that I coordinate.  So you may see that I don't respond on this today.  It may take me a few days before the police give me the green light to contact [Doe].  So I—I want to give you a heads-up.  That doesn't mean that

we're ignoring you; it means we have to work with the police department on our timing. Okay?"  (*Id.* at 57-58.)

Finally, at the end of Roe's interview, Davis mentioned that "[b]ecause like we talked about earlier about coordinating our efforts, now that there's a legal case I also don't want to interfere with any motions they may be having or things like that. . . .  So I'll wait to—you know, to move forward, especially because they have pending charges.  Okay? . . . But I will ask [Roe's detective liaison] if he feels that it would be possible for me to go ahead and charge the student now."  (*Id.* at 72-73.)  After summarizing "next steps," Davis repeated that "I'm going to reach out to the [detective], and I'm going to ask the detective about what would be the appropriate timing for me, and then I will let you know. . . .  As soon as I have the green light, I will charge both of them. . . .  It's just I have to defer to the police first. . . .  Okay?  I have to let them take the lead."  (*Id.* at 75-76.)

On September 21, 2016, Doe was informed via email that he was being placed on interim suspension.  (Doc. 189-2 at 16.)   The email stated that the basis for the suspension was Roe's report that Doe "provided alcohol to a minor female student of ASU.  After she became heavily intoxicated, you and another male took her to a room in your off-campus house where you engaged in oral and vaginal sex without her consent.  Reportedly, a camera was used to record the sexual acts and the female did not consent to the recording." (*Id.*)  The letter informed Doe that, if true, his behavior would violate sections F-15, F-23, and F-25 of the ASU Code of Conduct ("Code"), which set forth the university's alcohol policy, sexual misconduct policy, and surreptitious recording policy.  (*Id.* at 16-17.)  The letter further explained that sexual misconduct is defined by ASU policy as including "Sexual violence and other non-consensual sexual contact—actual or attempted physical sexual acts perpetrated against a person by force or without consent."  (*Id.* at 16.)

On September 22, 2016, Davis met with Doe.  (Doc. 155-8 at 2-28.)  That meeting was also recorded and transcribed.  (*Id.*)  Davis notified Doe that he was being investigated for violations of the Code related to alcohol, sexual misconduct, and surreptitious recording.  (*Id.* at 10-12.)  Davis further informed Doe that she would handle ASU's

investigation, acting as "a neutral third party investigator," and that her job was to "collect information, anything I can get, by speaking to people, by collecting documentation that may be available, and then I just compile a report."  (*Id.* at 7.)  Davis also explained the "more likely than not" standard and how it differed from the criminal "beyond a reasonable doubt" standard.  (*Id.* at 8.)  She listed "resources we have available" for Doe, including a confidential counseling resource in case "you'll be up at 3:00 in the morning and unable to sleep or maybe you get some anxiety and want someone to talk to."  (*Id.* at 13.)  Davis explained that she would not ask Doe to make a statement and he did not have to answer any questions, and in fact he could choose "not to come in at all at any point."  (*Id.* at 16-17.)  However, Davis also warned Doe that the Dean's Review Committee ("the Committee") would determine whether Doe violated the Code "based on whatever (information) is available to them.  So if there is a wealth of information from [Roe's] side, that will be all that is considered.  And so you respond in the way that you feel is best that your attorney will advise you. . . .  You can come back next week and still not say anything, and that's okay . . . .  Just know that there would be an absence of information, and so when a decision is made, it would wind up being only from one side that information would be had."  (*Id.* at 17-18.)

Following this meeting, Davis continued with the investigation, ultimately meeting with Doe three more times: on September 26, 2016 (*id.* at 31-65), November 18, 2016 (*id.* at 67-83), and December 21, 2016 (Doc. 155-9 at 2-19).

Davis also met with Roe several more times.  During one meeting, which took place on November 27, 2016, Davis mentioned that a decision would be coming soon and reminded Roe that "if the decision is suspension or expulsion, there is a right to appeal . . . .  So even though you're asking, like, what's the timeline on this, know that if there is an appeal, it may continue."  (Doc. 189-2 at 39-41.)  Roe asked, "What does it mean if there's an appeal?"  (*Id.*)  Davis responded that "if the decision is suspension or expulsion, he has the right to say, I disagree and I want the investigation reheard," and explained the composition of the rehearing board.  (*Id.*)  Davis then explained that "the university would

represent you and would say, We, as a university, suspended or expelled him because of all this information.  And they would present their case.  [Doe] would have an opportunity to [respond]."  (*Id.* at 41.)

On December 11, 2016, Davis met again with Roe, this time to review Doe's counsel's response to a draft of Davis's investigative report.  (Doc. 155-1 at 81.)  During this meeting, Roe made several statements regarding the incident, including that "while [Doe] and [Witness 1] were having sex with her, she was not aware of what was going on because she was too intoxicated" (*id.* at 94); that "she was unable to fight back because she was too intoxicated" (*id.* at 96); that "she was not aware that a photo was taken, but remembers seeing a flash" (*id.* at 98); that "she did not say 'stop' because she was too intoxicated," that she "could not resist and denied demonstrating an ability to do so," and that she "cried because she was in pain and did not comprehend that she was having sex with [Doe] and [Witness 1]" (*id.* at 99); that Doe's contention that she "didn't say anything to refuse sex" was not exculpatory "because the Code of Conduct states consent cannot be inferred from passivity" (*id.* at 100); that "she was too intoxicated to say no or physically refrain" (*id.* at 102); that "she does not remember what happened" (*id.* at 104); that "her statements are based on the police report and information from (the county) attorney" and "she is not stating what she saw, she is stating what she found out" (*id.* at 106); and that "she was incoherent and did not understand what was happening" (*id.* at 107).

On December 20, 2016, Davis sent her final investigative report to the Committee.  (*Id.* at 65-124.)  That same day, Davis informed Doe's counsel via email of the report's transmission.  (Doc. 189-2 at 64.)  Doe's counsel responded: "Was there no additional input from [Roe]?  If additional facts were provided, we would like to know of those."  (*Id.*)  Davis responded that Roe "did have the opportunity to respond to the information you provided.  Although she disagreed with statements in your letter, she did not offer any new evidence or witnesses.  I am happy to have you come in to view her responses."  (*Id.* at 63.)  Doe's counsel asked: "Because the matter is already sent to the Dean, what would the point of review be?"  (*Id.*)  Davis responded that "[w]e can . . . delay the outcome one day if you

would like to see [Roe's input] before the Dean concludes the case."  (*Id.* at 63.)

On December 21, 2016, after reviewing Roe's December 11, 2016 statements, Doe submitted a letter to Davis stating that there was, "contrary to [Davis's] email, substantial new evidence, including statements about state of mind, relationships, changes in position, and other matters."  (*Id.* at 52.)

V.    The Committee's Expulsion Decision

On December 21, 2016, before receiving Doe's supplemental letter, Dr. Jennifer Hightower, ASU's acting dean of students, determined that Doe had violated section F-15, the university's alcohol policy, and section F-23, the university's sexual misconduct policy. (Doc. 155-2 at 72-23.)  Doe was not found responsible for violating section F-25, the university's surreptitious recording policy.  (*Id.* at 72.)

Dr. Hightower signed an initial expulsion letter that day.  (Doc. 155-1 at 42.) Nevertheless, "[b]ecause Doe had submitted an additional response to the investigative material and the investigative report," Dr. Hightower "wanted to review that material, and so therefore she did.  And then after that made the determination and needed to resign a letter."  (*Id.*)  The second expulsion letter was sent to Doe on December 22, 2016.  (*Id.*)

VI.   The UHB Hearing

Doe appealed Dr. Hightower's decision to the University Hearing Board ("UHB"). (Doc. 155-4 at 46.)  Before the UHB hearing, Doe and the Dean of Students' Office ("DSO") exchanged documents and witness lists.  (*Id.* at 12-15, 51, 60, 91-92.)

At the hearing, which took place on May 23, 2017, Doe's counsel made opening statements and closing arguments, presented evidence, cross-examined DSO witnesses, and called witnesses to testify on Doe's behalf.  (Doc. 155-4 at 51-52.)  The chair of the UHB extended the length of the hearing multiple times at Doe's request, although the chair did not grant Doe's extension requests in full.  (Doc. 155-4 at 190.)  Near the end of the hearing, the chair warned Doe that there were only 20 minutes remaining, and Doe's counsel responded: "We have two experts. . . . Cindi [Nannetti is] going to take a while and then I have one other witness [a toxicologist], but if I don't get to him, I don't get to

1    him." (*Id.* at 4.) Doe's counsel did not ultimately call his second witness.

2        The UHB issued its findings and recommendations on May 30, 2017. (*Id.* at 100-

3    16.) First, the UHB found that Doe violated the portion of section F-23 that defines sexual

4    misconduct as "sexual violence . . . attempted [by] physical sexual acts perpetrated against

5    a person by force" because Doe had "engaged [Roe] by force." (*Id.* at 110.) On this point,

6    the UHB was persuaded by (1) Roe's testimony that the sex caused her pain, (2) Witness

7    1's statements to the same effect when speaking to the Tempe Police Department, and (3)

8    the results of the SANE exam, which revealed minor physical and genital injuries that were

9    consistent with Roe's text messages, which complained of abrasions. (*Id.* at 110-11.) The

10   UHB acknowledged that it had previously identified a different "rationale" for the section

11   F-23 violation, which was that "the encounter was non-consensual," but concluded there

12   was insufficient evidence to show that Roe refused consent or was too incapacitated to

13   provide consent. (*Id.* at 111-12.) Nevertheless, the UHB deemed the absence of evidence

14   on this point "peripheral" in light of the evidence of force that "justifies the F-23 violation."

15   (*Id.* at 112-13.) Second, the UHB found that it was more likely than not that Doe violated

16   section F-15, because Doe had "admit[ted] that he distributed alcohol to [Roe], who is

17   underage." (*Id.* at 113.) The UHB thus upheld Doe's expulsion. (*Id.*)

18   VII.   Dr. Rund's Review Of The UHB's Decision

19       The UHB's findings were given to Dr. Rund, ASU's final arbiter on student

20   misconduct issues. In a letter dated June 27, 2017, Dr. Rund overruled the UHB's finding

21   of no incapacitation, adopted the UHB's finding of impermissible force, and adopted the

22   UHB's conclusion on the alcohol charge. (*Id.* at 183-84.)

23       In a letter dated August 30, 2017, Dr. Rund denied Doe's motion for reconsideration

24   of his ruling. (*Id.* at 186.) Among other things, Dr. Rund explained his decision to overrule

25   the UHB's finding of no incapacitation. (*Id.* at 188.) Dr. Rund noted that "[i]t is

26   uncontroverted that [Doe] and [Roe] were drinking at the same event, so there is no

27   question that [Doe] saw [Roe] drinking shots of vodka." (*Id.*) Dr. Rund also observed that

28   "[d]uring the confrontation call, [Doe] acknowledged that [Roe] had previously told him

that she was not going to have sex with him." (*Id.*)  Dr. Rund stated that "[a] reasonable person who had previously had this conversation, and who had then been with [Roe] while she was drinking, should have known that [Roe] was not in a position to make informed, rational judgments when she went into a bedroom with not just one, but two males.  At the very least, [Roe] was engaging in outrageous behavior evidencing her intoxication level." (*Id.*)  Dr. Rund also identified two other facts that "betray [Doe's] claim that he lacked knowledge of [Roe's] intoxication to the point of incapacity" and "reveal[] his awareness of [Roe's] incapacitation": first, that Doe "had no trouble believing that [Roe] had very little recollection of the encounter," and second, that after Roe "cried out" during the encounter, Doe "immediately said to [Witness 1] 'we should stop, we don't want her filing a report.'"  (*Id.* at 189.)  Dr. Rund stated that "[t]his is clear evidence that [Doe] knew what he was doing was wrong."  (*Id.*)

VIII.   Doe's Appeal To The Maricopa County Superior Court

On October 2, 2017, Doe appealed ASU's expulsion decision to the Maricopa County Superior Court pursuant to A.R.S. § 12-901 *et seq.*  (Doc. 28 at 1.)

On October 29, 2018, the Maricopa County Superior Court issued a six-page order rejecting Doe's appeal.  (Doc. 40-1.)[2]  The court concluded that Dr. Rund's incapacity, force, and alcohol-related determinations were "supported by substantial evidence" (*id.* at 5-7), that "Doe was not denied due process" (*id.* at 7), and that the penalty of expulsion was not excessive (*id.* at 7-8).

IX.   Doe's Appeal To The Arizona Court Of Appeals

Doe appealed to the Arizona Court of Appeals.  *Doe v. Arizona Bd. of Regents*, 2019 WL 7174525 (Ariz. Ct. App. 2019).  In a decision issued in December 2019, the appellate court affirmed in part and vacated in part.  First, the court held that the evidence adduced at the hearing "could not lead a reasonable mind to conclude ASU proved [Roe]

---

[2]     The Superior Court's order and the Court of Appeals' decision are both subject to judicial notice.  *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("[Courts] may take judicial notice of court filings and other matters of public record.") (citation omitted).

was [incapacitated] on the night in question," and thus Dr. Rund's finding that Doe violated section F-23 because Roe was incapacitated was an abuse of discretion.  *Id.* at \*6.  Second, the court held that a reasonable mind could not find that Doe engaged in sex with Roe by force, and thus Dr. Rund's finding that Doe violated section F-23 because he used force was an abuse of discretion.  *Id.* at \*7-8.  Third, the court upheld Dr. Rund's finding that Doe provided alcohol to Roe when she was underage, violating section F-15.  *Id.* at \*8.  The court declined to address Doe's remaining due-process arguments, vacated the expulsion order, and remanded to ASU to determine the appropriate sanction for a violation of section F-15.  *Id.* at \*9.

