1
2
3
4
5
6                    **IN THE UNITED STATES DISTRICT COURT**
7                        **FOR THE DISTRICT OF ARIZONA**
8
9    Unknown Party,                          No. CV-18-01623-PHX-DWL
10               Plaintiff,                   **ORDER**
11   v.
12   Arizona Board of Regents, et al.,
13               Defendants.
14
15          In advance of the motion hearing on September 7, 2022, the Court wishes to provide
16   the parties with its tentative ruling.  This is, to be clear, only a tentative ruling.  The point
17   of providing it beforehand is to allow the parties to focus their argument on the issues that
18   seem salient to the Court and to maximize their ability to address any perceived errors in
19   the Court's logic.  This is not an invitation to submit additional briefing.
20          Dated this 30th day of August, 2022.
21
22
23                                          _____
24                                              Dominic W. Lanza
                                            United States District Judge
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14                              <u>TENTATIVE RULING</u>
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Pending before the Court are Defendant Arizona Board of Regents' ("ABOR") motions to exclude the opinions and testimony of Curtis Owen (Doc. 158), Dr. Lance Kaufman (Doc. 159), and Cindi Nannetti (Doc. 161) and Plaintiff John Doe's motions to exclude certain opinions and testimony of Peter F. Lake (Doc. 164) and Jason Borrelli and Dwight Duncan (Doc. 165).  Each motion is addressed below.

## ANALYSIS

I.   <u>Legal Standard</u>

"The party offering expert testimony has the burden of establishing its admissibility." *Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012).  Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony.  It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

As for the threshold requirement that an expert witness be qualified "by knowledge, skill, experience, training, or education," "Rule 702 contemplates a broad conception of expert qualifications." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (internal quotation marks and emphasis omitted).  Years of relevant experience can establish the necessary "minimal foundation." *Id.* at 1015-16.  "Disputes as to the strength of [an expert's] credentials . . . go to the weight, not the admissibility, of his testimony." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998) (first alteration in original) (internal quotation marks omitted).

A district court's decision to admit or exclude expert testimony is guided by a two-

part test that focuses on the opinion's relevance and reliability. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). "The inquiry envisioned by Rule 702 is . . . a flexible one." *Id.* at 594. "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Id.* at 587 (quoting Fed. R. Evid. 401). "The Rule's basic standard of relevance thus is a liberal one." *Id.*

The basic standard of reliability is similarly broad. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). *See also* Fed. R. Evid. 702, advisory committee's note to 2000 amendment ("[P]roponents do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable. . . . The evidentiary requirement of reliability is lower than the merits standard of correctness.") (alteration in original) (internal quotation marks omitted).

Nevertheless, courts serve an important "gatekeeper" role when it comes to screening expert testimony. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997). "Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592 (citation omitted). "Presumably, this relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.* This "general 'gatekeeping' obligation . . . applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd.*

*v. Carmichael*, 526 U.S. 137, 141 (1999).

The Court has "broad discretion," both in deciding whether the evidence is reliable and in deciding how to test for reliability. *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). In *Daubert*, the Supreme Court listed various factors that might apply, including whether the expert's technique or theory (1) can be tested; (2) has been peer reviewed or published; (3) has a known or potential basis for error; and (4) is generally accepted in the pertinent scientific community. 509 U.S. at 593-94. However, "[t]he *Daubert* factors were not intended to be exhaustive nor to apply in every case." *Hankey*, 203 F.3d at 1168. In particular, "[t]he *Daubert* factors . . . simply are not applicable to [testimony] whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *Id.* at 1169. *See also* Fed. R. Evid. 702, advisory committee's note to 2000 amendment ("Some types of expert testimony will be more objectively verifiable, and subject to the expectations of falsifiability, peer review, and publication, than others. Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise."). The bottom line is that "[t]he trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." *See* Fed. R. Evid. 702, advisory committee's note to 2000 amendment.

Finally, "expert testimony is inadmissible if it concerns factual issues within the knowledge and experience of ordinary lay people because it would not assist the trier of fact in analyzing the evidence." *Liberty Life Ins. Co. v. Myers*, 2013 WL 524587, *5 (D. Ariz. 2013). *See also Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 2020 WL 2553181, *6 (S.D. Cal. 2020) ("Expert testimony is inadmissible if it addresses lay matters which a jury is capable of understanding and deciding without the expert's help.") (internal quotation marks omitted); *In re Apollo Grp. Inc. Sec. Litig.*, 527 F. Supp. 2d 957, 961-62

(D. Ariz. 2007) ("[E]xpert testimony is inadmissible if it concerns factual issues within the knowledge and experience of ordinary lay people, because it would not assist the trier of fact in analyzing the evidence.").  In the Ninth Circuit, "[t]he general test regarding the admissibility of expert testimony is whether the jury can receive 'appreciable help' from such testimony." *United States v. Gwaltney*, 790 F.2d 1378, 1381 (9th Cir. 1986).

II.    Discussion

    A.    **Curtis Owen**

        1.    The Owen Report

Curtis Owen is a wrestling coach at Chandler High School.  (Doc. 158-1 at 2.)  He has extensive coaching and wrestling experience and was a three-time NCAA qualifier, Pac-10 champion, top 20 amateur wrestler at his weight class, and All-American at Arizona State University, among other accolades.  (*Id.*)  Owen "come[s] from a family of successful wrestlers [and] worked closely with [his family] throughout [his] career." (*Id.*)

Doe asked Owen to testify on the following topics: (1) the qualifications needed to become a high school, college, and Olympic-level wrestling coach; (2) the impact on Doe's wrestling career of missing his final two years of NCAA eligibility; (3) the training opportunities, if any, that are lost by being unable to train at the Regional Training Center ("RTC") at ASU; (4) the alternatives to training at the RTC; (5) the impact of injuries on a wrestling career, including the injuries suffered by Doe; and (6) Doe's skill as a wrestler. (*Id.*)

Owen's opinions are as follows.  First, the more "high level" a coaching position is, the more elite a candidate's wrestling credentials must be—even "national-level high school programs are almost always staffed by former nationally competitive college wrestlers."  (*Id.* at 3.)  Second, "a college wrestler who misses the final two years of collegiate eligibility at his chosen school would have his opportunities diminished because most athletes are at their peak physically, mentally, and experientially when they are further into their careers."  (*Id.*)  Third, "not being able to train at the [RTC] in Arizona, would make it almost impossible to train properly in Arizona."  (*Id.* at 4.)   Fourth, "the RTC is

the only option outside of the Olympic Training Center in Colorado."  (*Id.*)  Fifth, "even though [Doe] suffered some injuries, based on my experience as a wrestler and coach, they were not something that would keep an athlete from reaching his potential."  (*Id.*)  Sixth, "Doe had the skill and athleticism to be one of the best wrestlers in the country at the college level and beyond."  (*Id.*)

Owen is not being paid for his work on this case, has authored no publications in the past ten years, has never testified as an expert witness, and did not review documents to prepare his report.  (*Id.* at 2.)

### 2.  Analysis

ABOR seeks to exclude Owen from offering any opinions at trial.  (Doc. 158.)  In general, ABOR raises objections based on Owen's qualifications, the reliability of Owen's opinions, and the relevance of Owen's opinions.  ABOR's more specific objections, and Doe's responses, are addressed on an opinion-by-opinion basis below.

### a.  **Coaching Qualifications**

ABOR asserts that, because Owen has always coached at the high school level or below, he is not qualified to opine on the qualifications needed to become a collegiate, national, or international wrestling coach.  (Doc. 158 at 4-5.)  ABOR also argues that Owen's opinions about coaching qualifications are "supported only by anecdotal information" and "[r]eliance on anecdotal observations or unfounded subjective beliefs does not satisfy Rule 702 or *Daubert I*."  (*Id.* at 9.)  Finally, ABOR asserts that Owen's opinions about the qualifications needed to coach high school and national or international wrestling are irrelevant because Doe's qualifications to coach high school are not in dispute and Doe's deposition testimony establishes that he only sought to be a Division I coach, not a national or international coach.  (*Id.* at 12.)

Doe responds that "Owen has substantial experience in wrestling, both as a former collegiate athlete and as a coach of a high-performing team. . . .  During Owen's own coaching tenure, he worked with numerous coaches, and was involved in all aspects of hiring and grooming coaches for future positions, including several coaches who are now

coaching at elite programs. . . .  He does not have to be an NCAA coach to speak to the requirements of becoming an NCAA coach when the parameters are well established within the sport." (Doc. 190 at 4-5.)  As for reliability, Doe argues that Owen's experiences and education give him the capacity to "carefully consider all relevant information and evaluate Doe through a prism of curated wrestling knowledge.  Using this methodology, Owen can reliably opine on Doe's . . . coaching prospects [] and related opportunity costs as a result of ABOR's actions."  (*Id.* at 6.)  As for relevance, Doe argues that any uncontested information will "provide background information to help inform opinions that are contested," and "[t]o the extent ABOR deems the opinions are unnecessary, the remedy is to challenge them not exclude them." (*Id.* at 7.)

ABOR replies that Owen's "upbringing" and relationships do not qualify him to opine on collegiate hiring.  (Doc. 194 at 3.)  ABOR further contends that "if his expertise is grounded solely in his personal experience," Owen does not "explain how his wrestling experience and high-school coaching generally provide a sufficient basis for his opinions on other discrete subjects."  (*Id.*)  Finally, ABOR asserts that the challenged opinions are irrelevant because Doe is not seeking damages that rely on national/international wrestling coach wages and because Doe is already working as a high school coach (so his qualifications for that position are not in dispute).  (*Id.* at 9-10.)

