COHEN DOWD QUIGLEY
The Camelback Esplanade One
2425 East Camelback Road, Suite 1100
Phoenix, Arizona 85016
Telephone 602•252•8400

Daniel G. Dowd (012115)
Email:  ddowd@CDQLaw.com
Betsy J. Lamm (025587)
Email:  blamm@CDQLaw.com
Rebecca van Doren (019379)
Email:  rvandoren@CDQLaw.com
Jenna L. Brownlee (034174)
Email:  jbrownlee@CDQLaw.com
   Attorneys for Defendants

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| John Doe,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>The Arizona Board of Regents; James Rund; Craig Allen; Tara Davis; Kendra Hunter; Kathleen Lamp; and Andrew Waldron,<br><br>　　　　　Defendants. | Case No.:  2:18-cv-01623-DWL<br><br>**ARIZONA BOARD OF REGENTS' MOTION FOR RECONSIDERATION**<br><br>(Assigned to the Honorable Dominic W. Lanza)<br><br>**(Oral Argument Requested)** |

Pursuant to LRCiv. 7.2(g), the Arizona Board of Regents ("ABOR") moves for reconsideration of the Court's August 30, 2022 Order denying ABOR's Motion for Summary Judgment (Doc. 209). Respectfully, the Order is manifestly erroneous in several material respects. First, prefacing its conclusion as a "close call," the Court relies on an admittedly incomplete "statistical" analysis as the sole evidence of gender bias surmounting summary judgment. Yet, the analysis does not satisfy Ninth Circuit standards regarding the use of such data at summary judgment as it does not even attempt to eliminate non-discriminatory explanations and does not itself evidence intentional discrimination against Doe on the basis of sex. Second, the Order finds three "procedural irregularities" probative, erroneously concluding the conduct at issue violated Arizona State University's ("ASU") procedures (the "Procedures"), and disregarding the harmlessness of the alleged irregularities. The Court's explanation that ABOR did not move on causation, thus justifying its consideration of harmless irregularities, is incorrect and does not validate the Order. Moreover, throughout its analysis, the Court relies on cases determined at the dismissal stage, effectively, but erroneously, applying the lower reasonable inference/plausibility standard to ABOR's dispositive motion. The standard imposed by this Court would indefensibly allow a male respondent who does not receive a flawless disciplinary process to go to trial without any evidence of actual bias—directly contrary to Title IX's purpose. Doe's inability to identify evidence of gender bias—actual proof that Doe was expelled because of anti-male gender bias or that Doe's disciplinary process was infected by gender bias—compels summary judgment in ABOR's favor. The Court should reconsider its Order and grant ABOR's Motion for Summary Judgment.

I.  **RECONSIDERATION OF THE SUMMARY JUDGMENT RULING IS WARRANTED.**

ABOR understands motions for reconsideration are disfavored and not often granted. ABOR is equally cognizant, however, of the Court's zest to "get it right" and its willingness to critically review its own rulings to achieve a correct result. The Court has broad discretion to review its rulings if legitimate questions are raised concerning the soundness of its orders and to avoid committing manifest error. *See* LRCiv. 7.2(g); *U.S. v.*

1

*Rezzonico*, 32 F. Supp. 2d 1112, 1116 (D. Ariz. 1998); *Acosta v. Austin Elec. Servs. LLC*, 325 F.R.D. 322, 324 (D. Ariz. 2018); *see also, e.g.*, *Liberty Mut. Co. v. E.E.O.C.*, 691 F.2d 438, 440-41 (9th Cir. 1982) (holding district courts are empowered to reconsider prior rulings based on legal errors); *Defs. of Wildlife v. Browner*, 909 F. Supp. 1342, 1351 (D. Ariz. 1995) (finding reconsideration "appropriate where, for example, the court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the court by the parties, or has made an error not of reasoning but of apprehension" (quotations and citations omitted)).

Reconsideration is warranted here. The Order is manifestly erroneous in several material respects. Once these errors are corrected, Doe's failure to proffer actual evidence that gender bias motivated the disciplinary decision in this case is irrefutable.[1]

### A.    The Court's "Statistical Anomalies" Conclusion Is Erroneous.

The Order identifies what the Court characterizes as three procedural irregularities supporting Doe's Title IX claim, but the Court does not find the irregularities alone evidence gender bias. Rather, the Court states that the "analysis fundamentally turns on whether Doe has proffered <u>other</u> <u>evidence</u> that could lead a reasonable juror to conclude these irregularities were indicative of gender bias." [Doc. 209 at 47 (emphasis added).] The <u>only</u> "other evidence" the Court finds are the alleged statistical anomalies proffered by Doe's expert, Kaufman. The Court's reliance on Kaufman to deny summary judgment is manifest error.

