1    **WO**

2

3

4

5

6              **IN THE UNITED STATES DISTRICT COURT**

7                **FOR THE DISTRICT OF ARIZONA**

8

9    Unknown Party,                          No. CV-18-01623-PHX-DWL

10              Plaintiff,                    **ORDER**

11   v.

12   Arizona Board of Regents, et al.,

13              Defendants.

14

15          Pending before the Court are four motions to exclude expert testimony.  Defendant

16   Arizona Board of Regents ("ABOR") moves to exclude the opinions of Curtis Owen (Doc.

17   158) and Cindi Nannetti (Doc. 161), while Plaintiff John Doe moves to exclude certain

18   opinions of Peter F. Lake (Doc. 164) and Jason Borrelli and Dwight Duncan (Doc. 165).

19   Each motion is addressed below.[1]

20                            **ANALYSIS**

21   I.    Legal Standard

22          "The party offering expert testimony has the burden of establishing its

23   admissibility."  *Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d

24   1144, 1154 (9th Cir. 2012).  Rule 702 of the Federal Rules of Evidence governs the

---

[1]      Also pending is ABOR's motion to exclude the opinions of Dr. Lance Kaufman. (Doc. 159.)  Although that motion was addressed in the tentative ruling issued before oral argument (Doc. 210), ABOR has now raised, in its motion for reconsideration of the summary judgment ruling, arguments that go to the admissibility of Dr. Kaufman's opinions.  (Doc. 227.)  Accordingly, the Court will defer ruling on the motion to exclude Dr. Kaufman until it reviews Doe's response to the motion for reconsideration.  As noted in the minute entry issued after oral argument, that response will also serve as a supplemental brief regarding the motion to exclude Dr. Kaufman.  (Doc. 231.)

admissibility of expert testimony.  It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

As for the threshold requirement that an expert witness be qualified "by knowledge, skill, experience, training, or education," "Rule 702 contemplates a broad conception of expert qualifications." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (internal quotation marks and emphasis omitted).  Years of relevant experience can establish the necessary "minimal foundation." *Id.* at 1015-16.  "Disputes as to the strength of [an expert's] credentials . . . go to the weight, not the admissibility, of his testimony." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998) (first alteration in original) (internal quotation marks omitted).

A district court's decision to admit or exclude expert testimony is guided by a two-part test that focuses on the opinion's relevance and reliability. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  "The inquiry envisioned by Rule 702 is . . . a flexible one." *Id.* at 594.  "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Id.* at 587 (quoting Fed. R. Evid. 401).  "The Rule's basic standard of relevance thus is a liberal one." *Id.*

The basic standard of reliability is similarly broad.  "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of

proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). *See also* Fed. R. Evid. 702, advisory committee's note to 2000 amendment ("[P]roponents do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable. . . . The evidentiary requirement of reliability is lower than the merits standard of correctness.") (alteration in original) (internal quotation marks omitted).

Nevertheless, courts serve an important "gatekeeper" role when it comes to screening expert testimony. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997). "Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592 (citation omitted). "Presumably, this relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.* This "general 'gatekeeping' obligation . . . applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

The Court has "broad discretion," both in deciding whether the evidence is reliable and in deciding how to test for reliability. *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). In *Daubert*, the Supreme Court listed various factors that might apply, including whether the expert's technique or theory (1) can be tested; (2) has been peer reviewed or published; (3) has a known or potential basis for error; and (4) is generally accepted in the pertinent scientific community. 509 U.S. at 593-94. However, "[t]he *Daubert* factors were not intended to be exhaustive nor to apply in every case." *Hankey*, 203 F.3d at 1168. In particular, "[t]he *Daubert* factors . . . simply are not applicable to [testimony] whose reliability depends heavily on the knowledge and

experience of the expert, rather than the methodology or theory behind it." *Id.* at 1169.  *See also* Fed. R. Evid. 702, advisory committee's note to 2000 amendment ("Some types of expert testimony will be more objectively verifiable, and subject to the expectations of falsifiability, peer review, and publication, than others.  Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise.").  The bottom line is that "[t]he trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted.  The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded."  *See* Fed. R. Evid. 702, advisory committee's note to 2000 amendment.

Finally, "expert testimony is inadmissible if it concerns factual issues within the knowledge and experience of ordinary lay people because it would not assist the trier of fact in analyzing the evidence."  *Liberty Life Ins. Co. v. Myers*, 2013 WL 524587, *5 (D. Ariz. 2013).  *See also Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 2020 WL 2553181, *6 (S.D. Cal. 2020) ("Expert testimony is inadmissible if it addresses lay matters which a jury is capable of understanding and deciding without the expert's help.") (internal quotation marks omitted); *In re Apollo Grp. Inc. Sec. Litig.*, 527 F. Supp. 2d 957, 961-62 (D. Ariz. 2007) ("[E]xpert testimony is inadmissible if it concerns factual issues within the knowledge and experience of ordinary lay people, because it would not assist the trier of fact in analyzing the evidence.").  In the Ninth Circuit, "[t]he general test regarding the admissibility of expert testimony is whether the jury can receive 'appreciable help' from such testimony."  *United States v. Gwaltney*, 790 F.2d 1378, 1381 (9th Cir. 1986).

…

…

…

…

…

II.   <u>Discussion</u>

    A.   **Curtis Owen**

        1.   <u>The Owen Report</u>

Curtis Owen is a wrestling coach at Chandler High School.  (Doc. 158-1 at 2.)  He has extensive coaching and wrestling experience and was a three-time NCAA qualifier, Pac-10 champion, top 20 amateur wrestler at his weight class, and All-American at Arizona State University, among other accolades.  (*Id.*)  Owen "come[s] from a family of successful wrestlers [and] worked closely with [his family] throughout [his] career."  (*Id.*)

Doe asked Owen to testify on the following topics: (1) the qualifications needed to become a high school, college, and Olympic-level wrestling coach; (2) the impact on Doe's wrestling career of missing his final two years of NCAA eligibility; (3) the training opportunities, if any, that are lost by being unable to train at the Regional Training Center ("RTC") at ASU; (4) the alternatives to training at the RTC; (5) the impact of injuries on a wrestling career, including the injuries suffered by Doe; and (6) Doe's skill as a wrestler. (*Id.*)

Owen's opinions are as follows.  First, the more "high level" a coaching position is, the more elite a candidate's wrestling credentials must be—even "national-level high school programs are almost always staffed by former nationally competitive college wrestlers."  (*Id.* at 3.)  Second, "a college wrestler who misses the final two years of collegiate eligibility at his chosen school would have his opportunities diminished because most athletes are at their peak physically, mentally, and experientially when they are further into their careers."  (*Id.*)  Third, "not being able to train at the [RTC] in Arizona, would make it almost impossible to train properly in Arizona."  (*Id.* at 4.)   Fourth, "the RTC is the only option outside of the Olympic Training Center in Colorado."  (*Id.*)  Fifth, "even though [Doe] suffered some injuries, based on my experience as a wrestler and coach, they were not something that would keep an athlete from reaching his potential."  (*Id.*)  Sixth, "Doe had the skill and athleticism to be one of the best wrestlers in the country at the college level and beyond."  (*Id.*)

Owen is not being paid for his work on this case, has authored no publications in the past ten years, has never testified as an expert witness, and did not review documents to prepare his report.  (*Id.* at 2.)

2.   Analysis

ABOR seeks to exclude Owen from offering any opinions at trial.  (Doc. 158.)  In general, ABOR raises objections based on Owen's qualifications, the reliability of Owen's opinions, and the relevance of Owen's opinions.  ABOR's more specific objections, and Doe's responses, are addressed on an opinion-by-opinion basis below.

a.   **Coaching Qualifications**

ABOR asserts that, because Owen has always coached at the high school level or below, he is not qualified to opine on the qualifications needed to become a collegiate, national, or international wrestling coach.  (Doc. 158 at 4-5.)  ABOR also argues that Owen's opinions about coaching qualifications are "supported only by anecdotal information" and "[r]eliance on anecdotal observations or unfounded subjective beliefs does not satisfy Rule 702 or *Daubert I*."  (*Id.* at 9.)  Finally, ABOR asserts that Owen's opinions about the qualifications needed to coach high school and national or international wrestling are irrelevant because Doe's qualifications to coach high school are not in dispute and Doe's deposition testimony establishes that he only sought to be a Division I coach, not a national or international coach.  (*Id.* at 12.)

Doe responds that "Owen has substantial experience in wrestling, both as a former collegiate athlete and as a coach of a high-performing team. . . .  During Owen's own coaching tenure, he worked with numerous coaches, and was involved in all aspects of hiring and grooming coaches for future positions, including several coaches who are now coaching at elite programs. . . .  He does not have to be an NCAA coach to speak to the requirements of becoming an NCAA coach when the parameters are well established within the sport." (Doc. 190 at 4-5.)  As for reliability, Doe argues that Owen's experiences and education give him the capacity to "carefully consider all relevant information and evaluate Doe through a prism of curated wrestling knowledge.  Using this methodology,

Owen can reliably opine on Doe's . . . coaching prospects [] and related opportunity costs as a result of ABOR's actions." (*Id.* at 6.)   As for relevance, Doe argues that any uncontested information will "provide background information to help inform opinions that are contested," and "[t]o the extent ABOR deems the opinions are unnecessary, the remedy is to challenge them not exclude them." (*Id.* at 7.)

