**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

---

**Unknown Party,**

Plaintiff,

vs.

**Arizona Board of Regents, et al.,**

Defendants.

No. **CV-18-1623-PHX-DWL**

Phoenix, Arizona
September 23, 2022
10:02 a.m.

**REDACTED**

**BEFORE: THE HONORABLE DOMINIC W. LANZA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**MOTION HEARING**

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Plaintiff:
Hagens Berman Sobol Shapiro
By: **Leonard W. Aragon**, Esq.
**Elizabeth Tory Beardsley**, Esq.
**Robert B. Carey**, Esq.
11 West Jefferson Street, Suite 1000
Phoenix, Arizona 85003

For the Defendants:
Cohen Dowd Quigley
By: **Daniel G. Dowd**, Esq.
**Betsy Jean Lamm**, Esq.
**Rebecca Lee Van Doren**, Esq.
**Jenna Brownlee**, Esq.
2425 East Camelback Road, Suite 1100
Phoenix, Arizona 85016

(Proceedings begin at 10:02 a.m.)

THE CLERK: Civil case 18-1623, Unknown Party versus the Arizona Board of Regents. Time set for motion hearing on various motions.

Counsel, please announce your presence for the record, starting with the plaintiff's counsel. 00:20:14

MR. ARAGON: Good morning.

MS. BEARDSLEY: Tory Beardsley --

THE COURT: Mr. Aragon, you go first.

MR. ARAGON: Okay. Thank you, Your Honor. 00:20:24

Leonard Aragon on behalf of the plaintiff.

I apologize for having to appear by phone. I'm in a deposition hearing this morning as well, and so I had to be here at the office. My apologies.

THE COURT: No problem. Good morning. 00:20:34

MS. BEARDSLEY: Tory Beardsley appearing for plaintiff, and with me is my colleague Robert Carey.

THE COURT: Good morning.

MR. DOWD: Good morning, Dan Dowd on behalf of the Arizona Board of Regents. With me are my colleagues Betsy Lamm, Jenna Brownlee and Rebecca Van Doren. 00:20:43

THE COURT: All right. Good morning to you as well.

All right. We are here this morning for the hearing on the parties' various motions to exclude expert witnesses.

As the parties know, I've issued a tentative going 00:20:56

through them. So I think the best way to do it is to just go one by one through the experts.

So the first expert who is addressed in the tentative is Curtis Owen. And so the movant here is ABOR, so I'll start with you. 00:21:14

MR. DOWD: Your Honor, we divided up these arguments, so this morning Jenna Brownlee will be presenting on that one.

THE COURT: Great.

MS. BROWNLEE: Good morning, Your Honor.

Thank you for hearing argument this morning on ABOR's motion to exclude certain of plaintiff's experts, including Mr. Owen. 00:21:38

ABOR sought to exclude Mr. Owen on a number of independent grounds, as set forth in the motion filed at document 158. 00:21:50

While we're happy to address any of the points raised in our briefing, I intend to focus my argument this morning on three specific issues:

Mr. Owen's qualifications or lack thereof.

The reliability of Mr. Owen's opinions. 00:22:02

And Mr. Owen's opinions regarding the Regional Training Center at Arizona State University.

Let's begin with Mr. Owen's qualifications to serve as plaintiff's expert and to offer opinions on the hiring criteria for collegiate wrestling coach positions. 00:22:16

To ensure we are on the same page throughout this discussion, unless I reference a different type of coaching positional, all references this morning refer to NCAA D-I wrestling coach positions.

As the Court's tentative ruling appropriately concludes, that is the only relevant career path at issue in this case. 00:22:30

We have thought about -- a lot about the Court's comments set forth in its tentative ruling regarding Mr. Owen's qualifications, and the Court's observations as set forth on page 8 of the Court's tentative ruling, that whether Mr. Owen is qualified to opine on this subject presents a fairly close call. 00:22:43

Respectfully, however, Rule 702 and the relevant case law ultimately compels the exclusion of Mr. Owen's proposed testimony. 00:22:56

Plaintiff has failed to establish that Mr. Owen himself has the specific knowledge, skill, experience, training, or education required to provide the minimal foundation necessary to qualify Mr. Owen as an expert regarding the distinct and separate field of collegiate wrestling hiring practices and qualifications. 00:23:11

Indeed, Doe himself does not dispute Mr. Owen does not have firsthand personal knowledge or experience in this discrete and specialized area. 00:23:26

ABOR does not dispute that Mr. Owen's personal experience and firsthand knowledge may qualify him as an expert on wrestling generally, or even on the qualifications necessary to become a high school wrestling coach, both subjects the Court's tentative ruling concludes are irrelevant. 00:23:44

Mr. Owen, however, remains unqualified to offer expert testimony concerning plaintiff's career prospects and, in particular, plaintiff's ability or inability to obtain a position as a collegiate D-I wrestling coach.

While this may not be the case for Mr. Owen's 00:24:01 accomplished family members or prior teammates, the simple reality is that their opinions are not disclosed and not before the Court, only Mr. Owen's are.

The Court's tentative ruling relies on two statements offered by plaintiff as support for Mr. Owen's qualifications. 00:24:17

First, the Court states that even though Mr. Owen has never coached above the high school level, he has helped others to careers as Division I coaches and discussed the qualifications that benefited them as they interviewed.

Second, the Court notes that Mr. Owen also grew up in 00:24:35 a family of college wrestling coaches and has discussed professional qualifications with them at length.

Notably, Your Honor, neither of those statements appear in either of Mr. Owen's actual expert reports. Instead, plaintiff disclosed this information for the first time in a 00:24:50

supplemental declaration attached to plaintiff's response to ABOR's motion to exclude Mr. Owen.

In other words, plaintiff only disclosed this information once it became clear that Mr. Owen's prior reports did not disclose the information necessary to demonstrate that Mr. Owen is qualified to testify to the only relevant issue for which plaintiff offers Mr. Owen's testimony, D-I coaching qualifications and hiring criteria. 00:25:05

THE COURT: Should I assume that without the declaration he never talked to his brother? 00:25:20

MS. BROWNLEE: Well, it's interesting you say that, because his reports reference that his father was a wrestler, a collegiate wrestler, and that his uncle is a junior college wrestling coach.

However, his declaration does not mention his brother or how he's related to these individuals. And his report doesn't say that he had discussions with them about qualifications or hiring practices. It instead says that he worked closely with his uncle throughout his career. He doesn't distinguish if that's his wrestling career, his coaching career. He just says it generally. 00:25:36 00:25:56

However, his declaration goes much further. It states that his family has experience as a Harvard University wrestling coach or a Eastern University of Oregon wrestling coach. And those people he had discussions with regarding 00:26:13

hiring qualifications and the criteria to become a D-I wrestling coach.

We don't even know who those people are. He has not disclosed who they are, what the conversations were or when they had them. 00:26:27

THE COURT: It just seems like a matter of common sense to that me that a person who is so enmeshed in the wrestling world like this would be speaking with other people. I mean, it just seems like the sort of things you're faulting him for not explicitly stating in his report or in his 00:26:41 declaration just seem like basic common sense. And if you had to state all those things in order to establish this sort of experience-based qualifications, we'd have thousand page reports.

MS. BROWNLEE: I mean, respectfully I agree that you 00:26:53 don't need to state every little nitty-gritty detail. But his report is three pages long, single spaced, and it frankly provides very little detail whatsoever. And the declaration takes it further and is untimely.

And ABOR did not have an opportunity to explore who 00:27:08 even those people are or the conversations they had. We have no idea if he even had those conversations with his uncle or anybody, or what they were even about.

It just seems -- while, it's common sense that they might have had that conversations, we're entitled to know what 00:27:22

they were and how they informed his opinions, and he did not provide those to us.

THE COURT: So in a different case, if you had a person with this type of wrestling experience and family background, and they had properly and timely disclosed that they had had conversations with all of these people, would that person be qualified to opine on the qualifications to become a D-I wrestling coach? 00:27:36

MS. BROWNLEE: It depends. They may be. But I'm not sure that would mean that their opinions are reliable if they're set forth the way they are in Mr. Owen's -- 00:27:51

THE COURT: I agree. I mean, I think reliability and qualifications are distinct issues, and so I just want to focus on the qualifications.

MS. BROWNLEE: I think that that could be argued, yes. 00:28:02
I think it depends on the specific facts and what was present in that expert's report and what we knew about them and what they were opining on.

But I think that could possibly be -- they could be qualified, yes. 00:28:13

THE COURT: Okay.

MS. BROWNLEE: Instead, plaintiff -- okay.

Setting aside the fact that plaintiff's supplemental declaration is untimely pursuant to Rule 26 and the Court's case management order, the untimely disclosed information still 00:28:26

does not meet the requirements of Rule 702.

On page 9 of the tentative ruling, the Court also notes that Mr. Owen makes clear throughout his report that conversations and anecdotal experiences, mastering his 20 years as an assistant high school coach, support his conclusions. 00:28:41

However, a detailed review of the substance of Mr. Owen's opinions in his reports don't disclose that or discuss his conversations whatsoever.

And frankly, Mr. Owen's November 23rd, 2021 declaration has left ABOR with more questions regarding his 00:28:58 qualifications and the basis of his opinions than before.

While Mr. Owen's declaration states that he only seeks to elaborate on statements in his report, it does no such thing. Mr. Owen's report never discusses his alleged discussions with his family members regarding the hiring and 00:29:13 qualifications of the NCAA, no less the D-I level.

In fact, his uncle is a junior college coach, not a D-I wrestling coach. And that's the sole wrestling coach mentioned in his report.

Mr. Owen's report certainly makes no mention of 00:29:26 Mr. Owen's unnamed and undisclosed family members and their experience coaching at nationally recognized schools such as Harvard University. Nor does Mr. Owen's report discuss his observations regarding his teammates' careers as D-I coaches and his role in helping them obtain such positions. 00:29:40

Even accepting plaintiff's newly disclosed information regarding Mr. Owen's qualifications and the underlying support for his opinions, Mr. Owen continues to lack the specialized experience and firsthand knowledge necessary to opine on the discrete issues for which he's offered. 00:29:56

THE COURT: Who would be qualified to opine on the qualifications to become a D-I coach?

MS. BROWNLEE: Well, I would say, for example, Mr. Borrelli, a D-I coach at -- and wrestling coach, not only at one university but two, and named coach of the year. 00:30:08 Someone who knows about D-I wrestling and what it takes. Someone who has applied for a position, or worked in the position, or provided detailed experience and knowledge to let us know that they actually know what the criteria is, not very unspecified opinions about what he believes subjectively is 00:30:25 required.

At best, the additional information provided in Mr. Owen's declaration only seeks to confirm what we already know --

(Court reporter interruption.) 00:30:30

MS. BROWNLEE: I figured that was coming.

MR. DOWD: We ask that quite often.

MS. BROWNLEE: Mr. Owen has no personal firsthand knowledge of the hiring criteria to become a collegiate wrestling coach. He's never hired anyone for that position. 00:30:51

He's never held such position.

More importantly, his secondhand knowledge continues to be based on undisclosed, isolated experiences, observations and conversations with unnamed and undisclosed individuals.

To be clear, we're not disputing the concept that an expert can testify based solely or primarily on personal experience or knowledge. We instead are disputing the application of that concept to Mr. Owen. 00:31:05

It remains undisputed, and plaintiff has provided no legal authority, that an expert's qualifications and opinions can be based solely on the knowledge of an undisclosed third party for which the Court and ABOR remain in the dark as the specifics of when or how such information was imputed to Mr. Owen. 00:31:19

Allowing Mr. Owen to testify on D-I coaching wrestling qualifications, a topic he admittedly has no firsthand experience in, cloaks Mr. Owen's speculative and anecdotal opinions with the mantle of an expert. 00:31:34

This is a significant -- this is significant, as the opinion of a purported expert on D-1 wrestling qualifications is likely to carry special weight with the jury. For that reason, care must be taken to assure Mr. Owen truly qualifies and as an expert and the proposed testimony meets the requirements of Rule 702. 00:31:47

Plaintiff simply has not met his burden of 00:32:02

establishing Mr. Owen's qualifications beyond the preponderance of evidence, and his opinions must be excluded.

I would like to talk about reliability next.

Mr. Owen's lack of experience in specialized firsthand personal knowledge pertaining to collegiate wrestling coach hiring criteria and qualifications raises stark concerns about the reliability of his opinions. 00:32:14

Even if the Court concludes, as it did in its tentative ruling, that Mr. Owen is qualified, which he isn't, based on his secondhand experience and knowledge, experience alone is insufficient foundation for expert testimony. No less secondhand experience. 00:32:29

Indeed, case law repeatedly indicates the opposite is true. When an expert relies solely or primarily on experience, they must establish how experience provides a basis for and leads to the conclusions they reach. 00:32:45

Beyond evaluating Mr. Owen's qualifications, the Court must still consider whether Mr. Owen provided a reliable basis for his opinion.

As this Court astutely points out in *Longoria v. Kodiak Concepts LLC,* this is a forgiving standard. However, it's still a standard. The law is very clear and is cited by the Court on 15 of tentative ruling. 00:32:58

Rule 26 requires Mr. Owen to produce the actual data or facts upon which he relied in establishing his opinions, as 00:33:14

opposed to vaguely referencing third-party sources of information on which he relies and asking ABOR and the Court to take his word for it.

Frankly, as we stand here today, we are still left wondering what Mr. Owen will say if and when he takes the stand, no less what he will offer to support his positions and the basis for any such statements. 00:33:28

For example, Mr. Owen opines generally, the All-American experience is all but a requirement for a Division I coach, and obtaining such position without this accolade is rare. 00:33:42

Not only is this opinion contradicted by Mr. Owen's own rebuttal expert report, but, importantly, we continue to wonder, how does he know that? Who told him this? Was it his father, his uncle, his unnamed family member from Harvard University, who would, in fact, be the only individual with relevant D-I coaching experience mentioned in his report? When did he talk to them? Was it based on his strategy sessions with his former teammates in an effort to help them obtain these positions? He simply does not tell us. 00:33:57 00:34:14

This is actual factual information that you cannot learn based on experience alone, no less experience you do not have.

And the law demands that an expert who does not independently have the knowledge or experience in the area they 00:34:25

seek to opine on are required to conduct the necessary research to obtain this information before they can be permitted to testify in front of a jury.

Expert testimony is simply not admissible if it is speculative. 00:34:41

Mr. Owen's proposed testimony requiring the typical qualifications necessary to obtain a D-I wrestling coach position are nothing more than conclusory and generalized statements that fail to meet the reliability requirements set forth in Rule 702. 00:34:56

And Mr. Owen's reports and supplemental declaration make no attempt to explain the underlying basis or foundation for his opinions.

It is plaintiff's burden to create a proper record which the Court could exercise its gatekeeping function. And 00:35:08 the record here is bare.

Respectfully, plaintiff has not met his burden of establishing the reliability and thus the admissibility of Mr. Owen's opinions. Although this is a forgiving standard, it's still a standard, and plaintiff has failed to meet it. 00:35:21

And, Your Honor, lastly, I would like to briefly touch upon Mr. Owen's proposed testimony regarding ASU's Regional Training Center, and plaintiff's inability to utilize the training center for a brief three-year period.