On September 4, 2020, ASU's vice president of student services wrote a letter to Doe acknowledging that "the Arizona Court of Appeals . . . held that Dr. Rund's conclusion that you had violated [section F-23] was not supported by substantial evidence and, therefore, constituted an abuse of discretion," stating that "[t]he Student Rights and Responsibilities (SRR) case file" would be updated to reflect that "Dr. Rund's finding of a violation of [section F-23] was vacated on appeal," and clarifying that "[t]he expulsion sanction . . . is withdrawn, effective as of the date of this letter.  A copy of this letter will be delivered to the University Registrar notifying that office of the expulsion withdrawal so it may remove any disciplinary notation from your transcript and revise its records to reflect your current status with the University  withdrawing the expulsion decision." (Doc. 140-1 at 29-30.)

X.    This Action

On May 29, 2018, Doe filed this action.  (Doc. 1.)  The initial complaint asserted two federal claims—(1) a violation of Doe's constitutional rights to due process and equal protection, asserted via 42 U.S.C. § 1983, against the Individual Defendants in their official and individual capacities, and (2) a violation of Title IX against ABOR—as well as various state-law claims (breach of contract, defamation, gross negligence, intentional infliction of emotional distress, and false light).  (*Id.*)  Doe sought monetary damages as well as injunctive and declaratory relief against ABOR.  (*Id.* at 71.)

In September 2018, the parties jointly moved to stay these proceedings pending the disposition of Doe's appeal to the Maricopa County Superior Court.  (Doc. 28.)  This request was granted.  (Doc. 29.)  After the Superior Court issued its decision on October 2, 2018 (Doc. 40-1 at 1), Doe requested another stay pending his appeal to the Arizona Court of Appeals (Doc. 32).  That request was denied.  (Doc. 35.)

On February 15, 2019, Doe filed his operative pleading, the First Amended Complaint ("FAC").  (Doc. 37.)  The only changes of note from the original complaint were (1) to amend the § 1983 claim to include ABOR as a defendant and to make clear that Doe was suing the Individual Defendants only in their individual capacities, and (2) to remove the state-law defamation claim.  (Doc. 36-1 at 54, 76.)

On December 27, 2019, the Court granted in part Defendants' motion to dismiss. (Doc. 66.)  This order dismissed Doe's § 1983 claim and his state-law claims for breach of contract, intentional infliction of emotional distress, and false light invasion of privacy. (*Id.*)

On May 17, 2021, the Court granted the individual Defendants' motion for summary judgment.  (Doc. 139.)  This order disposed of the state-law gross negligence claim.  (*Id.*)

On October 12, 2021, ABOR filed the pending motion for summary judgment. (Doc. 155.)

On November 23, 2021, Doe filed a response.  (Doc. 189.)

On December 23, 2021, ABOR filed a reply.  (Doc. 201.)

Due to scheduling conflicts, oral argument on the summary judgment motion could not be held until August 17, 2022.  (Docs. 203, 204, 205.)  In advance of oral argument, the Court issued a tentative ruling.  (Doc. 206.)

…

…

…

…

…

# ANALYSIS

I.  <u>Legal Standards</u>

A.  **Summary Judgment**

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125.

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not

significantly probative, summary judgment may be granted." *Id.* at 249-50.  At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254.  Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

> B.   **Title IX**

Title IX prohibits discrimination on the basis of sex at all educational institutions receiving federal financial assistance.  20 U.S.C. § 1681(a).  This prohibition extends to all operations of such an institution.  *Id.* § 1687.  "Title IX is enforceable through an implied right of action in which monetary damages are available." *Schwake v. Ariz. Bd. Of Regents*, 967 F.3d 940, 946 (9th Cir. 2020).  Among other things, "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Id.* (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994)).

Since 2019, the Ninth Circuit has issued three published decisions in cases, similar to this one, in which a male university student who had been disciplined based on allegations of sexual misconduct by a female student asserted that the school's disciplinary process violated Title IX because it was tainted by anti-male gender bias.  Although all three cases arose in a different procedural posture than this case's current posture—each evaluated a challenge to the sufficiency of the complaint under Rule 12(b)(6), whereas the question here is whether Doe has adduced sufficient evidence to survive summary judgment—it is nevertheless helpful to begin by summarizing them.

First, in *Austin v. University of Oregon*, 925 F.3d 1133 (9th Cir. 2019), the plaintiffs—three male student-athletes at the University of Oregon—were accused by a female student of forcing her to engage in nonconsensual sex at an off-campus apartment. *Id.* at 1135.  Following a hearing, a university official "found the student athletes

- 16 -

responsible for sexual misconduct because they had violated the Student Conduct Code by 'engaging in penetration without explicit consent.'  The University suspended the student athletes for at least four years and until the female student is no longer enrolled at the University (but not longer than ten years)." *Id.* at 1136.  Afterward, the plaintiffs sued the school under two different Title IX theories: a "selective enforcement" theory and an "erroneous outcome" theory.  *Id.* at 1137-38.[3]  The district court dismissed the plaintiffs' complaint for failure to state a claim and the Ninth Circuit affirmed.  As for the "selective enforcement" theory, the court acknowledged that the complaint "recites such facts as the content of the University president's speech and the campus protests" but held that there was no "plausible link connecting these events and the University's disciplinary actions to the fact that the student athletes are male." *Id.* at 1138.  The court also acknowledged that the plaintiffs alleged that "the University disciplines male students for sexual misconduct but never female students" but held that this allegation was, on its own, insufficient to raise a plausible claim of gender bias because "the complaint does not claim that any female University students have been accused of comparable misconduct, and thus fails to allege that similarly situated students—those accused of sexual misconduct—are disciplined unequally." *Id.*  Finally, as for the "erroneous outcome" theory, the court held that it failed because "[e]ven if the outcome of the administrative conference procedure was erroneous, the complaint is missing any factual allegations that show that sex discrimination was the source of any error." *Id.*

Next, in *Schwake v. Arizona Board of Regents*, 967 F.3d 940 (9th Cir. 2020), a male graduate student at ASU was accused by a female graduate student of "engag[ing] in unwanted contact and sexual misconduct with her." *Id.* at 943.  Schwake's defense was that "the sexual activity o[n] the night of the accusation was consensual and that the two had a friendly and romantic relationship for several months afterwards." *Id.* at 944.  Following an investigation, ASU "found [Schwake] responsible for the disciplinary

---

[3]    The plaintiffs also advanced a "deliberate indifference" theory, but the Ninth Circuit deemed it waived.  *Id.* at 1138.

- 17 -

charges" and ordered a suspension as punishment. *Id.* at 944. Schwake then appealed, but before a hearing could be held, the punishment was changed "from suspension to certain campus restrictions" and an ASU official told Schwake that he was no longer entitled to a hearing and could face additional sanctions, including degree revocation, if he filed his own harassment complaint against his accuser. *Id.* at 945. In the ensuing Title IX action, Schwake argued that ASU "discriminated against him on the basis of sex during the course of the disciplinary case." *Id.* at 943. The district court dismissed Schwake's complaint for failure to state a claim but the Ninth Circuit reversed, holding that "Schwake plausibly alleged that the University discriminated against him on the basis of sex." *Id.*

As an initial matter, the court clarified that although several "sister circuits have fashioned doctrinal tests for sex discrimination claims in this context," including "the so-called 'erroneous outcome' and 'selective enforcement' tests," such "doctrinal tests" should be rejected in favor of a "far simpler standard for Title IX claims in this context"—namely, whether "the alleged facts, if true, raise a plausible inference that the university discriminated against the plaintiff on the basis of sex." *Id.* at 946-47 (cleaned up). Turning to the sufficiency of Schwake's complaint, the court grouped his relevant allegations into two categories: "Background Indicia of Sex Discrimination" and "Schwake's Disciplinary Case." *Id.* at 948-51. When discussing the first category, the court did not address whether the "Dear Colleague" letter might provide support for Schwake's Title IX claim because his complaint did not mention the letter. *Id.* at 948. Nevertheless, the court noted that Schwake's complaint contained two other sets of factual allegations intended to establish background indicia of sex discrimination: first, that the DOE initiated an investigation of ASU in 2014 "for possible Title IX violations in the University's handling of sexual misconduct complaints"; and second, that ASU followed "a pattern of gender-based decisionmaking against male respondents in sexual misconduct disciplinary proceedings," including "invariably" finding against male respondents "regardless of the evidence or lack thereof." *Id.* at 948-49. The court concluded that "it is reasonable to infer that such a federal investigation placed tangible pressure on the University . . . [that] would affect how

the University treated respondents in sexual misconduct disciplinary proceedings on the basis of sex" and that the allegations of gender-based decisionmaking provided further "background indicia of sex discrimination relevant to [Schwake's] Title IX claim." *Id.* Next, the court turned to the details of Schwake's disciplinary case, clarifying that those details were critical because background indicia of sex discrimination are alone insufficient to support a Title IX claim. *Id.* at 949 (citing *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 855 (7th Cir. 2019)).  The court noted that Schwake had alleged that his case was marred by various "procedural irregularities"—including one ASU official's[4] efforts to "divulge[] confidential and privileged information about Schwake's disciplinary case" before the case was completed, ASU's efforts to foreclose Schwake from pursuing an appeal of the modified punishment or filing his own harassment complaint against his accuser, and various aspects of the investigation that were "one-sided"—and held that such procedural irregularities "support an inference of gender bias." *Id.* at 949-51.[5]  Thus, the court concluded that "[c]onsidering the combination of Schwake's allegations of background indicia of sex discrimination along with the allegations concerning his particular disciplinary case, we conclude that sex discrimination is a plausible explanation for the University's handling of the sexual misconduct disciplinary case against Schwake.  This is sufficient for Schwake's Title IX claim to proceed beyond the motion to dismiss stage." *Id.* at 951.

Finally, in *Doe v. Regents of the University of California*, 23 F.4th 930 (9th Cir. 2022), a male graduate student at UCLA (Doe) and a female undergraduate student at

---

[4]    The court clarified that Schwake could rely on this ASU official's conduct, even though the official "was not a decisionmaker," because conduct by 'pertinent university officials,' not just decisionmakers, can support an inference of gender bias." *Id.* at 950.

[5]    *Schwake* repeatedly states that procedural irregularities may give rise to an inference of gender bias.  *See also id.* at 950 ("Like the procedural irregularities some of our sister circuits have considered when faced with allegations of pressure, the violation of confidentiality by those involved in Schwake's disciplinary case supports an inference of gender bias when considered along with Schwake's allegations of background indicia of sex discrimination."); *id.* (citing *Doe v. Columbia Univ.*, 831 F.3d 46, 59 (2d Cir. 2016), for the proposition that "procedural irregularities in the university's investigation and handling of a sexual assault complaint raised an inference of bias"); *id.* at 951 ("Schwake's allegations of the University's one-sided investigation support an inference of gender bias.").

UCLA (Roe) who had been engaged in a "long-term romantic relationship" broke up amid suspicions of infidelity. *Id.* at 932. Several months later, Roe "lodged a Title IX complaint with the University against Doe, alleging thirteen instances of misconduct, some dating back" more than three years. *Id.* at 933. Following an investigation, a UCLA representative determined that Doe was responsible for one of the alleged incidents and that his conduct violated various provisions of the university codes of conduct. *Id.* at 933. Notably, "these violations were not contained in the joint amended Notice of Charges" that had been provided to Doe at the outset of the investigation. *Id.* The violation finding was later upheld by a UCLA dean and by the school's internal appeal body and Doe received a two-year suspension sanction. *Id.* at 934. Afterward, as in this case, Doe brought a Title IX action against the school in federal court and also sought review of the underlying disciplinary decision in state court. *Id.* at 934. As in this case, a state-court judge eventually reversed the school's disciplinary finding on the ground "that the evidence did not support the University's finding" and vacated the suspension. *Id.*

As for the Title IX claim, the district court dismissed it under Rule 12(b)(6) but the Ninth Circuit reversed. The court noted that Doe's allegations fell "into three categories: (1) allegations of external pressures, (2) allegations of an internal pattern and practice of bias, and (3) allegations of specific instances of bias in his case." *Id.* at 936-37. As for the first category (external pressures), Doe's allegations included both the "Dear Colleague" letter and that UCLA had been audited in 2013 following allegations "about a lack of response to sexual harassment claims." *Id.* at 937-38. The court held that it was "reasonable to infer" that such matters "would place 'tangible pressure' on the University" and that, "[w]hen taken alongside Doe's other allegations discussed below, it is plausible that such pressure would affect how the University treated respondents in disciplinary proceedings on the basis of sex, even in 2017." *Id.* As for the second category (internal pattern and practice of bias), the court focused on Doe's allegations that "the respondents in Title IX complaints that UCLA decided to pursue from July 2016 to June 2018 were overwhelmingly male," that UCLA "doesn't report by gender the percentage of

respondents found to have violated campus policy," and that UCLA "has never suspended a female for two years based upon these same circumstances, nor [has it] used the reasoning that two years is a minimum suspension when issuing a suspension to a female." *Id.* at 938.  UCLA argued these allegations were insufficient because "the gender breakdown of complainants and respondents could be attributed to numerous possible factors that are not gender bias" but the court disagreed, holding that such "asymmetrical enforcement allegations . . . can, and here do, lead to a plausible inference of discrimination on the basis of sex, at least when considered in conjunction with the other well-pleaded facts regarding external pressures and specific instances of bias in Doe's case." *Id.* at 938-39.  Finally, as for the third category (specific instances of bias in Doe's case), the court noted that Doe made various "allegations of irregular proceedings," including that UCLA's investigator "made findings of violations of policy not included in the Joint Notice or Amended Joint Notice of Charges" and that a state-court judge ultimately "found that the evidence did not support the Regents' findings," and held that such irregularities, "while not dispositive on their own, support an inference of gender bias." *Id.* at 939-40.[6]  Thus, the court concluded that, "[t]aken together, Doe's allegations of external pressures and an internal pattern and practice of bias, along with allegations concerning his particular disciplinary case, give rise to a plausible inference that the University discriminated against Doe on the basis of sex.  The fact that sex discrimination is 'a plausible explanation' for the University's handling of the disciplinary case against Doe is sufficient for his Title IX claim to survive a motion to dismiss.  While Doe 'may face problems of proof, and the factfinder might not buy the inferences that he's selling,' his Title IX claim makes it past the pleading stage." *Id.* at 941 (citations omitted).