Whether Owen is qualified to opine on hiring criteria for NCAA coaches presents a fairly close call.  On the one hand, Owen has extensive experience as a decorated collegiate wrestler and high-school wrestling coach.  Even though he has never coached above the high school level, he has helped others rise to careers as Division I coaches and discussed the qualifications that benefitted them as they interviewed.  Owen also grew up in a family of college wrestling coaches and has discussed professional qualifications with them at length.  On the other hand, Owen has never hired collegiate coaches himself, so any understanding of what recruiters are seeking is necessarily second-hand.  More important, Owen is imprecise about the scope of his opinion—he might be viewed as (1) opining on "requirements" with "well established parameters" that conclusively prevented Doe from

seeking work as a collegiate wrestling coach, or (2) opining that such positions "almost always" go to candidates with substantial accolades and, based on Owen's experience, Doe accordingly would not have been hired for those roles.

The Ninth Circuit has emphasized that Rule 702 "is broadly phrased and intended to embrace more than a narrow definition of qualified expert." *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994). The proponent of expert testimony need only lay a "minimal foundation" of "knowledge, skill, experience, training, or education" in the topic at hand. *Id.* Although an expert may not offer opinions on matters "outside the areas of [the expert's] expertise," *Avila v. Willits Env't Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011), an expert's "lack of particularized expertise goes to the weight accorded [his or] her testimony, not to the admissibility of [his or] her opinion as an expert." *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993). With that said, "lack of specialization may go to weight only as long as an expert stays within the reasonable confines of his subject area." *Avila*, 633 F.3d at 839.

Applying these principles, Owen is qualified to offer opinions about a collegiate wrestling coach's typical qualifications despite his lack of personal experience at the collegiate level. It is not difficult to believe that a coach who has been enmeshed in the wrestling world for 20 years, especially one surrounded by a family of collegiate wrestling coaches, would have a refined understanding of the implicit qualifications to be a wrestling coach at the collegiate level. *Cf. Hangarter*, 373 F.3d at 1015-16 (no error in district court's determination that an expert who had "significant knowledge of and experience within" the insurance industry was qualified to opine about the practices and norms of insurance companies in an area in which he lacked specialized knowledge). Owen makes clear throughout his report that conversations and anecdotal experiences amassed during his 20 years of coaching support his conclusions and identifies examples of coaching careers that have informed his opinion. (Doc. 158-1 at 6-7.)

The qualifications cases on which ABOR relies are distinguishable. They involved putative experts who sought to opine on complex subjects outside their core expertise.

Here, in contrast, Owen is not inappropriately seizing the mantle of a college coach's expertise and stepping outside his own sphere to wield it—Owen asserts that he has developed his *own* expertise in how college-coach recruiting works through conversations and experiences.  Thus, comparisons to a police officer who wished to opine on forensic ballistics without training or experience on the issue (*Krause v. Cnty. of Mohave*, 459 F. Supp. 3d 1258 , 1265-67 (D. Ariz. 2020); or an accident reconstruction expert who wished to opine on vehicle electronic systems despite admitting to no experience in the field (*Manion v. Ameri-Can Freight Sys. Inc.*, 2019 WL 3858415 (D. Ariz. 2019)); or investors who wished to opine on a precise fiduciary standard of care without relevant training or experience (*In re GFI Com. Mortg. LLP*, 2013 WL 4647330, *6 (N.D. Cal. 2013)) fail because they assume Owen does not have relevant experience.  He does.

Tangential to the qualifications inquiry is the relevance of Owen's opinions about the necessary qualifications for high school and national/international/Olympic coaches. Doe has the burden to explain why Owen's opinions are relevant, *Bldg. Indus. Ass'n of Wash.*, 683 F.3d at 1154, but it is somewhat hard to make sense of Doe's response on this point.  It seems to boil down to two arguments: (1) the opinions will emphasize that ABOR's actions interfered with Doe's current and future job prospects; and (2) the opinions will help the jury understand the dynamics of a wrestling career at a high level and career prospects for a Division I wrestler.  (Doc. 190 at 7.)

The Court agrees with ABOR that Owen's opinions about high school coaching qualifications are irrelevant.  It is difficult to see how Owen's opinions about the qualifications for a job that Doe *already* holds will help the jury understand that ABOR's actions denied Doe the opportunity to work in his chosen field and unduly interfered with his current and future job prospects.

The Court also agrees with ABOR that Owen's opinions about national/international/Olympic coaching qualifications are irrelevant.  Doe does not explain why the jury would benefit from hearing about the qualifications for a job that Doe himself does not seek to perform.  Nothing prevents Owen from mentioning that those jobs

*exist* to help the jury understand the industry overall, but opining about the qualifications required to obtain such jobs and implying that ABOR's interference prevented Doe from reaching those undisputedly unsought heights could only serve to confuse or inappropriately inflame the passions of the jury.

### b.     **Impact Of Non-Eligibility On Doe's Wrestling Career**

Owen's opinion is that college wrestlers are at their most productive during their final two years of college, which made ABOR's interference with Doe's wrestling career especially damaging because it "cost him many achievements and accolades that would have allowed him to increase his marketability (sponsorships and employment) and earning power down the road, should he choose to make his living as an athlete and then as a coach at the collegiate and/or National level."  (Doc. 158-1 at 3-4.)

This opinion is really a synthesis of two opinions: (1) college wrestlers are at their prime in the final two years of NCAA eligibility; and (2) Doe was a skilled wrestler who would have received many accolades in those two years.  ABOR apparently does not seek to exclude Owen's opinion about the usual trajectory of college wrestlers, which is reasonable given that Owen was, himself, a college wrestler and is presumably qualified to opine on that issue.

Owen's other point, which is that Doe would have achieved extraordinary success during his final two years, smuggles in Owen's sixth noticed opinion, which is that Doe had a great deal of wrestling skill.  But as discussed below, Owen's opinion of Doe's skill is inadmissible.  And armed with Owen's uncontested opinion that wrestlers mature in their final two years and the *assumption* that Doe was a talented wrestler, a juror could independently conclude that the impact of NCAA non-eligibility was particularly significant.  Because Owen's second opinion does not provide "appreciable help" to the jurors, it is inadmissible.  *Gwaltney*, 790 F.2d at 1381.

### c.     **The RTC And Other Training Options**

As far as the Court can tell, ABOR doesn't seek to exclude Owen's third and fourth opinions, which are that being unable to train at the RTC in Arizona would make it difficult

1    to train properly and that the only option for Doe other than the RTC was the Olympic

2    Training Center in Colorado.  (Doc. 158-1 at 4.)

3                    d.    **Impact Of Injuries**

4        ABOR asserts that Owen is not qualified to offer opinions about the impact of Doe's

5    injuries on his wrestling career.  (Doc. 158 at 5.)  Although Doe references Owen's opinion

6    in his response brief (Doc. 190 at 3) and argues that all of Owen's opinions are reliable (*id.*

7    at 6), he does not respond to ABOR's point that Owen is unqualified to deliver this

8    particular opinion.

9        Because Doe has the burden of explaining why Owen is qualified to deliver an

10   expert opinion, *Bldg. Indus. Ass'n of Wash.*, 683 F.3d at 1154, the Court finds that Doe has

11   forfeited the issue and that Owen may not opine on whether Doe's injuries impacted his

12   wrestling career.  But even if Doe hadn't forfeited the issue, the Court is skeptical that

13   Owen would be qualified to offer a medical prognosis on Doe's injuries, especially given

14   how vaguely he describes them in his report.  *See, e.g.*, *Krause*, 459 F. Supp. 3d at 1266

15   (noting that the expert was not a trained medical professional and "obviously" could not

16   testify about the severity of the plaintiff's injuries).

17                   f.    **Doe's Wrestling Skill**

18       ABOR argues that Owen is "not qualified to opine under the mantle of an

19   expert . . . that Doe had the skill and athleticism to be one of the best wrestlers in the

20   country at the college level and beyond" because "Owen's experience as an assistant high

21   school wrestling coach, even when accompanied by his personal experience as a collegiate

22   wrestler from 1997 to 2003, do not standing alone qualify Mr. Owen to opine on Doe's

23   potential collegiate and post-collegiate accolades, including whether Doe would have

24   achieved 'All-American' status.  Mr. Owen offers no data, besides his own unexplained

25   subjective beliefs, to support his opinion."  (Doc. 158 at 6-7.)  ABOR also asserts that

26   Owen's opinion is unreliable because he does not "consider data relating to, *inter alia*, the

27   weight class at which Doe would have competed, the other ASU wrestlers in that weight

28   class during the relevant years, the wrestlers in that weight class at other Division I schools

during the relevant years and their skill level, Doe's past wrestling performance (including his failure to achieve All-American status in the prior three years), or Doe's record competing against the specific wrestlers against whom he would have been matched during the relevant years.  (*Id.* at 8.)

Doe responds that Owen is qualified to opine on this topic because of his background as a wrestler and coach.  (Doc. 190 at 4-5.)  Doe also argues that Owen was not obligated to review records because Owen has an "established personal relationship with Doe and coaches and [trains] with Doe at Chandler High School.  Owen is intimately familiar with Doe's wrestling experience [and] talent . . . [which] would not otherwise be garnered by a simple review of records."  (*Id.* at 7.)

In reply, ABOR reasserts its earlier contentions that Owen is not qualified to opine on Doe's future potential and that Owen's opinion is unreliable because he did not consider the contrary information available to him before forming the opinion.  (Doc. 194 at 4, 7.)

The Court is conscious that "the relevant factors for determining reliability will vary from expertise to expertise," Fed. R. Evid. 702, advisory committee's note to 2000 amendment, and that evaluating a young athlete's skill level and career trajectory is a uniquely subjective inquiry.  Even so, that an expert exclusively relies on his experience and renders a subjective opinion does not mean that the testimony "should be treated more permissively simply because it is outside the realm of science."  *Id.*

Owen opines that Doe "had the skill and athleticism to be one of the best wrestlers in the country at the college level and beyond" and "would have been an All-American in college if his career was not cut short."  (Doc. 158-1 at 4, 7.)  However, Owen's stated support for these opinions is either conclusory or a bare-bones recitation of Doe's achievements without context that might appreciably assist the jury.