The Ninth Circuit has observed that "[s]tatistical evidence has an inherently slippery nature" and "can be exaggerated, oversimplified, or distorted to create support for a position that is not otherwise supported by the evidence." *See Spaulding v. Univ. of Wash.*, 740 F.2d 686, 703 (9th Cir. 1984) (quotations and citations omitted), *overruled on other grounds*, *Atonio v. Wards Cove Packing Co. Inc.*, 810 F.2d 1477 (9th Cir. 1987). The Ninth Circuit has further cautioned that "the use of statistics is conditioned by the existence of proper supportive facts and the

---

[1] The Court rejected Doe's arguments that a reasonable juror could view external pressure, statements of ASU officials, or the Start By Believing campaign as evidence that Doe's disciplinary proceeding was motivated by gender bias.

2

absence of variables which would undermine the reasonableness of the inference of discrimination which is drawn." *White v. Cty. of San Diego*, 605 F.2d 455, 460 (9th Cir. 1979) (quotations and citation omitted). The Court violated this binding authority in finding one aspect of Kaufman's "statistics" not only relevant, but also sufficient to "create[] a genuine issue of material fact about whether ASU's Title IX disciplinary process was infected by gender bias." [Doc. 209 at 54.] This conclusion is manifestly erroneous.

### 1. The Order Is Contrary To Binding Ninth Circuit Authority.[2]

The Order states: "[t]he Ninth Circuit has repeatedly held that statistics suggesting that a university's Title IX disciplinary process is biased against male respondents can support an inference of gender bias in an individual Title IX case." [Doc. 209 at 54 (*citing Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940 (9th Cir. 2020); *Doe v. Regents of the Univ. of Cal.*, 23 F.4th 930 (9th Cir. 2022))*.*] The two cases cited arose on motions to dismiss. The courts needed only to find <u>allegations</u> sufficient to state a plausible claim, and presumed there were facts to support the allegations.[3] *Doe*, 23 F.4th at 932; *Schwake*, 967 F.3d at 946. In contrast, "[t]o survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011). The analysis at summary judgment is "a world apart from 'assuming' that general averments embrace the 'specific facts' needed to sustain the complaint." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Reliance on dismissal cases that focus on permissible inferences from unproven allegations is manifest error.

Where statistics to support a discrimination claim are proffered on summary judgment, the Ninth Circuit has instructed:

> The question whether the facts proved are sufficient to permit a legal inference of discriminatory intent cannot properly be reduced into a mere battle of statistics. … Whatever the impact demonstrated by a plaintiff's statistical

---

[2] For the "statistics" on which the Court relied, Kaufman merely counted certain rows from a spreadsheet and did simple division to reach a percentage. These are not "statistics" and, given his failure to evaluate the specifics of each F-23 charge, no expertise was required.

[3] In *Schwake*, the "statistics" were an allegation that males were "invariably found guilty," which the court viewed as "background indicia," <u>not</u> evidence of discrimination in that specific case. 967 F.3d at 948-49.

3

> evidence is in fact, <u>the legal question is whether that impact is sufficiently gross or stark that a court must infer that it was intended</u> by the defendant. … In order to establish a *prima facie* case of <u>disparate treatment based solely on statistical evidence</u>, the plaintiff <u>must produce statistics</u> showing "<u>a clear pattern, unexplainable on grounds other than race</u>."

*Gay v. Waiters & Dairy Lunchmen's Union, Local No. 30*, 694 F.2d 531, 552 (9th Cir. 1982) (quotations and citation omitted)) (emphasis added); *see also Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1423 (9th Cir. 1990) (affirming summary judgment on disparate treatment claim, finding statistics "insufficient in themselves to create a triable issue of fact of intent to discriminate" based on age).

In response to ABOR's Motion, Doe alleged the "anomalies" Kaufman cites "cannot be explained by non-discriminatory possibilities." [Doc. 189 at 17.] The Court knows this is incorrect. Kaufman candidly admits the disparities could be explained by non-gender factors. [Doc. 155-10 at 113 ("[E]ven within combination of charges there may be non-gender factors that affect the severity of sanctions.").] That admission renders Kaufman's opinions unreliable and inadmissible to establish intentional gender bias under binding Ninth Circuit precedent. *See also I.V. v. Wenatchee Sch. Dist. No. 246*, 342 F. Supp. 3d 1083, 1092 (E.D. Wash. 2018) (holding expert's admission that motive for allegedly discriminatory statements might not have related to plaintiff's perceived sexual orientation "demonstrates the unreliability of [the expert's] opinion and highlights the speculative nature of her opinion").

### 2. The Court Erroneously Abdicated Its Gatekeeping Role.

The Court accepted Kaufman's opinions at face value. [Doc. 209 at 55 ("And <u>on its face</u>, Dr. Kaufman's statistical analysis suggests that a gender-based disparity exists in this area." (emphasis added)).] Rather than critically evaluate Kaufman's work, the Court simply held that ABOR's opposition to Kaufman's opinions was "an argument as to the weight of the evidence that ABOR can pursue at trial through cross-examination." [Doc. 209 at 57-58 (*citing Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108 (9th Cir. 2011); *Currier v. United Tech. Corp.*, 393 F.3d 246 (1st Cir. 2004)).] This approach violates the Court's role as gatekeeper to ensure the reliability of expert testimony, including statistical evidence, before admitting that evidence for any purpose. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)

("[U]nder the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."). As the Ninth Circuit instructs, "dismissing an argument as 'going to the weight, not admissibility, of [the expert's] testimony' is not a reliability determination." *U.S. v. Valencia-Lopez*, 971 F.3d 891, 899 (9th Cir. 2020) (holding district court abused its discretion in admitting expert testimony) (citations omitted)).