ABOR replies that Owen's "upbringing" and relationships do not qualify him to opine on collegiate hiring. (Doc. 194 at 3.)   ABOR further contends that "if his expertise is grounded solely in his personal experience," Owen does not "explain how his wrestling experience and high-school coaching generally provide a sufficient basis for his opinions on other discrete subjects." (*Id.*)   Finally, ABOR asserts that the challenged opinions are irrelevant because Doe is not seeking damages that rely on national/international wrestling coach wages and because Doe is already working as a high school coach (so his qualifications for that position are not in dispute). (*Id.* at 9-10.)

Whether Owen is qualified to opine on hiring criteria for NCAA coaches presents a fairly close call.   On the one hand, Owen has extensive experience as a decorated collegiate wrestler and high-school wrestling coach.   Even though he has never coached above the high school level, he has helped others rise to careers as Division I coaches and discussed the qualifications that benefitted them as they interviewed.   Owen also grew up in a family of college wrestling coaches and has discussed professional qualifications with them at length.   On the other hand, Owen has never hired collegiate coaches himself, so any understanding of what colleges are seeking is necessarily second-hand.   More important, Owen is imprecise about the scope of his opinion—he might be viewed as (1) opining on "requirements" with "well established parameters" that conclusively prevented Doe from seeking work as a collegiate wrestling coach, or (2) opining that such positions "almost always" go to candidates with substantial accolades and, based on Owen's experience, Doe accordingly would not have been hired for those roles.

The Ninth Circuit has emphasized that Rule 702 "is broadly phrased and intended to embrace more than a narrow definition of qualified expert." *Thomas v. Newton Int'l*

- 7 -

*Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994).  The proponent of expert testimony need only lay a "minimal foundation" of "knowledge, skill, experience, training, or education" in the topic at hand.  *Id.*  Although an expert may not offer opinions on matters "outside the areas of [the expert's] expertise," *Avila v. Willits Env't Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011), an expert's "lack of particularized expertise goes to the weight accorded her testimony, not to the admissibility of her opinion as an expert." *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993).  With that said, "lack of specialization may go to weight only as long as an expert stays within the reasonable confines of his subject area." *Avila*, 633 F.3d at 839.

Applying these principles, Owen is qualified to offer opinions about a collegiate wrestling coach's typical qualifications despite his lack of personal coaching experience at the collegiate level.  It is not difficult to believe that a coach who has been enmeshed in the wrestling world for 20 years, especially one surrounded by a family of collegiate wrestling coaches, would have a refined understanding of the implicit qualifications to be a wrestling coach at the collegiate level. *Cf. Hangarter*, 373 F.3d at 1015-16 (no error in district court's determination that an expert who had "significant knowledge of and experience within" the insurance industry was qualified to opine about the practices and norms of insurance companies in an area in which he lacked specialized knowledge).  Owen makes clear throughout his report that conversations and anecdotal experiences amassed during his 20 years of coaching support his conclusions, and he identifies examples of coaching careers that have informed his opinion.  (Doc. 158-1 at 6-7.)

The qualifications cases on which ABOR relies are distinguishable.  They involved putative experts who sought to opine on complex subjects outside their core expertise.  Here, in contrast, Owen is not inappropriately seizing the mantle of a college coach's expertise and stepping outside his own sphere to wield it—Owen asserts that he has developed his *own* expertise in how college-coach recruiting works through conversations and experiences.  Thus, comparisons to a police officer who wished to opine on forensic ballistics without training or experience on the issue (*Krause v. Cnty. of Mohave*, 459 F.

Supp. 3d 1258 , 1265-67 (D. Ariz. 2020)); or an accident reconstruction expert who wished to opine on vehicle electronic systems despite admitting to no experience in the field (*Manion v. Ameri-Can Freight Sys. Inc.*, 2019 WL 3858415 (D. Ariz. 2019)); or investors who wished to opine on a precise fiduciary standard of care without relevant training or experience (*In re GFI Com. Mortg. LLP*, 2013 WL 4647330, *6 (N.D. Cal. 2013)) fail because they assume Owen does not have relevant experience.  He does.

Next, ABOR contends that Owen's opinions regarding the qualifications necessary to become a collegiate coach are unreliable because (1) they "are supported only by anecdotal information—not research, data, personal experience, any comprehensive study of the qualifications of collegiate wrestling coaches, or the number of open positions available during the relevant time frame"; and (2) "Owen does not disclose a methodology employed in reaching his proffered opinions."  (Doc. 158 at 9-10.)  The Court disagrees. As discussed above, Owen is an experience-based expert who has adequately explained how his experiences informed his opinions regarding collegiate coaching qualifications. Nor is there any merit to ABOR's contention, raised during oral argument, that Owen's report is deficient because it fails to identify the *specific* experiences and conversations with third parties that led Owen to form the opinions at issue.  ABOR's analogy to *Longoria v. Kodiak Concepts LLC*, 2021 WL 1100373 (D. Ariz. 2021), is misplaced because the expert whose opinions were partially excluded in that case had "no first-hand experience" in the relevant industry and thus had to rely on "source material" to formulate his opinions. *Id.* at *13.  Because the expert failed to produce that source material after placing it "squarely at issue," the Court concluded that his resulting opinions lacked reliability.  *Id.* But here, Owen is an experience-based expert and has described, albeit in broad strokes, the experiences that provided the foundation for his opinions.[2]

Finally, although Owen's opinions regarding collegiate coaching qualifications are relevant (because Doe's claim for damages turns, in part, on ABOR's purported inference

---

[2]     The tentative ruling issued before oral argument did not directly address the reliability of Owen's opinions concerning collegiate coaching qualifications, which is a challenge that ABOR raised in its motion and reiterated during oral argument.  This new paragraph is intended to address that challenge.

with his plan to become a collegiate wresting coach), this does not mean that Owen's opinions about the necessary qualifications for high school and national/international/Olympic coaches are also relevant.  Doe has the burden to explain why all of Owen's opinions are relevant, *Bldg. Indus. Ass'n of Wash.*, 683 F.3d at 1154, but it is somewhat hard to make sense of Doe's response on this point.  It seems to boil down to two arguments: (1) the opinions will emphasize that ABOR's actions interfered with Doe's current and future job prospects; and (2) the opinions will help the jury understand the dynamics of a wrestling career at a high level and career prospects for a Division I wrestler.  (Doc. 190 at 7.)

The Court agrees with ABOR that Owen's opinions about high school coaching qualifications are irrelevant.  It is difficult to see how Owen's opinions about the qualifications for a job that Doe *already* holds will help the jury understand that ABOR's actions denied Doe the opportunity to work in his chosen field and unduly interfered with his current and future job prospects.

The Court also agrees with ABOR that Owen's opinions about national/international/Olympic coaching qualifications are irrelevant.  Doe does not explain why the jury would benefit from hearing about the qualifications for a job that Doe himself does not seek to perform.  Nothing prevents Owen from mentioning that those jobs *exist* to help the jury understand the industry overall, but opining about the qualifications required to obtain such jobs and implying that ABOR's interference prevented Doe from reaching those undisputedly unsought heights could only serve to confuse or inappropriately inflame the passions of the jury.

### b.   **Impact Of Non-Eligibility On Doe's Wrestling Career**

Owen's opinion is that college wrestlers are at their most productive during their final two years of college, which made ABOR's interference with Doe's wrestling career especially damaging because it "cost him many achievements and accolades that would have allowed him to increase his marketability (sponsorships and employment) and earning power down the road, should he choose to make his living as an athlete and then as a coach

at the collegiate and/or National level." (Doc. 158-1 at 3-4.)

This opinion is really a synthesis of two opinions: (1) college wrestlers are at their prime in their final two years of NCAA eligibility; and (2) Doe was a skilled wrestler who would have received many accolades in those two years.  ABOR apparently does not seek to exclude Owen's opinion about the usual trajectory of college wrestlers, which is reasonable given that Owen was, himself, a college wrestler and is presumably qualified to opine on that issue.

Owen's other point, which is that Doe would have achieved extraordinary success during his final two years, smuggles in Owen's sixth noticed opinion, which is that Doe had a great deal of wrestling skill.  But as discussed below, Owen's opinion of Doe's skill is inadmissible.  And armed with Owen's uncontested opinion that wrestlers mature in their final two years and the *assumption* that Doe was a talented wrestler, a juror could independently conclude that the impact of NCAA non-eligibility was particularly significant.  Because Owen's second opinion does not provide "appreciable help" to the jurors, it is inadmissible.  *Gwaltney*, 790 F.2d at 1381.