ABOR did effectively move to exclude Mr. Owen's 00:35:37

opinions relating to the Regional Training Center by virtue of moving to exclude Mr. Owen's opinions relating to plaintiff's allegations that ABOR harmed its ability to seek any -- his ability, I'm sorry, to seek any career path at the national, international, or Olympic level. 00:35:53

Plaintiff's response to ABOR's motion inaccurately captures the opinions set forth in Mr. Owen's reports regarding ASU's Regional Training Center.

While plaintiff's response argued that Mr. Owen's proposed testimony focused on plaintiff's alleged stifled 00:36:06 athletic development as a result of his inability to access the Regional Training Center, Mr. Owen's proposed testimony actually relates to plaintiff's inability to adequately train to compete on an international level, or to obtain a coaching position at the international level. Both opinions are 00:36:23 irrelevant.

For the reasons we have discussed, Your Honor, we ask the Court to exclude Mr. Owen's opinions in their entirety as he is not qualified. His opinions are not reliable. And the RTC opinions are irrelevant and will only serve to confuse and 00:36:38 mislead the jury.

THE COURT: Thank you.

With respect to that final point about the RTC-related opinions you're trying to exclude, do you think the argument you just made right now is the same argument that you made in 00:36:49

your motion papers?

MS. BROWNLEE: I do, respectfully.

We moved to exclude any testimony as irrelevant relating to any Olympic, national, international coaching position. And Mr. Owen's opinions relate just to that when he's discussing the RTC. 00:37:02

For example, he says -- and he's not opining on Doe's career as an athletic wrestler, he's opining on his D-I coaching qualifications and ability to become a D-I coach. So he says, in order to be competitive at the international level. 00:37:21 He's basing his D-I coaching propositions on him being an All-American or Pac-12 champion. That's not an international level.

And when he says, in order to be competitive at the international level, it's more important that you are 00:37:36 training in an environment with the best coaches and workout partners, the RTC.

He again then says, as a result of defendants' actions, Doe was not permitted to train at the Regional Training Center. 00:37:48

This has significantly impacted his ability to train and compete as a freestyle wrestler which, in turn, impacted his ability to get a job as a coach at a Regional Training Center elsewhere.

But he says in his opinion that the Regional Training 00:37:58

Center position, coaching position, is an international position.

So when we effectively moved to exclude any opinions relating to coaching at the international level, it included the RTC. 00:38:10

THE COURT: Okay.

MS. BROWNLEE: Thank you, Your Honor.

MS. BEARDSLEY: Good morning, Your Honor.

Tory Beardsley for plaintiff.

So to the extent that defendants have reiterated 00:38:29 what's already in their brief, we've discussed that, Your Honor has tentatively ruled on that, and so I'm not going to spend a lot of time rehashing what's already in the briefing.

But there are a few points that Miss Brownlee made that I wanted to address today. 00:38:47

And the first point is where we ended off, with regard to Mr. Owen's opinions relating to the Regional Training Center.

And I think that there's a distinction with regard to international coaching and competing at an international level 00:39:03 that I want to make here today. Because competing at an international level and the ability to compete at that level is one of those accolades that Mr. Owen talks about that helps a wrestler get the notice that he needs in order to become a Division I coach. 00:39:25

So we understand Your Honor's ruling with regard to the international coaching position and the high school coaching position as far as damages go. But as far as the international competition goes, we think that that is relevant to Mr. Owen's opinion. 00:39:45

And finally, I will just say that we disagree that defendants successfully challenged the RTC opinions in their briefing.

THE COURT: I'm just looking at the paragraph again. In order to be competitive at the international level, it is 00:40:03 even more important that you are in a training environment with the best coaches and workout partners. Not being able to train at the RTC would make it almost impossible to train properly in Arizona, because it gives you the opportunity to wrestle with some of the best athletes in the country. 00:40:19

I read that paragraph as talking about why training at the RTC is important for a wrestler's trajectory as a wrestler. I don't -- unless I'm missing something, it doesn't seem to me, except in a very indirect way, it relates to coaching. It just talks about when you're a wrestler you need to go to the RTC, 00:40:41 because that's how you get really good at wrestling so you can go on and win the highest competitions and achieve the greatest accolades.

MS. BEARDSLEY: Sure. And I think that ties back to Mr. Borrelli's -- excuse me, Mr. Owen's first opinion, which is 00:40:54

that wrestlers need to achieve certain accolades in order to become Division I coaches.

THE COURT: All right. I guess, can you address Miss Brownlee's argument that when it goes to the opinions about why the qualifications for becoming a D-I college 00:41:18 wrestling coach -- I think I understand the arguments about whether he's qualified to give those opinions.

But a different one of their arguments is, that opinion fails on the reliability test because he doesn't articulate his rationale with sufficient precision that they 00:41:36 even know how to challenge it at trial. And there's, therefore, not a relight methodology that passes 702's gatekeeping.

MS. BEARDSLEY: Sure.

And I disagree with the defendants' characterization 00:41:53 of the requirements.

The committee notes make it clear that the expert needs to explain how his experience leads to the conclusion reached. That is all.

And so what he is saying is that he has been enmeshed 00:42:07 in this community for 19 years as an athlete and 20 years as a coach.

And as the Court in a roundabout way pointed out, Miss Brownlee and defendants would essentially have Mr. Owen write down every conversation he had with every person that he 00:42:27

had a conversation with in order to prove that his opinions on coaching are reliable. And that's just not the standard.

And going back to *Kodiak* -- *Longoria versus Kodiak Concepts*, that is a very different case. In *Longoria*, the valuation expert didn't have any experiential knowledge of the modeling industry. And he also didn't disclose the contracts that he was relying upon. 00:42:51

Here, Mr. Owen has said, I have lived wrestling my entire life. That's where I get this experiential knowledge from. 00:43:11

And he goes on to disclose that -- the conversations he's had with people, and the fact that he has been a coach for 20 years, and he's watched wrestlers go through the process in order to become D-I coaches.

And finally, I want to address defendants -- excuse me, finally on this point, I want to address defendants' assertion that because he isn't himself a D-I coach he doesn't have the experience necessary to opine on D-I coaching. 00:43:27

That is the equivalent of saying a college counselor, because they didn't go to an Ivy League school, doesn't have what it takes to instruct a student on what it takes to get into an Ivy League school. That can't be the standard. That's not what the law says. And it's just an overreach. 00:43:49

THE COURT: Okay.

The tentative also grants their motion in several 00:44:07

respects and excludes several of the opinions at issue here. Do you want to be further heard on any of that?

MS. BEARDSLEY: Yes, Your Honor.

We'd like to ask the Court to reconsider its concerns regarding Mr. Owen opining on the likelihood of Doe's success and his skill level. 00:44:26

The Court has characterized his opinions as conclusory. But this is not a matter of Mr. Owen saying, I know a great wrestler when I see one. Owen is relying on objective performance metrics. He's looking at a Pac-12 00:44:46 conference title as a sophomore, meaning that Mr. Doe beat everyone in his weight class in the Pac-12 Conference, not only that were his year, but that were years ahead of him.

And as Your Honor noted, defendants don't dispute -- or it's undisputed in this case that a collegiate wrestler only 00:45:10 gains skill with the experience of the last two years of college. So he's beating wrestlers that have that experience already.

And placing fifth in the World Cadet Competition is a tremendous accolade. America -- 00:45:30

THE COURT: I agree. I think everybody agrees.

And why do we need an expert to tell us that it's a tremendous accolade when on its face it, of course, is a tremendous accolade because it speaks for itself.

MS. BEARDSLEY: Right. So we agreed with that. We 00:45:47

think that these accolades speak for themselves. They are objective benchmarks on which somebody with Owen's knowledge, education, training and experience can look at those and say, he's met these benchmarks. He's going to have a successful career. 00:46:07

Now to make a clumsy attempt at relating it to Your Honor's basketball analogy, this isn't Charles Barkley saying, I know an NBA player when I see one. This is Charles Barkley saying, this guy was a top scorer in the NBA Summer League, he was the rookie of the year, and I've played with 00:46:22 him, I coached him, I've seen him in games, and I think he's got what it takes to become an NBA champion.

So just like Charles Barkley can look at those objective benchmarks of --

THE COURT: But doesn't he -- doesn't whoever -- the 00:46:41 analogy -- sometimes I try, my analogies are not the best. But the point is that he doesn't explain why these accolades are meaningful accolades in comparison to other accolades. You know, what -- why is a person who would get fifth of this competition be one of the best in the world, but somebody who 00:47:00 only got 12th would not be the best in the world.

There's just -- this report is so spare, and there's so little explanation in there, I guess that's my concern. The tentative says, he just rattles off a bunch of accolades that on their face seem pretty good and says, that means he's going 00:47:17

to be the best in the world. And he didn't show his work between those two things.

MS. BEARDSLEY: Well, to offer a slight clarification, he doesn't say he's going to be the best in the world, but he says that -- 00:47:31

THE COURT: One of the best in the country.

MS. BEARDSLEY: One of the best in the country.

And, again, as you mentioned, I think that that's self-evident in these accolades. Because in order to get to worlds, you have to be the best in the country in your weight 00:47:42 class. And so the fact that he even went to worlds is in and of itself an accomplishment.

So I don't think that the rule requires Owen to explain why these accolades have meaning. The rule requires him to explain that they do have meaning, and that it's an 00:48:05 accepted metric in the field.

So the question then becomes, would somebody in his field rely on these objective bench marks? And the answer is yes.

THE COURT: Okay. 00:48:20

MS. BEARDSLEY: Thank you, Your Honor.

THE COURT: Thank you.

MS. BROWNLEE: We just have a few brief reply points.

And respectfully, I think we could start again with the basketball analogy. This isn't a Barkley scenario. He's 00:48:47

more like someone in maybe the G league.

And I think a great analogy would be Jalen Smith who was signed by Phoenix Suns. He was an all-star, he was the best there was. People were so excited, everyone wanted him.

And for the majority of his career, until the very end with the Suns, and I was sad to see him go, he wasn't that good. He didn't perform that well. 00:49:06

Same thing with Deandre Ayton. For the first couple of seasons everyone was convinced that we needed to put glue on his hands. He was the number one draft pick. 00:49:20

So without looking at the documents, considering Doe's -- plaintiff's actual college career and his injuries and how long he was out, really reflects that the opinion is just barebones and it doesn't have enough to hold weight.

And we continue to talk about his amazing accolade, fifth in the world, but that was in high school. One evolves. And for Mr. Owen not to tell us how he gets to these conclusions is just frankly inappropriate under Rule 702, as the Court points out. 00:49:37

I mean, we're entitled to know what he bases his opinions on, and we shouldn't be having to hold our thumb in the dark and wait to see what he says at trial. We are entitled under the rule for him to disclose this information and he simply didn't do so. 00:49:52

And Miss Beardsley's point as to the expert in 00:50:04

*Longoria* and how it was different here, she says that that expert didn't disclose the contracts he relied on and he didn't have the specific experience.

That's the exact situation here. Mr. Owen does not have the personal firsthand knowledge and experience. He's relying on undisclosed conversations and facts for the basis of his opinion. There's no difference. 00:50:21

So while, like the expert in *Longoria*, he may be generally qualified, his opinions are still not reliable.

THE COURT: Thank you. 00:50:39

MS. BROWNLEE: Thank you.

THE COURT: Next in the tentative is Dr. Kaufman.

I want to keep Mr. -- Dr. Kaufman for the end, because I think that's the one that I probably have the most thoughts about. And I know that things have changed a little since the motion for reconsideration came in and I asked for supplemental briefing on that. So I really want to focus on that last at the end. 00:51:04

So let's talk next about Cindi Nannetti.

MS. LAMM: Good morning, Your Honor. 00:51:22

With respect to Miss Nannetti, we do appreciate the tentative ruling. As you noted, we know how much time it takes to put that together. It's lengthy and it's detailed, and we have reviewed it very closely.

There's a couple of key issues that I'd like to 00:51:40

address today with respect to Miss Nannetti, focusing on where we think the tentative just is slightly off base, and hopefully can be revised to exclude Miss Nannetti.

The first is qualifications.

Miss Nannetti is not qualified to offer expert testimony on Title IX investigations. I feel like now with the response brief from Doe that's effectively conceded, but I still think it's important that we address it because of the nature of her opinions and how those really do tie to Title IX and judging a Title IX investigation. 00:51:56 00:52:14

The second is reliability.

Miss Nannetti's opinions are not reliable. They're not reliable because she doesn't have the qualifications to offer them. But also, and what I would like to focus on today, is they are based on assumptions that either this Court has found to be false or that we have demonstrated with record evidence are belied by the evidence, and Doe has effectively conceded that in his response as well. 00:52:30

So I'll start with qualifications.

Now, Miss Nannetti's report offers expert testimony on Title IX investigations. The underlying investigation into Doe was a Title IX investigation. She spends nearly two pages at the beginning of her report under a heading Investigative Standards in which she walks through her view of what the standards are that apply in a Title IX setting. 00:52:48 00:53:09

She cites mainly to ATIXA, and then references some deposition testimony.

Following that she spends the next 12 pages or so applying those standards to the investigation that Miss Davis conducted of Doe while he was at Arizona State University. 00:53:25

Because of the focus of her report on Title IX investigations, we moved to exclude her for Title IX because she does not have the qualifications to opine on a Title IX investigation.

All of Miss Nannetti's background is as a sex crimes 00:53:42 prosecutor. Right.

In -- even in Peter Lake's -- motion to exclude Mr. Lake, they refer to Miss Nannetti as having 23 years of experience in prosecuting sex crimes. This Court recognizes in the tentative she has decades of experience as a prosecutor in 00:53:59 sex crimes.

That does not translate to Title IX investigative expertise. She's never conducted a Title IX investigation. There's no evidence that she has training in Title IX investigations. No evidence that she's given training on 00:54:14 Title IX investigations. No evidence that she's even interviewed a Title IX coordinator, investigator, or decision-maker. It's just absent from her report.

There are a couple of vague references that I'm happy to address if that would be helpful, but I don't want to waste 00:54:31

the Court's time.

I know there was one reference that we addressed in the motion and the Court pointed out in the tentative where she referenced being an expert in Title IX cases, and it's just not supported. 00:54:45

Now the reason this is important -- and we've cited cases for this, which I will address in just a few minutes. But it's important because criminal investigative standards are materially different than Title IX. They are. The standards are different. The ability to obtain evidence is materially 00:54:57 different.

The timeline for a Title IX investigation is significantly truncated. It has to be, quote, prompt under the regulations.

They don't have the ability to compel evidence. They 00:55:09 can't force anyone to give evidence, and they have to do it within a very short window of time, both for the complainant's rights and the respondent's rights.

The standards of proof are different. The role of the investigator, as the *Colgate University* case also recognized, 00:55:26 can also be materially different.

Here we have Miss Davis, who was in a position as the investigator without the position or authority or role of resolving ambiguities and making a decision as to the evidence. Her job was just to collect the evidence and give it to a 00:55:42

decision-maker.