     …

---

[6]   *See also id.* at 940 ("Although the Regents contends that these allegations of procedural irregularities do not suggest that gender was the reason for the supposed errors, this Circuit, as well as the Seventh and Sixth Circuits, have found similar irregularities support an inference of gender bias, particularly when considered in combination with allegations of other specific instances of bias and background indicia of sex discrimination.").

1  II.  Discussion

2         Doe contends that he has asserted a viable Title IX claim because he was

3  "wrongfully found to have committed the alleged offenses related to sexually engaging an

4  incapacitated person, forcible sexual contact, and alcohol violations and such decisions

5  were motivated by gender bias because Plaintiff was a male athlete."  (Doc. 37 ¶ 253.)

6  Regardless of the precise standard,[7] the parties agree that to survive summary judgment,

7  Doe must proffer evidence that would permit a reasonable juror to infer that his sex was a

8  motivating factor in ASU's handling of his disciplinary proceeding.

9         In the December 2019 order denying ABOR's motion to dismiss the Title IX claim,

10 the Court found that "[a]lthough this issue presents a close call, . . . the FAC contains just

11 enough case-specific, non-conclusory allegations of gender bias (which, at this stage of the

12 proceedings, the Court must assume to be true) to survive a motion to dismiss."  (Doc. 66

13 at 20.)  The Court identified three categories of well-pleaded allegations that, taken as true

14 and in concert, gave it pause: (1) external pressure arising from the "Dear Colleague" letter

15 and OCR's contemporaneous investigations of ASU (*id.* at 21-22); (2) statements made by

16 representatives of ASU (*id.* at 22-23); and (3) an array of irregularities during the

17 disciplinary proceedings.  (*Id.* at 23-24.)

18        Now that the case has progressed past the pleading stage, Doe must proffer evidence

19 that would validate his allegations.  *Anderson*, 477 U.S. at 255.  Accordingly, the Court

20 will begin by reassessing the allegations it found compelling at the motion-to-dismiss stage.

21 Next, the Court will discuss new evidence and arguments raised during the summary

22 judgment process.  Finally, the Court will weigh the allegations that have been validated

23 by competent evidence and decide whether Doe has carried his burden of establishing the

24 ─────────────

25 [7]     Doe asserts that the three-part burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), should apply.  (Doc. 189 at 1.)  ABOR responds that "[t]he Ninth Circuit has not adopted the *McDonnell Douglas* standard in Title IX disciplinary cases."  (Doc. 201 at 2.)  It is unnecessary to resolve this dispute here because both parties agree that this Court need only determine "whether there is a contested issue of fact regarding gender bias" (Doc. 189 at 1; Doc. 201 at 1), and *McDonnell Douglas* itself requires an initial showing that sex was a motivating factor in the school's investigation and disciplinary decision.  *Doe v. Univ. of Denver*, 1 F.4th 822, 829 (10th Cir. 2021).

1   existence of a triable issue of fact.

2   A.   **Issues Raised In The Motion To Dismiss**

3   1.   External Pressure

4   When deciding the motion to dismiss, the Court noted that "the FAC—like many of
5   the complaints in other recent Title IX cases brought by male university students who
6   contend they were subjected to gender-biased disciplinary proceedings—contains an
7   extensive discussion of the 'Dear Colleague' letter that was issued by OCR in 2011." (Doc.
8   66 at 21.) The Court found that "the letter does not, on its own, get Doe over the plausibility
9   line," but "'provides a backdrop that,' if combined with other evidence, 'may give rise to
10  a plausible claim.'" (*Id.*, quoting *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018).)

11  In the motion for summary judgment, ABOR argues that (1) "the DCL ['Dear
12  Colleague' letter] does not use gender-specific language in calling upon schools to address
13  sexual violence"; and (2) "there is no evidence that the DCL unfairly influenced any
14  decision-maker in Doe's case or resulted in ABOR or ASU policies unfair to male
15  respondents." (Doc. 155 at 5-6.) Doe responds that "ASU incorporated the DCL into its
16  training and manuals governing the disciplinary process," that the letter "mandated that
17  ASU prioritize the investigation and resolution of harassment claims and defined 'sexual
18  harassment' more broadly than in comparable contexts," and that the letter also threatened
19  ASU with a loss of federal funding if it did not vigorously investigate and punish sexual
20  misconduct. (Doc. 189 at 15.) In reply, ABOR argues that Doe does "not controvert
21  ABOR's evidence that the DCL did not cause a gender-biased outcome here." (Doc. 201
22  at 10.) ABOR also noted that Doe's cited cases were decided at the motion-to-dismiss
23  stage. (*Id.* at 10.)

24  The Court agrees with ABOR that the "Dear Colleague" letter, standing alone, does
25  not create a triable issue of fact as to whether ASU's disciplinary process was infected by
26  gender bias. In general, the "rationale for the letter's relevance is as follows: the letter
27  applied government pressure and threatened financial punishment in a way that could lead
28  colleges to discriminate against men in their sexual assault adjudication processes." *Doe*

*v. Coastal Carolina Univ.*, 522 F. Supp. 3d 173, 179 (D.S.C. 2021).  But as ABOR correctly notes, the difficulty with this chain of inferences is that the letter does not explicitly single out men as the perpetrators of sexual violence and women as the victims of sexual violence. The letter uses the words "students" and "he or she" when referring to both victim and perpetrator.  (Doc. 155-6 at 2-20.)  Additionally, the letter provides statistics concerning the rates at which both female and male college students are the victims of sexual violence. (*Id.* at 3 ["The statistics on sexual violence are both deeply troubling and a call to action for the nation.  A report prepared for the National Institute of Justice found that about 1 in 5 women are victims of completed or attempted sexual assault while in college.  The report also found that approximately 6.1 percent of males were victims of completed or attempted sexual assault during college."].)  As a result, the "Dear Colleague" letter could only serve as a probative "backdrop" to a gender bias claim if a plaintiff produced university-specific evidence suggesting that university officials interpreted the letter's mandate to protect "victims" from "perpetrators" as coded language ordering the university to protect "women" from "men."   Otherwise, the letter would simply serve as a directive to aggressively investigate and pursue accusations of sexual misconduct, irrespective of the gender of the accuser and accused.  *Cf. Bleiler v. Coll. Of Holy Cross*, 2013 WL 4714340, *12 (D. Mass. 2013) (bias "toward the rights of reporting complainants" is not the same as bias against male students).

This understanding of the "Dear Colleague" letter is consistent with the Ninth Circuit's recent decision in *Doe*.  As noted, *Doe* held that it was "reasonable to infer that the [letter], the threat of losing federal funding if sexual misconduct was not vigorously investigated, and the . . . audit regarding [UCLA's] 'lack of response to sexual harassment claims' would place 'tangible pressure' on the University."  23 F.4th at 937.  But again, this pressure was to vigorously investigate sexual misconduct *claims*, which is not the same thing as pressure to discriminate against *men* accused of sexual misconduct.  The *Doe* court held that it was only when this pressure was "taken alongside Doe's other allegations" that it could be reasonably viewed as "affect[ing] how the University treated respondents in

1    disciplinary proceedings on the basis of sex." *Id.*  Thus, the critical question here is whether

2    Doe has adduced any evidence, apart from the "Dear Colleague" letter itself, from which

3    a reasonable juror could infer that ASU officials interpreted the letter as a directive to

4    discriminate against men during sexual misconduct-related disciplinary proceedings.

5        On this point, the Court noted during the motion-to-dismiss process that "the FAC

6    alleges that, following the issuance of the letter, OCR specifically identified ASU as one

7    of the universities whose Title IX processes were under investigation and sent investigators

8    to the ASU campus to 'gather information' about those processes."  (Doc. 66 at 21-22.)

9    The Court determined that these school-specific allegations of external pressure were

10   "additional support for Doe's claim."  (*Id.*)

11       In the motion for summary judgment, ABOR argues that "Doe cannot offer any

12   evidence to show the OCR investigations impacted Doe's disciplinary proceedings or

13   outcome.  The OCR never found that ASU violated Title IX, ordered any policy changes,

14   or otherwise influenced ASU's actions.  The evidence is uncontroverted that the relevant

15   decision-makers did not consider, and were not influenced by, the OCR investigations."

16   (Doc. 155 at 6.)  Doe responds that "[t]he University was being investigated by the Office

17   of Civil Rights, a sub-agency of the Department of Education, during Doe's disciplinary

18   proceedings." (Doc. 189 at 15.)  Doe argues that "a jury can infer the *pending* investigation

19   unduly influenced the decision-making during Doe's proceedings."  (*Id.* at 16.)  ABOR

20   replies that it would defy common sense and the law to conclude, as Doe urges the Court

21   to do, that "OCR investigations did not influence the outcome, but . . . the jury can still

22   infer that there was such influence."  (Doc. 201 at 10-11.)

23       Doe cites "Exhibit M" to support his assertion that ASU was investigated by OCR

24   during the pendency of his disciplinary proceedings.  Exhibit M, as discussed in the factual

25   background, is a December 1, 2017 letter sent by an ASU representative to an OCR

26   representative.  (Doc. 189-2 at 86-98.)  The letter summarizes ASU's investigation of a

27   particular allegation of sexual misconduct, and its inclusion of the comment that "ASU

28   complied with the requirements of Title IX . . . [and] looks forward to a prompt and

favorable resolution of this investigation" suggests there was a contemporaneous OCR investigation into ASU's Title IX practices.

Nevertheless, Exhibit M does not support Doe's position because it describes OCR's investigation into ASU's failure to sanction a male charged with sexually assaulting *another male*.  Although the parties' names are redacted, contextual clues make readily apparent that both the victim and the perpetrator were male.  (Doc. 189-2 at 89 ["[Complainant] was working to obtain a medical compassionate withdrawal from some of his courses, and he contacted Claudia Morales . . . .  [Complainant] told Ms. Morales of the alleged assault and provided Mr. [Respondent]'s name."].)  It is unclear how OCR's investigation into ASU's alleged failure to protect a male victim of sexual assault could support Doe's theory that "OCR was enforcing . . . a gendered view that saw men as the paradigmatic perpetrators of that violence and heterosexual women as its paradigmatic targets" and that OCR was placing "extraordinary pressure" on ASU "to appear tough on allegations of sexual assault made by women against men, no matter their merit."  (Doc. 37 ¶¶ 84, 98.)[8]  To the contrary, Exhibit M at most suggests ASU could have interpreted the "Dear Colleague" letter as creating pressure to favor *accusers* during sexual misconduct proceedings, not women to the detriment of men.  *See also Doe v. Marian Univ.*, 2019 WL 7370404, *12 (E.D. Wisc. 2019) ("There is no evidence by which a reasonable juror could infer that Doe was treated a certain way because of his gender, rather than because he was accused of raping someone."); *Doe v. Fairfax Cty. Sch. Bd.*, 403 F. Supp. 3d 508, 519 (E.D. Va. 2019) ("[V]igilance in enforcing Title IX, even when it results in bias in favor of victims and against those accused of misconduct, is not evidence of anti-male bias.").

---

[8]     During oral argument, Doe asserted for the first time that Exhibit M could be viewed as evidence that ASU engaged in disparate gender-based treatment during sexual misconduct investigations because the alleged perpetrator in that case was allowed to remain on campus despite various violations of no-contact orders related to the victim, whereas he was immediately placed on an interim suspension and banned from campus.  The Court concludes this argument is forfeited—Doe did not raise this theory in the summary judgment briefing and appears not to have disclosed it to ABOR in any of his disclosures under the Mandatory Initial Discovery Pilot Project ("MIDP"), as he was required to do.  Additionally, there is no evidence that OCR inquired into (or made any statements regarding the permissibility of) this particular aspect of the investigation.

These details also distinguish this case from *Schwake*.  There, the plaintiff alleged that "in April 2014 the DOE initiated an investigation of [ASU] for possible Title IX violations in the University's handling of sexual misconduct complaints" and the Ninth Circuit held that it was "'entirely plausible' that such pressure would affect how the University treated respondents in sexual misconduct disciplinary proceedings on the basis of sex."  967 F.3d at 948.  But here, Doe provides no evidence of a 2014 investigation of ASU, let alone a 2014 investigation that was focused on male-against-female sexual violence.  Instead, his sole evidence is Exhibit M, which discusses a 2017 investigation of ASU by OCR that was apparently focused on a single incident of male-against-male sexual violence.

For these reasons, no reasonable juror could view the "Dear Colleague" letter or the OCR investigation as evidence that ASU's handling of Doe's disciplinary proceeding was motivated by gender bias.

## 2. Statements Made By ASU Representatives

### a. **Dr. Hunter's Statement**

When deciding the motion to dismiss, the Court noted that "the FAC alleges that an ASU representative referred to Doe's male gender when explaining why prompt action was needed: 'When this case first came to the attention of ASU, [Dr. Hunter] indicated that action had to be taken quickly because [Doe] was a male athlete—a collegiate wrestler.'" (Doc. 66 at 22.)  However, the Court also noted that another part of the FAC "characterizes [Dr.] Hunter's email as follows: 'After receiving the report from ASU's police department, [Dr. Hunter] wrote in an email to her colleagues that she 'wanted to figure out what to do with [Doe]' and 'clearly we would want to move swiftly' due to his status as a student-athlete . . . .'" (*Id.* at 4 n.1.)  During oral argument, Doe's counsel clarified that Dr. Hunter's email would make clear to any reasonable reader that it was referring to a male athlete. (*Id.*)  Taking Plaintiff's well-pleaded allegations as true, the Court concluded that Dr. Hunter's alleged reference to Doe's gender ("male athlete") as a reason for prompt action, paired with the fact that Dr. Hunter was alleged to have overseen the university's

investigation into Doe and sat on the Dean's Review Committee, supported Doe's Title IX claim.  (*Id.* at 4 n.1, 22.)