Owen's observations that "as a high school wrestler, [Doe] was one of the top wrestlers in the country" and that Doe "was an exceedingly better freestyle wrestler than collegiate wrestler" (*id.* at 3, 7) lack external support and are "nothing more than a series of *ipse dixits*," which "nothing in either *Daubert* or the Federal Rules of Evidence require

a district court to admit." *Longoria v. Kodiak Concepts LLC*, 2021 WL 1100373, *15 (D. Ariz. 2021).  Owen notes that Doe won several athletic competitions (which the Court will not repeat to protect Doe's identity).  (*Id.* at 4, 7.)  But even if Owen believes those accolades would support his conclusion that Doe was "one of the top wrestlers in the country," Owen makes no effort to explain *why*.  In fact, the Court need not identify the accolades by name because Owen does not meaningfully distinguish between them— Owen does not explain that a particular accolade is especially prestigious or that, for example, all ten of the past winners of a particular trophy have gone on to the Olympic wrestling team.  At most, these awards support the common-sense notion that Doe is probably a *good* wrestler, at least better than his competitors in those matches, but it does not remotely support the opinion that Doe would have become one of the *best* wrestlers in the country.

This combination of conclusory and common-sense testimony does not denote admissible expertise.  To offer something resembling a reliable opinion regarding a young wrestler's future prospects, an expert might be expected to dive into some sort of supporting data to produce an opinion that lay jurors could not reach on their own—perhaps explaining why a wrestler's height was especially advantageous, or parsing his match history to project why new competitors would be unlikely to defeat him, and so on.  But jurors would intuit that a wrestler who has won trophies is a good wrestler, and allowing Owen to testify that Doe was the *best* based on a list of undifferentiated accolades runs the risk of inappropriately allowing Owen to cloak his unfounded opinion with the weight of expert testimony.

This is true even though Owen, himself, was an excellent wrestler in his day.  Imagine a hypothetical case in which a plaintiff wished to establish that, but for injuries caused by the defendant, he would have become a star basketball player in the NBA and earned millions of dollars as a professional athlete.  If that plaintiff wished to call Charles Barkley—an 11-time NBA all-star and former league MVP[1]—as an expert concerning his

---

[1]     Michael Jordan would also work for purposes of this hypothetical, but because this case arises from the District of Arizona, Charles Barkley seems the better choice.

future NBA prospects, there is little doubt that Barkley would be *qualified* to opine on the topic.  Nevertheless, if would not be sufficient, for *reliability* purposes, for Barkley to simply assert that he knows a future NBA player when he sees one.  Instead, like any other expert, Barkley would need to provide a comprehensible rationale for his opinion grounded in reason and logic.  *See* Fed. R. Evid. 702, advisory committee's note to 2000 amendment ("The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded."). That rationale is what is missing here.

Because Owen's opinion that Doe would have been one of the *best* wrestlers in the nation is conclusory and unreliable, and it is common sense to a reasonable juror that a wrestler who receives awards is a *good* wrestler, Owen's opinion regarding Doe's skill level is inadmissible.

### g.   **Summary As To Owen**

For the reasons discussed above, ABOR's request to categorically exclude Owen from testifying is denied, but Owen must limit his opinions to the following topics: (1) the qualifications needed to become a college wrestling coach; (2) the training opportunities, if any, that are lost by being unable to train at the RTC; and (3) the alternatives to training at the RTC.

### B.   **Dr. Lance Kaufman**

#### 1.   The Kaufman Report

Dr. Lance Kaufman possesses a Ph.D. in economics, has been recognized as an "expert in the field of economics," and has "over 15 years of experience performing economic research and modeling."  (Doc. 159-1 at 22.)  Dr. Kaufman has provided expert witness testimony on "forecasting, production cost modeling, and labor costs," and his hourly rates range from $350 to $500 per hour.  (*Id.* at 22.)

Dr. Kaufman's opinions in this case can be divided in two categories: (1) opinions relating to the enforcement of ASU's student code, or "whether ASU's sanctions are gender neutral"; and (2) opinions relating to Doe's alleged economic loss, or "the economic harm

resulting from [ABOR's] unlawful expulsion of Doe." (*Id.* at 5.)

### a.  **Student Code Enforcement Disparity**

ASU provided Dr. Kaufman with information about its history of student code enforcement over alcohol ("F-15") and sexual misconduct ("F-23") violations. (*Id.* at 6.) Dr. Kaufman states that the information was categorized by: (1) incident ID, (2) gender of respondent, (3) incident type, (4) date and time of incident, (5) date of report, (6) "SCC Charge Code," (7) Dean of Students' decision, (8) sanctions, (9) whether the decision was appealed, (10) hearing board's recommendation, and (11) University Vice President's decision. (*Id.* at 6-7.) For F-23 violations, ASU also noted (1) respondent's student athlete status, (2) gender of counter party, (3) charge investigator, (4) date of decision, and (5) date of review of decision. (*Id.* at 7.)

At the outset, Dr. Kaufman noted that the "SCC Charge Data provide several different types of sanctions. These sanctions can be grouped and ranked in order of severity. I rank warnings as the mildest sanction, expulsion and suspension as severe sanctions, and all other sanctions as mild sanctions." (*Id.*) Having developed this convention, Kaufman found that of 161 male F-23 respondents, 3 received no sanction, 79 received a mild sanction, 27 were suspended, and 52 were expelled. (*Id.*) Of 10 female F-23 respondents, 1 received no sanction, 9 received a mild sanction, none received a suspension, and none were expelled. (*Id.*) Dr. Kaufman concluded that "males tend to receive more severe sanctions than females" and described his "statistical analysis of the disparity between male and female Respondents." (*Id.*) As a preface, Dr. Kaufman explained:

> In cases concerning the disparate impact on protected classes, outcomes for the protected class are compared to the rates for other individuals to determine if the difference is statistically significant.

> A disparity is considered statistically significant if it would occur so rarely in a nondiscriminatory situation that we can rule out that it occurred by chance. . . .  [T]he courts typically require a demonstration . . . that the disparity is large enough that it would occur by chance less than 5 percent of the time, or in less than one in 20 non-discriminatory events.

> To assess the evidence of gender bias in sanctions, respondents are classified by two criteria, whether they are a member of the protected class or not, and whether they were severely sanctioned or not. . . .  If the disparity in sanction rates between two groups is not sufficiently large, or if the direction of the disparity varies substantially across subgroups, the disparity will not be statistically significant.

(*Id.* at 8.)

Dr. Kaufman also described the "Chi-Square Analysis," which posits that, if males are a certain proportion of all respondents, a gender-neutral process will lead to a similar proportion of males actually being punished, as compared to the overall pool of students punished.  (*Id.* at 9.)  The chi-square test "gives us a way of determining what proportion is 'high enough' to conclude that sanctions were not gender-neutral."  (*Id.*)  Last, Dr. Kaufman explained the "Mantel Haenszel Peer-Group Analysis," which is a method of peer-group analysis that informs Dr. Kaufman's use of respondent charges to create peer groups with the same combination of charges, controlling for the type and number of violations.  (*Id.* at 9-10.)

Dr. Kaufman performed four analyses.  (*Id.* at 10.)  First, he compared the Dean of Students' decisions for male and female respondents in cases involving F-15 and F-23 charges and determined that males are found in violation more often than females.  (*Id.*)  Second, he compared sanctions for male and female F-23 respondents and found that males receive severe sanctions at a higher rate than females.  (*Id.*)  Third, he compared the severity of sanctions for F-15 only charges between males and females and found that males are given more severe sanctions.  (*Id.* at 10, 12.)  Fourth, he compared sanctions of F-23 incidents involving male complainants with incidents involving female complainants and found that incidents involving male complainants (unlike female complainants) never lead to severe sanctions.  (*Id.* at 10.)

Dr. Kaufman concluded that (1) male respondents are found in violation of F-15 and F-23 charges more often than female respondents, which is statistically significant; (2) male F-23 respondents are sanctioned with expulsion and suspension at a higher rate than female F-23 respondents, which is statistically significant; and (3) F-23 charges involving

male complainants result in expulsion and suspension at lower rates than charges involving female complainants.  (*Id.* at 14.)  However, Dr. Kaufman acknowledged that "[w]here possible my analysis controls for peer-groups by grouping respondents according to charge or combination of charges" but "even within combination of charges there may be non-gender factors that affect the severity of sanctions."  (*Id.*)

b.  **Economic Loss**

Assuming that "Defendants' actions interrupted Doe's education and competitive sports career [which] modified Doe's career trajectory and diminished his lifetime earning capacity," Dr. Kaufman estimated "the economic impact by comparing Doe's economic situation in a hypothetical ('But-for') world absent Defendant's unlawful actions with Doe's current expected economic situation ('Actual').  (*Id.* at 15.)  Dr. Kaufman based his calculations on some of Owen's opinions (*i.e.*, Doe was an elite freestyle wrestler and coaching at an NCAA Division I program requires elite competitive wrestling experience) and on Doe's testimony that he planned to become a college wrestling coach after his competitive career.  (*Id.* at 15-16.)

Based on those assumptions, and accounting for various other sources of income, Dr. Kaufman concluded that Doe's economic loss could range from $631,490 in a scenario in which Doe became a Division II or III coach to $5,543,579 in a scenario in which Doe became a Division I coach.  (*Id.* at 20.)

2.  <u>The Parties' Arguments</u>

a.  **Student Code Enforcement Disparity**

ABOR challenges Dr. Kaufman's statistical analysis on a variety of grounds.  (Doc. 159 at 3.)  First, ABOR asserts that Dr. Kaufman did not consider sanctions imposed on male and female students who engaged in misconduct of "comparable seriousness" and that Dr. Kaufman's defense that ABOR did not produce necessary information is false.  (*Id.* at 5-8.)  Second, ABOR argues that Dr. Kaufman's analysis does not consider that many respondents charged with F-23 violations were also charged with other code violations.  (*Id.* at 9-10.)  Third, ABOR asserts that Dr. Kaufman erred when he concluded that "male

complainants do not result in severe sanctions" and that readily available data provided by ABOR would have made that error clear. (*Id.* at 10.) Finally, ABOR argues that Dr. Kaufman's F-15 analysis is irrelevant because "there is no issue in this lawsuit about whether the sanctions imposed on students facing solely [F-15] violations are harsher for females than they are for males." (*Id.* at 12.)