Moreover, neither of the cases cited by the Court involved the type of purely mathematical calculation on which Doe relies. The issue in *Earl* was whether plaintiff had raised a triable issue of fact as to pretext, not a *prima facie* case of discrimination.[4] 658 F.3d at 1113 ("A plaintiff may raise a triable issue of pretext through comparative evidence that the employer treated younger but otherwise similarly situated employees more favorably than the plaintiff."). *Earl* held that a jury should decide whether specific, identified employees were similarly situated to plaintiff. *Id.* at 1116. As Kaufman never attempted to identify similarly situated female students, there is nothing to compare and *Earl* is inapposite. *Currier*, a First Circuit case not cited by the parties but added to the Order, is even more distinguishable. The appeal arose from the denial of a motion for judgment as a matter of law following trial. 393 F.3d at 248. The court found no abuse of discretion in admitting the evidence at trial, as "the district court faced a moving target, both in the nature of the company's objections and in the state of the evidence." *Id.* at 251. In fact, defendant did not even make the argument at issue until after the trial. *Id.* No such circumstances exist here.

Even if Doe identified specific comparators (he did not), the Court is required to evaluate those alleged comparators on summary judgment. *See Freyd v. Univ. of Or.*, 990 F.3d 1211, 1218-19 (9th Cir. 2021). In *Freyd,* plaintiff asserted Title VII and Title IX claims, alleging, *inter alia*, gender-based disparate treatment in connection with faculty members'

---

[4] This Court recognized *Doe v. Univ. of Denver*, 1 F.4th 822 (10th Cir. 2021), as inapposite because the evidence in that case was offered to demonstrate pretext. [Doc. 209 at 57.] The Court should withdraw its reliance on *Earl* for the same reason.

5

salaries. Plaintiff appealed the grant of summary judgment to defendant. *Id.* at 1219. [5] The Ninth Circuit first confirmed that a disparate treatment theory requires proof of discriminatory intent.[6] *Id.* at 1228. Finding plaintiff had "not presented direct or circumstantial evidence of discriminatory intent," the court considered whether plaintiff established a *prima facie* case under *McDonnell Douglas* by showing "similarly situated individuals outside of her protected class were treated more favorably than her." *Id.* at 1228-29. The court evaluated the specific attributes of the alleged comparators, finding they engaged in retention negotiations, while plaintiff only sought a retroactive equity raise. *Id.* The Ninth Circuit affirmed the grant of summary judgment on both the Title VII disparate treatment and Title IX claims, finding "[b]ecause equity raises and retention raises are not comparable, we cannot say that Freyd's comparators were treated 'more favorably' than was Freyd in this context." *Id.*; *see also Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006) (affirming summary judgment where alleged comparators were not "similarly situated in all material respects").

The Ninth Circuit has further confirmed that an expert who has access to the information necessary to determine whether alleged comparators are similarly situated must utilize it, and an expert's failure to do so renders the statistical analysis unreliable and insufficient to raise a triable issue of fact. *See Pottenger v. Potlatch Corp.*, 329 F.3d 740, 748-49 (9th Cir. 2003) (affirming summary judgment of disparate treatment claim). It is undisputed Kaufman had access to the specific information necessary to accurately conduct his statistical analysis, but he did not utilize it. This renders his analysis unreliable and insufficient to raise a triable issue of fact at summary judgment. [Doc. 141-1, Ex. A, ¶ 5, 11; 8/18/22 Transcript (Ex. 1), 49:15-52:18, 58:12-16.]

An additional fact establishing that what the Court described as "statistical

---

[5] Title IX claims are analyzed like Title VII claims. *See Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022) ("We construe Title IX's protections consistently with those of Title VII.").

[6] As with disparate treatment under Title VII, Title IX requires evidence of intentional discrimination. *See Freyd*, 990 F.3d at 1229 (affirming summary judgment on Title IX; "As with her Title VII disparate treatment claim, because Freyd has presented no evidence of intentional discrimination, there is no genuine issue of material fact here.").

anomalies" can be explained by non-gender factors—and thus not sufficient to create a triable issue—is the ASU Procedures themselves. They provide that, in determining the appropriate sanction to impose, the Dean considers "any mitigating or aggravating factors, including any prior violations of the Student Code of Conduct." [Doc. 155-2 at 65.] Kaufman did not consider prior violations in attempting to "compare" sanctions received by males and females, which ABOR pointed out during oral argument. [Ex. 1, 58:12-16.] The Court's failure to consider this evidence demonstrating the impotence of Kaufman's analysis is manifest error.