### c.   The RTC And Other Training Options

In the tentative ruling issued before oral argument, the Court stated: "As far as the Court can tell, ABOR doesn't seek to exclude Owen's third and fourth opinions, which are that being unable to train at the RTC in Arizona would make it difficult to train properly and that the only option for Doe other than the RTC was the Olympic Training Center in Colorado." (Doc. 210 at 11-12.)

During oral argument, ABOR stated that it "effectively" sought to exclude these opinions by moving to exclude, on relevance grounds, Owen's opinions regarding the qualifications to become a wrestling coach at the national, international, or Olympic levels.  According to ABOR, this is because the RTC opinions are intended to establish Doe's ability to compete on an international level or obtain a coaching position at that level.

This argument, even assuming it is properly raised in ABOR's motion papers, is unavailing.  Owen's third and fourth opinions are as follows:

1
2
3
4
5

In order to be an All-American or National Champion you need to have high-level coaching, top-tier workout partners that can give you the looks you need to improve, and quality facilities with the right equipment and space.  The other issue you can run into when not in the right environment is that working out with athletes that are not experienced can lead to injuries, because they do not move the right way and do not react correctly so you can get into situations that can get you hurt.

6
7
8
9
10
11
12
13
14

In order to be competitive at the international level, it is even more important that you are in a training environment with the best coaches and workout partners.  Not being able to train at the Regional Training Center ("RTC") in Arizona, would make it almost impossible to train properly in Arizona.  The RTC gives you the opportunity to wrestle with some of the best athletes in the country and to be trained by Olympic-level coaches.  There is no room for error at the highest level of wrestling and the only way to develop the technical, physical, and mental skills needed for this level of competition is to be in the right environment with the right people.  In Arizona and much of the Southwest, the RTC is the only option outside of the Olympic Training Center in Colorado.  The only competitive Division I program in the Southwest right now is Arizona State University, so you just will not get the facilities, partners, and coaching needed on a regular basis in the other Southwest training facilities.

15
16
17
18
19
20

(Doc. 148-1 at 3-4.)  The Court does not construe these opinions as being limited to Doe's ability to obtain an international coaching position.  Instead, these opinions more broadly address the steps Doe would have needed to follow to become a top wrestler.  And as noted, Owen elsewhere opined that being a top wrestler is a key qualification for becoming a collegiate wrestling coach.  Thus, Owen's third and fourth opinions are relevant.[3]

21

### d.   Impact Of Injuries

22
23
24

ABOR asserts that Owen is not qualified to offer opinions about the impact of Doe's injuries on his wrestling career.  (Doc. 158 at 5.)  Although Doe generally references Owen's opinion in his response brief (Doc. 190 at 3) and argues that all of Owen's opinions

25
26
27
28

[3]   To the extent Owen's first opinion (regarding coaching qualifications) includes that "[t]o get a National/International level coaching position such as a Regional Training Center Coach or Olympic Training Center Coach you would have to have successfully competed at the Olympics, World Championships, World Cup, or other well recognized events" (Doc. 158-1 at 3), that component of the first opinion has already been excluded by virtue of the Court's determination that testimony regarding the qualifications for non-collegiate wrestling positions is irrelevant.  But the distinct question here is whether Owen's third and fourth opinions are relevant.

are reliable (*id.* at 6), he does not respond to ABOR's point that Owen is unqualified to deliver this particular opinion.

Because Doe has the burden of explaining why Owen is qualified to deliver an expert opinion, *Bldg. Indus. Ass'n of Wash.*, 683 F.3d at 1154, the Court finds that Doe has forfeited the issue and that Owen may not opine on whether Doe's injuries would have adversely affected his wrestling career.  But even if Doe hadn't forfeited the issue, the Court is skeptical that Owen would be qualified to offer a medical prognosis on Doe's injuries, especially given how vaguely he describes them in his report.  *See, e.g.*, *Krause*, 459 F. Supp. 3d at 1266 (noting that the expert was not a trained medical professional and "obviously" could not testify about the severity of the plaintiff's injuries).

### e.    **Doe's Wrestling Skill**

ABOR argues that Owen is "not qualified to opine under the mantle of an expert . . . that Doe had the skill and athleticism to be one of the best wrestlers in the country at the college level and beyond" because "Owen's experience as an assistant high school wrestling coach, even when accompanied by his personal experience as a collegiate wrestler from 1997 to 2003, do not standing alone qualify Mr. Owen to opine on Doe's potential collegiate and post-collegiate accolades, including whether Doe would have achieved 'All-American' status.  Mr. Owen offers no data, besides his own unexplained subjective beliefs, to support his opinion."  (Doc. 158 at 6-7.) ABOR also asserts that Owen's opinion is unreliable because he does not "consider data relating to, *inter alia*, the weight class at which Doe would have competed, the other ASU wrestlers in that weight class during the relevant years, the wrestlers in that weight class at other Division I schools during the relevant years and their skill level, Doe's past wrestling performance (including his failure to achieve All-American status in the prior three years), or Doe's record competing against the specific wrestlers against whom he would have been matched during the relevant years.  (*Id.* at 8.)

Doe responds that Owen is qualified to opine on this topic because of his background as a wrestler and coach.  (Doc. 190 at 4-5.)  Doe also argues that Owen was

not obligated to review records because Owen has an "established personal relationship with Doe and coaches and [trains] with Doe at Chandler High School.  Owen is intimately familiar with Doe's wrestling experience [and] talent . . . [which] would not otherwise be garnered by a simple review of records."  (*Id.* at 7.)

In reply, ABOR reasserts that Owen is not qualified to opine on Doe's potential and that Owen's opinion is unreliable because he did not consider the contrary information available to him before forming the opinion.  (Doc. 194 at 4, 7.)

The Court is conscious that "the relevant factors for determining reliability will vary from expertise to expertise," Fed. R. Evid. 702, advisory committee's note to 2000 amendment, and that evaluating a young athlete's skill level and career trajectory is a uniquely subjective inquiry.  Even so, that an expert exclusively relies on his experience and renders a subjective opinion does not mean that the testimony "should be treated more permissively simply because it is outside the realm of science."  *Id.*

Owen opines that Doe "had the skill and athleticism to be one of the best wrestlers in the country at the college level and beyond" and "would have been an All-American in college if his career was not cut short."  (Doc. 158-1 at 4, 7.)  However, Owen's stated support for these opinions is either conclusory or a bare-bones recitation of Doe's achievements without context that might appreciably assist the jury.

Owen's observations that "as a high school wrestler, [Doe] was one of the top wrestlers in the country" and that Doe "was an exceedingly better freestyle wrestler than collegiate wrestler" (*id.* at 3, 7) lack external support and are "nothing more than a series of *ipse dixits*," which "nothing in either *Daubert* or the Federal Rules of Evidence require a district court to admit."  *Longoria*, 2021 WL 1100373 at *15.  Owen notes that Doe won several athletic competitions (which the Court will not repeat to protect Doe's identity).  (Doc. 158-1 at 4, 7.)  But even if Owen believes those accolades would support his conclusion that Doe was "one of the top wrestlers in the country," Owen makes no effort to explain *why*.  In fact, the Court need not identify the accolades by name because Owen does not meaningfully distinguish between them—Owen does not explain that a particular

accolade is especially prestigious or that, for example, all ten of the past winners of a particular trophy have gone on to the Olympic wrestling team.  At most, these awards support the common-sense notion that Doe is probably a *good* wrestler, at least better than his competitors in those matches, but it does not remotely support the opinion that Doe would have become one of the *best* wrestlers in the country.

This combination of conclusory and common-sense testimony does not denote admissible expertise.  To offer something resembling a reliable opinion regarding a young wrestler's prospects, an expert might be expected to dive into some sort of supporting data to produce an opinion that lay jurors could not reach on their own—perhaps explaining why a wrestler's height was especially advantageous, or parsing his match history to project why new competitors would be unlikely to defeat him, and so on.  But jurors would intuit that a wrestler who has won trophies is a good wrestler, and allowing Owen to testify that Doe was the *best* based on a list of undifferentiated accolades runs the risk of inappropriately allowing Owen to cloak his unfounded opinion with the weight of expert testimony.

This is true even though Owen, himself, was an excellent wrestler in his day.  Imagine a hypothetical case in which a plaintiff wished to establish that, but for injuries caused by the defendant, he would have become a star basketball player in the NBA and earned millions of dollars as a professional athlete.  If that plaintiff wished to call Charles Barkley—an 11-time NBA all-star and former league MVP[4]—as an expert concerning his future NBA prospects, there is little doubt that Barkley would be *qualified* to opine on the topic.  Nevertheless, if would not be sufficient, for *reliability* purposes, for Barkley to simply note that the plaintiff won various awards when playing high school and college basketball and then assert that he knows a future NBA player when he sees one.  Instead, like any other expert, Barkley would need to provide a comprehensible rationale for his opinion grounded in reason and logic.  *See* Fed. R. Evid. 702, advisory committee's note to 2000 amendment ("The expert's testimony must be grounded in an accepted body of

---

[4]     Michael Jordan would also work for purposes of this hypothetical, but because this case arises from the District of Arizona, Charles Barkley seems the better choice.