The purposes served by Title IX and criminal sexual misconduct laws are also materially different. And, of course, the resulting potential punishment is significantly different. In Title IX, it's designed to foster an educational environment where everyone can attend free of the potential for discrimination and harassment, which includes potential sexual misconduct. 00:56:00

We're not -- ABOR doesn't put anyone in prison. They cannot take away someone's liberty. At most they can do is expel someone, which means they have to go to a different university. That's the most they can do. Nobody has to register as a sex offender. It's just a very different situation. 00:56:15

Now, we moved to exclude Miss Nannetti because her criminal background does not translate into expertise as a Title IX investigator or the standards that apply in a Title IX investigation. 00:56:29

Now, in the response, it was the first time that we learned Doe's position, that he's not offering Miss Nannetti as a Title IX expert. Notwithstanding the language in her report regarding Title IX, Title IX standards, and then applying those, suddenly he's not offering her as a Title IX expert. 00:56:48

He then says that Miss Nannetti should be allowed to testify, because although not a Title IX expert, she has 00:57:09

specialized knowledge involving gender bias in sexual misconduct inquiries.

Well, that's not disclosed in her CV. In her report there's not even a reference once to gender bias. And I know we pointed that out in our motion. It's a term that's just thrown in here through the response brief by Doe. 00:57:30

But really, gender bias is at the heart of Title IX. If she's not an expert on Title IX, she cannot be offering opinions regarding gender bias or her belief, undisclosed in her report, that gender bias existed here. 00:57:49

In the tentative the Court states first that Miss Nannetti does not ultimately opine about how a Title IX investigation should be conducted, or whether ASU's investigation of Doe was a proper Title IX investigation.

But, Your Honor, we submit that she does. She has the 00:58:08 beginning of her report where she addresses Title IX investigative standards. There's no question that the underlying investigation of Doe was a Title IX investigation.

And then Miss Nannetti applies those standards to the underlying investigation of Doe, a Title IX investigation, to 00:58:26 conclude that there are flaws or bias or irregularities in that investigation.

There's no way to take that conclusion in her report and divorce it from a Title IX setting. That's the setting that we're in. And that's exactly what she's offering opinions 00:58:44

on.

The tentative also states that Miss Nannetti may testify because she's merely offering opinions regarding how investigations generally should be conducted. And that, of course, she would have become familiar with general investigative standards in her decades as a sex crimes prosecutor. 00:59:01

But first I think it's important to keep in mind, her perspective, her entire perspective for approaching this is as a prosecutor. It's not as a Title IX investigator. 00:59:15

And second, it's not accurate to characterize Miss Nannetti as merely opining about basic investigative standards, when the very beginning of her report, the foundation for her opinions, is setting forth what she believes -- unqualified though she may be, what she believes are Title IX standards. 00:59:33

That's the foundation for her report, which then carries through to when she applies those to conclude either that Miss Davis didn't resolve all ambiguities, didn't follow up on evidence, or was somehow unfair towards Doe. 00:59:49

Your Honor, the law, evidence in the record, and also the cases that we cited in our motion also make clear that experience in criminal justice settings does not translate to experience in a Title IX investigation.

So I'll start with the law. 01:00:15

We didn't detail this in our motion because, frankly, we didn't think it was at issue.

But the evidence in the record does show, first, for Title IX, the Code of Federal Regulations, 34 CFR Section 106.8, the one in place at the time of Doe's investigation, all it required was prompt and equitable resolution of complaints. That's what it required. 01:00:33

The dear colleague letter, which is in the record, it's at doc 155-6 at page 11. That letter specifically states, standards for criminal investigations are different. 01:00:53

The dear colleague letter then cites to the Office of Civil Rights Revised Sexual Harassment Guidance, which again states, standards for criminal investigations are different.

THE COURT: I just feel like -- you know, "standards" is a big word. And so one way of talking more specifically is, the dear colleague was talking about two specific standards, has to do with the right of cross-examination during the actual proceeding and the standard of proof during the actual proceeding. 01:01:10

Those are not things that Miss Nannetti was testifying about, she was talking about different standards that apply during different parts of the process, and that specifically the factual investigation that precedes the formal proceeding at the end where you apply those standards. 01:01:24

And so I guess it's not clear to me that the materials 01:01:38

you just referenced suggest that all of the ways that sexual misconduct investigators typically go about investigating those things are totally irrelevant in the Title IX context.

MS. LAMM: Well, I wouldn't say they're totally irrelevant, but they're not on point. And I think there's a difference between saying rights of cross-examination or confronting your witnesses at a hearing versus in the investigation process. 01:01:58

And the citations that I was just quoting from deal specifically with investigations, criminal investigations. 01:02:13

And then when we look at the guidance that the OCR offers, it references prompt and equitable grievance procedures, including -- now I've lost it here -- but including the ability to obtain evidence from both sides.

So it's not -- it's not the same as addressing the hearing process, which Miss Nannetti does not testify about. It's specific to the investigative process. 01:02:36

THE COURT: Let me ask the question a different way.

The way that the tentative lays it out is Miss Nannetti's -- three of her core opinions are that the basic investigative standards for anybody conducting an investigation into a sexual misconduct allegation is that the investigator needs to address inconsistencies and ambiguities to the extent possible. 01:02:51

The investigator needs to engage in the active 01:03:08

accumulation of evidence, or at the very least try to obtain all the relevant and reasonably available evidence.

And third, the investigator needs to begin the investigation without bias or preconceived notions and follow the evidence in a neutral fashion. 01:03:25

Can you point to anything in the CFR regulations or the dear colleague letter that states that those three standards are inapplicable in a Title IX investigation?

MS. LAMM: No, Your Honor.

The guidance in the CFR, all it states is that the 01:03:37 only requirement is that universities adopt grievance procedures that provide for prompt, equitable resolution.

THE COURT: Aren't these just a different way of coming to an equitable resolution of an allegation?

MS. LAMM: I would say no, Your Honor. Because, for 01:03:54 example, the requirement that the investigator resolve ambiguities, right, that's found nowhere in the Title IX regulations, nowhere in any Title IX guidance that Miss Nannetti has pointed to.

And so she's relying solely on her expertise as a 01:04:10 criminal prosecutor to say, well, in the criminal setting we would have done that. And so here, translate that over, and necessarily that should have been done here.

But it's a very different setting here, where Miss Davis's role is not to resolve ambiguities. 01:04:26

The *Colgate University* case actually uses the role of an investigator and whether they resolve ambiguities as a difference that could be different from criminal settings.

So, respectfully, I think that case is very helpful and very on point to determining this issue. 01:04:43

But I think --

THE COURT: Does her opinion say the investigator needs to resolve the inconsistencies, or does she say they need to address the inconsistencies?

MS. LAMM: She says she should address them to the extent practicable, and that Davis failed to meet these standards. And then walks through a variety of bullet points. 01:04:58

So, Your Honor, I understand that -- I understand the questions that you just raised and the points that they make. But I would submit that it is not ABOR's obligation to come in and prove why what Miss Nannetti is saying as the foundation for her opinions regarding this Title IX investigation are the proper or improper standards. It is Miss Nannetti's obligation to establish that those opinions are reliable and founded in expertise relating to Title IX investigations. 01:05:23 01:05:50

And I think it's helpful --

THE COURT: Let me ask it a different way.

It seems like -- you know, I see why it would be frustrating from your perspective where the report looks like in some ways it has verbiage that suggests that it's Title IX 01:06:06

specific opinions, but then when you dig into them and then you see their response brief, they characterize it in a different way. I understand why that would be frustrating.

But in my tentative I tried to do my best to look at the substance of the report and figure out what the opinions are. 01:06:19

So if you accept that this is just an opinion that has to do with generally how investigations into sexual misconduct should be conducted, characterizing it that way, it seems to me it's pretty clear that Miss Nannetti's qualified to testify on that topic. And she has reliably gone through her methodology on why she thinks there's errors here. 01:06:37

So it seams like really accepting that characterization -- you know, when you have expert issues, you've got these buckets you put the disputes into. Is it about qualifications, is it about reliability, is it about relevance? 01:06:52

It seems to me that this is fundamentally a fight about relevance. Your position is that, to the extent she wants to talk about how sexual misconduct investigations generally are operated, that's just irrelevant here because Title IX is a totally different world, with totally different standards, and it's confusing to the jury and irrelevant to talk about how you conduct these investigations in other settings because it's so dissimilar here. 01:07:04 01:07:18

And I understand your point on that. But relevance is pretty broad. And I think there's reasons why it would be relevant here.

And the points you're making about why Title IX is different and why the standards she applied are inapplicable, given the breadth of relevance in this area, I think there's an argument that those are things you should be making on cross or to the jury rather than as a basis for excluding. 01:07:31

MS. LAMM: Well, two points I'd like to say in response to that. 01:07:47

The first is, if these are really just basic investigative approaches, right, that you approach it from a non-biased perspective, that's a basic point that I don't think the jury needs. And it wouldn't be helpful for the jury to have an expert witness who was a 23-year career prosecutor in sex crimes to opine on that and instruct them on that. 01:08:02

Because then she's being viewed under this cloak of an expert with this higher authority to give -- if she's really just giving a rudimentary explanation of basic, you shouldn't be biased, that's not necessary and not helpful and would be prejudicial. 01:08:23

But secondly, Your Honor, I do think it is critical here, and I do think the case law requires it, that she be qualified to opine on Title IX investigations specifically.

And I want to point the Court to the *Doe v. Colgate* 01:08:41

*University* case, which is cited in our motion. I was surprised it was not addressed in the tentative, but hopefully it will be in the final version of the order.

But that case, Your Honor, is really directly on point. It was a Title IX case where the plaintiff's expert was a law professor with expertise in criminal procedure and criminal investigations. Like Miss Nannetti, an expert on the criminal law and criminal investigations. 01:08:55

As with Miss Nannetti, that expert had never served on a Title IX panel, had never conducted a Title IX investigation, didn't interview the Title IX disciplinary -- individuals involved in the disciplinary process or the investigator. 01:09:16

And the Court there noted -- the Northern District of New York, in 2017, affirmed by the Second Circuit in 2019, the Court noted criminal investigations and Title IX investigations can vary dramatically. And because someone with criminal expertise does not have the expertise in Title IX investigations specifically, they're unqualified to offer opinions relating to not only the investigation, but procedural deficiencies, which is exactly what Miss Nannetti purports to do. Procedural deficiencies in a Title IX investigation, or to opine on the alleged bias of the investigator, which is also what Miss Nannetti purports to do. 01:09:39 01:09:57

So, respectfully, the *Colgate* case is directly on point. 01:10:15

Then, last month -- we were frankly surprised there are not more cases in this area. *Colgate University* was the first one and only one we found until last month. In August of 2022 the District of Nebraska issued *Doe v. Board of Regents of the University of Nebraska*, similar to the *Colgate University* case. 01:10:33

There, the plaintiff's proposed expert was a SANE examiner, a licensed nurse practitioner who had tons of experience in sexual assault investigations.

Just like in *Colgate* the Court concluded that expert 01:10:46 was not qualified and could not offer opinions regarding a Title IX investigation, because expertise in how to conduct criminal investigations does not translate. It cannot just be picked up and all of a sudden the person is qualified to offer opinions in a Title IX case. 01:11:06

That expert, the SANE examination nurse, was also excluded.

So I think, respectfully, there's no real difference between Miss Nannetti or the law professor in *Colgate* or the SANE nurse in *Doe v. Board of Regents of University of* 01:11:20 *Nebraska*. She does not have Title IX expertise. And Doe effectively concedes that.

And so as a result of that, her opinions should be excluded.

Your Honor, I want to address briefly the reliability, 01:11:33

if I may turn to that.

THE COURT: Sure.

MS. LAMM: The first point on reliability relates to the false foundation of Start by Believing, which directly, after the nearly two pages on Title IX standards, Miss Nannetti's report addresses Start by Believing, and spends a significant number of pages articulating her belief that ASU followed Start by Believing. 01:11:47

It's not accurate. The Court's tentative notes that that is not accurate. The summary judgment order notes that that is not accurate. So that opinion was rightly excluded. 01:12:04

The problem we have is that on -- at the tentative at page 30, the Court notes that although the Court is excluding the Start by Believing opinion, that opinion does not undermine the reliability of Miss Nannetti's other two opinions, because they turn on additional perceived flaws relating to Start by Believing. 01:12:23

We would submit, Your Honor, that's not a fair reading of her report. Because if we read her report, Start by Believing, that premise, is the foundation for the rest of her opinions and permeates through the rest of her report. 01:12:39

So if we look, for example, one of her first opinions, which is at doc 161-1 at page 12, the header for her opinion is The Investigation Was Biased Against Doe.

And she states, it is my opinion that the 01:12:59

investigation in this case was tainted by Davis's unwarranted presumption that Roe was a victim of sexual assault and her subsequent confirmation bias to support that narrative.

That's Start by Believing.

On the next page, at page 13, her next opinion, Miss Davis never gathered relevant reasonably available evidence, or never substantially sought relevant evidence as she believed Roe's allegations from the start. 01:13:17

Again, Start By Believing.

Then on page 14, again, Davis began her investigation believing the complainant. This mindset colored her opinion. That too is Start by Believing. 01:13:33

And at page 16, her last opinion, in her rush to judgment and her belief of Roe's version, Davis was not a neutral fact finder. 01:13:51

Again, each of those opinions ties back to Start by Believing.

And I would suggest, Your Honor, the *Doe v. Colgate University* case is, again, directly on point in this case. Because in *Colgate*, just like with Miss Nannetti, the expert there sought to offer an opinion that college administrators are influenced by feminist ideology and presume sexual assault complainants are traumatized. 01:14:02

Then from that opinion the expert said that led to -- this assumption led to procedural irregularities in the 01:14:23

Title IX investigative process.

The court, just like Your Honor has found, there's no basis for Miss Nannetti's assumption that ASU followed Start by Believing. The court in *Colgate* said there's no basis for her opinion, that there was a presumption of this feminist ideology, and that complainants are traumatized. 01:14:43

And as a result there's no basis for concluding that all of these procedural irregularities occurred. And the court stated, because the court finds that Gruber, the expert's general conclusions regarding Title IX administrators' acceptance of a trauma trope is unreliable. It also rejects her application of these conclusions to *Colgate*'s administrators. 01:15:02

I think the *Hanna* case that the Court cited in the tentative is also on point here, where there expert testimony was excluded where the plaintiff gave heavy weight to false assumptions. 01:15:17

Here Start by Believing is woven throughout the entirety of Miss Nannetti's report. And in each opinion, in each header, she ties it back to Start by Believing. 01:15:36

Once that Start by Believing presumption is proven false, the rest of her opinions are necessarily unreliable.

Now, the opinions are also unreliable because they are belied by the evidence.

In ABOR's motion we identified as an example 01:15:54

Miss Nannetti's false assertion that Miss Davis did not attempt to obtain investigative materials from the Tempe Police Department. That includes a whole host of things. Right. That includes the police report, notes from the police officers, alleged DNA evidence, the alleged video, the SANE examination. It includes a host of things. But that was a factual assertion that Miss Nannetti makes. 01:16:12

We demonstrated in the motion that that assertion is false. In response, Doe does not contest it. There's no response on those allegations, effectively conceding that there's no basis for Miss Nannetti to make those statements. 01:16:29

So then in the tentative, the Court states, these are just two of the many perceived investigative flaws identified in Miss Nannetti's report.