In the motion for summary judgment, ABOR argues that "Dr. Hunter did not say she wanted the process to move quickly because Doe is male. . . .  Dr. Hunter explained that she referred to him as being a wrestler to ensure that the ASU athletic department was notified . . . as that department has its own procedures relating to student misconduct, which may require an athlete's removal from his or her respective team during the pendency of an investigation."  (Doc. 155 at 6-7.)  Doe does not address this point or make any attempt to refute ABOR's position in his response.

The Court agrees with ABOR that Dr. Hunter's email does not support Doe's claim. In the motion to dismiss, the Court was presented with Doe's *summary* of Dr. Hunter's email: "[Dr. Hunter] indicated that action had to be taken quickly because [Doe] was a male athlete—a collegiate wrestler."  (Doc. 66 at 22.)  This allegation arguably linked the university's action ("taken quickly") with ("because") Doe's gender ("male athlete").  The proffered email from Dr. Hunter does not bear out that characterization.

The email chain, described above in the statement of facts, arose after Dr. Hunter was forwarded a copy of Roe's police report by the ASU Police Department.  (Doc. 155-1 at 7-8.)  In the report, the police sergeant referred to both Doe and Witness 1, describing them as "ASU wrestling students," and explained that only Doe still attended ASU.  (*Id.*) Dr. Hunter's forwarded message instructed her staff to engage with Roe today "so we can figure out what to do with the male.  He is a wrestler, so clearly we would want to move swiftly, but not before we engage [Roe.]"  (*Id.* at 7.)

Dr. Hunter's email cannot plausibly be construed as connecting Doe's gender with any university action.  Dr. Hunter stated that "[h]e is a wrestler, so clearly we would want to move swiftly."  The conjunction "so," which commonly means "and for this reason; therefore," connects Doe's status as a wrestler with Dr. Hunter's desire to move quickly. Although the Court acknowledges Dr. Hunter's use of the words "he" and "the male," they are not syntactically connected to Dr. Hunter's instruction to move quickly.

More important, ABOR proffers undisputed evidence that ASU's athletic department has its own procedures relating to student misconduct, which supports ABOR's contention that Dr. Hunter was preparing for the athletic department's imminent participation. (Doc. 155-1 at 24 ["I mentioned that he was a wrestler in the email so that [my staff] were aware that there were other entities who were notified and aware that the student was an athlete."]; Doc. 155-7 at 6 [ASU Student-Athlete Code Of Conduct: "When a student-athlete is determined to have committed a major offense, the [university] will prohibit the student athlete from participation in [athletics]."].)

ABOR has carried its burden of proffering evidence negating an essential element of Doe's claim, but Doe has not carried his responsive burden of proffering evidence to support his claim or defense. *Nissan Fire*, 210 F.3d at 1102. Nor has Doe provided an opposing view of how Dr. Hunter's email should be interpreted. Thus, no reasonable juror could view Dr. Hunter's statement as evidence that ASU's investigation into Doe was motivated by gender bias.

### b.   **Dr. Rund's Statement**

When deciding the motion to dismiss, the Court noted that "the FAC identifies another instance where an ASU official [Dr. Rund] made statements that reflect gender bias—this time, implicit bias. . . . [Doe] alleges that [Dr.] Rund based his finding that Roe was 'incapacitated' during the sexual encounter in part on the nature of the encounter (a 'threesome'), which [Dr.] Rund characterized as 'outrageous behavior' that could not be the product of a rational, informed decision by an adult. This characterization, according to the FAC, reflects implicit gender bias and antiquated 'sexual mores' because [Dr.] Rund 'did not characterize the men's decision to engage in three-way sex as 'outrageous.'" (Doc. 66 at 22.) The Court noted that this "may not be Doe's strongest argument," because Dr. Rund "had no reason to opine on the reasonableness of the male participants' behavior [as] the narrow issue before him was whether Roe was incapacitated." (*Id.* at 23.) Even so, the Court found that "at the pleading stage and when viewed in the light most favorable to Doe, it provides a modest degree of additional support for his Title IX claim." (*Id.*)

1        In the motion for summary judgment, ABOR argues that "Dr. Rund's comment was

2    based on the evidence presented to him, and cannot be contorted to suggest or imply gender

3    bias.  Further, even assuming Dr. Rund's use of 'outrageous' was a comment on sexual

4    mores (it was *not*), Doe (again) cannot show the characterization has anything to do with

5    the gender of the participants in the sexual activity."   (Doc. 155 at 8-9.)  Doe responds[9]

6    that "the University's witness testified that a reasonable person exercising free will could

7    decide to participate in a threesome, and Roe admitted she had capacity[10]. . . .  A reasonable

8    jury can infer gender bias based on Rund's finding that a female was incapacitated due to

9    her 'outrageous behavior,' when there is no reason to believe her behavior was unusual

10   other than her sex."  (Doc. 189 at 9.)  In reply, ABOR offers a lengthy rebuttal of Doe's

11   argument that the Arizona Court of Appeals' decision should be entitled to some preclusive

12   effect and also argues that "even if Doe were to show . . . that Dr. Rund favored Roe, Doe

13   has no evidence of gender bias rather than, for example, sympathy for sexual assault

14   victims regardless of sex."  (Doc. 201 at 7.)

15       In the tentative order issued before oral argument, the Court stated that a reasonable

16   juror could construe Dr. Rund's "outrageous" comment as some evidence of gender bias.

17   In large part, this was because the phrase "outrageous" seemed to appear out of nowhere

18   and be untethered to the surrounding analysis in Dr. Rund's letter concerning Doe's

19   knowledge of Roe's level of intoxication.  Given this understanding of the facts, although

20   the Court acknowledged that ABOR's proffered interpretation of the "outrageous"

21   comment—that Dr. Rund was merely stating that Doe should have viewed Roe's evolution

22   from refusing to have sex with Doe to participating in a threesome with Doe and Witness

---

[9]       Throughout his response to the motion for summary judgment, Doe asserts that certain issues discussed or decided in the Arizona Court of Appeals' decision are "law of the case and cannot be disputed."  (Doc. 189 at 5.)  Doe's argument about Dr. Rund thus mostly nods to the appellate court's analysis of purportedly relevant issues.  Although the Court addresses Doe's "law of the case" theory below, for purposes of this issue, the Court addresses Doe's argument on its own merits.

[10]      Doe cites paragraphs 12 and 25 in the Arizona Court of Appeals' decision for the proposition that Roe "admitted" that she had capacity.  Paragraph 12 sets forth the standard for incapacity.  2019 WL 7174525 at *3.  Paragraph 25 states that the proffered evidence does not "support Rund's conclusion that [Roe] lacked the capacity to say no." *Id.* at *5.  Nowhere does the decision state that Roe admitted she had capacity.

1 as "outrageous" behavior suggesting her incapacitation—was reasonable, a reasonable juror could also reach a contrary interpretation and construe Dr. Rund's comment as a suggestion that a woman would only engage in a threesome if incapacitated. The tentative order then cited various cases suggesting that when university representatives make comments during disciplinary proceedings that reflect outdated or biased assumptions about the sexual preferences of men and women, such comments may serve as evidence that the proceedings were tainted by gender bias in violation of Title IX. *See, e.g.*, *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 585-86 (E.D. Va. 2018) (administrator's suggestion that male student may have been aroused by unwanted touching could be viewed as evidence of "outdated and discriminatory views of gender and sexuality" that "would have naturally infected the outcome of [the plaintiff's] Title IX disciplinary proceedings" and thus "create[d] an inference of gender discrimination in Marymount's disciplinary proceedings"); *Doe v. Washington & Lee Univ.*, 2021 WL 1520001, *13-14 (W.D. Va. 2021) (hearing panel's "differing treatment of Doe's and Roe's testimony" regarding their openness to certain sexual acts "shows that gender bias impacted Doe's disciplinary proceeding" because it suggests the "panel's determination of responsibility was predicated on biased assumptions regarding the sexual preferences of men and women"); *Doe*, 23 F.4th at 939-40 (university official's comment that the male respondent should have invited the female complainant into his office when she showed up angry and unannounced "support[ed] an inference of gender bias" because it "at the very least raise[d] the question of whether, if the gender roles were reversed, [the official] would have made the same recommendation to a female approached by her angry, male ex-fiancé when he showed up unannounced to confront her at her place of employment").

Upon reflection, and after carefully considering the points raised during oral argument, the Court changes course and concludes that a reasonable juror could not construe Dr. Rund's "outrageous" comment as evidence of gender bias. During oral argument, ABOR's counsel identified additional (and undisputed) evidence that explains the genesis of the "outrageous" comment. That evidence shows that the Association of

1    Title IX Administrators ("ATIXA") has proposed certain best-practice guidelines for

2    universities to follow when conducting investigations.  (Doc. 155-1 at 55.)  Among other

3    things, the ATIXA guidelines include guidance for "determining whether someone is

4    incapacitated."  (*Id.*)  That guidance calls for an assessment of whether the person

5    "displayed outrageous or unusual behavior," and the "ATIXA materials" define the term

6    "outrageous" by identifying "context[ual] clues to determine whether or not someone is

7    incapacitated." (*Id.*)  Given this additional context, it would not be reasonable for a juror

8    to construe Dr. Rund's "outrageous" comment as some sort of Victorian commentary on

9    whether a woman would ever voluntarily engage in the sexual act at issue in this case.

10   Instead, the only reasonable interpretation of this comment is as an evaluation of Roe's

11   level of intoxication and capacity to consent through the lens of the ATIXA guidelines.

12                    3.    Procedural Irregularities

13         As noted, the Ninth Circuit has repeatedly held that procedural irregularities during

14   a disciplinary proceeding can give rise to an inference of gender bias.  *See, e.g.*, *Schwake*,

15   967 F.3d at 950 ("[P]rocedural irregularities . . . support[] an inference of gender bias when

16   considered    along   with   Schwake's   allegations   of   background   indicia   of   sex

17   discrimination."); *Doe*, 23 F.4th at 940 ("[I]rregularities in Doe's proceedings . . . , while

18   not dispositive on their own, support an inference of gender bias.").  When deciding the

19   motion to dismiss, the Court noted that "the FAC alleges an array of irregularities during

20   the disciplinary proceedings."  (Doc. 66 at 23.)  The Court found that "[a]lthough these

21   alleged procedural errors may not, standing alone, serve as plausible evidence of gender

22   bias in a Title IX case . . .  taken together, these allegations are sufficient to survive a

23   motion to dismiss."  (*Id.* at 24.)

24                    a.    **Davis's Promise To Bring "Charges"**

25         The first procedural irregularity discussed in the December 2019 order was the

26   FAC's allegation that "the lead investigator promised Roe she would attempt to bring

27   charges against Doe at the very outset of the investigation, before even interviewing Doe

28   or obtaining corroborating information."  (Doc. 66 at 23.)

1    In the motion for summary judgment, ABOR contends this statement does not

2 qualify as a procedural irregularity because, under the Student Disciplinary Procedures (the

3 "Procedures"), a "charge" is simply a notice provided to the respondent that an accusation

4 has been made and an investigation has begun. (Doc. 155 at 9 [citing Doc. 155-2 at 64;

5 Doc. 155-7 at 26].) Thus, ABOR contends that a "charge" does not suggest Doe was

6 accused of a violation in the same way a prosecutor's "charge" of a crime generally must

7 be founded on probable cause. (*Id.* at 9.) Doe does not directly respond to ABOR's

8 explanation. He does, however, mention Davis's alleged failure to investigate before

9 charging him when presenting a new procedural-irregularity argument related to his interim

10 suspension. (Doc. 189 at 11 ["There was no basis for the interim suspension . . . . [T]he

11 University immediately charged Doe with sexual misconduct for having sex with a person

12 who was incapacitated and placed him on interim suspension, even though Davis had not

13 interviewed Doe, collected corroborating information to confirm Roe's allegations, and

14 Roe admitted she had capacity during the sex act."].)

15    Because Doe does not dispute ABOR's explanation that a "charge" is not a

16 determination of guilt, but rather only ASU's declaration that an investigation has begun,

17 no reasonable juror could view Davis's promise to "charge" Doe as a procedural

18 irregularity. In later sections of this order, the Court discusses Doe's new procedural-

19 irregularity argument related to the interim suspension.

20        b.    **Davis's Statements About Her Role**

21    The second procedural irregularity discussed in the December 2019 order was the

22 FAC's allegation that "the lead investigator made conflicting statements to Doe and Roe

23 about the investigator's role." (Doc. 66 at 23.)

24    In the motion for summary judgment, ABOR argues that "Doe severely

25 mischaracterized" Davis's statement to the parties. (Doc. 155 at 9.) ABOR asserts that

26 "Davis told Roe and Doe the same thing: she did not have subpoena power and would rely

27 on them to provide documentation and other information they wanted considered." (*Id.* at

28 9.) ABOR disputes Doe's "notion that Ms. Davis allowed Roe to control the investigation

or dissuaded Doe from providing evidence," notes that "Ms. Davis repeatedly asked Doe for information and documents," and asserts that Doe, in fact, was uncooperative.  (*Id.* at 9-10.)  In response, Doe argues that "the University acted as Roe's advocate" and that "a reasonable jury can infer gender bias based on the University's self-described advocacy for the female, a role never afforded a male."  (Doc. 189 at 13.)  Relevant to the narrower allegation addressed at the motion-to-dismiss stage,[11] Doe asserts that Davis described herself to Doe as a "neutral third-party investigator," "half-heartedly" asked for information, but also claimed that she would gather information herself.  (*Id.* at 13.)  Doe argues that, in contrast, Davis told Roe that she was "her partner" and asked Roe to locate specific information because "the onus was on her to prove her case."  (*Id.*)  In reply, ABOR accuses Doe of raising his university-as-advocate theory "for the first time" and focuses on rebutting that argument without relitigating the issue of Davis's description of her role. (Doc. 201 at 9.)