Doe responds that Dr. Kaufman's data is reliable because ASU provided it and any conclusions that can be drawn from that data are subject to cross-examination, not exclusion. (Doc. 188 at 4-5.) According to Doe, whether respondents are "similarly situated" does not bear on reliability because ABOR "has not produced any evidence that the respondents reflected in the F-23 spreadsheet are not similarly situated." (*Id.* at 6.) Further, Doe argues that whether the respondents are in fact similarly situated is not grounds for exclusion, but a question of fact for the jury. (*Id.* at 8.) Doe argues that Dr. Kaufman's opinions about male complainant cases are reliable because Dr. Kaufman relied on information provided by ABOR, and—perhaps in the alternative—that the information is inconsistent and incomplete. (*Id.* at 10-11.) Doe also argues that Dr. Kaufman's F-23 opinions are relevant because they tend to show that men and women are treated differently in the disciplinary process by ASU. (*Id.* at 12.) Finally, Doe asserts that Dr. Kaufman's opinions about F-15 violations are reliable, for similar reasons as his opinions regarding F-23 violations, and relevant, because a juror can infer the presence of gender bias from the fact that men are sanctioned for alcohol violations at a higher rate than women. (*Id.* at 12-13.)

ABOR replies that Doe was required to identify comparators who engaged in conduct of "comparable seriousness." (Doc. 196 at 1.) ABOR asserts that Dr. Kaufman's data is not admissible purely because ABOR produced it and that Doe's characterization of the spreadsheets is false. (*Id.* at 3-4.) ABOR also argues that Dr. Kaufman cannot use all female respondents as comparators, and that it was Doe's (not ABOR's) burden to identify female respondents accused of conduct of comparable seriousness but treated more favorably than Doe. (*Id.* at 5.) On that note, ABOR reasserts that a jury cannot decide the

1    "comparable seriousness" issue, which is reserved for the Court.  (*Id.* at 6.)  Finally, ABOR

2    argues that Dr. Kaufman's F-15 analysis is irrelevant for the reasons identified in the

3    motion to exclude.  (*Id.* at 7-9.)

4                    b.    **Economic Loss**

5            First, ABOR argues that Dr. Kaufman's assumptions about Doe's career

6    progression are unfounded and unreliable because there is no evidence to support those

7    assumptions in the record.  (Doc. 159 at 12-14.)  Relatedly, ABOR points to Dr. Kaufman's

8    assertions that Doe "was a Division One wrestler on his way to earning the title of All-

9    American at nationals" and that Doe's career plan was "consistent with the career paths of

10   other college wrestling coaches" and argues that Kaufman is not qualified to opine on those

11   issues.  (*Id.* at 13 n. 5.)  Second, ABOR asserts that Dr. Kaufman's assumptions about

12   projected salary data are inaccurate and inapplicable to the facts in this case.  (*Id.* at 15-

13   17.)

14           Doe responds that "there is no requirement that Doe unequivocally prove that he

15   would have achieved any of these positions before an expert can opine on his lost earnings.

16   . . .  The standard for assessing earning capacity is whether the plaintiff had a 'reasonable

17   probability' of achieving that career path. . . .   Dr. Kaufman is permitted to make

18   assumptions about Doe's career path so long as there is a reasonable probability that those

19   paths would have . . . or are likely to occur."  (Doc. 188 at 14-15.)  Doe also argues that

20   Dr. Kaufman's sources for his salary projection are reliable and, to the extent there are

21   factual disputes to be had, those issues are either scrivener's errors or may be addressed

22   during cross-examination.  (*Id.* at 15-17.)

23           ABOR replies that Doe has mischaracterized its argument: ABOR argues that "Dr.

24   Kaufman has no expertise or foundational facts to support his assumptions as to Doe's

25   expected career path."  (Doc. 196 at 9.)  ABOR also objects to Dr. Kaufman's use of

26   median, rather than entry-level, salary figures and contends that the inflated salary

27   information caused Dr. Kaufman's opinion to be irrelevant.  (*Id.* at 10-11.)

28           …

3. <u>Analysis</u>

a. **Student Code Enforcement Disparity**

i. <u>Males Receive More Severe F-23 Sanctions</u>

In Tables 2 and 3 of his Report, Dr. Kaufman found a "highly significant" disparity in the frequency and severity of F-23 sanctions: "male Respondents are found 'guilty' of F-23 and F-15 charges at a higher rate than other Respondents," which is "highly significant," and "Fifty percent of Males [charged with violating F-23] are sanctioned with . . . severe sanctions" but "[n]o females with F-23 [violations] were sanctioned with severe sanctions.  This disparity is highly statistically significant."  (Doc. 159-1 at 10-12.)

The Ninth Circuit has held that such statistics can support an inference of gender bias in a Title IX case.  *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 949 (9th Cir. 2020) (plaintiff's "allegations of a pattern of gender-based decisionmaking against male respondents in sexual misconduct disciplinary proceedings" were "relevant" and bolstered plausibility of Title IX claim); *Doe v. Regents of the University of California*, 23 F.4th 930, 938 (9th Cir. 2022) ("Doe alleges that the respondents in Title IX complaints that UCLA decided to pursue from July 2016 to June 2018 were overwhelmingly male (citing specific statistics for each of those years) . . . .  Doe also alleges that the University 'has never suspended a female for two years based upon these same circumstances' . . . .  As we noted in *Schwake*, these are precisely the type of non-conclusory, relevant factual allegations that the district court may not freely ignore.").  As discussed in the order denying ABOR's motion for summary judgment, Dr. Kaufman's F-23 statistics are relevant under these standards.  Although there may e bias-free explanations for the divergent outcomes that Dr. Kaufman identified—perhaps all of the cases involving female F-23 respondents involved mild forms of sexual misconduct while the cases involving severe sanctions imposed against male F-23 respondents involved more serious forms of sexual misconduct—there is no evidence that the distribution of violations is *actually* skewed along gender lines in this manner.  Instead, ABOR simply identifies two cases involving relatively mild violations by female respondents and two cases involving relatively serious

violations by male respondents and speculates that the remaining cases may follow the same pattern.  Additionally, this is not a situation where Dr. Kaufman made up his own definition of "sexual misconduct" in an attempt to create some sort of cherry-picked statistic.  The Court finds it persuasive that section F-23's definition of "sexual misconduct" is a definition both created and used by ASU, which suggests that ASU has already decided it unifies a population of similarly situated respondents in some material respect.  Finally, although some F-23 respondents were charged with multiple code violations, Dr. Kaufman states that he used the Mantel Haenszel approach to create peer groups for Tables 2 and 3, which accounts for multiple violations, and ABOR does not challenge the reliability of the approach itself under *Daubert*.

The bottom line is that the challenged data is not irrelevant.  Although a reasonable juror could conclude that the wide scope of F-23 violations and the complicating factor of multi-violation sanctions reduces (or eliminates) the probative value of Dr. Kaufman's evidence, it is the jury's role to make that determination after cross-examination.

ii.    Males Receive More Severe F-15 Sanctions

ABOR argues that Dr. Kaufman's opinions on the gender disparity in F-15 violations in Table 4 are unreliable and irrelevant.  This is because "Dr. Kaufman states that he attempted to control for the 'type' of violation by only including matters in which [F-15] was the sole alleged violation," but "Doe was not solely charged with an [F-15] violation" and "there is no issue in this lawsuit about whether the sanctions imposed on students facing solely [F-15] violations are harsher for females than they are for males." (Doc. 159 at 11-12.)

Again, ABOR demands too much at the motion-to-exclude stage.  If true, the conclusion that ASU sanctions men accused of alcohol violations more harshly than women accused of alcohol violations is relevant, both because (1) Doe was accused of an alcohol violation and (2) any statistical evidence showing that ASU is biased against men in disciplinary proceedings is at least some evidence supporting Doe's gender bias claim. The fact that Doe was accused of multiple violations, and that ASU's record of

1    investigating alcohol violations may not be as probative of bias as ASU's record of

2    investigating sexual misconduct, is fertile territory for cross-examination, but it does not

3    provide a basis for exclusion.

4                        iii.    Male Complainants Do Not Result In Severe Sanctions

5            ABOR argues that Dr. Kaufman's opinions on ASU's treatment of male

6    complainants in F-23 cases in Table 5 are unreliable because, although Dr. Kaufman states

7    that most of the data available to him did not identify a complainant's gender, information

8    *was* available to him that provided this information.  (Doc. 159 at 10.)  Specifically, ABOR

9    points to Exhibit 5, row 250.  (*Id.*)

10           The Court has reviewed the cited document.  Although Exhibit 5 provides a wide

11   array of information (incident number, lead investigator, incident date and month, date

12   reported, date closed, days open, relevant campus, charges, type of charge, category of

13   charge, status of charge, incident summary, investigation's progress, any interim action,

14   university's findings and sanctions, any appeal, student's status, whether the student is in

15   Greek life, whether the student is an athlete, whether the student is international, where the

16   incident occurred, and whether an attorney is involved), row 250 does not appear to identify

17   the gender of the respondent.  (Doc. 159-4 at 20-22.)  Perhaps ABOR means that Dr.

18   Kaufman should have combed through incident descriptions to find gender pronouns,

19   where available.   But in the incident description provided in row 250, the respondent

20   appears to be female, not male.  (*Id.* at 21 ["A student informed SRR that *she* is being

21   harassed . . . ."].)

22           No one disputes that Dr. Kaufman reliably analyzed the (according to ABOR,

23   incomplete) data before him.  ABOR's reference to evidence of a single charge that does

24   not on its face contradict Dr. Kaufman's findings is hardly "indisputable record facts [that]

25   contradict or otherwise render the opinion unreasonable." *Rebel Oil Co. v. Atl. Richfield

26   Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995).  ABOR may seek to establish through cross-

27   examination that Dr. Kaufman's opinions are incomplete or misleading, but exclusion is

28   not warranted.