### 3. The Court Reached An Erroneous Conclusion Without Evidence And Based On An Argument Doe Did Not Make.

The Court excused Kaufman's decision to base his analysis on the charge rather than the actual conduct and treat all F-23 violations as comparable, "find[ing] it persuasive that Section F-23's definition of 'sexual misconduct' is a definition both created and used by ASU, which suggests that ASU has already decided it unifies a population of similarly situated respondents in some material respect." [Doc. 209 at 59.] Doe never made this argument. Ninth Circuit law is clear that courts are to rule based on the evidence and arguments made by the parties, and it is improper for a court to create arguments on behalf of a party. *See Indep. Towers of Wash. v. Wash.*, 350 F.3d 925, 929 (9th Cir. 2003) ("Our adversarial system relies on the advocates to inform the discussion and raise the issues to the court."); *Bias v. Moynihan*, 508 F.3d 1212, 1219 (9th Cir. 2007) (rejecting plaintiff's assertion that court should have searched the record for evidence supporting her claim, noting that "[a] district court lacks the power to act as a party's lawyer[.]").[7]

The Court also manifestly errs because the Order does not cite evidence supporting its supposition that ASU "decided" all F-23 violations were comparable. In fact, the undisputed evidence is directly contrary. The definition of "sexual misconduct" has three subsections: E-17(a), which includes sexual violence and sex without consent; E-17(b),

---

[7] The Court's statement was also not in the Court's Tentative Ruling, so ABOR was unable to address it at oral argument.

7

which includes stalking and sexual harassment; and E-17(c), which includes indecent exposure, voyeurism, and non-consensual audio or video recording. [Doc. 155-2 at 53.] Davis explained to Doe that he was being investigated under (a) and (c), but not (b). [Email from T. Davis to J. Doe (Ex. 2); Doc. 155-8 at 10-12.] Doe was ultimately found responsible for engaging in sex with Roe without her consent, which violates E-17(a). [Doc. 155-4 at 183.] Thus, even accepting the false proposition that all violations of the same section of the Student Code of Conduct (the "Code") are necessarily comparable, Kaufman should have limited his analysis to only those students alleged to have violated E-17(a).

The Court's decision to substitute the Code section charged for actual comparable conduct is further erroneous because it centers the analysis, <u>not</u> on the salient issue of the conduct in which the comparators engaged, but rather on how a particular institution's code is written. This approach will lead to arbitrary variations in the application and enforcement of Title IX.[8] That does not make sense or follow the law, but is the outcome ordained by the Court's Order.[9] As stated above, statistics support a *prima facie* showing of discriminatory intent only if they indicate "a clear pattern, unexplainable on grounds other than [gender]." *Gay*, 694 F.2d at 552.

### 4. The Court Erroneously Shifted The Burden Of Proof To ABOR.

During oral argument, the Court asked whether ABOR had "shown that, in fact, every single one of the women who did not receive the severe punishment was engaged in these far less serious forms of F-23 violations." [Ex. 1, 51:19-23.] Although the Court acknowledges it is not ABOR's burden to conduct such an analysis, its Order faults ABOR for not doing so: "[T]here is no evidence that the distribution of violations is actually skewed along gender lines in this manner—ABOR simply identifies two cases involving relatively mild violations by female respondents and two cases involving relatively serious violations by

---

[8] Kaufman was only able to compare incomparable <u>conduct</u> because the conduct fell within a broad definition of "sexual misconduct" (E-17(a)-(c)) rather than stand-alone sections of the Code separating non-consensual sexual contact from other forms of sexual misconduct.

[9] The Order will also incentivize universities to endure the unnecessary expense of redrafting their codes of conduct so that charge-focused analyses cannot be used to get to trial without actually providing evidence of intentional discrimination.

8

male respondents and speculates that the remaining cases may follow the same pattern." [Doc. 209 at 59.] Respectfully, it is Kaufman's conclusions that constitute speculation. The Court's improper burden-shifting is another manifest error, ignoring settled law that ABOR is not required to support its Motion with evidence "*negating* the opponent's claim." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (emphasis in original).

### 5. The Evidence Proves The Unreliability Of Kaufman's Analysis.

Demonstrating that the Court's rejection of ABOR's arguments as "speculation" was erroneous, attached as Exhibit 3 is a chart identifying disciplinary cases involving the 10 female students found responsible for violating Section F-23 (as relied upon by Kaufman and, ultimately, the Court), along with a description of the alleged conduct at issue, where available.[10] Of the nine female respondents (for whom information was produced in this litigation), the overwhelming majority were alleged to have engaged in either sexual harassment, as defined in Section E-17(b), or indecent exposure, as defined in Section E-17(c). Further, the female alleged to have engaged in non-consensual sexual contact under E-17(a) involved conduct not comparable to the circumstances here. [*See* Ex. 4, pp. 7-9, Row 98 (female student was alleged to have gone into male's room, at which point male's roommate left, assuming they wanted to be alone, female touched and kissed male and took off her clothes; male covered himself with a blanket and ignored female until she left).] There was no allegation of sexual intercourse or penetration without consent, a fact that explains the female's receipt of a lesser sanction than Doe. In view of this evidence, which, again, ABOR produced to Doe but had no burden to identify for the Court, and which Kaufman ignored, there is no basis for the Court's conclusion that Kaufman's statistics are relevant on the issue of gender bias. None of the females on which Kaufman relied are valid comparators, and Kaufman's calculation is irrelevant.[11]

---

[10] The documents used to prepare this chart are attached as Exhibits 4 and 5.