1    learning or experience in the expert's field, and the expert must explain how the conclusion

2    is so grounded.").  That rationale is what is missing here.

3    　　　　Because Owen's opinion that Doe would have been one of the *best* wrestlers in the

4    nation is conclusory and unreliable, and it is common sense to a reasonable juror that a

5    wrestler who receives awards is a *good* wrestler, Owen's opinion on this topic is

6    inadmissible.

7    　　　　　　　　f.　　**Summary As To Owen**

8    　　　　For the reasons discussed above, ABOR's request to categorically exclude Owen

9    from testifying is denied, but Owen must limit his opinions to the following topics: (1) the

10   qualifications needed to become a college wrestling coach; (2) the training opportunities,

11   if any, that are lost by being unable to train at the RTC; and (3) the alternatives to training

12   at the RTC.

13   　　　　B.　　**Cindi Nannetti**

14   　　　　　　1.　　The Nannetti Report

15   　　　　Cindi Nannetti "spent 32 years as a prosecutor focusing primarily on the prosecution

16   of crimes involving sexual misconduct."  (Doc. 161-1 at 2.)  During that time, she worked

17   with various entities, including schools and government agencies, to "develop and draft

18   . . . policies, procedures and trainings for the prevention of and reaction to sexual

19   misconduct" and to "educate employees on sexual misconduct."  (*Id.*)  Since retiring in

20   2014, she has continued teaching and consulting on these issues and has "served as an

21   expert witness in cases involving Title IX claims."[5]  (*Id.*)  Nannetti is receiving $250 per

22   hour for her consulting work on this case and $350 per hour for testifying.  (*Id.*)

23   　　　　Doe asked Nannetti to testify on the following topics: (1) whether the investigation

24   into the sexual misconduct allegations levied against Doe was fair and impartial; (2)

25   _____

26   [5]　　　Nannetti claims that she has experience as an expert witness in cases "involving
     Title IX claims," but in support of that contention she simply cites a roster of individuals
     who are members of the "Governor's Commission to Prevent Violence Against Women
27   Start by Believing Work Group."  (Doc. 161-1 at 52.)  This document does not provide any
     insight into Nannetti's work on a particular controversy, or what it means for a case to
     "involve" Title IX claims, or whether Nannetti's service as an expert in some unspecified
28   case was relevant to the Title IX claims in that case (rather than some other part of the
     case).

1   whether there were any errors or flaws in the investigation; and (3) whether the

2   investigation was affected by the Start by Believing ("SBB") campaign at ASU.  (*Id.*)

3        In sum, Nannetti opined that (1) the investigation was biased, (2) there were many

4   errors and flaws in the investigation, and (3) the SBB campaign "resulted in an

5   investigation and subsequent disciplinary proceeding that starts by believing accusers . . .

6   [which] impacted Doe because evidence that did not fit within that narrative was ignored,

7   while evidence that supported that narrative was weighted heavily."  (*Id.* at 2-3.)

8                    2.    Analysis

9        ABOR seeks to exclude Nannetti from offering any opinions at trial.  (Doc. 161.)

10  In general, ABOR raises objections based on Nannetti's qualifications, the reliability of

11  Nannetti's opinions, and the relevance of Nannetti's opinions.   ABOR's more specific

12  objections, and Doe's responses, are addressed on an issue-by-issue basis below.

13                   a.    **Qualifications**

14       ABOR contends that all Nannetti's opinions should be excluded because her

15  expertise as a criminal prosecutor does not qualify her to opine on "the fundamentally

16  different Title IX investigative process in student disciplinary settings, let alone to opine

17  on whether student disciplinary processes comply with Title IX."  (Doc. 161 at 1.)  Doe

18  responds that "Nannetti is not offered for Title IX opinions; she is offered as an expert on

19  sexual misconduct investigations, specifically involving gender and confirmation bias."

20  (Doc. 191-1 at 6-7.)  Doe adds that the cases cited by ABOR are distinguishable "because

21  Nannetti is opining on the investigative process, as there is no distinct 'Title IX

22  investigative process;' only general guidelines adopted by ASU.  Because Doe only offers

23  Nannetti for a limited purpose for which she is clearly qualified, the motion must be

24  denied."  (*Id.* at 7.)

25       Doe largely has the better of these arguments.  Although Nannetti's report contains

26  multiple references to Title IX, Nannetti does not ultimately opine about how a *Title IX*

27  investigation should be conducted or about whether ASU's investigation of Doe was a

28  proper *Title IX* investigation.  Instead, Nannetti opines that "the investigation into the

allegations of sexual misconduct against Doe was biased" and that "there were a multitude of errors and flaws in the investigation of the claims against Doe." (*Id.* at 2-3.) These are not Title IX-specific opinions, but opinions about how investigations into allegations of sexual misconduct should generally be conducted. Indeed, Nannetti faults ASU's representatives for not following certain "basic investigative standards" during the investigation, which Nannetti identifies as (1) the need to "address[] inconsistencies and ambiguities to the extent practicable," (2) the need to "to engage in the active accumulation of evidence" or "[a]t the very least . . . try to obtain all relevant and reasonably available evidence," and (3) the need to "begin the investigation without bias or preconceived notions and follow the evidence in a neutral fashion." (Doc. 161-1 at 12-16.) The Court has little trouble concluding that Nannetti would have become familiar with these "basic investigative standards," which are not unique to the Title IX investigatory context, during her decades as a sex-crimes prosecutor. Thus, Nannetti is qualified to testify about them. Whether they are relevant in this Title IX action is a distinct issue addressed below.

There are two exceptions. The first concerns Nannetti's opinion that the investigation was flawed and biased in part because "Davis failed to follow the ATIXA Training and Certification materials provided to achieve best practices for civil rights investigations." (*Id.* at 16-17.) Elsewhere in the report, Nannetti explains that "[s]exual misconduct investigations involving Title IX, including those at [ASU], are guided by the standards set forth by the Association of Title IX Administrators ('ATIXA')." (*Id.* at 3.) These are Title IX-specific opinions, not opinions about how sexual misconduct investigations should generally be conducted. Doe makes no effort to establish that Nannetti is qualified to offer these particular opinions and the Court agrees with ABOR that she is not.

Second, one of the opinions included within Nannetti's overarching opinion regarding inconsistencies and ambiguities is that "[t]o an investigator with experience reviewing SANE exams, [Roe's] exam was consistent with consensual sex. If Davis was not sufficiently experienced, she should have sough assistance reviewing the exam." (Doc.

161-1 at 13.)  The Court agrees with ABOR that Nannetti should not be allowed to offer this particular opinion.  She is a former prosecutor, not a medical professional.[6]

b.   **Reliability**

ABOR contends that Nannetti's opinions are unreliable for four reasons: (1) they are predicated on the "false foundation" of criminal prosecution experience, which is substantially different from "an administrative proceeding in an educational setting"; (2) she erroneously assumed that ASU followed the SBB campaign when investigating student disciplinary matters, when "all of the evidence in this case, including witness testimony, regarding SBB establishes that [ASU's Student Rights & Responsibilities Office] did not follow the campaign"; (3) her opinions are not supported by a "systematic evaluation of the facts," but instead reflect "a series of overgeneralizations, unsupported speculation and her own subjective beliefs"; and (4) her opinions are "contradicted by testimony and documents in the record."  (*Id.* at 8-156.)

In response, Doe contends that "Nannetti can reliably apply decades of experience and her knowledge of established standards of bias-centric investigations to Doe's alleged sexual misconduct" and that "Nannetti is allowed to assume ASU followed the [SBB] campaign."  (Doc. 191-1 at 7-9.)

The Court will begin with Nannetti's final opinion, which is that the SBB campaign "resulted in an investigation and subsequent disciplinary proceeding that starts by believing accusers . . . [which] impacted Doe because evidence that did not fit within that narrative was ignored, while evidence that supported that narrative was weighted heavily."  (Doc. 161-1 at 2-3.)  ABOR argues this opinion is unreliable because "[t]here is no evidence— none—that Ms. Davis followed SBB" and "all of the evidence in this case, including witness testimony, regarding SBB establishes that SRR did not follow the campaign."  (Doc. 161 at 10.)  In response, Doe does not dispute ABOR's description of the evidence in the record and simply asserts that "Nannetti is allowed to assume ASU followed the

---

[6]    The tentative ruling issued before oral argument did not address this particular exclusion argument, which ABOR raised in its motion (Doc. 161 at 14) and reiterated during oral argument.

campaign" for purposes of formulating expert opinions.  (Doc. 191-1 at 9.)