Your Honor, that's just not accurate. The general category might be two, but when we look at her opinions -- if we look, for example, at page 9, she has nine bullet points of things that she says are flaws. At least five of those are based on information that she alleges Miss Davis didn't get that would have been available through the Tempe Police Department. 01:16:51 01:17:11

On page 13 there's 16 bullets, and 50 percent, eight of those are based on the same false foundation.

And then if we look at Miss Nannetti's reply report, her rebuttal report, the first three paragraphs are focused on 01:17:28

this false factual assumption.

So, respectfully, the entire report should be out. But at a minimum, Miss Nannetti cannot be permitted to get up on the stand and offer expert testimony relating to these issues that are belied by the evidence and there's no contrary evidence asserted for that by Doe. 01:17:43

And the final opinion by Miss Nannetti that I'd like to address briefly is her opinion that the SANE examination report, that the injuries reflected in that report are consistent with consensual sex. Miss Nannetti says that in her expert report. 01:18:05

We raised this in the motion. I didn't see it in the tentative, so hopefully it makes its way in. But Miss Nannetti is not a SANE examination nurse. She's not qualified to make that opinion. 01:18:22

But equally important, that opinion that she makes is contradicted by the opinions offered by Doe's SANE examination expert Karyn Rasile. And Karyn Rasile's expert report, she's the only one qualified to testify and the only one offered regarding SANE examinations and how to interpret those reports. 01:18:42

In her expert report she testifies that the SANE examination of Roe here, based on that report, it's impossible to tell. It's impossible to tell whether the sex was consensual, it's impossible to tell whether it was not consensual. 01:19:01

That contradicts Miss Nannetti's unqualified opinion that she puts in her expert report that the SANE examination report reflects consensual sex.

So, respectfully, that opinion has to also be excluded. 01:19:14

Your Honor, I'm happy to answer any questions. I know I'll probably have a few minutes for rebuttal.

THE COURT: I'll hear first from Doe, and then we'll go from there.

MS. BEARDSLEY: Would Your Honor like to start with questions or should I address -- 01:19:28

THE COURT: Go ahead.

MS. BEARDSLEY: Okay. Thank you.

So working my way backwards, again, I want to start with the point about what Miss Nannetti said in her report about the bruising and the SANE exam being consistent with. She did not say indicative of consensual sex, she said consistent with consensual sex. 01:19:44

And what Rasile says is absence or presence of bruises does not speak to force or consent. Meaning, that the presence of bruises can be consistent with consensual sex. 01:20:05

THE COURT: Why is Miss Nannetti qualified to testify about medical topics like this?

MS. BEARDSLEY: Your Honor, we're not presenting Miss Nannetti as a medical expert per se, but I do think that 01:20:25

she's qualified because she has experience looking at SANE exams and deciding what to prosecute or what to investigate and what procedures should be followed from that point on.

Speaking to what Miss Lamm said with regard to Start by Believing and how it infects all of Miss Nannetti's points, 01:20:54 we understand the Court's ruling on Start by Believing, that the Court's not going to allow to Miss Nannetti to opine on Start by Believing, and we are not contesting that at this hearing today.

However, the Court's ruling cannot possibly be read to 01:21:12 also exclude every single instance of bias toward the complainant that Miss Nannetti identified in her report. That's just taking it way too far.

Part of the basis for which Miss Nannetti found that Start by Believing was followed in her report was by looking at 01:21:32 the investigation and saying, these are acts -- in my knowledge, training, skill and experience, these are acts that are consistent with an investigator who has started with a bias toward the complainant.

And that notion is not limited to Start by Believing, 01:21:52 it's not new to the Start by Believing. That notion predates Start by Believing.

And so defendants' request today to preclude all of Miss Nannetti's testimony on evidence of bias toward Roe is just a bridge too far. 01:22:12

With regard to the helpfulness of the -- actually, let me back up a little bit further.

Miss Lamm has focused a great deal of her argument on the fact that Miss Nannetti was a 23-year sex crimes prosecutor. But has conveniently ignored that on the first page of her report Miss Nannetti says that she has worked with the Catholic Church and numerous other organizations to develop and draft sound policies and procedures and trainings for the prevention of and reaction to sexual misconduct. 01:22:33

And so when you're talking about somebody who has gone into schools and churches and other nongovernmental entities, and not only written policies for them, but then worked on trainings, which is essentially an interpretation of policy, this is somebody who is an expert on procedural irregularities and can look at a set of procedures and say, okay, here's how this needs to be carried out. That's her consulting experience. 01:22:55 01:23:18

And if you look at the CV that Miss Nannetti submitted, it is quite extensive.

THE COURT: Let me just ask a question on that. 01:23:32

It seems to me the opinions in this case are really focused on how one should conduct a historical investigation into an alleged instance of sexual misconduct. And so I'm not sure I have much information -- or there's much information in the record about what specifically she did for the Catholic 01:23:54

Church and these other organizations.

I mean, when you're talking about formulating policies for them, I don't know what those policies are. Are they policies on how to prevent prospectively sexual abuse? Are they policies about -- in contrast that might be more relevant here, about how to conduct sexual investigations into sexual misconduct. 01:24:07

I just don't know, and so I'm not sure just the reference to those things without more information about what they entail helps her qualifications. 01:24:14

MS. BEARDSLEY: Well, she actually does note that the trainings were on the prevention of and reaction to. That implies investigations and probably disciplinary procedures as well.

Your Honor's point is well taken, but I think to preclude Miss Nannetti's opinion because she didn't use precise verbiage would be problematic and is not what the law requires. 01:24:34

THE COURT: Okay.

MS. BEARDSLEY: And with regard to the -- excuse me.

So Miss Nannetti is offered to testify on sexual misconduct investigations, not Title IX. 01:25:02

As Miss Lamm pointed out, Title IX does not set forth within it a specific set of investigatory standards. So Miss Nannetti uses her knowledge, skill and experience working with schools, these other organizations, to define what would 01:25:26

be and is a key, is the equitable resolution.

And that includes things such as -- excuse me. It includes things such as an investigator must participate in the active collection of evidence.

And that isn't all that Miss Nannetti seeks to opine on here. Miss Lamm noted that she didn't think that this would be helpful to a jury. 01:25:53

First of all, of course, we disagree. We think an understanding of what basic investigatory standards are in a sexual misconduct investigation is very helpful to a jury to have that kind of understanding. 01:26:09

But in addition to that, she's also permitted to opine on whether or not those investigative standards were met here. And that's what's helpful to the jury, because as you noted in your tentative, *Schwake* and *Doe versus the California* -- excuse me *the Board of Regents for the University of California*, both note that not only can you show procedural irregularities, but you must show procedural irregularity in order to prove Title IX gender bias. 01:26:26

THE COURT: All right. A couple questions. 01:26:49

One, one of the points Miss Lamm made was, listen, she criticizes us for those procedural irregularities, and a huge portion of those procedural irregularities are based on the false premise that the investigator never bothered to try to get the evidence from the relevant sources when, in fact, she 01:27:10

did. And so that factual error is so pervasive that calls into question the reliability of all of her opinions.

MS. BEARDSLEY: That's simply untrue.

And to the extent that Your Honor is going to consider the Board of Regents' newly presented specific arguments 01:27:28 regarding factual points, plaintiff would like the opportunity to provide a written response and to consider those more fully, because those points were brought up for the first time today.

THE COURT: Just a moment.

MS. BEARDSLEY: Sure. 01:27:46

THE COURT: I'm not sure I agree that that's a new argument. I think that on page 30 of the tentative we specifically addressed the fact on page 10 of their motion they argue -- the reliability objection concerns her reliance on -- excuse me, that's SBB. 01:28:16

All right. Strike that. Okay.

MS. BEARDSLEY: And just to provide some examples, the bullet points on page 13 of Miss Nannetti's --

THE COURT: I guess it's on page 31 where they specifically argued in their motion papers that she levels 01:28:39 several accusations that are contradicted by the testimony and documents in the record.

They specifically talk about her failure -- that she did attempt to gather records from the Tempe Police Department. And so the fact that her purported failure to do so provides a 01:28:56

big portion of the foundation is a problem here.

So I'm not sure that's a new argument.

MS. BEARDSLEY: Sure.

So that is, as Your Honor noted in the tentative, a single point, a flaw in the investigation. And then what Miss Lamm has done today is argue that that infects all of these bullet points on page 13. 01:29:10

And these are things that are not contradicted.

Never interviewed J.W. That's not something that's contradicted by anything in the record. 01:29:32

Never asked any witness if they were aware of prior sex with Doe. That's not contradicted anywhere in the record.

And so there are several points here that don't relate to the failure to obtain the police report.

And that's also an important point. She did not obtain on her own volition the police report on her own. But plaintiff concedes that, yes, there is evidence of her making some minimal attempt in order to obtain the police report. But she never did obtain it. 01:29:55

Never sought to obtain all of the parties' social media posts. Never interviewed the ASU detective or interview tapes. 01:30:12

There are several points in here that are not infected by that mischaracterization on Miss Nannetti's part.

THE COURT: Okay. Another question. There was some 01:30:28

discussion about the *Colgate* case in the Northern District of New York, this new case from Nebraska that I'm not sure you're aware of yet. So what's your position on those, did those courts get it wrong, or are those cases distinguishable because the opinions in this case are factually different from the opinions that were excluded in those cases? 01:30:44

MS. BEARDSLEY: Well, again, with regard to the case out of Nevada (sic), we would like the opportunity to respond, to the extent the Court intends to rely on that case.

But with regard to the *Colgate* case, we know that the expert in that case went much further than Miss Nannetti did or than Miss Nannetti is permitted to under the Court's current tentative ruling, which does not permit her to opine on Title IX and confines her just to basic investigatory standards. 01:30:57 01:31:19

THE COURT: Thank you.

Anything else?

MS. BEARDSLEY: Also, distinguishable -- Miss Nannetti's also distinguishable from the expert in the *Colgate* case because of the additional experience working with these other organizations and consulting with other organizations. She is not just a criminal sexual investigation expert. 01:31:26

THE COURT: Thank you.

MS. BEARDSLEY: Thank you, Your Honor. 01:31:38

Your Honor, may I consult with my co-counsel and make one more point?

THE COURT: Sure.

MS. BEARDSLEY: Thank you.

(Discussion off the record between plaintiff's counsel.) 01:31:58

MS. BEARDSLEY: Your Honor, finally, with regard to the police report, Davis had the right to compel Roe to get the police report for her, and said that she was going to do that. And we asked her to do that. Excuse me, counsel for Doe in the underlying case asked her to do that. And she never did so. 01:32:38 So I just --

THE COURT: Can you elaborate on that? What do you mean by she had the right to compel --

MS. BEARDSLEY: Sure. So under the student code of conduct, ASU is permitted to do things such as withholding 01:32:50 transcripts or not allowing a student -- I believe not allowing a student to take final examinations in order -- if they are not complicit with investigative efforts under Title IX.

THE COURT: Okay.

MS. BEARDSLEY: Thank you. 01:33:08

MS. LAMM: Thank you, Your Honor.

I had three points, but now I have four.

The first is the last point that Miss Beardsley just raised, the right to compel Roe to provide the police report.

First of all, that does not apply in this setting, 01:33:27

because Miss Roe at the time of the investigation was no longer a student. So there's no penalty Miss Davis could have inflicted to cause her to give the police report.

The person who had the police report was Mr. [redacted]. He's the person who did not provide it. Mr. Doe. Sorry. 01:33:45

Redact that for me.

THE COURT: We'll figure it out later.

MS. LAMM: Sorry.

THE COURT: No problem.

MS. LAMM: The second point I'd like to make is the 01:34:00 issue with respect to the single sentence on page 1 of Miss Nannetti's report in which she references working with various entities, including schools, to develop and draft policies, procedures and trainings for the prevention of and reaction to sexual misconduct. 01:34:19

I'm glad Miss Beardsley brought that up, because I wasn't going to address it in case someone brought it up.

But the Court's question is a good one here. There's no support for that assertion. There's none found in the report. None found in Miss Nannetti's CV. 01:34:31

And, in fact, with respect to schools, we searched her CV. Every portion of her CV that references schools, lectures at schools, trainings at schools, relates to criminal matters. So she has University of Phoenix, Mesa Community College, Glendale Community College, ASU West. Those relate to issues 01:34:55

such as date rape drug prosecution, DNA sexual assault investigations, exploitation of children. They are not issues relating to Title IX procedures, Title IX investigations, Title IX standards. They simply don't imbue her with the qualification to testify here. 01:35:15

The point with respect to the false factual assertions for Miss Nannetti's opinions relating to the alleged failure of Miss Davis to obtain the police department records, that was raised, as the Court noted in ABOR's motion. It's at doc 161, page 14 to 15 using the top numbers. And we cited to page 11, 01:35:39 page 13 and pages 1 to 2 of Miss Nannetti's rebuttal report. Those are the same pages I cited to today to this Court.

Now in response to that, Miss Beardsley attempted to identify one or two of the 16 bullet points on page 13 that don't relate to the criminal investigation and the attempt to 01:36:03 get the Tempe Police Department notes.

We don't dispute those don't relate to the Tempe Police Department. They're still belied by the record.

And, respectfully, as Mr. Dowd commented at the last oral argument, we are beyond the close of discovery, it is 01:36:19 beyond the time, I think his verbiage was, to play fast and loose with the record.

We're happy to point out to the Court areas where all of those other ones are also belied by the evidence, but it wasn't necessary in our motion, because the ones we pointed out 01:36:34

are the majority of her opinions and they undermine the reliability of her opinions as a whole.

Now the final point I'd like to make is -- relates to the distinction of *Colgate*. And it really relates to the entire approach that Doe has taken in his response and at oral argument. That even though Miss Nannetti purports to offer Title IX opinions in her report, they can simply just remove the world "Title IX" and suddenly she's qualified. Suddenly *Colgate University* is distinguishable and she should be allowed to come in and offer expert testimony regarding the investigation in this case and whether it complied with proper processes. 01:36:54 01:37:15

But it's a Title IX investigation, so *Colgate* holds true. Miss Nannetti still does not have the qualifications to opine here and her opinions are unreliable. 01:37:32

THE COURT: Thank you.

MS. LAMM: I'm happy to answer any questions.

THE COURT: I don't have anymore questions. Thank you.

MS. LAMM: Okay. Sorry about the slipup. 01:37:40

All right. On to Mr. Lake.

MS. BEARDSLEY: Your Honor, plaintiff has read and considered the Court's tentative ruling, and we do not dispute the tentative at this time.

THE COURT: Okay. 01:38:01

MS. BEARDSLEY: Thank you.

MS. LAMM: Your Honor, with respect to Peter Lake, there's just a couple of points that we would like to make.

We don't disagree with the conclusions in the tentative order, but I think it's helpful to clarify that Doe's attempt to exclude Peter Lake, at least as reflected in their reply brief, makes clear that Doe is not actually seeking to categorically exclude his opinions. I think that's the language used at page 39 of the tentative. 01:38:26

Instead, in the reply brief, which is at doc 198, Doe says that he's seeking to limit Lake's opinions and to exclude certain opinions. 01:38:47

Those opinions that they would like to exclude are not identified in detail. But I will note that it's at least only certain opinions, whatever that means. 01:39:03

With respect to the scope of Peter Lake's testimony on Title IX, ABOR agrees, Professor Lake is not going to wade into instructing the jury on the law or onto the ultimate issue of the legal requirements under Title IX.