The Court finds no evidence of a genuine dispute about Davis's characterization of her own role to Roe and Doe.  Davis told Roe "it's going to be up to you to provide us with whatever information you feel is relevant; provide us with names of witnesses; provide your own statements.  It's going to have to be, unfortunately, on your shoulders to determine what it is that you feel like you want me to know."  (Doc. 155-7 at 56.)  She clarified the sort of evidence Roe could provide: "It's going to be up to you to provide photos or text messages or receipts or social media posts or whatever have you that you feel would be relevant for me to know."  (*Id.*)  She explained to Roe that "at the end of the investigation I'll prepare a report and you will know exactly what I've been able to collect because throughout this process my job is just to be that neutral third-party investigator, not the decider."  (*Id.* at 63-64.)

Davis told Doe that she would handle ASU's investigation, acting as "a neutral,

---

[11] Although Doe now raises a broader argument, this portion of the order only addresses the well-pleaded allegations found compelling at the motion-to-dismiss stage. Here, it is the FAC's allegation that "the lead investigator made conflicting statements to Doe and Roe about the investigator's role."  (Doc. 66 at 23.)

third party investigator," and that her job was to "collect information, anything I can get, by speaking to people, by collecting documentation that may be available, and then I just compile a report." (Doc. 155-8 at 7.)  Davis explained that she would not ask Doe to make a statement, that he did not have to answer any questions, and in fact he could choose "not to come in at all at any point." (*Id.* at 16-17.)  But Davis warned Doe that the Dean's Review Committee would determine whether Doe violated the Code "based on whatever (information) is available to them.  So if there is a wealth of information from [Roe's] side, that will be all that is considered.  And so you respond in the way that you feel is best that your attorney will advise you. . . .  You can come back next week and still not say anything, and that's okay. . . .  Just know that there would be an absence of information, and so when a decision is made, it would wind up being only from one side that information would be had." (*Id.* at 17.)  She concluded that "[w]hat I would encourage you to note is, like we talked about earlier, I can't subpoena information, so down here is an option for you to provide the names of any potential witnesses, people you want me to speak with, people you feel may have information that would be relevant to our case.  Also, for you to provide any evidence you may have.  So if you have receipts or phone logs or text messages or Snapchats or anything you feel that may help substantiate your statement, you can provide those to me.  Okay?" (*Id.* at 19.)

In short, when speaking to both Roe and Doe, Davis described herself as a "neutral third-party investigator" who was compiling a report that would go to decisionmakers. Davis told both Roe and Doe that they would be responsible for building their own cases because she did not have the power to subpoena evidence, and Davis gave nearly identical examples ("photos or text messages or receipts or social media posts" to Roe, "receipts or phone logs or text messages or Snapchats" to Doe) of the sort of evidence they might wish to submit.  Although Davis presented the explanation more carefully to Doe to emphasize that he should "respond [*i.e.*, present evidence] in the way that you feel is best that your attorney will advise you," she was clear that if Doe did not advocate for himself, the Dean's Review Committee would only be presented with evidence provided by Roe.

1    Without prejudging Doe's broader argument that Davis comported herself as an

2    advocate for Roe in practice, there is no evidence[12] that she made "conflicting statements

3    to Doe and Roe about the investigator's role." Thus, no reasonable juror could find a

4    procedural irregularity arising from this narrow aspect of the disciplinary proceeding.

5                    c.    **Davis's Statement About Roe's "New Evidence" And Dr.**

6                          **Hightower's Signature Of Doe's Expulsion Letter**

7    The third procedural irregularity discussed in the December 2019 order was the

8    FAC's allegation that "the lead investigator falsely told Doe that one of Roe's written

9    submissions did not contain any new evidence." (Doc. 66 at 23.)  The fourth procedural

10   irregularity was the FAC's allegation that "the Committee violated its own procedural rules

11   by issuing the expulsion letter without considering Doe's response to the new evidence

12   discussed in Roe's final written submission." (*Id.* at 23.)

13   In the motion for summary judgment, ABOR contends that Doe's argument about

14   Roe's submission reflects "disagreement between Doe and Davis as to what constitutes

15   'new evidence.'  Davis testified that she did not consider repetitive or clarifying

16   information from Roe that did not contain a 'new fact' to be new evidence." (Doc. 155 at

17   10.)  ABOR also argues that although Dr. Hightower signed an initial expulsion letter

18   before receiving Doe's new submission, she signed a second expulsion letter after she

19   considered the submission and found that it did not change her decision.  (*Id.* at 11.)  Doe

20   responds that "a reasonable jury can infer gender bias based on the University's failure to

---

12    Doe quotes a statement allegedly made to Roe by Davis: "my job [is] to be like a
detective that you're working with and to gather evidence."  (Doc. 189 at 13.)  Doe
characterizes this statement as evidence that Davis was casting herself as a "partner" to
Roe rather than a neutral fact finder.  But the quotation misstates Davis's choice of words
and omits significant context.  Davis actually said, "So my job in this process is to be a
neutral third-party investigator.  I am not the decider.  It's my job to be just like the
detective that you're working with and to gather information."  (Doc. 155-7 at 59-60.)  The
actual sequence of Davis's conversation with Roe made clear that Davis was comparing
herself to Roe's *actual police detective liaison*, "the detective," whom they had discussed
seconds earlier, and explaining that she had an investigatory, not a deciding, role.  Even if
Davis had indeed said, "like a detective that you're working with," it strains credulity to
say this casts her as a "partner" when Davis had described herself as a "neutral third-party
investigator" to Roe exactly two sentences earlier.  Nothing about Davis's presentation to
Roe portrayed Davis as a "partner" to her, at least no more so than Davis's presentation to
Doe portrayed Davis as a partner to him.

1   give the male accused an opportunity to review and comment on evidence and granting the

2   female accuser th[at] right, and by failing to address obvious and relevant issues in the draft

3   report before finding a male guilty of violating the Code."  (Doc. 189 at 15.)  More

4   specifically, Doe asserts that Davis "refused" to allow him to review Roe's new submission

5   of December 11, 2016 until his lawyer intervened and that the submission contained new

6   evidence despite Davis's assurance otherwise.  (*Id.* at 14.)  Doe also asserts that his

7   supplemental letter "was not seriously considered (and certainly no substantive effort was

8   made to examine or corroborate the information) as the University issued its disciplinary

9   decision the next day."  (*Id.*)  In reply, ABOR argues that Dr. Hightower received and

10  reviewed all of Doe's responses before issuing her final decision and that Doe cites no

11  evidence supporting the idea that his response was not "seriously considered."  (Doc. 201

12  at 10.)

13          Doe really raises three procedural allegations here: (1) Davis refused to let Doe

14  review Roe's December 11, 2016 comments until his attorney became involved, whereas

15  Roe was always able to review new evidence; (2) Davis lied or otherwise misrepresented

16  the fact that there was "substantive, new information presented by Roe" on December 11,

17  2016; and (3) the University did not take Doe's new submission seriously.  By contrast,

18  Doe does not seem to argue that Dr. Hightower's re-signing of the expulsion letter would

19  be procedurally defective if she *had* taken his new submission seriously.

20          Doe has the better side of some, but not all, of these arguments.  As noted in the

21  Background section of this order, Davis met with Roe on December 11, 2016 to review

22  one of the letters written by Doe's counsel.  During this meeting, Roe made a variety of

23  statements about the underlying incident.[13]

24          The Court agrees with Doe's contention that a reasonable juror could construe these

25  statements as new, substantive information.  For example, Roe repeatedly stated in her

26

27  _____

    [13]    The tentative ruling incorrectly stated that Roe's December 11, 2016 comments
28  were not part of the record.  During oral argument, ABOR's counsel clarified that Roe's
    December 11, 2016 comments are embedded in the final version of the investigative report.
    The analysis here has been updated accordingly.

1   December 11, 2016 comments that she was "too intoxicated" during the sexual encounter

2   to be "aware of what was going on" and did "not remember what happened." (Doc. 155-1

3   at 94, 104.) However, the police report from the Tempe Police Department reflects that

4   during an interview on April 2, 2016 (*i.e.*, the day after the incident), Roe did not claim to

5   have been too intoxicated to remember the details of what occurred. To the contrary, the

6   police report states that Roe provided a detailed description of the sexual encounter. (Doc.

7   189-2 at 44-45.) Similarly, during Roe's initial meeting with Davis on September 19, 2016,

8   Roe provided another detailed recollection of the encounter. (Doc. 155-1 at 66.) And

9   again, during Roe's subsequent meeting with Davis on October 27, 2016, Roe was again

10   able to recall and recount various details about the sexual encounter itself. (*Id.* at 67-69.)

11      Roe also stated on December 11, 2016 that "she did not say 'stop' because she was

12   too intoxicated." (*Id.* at 99.) However, the police report from the Tempe Police

13   Department states that Roe "told them to stop because it was hurting." (Doc. 189-2 at 49.)

14   There is evidence that Roe also made statements to this effect during her October 27, 2016

15   meeting with Davis. (Doc. 155-1 at 68 ["[Roe] stated [Doe] and [Witness 1] did not stop

16   after she said no . . . ."].)

17      Finally, Roe stated on December 11, 2016 that "she was not aware that a photo was

18   taken." (Doc. 155-1 at 98.) However, during her April 2016 interview with the Tempe

19   Police Department, Roe reported that "she saw a camera flash and realized that [Witness

20   1] was taking pictures of her." (Doc. 189-2 at 49. *See also id.* at 45 ["[Roe] said at some

21   point during the incident, she saw flashes from a camera, and noticed [Witness 1] was

22   taking photos of the incident with a cell phone."].) Similarly, during Roe's initial meeting

23   with Davis on September 19, 2016, Roe stated that "[d]uring the encounter, she stated to

24   see flashes going off. She asked what it was and was told not to worry about it. She then

25   responded that she did not want to be recorded." (Doc. 155-1 at 66.) And during her

26   subsequent meeting with Davis on October 27, 2016, Roe stated that "the camera was

27   brought out after she said no." (*Id.* at 68.)

28      Given this background, a reasonable juror could conclude that it was procedurally

1    irregular for Davis not to share Roe's December 11, 2016 comments with Doe before

2    submitting her final investigative report to the Committee and that it was also procedurally

3    irregular for Davis to assure Doe's counsel that Roe "did not offer any new evidence"

4    during the December 11, 2016 interview (Doc. 189-2 at 63).  The former was procedurally

5    irregular because, under § C(5) of the Procedures, "[b]efore concluding the investigation,

6    and upon request, the Dean of Students will provide the parties with an opportunity to

7    respond to all investigative materials."  (Doc. 155-2 at 64.)  The latter was procedurally

8    irregular because, for the reasons discussed above, a reasonable juror could conclude that

9    Roe did, in fact, provide important new evidence during the December 11, 2016 interview,

10   by changing her account on several key points.

11          In contrast, ABOR presents undisputed evidence that Dr. Hightower seriously

12   considered Doe's December 21, 2016 submission (which addressed the new evidence that

13   Roe provided on December 11, 2016) and decided to expel him anyway.  (Doc. 155-1 at

14   42.)  Doe cites no evidence to show that Hightower failed to seriously consider his

15   submission.  The Court observes that thoughtful decisions are sometimes made quickly,

16   just as thoughtless decisions are sometimes made slowly.  Speed, without more, is not

17   evidence of a lack of deliberation (although it might be different if Doe had evidence that

18   Dr. Hightower affirmed the decision 30 seconds after receiving a 100-page submission).

19   Nor does Doe argue that Dr. Hightower was administratively bound to consider new

20   evidence for a certain amount of time before ruling on it or to formally remark on new

21   evidence in her revised expulsion letter.  There is thus no genuine dispute about whether

22   Dr. Hightower considered Doe's new submission before expelling him.  Although Dr.

23   Hightower's decision to reject Doe's arguments may have been substantively flawed—as

24   evidenced by the ultimate reversal of the expulsion decision—there was no irregularity in

25   the process that Dr. Hightower followed to reach her decision.

26          For these reasons, Doe has adduced sufficient evidence to corroborate some, but not

27   all, of the allegations in the FAC pertaining to procedural irregularities that occurred during

28   the December 2016 portion of the disciplinary proceeding.

1

d.    **ASU's Failure To Obtain Key Evidence**

2      The fifth procedural irregularity discussed in the December 2019 order was the

3   FAC's allegation that "ASU representatives failed during various stages of the proceedings

4   to take steps to obtain key evidence—among other things, they could have required Roe to

5   obtain the cellphone video footage from the Tempe Police Department and simply chose

6   not to do so."  (Doc. 66 at 23.)

7      In the motion for summary judgment, ABOR explains that (1) the video was

8   unavailable to Davis and Roe and Davis could not compel Roe to obtain it, (2) Dr. Allen

9   properly refused to order Roe to cooperate in Doe's pursuit of the video, and (3) Davis

10   sought to contact Witness 1 and the individual who drove Roe home after the incident but

11   was obstructed by Witness 1 and could not reach the driver.  (Doc. 155 at 10-11.)  Doe

12   does not respond.[14]

13      Given Doe's failure to pursue this aspect of his claim at summary judgment, no

14   reasonable juror could conclude that ASU's failure to obtain cellphone footage from the

15   Tempe Police Department or testimony from Witness 1 or Roe's driver constituted a

16   procedural irregularity.

17

e.    **UHB's Refusal To Hear Toxicology Evidence**

18      The sixth procedural irregularity discussed in the December 2019 order was the

19   FAC's allegation that "the UHB refused to consider Doe's proffer of the testimony his

20   alcohol expert would have provided."  (Doc. 66 at 23.)