1

c.     **Economic Loss**

ABOR's first objection is that Dr. Kaufman's assumptions about the trajectory of Doe's career are unfounded and inaccurate.  As for foundation, there is evidence in the record to support the assumption that Doe had a reasonable probability of achieving a wide range of professional outcomes within the wrestling profession.  Although the Court has excluded Owen from testifying that Doe would have been one of the nation's best wrestlers, the fact that Doe had won several wrestling competitions is still before the jury.  Additionally, both Doe's and ABOR's experts agree that Doe could have become a Division I coach and simply disagree on where, exactly, Doe's ceiling would be. (Doc. 163-1 at 4, Doc. 165-1 at 10.)

As for accuracy, it is irrelevant—for threshold admissibility purposes—that Dr. Kaufman's assumptions may be proved inaccurate at trial.  All that matters is that they have some basis in the record.  An expert may, in appropriate circumstances, rely on assumptions when formulating opinions. Fed. R. Evid. 702, advisory committee notes to 2000 amendments ("The language 'facts or data' is broad enough to allow an expert to rely on hypothetical facts that are supported by the evidence.").  Disagreement with an expert's assumptions does not, in general, provide a basis for excluding the expert's testimony.  *See, e.g.*, *Marsteller v. MD Helicopter Inc.*, 2018 WL 3023284, *2 (D. Ariz. 2018) ("The challenges to Equals' opinions and the weaknesses in his assumptions are issues to be explored on cross-examination.").  To be sure, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146.  Nevertheless, "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564.  "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc.*, 738 F.3d at 969.  *See also* Fed. R. Evid. 702

advisory committee's note to 2000 amendment ("[P]roponents do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable . . . .  The evidentiary requirement of reliability is lower than the merits standard of correctness." (alteration in original) (internal quotation marks omitted)).

Here, Dr. Kaufman takes core assumptions that have a reasonable basis in the record and stretches them to opposing extremes to establish a range of possible outcomes.  If ABOR can discredit these assumptions at trial, that will also invalidate the opinion.  *See generally United States v. Crabbe*, 556 F. Supp. 2d 1217, 1224 (D. Colo. 2008) ("An expert witness may often 'assume' a fact for purposes of applying the methodology. . . .  If the assumption is in error, the opinion may be entirely invalidated.").  But because the assumptions about Doe's future employability do not veer into "unreliable nonsense," and ABOR does not dispute Dr. Kaufman's algebraic methodology of converting a range of assumptions into a range of potential economic loss, exclusion is not warranted.

As for Dr. Kaufman's salary assumptions, largely the same analysis applies.  ABOR objects to Dr. Kaufman's use of median wages that do not account for school size, stature, or a coach's experience, arguing that "Dr. Kaufman shows no connection between the salary he selected and the facts in this case."  (Doc. 159 at 15-16.)  Not so.  Dr. Kaufman's choice of salary data and analysis thereof may not meet ABOR's standards for persuasiveness, but it is certainly relevant to and has a foundation in the record.  ABOR also points to actual errors in Dr. Kaufman's data, but Doe replies that these are scrivener's errors which have since been updated in the record and do not meaningfully affect Dr. Kaufman's overall analysis.  Scrivener's errors that have already been corrected are not grounds for exclusion.

C.   **Cindi Nannetti**

1.   The Nannetti Report

Cindi Nannetti "spent 32 years as a prosecutor focusing primarily on the prosecution of crimes involving sexual misconduct."  (Doc. 161-1 at 2.)  During that time, she worked

1    with various entities, including schools and government agencies, to "develop and draft

2    . . . policies, procedures and trainings for the prevention of and reaction to sexual

3    misconduct" and to "educate employees on sexual misconduct." (*Id.*)  Since retiring in

4    2014, she has continued teaching and consulting on these issues and has "served as an

5    expert witness in cases involving Title IX claims."[2]  (*Id.*)  Nannetti is receiving $250 per

6    hour for her consulting work on this case and $350 per hour for testifying.  (*Id.*)

7         Doe asked Nannetti to testify on the following topics: (1) whether the investigation

8    into the sexual misconduct allegations levied against Doe was fair and impartial, (2)

9    whether there were any errors or flaws in the investigation, and (3) whether the

10   investigation appears to be impacted by the Start by Believing ("SBB") campaign at ASU.

11   (*Id.*)

12        In sum, Nannetti opined that (1) the investigation was biased, (2) there were many

13   errors and flaws in the investigation, and (3) the SBB campaign "resulted in an

14   investigation and subsequent disciplinary proceeding that starts by believing accusers . . .

15   [which] impacted Doe because evidence that did not fit within that narrative was ignored,

16   while evidence that supported that narrative was weighted heavily." (*Id.* at 2-3.)

17             2.    Analysis

18        ABOR seeks to exclude Nannetti from offering any opinions at trial.  (Doc. 161.)

19   In general, ABOR raises objections based on Nannetti's qualifications, the reliability of

20   Nannetti's opinions, and the relevance of Nannetti's opinions.  ABOR's more specific

21   objections, and Doe's responses, are addressed on an issue-by-issue basis below.

22             a.    **Qualifications**

23        ABOR contends that all Nannetti's opinions should be excluded because her

24   expertise as a criminal prosecutor does not qualify her to opine on "the fundamentally

---

[2]      Nannetti claims that she has experience as an expert witness in cases "involving
Title IX claims," but in support of that contention she simply cites a roster of individuals
who are members of the "Governor's Commission to Prevent Violence Against Women
Start by Believing Work Group." (Doc. 161-1 at 52.)  This document does not provide any
insight into Nannetti's work on a particular controversy, or what it means for a case to
"involve" Title IX claims, or whether Nannetti's service as an expert in some unspecified
case was relevant to the Title IX claims in that case (rather than some other part of the
case).

different Title IX investigative process in student disciplinary settings, let alone to opine on whether student disciplinary processes comply with Title IX." (Doc. 161 at 1.) Doe responds that "Nannetti is not offered for Title IX opinions; she is offered as an expert on sexual misconduct investigations, specifically involving gender and confirmation bias." (Doc. 191-1 at 6-7.) Doe adds that the cases cited by ABOR are distinguishable "because Nannetti is opining on the investigative process, as there is no distinct 'Title IX investigative process;' only general guidelines adopted by ASU. Because Doe only offers Nannetti for a limited purpose for which she is clearly qualified, the motion must be denied." (*Id.* at 7.)

Doe largely has the better of these arguments. Although Nannetti's report contains multiple references to Title IX, Nannetti does not ultimately opine about how a *Title IX* investigation should be conducted or about whether ASU's investigation of Doe was a proper *Title IX* investigation. Instead, Nannetti opines that "the investigation into the allegations of sexual misconduct against Doe was biased" and that "there were a multitude of errors and flaws in the investigation of the claims against Doe." (*Id.* at 2-3.) These are not Title IX-specific opinions, but opinions about how investigations into allegations of sexual misconduct should generally be conducted. Indeed, Nannetti faults ASU's representatives for not following certain "basic investigative standards" during Doe's investigation, which Nannetti identifies as (1) the need to "address[] inconsistencies and ambiguities to the extent practicable," (2) the need to "to engage in the active accumulation of evidence" or "[a]t the very least . . . try to obtain all relevant and reasonably available evidence," and (3) the need to "begin the investigation without bias or preconceived notions and follow the evidence in a neutral fashion." (Doc. 161-1 at 12-16.) The Court has little trouble concluding that Nannetti would have become familiar with these "basic investigative standards," which are not unique to the Title IX investigatory context, during her decades as a sex-crimes prosecutor. Thus, Nannetti is qualified to testify about them. Whether they are relevant in this Title IX action is a distinct issue addressed below.

The only caveat concerns Nannetti's opinion that the investigation was flawed and

biased in part because "Davis failed to follow the ATIXA Training and Certification materials provided to achieve best practices for civil rights investigations." (*Id.* at 16-17.) Elsewhere in the report, Nannetti explains that "[s]exual misconduct investigations involving Title IX, including those at [ASU], are guided by the standards set forth by the Association of Title IX Administrators ('ATIXA')." (*Id.* at 3.) These are Title IX-specific opinions, not opinions about how sexual misconduct investigations should generally be conducted. Doe makes no effort to establish that Nannetti is qualified to offer these particular opinions and the Court agrees with ABOR that she is not.

### b.   **Reliability**

ABOR contends that Nannetti's opinions are unreliable for four reasons: (1) they are predicated on the "false foundation" of criminal prosecution experience, which is substantially different from "an administrative proceeding in an educational setting"; (2) she erroneously assumed that ASU followed the SBB campaign when investigating student disciplinary matters, when "all of the evidence in this case, including witness testimony, regarding SBB establishes that [ASU's Student Rights & Responsibilities Office] did not follow the campaign"; (3) her opinions are not supported by a "systematic evaluation of the facts," but instead "a series of overgeneralizations, unsupported speculation and her own subjective beliefs"; and (4) her opinions are "contradicted by testimony and documents in the record." (*Id.* at 8-156.)

In response, Doe contends that "Nanetti can reliably apply decades of experience and her knowledge of established standards of bias-centric investigations to Doe's alleged sexual misconduct" and that "Nannetti is allowed to assume ASU followed the [SBB] campaign." (Doc. 191-1 at 7-9.)

The Court will begin with Nannetti's final opinion, which is that the SBB campaign "resulted in an investigation and subsequent disciplinary proceeding that starts by believing accusers . . . [which] impacted Doe because evidence that did not fit within that narrative was ignored, while evidence that supported that narrative was weighted heavily." (Doc. 161-1 at 2-3.) ABOR argues this opinion is unreliable because "[t]here is no evidence—

none—that Ms. Davis followed SBB" and "all of the evidence in this case, including witness testimony, regarding SBB establishes that SRR did not follow the campaign." (Doc. 161 at 10.)  In response, Doe does not dispute ABOR's description of the evidence in the record and simply asserts that "Nannetti is allowed to assume ASU followed the campaign" for purposes of formulating expert opinions.  (Doc. 191-1 at 9.)