[11] Even if Kaufman's original pool of 10 females was supportable, such "statistical evidence derived from an extremely small universe … has little predictive value and must be disregarded." *See, e.g.*, *Aragon v. Rep. Silver State Disposal Inc.*, 292 F.3d 654, 663 (9th Cir. 2002). "The problem with a small number, of course, is that slight changes in the data can drastically alter the result." *Id.* Here, with only 10 females as purported comparators, a

9



1        The Court's reliance on Kaufman to defeat summary judgment is in error. Summary
2 judgment is required, as the three alleged procedural irregularities are themselves insufficient
3 to show (or create a triable issue of fact regarding) gender bias.

       **B.**     **The Court Commits Manifest Error In Relying On Three Alleged "Procedural Irregularities."**

6        The Court's August 30, 2022 Order identifies three occurrences that it finds a
7 reasonable juror could view as procedural irregularities. This is important because the Court
8 noted that procedural irregularities—while <u>not</u> dispositive on their own—can support an
9 inference of gender bias when considered along with "other evidence."[12] As noted, the
10 solitary "other evidence" cited by the Court is Kaufman's inapposite "statistical" analysis.
11 The Court committed manifest error because the alleged irregularities are either not
12 irregularities at all, or they are harmless and, by definition, cannot create a genuine issue
13 regarding gender bias. We address each in turn.[13]

14        **1.**     **Doe's December 21, 2022 Review Of The Investigative Report.**

15        The Court does not hold Doe to the black letter law requiring him to identify record
16 evidence sufficient to demonstrate genuine issues of material fact on his claim of intentional
17 gender bias. *See, e.g.*, *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1030-31 (9th Cir. 2001)
18 ("Whether the evidence is attached or not, Rule 56(e) requires that the adverse party's
19 'response,' not just the adverse party's various other papers, 'set forth specific facts'
20 establishing a genuine issue."); *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818
21 F.2d 1466, 1468 (9th Cir. 1987) ("[T]o withstand a motion for summary judgment, the non-
22 moving party must show that there are "genuine factual issues that properly can be resolved
23 only by a finder of fact *because they may reasonably be resolved in favor of either party*." (quotations

---

change with respect to any female alters the result by 10%. Kaufman's statistics rely on too small of a sample size to bear the heavy weight the Court places on it.

[12] The Court relied exclusively on Rule 12(b)(6) cases, but "inferences" of gender bias are not evidence sufficient to surmount summary judgment.

[13] The Court found three procedural irregularities, two of which are harmless and one of which was not disclosed. None of them evidence gender bias. The Court's characterizations of the proceeding as "marred by an array of procedural irregularities" or based on a "one-sided investigation" [Doc. 209 at 60] are inaccurate.

COHEN DOWD QUIGLEY

omitted) (emphasis in original). This alone constitutes manifest error.

In the Order, the Court goes to lengths never attempted by Doe, examining the record to try to identify "evidence" appearing to create a question of fact. The Ninth Circuit has explained that this approach is patently unfair to ABOR as the movant and creates the very real risk—a risk manifested in this case—of the Court denying summary judgment based on illusory questions of fact:

> Requiring the district court to search the entire record for a genuine issue of fact, even though the adverse party does not set it out in the opposition papers, is also profoundly unfair to the movant. … If the district court, or later this court, searches the whole record, <u>in practical effect, the court becomes the lawyer for the respondent, performing the lawyer's duty of setting forth specific facts showing that there is a genuine issue for trial. The movant is then denied a fair opportunity to address the matter in reply papers.</u> Unless the court holds oral argument and brings up the fruit of its search, the movant never receives notice and an opportunity to be heard on the critical evidence. <u>If given an opportunity, the movant might sometimes be able to show that the appearance of a genuine issue of fact was illusory.</u>

*Carmen*, 237 F.3d at 1030-31 (emphasis added); *accord Bias,* 508 F.3d at 1219 ("A district court lacks the power to act as a party's lawyer, even for *pro se* litigants.").