Doe is incorrect.  Although experts have broad leeway to rely on assumptions when formulating opinions, there is a limit.  One such limit is when an opinion is based on an assumption that is demonstrably and inarguably incorrect.  *Hanna v. Reg'l Trans. Comm'n*, 2008 WL 11450865, *4 (D. Nev. 2008) ("Plaintiff's expert testimony fails to meet the threshold Rule 702 requirement of assisting the trier of fact because it is based upon a false factual assumption vital to the conclusion Plaintiff was the most qualified applicant. . . . Plaintiff admitted that she did not perform all duties of the Procurement and Compliance Analyst position . . . [and] also admitted that she had little experience in the qualification areas of minority business enterprises and women-owned business enterprises.  As Plaintiff's expert gave 'heavy weight' to the incorrect assumption that Plaintiff was experienced in the duties of the advertised position, the expert testimony is inadmissible.").  As discussed in more detail in the order denying ABOR's summary judgment motion (Doc. 209 at 48-50), the undisputed evidence establishes that Davis and other individuals associated with Doe's disciplinary process did *not* follow SBB as part of that process.  Accordingly, Nannetti's third opinion is unreliable and inadmissible.

This leaves Nannetti's other two opinions, which are that the investigation was biased and that the investigation was flawed.  ABOR's first reliability objection to those opinions is that Nannetti's criminal prosecution experience provides a "false foundation" because she "rel[ied] on criminal concepts throughout her Report," which "confirms that she viewed the evidence through the wrong prism and, as a result, her opinions are inherently unreliable."  (Doc. 161 at 9.)  The problem with this argument is that, as noted above, Nannetti applied the following three "basic investigative standards" when reaching her opinions—(1) the need to address inconsistencies and ambiguities, (2) the need to attempt to obtain all relevant and reasonably available evidence, and (3) the need to begin the investigation without bias or preconceived notions and follow the evidence in a neutral fashion.  These are not criminal-specific standards but basic investigative techniques.  During oral argument, ABOR acknowledged that the Dear Colleague Letter and the

1  relevant CFR guidelines do not somehow preclude adherence to these basic investigative

2  standards during a Title IX investigation.[7]

3  　　　The Court also disagrees with ABOR's contention that *Doe v. Colgate University*,

4  2017 WL 4990629 (N.D.N.Y. 2017), supports the exclusion of Nannetti's first two

5  opinions.  In *Colgate*, a male student who had been expelled after being found responsible

6  for three episodes of sexual misconduct brought a Title IX action.  *Id.* at *1.  The plaintiff's

7  expert was a "law professor" who had "never conducted an investigation of an alleged

8  sexual assault."  *Id.* at *6, *10.  As an initial matter, the district court found that many of

9  the topics on which the expert sought to opine, which had nothing to do with procedural

10  irregularities, were inadmissible—among other things, the expert improperly sought to

11  offer the "sweeping assertion that administrators presume that all complainants are

12  traumatized;" improperly sought to advance the "serial rapist trope," which is that "anti-

13  rape activists and Title IX administrators [believe] that the epidemic of campus rapes is

14  attributable to a small number of 'serial rapists' on campus"; and improperly sought to

15  opine that the hearing panel misapplied the applicable consent standard even though she

16  "could not recall anything the administrators particularly said in this case to suggest that

17  they misunderstood the . . . standard."  *Id.* at *7-9 (quotation marks omitted).  Against this

18  backdrop, the district court held that the expert also should not be allowed to opine about

19  procedural irregularities and provided the following reasons for this conclusion: (1) the

20  expert did not limit herself to identifying procedural irregularities but also opined that those

21  irregularities impacted the proceeding and/or violated the school's grievance policy, both

22  of which were impermissible legal conclusions; (2) the expert was "unqualified" to offer

23  opinions regarding procedural irregularities in the investigation because "even if [she] is

24  an accomplished legal scholar with respect to criminal procedure, and even if Title IX

25  discussions make up a small portion of her criminal law courses, she has never conducted

26  an investigation of an alleged sexual assault, attended a Title IX training, or served as a

27

28  ───────────────
[7]　　　Presumably, ABOR's position is not that investigators in Title IX proceedings (unlike in criminal proceedings) are free to ignore inconsistencies and ambiguities, to decline to seek out relevant evidence, and to begin with preconceived notions and cling to those notions throughout the investigation.

Title IX investigator"; (3) the expert's "knowledge of bias in criminal investigations is not a sufficient experiential foundation for her exacting scrutiny of . . . a qualitatively distinct Title IX investigation" because "she concedes elsewhere" that "what constitutes appropriate conduct can vary dramatically between criminal and Title IX investigations"; (4) the expert offered "qualified language" and "nothing but conjecture" in support of her contention that the investigator was biased; and (5) the expert's report was so "ridden with improper statements and opinions" that the court declined "to identify the limited portions that might qualify as expert testimony." *Id.* at *10-11 (citations and internal quotations omitted). The Second Circuit affirmed, explaining that "[t]he district court . . . did not abuse its discretion by excluding [the expert's] conclusions about procedural deficiencies in the University's handling of John Doe's case" because (1) "[t]he court reasonably concluded that [the expert's] lack of experience investigating sexual assault and lack of familiarity with Title IX training and investigations rendered her unqualified to opine on the propriety of [the] investigation"; and (2) "the district court properly excluded [the expert's] other procedural conclusions because they were unhelpful to the trier of fact." *Doe v. Colgate Univ.*, 760 F. App'x 22, 29 (2d Cir. 2019).

The considerations that led to the exclusion of the expert's procedural-irregularity opinions in *Colgate* are simply not present here. Most important, the expert in *Colgate* was deemed unqualified to offer those opinions because she had never conducted a sexual assault investigation, but Nannetti has extensive, first-hand experience conducting such investigations. The expert in *Colgate* also conceded that the relevant investigative standards could "vary dramatically" between criminal and Title IX investigations, but Nannetti made no such concession here—to the contrary, the three "basic investigative standards" Nannetti accuses ABOR of violating are not criminal-specific standards and are not somehow inapplicable in a Title IX investigation. Finally, the expert's report in *Colgate* was found to have so many flaws as to render all of the expert's opinions inadmissible, but the Court concludes that the better approach here (which it is also applying to ABOR's expert, Mr. Lake) is to admit the specific opinions as to which

qualification, reliability, and relevance have been established.[8]

ABOR's next reliability objection concerns Nannetti's reliance on erroneous assumptions regarding SBB. (Doc. 161 at 10.) During oral argument, ABOR elaborated that SBB "permeates" and provides the foundation for all of Nannetti's opinions, such that the exclusion of her third opinion means her other opinions must be excluded, too. The Court disagrees. The first and second opinions go to whether the underlying investigation was biased and flawed while the third opinion seeks to provide an explanation for why those perceived errors occurred. Even if that explanation is excluded, the diagnosis of the perceived errors remains.

ABOR's next reliability objection is that Nannetti's opinions are "founded upon a series of overgeneralizations, unsupported speculation and her own subjective beliefs, which are undeniably framed by her personal experience as a criminal prosecutor, not a Title IX investigator. Throughout her Report, Ms. Nannetti repeatedly speculates that Ms. Davis presumed Roe was a 'victim' of sexual assault, which resulted in 'confirmation bias' permeating throughout the student disciplinary investigation." (Doc. 161 at 11-12.) ABOR takes particular issue with Nannetti's opinion that Davis *intentionally* failed to gather relevant evidence, which ABOR views as not only "incendiary" but wholly unsupported

---

[8]     During oral argument, ABOR identified *Doe v. Board of Regents of the University of Nebraska*, 2022 WL 3566990 (D. Neb. 2022), as another decision supporting the exclusion of Nannetti's first and second opinions. There, a female student asserted a Title IX claim alleging that university employees "failed to properly investigate her allegations of sexual assault and harassment." *Id.* at *1. One of the plaintiff's experts was a SANE nurse whose report "set[] forth thirteen numbered paragraphs outlining what she sees as 'failures' by the Board and its investigators." *Id.* at *2. Critically, although the plaintiff "generically tout[ed]" her expert's "extensive experience investigating sexual assaults," she "fail[ed] to provide any specific details about that experience or tie it to her challenged opinions about the Board's alleged Title IX failures." *Id.* at *3. Additionally, the expert stated that she was expressing her opinions "to a reasonable degree of medical certainty" and that she was relying on her experience of "providing medical evaluation and treatment." *Id.* Given the "disconnect between [the expert's] qualifications and [her] opinions," the court concluded that the plaintiff had not "provide[d] any colorable basis for what she sees as the requisite standard of care for a proper Title IX investigation, let alone show[n] that [her expert] is qualified to give opinions about the Board's purported failure to comply with it." *Id.* But again, these shortcomings are not present here. Unlike the nurse in *University of Nebraska*, Nannetti has extensive experience overseeing investigations of alleged sexual assaults, and the opinions she offers are not medical opinions expressed to a reasonable degree of medical certainty but observations about the basic investigative techniques that sexual assault investigators should follow.

by the record.  (*Id.* at 12-13.)