But as the Court recognizes, Professor Lake is permitted to testify about the history and purpose of Title IX. And also on one page earlier in the tentative the Court recognizes that the law permits Professor Lake also to testify about industry practice and standards in Title IX cases. 01:39:19

In terms of Miss Nannetti, Professor Lake's report is, 01:39:37

again, permitted to identify errors in the foundation for her opinions. But we agree he will not be opining on admissibility of her opinions, which the Court will decide following argument today.

So with respect to Professor Lake's opinions and the tentative, we agree that but for those two limitations, that Professor Lake won't be instructing the jury on the law, won't be opining on the ultimate issue, and won't be opining on the credibility or motives of Miss Nannetti. The rest of his opinions should come through. And I think that's what the tentative holds. 01:39:56 01:40:16

Thank you.

THE COURT: Thank you.

MS. BEARDSLEY: Nothing more from plaintiff, Your Honor. 01:40:24

THE COURT: Okay.

All right. Next, Mr. Borrelli.

MR. ARAGON: Good morning, Your Honor.

So, Mr. Borrelli -- I really just have a couple points on Mr. Borrelli, and primarily stand by the tentative. 01:40:42

If Mr. Borrelli is able to testify -- I frankly don't think I'm going to change your mind regarding experience-based experts, but if we're allowing Mr. Borrelli to testify regarding salary of NCAA coaches, Division I and Division II and Division III, then we necessarily need to allow Mr. Owen to 01:41:00

testify regarding the NCAA qualifications. Both have the same deficiencies in their report.

Mr. Borrelli relies on five data points to support his Division I and Division II salary opinions, and then his personal experience. And then for Division I he relies on his personal experience only. But there's no explanation in the record of how he gets to those numbers precisely. 01:41:19

And they're belied by the numbers we see reported by the NCAA and the Federal Government and the Department of -- by the Government indicating exactly what those salaries are, or by the schools indicating exactly what those salaries are. 01:41:36

But I understand, this is experience-based expert testimony. My only point is that they both have really some very similar deficiencies with respect to their opinions.

THE COURT: Okay. Thank you. 01:41:58

MR. ARAGON: The second point I would make --

I'm sorry, Your Honor.

THE COURT: No, go ahead.

MR. ARAGON: Okay. The second point I would make is, to go back to the Jalen Smith/Deandre Ayton example that was made earlier, which is related to experienced-based experts. I think those are good examples, because the experts in both of those cases essentially were correct. 01:42:05

Mr. Ayton was the number one high school prospect coming out of high school. He was a good, very good player in 01:42:29

college, with lots of accolades. And then in the NBA he was chosen first. And then ultimately we know he got a max contract, which means we're paying him the most you can pay a salary.

So the people who looked at him, looked at his accolades, looked at what he did, and tried to predict his future success, were spot on. Right. People might disagree with it. They were spot on. And we know that because he's literally one of the highest paid players of the NBA. 01:42:44

Jalen Smith is the exact same way. Jalen Smith was an all-conference player. I think counsel said he was an all-star. All-conference is what I think she meant to say. He was an all-conference player. He was a third team All-American and he was drafted tenth in the draft. And he is now a role player who just signed -- an active role player who just signed an extension to his contract as a starter or rotational player for the Indiana Pacers. Again, spot on. 01:43:00 01:43:16

You don't have to be 100 percent right that this person is going to be a superstar.

Devin Booker, for example, was drafted tenth. He became a superstar. That's an anomaly. 01:43:34

These guys were right with respect to their analysis.

Same thing here, Mr. Owen can make these same predictions based on his own experience, and just like the NBA predictions, spot on. 01:43:50

And those are my only two points with respect to Mr. Borrelli. I stand on the tentative and our briefing on the rest, Your Honor.

THE COURT: All right. Anything by way of reply on Mr. Borrelli? 01:44:00

MR. DOWD: Good morning, Your Honor. Dan Dowd on behalf of the Board of Regents.

Very little. I'm not going to go back to Mr. Owen, I know that that's already been heavily argued.

There is a big difference between the two in that, 01:44:15 one, Mr. Borrelli has provided in his report and in the work papers that were subpoenaed the data he relied on, the people he talked to, the other coaches that he reached out to to say, hey, an entry level D-I or an entry level D-II, D-III, what do you think they'll make? He had his own notions and he went out 01:44:36 and confirmed them with data that has been produced that can actually be examined on cross-examination.

He stayed right in his lane. He is a D-I coach. He has hired assistants. He knows what the salaries are. And he stayed away -- he looked at, but stayed away from the data that 01:44:52 Dr. Kaufman relied upon, which was looking at median salaries and other types of kind of macro salary data that didn't drill down to the specific positions at issue here.

So we think your order is right. We think he stayed right within his lane. 01:45:10

And I'm happy to answer any questions you have.

THE COURT: I don't have any questions. Thank you.

Mr. Aragon, anything by way of reply?

MR. ARAGON: Nothing other than to point out that Mr. Borrelli's survey, if that's what you want to call it, is ripe with confirmation bias. And his own experience hiring assistants is also ripe with confirmation bias. 01:45:20

I went to Stanford. I rented an apartment at Stanford. Paid considerations at Stanford are not the same as they are in the rest of the country. And we have no idea what other coaches are being paid based on what Mr. Borrelli put in his expert report. 01:45:46

And there's just -- there's a big gap there between what he pays his assistant salaries, what's he's being paid, and what other people across the country are being paid, even at the bottom quartile of Division I schools. 01:46:03

THE COURT: All right. Thank you.

All right. Last, Mr. Duncan.

And that's Doe's motion. So does anybody wish to be further heard on that? 01:46:26

MR. ARAGON: No, Your Honor. Borrelli and Duncan are tied together. So to the extent Borrelli stays in, Mr. Duncan -- I believe it's Mr. Duncan, I don't believe he's a doctor -- Mr. Duncan's opinions, we stand by the tentative on that issue. 01:46:45

THE COURT: Anything from ABOR on Duncan?

MR. DOWD: No, Your Honor.

THE COURT: Okay. All right. And on the final expert, Dr. Kaufman.

MR. DOWD: Thank you. 01:46:59

Your Honor, Dr. Kaufman's opinions should be excluded, both his analysis of student code of conduct enforcement data and his damage analysis.

I'm going to spend the bulk of my time, subject to the Court's indulgence and questions, on the student code of 01:47:23 conduct enforcement data, and maybe just two or three minutes on the lost earnings analysis that Dr. Kaufman engaged in.

And it's really important to start with the student code of conduct enforcement data, because in the Court's summary judgment ruling, it said, and I quote, the analysis 01:47:40 fundamentally turns on whether Doe has proffered other evidence that could lead a reasonable juror to conclude that these procedural irregularities were indicative of gender bias.

And Dr. Kaufman's analysis is it. It is the only, quote, other evidence, close quote, of the other -- or the 01:47:59 only, quote, something more that the cases require that the Court found could support an inference of gender bias.

So if those opinions go, so does this lawsuit.

His opinion's based on statistics or mathematical analysis, or whatever we call it -- and I'm not denigrating the 01:48:18

computational route that he traveled -- it fails for two reasons.

First, the manner in which he formulated his opinion is not reliable because he didn't take advantage of the actual data he had at hand to do the analysis. 01:48:32

And secondly, a review of the actual data shows that his opinions are wrong, or certainly they don't hit a target that's relevant to the issues that remain in this case. And they're not proof of gender bias.

His primary opinion within the student code data that 01:48:46 he evaluated, and the one -- the one found relevant by the Court in the summary judgment ruling, was that male respondents are found responsible -- excuse me, male respondents found responsible for an F-23 violation receives more severe sanctions than female students found responsible under F-23. 01:49:06

Your Honor, that opinion is unsalvageably flawed.

It's undisputed how he did the analysis. He took the F-23 spreadsheets that ABOR provided to Doe, he looked at the sanctions imposed on anyone, male or female, found responsible under F-23. And from that he drew his analysis and formed his 01:49:28 opinion.

Regardless of the nature of the conduct, he deemed all F-23 violations comparable, from drawing a penis on an answer sheet and sending it in, to forcible rape.

There was no effort, none, to evaluate the actual 01:49:47

conduct underlying the F-23 charge, no effort to consider the impact of that conduct on the severity of the sanction. And he treats sexting, an email that's provocative, the same as forced penetration.

Stated differently in words that matter, words that are legally dispositive, he doesn't account for the possibility that a female student received lesser sanctions under F-23 because she engaged in less serious conduct than a male found responsible under F-23. 01:50:07

He confirms in his report that he checked for two variables. The first variable was gender, male versus female. The second variable was sanctions. 01:50:23

He readily admits the vulnerabilities of this approach, and that it doesn't explain away non-gender based explanations. 01:50:44

On page 4 of his report he states, some of the data that I requested for my review may contain important information regarding the factors used to determine the severity of the sanctions.

And more particularly, on page 13 of his report he states, even within combination of charges, there may be non-gender factors that affect the severity of the sanctions. 01:50:59

It's patently obvious what the non-gender factor is that he didn't consider, and that's the underlying conduct that led to the F-23 charge. 01:51:19

The bottom line is that he can't rule out a non-gender explanation for his results. He didn't even try. And that renders his analysis unreliable. It also renders it completely in conflict with the law of this circuit and other circuits.

There's a wealth of authority on the use of comparators to try to establish gender bias, both in the Title IX context, the Title VII context and in other contexts. 01:51:38

And if you read that authority, Kaufman's analysis only matters if it is evidence that similarly situated students are treated differently based on their gender. 01:51:55

Now similarly situated has been the subject of multiple published opinions. It means misconduct in which the comparators are alleged to have engaged -- excuse me, the misconduct in which the comparators are alleged to have engaged in was of comparable seriousness. 01:52:14

That comes from the *Farber City of Mesa* Ninth Circuit case.

But if we look at other courts, they use similar phraseology. Some courts say it has to be comparable conduct. It has to be similar conduct. It has to be conduct that is similar in all material respects. The focus is on the conduct, it's not on the section of the university's code under which it is charged. 01:52:27

And Kaufman admits he didn't do it. We know that if he had done it, based on his own language, there could be 01:52:43

non-gender explanations for the opinions he draws. He admits that in two different places, that he didn't feel he had the information that could be a material impact on how sanctions are meted out for a violation of F-23.

And he has no idea if the ten female comparators that he identifies in his opinion engaged in conduct of comparable seriousness as that which Mr. Doe was accused of. 01:52:59

We cited a lot of cases and a lot of briefs before you, but if we take a look just at the *Nelson v. Tennessee Gas* case, that is a Sixth Circuit case that is not a Title IX case, but that was a motion to exclude. 01:53:20

A lot of times these issues come up in summary judgment cases. And I appreciate the standard on summary judgment is different that the standard on the *Daubert* analysis, but *Nelson* is a *Daubert* case. 01:53:32

And there they said the expert's failure to account for other possibilities and reasons that could affect the analysis was a significant flaw in the methodology that renders the opinion unreliable. And the opinion was excluded. Actually two doctors were excluded in that case. 01:53:46

Well, the law about the use of comparators and whether someone's actually similarly situated so you can draw an actual inference of whether gender played a part on differential treatment is also reinforced by Ninth Circuit law on the use of statistics in a disparate treatment case. 01:54:04

Now on page 7 of his report, which this Court quotes on page 16 of the tentative order, Kaufman describes the use of statistics in disparate impact cases.

This isn't a disparate impact case. This isn't the application of a facially neutral policy that has a disparate impact on some protected class. This is a disparate treatment case. 01:54:22

Title IX requires proof of intentional discrimination. Whether we use the buzz words that the process was infected by bias or that the outcome was motivated by anti-male gender bias, however you look at it, this is a disparate treatment case. 01:54:36

And in the Ninth Circuit, to use statistics to support a disparate treatment discrimination claim, the statistics must show a clear pattern, unexplainable grounds other than gender. 01:54:50

And we cited to the Court two Title VII cases. *Gay v. Waiters' Union*, you know, and *Rose v. Wells Fargo,* both out of the Ninth Circuit circuit.

That is, the expert must eliminate non-discriminatory explanations for the outcome. 01:55:08

Now, in our motion to exclude Dr. Kaufman, we cited two cases that rise in the Title IX context. The first one is *Haidak versus UMass Amherst,* which is out of the First Circuit 2019. A summary judgment case, where summary judgment was granted in favor of the university against the plaintiff. 01:55:28

And the Court there found that the expert failed to address an array of alternative explanations, such as the respondent's disciplinary history and the seriousness of the assault at issue.

And then the Court found that no reasonable person could infer from the expert report that the decision to expel the plaintiff was motivated by sex. 01:55:45

Why? Because the expert didn't eliminate the array of alternative explanations.

It was also recently reviewed by the Tenth Circuit in one of the *Doe v. University of Denver* cases. This is the one from 2020 out of the Tenth Circuit, Title IX case. 01:56:00

And here's what the Court says -- and it directly applies here. Where statistics do not eliminate obvious alternative explanations, an inference that the disparity arose from gender bias is not reasonable. 01:56:16

And in that case, again, it's a summary judgment case, summary judgment was granted to the University of Denver because the expert statistics did not eliminate non-gender based explanations for the analysis. And the Court found that there's no reasonable conclusion that can be drawn from that. 01:56:33

So let's take that, lift it up and apply it to what Dr. Kaufman did or didn't do here.

He admits -- we didn't have to depose him to get him to say it, on page 13 of his report -- there may be non-gender 01:56:48

explanations for the severity of sanctions handed out in the cases that I've evaluated under F-23.

And, of course, that's common sense, Your Honor. When you control for two variables, one being gender and one being the severity of the sanction, you haven't controlled for the conduct. You haven't compared. You haven't found if someone is actually similarly situated. 01:57:06

Now, given these flaws, this analysis, whether you look at it on a micro level of, did he really find a comparator? Well, we know Dr. Kaufman didn't. Or if you look at a macro level. This is a disparate treatment case. 01:57:22

And in this circuit if you're going to have a disparate treatment case where you're relying solely, the only other evidence this Court found, solely on statistics, it has to eliminate all other explanations for the statistical result. And he didn't. 01:57:36

So what's Doe's response to all of this? It's twofold.

The first response is, Kaufman's opinions are admissible because he relied on data produced by the Board of Regents. 01:57:50

And secondly he says, the Board of Regents refused to produce data relating to the severity of the conduct.

Now those are mutually exclusive statements. You can't say I'm all good because you gave me the data, but I'm 01:58:03

not all good because you refused to give me the data, but that's essentially what they say in response to the *Daubert* motion. But this Court knows that assertion is false.

Dr. Kaufman relied on what has been called the F-23 and the F-15 spreadsheets that were produced, and it's what he looked at. And he went down columns and he counted and then he did his division and he came up with the statistics. 01:58:18

And as far back as September of 2020, two years ago from right now, Your Honor, we produced multiple times the Title IX case tracking reports. They're massive. 01:58:37

I will tell you it took our law firms hundreds of hours and tens of thousands of dollars to do the redacting necessary to produce those spreadsheets. And we did it. And when we handed it over to Doe's counsel, we said, guys, we should talk about this. We want to explain to you what we have provided to you. 01:58:57

And you'll recall from the 30(b)(6) motion for protective order, Miss Van Doren's 16-page declaration where she goes chapter and verse through all of our efforts to let them know what they have. 01:59:12

If they had looked at those reports, and we are certain that Dr. Kaufman didn't, it provides information on the underlying conduct that led to the F-23 charge. And all you have to do, because both spreadsheets have -- the F-23 spreadsheet and the Title IX case tracking report have at least 01:59:33

one common column, and that is the case number.