21      In the motion for summary judgment, ABOR argues that Doe's counsel made a

22   strategic decision not to call his toxicology expert and instead offered a lengthy

23   presentation by Ms. Nannetti, his sexual assault expert.  (Doc. 155 at 12 n.6.)  ABOR

24   asserts that the UHB's decision to reject Doe's proffer of a toxicology report "after the

25   record closed, and well after the deadline in the Procedures," and with no opportunity for

26   ASU to cross-examine the expert or offer a rebuttal, is not evidence of gender bias.  (*Id.* at

27

28   [14]    Doe does assert, as part of his broader argument that Davis acted as an advocate for
Roe, that Davis failed to interview certain individuals.  (Doc. 189 at 14.)

1    11.)  Doe does not respond.

2         Given Doe's failure to pursue this aspect of his claim at summary judgment, no

3    reasonable juror could conclude that the UHB's refusal to consider the report of Doe's

4    toxicologist constituted a procedural irregularity.

5                    f.      **Failure To Disclose Sex-By-Force Theory**

6         The seventh procedural irregularity discussed in the December 2019 order was the

7    FAC's allegation that "the UHB sustained the sexual misconduct finding under an

8    'impermissible force' theory, but this theory wasn't properly disclosed to Doe before the

9    hearing and conflicted with Roe's statements to the police and with the uncontradicted

10   testimony of Doe's expert."  (Doc. 66 at 23.)

11        In the motion for summary judgment, ABOR argues that "the notice regarding the

12   initiation of the investigation and Hightower's decision gave Doe notice of the potential

13   for force to be considered, quoting in full the range of sexual misconduct subject to the

14   Code." (Doc. 155 at 12.)  ABOR also points out that Doe "specifically addressed the issue

15   of force in communications with Ms. Davis and during the UHB hearing."  (*Id.* at 12.)

16   Finally, ABOR asserts that the final expulsion decision did not hinge on force, as Dr. Rund

17   also found that Roe was incapacitated and unable to consent to the sex acts.  (*Id.* at 12-13.)

18   In response, Doe argues that "the University found Doe guilty of . . . sex by force without

19   informing Doe, investigating the charge, or presenting the issue at trial." (Doc. 189 at 13.)

20   He asserts that "a reasonable jury can infer the University wanted to convict males at any

21   cost based on the University's failure to inform Doe he was charged with sex by force, the

22   failure to investigate sex by force, the failure to inform Doe he needed to produce evidence

23   by force charge, and the failure to support the charge at the hearing."  (*Id.* at 12-13.)

24   Specifically, he argues that the information supporting the interim suspension makes no

25   mention of sex by force, that Davis did not tell him that she was investigating a claim of

26   sex by force (and thus he did not produce evidence to defeat such a claim), and that

27   testimony at the UHB hearing makes clear sex by force was not an issue but was

28   "mentioned only in passing."  (*Id.* at 12.)  ABOR replies that "force was always at issue,

1   Doe addressed it during the investigation and the UHB hearing, force was not the primary

2   reason for his expulsion, and Doe cannot link the force finding to gender bias." (Doc. 201

3   at 8.)

4        A reasonable juror could conclude that the UHB's decision to find Doe responsible

5   under a sex-by-force theory constituted a procedural irregularity. *Doe*, 23 F.4th at 940

6   (where UCLA's investigator "made findings of violations of policy not included in the

7   Joint Notice or Amended Joint Notice of Charges," this qualified as an "irregularit[y]").

8   It is undisputed that the Code requires ASU to notify students of charges against them.

9   (Doc. 155-2 at 64.)  The letter sent by Dr. Hunter on September 21, 2016 provided the

10  following summary of the allegations against Doe: "[O]n or around April 2, 2016, you

11  provided alcohol to a minor female student of ASU. *After she became heavily intoxicated,*

12  *you and another male took her to a room in your off-campus house where you engaged in*

13  *oral and vaginal consent without her consent*.  Reportedly, a camera was used to recover

14  the sexual acts and the female did not consent to the recording." (Doc. 189-2 at 16,

15  emphasis added.)  The letter explained that, "[i]f true, the behavior stated above would be

16  in violation of the [ABOR] Student Code of Conduct, pertinent parts of which are stated

17  below." (*Id.*)  The letter then quoted the provisions of the Code (sections F-15, F-23, and

18  F-25) addressing alcohol, sexual misconduct, and surreptitious recording.  (*Id.* at 16-17.)

19  Although the full definition of section F-23, which was provided in the letter, identifies

20  "sexual acts perpetrated . . . by force" as one of the many forms of prohibited conduct, a

21  reasonable juror could conclude that a passing citation to a broadly defined category of

22  offenses does not qualify as an "explanation of the charges which have been made," as

23  required by the Procedures.  (Doc. 155-2 at 64.)  This is particularly true because the

24  summary of the charges provided at the outset of the letter only accused Doe of engaging

25  in sexual acts "without her consent" and did not make any separate mention of sex by force.

26  *Cf. N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017) (explaining that the interpretive

27  canon of *expressio unius est exclusio alterius* applies when circumstances support a

28  sensible inference that the statutory term left out must have been meant to be excluded).

1    Similarly, during later meetings with Doe, Davis made comments that can be reasonably

2    construed as suggesting the sexual-misconduct investigation was only focused on

3    incapacitation and the lack of consent, not on the presence of force.  (Doc. 155-8 at 32

4    [Davis, agreeing that "what you were looking for [is] incapacitation"].)

5           Finally, although ABOR correctly notes that Dr. Rund did not rely solely on the sex-

6    by-force finding to uphold the expulsion (Doc. 155 at 12-13), this is at most an argument

7    about whether the procedural irregularity was harmless, not whether an irregularity

8    occurred.  During oral argument, ABOR argued that harmless procedural irregularities can

9    be disregarded because "if it's harmless, it can't be evidence of discrimination on the basis

10   of sex.  It can't have motivated the final outcome.  He couldn't have been expelled because

11   of it.  Because if it's harmless, that means it doesn't satisfy the clear standard under Title

12   IX."   The Court disagrees.   The Ninth Circuit has repeatedly stated that procedural

13   irregularities may support an inference of gender bias in a Title IX proceeding.  *Schwake*,

14   967 F.3d at 950 ("[P]rocedural irregularities . . . support[] an inference of gender bias when

15   considered  along  with  Schwake's  allegations  of  background  indicia  of  sex

16   discrimination."); *Doe*, 23 F.4th at 940 ("[I]rregularities in Doe's proceedings . . . , while

17   not dispositive on their own, support an inference of gender bias."); *id.* at 941 ("[A]t some

18   point an accumulation of procedural irregularities all disfavoring a male respondent begins

19   to look like a biased proceeding . . . .").  Those cases do not suggest that a Title IX plaintiff

20   must go further and show that a specific irregularity was the cause of an erroneous outcome.

21   At any rate, ABOR did not move for summary judgment on causation, but only on the issue

22   of whether "Doe can "come forward with actual evidence of gender bias" (Doc. 155 at 18),

23   and for the reasons stated above, Doe has identified several procedural irregularities in his

24   proceeding that—at least if coupled with other evidence of bias—could lead a reasonable

25   juror to conclude that the proceeding was infected with bias.

26          …

27          …

28          …

1    B.    **Issues Raised In The Motion For Summary Judgment**

2          1.    The Arizona Court Of Appeals' Decision

3          In response to the motion for summary judgment, Doe advances various arguments

4    based on the Arizona Court of Appeals' 2019 decision overturning his expulsion.  Doe

5    makes three overarching points: (1) "a jury can infer gender bias based on the University's

6    baseless finding that Doe engaged in sex by force" (Doc. 189 at 3-5); (2) "gender bias can

7    be inferred by the University's abuse of discretion" (*id.* at 5); and (3) "the Court of Appeals

8    identified specific facts that a jury can use to infer sex bias under Title IX, and those facts

9    are law of the case" (*id.* at 5-10).

10         The Court views the first and second arguments as a matched set: Doe believes the

11   appellate court's determination that Dr. Rund "convicted" him with insufficient evidence

12   can, itself, be some evidence to support his overall argument that "the University wanted

13   to convict males at any cost." (*Id.* at 12.)  The third argument is that "the appellate court's

14   factual and legal findings are law of the case and cannot be disputed" and "a jury can infer

15   sex bias based on . . . ten issues identified by the Court of Appeals." (*Id.* at 5, 7.)  Doe

16   asserts that "the issues resolved in the Court of Appeals' Order are entitled to preclusive

17   effect" and "the University cannot relitigate the factual and legal issues decided by the state

18   court, including factual determinations necessary to find there was no evidence to support

19   a finding of incapacitation or that Doe engaged in sex by force. . . .  In short, if the

20   University is arguing that there is evidence to support a finding of sex by force or Roe was

21   incapacitated, it cannot do so." (*Id.* at 7.)  Doe then proceeds to identify ten "issues

22   identified by the Court of Appeals." (*Id.* at 7.)   In some instances, these "issues" appear

23   to be Doe's understanding of evidentiary findings made by the appellate court from which,

24   in Doe's view, a juror might infer gender bias.  In some instances, the "issues" are simply

25   quotations from the appellate decision, which Doe combines with his own arguments and

26   blends into "law of the case."

27         In reply, ABOR makes the following arguments: (1) Doe waived his ability to rely

28   on the Arizona Court of Appeals' decision by not mentioning it in his disclosures pursuant

to the District of Arizona's Mandatory Initial Discovery Pilot Project ("MIDP"); (2) Doe mischaracterizes the decision; (3) the decision does not have preclusive effect; (4) the decision is not evidence that can go to the jury; and (5) the decision does not raise a fact issue on *gender bias* because that was not at issue in the state-court proceedings.  (Doc. 201 at 2-7.)

With the benefit of oral argument, and in light of other changes to the tentative ruling, the Court finds it necessary to discuss the relevance of the Arizona Court of Appeals' decision in more detail than it did in the tentative ruling.  In a nutshell, the Court concludes that the fact of reversal helps support Doe's contention that his disciplinary proceeding was infected by irregularities that may, in concert with other evidence, give rise to an inference of gender bias.  The clearest support for this conclusion comes from the Ninth Circuit's recent *Doe* decision, which identified "the state court's ruling . . . in the writ proceeding . . . that the evidence did not support the Regents' findings" as one of the "procedural irregularities" that could "support an inference of gender bias, particularly when considered in combination with allegations of other specific instances of bias and background indicia of sex discrimination."  23 F.4th at 940.  That is essentially what happened here—although Dr. Hightower, the UHB, and Dr. Rund all determined that Doe had committed sexual misconduct in violation of section F-23, the appellate court held that no reasonable person could have reached that conclusion.  *Doe*, 2019 WL 7174525 at *6-7 ("[W]e conclude the evidence at the hearing could not lead a reasonable mind to conclude ASU proved Complainant was unable to make 'informed, rational judgments' on the night in question. . . .  We [also] conclude the finding that Respondent engaged in sex with Complainant by force was not supported by substantial evidence because a reasonable mind could not reach that conclusion based on the evidence.").  Although the Court agrees with ABOR (Doc. 201 at 7) that the fact of reversal does not, in itself, mean that Doe must prevail on his Title IX claim or even survive summary judgment—there must be other evidence from which a reasonable juror could conclude this irregularity was indicative of gender bias—it would be reasonable for a juror to find *irregularity* based on the reversal.

Another of ABOR's arguments is that the appellate decision is not evidence that can go to the jury.  (Doc. 201 at 6-7.)  Without taking any position on the admissibility of the appellate decision itself, the fact that ASU's sexual misconduct findings and expulsion decision were reversed based on insufficient evidence can be established through other pieces of evidence in the record apart from the appellate decision.  (*See, e.g.*, Doc. 140-1 at 29-30 [September 4, 2020 letter to Doe from ASU's vice president of student services, acknowledging that "the Arizona Court of Appeals . . . held that Dr. Rund's conclusion that you had violated [section F-23] was not supported by substantial evidence . . . ."].)

Finally, ABOR raises objections based on waiver and late disclosure.  (Doc. 201 at 3-4.)  Although those objections may be meritorious when applied to some of the other alleged procedural irregularities discussed in Doe's summary judgment brief, they lack merit with respect to the appellate decision.  Doe expressly identified the appellate decision in the portion of his MIDP disclosures calling for disclosure of the "facts and legal theories relevant to claims."  (Doc. 155-5 at 100-01 ["Rund never made a reasonable connection between [Roe's] behavior and an inability to make rational, informed decisions—the standard for incapacitation articulated by ASU at the hearing—and never addressed, let alone explained, the evidence showing that Doe was coherent, communicative, and logical during the encounter.  He also failed to address an essential element of the charge: that Doe knew or should have known [Roe] was incapacitated.  Rund nonetheless expelled Doe from Arizona's public educational institutions . . . .  On December 24, 2019, the Arizona Court of Appeals issued a Memorandum Decision finding that Rund's determination that Doe had sex with by force and was incapacitated were not supported by substantial evidence."].)  Although Doe may not have disclosed his intention to rely on the appellate decision for law-of-the-case purposes, he clearly disclosed his intention to rely on the decision to support his broader argument that the underlying proceeding was flawed and irregular.

Given these conclusions, it is unnecessary at this juncture to delve into whether the appellate decision has some sort of law-of-the-case or preclusive effect.  Taken solely as evidence of a procedural irregularity, it provides further support for Doe's Title IX claim.

1

2.     Additional Assertions Of Procedural Irregularity

2       Doe's summary judgment brief identifies three additional alleged procedural

3   irregularities that were not addressed at the motion-to-dismiss stage: (1) Davis's acting as

4   an advocate for Roe in practice, by failing to interview certain witnesses Doe had

5   identified, directing Roe to an ASU-sponsored advocate to whom Doe was not given

6   access, and promising to represent Roe if there was an appeal; (2) the placement of Doe on

7   an interim suspension during the pendency of the investigation; and (3) ASU's failure to

8   address inconsistencies in Roe's testimony.  (Doc. 189 at 11-14.)  In reply, ABOR argues

9   that (1) Doe never properly disclosed these theories; and (2) alternatively, these theories

10  fail on the merits.  (Doc. 201 at 8-10.)