Doe is incorrect.  Although, as discussed with respect to Dr. Kaufman, experts have broad leeway to rely on assumptions when formulating opinions, there is a limit.  One such limit is when an opinion is based on an assumption that is demonstrably and inarguably incorrect.  *Hanna v. Reg'l Trans. Comm'n*, 2008 WL 11450865, *4 (D. Nev. 2008) ("Plaintiff's expert testimony fails to meet the threshold Rule 702 requirement of assisting the trier of fact because it is based upon a false factual assumption vital to the conclusion Plaintiff was the most qualified applicant. . . .  Plaintiff admitted that she did not perform all duties of the Procurement and Compliance Analyst position . . . [and] also admitted that she had little experience in the qualification areas of minority business enterprises and women-owned business enterprises.  As Plaintiff's expert gave 'heavy weight' to the incorrect assumption that Plaintiff was experienced in the duties of the advertised position, the expert testimony is inadmissible.").  Here, as discussed in more detail in the order denying ABOR's summary judgment motion, the undisputed evidence establishes that Davis and other individuals associated with Doe's disciplinary process did *not* follow SBB as part of that process.  Accordingly, Nannetti's third opinion is unreliable and inadmissible.

This leaves Nannetti's other two opinions, which are that the investigation was biased and that the investigation was flawed.  ABOR's first reliability objection to those opinions is that Nannetti's criminal prosecution experience provides a "false foundation" because she "rel[ied] on criminal concepts throughout her Report," which "confirms that she viewed the evidence through the wrong prism and, as a result, her opinions are inherently unreliable."  (Doc. 161 at 9.)  The problem with this argument is that, as noted above, Nannetti applied the following three "basic investigative standards" when reaching

her opinions—the need to address inconsistencies and ambiguities, the need to attempt to obtain all relevant and reasonably available evidence, and the need to begin the investigation without bias or preconceived notions and follow the evidence in a neutral fashion.  These are not criminal-specific standards but basic investigative techniques.[3]

ABOR's next reliability objection concerns Nannetti's reliance on erroneous assumptions regarding SBB.  (*Id.* at 10.)  Although, as noted above, that objection provides a basis for excluding Nannetti's third opinion, it does not undermine the reliability of Nannetti's other two opinions because they turn on additional perceived flaws unrelated to the SBB campaign.

ABOR's next reliability objection is that Nannetti's opinions are "founded upon a series of overgeneralizations, unsupported speculation and her own subjective beliefs, which are undeniably framed by her personal experience as a criminal prosecutor, not a Title IX investigator.  Throughout her Report, Ms. Nannetti repeatedly speculates that Ms. Davis presumed Roe was a 'victim' of sexual assault, which resulted in 'confirmation bias' permeating throughout the student disciplinary investigation." (Doc. 161 at 11-12.)  ABOR takes particular issue with Nannetti's opinion that Davis *intentionally* failed to gather relevant evidence, which ABOR views as not only "incendiary" but wholly unsupported by the record.  (*Id.* at 12-13.)

Although the Court agrees with ABOR that Nannetti is not qualified to opine about Davis's intent, ABOR's reliability objections otherwise lack merit.  In the relevant portions of her report, Nannetti identifies various inconsistencies and ambiguities that, in Nannetti's view, should have been addressed during the investigation (Doc. 161-1 at 12-13); identifies various investigative steps that, in Nannetti's view, Davis should have taken (*id.* at 13-14); and identifies various other developments during the investigation that, in Nannetti's view, reflect confirmation bias and a failure to neutrally follow the evidence (*id.* at 14-15).

---

[3]     Presumably, ABOR's position is not that investigators in administrative proceedings (unlike in criminal proceedings) are free to ignore inconsistencies and ambiguities, to decline to seek out relevant evidence, and to begin with preconceived notions and cling to those notions throughout the investigation.

1    ABOR's disagreement with these criticisms is fodder for cross-examination, not a basis for

2    exclusion based on unreliability.

3         ABOR's final reliability objection is that Nannetti "levies several accusations that

4    are contradicted by testimony and documents in the record." (Doc. 161 at 13-15.)  More

5    specifically, ABOR identifies evidence that Davis attempted to gather materials from the

6    Tempe Police Department and the SANE report.  (*Id.*)  The Court concludes once again

7    that ABOR's arguments on this point are fodder for cross-examination, not a basis for

8    exclusion.  Even if Nannetti made factual assumptions belied by the record with respect to

9    these two particular criticisms, they were simply two of the many perceived investigative

10   flaws identified in Nannetti's report.  Accordingly, they do not render Nannetti's first two

11   opinions categorically unreliable and inadmissible.

12                          c.      **Relevance**

13        ABOR contends that Nannetti's opinions are irrelevant and likely to confuse the

14   jury because they erroneously emphasize anti-perpetrator bias (when the relevant inquiry

15   is anti-male bias), erroneously presuppose that Title IX must be "flawless," and are cabined

16   to criticisms of Davis, who was not a decisionmaker and not the sole source of Dr. Rund's

17   decision.  (Doc. 161 at 15-17.)  Doe responds that "Nannetti's testimony is relevant under

18   Rule 702" because "Nannetti's testimony shows that the investigation was improper as to

19   Doe, a male, and favored Roe, a female."  (*Id.* at 9-11.)

20        The Court agrees with Doe that Nannetti's first two opinions satisfy Rule 702's

21   liberal standard for relevance.  As discussed in more detail in the summary judgment order,

22   the Ninth Circuit has emphasized that evidence of procedural irregularities during a

23   university's sexual misconduct investigation may, at least when coupled with other

24   evidence, support an inference of gender bias in a Title IX proceeding.  *See, e.g.*, *Schwake*,

25   967 F.3d at 950 ("[P]rocedural irregularities . . . support[] an inference of gender bias when

26   considered along with Schwake's allegations of background indicia of sex

27   discrimination."); *Doe*, 23 F.4th at 940 ("[I]rregularities in Doe's proceedings . . . , while

28   not dispositive on their own, support an inference of gender bias."); *id.* at 941 ("[A]t some

point an accumulation of procedural irregularities all disfavoring a male respondent begins to look like a biased proceeding . . . .").  Nannetti's first two opinions could be viewed by a reasonable juror as establishing the existence of procedural irregularities during Doe's investigation—that is, a failure to follow basic investigative standards.  Although such irregularities may, on their own, only serve as evidence of pro-complainant bias (rather than anti-male bias), they still constitute one relevant component of a plaintiff's Title IX case.  Nor do Nannetti's criticisms presuppose that a Title IX investigation must be flawless.  Nannetti purports to identify a long list of flaws and errors.  Finally, ABOR cites no authority in support of its position that only procedural irregularities committed by final decisionmakers are relevant in a Title IX action and Ninth Circuit law appears to be to the contrary.  *See, e.g., Doe*, 23 F.4th at 939 ("Contrary to the Regents' argument, statements by pertinent university officials, not just decisionmakers, can support an inference of gender bias. . . .  It is therefore reasonable to infer that Mr. Zeck's statement reflects the broader gender assumptions within UCLA's Title IX office during its investigation of Doe.") (cleaned up); *Schwake*, 967 F.3d at 950 ("The University argues that Dr. Seager's statements cannot show that gender bias affected Schwake's sexual misconduct disciplinary case because Dr. Seager was not a decisionmaker.  We disagree.  Statements by 'pertinent university officials,' not just decisionmakers, can support an inference of gender bias. . . .  Like the procedural irregularities some of our sister circuits have considered when faced with allegations of pressure, the violation of confidentiality by those involved in Schwake's disciplinary case supports an inference of gender bias when considered along with Schwake's allegations of background indicia of sex discrimination.") (citation omitted).

        d.    **Summary As To Nannetti**

       For the reasons discussed above, ABOR's request to categorically exclude Nannetti from testifying is denied, but Nannetti must limit her opinions to the following topics: (1) whether the investigation into the sexual misconduct allegations levied against Doe was fair and impartial; and (2) whether there were any errors or flaws in the investigation.

1    Additionally, Nannetti's noticed opinions on those topics are limited in that Nannetti may

2    not offer the opinions that (1) the investigation was flawed and biased in part because

3    "Davis failed to follow the ATIXA Training and Certification materials provided to

4    achieve best practices for civil rights investigations"; and (2) Davis intentionally failed to

5    gather relevant evidence.

6        D.    **Peter F. Lake**

7            1.    The Lake Report

8        Peter Lake has "extensive experience in higher education law and policy, and

9    academic and operational expertise with respect to the law of higher education and . . . Title

10   IX." (Doc. 175-1 at 4.)  In the past, Lake served as Director of Title IX Compliance at

11   Stetson University, and he has experience as a student discipline officer at Stetson

12   University College of Law.  (*Id.* at 4.)  Lake has been qualified as an expert in matters

13   relating to Title IX, trains colleges and universities on Title IX, and is "familiar with

14   industry behavior relating to Title IX compliance."  (*Id.*)  Lake has reviewed documents

15   provided by ABOR but has otherwise done no independent inquiry into this matter beyond

16   brief interviews.  (*Id.*)  He charges $550 per hour for most tasks with a minimum fee of

17   $20,000.  (*Id.* at 145.)

18       Lake was asked to review the Nannetti Report as well as Nannetti's one-page

19   supplemental expert report and offer his expert opinions in response.  (*Id.* at 4-5.)  In sum,

20   Lake opined that (1) Nannetti is not qualified to offer opinions and has not offered relevant

21   opinions, even if she is qualified (*id.* at 6-10); (2) there is no evidence that ASU's

22   investigation was biased against Doe (*id.* at 10); (3) even if Davis was biased, she was not

23   in a position to make a disciplinary decision (*id.*); (4) Davis's investigation did not

24   discriminate against Doe on the basis of sex and did not deviate from ASU's policies and

25   procedures (*id.*); (5) "Title IX does not mandate that grievance processes as a whole or

26   initial investigations, be ideal," and "the fact that a final decision , , , is reviewed and even

27   overturned internally or by an external authority does not imply, or raise an inference, in

28   and of itself, that an initial investigation was flawed or materially biased in any way" (*id.*

at 11); (6) although respondents are "entitled to a presumption of non-responsibility in Title IX proceedings," complainants are "entitled to a presumption that they are not inherently lacking in credibility," and Nannetti's approach would undermine the latter presumption (*id.*); (7) there is no indication that ASU personnel were motivated by the SBB campaign (*id.*); and (8) although Nannetti faults Davis for not securing certain pieces of evidence, Doe could have provided those materials to Davis, and his failure to do so "suggests the possibility of an effort (potentially collaborative) to obstruct [the] ASU disciplinary process." (*Id.* at 11-12.)