Here, the Court assumes Doe's burden and then misapprehends the facts and evidence in the record. In particular, the Court interprets the following statements to Davis by Roe on December 11, 2016 as "new, substantive information," which the Court identifies for the first time in its Order (and which Doe did <u>not</u> cite in response to ABOR's Motion):

− Roe's comment that she was "too intoxicated," was not "aware of what was going on" and did "not remember what happened."[14] [Doc. 209 at 38.] This is not "new" information. In <u>every</u> interview between Roe and the police and/or Davis, Roe indicated she was intoxicated and could not recall all details. [*See* Doc. 189-2 at 44 (stating she was "extremely drunk," "didn't know what was going on," "so intoxicated that she was not able to move or try to physically prevent the incident" and "could not remember" details); Doc. 155-1 at 66 (Roe was "too drunk" and "unsure exactly how her clothes came off"), 68

---

[14] The Court's conclusion regarding this "new, substantive information" is further belied by Doe's argument regarding Roe's alleged "inconsistent statements" as of October 2016. [*See* Doc. 189 at 14-15.]

(stating she "does not remember what was occurring in the hall" or "who initiated them leaving" and "does not remember who or how she flipped, but knows she did not have control of her body and one of them moved her"); Doc. 189-2 at 32-34 (stating she "couldn't walk … [b]ecause [she] was really drunk," and did not remember details).] In fact, in his December 9, 2016 letter—<u>before</u> Roe's December 11 meeting with Davis—Doe responded to Roe's earlier assertion that she did not recall certain details. [Doc. 189-2 at 76 (Doe offering arguments "to prove her lack of credibility and to undermine the argument that her inability to comprehend the situation").]

− Roe's statement that she "did not say 'stop' because she was too intoxicated." [Doc. 209 at 38.] This assertion also cannot credibly be construed as "new" information. Two days earlier, Doe responded to Davis and sought to refute the same statements made previously by Roe. [Doc. 189-2 at 69 ("She was, she testified … [t]oo intoxicated to even say no or physically try to stop them. … Her allegation is that she… was so intoxicated she couldn't resist or say a word."), 71 n.1 ("She …didn't even try to say anything because of her intoxication. … She understood she was engaged in sex acts <u>but claims she could not resist or even utter 'no</u>,' despite the demonstrated ability to do both[.]" (emphasis added)).]

− Roe's statement that "'she was not aware that a photo was taken.'" [Doc. 209 at 38.] Davis' Report actually states:

> Jane Roe stated that just because she can remember the room and the fact that John Doe and Cordova were present does not mean that she was aware of what was going on. Jane Roe also stated that she was not aware that a photo was taken, but remembers seeing a flash and being told…to not worry about it. Jane Roe was previously unaware that the photo showed both her and John Doe.

[Doc. 155-1 at 98.] Roe's memory of a flash and uncertainty that a photo was taken, and/or what it depicted is not "new, substantive information." In police interviews, following an officer's request for photos from Roe, Roe remembered: "They took pictures. … I don't know.  I don't know -- I just remember the flashing light and they were like, 'Oh we're not taking pictures', but I was like they were taking pictures." [4/3/16 Interview Transcript (Ex. 6).] Even the Court calls the recording "surreptitious." [Doc. 209 at 1, 3.]

The Court's inaccurate finding that these statements constitute "new, substantive information," and its decision to venture "outside the adversarial issues presented to the [C]ourt by the parties" warrants reconsideration. *Defs. of Wildlife*, 909 F. Supp. at 1351.[15] Also warranting reconsideration is the Court's erroneous conclusion that this so-called irregularity violated ASU's Procedures. Davis did <u>not</u> violate any Procedure in stating that Roe "did not offer any new evidence." No "Procedure" requires Davis to use particular language or to determine whether Doe may deem each and every statement provided by Roe to contain "new, substantive information." Neither Doe nor the Court identifies a Procedure Davis' statement allegedly violated. The Court also concludes that Davis somehow violated "§ C(5) of the Procedures" by not affirmatively presenting Doe with Roe's December 11, 2016 statements. [Doc. 209 at 39.] In originating this argument, the Court misconstrues the Procedures which, as the Court quotes, require Davis "provide the parties with an opportunity to respond to all investigative materials" "upon request." [Doc. 155-2 at 64.] Davis followed this exact Procedure and, "upon request" of Doe's counsel, immediately provided Doe with a third opportunity to review and respond to the investigative materials. [Doc. 189-2 at 63-64 ("Although she disagreed with statements in your letter, she did not offer any new evidence or witnesses. <u>I am happy to have you come in to view her responses</u>." (emphasis added)); *see also* Doc. 155-1 at 79-81, 115-123; Doc. 189-2 at 61-64.] The Court's conclusion that Davis' conduct violated a Procedure is manifestly erroneous.

Finally, even if the Court's "procedural irregularity" conclusion is not manifestly erroneous, the Court commits yet another serious error in failing to consider the harmlessness of the alleged irregularity (confirmed by the Court's recognition that Doe did in fact review and respond to Roe's December 11 comments, and that Hightower considered Doe's submission). *See Doe v. Univ. of S. Ind.*, 43 F.4th 784, 795-96 (7th Cir. 2022) (irregularities in plaintiff's favor do "not show an antimale bias against him"); *Doe v. Case W.*

---

[15] Doe never disclosed this theory of alleged procedural irregularity. As a result, ABOR did not conduct discovery on this allegation, address the alleged "new information" in its summary judgment briefing, or attach relevant exhibits to its briefing. The one and only time it has been asserted is by the Court in its Order.