Although the Court agrees with ABOR that Nannetti is not qualified to opine about Davis's intent, ABOR's reliability objections otherwise lack merit.  In the relevant portions of her report, Nannetti identifies various inconsistencies and ambiguities that, in Nannetti's view, should have been addressed during the investigation (Doc. 161-1 at 12-13); identifies various investigative steps that, in Nannetti's view, Davis should have taken (*id.* at 13-14); and identifies various other developments during the investigation that, in Nannetti's view, reflect confirmation bias and a failure to neutrally follow the evidence (*id.* at 14-15).  ABOR's disagreement with these criticisms is fodder for cross-examination, not a basis for exclusion based on unreliability.

ABOR's final reliability objection is that Nannetti "levies several accusations that are contradicted by testimony and documents in the record."  (Doc. 161 at 13-15.)  More specifically, ABOR identifies evidence that Davis attempted to gather materials from the Tempe Police Department and the SANE report.  (*Id.*)  The Court concludes once again that ABOR's arguments on this point are fodder for cross-examination, not a basis for exclusion.[9]

### c.     **Relevance**

ABOR contends that Nannetti's opinions are irrelevant and likely to confuse the jury because they erroneously emphasize anti-perpetrator bias (when the relevant inquiry is anti-male bias), erroneously presuppose that a Title IX investigation must be "flawless," and are cabined to criticisms of Davis, who was not a decisionmaker and not the sole source of Dr. Rund's decision.  (Doc. 161 at 15-17.)  Doe responds that "Nannetti's testimony is relevant under Rule 702" because "Nannetti's testimony shows that the investigation was improper as to Doe, a male, and favored Roe, a female."  (*Id.* at 9-11.)

---

[9]     During oral argument, ABOR emphasized that Davis's purported failure to attempt to gather these materials provides the foundation for many (and not just two) of Nannetti's specific criticisms of Davis.  This may be true, but Doe's counsel correctly pointed out that many other of Nannetti's specific criticisms of Davis do not relate to the SANE report or to the evidence from the Tempe Police Department.  Accordingly, the Court stands by the conclusion in the tentative order that any error on this topic goes to the weight of Nannetti's first and second opinions and is best addressed through cross-examination, not exclusion.

The Court agrees with Doe that Nannetti's first two opinions satisfy Rule 702's liberal standard for relevance.  As discussed in more detail in the summary judgment order, the Ninth Circuit has emphasized that evidence of procedural irregularities during a university's sexual misconduct investigation may, at least when coupled with other evidence, support an inference of gender bias in a Title IX proceeding.  *See, e.g.*, *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 950 (9th Cir. 2020) ("[P]rocedural irregularities . . . support[] an inference of gender bias when considered along with Schwake's allegations of background indicia of sex discrimination."); *Doe v. Regents of Univ. of Cal.*, 23 F.4th 930, 940 (9th Cir. 2022) ("[I]rregularities in Doe's proceedings . . . , while not dispositive on their own, support an inference of gender bias."); *id.* at 941 ("[A]t some point an accumulation of procedural irregularities all disfavoring a male respondent begins to look like a biased proceeding . . . .").  Nannetti's first two opinions could be viewed by a reasonable juror as establishing the existence of procedural irregularities during Doe's investigation—that is, a failure to follow basic investigative standards.  Although such irregularities may, on their own, only serve as evidence of pro-complainant bias (rather than anti-male bias), they still constitute one relevant component of a plaintiff's Title IX case.  Nor do Nannetti's criticisms presuppose that a Title IX investigation must be flawless.  Nannetti purports to identify a long list of flaws and errors.  Finally, ABOR cites no authority in support of its position that only procedural irregularities committed by final decisionmakers are relevant in a Title IX action and Ninth Circuit law appears to be to the contrary.  *Doe*, 23 F.4th at 939 ("Contrary to the Regents' argument, statements by pertinent university officials, not just decisionmakers, can support an inference of gender bias. . . .  It is therefore reasonable to infer that Mr. Zeck's statement reflects the broader gender assumptions within UCLA's Title IX office during its investigation of Doe.") (cleaned up); *Schwake*, 967 F.3d at 950 ("The University argues that Dr. Seager's statements cannot show that gender bias affected Schwake's sexual misconduct disciplinary case because Dr. Seager was not a decisionmaker.  We disagree.  Statements by 'pertinent university officials,' not just decisionmakers, can support an inference of

gender bias. . . .  Like the procedural irregularities some of our sister circuits have considered when faced with allegations of pressure, the violation of confidentiality by those involved in Schwake's disciplinary case supports an inference of gender bias when considered along with Schwake's allegations of background indicia of sex discrimination.") (citation omitted).

### d.  **Summary As To Nannetti**

For the reasons discussed above, ABOR's request to categorically exclude Nannetti from testifying is denied, but Nannetti must limit her opinions to the following topics: (1) whether the investigation into the sexual misconduct allegations against Doe was fair and impartial; and (2) whether there were any errors or flaws in the investigation.  Additionally, Nannetti's noticed opinions on those topics are limited in that Nannetti may not offer the opinions that (1) the investigation was flawed and biased in part because "Davis failed to follow the ATIXA Training and Certification materials provided to achieve best practices for civil rights investigations"; (2) "[t]o an investigator with experience reviewing SANE exams, the exam was consistent with consensual sex"; and (3) Davis intentionally failed to gather relevant evidence.

### C.  **Peter F. Lake**

#### 1.  The Lake Report

Peter Lake has "extensive experience in higher education law and policy, and academic and operational expertise with respect to the law of higher education and . . . Title IX."  (Doc. 175-1 at 4.)  In the past, Lake served as Director of Title IX Compliance at Stetson University, and he has experience as a student discipline officer at Stetson University College of Law.  (*Id.* at 4.)  Lake has been qualified as an expert in matters relating to Title IX, trains colleges and universities on Title IX, and is "familiar with industry behavior relating to Title IX compliance."  (*Id.*)  Lake has reviewed documents provided by ABOR but has otherwise done no independent inquiry into this matter beyond brief interviews.  (*Id.*)  He charges $550 per hour for most tasks with a minimum fee of $20,000.  (*Id.* at 145.)

Lake was asked to review the Nannetti Report as well as Nannetti's one-page supplemental expert report and offer his expert opinions in response.  (*Id.* at 4-5.)  In sum, Lake opined that (1) Nannetti is not qualified to offer opinions and has not offered relevant opinions, even if she is qualified (*id.* at 6-10); (2) there is no evidence that ASU's investigation was biased against Doe (*id.* at 10); (3) even if Davis was biased, she was not in a position to make a disciplinary decision (*id.*); (4) Davis's investigation did not discriminate against Doe on the basis of sex and did not deviate from ASU's policies and procedures (*id.*); (5) "Title IX does not mandate that grievance processes as a whole or initial investigations, be ideal," and "the fact that a final decision . . . is reviewed and even overturned internally or by an external authority does not imply, or raise an inference, in and of itself, that an initial investigation was flawed or materially biased in any way" (*id.* at 11); (6) although respondents are "entitled to a presumption of non-responsibility in Title IX proceedings," complainants are "entitled to a presumption that they are not inherently lacking in credibility," and Nannetti's approach would undermine the latter presumption (*id.*); (7) there is no indication that ASU personnel were motivated by the SBB campaign (*id.*); and (8) although Nannetti faults Davis for not securing certain pieces of evidence, Doe could have provided those materials to Davis, and his failure to do so "suggests the possibility of an effort (potentially collaborative) to obstruct [the] ASU disciplinary process."  (*Id.* at 11-12.)

Doe argues that some of Lake's opinions should be excluded for the following reasons: (1) "certain of Lake's opinions usurp the role of the Court by opining on legal issues reserved for the Court";  (2) "Lake invades the Court's role as gatekeeper by opining on the admissibility and relevance of . . . Nannetti's expert opinions";  (3) "Lake invades the jury's province by opining on the credibility of Nannetti"; (4) "Lake's report purports to be a rebuttal to Nannetti's expert report, yet Lake asserts a series of new opinions that do not address, let alone contradict or challenge, anything in Nannetti's report and are improper for an expert report"; and (5) "Lake opines on matters that are not helpful to the trier of fact and should be excluded under Rule 403."  (Doc. 164 at 1.)   The Court will

address each argument separately, but because the appropriate scope of Lake's opinion will guide the rest of the inquiry, the Court begins there.

## 2.   Scope Of Lake's Report

Doe argues that "Lake's rebuttal report attempts to opine on issues outside the scope of rebuttal," and because Nannetti's report did not offer any opinion on Title IX standards or protocols, "Lake's opinions as to Title IX standards and protocols should be excluded as improper rebuttal." (Doc. 164 at 7-9.) ABOR responds, in brief, that Lake is not formally a rebuttal expert, but an affirmative expert who is responding to Nannetti's report, and thus his scope is not limited to rebuttal. (Doc. 186 at 14-16.) Doe replies that "the Court should strike the opinions of Lake that do not rebut Nannetti" because Lake uses rebuttal-report limiting language at the outset of his report and rebuttal reports are those "intended solely to contradict or rebut evidence" in an opposing party's expert disclosure. (Doc. 198 at 7.)