So if Dr. Kaufman's looking at his F-23 spreadsheet, and he sees, gee, here's one, female respondent, a finding of an F-23 violation. I wonder what the conduct was. You go to the case tracking report, you look at that case number, you go to a field, and it gives you what the allegations are. You can see whether it was someone who drew a penis on an answer key or whether it was someone who was engaged in forcible penetration. 01:59:55

And you can do the analysis that this circuit requires is, is it comparable conduct? Are they actually similarly situated? 02:00:13

He didn't do that. And we know he didn't do it because he had the temerity to attach to the response to the *Daubert* motion a declaration from Dr. Kaufman where he said, I didn't look at those things, they're only for one year. 02:00:31

That's demonstrably false. They cover the years 2013 to 2017. Almost a direct overlap to the F-23 spreadsheets that he did rely on.

They never asked anybody about them at deposition. Either they didn't care, they didn't understand. I don't really care, because it's their burden to show that what Kaufman did is reliable and relevant. And he ignored stuff that was right in his bread basket that he could have looked at to do the analysis the circuit requires. That matters. 02:00:46

You're aware of our recent motion for reconsideration. 02:01:03

And in your minute entry asking for a response to that, you cited the *Pottenger* case, which we had cited to you in the motion for reconsideration.

And in that case an expert's failure to utilize information necessary to determine whether alleged comparators are similarly situated renders the analysis unreliable. 02:01:18

That was an age discrimination case. And in that case the plaintiff offered statistics saying, hey, this is the percentage of old people that got fired and, look, they were replaced by young people. And it got thrown out because they didn't look at job performance. They didn't look at whether some of the people that met the qualification under age, under the ADA, just weren't doing their job. And maybe they don't fit into the statistic. 02:01:35

That's exactly what's going on here. Because he's identified 11 females found responsible under F-23, and he has no idea -- if we put him under oath right now, he has no idea whether they sent a sexually explicit text, whether they urinated in an elevator, whether they were walking naked on Apache Boulevard, or whether they engaged in forced penetration. He'd have no idea. 02:01:50 02:02:08

And court has said -- this circuit has said, that renders his analysis unreliable.

Now the Court has taken a little bit different approach in the tentative order. And on page 21, Your Honor, 02:02:20

you state, while there may be bias-free explanations -- I'm going to come back to that in a minute. But while there may being bias-free explanations for divergent outcomes, there's no evidence that the distribution of violations is actually skewed along gender lines as ABOR suggests. 02:02:37

Then you go a little bit further and you spank us a little bit, Your Honor, and you say, ABOR simply identified two cases involving mild variations by female respondents, two cases involving serious violations by male respondents, and speculates the remaining cases may follow the same pattern. 02:02:54

Respectfully, that flips the burden on its head. Doe has the clear burden to establish the admissibility of Kaufman's opinions. There's case law that says we don't even have to respond if he comes in with comparators. Because it's not our job to show to show that there aren't any comparators, 02:03:13 it's his job to show that there are.

And he has to show that the comparators are similarly situated, that they're legitimately comparable.

And it's not our duty. We didn't speculate. We had no obligation to come forward to Your Honor and say, hey, he 02:03:27 identified ten. Well, he's not going to do his job to show that they're comparables, so we're going to do the opposite and show that they're not comparables. That was never our burden.

But, the Court's recognition in the tentative that there may be bias-free explanations for divergent outcomes, 02:03:44

which Kaufman didn't account for, that's the death knell to his opinion under Ninth Circuit case law and under the District of Arizona case law if you look back at the *Farber* case.

But the Court had another conclusion. So the first one was, we didn't come forward, despite the fact that the burden is clearly on the plaintiff, and show these guys were actually dissimilar. 02:04:02

And then the Court had one other conclusion that it said in response to our argument, and that was, it's okay to base the analysis on the charge rather than the conduct, i.e. all F-23 violations are comparable, because ASU has decided that F-23 unifies a population of similarly situated respondents. 02:04:15

Well, Doe's never made that argument. First time we saw the argument was in Your Honor's ruling. 02:04:35

But there's no evidence to support that supposition, that the fact that F-23, which says sexual misconduct, then you veer over to E-17 which defines it, and it has three different types of sexual misconduct: 17-A is force, physical contact; 17-B is sexual harassment; and 17-C is noncontact things such as voyeurism, sexting, unauthorized photography, things like that. 02:04:56

There's no evidence, there's no evidence that by the way that they were grouped in subsections under one definition that that was some recognition by ASU that it unifies similarly 02:05:15

situated respondents. It most certainly does not.

The woman who got a slap on the wrist for urinating in the elevator is nowhere near similar to the allegations of Mr. Doe, which was forced penetration with a stranger invited into the room with a young woman who was underage and allegedly had somewhere eight to ten shots of vodka. 02:05:37

Those are not comparable at all. There's no way that if Dr. Kaufman took the stand and said, I have -- I've got a comparator, it's the woman in the elevator in the dorm room who urinated. And we're going to compare that here and look, she got -- I don't know what. I think she had to write a letter or something. And he got expelled. Voila, that's an inference of gender discrimination. 02:05:51

That turns the circuit's law on its head. You have to eliminate non-gender based reasons. And what's the non-gender based reason for the difference in sanctions in that case? The woman urinated in an elevator, another one the man allegedly stuck his penis into a woman who didn't want it there. Those are not comparable. 02:06:05

Finally, Your Honor, beyond the flawed methodology, beyond the disregard for this circuit's law, the evidence that the Board of Regents has produced proves the unreliability of his analysis. 02:06:19

Now, we didn't know until we read your ruling on the summary judgment that the burden was going to be on us to show 02:06:37

that the ten comparators were dissimilar, which is not the law. So in our motion for reconsideration you'll see at --

THE COURT: I've seen it. And my question was, I appreciate the analysis, and I just wanted to confirm that the analysis as to all ten female comparators is based on evidence that was not part of the *Daubert* or summary judgment record. And I get why you didn't have notice. 02:06:54

MR. DOWD: So you might recall in the summary judgment and in the motion for protective order, we attached as exhibits a sampling of the Title IX tracking report. We couldn't attach the whole thing because of the level of redacting, the district court system would have rejected it. It's -- I don't know if I can say hundreds or thousands. It's long. 02:07:10

So what we gave the Court, back at a time where we didn't know we had to show the dissimilarity of every one, we gave the Court like ten or 12 pages. 02:07:29

So you'll see in the 30(b)(6) protective order briefing and you'll see as an attachment to the summary judgment briefing, and I think you'll see maybe as an exhibit to the *Daubert* briefing, a small sampling of the case tracking report. 02:07:42

It wasn't until our motion for reconsideration that we provided you with -- we still didn't give you the whole report, we gave you the report that has every one of the ten female comparators on it, so you can see what was available to 02:07:58

Dr. Kaufman two years ago from right now, you can see the underlying conduct. And you can actually control for a variable that matters in a disparate treatment case.

Did the conduct have anything to do with the severity of the sanction? The answer is unequivocally yes. 02:08:12

So the information we provided as Exhibits 3 to 5 to the motion for reconsideration is not our burden. But if the burden is going to be thrust on us, you now have the same information that Doe has had for two years that shows you that you cannot make comparisons. 02:08:31

If you can't make comparisons then his analysis, Dr. Kaufman's analysis, where he says 0 for ten on the females, 81 for 163 on the males, that is consistent with gender bias, that has to go right out the door and has to be excluded.

I'm happy to answer any questions you have. 02:08:49

I'm sorry, I've got more to argue.

THE COURT: The one question I have is, we've talked mostly about the statistical analysis regarding F-23 sanctions.

MR. DOWD: Right.

THE COURT: Dr. Kaufman also has opinions regarding how alcohol cases came out. And that sort of received less attention, both at summary judgment and in the motion papers, but I just wanted you to have a chance to address that. 02:09:02

MR. DOWD: Thank you. Yeah, there's actually two more opinions I want to address. 02:09:16

So on F-15 sanctions, the alcohol, I think his opinion is first that men are found responsible for an F-15 violation at a higher percentage, within like four or five percentage points, than women.

And then secondly he has an opinion that they received harsher sanctions if they are found responsible. 02:09:30

Our response to that, Your Honor, is, here Doe was found responsible for the alcohol violation. It was upheld by the Court of Appeals. The Court of Appeals found there was substantial evidence to support that. 02:09:44

So that opinion, in our view, has no connection to any issue in this case.

THE COURT: And I've remembered and forgotten so much about this case because I've had it for so long, I feel bad even asking this question, because I'm sure I knew it earlier. 02:09:55

Did he contest the alcohol violation during the underlying proceedings?

MR. DOWD: He did. He did.

And as we looked at that, we're like, if he's found responsible, the Court of Appeals -- and remember the level of 02:10:06 significance our opponents and this Court has attached to the Court of Appeals' decision. They specifically found there was substantial evidence to support a finding that he violated F-15.

So how could that possibly be indicative of gender 02:10:17

bias or some sort of discord within the rate at which F-15 violations or sanctions are handed out to men as opposed to women?

We just don't think it's an opinion that touches anything that matters in the case. 02:10:33

THE COURT: In the ASU investigatory apparatus, do Title IX investigators conduct alcohol investigations, or are they conducted different -- we had a lot of discussion about this with respect to Miss Nannetti earlier on what's the difference between a -- is a Title IX investigation simply a 02:10:52 subset of a sexual misconduct investigation, or is it something different?

MR. DOWD: Well, alcohol is not a sexual misconduct charge. Alcohol is under its own separate section, F-15.

In this case the alcohol charge was part of the 02:11:05 investigation because it was part of the F -- it was combined with an F-23 sexual misconduct allegation.

If someone just is charged with an alcohol violation, I don't think there's any investigatory process that happens.

And recall, you only get past the first level if 02:11:22 the -- if the sanction is expulsion, suspension, or degree revocation. So I don't even know if that's in the realm of possibility if you're just charged with an F-15 violation. But I think they're handled administratively in a much different manner than an F-23 investigation. 02:11:43

THE COURT: Okay.

MR. DOWD: Quickly, Your Honor, I just need to correct an error that we made.

Dr. Kaufman has an opinion that male complainants do not receive severe sanctions. When the male is in the complainant seat, he says, F-23 incidents involving male complainants never result in severe sanctions. 02:11:54

In our motion we argued that that opinion should be excluded because it was erroneous, and we directed the Court to *Roe 250* of the Title IX case tracking report, which we provided at Exhibit 5 of our *Daubert* motion. 02:12:11

The Court looked at it and properly noted, like, wait a minute, that looks like it's a case involving a female complainant, not a male. It doesn't support your position.

And you're exactly right, because we cited the wrong Roe. It's actually *Roe 251*, not 250. And you will see -- and you have it on Exhibit 5 of the motion -- that that's an F-23 incident involving a male complainant and the sanction was expulsion. 02:12:26

So the opinion's erroneous. The opinion is, incidents involving male complainants never result in severe sanctions. We've just provided one where the male was expelled. 02:12:43

And that information was at the fingertips of Dr. Kaufman. If he just would have gone to the case tracking report and looked at the incident number, he would have seen 02:13:01

that the complainant was male, and he would have seen from both spreadsheets that the sanction was expulsion.

So that opinion is just erroneous and it should be excluded.

Finally, Your Honor, and I will be really quick, the economic analysis. 02:13:15

Dr. Kaufman calculates damages based on the difference between but-for projected earnings and actual projected earnings. And to determine that he came up with three different career scenarios that mixed and matched different career paths that he assumed Mr. Doe would follow, both in the actual and the but-for world. And they were very specific assumptions regarding career paths. 02:13:32

Every iteration -- there's six iterations, three in the actual world, three in the but-for world. Every one of those iterations involves some sort of combination of Mr. Doe serving as a secondary coach, something called a recreational coach, or a Division II or Division III coach. 02:13:50

There are other assumptions in there, but those are in every one. 02:14:08

There's no evidence in the record to support those assumptions. There's no document that says Mr. Doe intended to pursue a Division II or Division III position. There's no testimony. There's nothing from Mr. Owen.

Mr. Owen talks about what it takes to become a D-I 02:14:27

coach. He doesn't talk about what the career trajectory of Mr. Doe would have been.

There's nothing from Doe that supports those six assumptions. He testified before the University Hearing Board he had no career plans. In his Complaint in this case he said, I want to be a high school coach. And in his interrogatory responses he says, I'd like to be a D-I coach or a sports commentator. 02:14:40

But there is nothing anywhere in the record that was available to Dr. Kaufman when he rendered his opinion about Doe becoming a D-II or a D-III coach. That's the assumption in every scenario. Each of his six has a D-II, D-III component to it. 02:14:57

And it didn't come from Kaufman himself because he, of course, doesn't have the vocational expertise to opine on the trajectory of an assistant coach in NCAA collegiate wrestling at any level. 02:15:15

So we don't have research, we don't have data, we don't have analysis to support it.

And the law in this area is very clear. And you cited on page 29 of your order, you say, experts have broad leeway to rely on assumptions when forming opinions. But there's a limit. 02:15:26

And the limit you site in the *Hanna* case is, one limit is when an opinion is based on an assumption that's 02:15:41

demonstrably incorrect.

We cited the *Buland* case that said one limit is when the opinion relies on an assumption that's entirely speculative.

Whereas the Ninth Circuit said in the *Nuveen* case, which we cited to you, you exclude an opinion based on an assumption that's unsupported by the evidence in the record and not sufficiently founded on fact. 02:15:53

So both Doe and this Court's responses to ABOR's argument that you have leeway but there is a limit, and if there's nothing in the record to support it, that goes over the line. 02:16:10

And we think the responses fall a little bit short. Doe says it's okay to rely on an assumption so long as there's a reasonable probability the assumption will occur. 02:16:23

We don't disagree with that as an abstract statement of the law, it's just, they don't offer any evidence to support this assumption, every assumption, D-II, D-III coach.

The Court said, there's evidence in the record to support the assumption that Doe had a reasonable probability of achieving the range of professional outcomes. 02:16:39

And our response is, what is it? There's no evidence that these career paths that form the foundation for the damage analysis are reasonably probable from anything in the record in this case. 02:16:57

And absent some support for that, even the broad leeway -- and I understand it goes to weight, not admissibility, because as long as we've all been practicing, depending on what side you're on, you say that.

But if there's no support for a critical assumption -- and we looked. Not from Owen, not from Kaufman, not from Doe, not from anything appended to any of the expert reports. That goes too far. 02:17:11

And that's a reliability issue. That's a gatekeeper issue. If there's no support for an assumption that is the bedrock of the damage analysis, the damage analysis should be excluded. 02:17:27

Thank you.

THE COURT: Thank you.

All right. Here's what I'm going to do: We've hit noon. I don't want to stop here, because these are important issues, I want to make sure we cover them. So what I'd like to do is just take a five-minute break, give my court staff a moment to stretch and give everybody a chance to take a break, and we'll come back in five and continue the argument. 02:17:34 02:17:47

(Recess at 12:00 p.m., until 12:07 p.m.)