11      Although the tentative ruling sought to address the merits of each additional theory,

12  ABOR explained during oral argument why any analysis of the merits should be reserved

13  until after ABOR's late-disclosure allegations are resolved.  Upon reflection, the Court

14  agrees.  The Court also concludes that, because it has already determined that Doe has

15  validated the existence of several properly disclosed irregularities, it is unnecessary at this

16  stage to determine whether Doe has established the existence of even more irregularities.

17  As discussed below, the summary judgment analysis fundamentally turns on whether Doe

18  has proffered *other* evidence that could lead a reasonable juror to conclude these

19  irregularities were indicative of gender bias (as opposed to pro-complainant bias or mere

20  incompetence or mistake).

21

3.     Doe's Proffered Expert Opinions

22      In response to the motion for summary judgment, Doe identifies the reports of two

23  of his experts, Cindi Nannetti and Dr. Lance Kaufman.  (Doc. 189 at 16-17 & n.9.)

24  Nannetti's report (Doc. 161-1) addresses the "Start By Believing" campaign, which

25  purportedly influenced Doe's disciplinary proceeding.  (Doc. 189 at 16.)  Dr. Kaufman's

26  report (Doc. 159-1) identifies statistical evidence that allegedly "raise[s] a fair inference of

27  anti-male bias" in ASU's disciplinary proceedings.  (*Id.* at 17.)  Although the parties have

28  also brought dueling *Daubert* motions to exclude these and other experts (Docs. 158, 159,

161, 164-65), which will be addressed in due course, the Court now addresses Nannetti's and Dr. Kaufman's opinions insofar as they are proffered as summary judgment evidence.

### a.    The "Start By Believing" Campaign

In the motion for summary judgment, ABOR argues that Nannetti's opinions do "not support gender bias, no less intentional gender bias." (Doc. 155 at 13.)  First, ABOR explains that Nannetti's criticisms are "confine[d] . . . to Ms. Davis' investigations," but "Dr. Rund's decision was not based solely on the information Ms. Davis gathered . . . , [and] [t]here is no evidence Dr. Rund's decisions were based on anything but the evidence presented by the parties during and after the UHB hearing." (*Id.* at 14.)  Second, ABOR asserts that it is "demonstrably false" that the SRR or Davis followed the Start By Believing campaign when carrying out the investigation.  (*Id.* at 14.)  Third, ABOR argues that Nannetti's opinion is that Start By Believing caused Davis to be biased in favor of Roe as a victim, not against Doe as a man, and pro-victim bias is not gender bias.  (*Id.* at 15.)  Fourth, ABOR asserts that although Nannetti "purports to measure Ms. Davis's investigation against the standards set forth by [ATIXA]," those standards are irrelevant because non-compliance would at most show that the investigation was imperfect, as opposed to being motivated by Doe's gender.  (*Id.* at 15.)  In response, Doe argues that "ASU was operating under the [Start By Believing] campaign during the disciplinary proceedings" and the campaign "assumes the accuser's accusations are true and acts accordingly." (Doc. 189 at 16.)  Doe points to a proclamation "announcing the University's adherence to the policy" that was "signed by the University president and the Title IX coordinator."  (*Id.*)  Doe argues that although ABOR "claims the campaign is gender neutral because it is victim-focused . . . the number of female accusers is higher than male accusers resulting in a strong bias in favor of female complainants and male accused."  (*Id.*)  Moreover, Doe asserts that "law enforcement" has repudiated the Start By Believing campaign and considers it an improper investigative technique.  (*Id.*)  "Based on this, Doe argues that a reasonable juror can find that the [Start By Believing] campaign influenced the decision to suspend a male accused without evidence."  (*Id.*)  In reply, ABOR argues

that "Doe mischaracterizes ABOR's position with respect to [Start By Believing]. ABOR does not contend that ASU rejected [Start By Believing]. Rather, the evidence establishes that [Start By Believing] was followed only by the ASU Police Department, which conducts criminal investigations, not by SRR, which investigates alleged violations of the Code pursuant to the Procedures. Doe has no contrary evidence." (Doc. 201 at 11.)

Doe has proffered no evidence from which a reasonable juror could conclude that the Start By Believing campaign influenced his disciplinary proceeding. The sole piece of evidence that is even tangential to Start By Believing is the April 4 Proclamation. (Doc. 189-2 at 100.) The Proclamation was signed by ASU's President, Executive Vice President, and the ASU Chief of Police. (*Id.*) It was only attested to by ASU's Title IX Coordinator Preudhomme. Attestation is defined by Black's Law Dictionary as meaning "bear witness . . . affirm to be true or genuine; to authenticate by signing as a witness." *Attest*, Black's Law Dictionary (11th ed. 2019). This makes logical sense because the Proclamation's text has no direct impact on ASU's Title IX system and requires no commitment from Preudhomme.

Rather, the Proclamation states that the Start By Believing campaign is "designed to improve responses of friends, family members, and community professions, so they can help victims to access supportive resources and engage the criminal justice system." (*Id.*) According to the Proclamation, this is necessary because victims are more likely to disclose sexual assault to a friend or family member, and when those loved ones respond with doubt, the victim experiences additional negative effects. (*Id.*) Consequently, the Proclamation stated that ASU was committing itself to celebrate April 4th of each year as "Start By Believing Day" to show its commitment to awareness of, prevention of, and response to sexual violence. (*Id.*) Notably, the Proclamation makes no demands of any ASU institution beyond a commitment to publicize the Start By Believing campaign.[15] It places

---

[15] ABOR concedes that the ASU Police Department "followed" the Start By Believing campaign (Doc. 201 at 11), and Preudhomme testified that "the proclamation supported the campaign issued by the ASU Police Department encouraging individuals to report crime." (Doc. 155-6 at 37.)

the onus on "loved ones" to start by believing victims of sexual violence rather than doubting them, in an effort to ensure that those victims will be connected with supportive resources and the criminal justice system.  It also mentions that both women and men are victims of sexual violence.  No reasonable juror could believe that a Proclamation that encourages friends and family to "start by believing" is evidence that ASU's Title IX department "adhered" to the policy, especially given that Preudhomme did not formally sign it, let alone commit to follow it.

Other pieces of evidence identified by Nannetti to prove ASU's purported adherence to Start By Believing are that Davis appeared to believe Roe's version of events and that Dr. Hunter stated, "I do have a strong belief in what she does say, yes" at the appeal hearing. (Doc. 161-1 at 11.)  No reasonable juror could believe that use of the word "belief," or the act of believing, is evidence of adherence to the Start By Believing campaign.

By contrast, ABOR points to undisputed evidence that "SRR's investigators were specifically instructed not to apply the [Start By Believing] philosophy in investigating allegations of sexual misconduct." (Doc. 155-6 at 37-40 [Preudhomme testifying that SRR did not follow the policy]; Doc. 155-10 at 96 [Associate Dean Hicks informing Preudhomme by email in 2015 that "ASU is participating in this proclamation, however as investigators we are not to participate as we are neutral fact finders and are tasked with investigating"].)  Preudhomme also testified that "the only information out there about the Start By Believing campaign in connection with ASU is the proclamation, which, as we've gone over, relate[s] to the criminal justice system." (*Id.* at 40.)

Accordingly, no reasonable juror could conclude that the Start By Believing campaign influenced ASU's investigation of Doe.[16]

…

…

---

[16]     Doe does not seek to avoid summary judgment by proffering other aspects of Nannetti's report unrelated to her opinions regarding the Start By Believing campaign. Accordingly, the analysis here is limited to the Start By Believing campaign.  In the forthcoming order resolving the parties' *Daubert* motions, the Court will address ABOR's challenges to other components of Nannetti's report.

     **b.**   **Statistical Anomalies**

  During the discovery process, ABOR produced spreadsheets that summarized the outcomes of disciplinary proceedings between 2012 and 2017 in which ASU students were alleged to have violated section F-23 of the Code (sexual misconduct) and/or section F-15 of the Code (alcohol).  (Doc. 159-1 at 5-6.  *See also* Doc. 159 at 4.)  For the cases involving alleged violations of section F-23, the spreadsheets contained sixteen data fields, including the gender of the respondent, the gender of the complainant, the Dean of Students' decision, the sanction imposed, the UHB's decision, and the university vice president's decision.  (*Id.*)  The spreadsheets did not, however, provide a narrative description of the underlying conduct that gave rise to the charge.  (*Id.*)

  One of Doe's experts, Dr. Kaufman, performed four statistical analyses of the information contained in these spreadsheets to determine whether there were "statistical disparities in the treatment of males."  (Doc. 159-1 at 5.)  First, Dr. Kaufman analyzed the overall rate at which ASU students were found "guilty" in a proceeding involving an alleged violation of section F-23 and/or section F-15.  He determined that male respondents were found "guilty" in 66% of such cases (3,927 out of 5,960) while female respondents were found "guilty" in 62% of such cases (1,650 out of 2,661).  (*Id.* at 10-11.)  (*Id.*)  Dr. Kaufman also asserted, without providing any calculations or data, that "[t]his gender disparity remains significant when performing a peer-group analysis of F-15 and F-23 charges separately."  (*Id.*)  Second, Dr. Kaufman focused on the subset of cases in which an ASU student was found "guilty" of a section F-23 violation and a "significant" sanction (*i.e.,* "expulsions and degree revocations") was imposed.  (*Id.* at 11-12.)  He determined that male respondents received a significant sanction in 50% of such cases (81 out of 163) while female respondents received a significant sanction in 0% of such cases (0 out of 10).  (*Id.*)  Third, Dr. Kaufman focused on the subset of cases in which an ASU student was charged only with a section F-15 violation and some form of sanction, beyond a warning, was imposed.  (*Id.* at 12-13.)  He determined that male respondents received a sanction beyond a warning in 63% of such cases (747 out of 1,191) while female respondents

received a sanction beyond a warning in 58% of such cases (421 out of 722).  (*Id.*)  Fourth, Dr. Kaufman returned to the subset of cases in which an ASU student was found "guilty" of a section F-23 violation and a "significant" sanction was imposed.  (*Id.* at 13-14.)  He determined that a significant sanction was imposed in 0% of such cases in which the complainant was male (0 out of 11) while a significant sanction was imposed in 29% of such cases in which the complainant was female (28 out of 98).  (*Id.*)  According to Dr. Kaufman, all four variations are statistically significant.  (*Id.* at 10-14.)

In its motion for summary judgment, ABOR argues that, to the extent Doe is offering Dr. Kaufman's statistical analyses to show "that Doe was treated more harshly than similarly situated females," this attempt fails because Dr. Kaufman did "not account for the wide variation of behavior that can be charged as an F(23) violation."  (Doc. 155 at 16-17.)  ABOR contends that because section F-23 encompasses "a variety of actions ranging from '[s]exual violence' and forced 'physical sexual acts' to sexual harassment and other unwanted and non-consensual conduct including non-contact offenses such as indecent exposure, voyeurism, or non-consensual photographing," it was incumbent upon Dr. Kaufman to consider "the *type* of misconduct that resulted in the disciplinary sanctions."  (*Id.*)  ABOR also notes that it provided information "detailing the type of conduct that resulted in sexual misconduct charges" to Doe during the discovery process, but Doe "elected not to provide this information to his expert."  (*Id.* at 17 n.9.)  ABOR concludes that, because Dr. Kaufman failed to incorporate this information into his analysis, his opinions are "irrelevant" and do not "evidence or support even an inference of gender bias."  (*Id.* at 17.)

ABOR elaborates on some of these points in its *Daubert* motion related to Dr. Kaufman.  (Doc. 159.)  There, ABOR contends that Dr. Kaufman's analysis is flawed because he "erroneously and impermissibly assumes that all F(23) sexual misconduct violations are comparable" and that "[i]n view of the wide range of actions that fall within the definition of 'sexual misconduct,' a valid (reliable) comparison of sanctions given to male and female students found responsible for violating F-23 of the Code cannot be made

without specific information as to the type of conduct at issue in each instance." (*Id.* at 6.) As an example, ABOR notes that two of the cases in which female respondents were found responsible for section F-23 violations but received only "mild" sanctions involved conduct (walking naked in public, sending unwanted sexual communications to a faculty mentor) that is not terribly serious but still qualifies as sexual misconduct under section F-23, whereas two of the cases in which male respondents were found responsible for section F-23 violations and received "severe" sanctions involved much more serious iterations of sexual misconduct under section F-23 (holding down the victim while "vaginally sexually assault[ing] her," having sexual intercourse with a passed-out female victim who was covered in blood and vomit). (*Id.* at 8-9.) ABOR contends that, "as the allegations in the examples cited above illustrate, cases involving female respondents are not necessarily (and in this case not remotely) comparable to cases involving male respondents," and "Dr. Kaufman's failure to consider the specific conduct at issue renders his sweeping assertions useless." (*Id.*)

In response to the summary judgment motion, Doe argues that Dr. Kaufman "found four statistical anomalies that raise a fair inference of anti-male bias." (Doc. 189 at 17.) Doe asserts that because these anomalies cannot be explained by nondiscriminatory possibilities, "a jury can infer sex bias based on evidence of a statistical disparity in the treatment of men and women by the University." (*Id.*) Additionally, in response to ABOR's *Daubert* motion, Doe identifies various reasons why Dr. Kaufman's statistical analysis remains relevant despite his failure to consider the individual factual circumstances of each case involving an alleged violation of section F-23, including that (1) "ABOR does not and cannot provide any support for its allegation that the various conduct constituting 'sexual misconduct' under its own Code is somehow 'less' serious than other harms"; (2) ABOR does not "endeavor to articulate which forms of conduct are allegedly less serious in the eyes of the University or that the 'seriousness' of the crimes is not evenly distributed by gender"; and (3) any "similarly situated" threshold has been satisfied here because all of the cases that Dr. Kaufman considered involved violations of

1    section F-23, "the same sexual misconduct violation under the Code," and any argument

2    related to dissimilarity based on factual circumstances is an issue "for cross-examination,

3    not exclusion."  (Doc. 188 at 8-9.)