Doe argues that Lake's opinions should be excluded for five reasons: (1) "certain of Lake's opinions usurp the role of the Court by opining on legal issues reserved for the Court"; (2) "Lake invades the Court's role as gatekeeper by opining on the admissibility and relevance of Plaintiff's expert Cindi Nannetti's expert opinions"; (3) "Lake invades the jury's province by opining on the credibility of Nannetti"; (4) "Lake's report purports to be a rebuttal to Nannetti's expert report, yet Lake asserts a series of new opinions that do not address, let alone contradict or challenge, anything in Nannetti's report and are improper for an expert report"; and (5) "Lake opines on matters that are not helpful to the trier of fact and should be excluded under Rule 403." (Doc. 164 at 1.) The Court will address each argument separately, but because the appropriate scope of Lake's opinion will guide the rest of the inquiry, the Court begins there.

### 2.   Scope Of Lake's Report

Doe argues that "Lake's rebuttal report attempts to opine on issues outside the scope of rebuttal," and because Nannetti's report did not offer any opinion on Title IX standards or protocols, "Lake's opinions as to Title IX standards and protocols should be excluded as improper rebuttal." (Doc. 164 at 7-9.) ABOR responds, in brief, that Lake is not formally a rebuttal expert, but an affirmative expert who is responding to Nannetti's report, and thus his scope is not limited to rebuttal. (Doc. 186 at 14-16.) Doe replies that "the Court should strike the opinions of Lake that do not rebut Nannetti" because Lake uses rebuttal-report limiting language at the outset of his opinion and rebuttal reports are those

"intended solely to contradict or rebut evidence" in an opposing party's expert disclosure. (Doc. 198 at 7.)

Lake is an expert witness in his own right, regardless of his choice to mainly respond to Nannetti. Lake's report was submitted on August 20, 2021, which was the deadline for ABOR to disclose its affirmative expert witnesses. (Doc. 67 at 3 [case management order], Doc. 145 [grant of motion to amend case deadlines].) The deadline for rebuttal witnesses was not until September 10, 2021. (Doc. 145.) Thus, the Lake report is not restricted to rebuttal by the terms of the case management order.

Doe argues that, "regardless of the Case Management Report," Lake has boxed himself into the strictures of a rebuttal expert by styling his report as an "Expert Response" on the cover page and stating that he was "asked by ABOR to review the [Nannetti Report and Supplement] and offer [his] expert opinions in response." (Doc. 175-1 at 1-4.) But Doe offers no caselaw suggesting that an affirmative expert can involuntarily become a rebuttal-only expert based on the form or cover page of his report.

True rebuttal experts are limited "solely to contradict[ing] or rebut[ting] another expert's evidence" because it would result in unfair surprise to spring new theories on the opposing party when it is too late to rebut them. Fed. R. Civ. P. 26(a)(2)(d)(ii). There is no similar risk here, as nothing prevented Doe from retaining an expert to prepare a rebuttal of *Lake's* opinions.

The Court thus agrees with ABOR that, although Lake styles himself as a "responsive" expert, he is not a formal rebuttal expert with the restrictions that accompany that designation. Doe's remaining arguments concern the proper scope of rebuttal opinion and are rendered moot by this conclusion.

### 3.   Legal Issues Reserved For The Court

Doe argues that some of Lake's opinions, mainly "the applicable legal standards that should be applied to Title IX cases," must be excluded because they instruct the jury on the law, which is the Court's responsibility. (Doc. 164 at 5.) ABOR responds that "Professor Lake does not opine on the 'ultimate issue of law,' (*i.e.*, whether ABOR violated

Title IX).  Instead, the Lake Report provides general background on Title IX . . . [which] is the exact type of testimony courts have repeatedly permitted Title IX experts to offer to assist the trier of fact in determining whether a university's Title IX responses and investigations are appropriate."  (Doc. 186 at 7-8.)  Doe disputes this characterization, arguing in reply that Lake "clearly attempts to instruct the fact finder on what legal standard should be applied to the facts of this case. . . .  That Lake's opinions are mixed with some discussion of the 'history and purpose' of Title IX does not cure the defects in the opinions which Doe seek to exclude."  (Doc. 198 at 2-3.)

The Ninth Circuit has excluded expert testimony that "defines the governing law," as well as testimony that "applies the law to the facts" and testimony that sets forth "what the law is and how it should be applied to the facts of the case."  *Pinal Creek Group v. Newmont Mining Corp.*, 352 F. Supp. 2d 1037, 1043 (D. Ariz. 2005).  *See generally Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996) ("Expert testimony is not proper for issues of law.  Experts interpret and analyze factual evidence.  They do not testify about the law. . . .") (citation and internal quotation marks omitted); *Fidelity Nat. Fin., Inc. v. National Union Fire Ins. Co. of Pittsburg, PA*, 2014 WL 128639, *8 (S.D. Cal. 2014) ("Federal law precludes an expert from invading the province of the court to instruct on the law . . . .  The rule is easy to state but difficult to apply and the outcome depends upon how the expert expresses his opinion.").  Accordingly, district courts have allowed experts to testify about industry practice and standards in Title IX cases but refused to allow "even a slight deviation . . . into the requirements of Title IX."  *Portz v. Cloud State Univ.*, 297 F. Supp. 3d 929, 953 (D. Minn. 2018); *see also Stevens v. Brigham Young Univ.*, 2020 WL 560572, *2 (D. Idaho 2020) (permitting testimony regarding Title IX's history and purpose and industry practices and standards but excluding "testimony regarding legal standards and their applicability to this case").

Here, Lake's opinions sometimes veer into legal analysis under the auspices of foundation.  In particular, Lake's opinions about the "objective authoritative legal standards for an implied cause of action for money damages in federal court under Title

IX," which are supported by citations to caselaw (Doc. 175-1 at 12-13), are inappropriate. It is the Court's responsibility to decide which legal standards govern the jury's interpretation of evidence. Similarly inappropriate are Lake's seeming opinion that the Arizona Court of Appeals' opinion is legally irrelevant ("the fact that a final decision . . . is reviewed and even overturned internally or by an external authority does not imply, or raise an inference, in and of itself, that an initial investigation was materially flawed or biased in any way") and Lake's other opinions of what types of evidence can (and can't) support an inference of bias in a Title IX. (*Id.* at 10.)

That said, much of Lake's proposed testimony appears to be unobjectionable recitation of Title IX's history that is within Lake's expertise. As a result, the Court will grant Doe's motion to exclude Lake's testimony inasmuch as he seeks to testify about the legal requirements of Title IX and the application of those legal requirements to this case. And if Lake cannot recount the history and purposes of Title IX without referencing its specific requirements, the Court will not hesitate in excluding that testimony as well.

### 4. Admissibility Of Nannetti Opinion

Doe argues that Lake's opinions about the admissibility of Nannetti's opinions "are not helpful and potentially interfere with the role of the Court," as "the Court can decide [qualification and relevance] issues on its own." (Doc. 164 at 6.) ABOR responds that "the Lake Report does not opine on admissibility and Professor Lake will not address admissibility at trial. Instead, Professor Lake offers testimony concerning the reliability . . . and foundation . . . of Ms. Nannetti's opinions." (Doc. 186 at 11.) Doe replies that "ABOR cannot and has not explained, for instance, how Lake's opinions supporting his contention that 'Cindi Nannetti, may not be qualified to offer in opinions in this matter and/or has not offered relevant opinions in this matter' could be construed as anything other than opinions on the admissibility of Nannetti's testimony." (Doc. 198 at 4.)

The Court is responsible for determining the admissibility of expert opinions. *Joiner*, 522 U.S. at 142. Nevertheless, an opposing expert's—even inartful—use of such terms "qualified," "relevant," or "foundation" does not automatically violate this principle.

1   Each of the specific opinions to which Doe objects are summaries of Lake's detailed

2   opinions, which themselves properly attack the validity of Nannetti's premises.  The Court

3   does not read Lake's report to be a statement about the admissibility of Nannetti's opinions,

4   but a statement about their persuasiveness.  This is, at a minimum, a "permissible topic of

5   rebuttal testimony."  *Smilovits v. First Solar, Inc.*, 2019 WL 6875492, * 13 (D. Ariz. 2019).

6                              5.    Nannetti's Credibility

7           Doe argues that Lake "endeavors to opine on Nannetti's credibility [but e]xpert

8   witness credibility is the exclusive province of the jury and Lake's 'opinions' on Nannetti's

9   credibility should be excluded."  (Doc. 165 at 7.)  ABOR responds that "the three excerpts

10  Doe quotes from the Lake Report address flaws in the substance of Ms. Nannetti's analysis

11  and conclusions, not her credibility. . . .  Professor Lake's critique . . . is appropriate expert

12  testimony."  (Doc. 186 at 12.)  Doe replies that "the opinions Doe cites as opining on

13  Nannetti's credibility blatantly accused her of having an 'interest in this matter' and having

14  a bias" and that ABOR "has not cited to one case supporting the admissibility of an expert

15  opinion making bald claims of bias against another."  (Doc. 198 at 4-5.)