13

*Rsrv. Univ.*, 2019 WL 1982266, at *9-11 (N.D. Ohio May 2, 2019) (holding plaintiff could not show gender bias as any purported was harmless); *Doe v. Wash. & Lee Univ.* 2021 WL 1520001, at *12 (W.D. Va. Apr. 17, 2021) (discussing the "applicable law" at summary judgment and the causation requirement of Title IX (citation omitted)). As the alleged irregularity was inarguably cured by Doe and his lawyer's review and response to Roe's comments, it had no effect on the outcome of Doe's disciplinary proceeding and the irregularity could not be probative of whether the decision was motivated by gender bias.

### 2.    ASU's Disclosure Of The Sexual Misconduct Charge.

The Court misapprehends the facts, misconstrues ASU Procedures, and makes several errors of law in concluding ASU did not provide Doe notice he was being charged with "sex by force" and that this failure was a procedural irregularity. [Doc. 209 at 41-43.].

First, with respect to ASU's disclosure of charges to Doe, there is no dispute ASU provided Doe written notice of charges relating to his encounter with Roe, including sexual misconduct under Section F-23. [Doc. 189-2 at 16-17.] There is also no dispute ASU identified the full range of misconduct under F-23, including force. [*Id.*] There is further no credible dispute Doe had notice that force was at issue. [*See* Doc. 155-8 at 11 (explaining the charges to Doe; stating subsection (a) was at issue, but ASU was not investigating subsection (b)); *see also* Ex. 2 (explaining subsections (a) and (c) of sexual misconduct are at issue).] Indeed, three days <u>after</u> receiving Davis' December 6, 2016 explanation of the charges, Doe's counsel sent a December 9, 2016 letter acknowledging that force was at issue. [Doc. 189-2 at 66 (addressing "the three categories of misconduct, as we understand them based on our communications with you"), 68 (addressing force; arguing "[n]o force was used"), 69 (stating Roe's "force and consent theory rests entirely on her intoxication").] The Court's conclusion that ASU failed to disclose a "sex by force" theory is belied by undisputed evidence authored by Doe and compels reconsideration.

The Court further erred in concluding that providing notice of the "charge" without detailing a "sex by force" theory violated the Procedures. The Procedures require notification to a respondent of "the alleged violation" and provide that all parties will receive

14

"an explanation of the charges which have been made." [Doc. 155-2 at 64.] Doe offers no evidence that the Procedures require a detailed description of each theory of sexual misconduct, nor does the Court cite such evidence. Instead, all evidence indicates that notification of the charge means notification of the code violation at issue. [Doc. 155-1 at 41 (confirming "charge" refers to the provisions of Code being investigated).] Doe received the precise notice the Procedures require; a procedural irregularity cannot exist.

The Court's analysis is also inconsistent with its conclusion regarding Doe's "statistical anomalies" argument. The Court cannot defensibly conclude (i) that the array of conduct under F-23 is so broad that if ASU does not give notice of the specific theory of misconduct alleged there is a procedural irregularity, and then—10 pages later—assert (ii) ASU "has already decided" that the expansive F-23 charge "unifies a population of similarly situated respondents" such that the Court can consider all F-23 allegations as a whole for purposes of Doe's "statistical anomalies" argument. This inherent contradiction exemplifies the manifest error permeating the Court's Order.

Next, even if a procedural irregularity existed, the Court commits legal error by ignoring harmlessness. *Univ. of S. Ind.*, 43 F.4th at 795; *Case W. Rsrv. Univ.*, 2019 WL 1982266, at *9-11; *Wash. & Lee Univ.*, 2021 WL 1520001, at *12. The Court improperly disregards ABOR's argument by contending ABOR did not move for summary judgment on causation. [Doc. 209 at 43 ("At any rate, ABOR did not move for summary judgment on causation[.]").] That assertion is belied by ABOR's summary judgment briefing and the Court's own Order, requiring Doe to show that gender bias affected (*i.e.*, caused) the outcome. [*See, e.g.*, Doc. 155 at 2 (seeking summary judgment as "Doe cannot come forward with actual evidence showing that the disciplinary decision against him was <u>infected by</u> anti-male gender bias"), 4 ("Doe must establish that he was expelled from ASU <u>because of his gender</u>….Doe must supply evidence that gender bias <u>influenced the outcome</u> of his disciplinary proceedings ….Absent such evidence, ABOR is entitled to summary judgment"), 18 ("Doe bears the burden of producing evidence from which a reasonable jury could fairly conclude that <u>gender bias tainted</u> his disciplinary proceedings[.]") (emphasis added); Doc.