Lake is an expert witness in his own right, regardless of his choice to mainly respond to Nannetti. Lake's report was submitted on August 20, 2021, which was the deadline for ABOR to disclose its affirmative expert witnesses. (Doc. 67 at 3 [case management order], Doc. 145 [grant of motion to amend case deadlines].) The deadline for rebuttal witnesses was not until September 10, 2021. (Doc. 145.) Thus, the Lake report is not restricted to rebuttal by the terms of the case management order.

Doe argues that, "regardless of the Case Management Report," Lake has boxed himself into the strictures of a rebuttal expert by styling his report as an "Expert Response" on the cover page and stating that he was "asked by ABOR to review the [Nannetti Report and Supplement] and offer [his] expert opinions in response." (Doc. 175-1 at 1-4.) But Doe offers no caselaw suggesting that an affirmative expert can involuntarily become a rebuttal-only expert based on the form or cover page of his report.

True rebuttal experts are limited "solely to contradict[ing] or rebut[ting] another expert's evidence" because it would result in unfair surprise to spring new theories on the opposing party when it is too late to rebut them. Fed. R. Civ. P. 26(a)(2)(d)(ii). There is

no similar risk here, as nothing prevented Doe from retaining an expert to prepare a rebuttal of Lake's opinions.

The Court thus agrees with ABOR that, although Lake styles himself as a "responsive" expert, he is not a formal rebuttal expert with the restrictions that accompany that designation. Doe's remaining arguments concern the proper scope of rebuttal opinion and are rendered moot by this conclusion.

### 3.    Legal Issues Reserved For The Court

Doe argues that some of Lake's opinions, mainly "the applicable legal standards that should be applied to Title IX cases," must be excluded because they instruct the jury on the law, which is the Court's responsibility. (Doc. 164 at 5.) ABOR responds that "Professor Lake does not opine on the 'ultimate issue of law,' (*i.e.*, whether ABOR violated Title IX). Instead, the Lake Report provides general background on Title IX . . . [which] is the exact type of testimony courts have repeatedly permitted Title IX experts to offer to assist the trier of fact in determining whether a university's Title IX responses and investigations are appropriate." (Doc. 186 at 7-8.) Doe disputes this characterization, arguing in reply that Lake "clearly attempts to instruct the fact finder on what legal standard should be applied to the facts of this case. . . . That Lake's opinions are mixed with some discussion of the 'history and purpose' of Title IX does not cure the defects in the opinions which Doe seek to exclude." (Doc. 198 at 2-3.)

The Ninth Circuit has excluded expert testimony that "defines the governing law," as well as testimony that "applies the law to the facts" and testimony that sets forth "what the law is and how it should be applied to the facts of the case." *Pinal Creek Group v. Newmont Mining Corp.*, 352 F. Supp. 2d 1037, 1043 (D. Ariz. 2005). *See generally Crow Tribe of Indians v. Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996) ("Expert testimony is not proper for issues of law. Experts interpret and analyze factual evidence. They do not testify about the law. . . .") (citation and internal quotation marks omitted); *Fidelity Nat. Fin., Inc. v. National Union Fire Ins. Co. of Pittsburg, PA*, 2014 WL 128639, *8 (S.D. Cal. 2014) ("Federal law precludes an expert from invading the province of the court to instruct

on the law . . . .  The rule is easy to state but difficult to apply and the outcome depends upon how the expert expresses his opinion.").  Accordingly, district courts have allowed experts to testify about industry practice and standards in Title IX cases but refused to allow "even a slight deviation . . . into the requirements of Title IX."  *Portz v. Cloud State Univ.*, 297 F. Supp. 3d 929, 953 (D. Minn. 2018); *see also Stevens v. Brigham Young Univ.*, 2020 WL 560572, \*2 (D. Idaho 2020) (permitting testimony regarding Title IX's history and purpose and industry practices and standards but excluding "testimony regarding legal standards and their applicability to this case").

Here, Lake's opinions sometimes veer into legal analysis under the auspices of foundation.  In particular, Lake's opinions about the "objective authoritative legal standards for an implied cause of action for money damages in federal court under Title IX," which are supported by citations to caselaw (Doc. 175-1 at 12-13), are inappropriate. It is the Court's responsibility to decide which legal standards govern the jury's interpretation of evidence.  Similarly inappropriate are Lake's seeming opinion that the Arizona Court of Appeals' opinion is legally irrelevant ("the fact that a final decision . . . is reviewed and even overturned internally or by an external authority does not imply, or raise an inference, in and of itself, that an initial investigation was materially flawed or biased in any way") and Lake's other opinions of what types of evidence can (and can't) support an inference of bias in a Title IX case.  (*Id.* at 10.)

That said, much of Lake's proposed testimony appears to be an unobjectionable recitation of Title IX's history that is within Lake's expertise.  As a result, the Court will grant Doe's motion to exclude Lake's testimony inasmuch as he seeks to testify about the legal requirements of Title IX and the application of those legal requirements to this case. And if Lake cannot recount the history and purposes of Title IX without referencing its specific requirements, the Court will not hesitate in excluding that testimony as well.

### 4.   Admissibility Of Nannetti's Opinions

Doe argues that Lake's opinions about the admissibility of Nannetti's opinions "are not helpful and potentially interfere with the role of the Court," as "the Court can decide

[qualification and relevance] issues on its own." (Doc. 164 at 6.)   ABOR responds that "the Lake Report does not opine on admissibility and Professor Lake will not address admissibility at trial.  Instead, Professor Lake offers testimony concerning the reliability . . . and foundation . . . of Ms. Nannetti's opinions." (Doc. 186 at 11.)   Doe replies that "ABOR cannot and has not explained, for instance, how Lake's opinions supporting his contention that 'Cindi Nannetti, may not be qualified to offer in opinions in this matter and/or has not offered relevant opinions in this matter' could be construed as anything other than opinions on the admissibility of Nannetti's testimony." (Doc. 198 at 4.)

The Court is responsible for determining the admissibility of expert opinions. *Joiner*, 522 U.S. at 142.  Nevertheless, an opposing expert's inartful use of such terms as "qualified," "relevant," or "foundation" does not automatically violate this principle.  Each of the specific opinions to which Doe objects are summaries of Lake's detailed opinions, which themselves properly attack the validity of Nannetti's premises.  The Court does not read Lake's report to be a statement about the admissibility of Nannetti's opinions, but a statement about their persuasiveness.  This is, at a minimum, a "permissible topic of rebuttal testimony." *Smilovits v. First Solar, Inc.*, 2019 WL 6875492, * 13 (D. Ariz. 2019).

### 5.   Nannetti's Credibility

Doe argues that Lake "endeavors to opine on Nannetti's credibility [but e]xpert witness credibility is the exclusive province of the jury and Lake's 'opinions' on Nannetti's credibility should be excluded." (Doc. 165 at 7.)  ABOR responds that "the three excerpts Doe quotes from the Lake Report address flaws in the substance of Ms. Nannetti's analysis and conclusions, not her credibility. . . .  Professor Lake's critique . . . is appropriate expert testimony." (Doc. 186 at 12.)  Doe replies that "the opinions Doe cites as opining on Nannetti's credibility blatantly accused her of having an 'interest in this matter' and having a bias" and that ABOR "has not cited to one case supporting the admissibility of an expert opinion making bald claims of bias against another." (Doc. 198 at 4-5.)

Lake exceeds the permissible scope of expert testimony when he asserts that Nannetti is personally biased toward Doe or in favor of respondents in general.  Lake is an

expert on Title IX investigations, not an expert *on* expert witnesses in Title IX investigations.  He has laid no foundation to establish his ability to determine Nannetti's bias, and although he may attack the merits of Nannetti's premises and conclusions, he cannot testify directly on Nannetti's credibility.  The credibility of an expert witness, and the weight to be given to her, are issues for the trier of fact.  *Robles v. Agreserves, Inc.*, 158 F. Supp. 3d 952, 992 (E.D. Cal. 2016); *see also City of Pomona v. SQM North Am. Corp.*, 750 F.3d 1036, 1053 (9th Cir. 2014) ("Facts casting doubt on the credibility of an expert witness . . . are questions reserved for the fact finder.").