MR. CAREY: Your Honor, could I address the Court for a second?

THE COURT: Sure.

MR. CAREY: I was here to support Miss Beardsley, and 02:25:01

I would like to ask the Court if I could be excused since she's finished.

THE COURT: Of course.

MR. CAREY: Thank you. I appreciate it.

THE COURT: All right. Mr. Aragon? 02:25:12

MR. ARAGON: Thank you, Your Honor.

One clarification on something you ended with earlier. There is -- ASU doesn't conduct a Title IX investigation per se. The Student Rights and Responsibilities Office conducts an investigation, and it's informed by things like ATIXA and their 02:25:31 own policies and procedures. So maybe that adds a little clarification about how that office works.

Okay. Let's start with the statement that the comparator was created by Dr. Kaufman. That's not true. The comparator, the F-23 comparator, what is a similar sexual 02:25:54 misconduct, is a statement by the University in response to interrogatories.

Give us every -- give us all information about every sexual misconduct case. And they provided that information. And that is ultimately what became the F-23 spreadsheet, and 02:26:15 then a different interrogatory, an F-15 spreadsheet.

And then we used that information, which is reliable, and is complete, according to the University, according to sworn testimony, interrogatory response from the University. And there's no errors in that data. And that's the exact type 02:26:36

of data that any statistician would rely on in the field.

So the question is, should Dr. Kaufman consider the other spreadsheet? Which was not in response to our request to identify all sexual misconduct charges. It was given to us later on not in response to the interrogatory. 02:26:54

Should he consider that?

And there was a statement that Dr. Kaufman didn't consider it. He did. There's absolutely a declaration. So I'm not sure what counsel's premise is for the statement that they absolutely know he didn't review it. He did, he said he did. 02:27:11

And he actually said why he couldn't rely on it. And there are two big points on that.

First, there's no data point for gender. This isn't a spreadsheet -- and it was given to us in pdf form, by the way. 02:27:22 But this isn't a spreadsheet that you can simply insert into Dr. Kaufman's findings and come up with additional information. There's no data point for gender. There is --

THE COURT: Let me jump in.

I thought that I understand Mr. Dowd's argument to be 02:27:40 that the spreadsheet that he had all along earlier identified all these by the case number. And so that obviously would have been one of the pieces of data that was associated with each of the findings that he did with respect to the F-23.

And so if then you go to the other dataset, it too has 02:27:56

the case number. And so it's not rocket science to just take the subset of cases he previously identified for purposes of his F-23, and then just look at the -- the case numbers of the -- I can't remember the exact numbers, the 150 cases of men and the ten cases with women, and just look at those 160 and the other spreadsheet to figure out what the facts were. 02:28:16

MR. ARAGON: Right.

And so I think it's very helpful to look at our interrogatory request and their response. They said that information wasn't relevant and that they weren't going to turn it over. We asked for all that information. We asked for all the gender identification, and they did not provide it in the F-23 spreadsheet or the F-15 spreadsheet. 02:28:30

There are identification numbers in the Title IX spreadsheet, but the pdf, again, that we were given, there are numbers in there, you can match them up to the F-23 data, but the F-23 data is also missing some gender -- well, actually quite a few gender data points. So you would have that problem as well. 02:28:45

So then the other -- 02:29:06

THE COURT: Let me just break it into two points. I think we're talking about two separate arguments here, and I just want to keep them distinct.

I'm going to give you all the time you want in a moment to talk about whether you think ABOR bears any fault for 02:29:16

how the discovery was produced in this case, but for now let's just talk, taking on the merits of Dr. Kaufman's report and talking about whether it's legally sufficient under Ninth Circuit law and the cases that -- some of the cases that have recently been cited to prove bias and the circumstance. 02:29:35

MR. ARAGON: Sure. Sure.

So the comparator is the comparator set forth by the University. And that is in our response brief, at page 6, we explicitly say that the data produced by ADOR categorizes all F-23 charges into a single category of sexual misconduct. 02:29:59

Our entire premise is that the F-23 violation, the sexual misconduct, is a comparator where we can compare whether or not men and women are being treated equally, or whether there's some sort of disparate treatment between the two based on gender. 02:30:19

So we have those comparators that both *Schwake* and what I call the UCLA Doe case asked us to look for.

Again, the question then becomes, do you have anything else? And there's nothing else here, Judge. That's the problem. There's no -- there's no way to -- well, there are ways to judge severity, but not based on the data the University gave us. 02:30:36

And we judge severity in two ways. And we were able to address severity in the expert report in two ways.

The first way was through the Mantel Haenszel test, 02:30:53

right, which is specifically designed to address non-gender based reasons for the discrepancies and the findings.

And then, more importantly, we had the expert conduct an F-15 analysis, an alcohol analysis, with the understanding -- and we cited to this in our brief -- in our expert report -- that men -- or male and female college students drink at the same rate. Right. So you're going to eliminate that severity argument. 02:31:18

Male and females drink at the same rate, that's the only evidence we have right now. There's no evidence to the contrary. 02:31:37

And we still found that there was a meaningful statistical difference in how men and women were treated based on the alcohol violation.

That's all you can do right now. 02:31:47

And we went through the problems with the Title 19 -- excuse me, Title IX database. It had -- it will require a subjective interpretation of the allegation against people -- against respondents. And then you would have to rank those by severity. No one's done that. I don't think that's even possible. It's just not something that can be done statically, not based on the evidence that we have. 02:32:09

And there are other problems with the database. It's missing -- it's missing data to compare to the F-23 database. It's not the exact same dates essentially. 02:32:27

The summaries are inconsistent, some are long, some are short.

They're all based on allegations, every summary in there is based on allegations, not actual outcome.

We see where that's a problem in this very case. The allegation was different than the ultimate findings, sex by force. Right. 02:32:42

So you really need that underlying data which the University said was not relevant to this case in order to make any additional findings. 02:32:58

And Dr. Kaufman didn't say that he didn't account for this, for non-gender based discrimination, he said there might be other things. And that's just an acknowledgement of a fact that there may be additional information.

But based on the evidence we have right now, the unrefutable, reliable data we have right now, there's no other explanation. So he has accounted for everything based on the information that's available. 02:33:14

THE COURT: All right. This question is, I think, going to be a little duplicative of the answer you just gave, but I'll just kind of take another run at it. 02:33:29

I gave a tremendous amount of thought to these issues in the summary judgment tentative, after oral argument on summary judgment, writing the final summary judgment order on this specific issue having to do with what to do with these 02:33:46

stats with F-23 violations.

And my ultimate conclusion was, listen, you've got a case where no -- neither side went into the specific facts of each episode that gave rise to Dr. Kaufman's statistical analysis to decide whether or not the facts were, in fact, similar. 02:34:05

And I tried to decide whether where nobody does that, does that mean that you didn't meet your burden, or is that the sort of thing that goes to the weight of the evidence and it should come in and then they should be allowed to cross-examine at will at trial. 02:34:20

And in the summary judgment order I cited this First Circuit case that seemed analogous, that said that, listen, when an expert in an age discrimination case conducts analysis similar to Dr. Kaufman, but actually doesn't get into the guts of the key fact that could explain the disparate outcomes, which is the job performance, the First Circuit said, you know what, that's a close call, but we're going to affirm the District Court's determination that this is still admissible and you attack it through cross-examination. 02:34:36 02:34:53

And so I thought that that supported what I was doing at summary judgment.

I'm now looking at *Pottenger*, which I had been aware of earlier, but it seems to address a very similar circumstance. But to the extent there's conflict between the 02:35:06

two cases, I need to follow *Pottenger* rather than the First Circuit case.

And *Pottenger* seems to adopt the exact opposite rule for the Ninth Circuit, which says, listen, when you're conducting this type of analysis that you're just looking at broad categories, and the expert had available to him the additional data that would bear on the potentially key variable, and the expert could have taken that into account but chose not to, the failure to do so is the tipping point that this -- this is no longer a question that just goes to the weight, but this means that it's not admissible. 02:35:18 02:35:37

The Ninth Circuit in *Pottenger*, if *Pottenger* had had access only to two variables, we'd be presented with a different case. But here, where *Pottenger* had or had access to additional relevant data and chose not to use it, we conclude that the statistical analysis is insufficient. 02:35:55

Isn't that the case here? I mean, he had access to the additional data regarding the factual circumstances of each of the incidents that he relied on for purposes of his F-23 analysis, and for whatever reason he didn't go further and look at it. 02:36:14

MR. ARAGON: I think that *Potlatch* is a very helpful case to Doe.

In *Potlatch,* the data that was available was reliable and easily used to apply to the statistical analysis by that 02:36:32

expert. All that expert had to do was take that information, that -- well, let me back up.

There were four data points that were available. And the analysis was whether or not the person was discriminated based on his age. 02:36:54

And so he looked at when the person was fired and what the age was, just two factors.

There was this third factor, which is, how well you did at your job.

Now within that there were four data points; you did 02:37:07 well, you did less well, you were average, or you were below average. A, B, C and D.

And these are evaluations given yearly, not because of litigation, not because of any other reason other than evaluating employees. And so it was reliable information that 02:37:19 that expert could then put those four data points into his analysis, he would then have a three-point regression analysis. And you would come up with better data, and it would obviously address one of the main issues in the case, which is, were you fired because of your performance or were you fired because of 02:37:39 your age? Obviously that should be used.

Here we have a different -- completely different situation. We have no data points. There is no gender data points in the spreadsheet. You can cobble together some sort of gender data points, and maybe come up with gender, we don't 02:37:54

know. We have pronouns in the explanation that you can also use for genders. In a gender fluid world that we're in, I'm not even sure that's helpful.

But more importantly, we don't have any indication of severity in our database. And that's what we're looking for. 02:38:12 How do you distinguish between a less severe or a more severe violation? That's not in our data.

And if you get it, you would have to do it subjectively by looking at the allegations again. This isn't the outcome, this isn't the investigation, this isn't a 02:38:28 determination by the UHD. This isn't a determination by the ultimate decision-maker. These are just allegations. And then try to figure out based on that how severity impacted.

That is a completely different dataset that's not reliable. It's not something that can be plugged into 02:38:45 Dr. Kaufman's analysis. And, frankly, it's not information that a typical statistician would use to make his findings or her findings.

THE COURT: Let me --

MR. ARAGON: And so that's why it wasn't used. 02:39:00

THE COURT: So even if the second set of data that he didn't consider here isn't just a bunch of objective numbers, instead it's words that are used to describe the allegations, the factual allegations giving rise to the charge -- I mean, F-23 has these three different buckets. There's subdivisions 02:39:17

A, B and C: A is penetration and the type of allegations at issue in this case; B is harassment; and C is really different types of allegations.

And acknowledging that there's always some play in the joints when it comes to the human language, isn't it possible to go through these allegations and at least figure out whether they were F-23 A, B, or C allegations? 02:39:36

MR. ARAGON: Yeah, and doing that doesn't help you. Because within A, B and C there are different variations of severity. 02:39:53

So, for example, an unwanted sexual contact, brushing up against someone's penis or breast, that would fall under A. So that doesn't give you a severity versus B or C, for example, where you would have stalking, for example. Not just one instance of stalking, but something that's egregious, where someone is just constantly bothering you. Right. Is that more severe than an F-A or F-B or F-C or F-D? They're variations within those limits as well. That's why you get to subjectivity. 02:40:10

And, again, we're basing this just on allegations, not findings. So we don't even know what's happening in these cases. 02:40:27

And then I go back to what I said originally, which is, we tried to get this information. We asked for the UHB's findings. We asked for the final decisionmaker's findings. 02:40:40

And they said it's not relevant and we're not giving it to you. And that's in their interrogatory response. So we relied on all the data that we had, Your Honor.

THE COURT: Okay. Have you -- without in any way suggesting that I think the evidence is properly part of the record, have you looked at the chart of the facts underlying the ten instances involving the females that they attached to their motion for reconsideration? 02:40:56

MR. ARAGON: Your Honor, I looked at a summary of the brief. I haven't -- I've been in -- I have 19 -- 17 multiday depositions over the last month and a half, two months. I haven't had a chance to. 02:41:14

In fact, Miss Beardsley is going to take the lead on responding to that. And she's the person who has looked at it.

So I looked at a summary, but I haven't looked at the attachment. 02:41:29

THE COURT: Okay.

All right. Anything else -- well, okay. So we've talked some about the F-23. I think I understand your position on that. 02:41:42

Can you just talk a little bit more about, why are statistics that only go to how ASU handles alcohol violations relevant in this case?

MR. ARAGON: Well, because they're indicative of treating males and females differently. 02:41:59

And it also addresses the severity issue, because we know that -- well, the only evidence in this case is that male and female college students drink at the same level, therefore, we address severity. And so it's additional information that men and women are being treated differently by the SRR, and extension the University. 02:42:22

THE COURT: I might not be articulating this just right. But I don't recall much, if anything, that you've ever argued in this case that the investigation of Mr. Doe or his hearing was procedurally irregular, or even substantively flawed, and how the alcohol violations that were charged against him were wrong. 02:42:41

MR. ARAGON: Oh, we have, Your Honor. I mean, it was a huge part of both the underlying case in -- at the administrative level. And it has been a -- and it's been part of this case, because the investigation is the same. It was the same investigation for alcohol violation as it is for the sexual misconduct violation. It was one investigation for both charges. 02:43:06

THE COURT: I guess when I look, for example, in Miss Nannetti's report, where am I going to find all of the things that she says, you know what, they really screwed up how they investigated this alcohol violation? 02:43:27

MR. ARAGON: In Miss Nannetti's report, it's just inextricably intertwined with the investigation as to the 02:43:44

sexual misconduct.

I think the best place to look, and I don't have it right in front of me, but would be Mr. Carey's letter that came after the Arizona Board of Regents made their decision. I'm sorry, the dean -- I forget her exact name, but the dean of students made her decision. 02:44:08

And we submitted additional information because we weren't given timely notice of additional information that Roe submitted. And we submitted a letter along with that -- along with that submission. It would be in there. 02:44:25

And then in the prior letter to that as well from Mr. Carey summarizing the problems with the alcohol investigation.

THE COURT: Like just big picture, I mean, isn't it undisputed that she was 19 and underage and was given alcohol? 02:44:41

MR. ARAGON: No, it was disputed.

There was a nuance in the law, and the question was whether or not it was provided to her by Mr. Doe. And it was at the house. Our argument was that it was at the house and there's no evidence that he provided it. In fact, I don't believe that he purchased it. 02:45:02

So then it really became, did he hand her drinks or was he trying to give her alcohol. And in our opinion they really glossed over that and didn't accept our argument.

And we argued that way all the way up to the Superior 02:45:17

Court -- I'm sorry, the Court of Appeals.

THE COURT: Let's turn to the economic analysis.

Mr. Dowd's argument is that assumptions are pretty loose, but there is a limit. And the assumption here that Doe was going to become a D-II or D-III coach is just totally unsupported. 02:45:37

MR. ARAGON: Well, even Mr. Borrelli says that he can become a D-II or D-III coach. According to Mr. Borrelli, you don't even need accolades, that's what he's saying.