4        In its summary judgment reply, ABOR argues that Doe's response "does not mask

5    the fact that Dr. Kaufman did not address other possible reasons for the alleged anomalies,

6    even confessing in his report that they could be caused by 'non-gender factors' . . . .

7    [S]tatistics are useful only when they show disparate treatment for 'substantially similar

8    charges' [and] Kaufman, however, admitted that he did not consider the underlying

9    conduct in analyzing the outcomes of disciplinary proceedings."  (Doc. 201 at 11.)  And in

10   its *Daubert* reply, ABOR elaborates that by "treating *all* alleged F-23 violations as

11   equivalent, Dr. Kaufman ensured that his opinions would not be relevant to this matter.

12   His conclusion that females are disciplined at a slightly lower rate for F-23 violations *in*

13   *general*, even if accurate, simply ignores the relevant question for a discrimination claim,

14   which is whether *similarly situated* female students received different treatment than Doe."

15   (Doc. 196 at 4.)

16       Although it presents a close call, the Court agrees with Doe that Dr. Kaufman's

17   statistical evidence is relevant and creates a genuine issue of material fact about whether

18   ASU's Title IX disciplinary process was infected by gender bias.  The Ninth Circuit has

19   repeatedly held that statistics suggesting that a university's Title IX disciplinary process is

20   biased against male respondents can support an inference of gender bias in an individual

21   Title IX case.  *Schwake,* 967 F.3d at 949 (plaintiff's "allegations of a pattern of gender-

22   based decisionmaking against male respondents in sexual misconduct disciplinary

23   proceedings" were "relevant" and bolstered plausibility of Title IX claim); *Doe,* 23 F.4th

24   at 938 ("Doe alleges that the respondents in Title IX complaints that UCLA decided to

25   pursue from July 2016 to June 2018 were overwhelmingly male (citing specific statistics

26   for each of those years) . . . .  Doe also alleges that the University 'has never suspended a

27   female for two years based upon these same circumstances' . . . .  As we noted in *Schwake*,

28   these are precisely the type of non-conclusory, relevant factual allegations that the district

court may not freely ignore."). ABOR does not dispute that statistics may, in general, be used to support a Title IX claim but argues that *Dr. Kaufman's* statistics are too flawed to qualify as relevant, admissible statistical evidence.

The starting point when evaluating ABOR's challenge is the Ninth Circuit's decision in *Austin*. There, the plaintiffs sought to support their Title IX claim with evidence that "the University disciplines male students for sexual misconduct but never female students." 925 F.3d at 1138. However, the plaintiffs did "not claim that any female University students have been accused of comparable misconduct, and thus fail[ed] to allege that similarly situated students—those accused of sexual misconduct—are disciplined unequally." *Id.* Given this "lack of parallelism," the Ninth Circuit held that the plaintiffs had not established "that the male students were treated any differently than similarly situated students based on sex." *Id.*

Here, Doe has attempted to do what the plaintiffs in *Austin* failed to do— demonstrate that female students "accused of sexual misconduct" are disciplined less harshly than male students "accused of sexual misconduct." And on its face, Dr. Kaufman's statistical analysis suggests that a gender-based disparity exists in this area. Among other things, Dr. Kaufman found that zero out of the 10 female ASU students found to have committed a "sexual misconduct" violation under section F-23 between 2012 and 2017 (that is, 0%) received a severe sanction of suspension or expulsion but 81 of the 163 male ASU students found to have committed such a violation (that is, 50%) received a severe sanction.

ABOR's response is that Dr. Kaufman's analysis is incomplete and misleading because he did not analyze the *facts* of the underlying cases to determine whether the instances of "sexual misconduct" that gave rise to the violations were similar to each other—and, without such a factual comparison, Dr. Kaufman's statistics cannot be proof that similarly situated students were treated differently based on their gender. ABOR also asserted, during oral argument, that footnote six of *Austin* shows that the Ninth Circuit requires this sort of factual comparison.

On the one hand, ABOR's argument has intuitive appeal.  Under section F-23, the term "sexual misconduct" is defined as follows:

> a. Sexual violence and other non-consensual sexual contact—actual or attempted physical sexual acts perpetrated against a person by force or without consent; or b. Sexual harassment—unwelcome conduct of a sexual nature that is sufficiently severe or pervasive as to create an intimidating, hostile, or offensive environment; or c. Other unwanted or non-consensual sexual conduct including but not limited to indecent exposure, sexual exploitation or voyeurism, or non-consensual photographing or audio-recording or video-recording or another in a state of full or partial undress or while engaged in sexual activity, or publishing or disseminating such materials.

(Doc. 189-2 at 16-17.)  As ABOR correctly notes, this definition is quite broad and encompasses a wide range of conduct, from forcible sexual violence to indecent exposure. It is understandable why an ASU administrator might, for reasons unrelated to gender bias, impose a severe punishment against a male ASU student found responsible for the former but impose a less-severe punishment against a female ASU student found responsible for the latter.

On the other hand, the Court does not lightly disregard the passage in *Austin* that female students "accused of sexual misconduct" would qualify as "similarly situated students" who had "been accused of comparable misconduct" in a case involving a Title IX claim brought by a male student.  925 F.3d at 1138.  Those are the precise circumstances here.  Although *Austin* admittedly does not explain how the University of Oregon defined the term "sexual misconduct" under its disciplinary code,[17] and thus it is possible the

---

[17]     In *Austin*, the Ninth Circuit stated that the University of Oregon Student Conduct Code "defined 'sexual misconduct' to include penetration without explicit consent" but noted that the Code's definition encompassed "[o]ther types of sexual activity . . . not at issue here."  925 F.3d at 1135.  The court also provided a hyperlink to Oregon's Code. *Id.* A review of the materials on the hyperlinked website suggests that the current version of Oregon's Code, like ASU's, includes an expansive definition of "sexual misconduct" that is not limited to nonconsensual/forced sex but also encompasses non-physical offenses such as, for example, "verbal . . . conduct of a sexual nature that is unwelcome and sufficiently severe or pervasive that interferes with work or access to educational benefits and opportunities because it has created an intimidating, hostile, or degrading environment."     *See* University of Oregon Policy III.01.01, *available at* https://investigations.uoregon.edu/sites/investigations1.uoregon.edu/files/iii.01.01_student_conduct_code_-_10_dec_2018_-_4_march_2019.pdf

definition there was narrower than ASU's definition, *Austin* still supports the conclusion that Dr. Kaufman's statistics qualify, at a minimum, as relevant evidence that a reasonable juror could construe as supporting Doe's Title IX claim.  Nor does footnote six in *Austin* suggest that a more searching factual inquiry is required before this sort of statistical comparison becomes relevant.  In footnote six, the Ninth Circuit simply noted that "the only incident cited in the complaint involving an 'accused' female student—threatening another student with a knife—did not constitute sexual misconduct." *Id.* at 1138 n.6.  Here, ABOR does not argue that any of the female-comparator cases on which Dr. Kaufman relief involved conduct that fell *outside* section F-23's definition of "sexual misconduct."

The tentative ruling also suggested that *University of Denver* supports the conclusion that Dr. Kaufman's statistics are relevant.  For the reasons explained by ABOR's counsel during oral argument, the Court is now persuaded that *University of Denver* is distinguishable because the statistics in that case were proffered for a different purpose.

Nevertheless, the Court stands by the conclusion in the tentative ruling that at least one component of Dr. Kaufman's statistical evidence—the evidence showing that male respondents found to have committed a "sexual misconduct" violation under section F-23 received a severe sanction in 50% of cases but female respondents received a severe sanction in 0% of such cases—is relevant and admissible and raises an inference of gender bias.  *Cf. Doe*, 23 F.4th at 938 (characterizing the plaintiff's allegation that UCLA "has never suspended a female for two years based upon these same circumstances" as one of several "facts which demonstrate an internal pattern of gender-based decisionmaking against male respondents").  To the extent ABOR argues this statistic is misleading because it involves a comparison of episodes of "sexual misconduct" that may be factually dissimilar, and thus does not involve a comparison of similarly situated male and female students, this is an argument as to the weight of the evidence that ABOR can pursue at trial through cross-examination. *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and

attention to the burden of proof, not exclusion.").  *Cf. Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1113-16 (9th Cir. 2011) (explaining, in the context of an employment-discrimination claim where the plaintiff sought to establish "a triable issue of pretext through comparative evidence that the employer treated younger but otherwise similarly situated employees more favorably than the plaintiff," that the similarly-situated requirement "is not an unyielding, inflexible requirement . . . because one can always find distinctions in . . . the nature of the alleged transgressions" and that whether the violations were of "comparable seriousness" was a question of fact) (citations omitted).

Although it arises from outside the Title IX context, the Court views *Currier v. United Technologies Corp.*, 393 F.3d 246 (1st Cir. 2004), as a decision supporting this conclusion.  There, a 61-year-old worker who had been terminated during a reduction-in-force ("RIF") brought an age discrimination claim.  *Id.* at 248.  In support of this claim, the plaintiff "presented the testimony of an expert statistician, Dr. Sat Gupta, who concluded that the RIF disproportionately affected older employees.  Gupta reported that the average age of the five employees who were laid off was 53, while the average age of those retained was 45."  *Id.* at 250.  The defense moved to exclude this statistical evidence on various grounds, including that "Gupta's analysis failed to consider whether any factors other than age and grade—such as the company's need for particular skill sets, salaries or longevity—accounted for the differing treatment among employees" and that "because Gupta's statistics were not drawn from the experience of 'similarly situated' employees, his conclusions lacked any probative value and were thus both irrelevant and highly prejudicial."  *Id.* at 250.  The defense also identified evidence "that one of the other employees laid off, who also was 61 years old at the time, had a history of performance issues," which "challenged the validity of Gupta's statistical conclusion of age bias."  *Id* at 252.  The district court overruled the defense's relevance objections and the First Circuit affirmed, explaining that "[w]e see no abuse of discretion in the district court's decision to view this weakness in Gupta's analysis as a matter of weight rather than admissibility and thus properly a subject of argument and jury judgment."  *Id.*  The court elaborated: "Here,

the information on which the statistical analysis was based was presented, and there is no claim that the statistics were an inaccurate representation of what the expert analyzed. Accuracy, of course, is not the whole story.  As we have noted, various factors blunted the significance of Gupta's conclusions and, indeed, we think his analysis skittered near the line of inadmissibility.  The jury was not, however, uninformed.  Challenges to the probative value of Gupta's analysis were amply brought to the jury's attention.  In these circumstances, we find no abuse of discretion, and thus no reversible error, in the district court's decision to admit Gupta's statistics and allow the jury to assess their significance." *Id.* at 253.

Here, too, a reasonable juror could conclude from the starkly different outcomes in cases involving proven instances of "sexual misconduct" in violation of section F-23— where 50% of the male respondents receive a severe sanction but 0% of the female respondents receive a severe sanction—that the process is infected by gender bias.  There may, of course, be bias-free explanations for these outcomes.  Perhaps all of the cases involving female respondents involved mild forms of sexual misconduct while the cases involving the imposition of severe sanctions against male respondents involved more serious forms of sexual misconduct.  Nevertheless, there is no evidence that the distribution of violations is *actually* skewed along gender lines in this manner—ABOR simply identifies two cases involving relatively mild violations by female respondents and two cases involving relatively serious violations by male respondents and speculates that the remaining cases may follow the same pattern.  Additionally, this is not a situation where Dr. Kaufman made up his own definition of "sexual misconduct" in an attempt to create some sort of cherry-picked statistic.  The Court finds it persuasive that section F-23's definition of "sexual misconduct" is a definition both created and used by ASU, which suggests that ASU has already decided it unifies a population of similarly situated respondents in some material respect.  Under these circumstances, Dr. Kaufman's failure to delve into the factual circumstances of each case involving an adjudicated "sexual misconduct" violation under section F-23 is not a flaw that renders his statistical analysis

1    irrelevant and inadmissible.  Instead, it is an omission that goes to the weight of the

2    evidence and can be explored through cross-examination.  Given this determination, it is

3    unnecessary at this juncture to resolve ABOR's objections to other aspects of Dr.

4    Kaufman's statistical analysis, which will be addressed in due course during the *Daubert*

5    process.

6        C.    **Conclusion**

7        Doe's proffered evidence could lead a reasonable juror not only to conclude that his

8    disciplinary proceeding was marred by an array of procedural irregularities, but also that

9    ASU's disciplinary process generates statistical anomalies that raise an inference of gender

10   bias.  Given this backdrop, it is unnecessary to decide whether, as Doe argues (Doc. 189 at

11   3), the existence of "perplexing" procedural irregularities is alone enough to survive

12   summary judgment in a Title IX case.  As the Tenth Circuit concluded in *University of*

13   *Denver*, "[w]hile a one-sided investigation, standing alone, might only raise a reasonable

14   inference of anti-complainant bias, where there is a one-sided investigation *plus* some

15   evidence that sex may have played a role in a school's disciplinary decision, it should be

16   up to a jury to determine whether the school's bias was based on a protected trait or merely

17   a non-protected trait that breaks down across gender lines."  1 F.4th at 836.  Such is the

18   case here.

19       Accordingly,

20       **IT IS ORDERED** that ABOR's motion for summary judgment (Doc. 155) is

21   **denied**.

22       Dated this 30th day of August, 2022.

23

24

25       _____

26       Dominic W. Lanza
         United States District Judge

27

28