16          Lake exceeds the permissible scope of expert testimony when he asserts that

17  Nannetti is personally biased toward Doe or in favor of respondents in general.  Lake is an

18  expert on Title IX investigations, not an expert *on* expert witnesses in Title IX

19  investigations.  He has laid no foundation to establish his ability to determine Nannetti's

20  bias, and although he may attack the merits of Nannetti's premises and conclusions, he

21  cannot testify directly on Nannetti's credibility.  The credibility of an expert witness, and

22  the weight to be given to her, are issues for the trier of fact.  *Robles v. Agreserves, Inc.*, 158

23  F. Supp. 3d 952, 992 (E.D. Cal. 2016); *see also City of Pomona v. SQM North Am. Corp.*,

24  750 F.3d 1036, 1053 (9th Cir. 2014) ("Facts casting doubt on the credibility of an expert

25  witness . . . are questions reserved for the fact finder.").

26                              6.    Lake's Opinions About Facts

27          Finally, Doe argues that "certain of Lake's opinions regarding facts in the case are

28  unhelpful to the jury and should be excluded," specifically those that "are nothing more

than his lay interpretation of a recitation of certain 'facts.'" (Doc. 164 at 9.)   ABOR responds that "an expert witness can and indeed must identify the facts relevant to his opinion" and that Lake's "opinions are highly probative and directly relate to Doe's Title IX claim against Doe." (Doc. 186 at 13-14, 17.)  Doe replies that "lay interpretation or recitations of 'facts'," such as Lake's statements that Davis was not the ultimate decisionmaker and that the Title IX investigation was not motivated by bias, run the risk of misleading the jury." (Doc. 198 at 5-6.)

The Court will not exclude Lake's challenged opinions on the ground that they are unhelpful.  This is mainly because these opinions (Doc. 164 at 9-10) respond to Nannetti's opinions that (1) the investigation into the sexual misconduct allegations levied against Doe was unfair; and (2) that there were errors and flaws in the investigation.  It is hard to see why Lake's attempt to question Nannetti's conclusions would be "unhelpful" to a jury that has already heard the underlying opinion.  And Doe's argument under Rule 403 presumes that Lake has nothing useful to offer the jury, which the Court has already rejected.

7.   Summary As To Lake

For the reasons discussed above, Doe's request to categorically exclude Lake from testifying is denied, but Lake must not (1) reference the legal requirements of Title IX or opine on the application of those legal requirements to this case; or (2) opine that Nannetti is biased in favor of Doe or otherwise opine directly on Nannetti's credibility.

E.   **Jason Borrelli**

1.   The Borrelli Report

Jason Borrelli is the head wrestling coach at American University and previously held the same position at Stanford University. (Doc. 165-1 at 3.)  Before becoming a coach, Borrelli twice won the Michigan state high school wrestling championship, was a multi-year starter on the Central Michigan University wrestling team, was part of five consecutive team conference championships, won individual conference titles, and qualified for the NCAA Championships.  (*Id.*)   Under Borrelli's tutelage, Borrelli's

1   programs have won several conference championships, produced All-Americans, sent

2   wrestlers to the NCAA Championships, and posted over 100 meet victories.  (*Id.*)  Borrelli

3   has personally been recognized by a wrestling magazine as "Coach of the Year."  (*Id.*)

4   Finally, while a coach, Borrelli has become "highly experienced in evaluating and

5   recruiting potential college wrestlers" and has produced nationally ranked recruiting

6   classes despite "Stanford's high academic standards."  (*Id.* at 4.)

7       Borrelli has not previously served as an expert witness, nor has he authored any

8   publications in the last ten years.  (*Id.*)  His hourly rate for this engagement is $500.  (*Id.*)

9       Borrelli was asked to review the Owen Report and aspects of the Kaufman Report.

10  (*Id.* at 3.)  He opined that (1) Doe's expulsion from ASU delayed his ability to seek

11  employment by at most a few years; (2) the expulsion was not the cause of Doe's inability

12  to find Division I coaching work because major accolades are not required to be a Division

13  I coach and, even if they were required, Doe was unlikely to achieve those accolades; and

14  (3) ABOR is not responsible for Doe's wrestling injuries.  (*Id.* at 7.)

15              2.    The Parties' Arguments

16      Although the Borrelli Report sets out several distinct opinions, Doe raises a single

17  issue in his motion to exclude: "Should Borrelli be permitted to opine as an expert on

18  college wrestling pay at Division I and II universities?"  (Doc. 165 at 1.)  Doe is clear that

19  the other opinions "will be addressed at trial and are not subject to this Motion."  (*Id.*)

20      Doe first argues that Borrelli's opinions about pay are unreliable because they are

21  not based on sufficient facts or data: "Borrelli does not survey all 'middle or lower-tier'

22  D1 schools, or even a random sample of such schools.  Instead, he cites the salary for [five

23  exemplar assistant coaches].  He then uses this information to opine that salaries are

24  between $35,000 and 45,000 annually—numbers that do not appear in his anecdotal

25  survey—for entry level coaches."  (*Id.* at 3.)  Second, Doe asserts that Borrelli's opinions

26  about pay are irrelevant or confusing because publicly reported NCAA pay data contradicts

27  his opinion, his opinion is presented as a "reliable, statistically valid random sample that

28  properly expresses coaches' pay" when it is not, and many of Borrelli's parameters are

- 40 -

undefined.  (*Id.* at 6-7.)  Finally, Doe argues that Borrelli is not qualified to offer opinions on pay because, although he may be an expert on wrestling, he is not an expert on wrestling coach pay at all Division I and II schools.  (*Id.* at 8.)

ABOR responds that Borrelli is qualified to opine on "salaries attendant to the positions Doe is likely to achieve in his but-for and actual career scenarios" given his wrestling background and because he has been "entrenched" in collegiate wrestling for decades.  (Doc. 185 at 7.)  ABOR also argues that Borrelli's opinions are reliable when understood as representations of Borrelli's own experience and not objective surveys or comprehensive analyses of the market.  (*Id.* at 9-13.)  Finally, ABOR asserts that Borrelli's opinions are directly relevant, because they inform Doe's economic losses, and not confusing, because Borrelli makes the scope of his opinion clear.  (*Id.* at 13-15.)

In reply, Doe reasserts that Borrelli is not qualified to offer opinions about salaries at *all* Division I and Division II schools, that Borrelli's testimony about salaries is unreliable because his data is misleading and incomplete, and that Borrelli's testimony will only confuse the jury.  (Doc. 197 at 1-6.)

### 3.   Analysis

The Court denies Doe's motion to exclude Borrelli's opinions about his view of the general salary range for college wrestling coaches, which he claims to have developed throughout his lengthy and successful career, for the same reasons it denied ABOR's motion to exclude Owen's opinion about his view of the general qualifications for college wrestling coaches, which he claims to have developed throughout his lengthy and successful career.

Borrelli is qualified to opine on this topic, his opinions are reliable enough to reach the jury, and any issues with the accuracy of the "data" underlying Borrelli's opinion may be attacked on cross-examination.  Borrelli has worked as a college wrestling coach for more than 15 years and, before that, was a successful wrestler in his own right.  Borrelli is just as "enmeshed," or as ABOR would put it, "entrenched," in the wrestling world as Owen.  Borrelli does not seek to step outside his expertise in this opinion but asserts that

he has developed his own expertise in collegiate wrestling salary ranges through a lifetime of conversations, anecdotes, and experiences.  And it is unsurprising that a longtime college wrestling coach, who has worked at multiple colleges, would have a refined sense of the national market and competitive salaries for collegiate wrestling coaches.  Borrelli is absolutely clear that he seeks to provide only "*his* experience" and does not detour into an implication that he can testify about comprehensive statistics gathered through, for instance, a national survey.  Finally, testimony about Doe's economic *potential* is manifestly relevant to Doe's economic *loss* claim, and Doe does not cogently explain why it would not be.

"[T]he judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc.*, 738 F.3d at 969.  Borrelli's opinion on collegiate wrestling coach salaries is no more an "unreliable nonsense opinion" than Owen's opinion on collegiate wrestling coach recruiting and hiring standards.  Any concerns with the precise transferability of Borrelli's background, or the reliability and accuracy of the data he gathered to reach his conclusions, can be explored on cross-examination.

F.    **Dwight Duncan**

1.    The Duncan Report

Dwight Duncan is an economist with more than 25 years of experience involving "economic consulting generally and the calculation of economic damages in commercial disputes specifically."  (Doc. 165-1 at 139.)  Duncan has provided expert testimony before various courts and provides economic consulting and expert witness services to the Office of the Arizona Attorney General.  (*Id.*)  Duncan's billing rates range from $130 to $445 per hour.  (*Id.* at 177.)

Duncan was asked to opine on the Kaufman report's two areas of analysis: sanction disparities and economic loss.  (*Id.* at 140.)  Broadly, Duncan found that Dr. Kaufman "made a series of computational and reference errors in his tables, failed to account for differences in the severity of violations of a given provision of the Student Code of

Conduct, and failed to consider when multiple violations were associated with a given sanction."  (*Id.*)  Duncan also found that Dr. Kaufman's career path assumptions were unsupported and unreliable and that Dr. Kaufman's computation of economic damages suffer from critical analytic flaws.  (*Id.*)

Doe argues that "[i]f Borrelli's opinions regarding [Division I and Division II] pay are excluded, Duncan's findings based on that data must also be excluded."  (Doc. 165 at 9.)  Because the Court has denied Doe's motion to exclude Borrelli's opinions, and Doe is clear that his motion to exclude Duncan's opinions depends on the outcome of the Borrelli motion, the Duncan motion is consequently also denied.

Accordingly,

**IT IS ORDERED** that:

1.      ABOR's motion to exclude the opinions and testimony of Curtis Owen (Doc. 158) is **granted in part and denied in part**.

2.      ABOR's motion to exclude the opinions and testimony of Dr. Lance Kaufman (Doc. 159) is **denied**.

3.      ABOR's motion to exclude the opinions and testimony of Cindi Nannetti (Doc. 161) is **granted in part and denied in part**.

4.      Doe's motion to exclude certain opinions and testimony of Peter F. Lake (Doc. 164) is **granted in part and denied in part**.

5.      Doe's motion to exclude certain opinions and testimony of Jason Borrelli and Dwight Duncan (Doc. 165) is **denied**.