15

209 at 17 (discussing cases requiring a "plausible link" to gender bias or that bias is the "source of any error"), 22 ("to survive summary judgment, Doe must proffer evidence that would permit a reasonable juror to infer that his <u>sex was a motivating factor in</u> ASU's handling of <u>his disciplinary proceeding</u> (emphasis added)), 25 (finding no impact or influence on the outcome of Doe's disciplinary proceedings), 31 (discussing cases finding evidence that bias "tainted" or "infected the outcome"; holding no reasonable juror could find Rund's statement as evidence of gender bias).] ABOR's Motion was premised on Doe's failure to come forward with evidence that gender bias affected the disciplinary decision. That is the essence of causation and the basis of ABOR's Motion.

### 3. The Arizona Court of Appeals ("ACOA") Decision.

The Court's conclusion that the ACOA Decision is evidence of a procedural irregularity is manifestly erroneous. First, this argument was never disclosed. In violation of the Mandatory Initial Disclosure Pilot Program ("MIDP") (Doc. 11 at 4, 7), Doe did not disclose any <u>legal theory</u> construing the ACOA Decision as evidence of a procedural irregularity. Doe did not raise this argument in his Response or at oral argument. Indeed, Doe rejected this argument, asserting instead that the ACOA Decision by itself establishes gender bias or what he called at oral argument a "substantive" violation of Title IX processes. [Doc. 189 at 5 (arguing ACOA Decision is "law of the case" and evidence in and of itself of gender bias); Ex. 1, 62:7-15 (arguing ASU's findings are a "substantive problem with the Title IX process" and "not a procedural issue").][16] The Court disregards Doe's late-disclosed legal theories and substitutes its own new legal theory, *i.e.*, the ACOA Decision evidences a procedural irregularity. The Court's advance of a new argument for Doe to overcome summary judgment is improper, "profoundly unfair," and constitutes manifest error. *See, e.g., Carmen*, 237 F.3d at 1030-31; *accord Bias*, 508 F.3d at 1219.

The Court's search for facts in Doe's MIDP (facts Doe did not identify in his

---

[16] Prior to his Response, Doe never disclosed a legal theory that the ACOA Decision alone is evidence of gender bias. And, prior to oral argument, Doe had not disclosed a legal theory that the ACOA Decision evidences a substantive Title IX violation. No amount of scouring the record will prove otherwise.

16

Response or at oral argument) to justify consideration of the ACOA Decision is likewise improper, as it rewards Doe's failure or refusal to disclose actual legal theories.[17] *Cramton v. Grabbagreen Franch. LLC*, 2020 WL 5880153, at *10 (D. Ariz. Oct. 2, 2020) (excluding undisclosed legal theory relating to damages as "obviously different" from that set forth in MIDP). It defies logic to conclude Doe disclosed a legal theory that he expressly eschewed at oral argument. It is manifest error to adopt the role of advocate and make new arguments for Doe. *Defs. of Wildlife*, 909 F. Supp. at 1351.

Similarly warranting reconsideration is the Court's conclusion, relying exclusively on *Doe v. Regents*, that the ACOA Decision evidences a procedural irregularity. The Order does not state what violations of ASU Procedures are evidenced by the Decision, nor could it. Reversal on appeal is an outcome specifically contemplated by the Procedures and statute governing judicial review of administrative decisions. The fact that the ACOA ultimately disagreed with the outcome is not evidence of a procedural irregularity, where all applicable Procedures were followed, and is certainly not an irregularity indicative of gender bias. *See Univ. of S. Ind.*, 43 F.4th at 799 ("Appellate courts do not quickly infer that an erroneous result must have been caused by unlawful bias, especially in difficult credibility contests."). In addition, the extraordinary facts set forth in the *Doe v. Regents* case do not exist here. ABOR strenuously opposed Doe's administrative appeal, and Rund's decision <u>was upheld by the Superior Court</u> before the ACOA reversed. It is manifest error to find a "procedural irregularity" based solely on the ACOA Decision.

## II. CONCLUSION.

Doe did not satisfy his burden of proffering actual evidence that he was expelled because of anti-male gender bias and the Court's effort to fill the gaping holes in Doe's position is improper and misapprehends the record. The Order denying summary judgment is manifestly erroneous. ABOR respectfully requests the Court reconsider its Order and grant ABOR's Motion for Summary Judgment (Doc. 155).

---

[17] Moreover, just as it is not plausible to interpret his MIDP as disclosing Doe's new theory regarding Exhibit M [Doc. 209 at 30], it is equally implausible to interpret a mere factual reference to the ACOA Decision as an adequate disclosure of a legal theory.

RESPECTFULLY SUBMITTED this 13th day of September, 2022.

        COHEN DOWD QUIGLEY
        The Camelback Esplanade One
        2425 East Camelback Road, Suite 1100
        Phoenix, Arizona 85016
         Attorneys for Defendants

By: */s/ Betsy J. Lamm*
   Daniel G. Dowd
   Betsy J. Lamm
   Rebecca van Doren
   Jenna L. Brownlee

18