### 6.   Lake's Opinions About Facts

Finally, Doe argues that "certain of Lake's opinions regarding facts in the case are unhelpful to the jury and should be excluded," specifically those that "are nothing more than his lay interpretation of a recitation of certain 'facts.'"  (Doc. 164 at 9.)   ABOR responds that "an expert witness can and indeed must identify the facts relevant to his opinion" and that Lake's "opinions are highly probative and directly relate to Doe's Title IX claim against Doe." (Doc. 186 at 13-14, 17.)  Doe replies that "lay interpretation or recitations of 'facts', such as Lake's statements that Davis was not the ultimate decisionmaker and that the Title IX investigation was not motivated by bias, run the risk of misleading the jury."  (Doc. 198 at 5-6.)

The Court will not exclude Lake's challenged opinions on the ground they are unhelpful.  This is mainly because these opinions (Doc. 164 at 9-10) respond to Nannetti's opinions that (1) the investigation into the sexual misconduct allegations against Doe was unfair; and (2) there were errors and flaws in the investigation.  It is hard to see why Lake's attempt to question Nannetti's conclusions would be "unhelpful" to a jury that has already heard the underlying opinion.  And Doe's argument under Rule 403 presumes that Lake has nothing useful to offer the jury, which the Court has already rejected.

### 7.   Summary As To Lake

For the reasons discussed above, much of Doe's exclusion request is denied, but Lake must not (1) reference the legal requirements of Title IX or opine on the application

of those legal requirements to this case; or (2) opine that Nannetti is biased in favor of Doe or otherwise opine directly on Nannetti's credibility.

D.     **Jason Borrelli**

1.     The Borrelli Report

Jason Borrelli is the head wrestling coach at American University and previously held the same position at Stanford University. (Doc. 165-1 at 3.)  Before becoming a coach, Borrelli twice won the Michigan state high school wrestling championship, was a multi-year starter on the Central Michigan University wrestling team, was part of five consecutive team conference championships, won individual conference titles, and qualified for the NCAA championships. (*Id.*)  Under Borrelli's tutelage, Borrelli's programs have won several conference championships, produced All-Americans, sent wrestlers to the NCAA championships, and posted over 100 meet victories. (*Id.*)  Borrelli has personally been recognized by a wrestling magazine as "Coach of the Year." (*Id.*)  Finally, while a coach, Borrelli has become "highly experienced in evaluating and recruiting potential college wrestlers" and has produced nationally ranked recruiting classes despite "Stanford's high academic standards." (*Id.* at 4.)

Borrelli has not previously served as an expert witness, nor has he authored any publications in the last ten years. (*Id.*)  His hourly rate for this engagement is $500. (*Id.*)

Borrelli was asked to review the Owen Report and aspects of the Kaufman Report. (*Id.* at 3.)  He opined that (1) Doe's expulsion from ASU delayed his ability to seek employment by at most a few years; (2) the expulsion was not the cause of Doe's inability to find Division I coaching work because major accolades are not required to be a Division I coach and, even if they were required, Doe was unlikely to achieve those accolades; and (3) ABOR is not responsible for Doe's wrestling injuries. (*Id.* at 7.)

2.     The Parties' Arguments

Although the Borrelli Report sets out several distinct opinions, Doe raises a single issue in his motion to exclude: "Should Borrelli be permitted to opine as an expert on college wrestling pay at Division I and II universities?" (Doc. 165 at 1.)  Doe is clear that

the other opinions "will be addressed at trial and are not subject to this Motion." (*Id.*)

Doe first argues that Borrelli's opinions about pay are unreliable because they are not based on sufficient facts or data: "Borrelli does not survey all 'middle or lower-tier' D1 schools, or even a random sample of such schools.  Instead, he cites the salary for [five exemplar assistant coaches].  He then uses this information to opine that salaries are between $35,000 and 45,000 annually—numbers that do not appear in his anecdotal survey—for entry level coaches." (*Id.* at 3.)  Second, Doe asserts that Borrelli's opinions about pay are irrelevant or confusing because publicly reported NCAA pay data contradicts his opinion, his opinion is presented as a "reliable, statistically valid random sample that properly expresses coaches' pay" when it is not, and many of Borrelli's parameters are undefined. (*Id.* at 6-7.)  Finally, Doe argues that Borrelli is not qualified to offer opinions on pay because, although he may be an expert on wrestling, he is not an expert on wrestling coach pay at all Division I and II schools. (*Id.* at 8.)

ABOR responds that Borrelli is qualified to opine on "salaries attendant to the positions Doe is likely to achieve in his but-for and actual career scenarios" given Borrelli's wrestling background and because Borrelli has been "entrenched" in collegiate wrestling for decades. (Doc. 185 at 7.)  ABOR also argues that Borrelli's opinions are reliable when understood as representations of Borrelli's own experience and not objective surveys or comprehensive analyses of the market. (*Id.* at 9-13.)  Finally, ABOR asserts that Borrelli's opinions are directly relevant, because they inform Doe's economic losses, and not confusing, because Borrelli makes the scope of his opinion clear. (*Id.* at 13-15.)

In reply, Doe reasserts that Borrelli is not qualified to offer opinions about salaries at *all* Division I and Division II schools, that Borrelli's testimony about salaries is unreliable because his data is misleading and incomplete, and that Borrelli's testimony will only confuse the jury. (Doc. 197 at 1-6.)

### 3. Analysis

The Court denies Doe's motion to exclude Borrelli's opinions about the general salary range for college wrestling coaches, which Borrelli claims to have developed

throughout his lengthy and successful career, for the same reasons it has denied ABOR's motion to exclude Owen's opinion about the general qualifications for collegiate wrestling coaches, which Own claims to have developed throughout his lengthy and successful career.

Borrelli is qualified to opine on this topic, his opinions are reliable enough to reach the jury, and any issues with the accuracy of the "data" underlying Borrelli's opinions may be attacked on cross-examination. Borrelli has worked as a college wrestling coach for more than 15 years and, before that, was a successful wrestler in his own right. Borrelli is just as "enmeshed," or as ABOR puts it, "entrenched," in the wrestling world as Owen. Borrelli does not seek to step outside his expertise in this opinion but asserts that he has developed his own expertise in collegiate wrestling salary ranges through a lifetime of conversations, anecdotes, and experiences. And it is unsurprising that a longtime college wrestling coach, who has worked at multiple colleges, would have a refined sense of the national market and competitive salaries for collegiate wrestling coaches. Borrelli is absolutely clear that he seeks to provide only "*his* experience" and does not detour into an implication that he can testify about comprehensive statistics gathered through, for instance, a national survey. Finally, testimony about Doe's economic *potential* is manifestly relevant to Doe's economic *loss* claim, and Doe does not cogently explain why it would not be.

"[T]he judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc.*, 738 F.3d at 969. Borrelli's opinion on collegiate wrestling coach salaries is no more an "unreliable nonsense opinion" than Owen's opinion on collegiate wrestling coach recruiting and hiring standards. Any concerns with the precise transferability of Borrelli's background, or the reliability and accuracy of the data he gathered to reach his conclusions, can be explored on cross-examination.

…

…

1      E.    **Dwight Duncan**

2          1.   The Duncan Report

Dwight Duncan is an economist with more than 25 years of experience involving "economic consulting generally and the calculation of economic damages in commercial disputes specifically." (Doc. 165-1 at 139.) Duncan has provided expert testimony before various courts and provides economic consulting and expert witness services to the Office of the Arizona Attorney General. (*Id.*) Duncan's billing rates range from $130 to $445 per hour. (*Id.* at 177.)

Duncan was asked to opine on the Kaufman Report's two areas of analysis: sanction disparities and economic loss. (*Id.* at 140.) Broadly, Duncan found that Dr. Kaufman "made a series of computational and reference errors in his tables, failed to account for differences in the severity of violations of a given provision of the Student Code of Conduct, and failed to consider when multiple violations were associated with a given sanction." (*Id.*) Duncan also found that Dr. Kaufman's career path assumptions were unsupported and unreliable and that Dr. Kaufman's computation of economic damages suffers from critical analytical flaws. (*Id.*)

Doe argues that "[i]f Borrelli's opinions regarding [Division I and Division II] pay are excluded, Duncan's findings based on that data must also be excluded." (Doc. 165 at 9.) Because the Court has denied Doe's motion to exclude Borrelli's opinions, and Doe is clear that his motion to exclude Duncan's opinions depends on the outcome of the Borrelli motion, the Duncan motion is consequently also denied.

…

…

…

…

…

…

…

1    Accordingly,

2    **IT IS ORDERED** that:

3    1.    ABOR's motion to exclude the opinions and testimony of Curtis Owen (Doc.

4    158) is **granted in part and denied in part**.

5    2.    ABOR's motion to exclude the opinions and testimony of Cindi Nannetti

6    (Doc. 161) is **granted in part and denied in part**.

7    3.    Doe's motion to exclude certain opinions and testimony of Peter F. Lake

8    (Doc. 164) is **granted in part and denied in part**.

9    4.    Doe's motion to exclude certain opinions and testimony of Jason Borrelli and

10   Dwight Duncan (Doc. 165) is **denied**.

11   Dated this 27th day of September, 2022.

12

13

14   _____

15            Dominic W. Lanza
         United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28