So to the extent he's looking to become a Division II or Division III coach, based on what Mr. Borrelli says is very low pay, he can do so. 02:45:53

So the assumptions here aren't baseless, they're based on admissions by Mr. Borrelli, on statements by Mr. Owen, and on Mr. [redacted]'s own testimony. 02:46:12

And as the Court indicated, it's also relatively common sense that a career wrestler would perhaps seek a job as a wrestling coach. And Mr. [redacted] clarified that in his declaration.

THE COURT: Okay. Anything else with respect to Dr. Kaufman? 02:46:29

MR. ARAGON: Just one second, Your Honor. I'm sorry. I got a lot notes here, as you might imagine.

No, Your Honor. I do not. Thank you.

THE COURT: All right. Thank you. 02:46:45

MR. DOWD: Thank you, Your Honor.

I just wanted to note that Mr. Aragon inadvertently used Mr. Doe's real name at the end of his argument, so we'll need to take care of that one as well.

THE COURT: Hold on just a moment, on that point. 02:47:00

(Discussion held off the record.)

THE COURT: All right. Somebody just called in to the line with a 402 area code number. Can you identify yourself, please?

MR. HILL: Hi. My name is Rupert Hill. 02:48:26

THE COURT: Are you here for the 1:30 hearing?

MR. HILL: Yes, sir.

THE COURT: Okay. We're in a hearing in a different case right now. I'll be back on for 1:30.

Can you hang up right now, please? 02:48:45

MR. HILL: Yes, sir.

THE COURT: Thank you.

What I was conferring about, I was hopeful that there might be a way that we could take care of the transcript. I don't think that's possible. The rules are such that the 02:48:59 transcript reflects what was said in court, and so I'm going to grant it. But what I'm going to need the parties to do is file a joint motion to redact the references and we'll get it taken care of that way.

MR. DOWD: We'll do. Thank you. 02:49:10

THE COURT: And I'm not angry in the slightest that it's happened. I'm surprised it hasn't happened more often in this case. So no problem.

MR. DOWD: Thank you, Your Honor.

I think I'll be brief, which is always a dangerous thing to say. 02:49:20

I want to talk about the data and how it was acquired, because precision matters. And in this case over the years we haven't always received precision from our opponents.

The data, the Title IX case tracking report was provided to them in multiple copies as early as September of 2020. It was provided as part of our MIDP responses. And it was accompanied by an invitation so that we could walk through the different types of data that we were providing, an invitation that was rejected by silence. 02:49:33 02:49:54

When we got to a protective order in the Summer of 2021, Miss Van Doren, at document 141-1, did a 16-page declaration walking through the various difficulties the parties had experienced with respect to the production of information, and it confirms in there under oath when we provided the information that has the very detail that brings us here. 02:50:10

That's important. Mr. Aragon said several times that they asked and we refused to provide the detail. I'm not sure what detail he was asking about. But as the Court will recall, 02:50:25

after discovery had closed, and they hadn't asked for that information, they served 30(b)(6) deposition notices that in our view were very broad and sought for what they said would be a sampling of the various cases identified on the spreadsheets, every piece of paper for the various incidents that were represented by that case number. 02:50:45

We objected. Said it's too late. Discovery has closed. We've given you the case tracking report, which if you map to the F-23 spreadsheet, you can deduce the data that you need. 02:51:02

And we ended up coming to you, first on a discovery dispute, and second on a protective order motion. And you agreed with us. You said, I could see where that might be relevant. But discovery is closed, we're too late in the game, it's unduly burdensome, the FERPA redaction process we'd have to go through after the close of discovery. You rejected it. You denied their request for that information. 02:51:14

So we didn't refuse to produce anything to them that would have allowed Mr. Kaufman to do the same type of analysis that experts do in deciding if someone is similarly situated, which is, he had information on the allegations for the ten females -- actually for nine, one of them predated the spreadsheet, and for the 163 males who were found responsible under F-23. 02:51:32

He then says, well, wait, we did control for severity 02:51:50

through the Mantel Haenszel Peer-Group Analysis. And it's ironic, because it's in that very part of Dr. Kaufman's report where he says, we did this peer-group analysis, but there may be non-gender factors that influenced the severity of sanctions. 02:52:11

He admitted that he couldn't control for conduct by relying only on the F-23 spreadsheet, because he didn't map it to the case tracking report.

The data they had -- all you have to do is look at Exhibit 3 for the motion for reconsideration. While this is 02:52:26 new to the Court, it is not new to our opponent, because we took these fields right out of the two spreadsheets that are the basis of our argument, that Dr. Kaufman had what he needed he just didn't use it and he's out.

So you've got -- you can see, and it does say, it says 02:52:42 sexual harassment, indecent exposure, nonconsensual sexual contact, indecent exposure. It goes through and it provides the type of qualitative information with descriptions after it that someone could sit down and say, is this really comparable to what Mr. Doe was accused of having done? 02:53:00

*Pottenger*, makes some distinction that, wait, in *Pottenger* they had really reliable empirical data because they had job evaluations. I don't know how a job evaluation isn't about as subjective as anything that one does. But experts do what they do. They get the best information they can. 02:53:19

So they get a job evaluation and look and say, gee, was this person who was terminated in the same -- engaged in a similar kind of job, similar kind of job performance as my plaintiff or not.

You do the same thing with the Title IX tracking reports. Gee, are these allegations similar enough to the allegations against Mr. Doe where I can do a reliable analysis? 02:53:33

So there's really no difference. And what he said might -- in his argument might be the most important thing I've heard in this case. He said -- this is a quote, we don't have any indication of severity of the conduct. 02:53:47

Doesn't that answer the question? If you don't have any indication of the severity of the conduct, factually not true, Doe had it, whether they gave it to Kaufman, I don't know. And the reason we say -- we don't think Kaufman actually looked at it, he did submit a declaration in the response to the *Daubert* motion that said, I looked at it, but it's only for one year. 02:54:05

It's not, it's for four years. There are variations of it that we produced that are by year. But we produced multiple copies of the four- or five-year version of it. 02:54:17

So when he says, I didn't use it because it was one year and it didn't look like it was randomly sampled, et cetera. It was never meant to be randomly sampled. It was the full sample size. 02:54:32

But he just didn't look at it. And that was clear as recently as the response to the *Daubert* motion.

The alcohol issue, he says the only evidence we have is information that males and females drank at the same rate. I don't know if they drink frequency wise on many days, or volume wise, I don't know. 02:54:50

But where that shows is in a footnote to Kaufman's rebuttal report. And it says, males and females drank at the same rate. Footnote has a website. We got that. The website is down. The website is to a link that doesn't exist anymore. 02:55:08

So the sum total that supports the notion that alcohol related violations somehow there on whether there's a prima facie case of gender bias is the assertion by an economist that men and women drink at the same rate supported by a link that doesn't exist anymore. 02:55:27

THE COURT: If we're just focusing really on alcohol violation, is there a world where the conclusion is that that specific opinion is admissible and it survives without a *Daubert* challenge? But that is a separate question from whether, even included, that is enough to get them over the summary judgment hump if the F-23 stats are out. 02:55:45

MR. DOWD: Did you say it's a separate question?

THE COURT: Correct.

MR. DOWD: Okay. In this -- there could be a case, let's say there's a case where the respondent is found 02:56:00

responsible for the alcohol violation, and that's overturned, saying there's a failure of substantial evidence, or something. And the statistics come in and say, you know what, males get rung up on alcohol violations at a statically significant different percentage than females. 02:56:24

And you might be able to -- I don't know if it's indicative of gender bias, but you might be able to say, wait a minute, is there a flaw in this process? Men get run up 80 percent of the time, women get run up 37 percent of the time. My client is a male and he got run up. Is this indicative of a 02:56:39 flawed process?

That has no application here, because he testified at the University Hearing Board that he provided alcohol to Roe. Okay. The University Hearing Board said he admitted he provided alcohol to Roe, we found an F-15 violation. 02:56:54

Judge Starr in the trial court said, he admitted that he provided alcohol to Roe, that's an F-15 violation.

And Judge Johnson on the Court of Appeals said, we do find substantial evidence to support the alcohol violation.

So if you've got a system hypothetically that's rigged 02:57:12 against men on alcohol violations, that wouldn't even lift itself up and land here, because every tribunal that's considered it found that he violated it.

So I don't think in this case that that's a freestanding opinion that bears on the issue. 02:57:28

And since you said it's disconnected from whether it gets you by summary judgment, I won't even address that.

The last thing is on the economic analysis, his response is, well, Kaufman can rely on Borrelli because Borrelli said he could have become a D-II or D-III coach. 02:57:46

Borrelli's report came out a month after Kaufman's. So I don't know if you can backfill that way.

And Borrelli's assumptions were different. He said that he would be a D-I assistant for six to eight years, and then a D-I head coach. That was the but-for world. And in the 02:58:01 actual world he could be a D-II or D-III assistant for four years, a D-I assistant for six, and then a D-I head coach for the remainder of his career.

So, Borrelli does talk about him becoming D-II or D-III coach. It's not anything that Kaufman said he relied on. 02:58:18 Owen didn't say anything about the D-II, D-III. Doe never said a word about D-II, D-III. And there's not a piece of paper in this record, until we got Kaufman's report, that ever mentioned D-II, D-III.

So I think that, while there's leeway, this one goes 02:58:34 over the line and should be excluded.

I'm happy to answer any questions. And I so appreciate your indulgence on this, Your Honor.

THE COURT: Here's a question that I'm not saying I'm going to do this. In acknowledging that I can only imagine how 02:58:47

much the parties have spent on briefing stuff in this case, and how expensive it has been to litigate this case, it appears to me in talking about Dr. Kaufman's statistics, and in particularly the F-23 statistic today, really one of the core disputed issues is whether Doe had a practical, meaningful ability to decipher the case tracking reports that were given after the initial reports. 02:59:05

I know I've heard your position, that they're totally decipherable and you just look at the case numbers. I've heard their position that there's not. It strikes me that I can make a more informed decision on this if I actually could look at these things and figure it out, rather than just have each side's characterization of whether they're decipherable. 02:59:25

Because, again, I've not fully made up my mind on this. I'm waiting to see the response to the motion for consideration. But I am very focused on this passage in *Pottenger* that sort of talks about when one side has access to additional important information and doesn't use it, that's really a big deal. 02:59:38

So that raises the question, did they have meaningful access to it in this case? 02:59:53

I just have never seen it, I've just heard characterizations of it. I don't know whether an appropriate way to do this would be to have some sort of additional presentation from the parties so I can just look at the stuff 03:00:05

firsthand and figure out what's going on.

MR. DOWD: Well, we'll certainly do anything you require.

I suggest Exhibits 3 through 5 to our motion for reconsideration, are at least the excerpts from the F-23 spreadsheet, the Title IX case tracking report, and then a chart that we made that does exactly what you say. But that's only for the ten female comparators. We didn't do it for the 163 men. I don't know if that's part of what you're thinking about. 03:00:17 03:00:37

But Exhibits 3 through 5 to the motion for reconsideration, that was the goal.

THE COURT: No, I understand. And I guess the potential counterargument or concern I could see is that that is the ability of the party that produced this information and is really familiar with it, how they were able to understand how these two things fit together. 03:00:48

It makes sense how you were able to comprehensively put the two together. That doesn't necessarily mean that it would be fair to expect Mr. Doe on the other side to have been able to make the same analytical leaps and connections between the two. Maybe it's really simple, I just don't know. 03:01:03

MR. DOWD: Okay. I think one response to that is, they had both sets of data by no later than the Fall of 2020. And it's literally, here are the ten where a female was found 03:01:25

responsible for F-23. What are the case numbers? Pull out the case Title IX case tracking report, find those case numbers, look over to the field -- I can't remember the title. It's the field that basically has the summary of the allegations. And read them. And say, gee, do these ten, do any of them make the cut as being similarly situated? 03:01:45

I mean, that's what we did to put it together. You just get them both out. And they're both long. And you can search them, I think, electronically, just put the case number in. And if not, you do it the old fashioned way, you flip through until you find the case number. 03:02:00

I'm not trying to -- I'm not trying to get off track. If you want something more, we're happy to provide it. But that's what we did.

THE COURT: Okay. All right. 03:02:12

MR. DOWD: Thank you very much.

THE COURT: Thank you.

All right. I guess before I conclude, Mr. Aragon, just because that's a point I didn't raise when you were on the line, either -- any thoughts on that? 03:02:23

MR. ARAGON: Yes. Just to be clear, we understand what's in the spreadsheets. It's a qualitative set of information, not a quantitative set of information. And the relevant information that they want us to analyze are summaries of allegations. And our expert said that's just simply not 03:02:43

reliable for a statistician to use that information.

We're happy to submit the documents to you in a more robust form. And again, they're pdf, they're not electronic -- they're not in a useable format. But we're happy to do that. And -- 03:03:02

THE COURT: Let me jump in. You just said that Mr. Kaufman stated that that's simply not reliable for a statistician to use that information. Is that assertion in his declaration or in his reports?

MR. ARAGON: What he said is he finds it unreliable in 03:03:17 the deposition. Then the logical conclusion of that is a statistician won't use unreliable information. And then he explains why it's unreliable. And I tried to explain today a little bit more why it's a little unreliable.

But that's the problem with the data, it's unreliable 03:03:36 to reach the conclusions that they want us to use the data for.

He did review it. He reviewed a year. And yes, there are three additional years, and he didn't review that because it's all substantively the same. I think Mr. Dowd would say the same thing. I don't know why you'd have to review all four 03:03:53 years.

THE COURT: All right. Thank you.

I know we've covered a lot today. I appreciate the argument, as always. I'll be taking this under consideration.

MR. ARAGON: Your Honor, Your Honor, can I just 03:04:01

address one thing?

THE COURT: Yes.

MR. ARAGON: I'm sorry.

So just for clarification on the motion for reconsideration, you asked for briefing and you named the *Pottenger* case. Do you want briefing just on that issue or do you want briefing on the entire -- on the entire motion for reconsideration? 03:04:08

THE COURT: I was hoping to get briefing on the entire motion. And I just wanted to alert you that based on my first cut through it, that was the one case that really stood out to me as something that would benefit from more discussion. But I didn't want to limit you just to that. 03:04:26

MR. ARAGON: Okay. I appreciate that, Your Honor.

And then, because of that, could we -- we would respectfully request an extension of time to respond. As I said, I mentioned, I have a very substantive and large and huge class certification brief due on the exact same date as your due date, and Miss Beardsley is helping me with that as well. 03:04:39

Could we get an additional ten business days? 03:04:57

THE COURT: Yes, that's fine.

MR. ARAGON: Thank you. Thank you, Your Honor.

THE COURT: Okay. So just we're on -- so it's currently due the 28th?

MR. ARAGON: Yes. 03:05:13

THE COURT: So you want it to be due October 12th?

MR. ARAGON: Yes, Your Honor, if that's okay with you and defense.

THE COURT: Any objection?

MR. DOWD: No, Your Honor. 03:05:25

THE COURT: Okay. October 12th it is.

MR. ARAGON: Thank you, Your Honor.

THE COURT: All right. Thank you very much.

(Proceedings concluded at 12:48 p.m.)

-oOo-

C E R T I F I C A T E

I, CANDY L. POTTER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 27th day of September, 2022.

s/Candy L. Potter________
Candy L. Potter, RMR, CRR