**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Unknown Party, | No. CV-18-01623-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Arizona Board of Regents, et al., | |
| Defendants. | |

Pending before the Court are a pair of related motions filed by Defendant Arizona Board of Regents ("ABOR"): (1) a motion to exclude the opinions and testimony of Dr. Lance Kaufman (Doc. 159); and (2) a motion for reconsideration of the Court's August 30, 2022 summary judgment ruling (Doc. 227).  For the following reasons, both motions are denied.

## RELEVANT BACKGROUND

The parties are familiar with the background details of this case, so only a brief recap is necessary here.

In April 2016, Plaintiff John Doe, then a student-athlete at Arizona State University ("ASU"), and another man had a three-way sexual encounter with ASU student Jane Roe at an off-campus party.  Roe immediately reported the incident to the police, who declined to pursue criminal charges against Doe after reviewing videotape footage of the incident (which the other male participant had surreptitiously created).  Several months later, Roe reported the incident to ASU, claiming she had been too intoxicated to consent.  Doe was

suspended by ASU and, after an investigation, expelled for violating various provisions of the ASU Student Code of Conduct, including provisions related to sexual misconduct.

In this action, Doe initially asserted an array of claims against an array of defendants, but his sole remaining claim is a Title IX claim against ABOR.  Additionally, as this case was proceeding, Doe prevailed in a separate state-court action in which he sought review of ASU's expulsion decision.  There, the Arizona Court of Appeals held that the sexual misconduct findings against Doe were "not supported by substantial evidence" and thus vacated the expulsion order.  *Doe v. Ariz. Bd. of Regents*, 2019 WL 7174525, *9 (Ariz. Ct. App. 2019).

Following the close of discovery, ABOR filed a motion for summary judgment on Doe's Title IX claim (Doc. 155) and both sides filed motions to exclude or limit expert testimony, including ABOR's pending motion regarding Dr. Kaufman (Docs. 158, 159, 161, 164, 165).

The Court first addressed ABOR's summary judgment motion, concluding in an August 30, 2022 order that summary judgment should be denied because "Doe's proffered evidence could lead a reasonable juror not only to conclude that his disciplinary proceeding was marred by an array of procedural irregularities, but also that ASU's disciplinary process generates statistical anomalies that raise an inference of gender bias."  (Doc. 209 at 60.)  Although this conclusion was premised on a finding that "Dr. Kaufman's statistical evidence is relevant and creates a genuine issue of material fact about whether ASU's Title IX disciplinary process was infected by gender bias," the Court acknowledged that ABOR had raised various challenges to the admissibility of Dr. Kaufman's statistical evidence in one of its pending exclusion motions.  (*Id.* at 52-54.)  Accordingly, during oral argument, the Court clarified that "I plan to address the *Daubert* motions in the near future.  And if for whatever reason I were to exclude Kaufman's opinions, at that point [ABOR] could come back and seek reconsideration of the summary judgment [ruling]."  (Doc. 228 at 47.)

On August 30, 2022, the Court also issued a tentative ruling addressing the parties' motions to exclude expert testimony.  (Doc. 210.)  It included a section addressing ABOR's

motion to exclude Dr. Kaufman.  (*Id.* at 15-25.)  However, before oral argument, ABOR filed the pending motion for reconsideration of the August 30, 2022 summary judgment order.  (Doc. 227.)  As discussed in more detail below, the reconsideration motion includes various arguments regarding the admissibility and evidentiary value of Dr. Kaufman's statistical evidence.  (*Id.* at 2-10.)  Accordingly, in the final version of the order addressing the parties' motions to exclude expert testimony, which was issued on September 27, 2022, the Court explained that it would "defer ruling on the motion to exclude Dr. Kaufman until it reviews Doe's response to the motion for reconsideration . . . [which] will also serve as a supplemental brief regarding the motion to exclude Dr. Kaufman."  (Doc. 223 at 1 n.1.)

On October 13, 2022, Doe filed his response/supplemental brief.  (Doc. 241.)

On October 25, 2022, ABOR filed a reply.  (Doc. 247.)[1]

## DISCUSSION

I.   ABOR's Motion To Exclude Dr. Kaufman (Doc. 159)

A.   **Legal Standard**

"The party offering expert testimony has the burden of establishing its admissibility."  *Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012).  Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony.  It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)   the testimony is based on sufficient facts or data;
>
> (c)   the testimony is the product of reliable principles and methods; and
>
> (d)   the expert has reliably applied the principles and methods to the facts of the case.

---

[1]   ABOR's request for oral argument on its motion for reconsideration is denied because the issues are fully briefed and have been addressed in extensive detail in earlier orders and oral arguments.  *See* LRCiv 7.2(f).

As for the threshold requirement that an expert witness be qualified "by knowledge, skill, experience, training, or education," "Rule 702 contemplates a broad conception of expert qualifications." *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004) (internal quotation marks and emphasis omitted). Years of relevant experience can establish the necessary "minimal foundation." *Id.* at 1015-16. "Disputes as to the strength of [an expert's] credentials . . . go to the weight, not the admissibility, of his testimony." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998) (first alteration in original) (internal quotation marks omitted).

A district court's decision to admit or exclude expert testimony is guided by a two-part test that focuses on the opinion's relevance and reliability. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). "The inquiry envisioned by Rule 702 is . . . a flexible one." *Id.* at 594. "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Id.* at 587 (quoting Fed. R. Evid. 401). "The Rule's basic standard of relevance thus is a liberal one." *Id.*

The basic standard of reliability is similarly broad. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). *See also* Fed. R. Evid. 702, advisory committee's note to 2000 amendment ("[P]roponents do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable. . . . The evidentiary requirement of reliability is lower than the merits standard of correctness.") (alteration in original) (internal quotation marks omitted).

Nevertheless, courts serve an important "gatekeeper" role when it comes to screening expert testimony. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997). "Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592 (citation omitted). "Presumably, this relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.* This "general 'gatekeeping' obligation . . . applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

The Court has "broad discretion," both in deciding whether the evidence is reliable and in deciding how to test for reliability. *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). In *Daubert*, the Supreme Court listed various factors that might apply, including whether the expert's technique or theory (1) can be tested; (2) has been peer reviewed or published; (3) has a known or potential basis for error; and (4) is generally accepted in the pertinent scientific community. 509 U.S. at 593-94. However, "[t]he *Daubert* factors were not intended to be exhaustive nor to apply in every case." *Hankey*, 203 F.3d at 1168. In particular, "[t]he *Daubert* factors . . . simply are not applicable to [testimony] whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *Id.* at 1169. *See also* Fed. R. Evid. 702, advisory committee's note to 2000 amendment ("Some types of expert testimony will be more objectively verifiable, and subject to the expectations of falsifiability, peer review, and publication, than others. Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise."). The bottom line is that "[t]he trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. The expert's testimony must be grounded in an accepted body of learning or experience in the

expert's field, and the expert must explain how the conclusion is so grounded." *See* Fed. R. Evid. 702, advisory committee's note to 2000 amendment.

### B.  **The Kaufman Report**

Dr. Kaufman possesses a Ph.D. in economics, has been recognized as an "expert in the field of economics," and has "over 15 years of experience performing economic research and modeling." (Doc. 159-1 at 22.)  Dr. Kaufman has provided expert witness testimony on "forecasting, production cost modeling, and labor costs," and his hourly rates range from $350 to $500 per hour. (*Id.* at 22.)

Dr. Kaufman's opinions in this case can be divided in two categories: (1) opinions relating to the enforcement of ASU's student code, or "whether ASU's sanctions are gender neutral"; and (2) opinions relating to Doe's alleged economic loss, or "the economic harm resulting from [ABOR's] unlawful expulsion of Doe." (*Id.* at 5.)

#### 1.  Student Code Enforcement Disparity

Dr. Kaufman explained in his report that ABOR produced certain "summary records," which he refers to as "SCC Charge Data," during discovery in this case that contain information about ASU's history of student code enforcement concerning alcohol ("F-15") and sexual misconduct ("F-23") violations. (*Id.* at 6.)  Dr. Kaufman stated that the information was categorized by: (1) incident ID, (2) gender of respondent, (3) incident type, (4) date and time of incident, (5) date of report, (6) "SCC Charge Code," (7) Dean of Students' decision, (8) sanctions, (9) whether the decision was appealed, (10) hearing board's recommendation, and (11) University Vice President's decision. (*Id.* at 6-7.)  For F-23 violations, the SCC Charge Data also noted (1) respondent's student athlete status, (2) gender of counter party, (3) charge investigator, (4) date of decision, and (5) date of review of decision. (*Id.* at 7.)

At the outset of his report, Dr. Kaufman noted that the "SCC Charge Data provide several different types of sanctions.  These sanctions can be grouped and ranked in order of severity.  I rank warnings as the mildest sanction, expulsion and suspension as severe sanctions, and all other sanctions as mild sanctions." (*Id.*)  Having developed this

convention, Dr. Kaufman found that of 161 male F-23 respondents, 3 received no sanction, 79 received a mild sanction, 27 were suspended, and 52 were expelled. (*Id.*) Of 10 female F-23 respondents, 1 received no sanction, 9 received a mild sanction, none received a suspension, and none were expelled. (*Id.*) Dr. Kaufman concluded that "males tend to receive more severe sanctions than females" and described his "statistical analysis of the disparity between male and female Respondents." (*Id.*) As a preface, Dr. Kaufman explained:

> In cases concerning the disparate impact on protected classes, outcomes for the protected class are compared to the rates for other individuals to determine if the difference is statistically significant.
>
> A disparity is considered statistically significant if it would occur so rarely in a nondiscriminatory situation that we can rule out that it occurred by chance. . . . [T]he courts typically require a demonstration . . . that the disparity is large enough that it would occur by chance less than 5 percent of the time, or in less than one in 20 non-discriminatory events.
>
> To assess the evidence of gender bias in sanctions, respondents are classified by two criteria, whether they are a member of the protected class or not, and whether they were severely sanctioned or not. . . . If the disparity in sanction rates between two groups is not sufficiently large, or if the direction of the disparity varies substantially across subgroups, the disparity will not be statistically significant.

(*Id.* at 8.)

Dr. Kaufman also described the "Chi-Square Analysis," which posits that, if males are a certain proportion of all respondents, a gender-neutral process will lead to a similar proportion of males actually being punished, as compared to the overall pool of students punished. (*Id.* at 9.) Dr. Kaufman explained that this test "gives us a way of determining what proportion is 'high enough' to conclude that sanctions were not gender-neutral." (*Id.*) Separately, Dr. Kaufman discussed the "Mantel Haenszel Peer-Group Analysis," which is a method of peer-group analysis that informs Dr. Kaufman's use of respondent charges to create peer groups with the same combination of charges, controlling for the type and number of violations. (*Id.* at 9-10.)

Dr. Kaufman performed four analyses. (*Id.* at 10.) First, he compared the Dean of

Students' decisions for male and female respondents in cases involving F-15 and F-23 charges and determined that males are found in violation more often than females. (*Id.*) Second, he compared the sanctions imposed against male and female F-23 respondents and found that males receive severe sanctions at a higher rate than females. (*Id.*)  Third, he compared the severity of sanctions for F-15 only charges between males and females and found that males are given more severe sanctions. (*Id.* at 10, 12.)  Fourth, he compared the sanctions imposed in F-23 cases involving male and female complainants and found that incidents involving male complainants (unlike female complainants) never lead to severe sanctions. (*Id.* at 10.)

Based on these analyses, Dr. Kaufman formed the following three opinions: (1) male respondents are found in violation of F-15 and F-23 charges more often than female respondents, at a rate that is statistically significant; (2) male F-23 respondents are sanctioned with expulsion and suspension at a higher rate than female F-23 respondents, at a rate that is statistically significant; and (3) F-23 charges involving male complainants result in expulsion and suspension at lower rates than F-23 charges involving female complainants. (*Id.* at 14.)  Dr. Kaufman noted that "[w]here possible my analysis controls for peer-groups by grouping respondents according to charge or combination of charges" but acknowledged that "even within combination of charges there may be non-gender factors that affect the severity of sanctions." (*Id.*)

### 2.   Economic Loss

Assuming that ABOR's "actions interrupted Doe's education and competitive sports career [which] modified Doe's career trajectory and diminished his lifetime earning capacity," Dr. Kaufman estimated "the economic impact by comparing Doe's economic situation in a hypothetical ('But-for') world absent [ABOR's] unlawful actions with Doe's current expected economic situation ('Actual')." (*Id.* at 15.)  Dr. Kaufman based his calculations on some of the opinions (*e.g.*, Doe was an elite freestyle wrestler, and coaching at an NCAA Division I program requires elite competitive wrestling experience) of Owen, who is another of Doe's experts, and on Doe's testimony that he planned to become a

- 8 -

college wrestling coach after his competitive career.  (*Id.* at 15-16.)

Based on those assumptions, and accounting for various other sources of income, Dr. Kaufman concluded that Doe's economic loss could range from $631,490 in a scenario in which Doe became a Division II or III coach to $5,543,579 in a scenario in which Doe became a Division I coach.  (*Id.* at 20.)

### C.    Student Code Enforcement Disparity Opinions

In its motion to exclude and motion for reconsideration, ABOR raises an array of arguments related to Dr. Kaufman's student code enforcement disparity opinions.  Below, the Court has grouped those arguments into four broad categories.

It should be noted that many of the arguments related to Dr. Kaufman in ABOR's reconsideration motion seem to address both the relevance/admissibility of Dr. Kaufman's opinions and the evidentiary weight (if any) those opinions should have been afforded for purposes of evaluating ABOR's entitlement to summary judgment.  Accordingly, in this part of the order, the Court addresses ABOR's arguments to the extent they are intended as relevance/admissibility objections (because such objections go to whether Dr. Kaufman's opinions should be excluded, as requested in ABOR's motion at Doc. 159).  In Part II of this order, the Court addresses the related but sometimes distinct question of evidentiary weight (which goes to ABOR's reconsideration request at Doc. 227).

#### 1.    F-23 Opinions—Failure To Consider Underlying Facts

##### a.    **ABOR's Arguments**

Two of Dr. Kaufman's opinions are intended to establish the existence of gender-based disparities in the sanctions imposed against ASU students found responsible for violations of section F-23 (*i.e.*, "sexual misconduct") of the Code of Student Conduct.  Those opinions are that (1) male F-23 respondents are sanctioned with expulsion and suspension at a statistically significant higher rate than female F-23 respondents; and (2) F-23 charges involving male complainants result in expulsion and suspension at lower rates than F-23 charges involving female complainants.  (Doc. 159-1 at 14.)

Most of ABOR's challenges focus on those opinions.  (Doc. 159 at 5-11; Doc. 227

at 2-10.)  ABOR's overarching position is that because "sexual misconduct" is defined under section F-23 as encompassing a wide range of conduct,[2] yet Dr. Kaufman made no effort to control for the specific types of sexual misconduct at issue in the cases on which his F-23 statistics and opinions are based, it follows that those statistics and opinions are irredeemably flawed.  (*See, e.g.*, Doc. 159 at 6 ["In view of the wide range of actions that fall within the definition of 'sexual misconduct,' a valid (reliable) comparison of sanctions given to male and female students found responsible for violating F-23 of the Code cannot be made without specific information as to the type of conduct at issue in each instance."].)

In its motion to exclude, ABOR characterizes this flaw both as a problem of reliability, because the analysis was not based on sufficient facts and data, and as a problem of relevance, because only comparisons of "similarly situated" individuals are relevant in a gender discrimination case.  (Doc. 159 at 2-7; Doc. 196 at 1-7.)  ABOR also contends that it provided the necessary factual information to Doe during the discovery process, in the form of a "Title IX Case Tracking Report" that "detailed the particular allegations against students alleged to have violated [F-23] and other Code violations," but Doe inexplicably "failed to provide it to Dr. Kaufman for analysis."  (Doc. 159 at 7-8.)  Meanwhile, in its motion for reconsideration, ABOR elaborates on these arguments by advancing what the Court perceives to be seven related reasons why Dr. Kaufman's F-23 opinions should be considered flawed:

(1)    Because the Ninth Circuit has recognized that statistical evidence is "inherently slippery" and can be exaggerated and distorted, it was manifestly erroneous for the Court to rely on Dr. Kaufman's opinions as part of the basis for denying summary judgment.  (Doc. 227 at 2-3; Doc. 247 at 1.)

---

[2]      Under section F-23, "sexual misconduct" is defined as follows: "a. Sexual violence and other non-consensual sexual contact—actual or attempted physical sexual acts perpetrated against a person by force or without consent; or b. Sexual harassment—unwelcome conduct of a sexual nature that is sufficiently severe or pervasive as to create an intimidating, hostile, or offensive environment; or c. Other unwanted or non-consensual sexual conduct including but not limited to indecent exposure, sexual exploitation or voyeurism, or non-consensual photographing or audio-recording or video-recording or another in a state of full or partial undress or while engaged in sexual activity, or publishing or disseminating such materials."  (Doc. 189-2 at 16-17.)

(2)     Dr. Kaufman's acknowledgement that non-gender factors may affect the severity of sanctions is an "admission that renders [his] opinions unreliable and inadmissible to establish intentional gender bias under binding Ninth Circuit precedent," as recognized in *Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30*, 694 F.2d 531 (9th Cir. 1982), *Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654 (9th Cir. 2002), *Rose v. Wells Fargo & Co.*, 902 F.2d 1417 (9th Cir. 1990), and *I.V. v. Wenatchee School District No. 246*, 342 F. Supp. 3d 1083 (E.D. Wash. 2018).  (Doc. 227 at 3-4; Doc. 247 at 2, 5.)[3]

(3)     To properly exercise its "role as gatekeeper," the Court must determine that the comparators at issue in Dr. Kaufman's statistics are "similarly situated" to Doe, as the Ninth Circuit did in *Freyd v. University of Oregon*, 990 F.3d 1211 (9th Cir. 2021), and it is an "abdicat[ion]" of that gatekeeping role to characterize the dispute over similarity as an argument going to weight rather than admissibility.  (Doc. 227 at 4-6.)

(4)     Because Dr. Kaufman had access to the information necessary to determine whether the alleged comparators were similar (*i.e.*, the Title IX Case Tracking Report) but failed to utilize it, "[t]his renders his analysis unreliable and insufficient" under *Pottenger v. Potlach Corp.*, 329 F.3d 740 (9th Cir. 2003).  (Doc. 227 at 6; Doc. 247 at 2-8.)

(5)     The Court's determination in the summary judgment order that it was reasonable for Dr. Kaufman to treat all F-23 violations as comparable because ASU itself has decided that all F-23 violations are unified by a population of similarly situated respondents in some material respect (Doc. 209 at 59-60) was factually incorrect, violates the principle of party presentation (because Doe never made that argument), and would "lead to arbitrary variations in the application and enforcement of Title IX" and "incentivize universities to ensure the unnecessary expense of redrafting their codes of conduct."  (Doc. 227 at 7-8.)

---

[3]     As an example of a non-gender factor that may affect the severity of sanctions, ABOR points to "the ASU Procedures themselves," which "provide that, in determining the appropriate sanction to impose, the Dean considers 'any mitigating or aggravating factors, including any prior violations of the Student Code of Conduct.'"  (Doc. 227 at 6-7.)

(6)     ABOR was not required to affirmatively demonstrate the factual dissimilarity of the F-23 incidents underlying Dr. Kaufman's statistics, and any argument to the contrary would amount to impermissible burden-shifting.  (Doc. 227 at 8-9.)

(7)     A new exhibit prepared by ABOR, which is enclosed as Exhibit 3 to its reconsideration motion, shows that the "great majority" of female F-23 respondents discussed in Dr. Kaufman's statistics "were alleged to have engaged in either sexual harassment . . . or incident exposure" and that the one female alleged to have engaged in non-consensual sexual conduct was still "not comparable to the circumstances here," and thus "[n]one of the females on which  Kaufman relied are valid comparators, and Kaufman's calculation is irrelevant."  (Doc. 227 at 9-10; Doc. 247 at 8.)

b.     **Analysis**

Dr. Kaufman's opinions related to gender-based disparities in F-23 enforcement, although impeachable in various respects, are sufficiently reliable and relevant to qualify for admission at trial.

As an initial matter, and contrary to ABOR's assertion that "Kaufman's analysis is <u>not</u> evidence of gender bias" (Doc. 247 at 1), the Ninth Circuit has suggested that enforcement-disparity statistics such as Dr. Kaufman's can support an inference of gender bias in a Title IX case.  *Schwake v. Ariz. Bd. of Regents*, 967 F.3d 940, 949 (9th Cir. 2020) (plaintiff's "allegations of a pattern of gender-based decisionmaking against male respondents in sexual misconduct disciplinary proceedings" were "relevant" and bolstered plausibility of Title IX claim); *Doe v. Regents of the University of California*, 23 F.4th 930, 938 (9th Cir. 2022) ("Doe alleges that the respondents in Title IX complaints that UCLA decided to pursue from July 2016 to June 2018 were overwhelmingly male (citing specific statistics for each of those years) . . . .  Doe also alleges that the University 'has never suspended a female for two years based upon these same circumstances' . . . .  As we noted in *Schwake*, these are precisely the type of non-conclusory, relevant factual allegations that the district court may not freely ignore.").  ABOR makes much of the fact that *Schwake* and *Doe* were decided at the motion-to-dismiss stage (Doc. 227 at 3; Doc. 247 at 2 n.1),

but it doesn't follow that they are inapplicable here.  ABOR's motion to exclude questions whether Dr. Kaufman's challenged opinions should be admitted under Rule 702, and one of the admissibility considerations under Rule 702—which ABOR expressly disputes in its motion papers—is relevance.  The Court interprets *Schwake* and *Doe* as recognizing that statistical evidence establishing a pattern of gender-based decisionmaking against male respondents in sexual misconduct disciplinary proceedings is, in general, relevant in a Title IX case such as this one.  Accordingly, and without prejudging ABOR's more specific arguments as to why the manner in which Dr. Kaufman conducted his statistical analysis was flawed, the Court agrees with Doe that the challenged opinions satisfy Rule 702's "basic standard of relevance," which "is a liberal one."  *Daubert*, 509 U.S. at 587.

These considerations also foreclose ABOR's first reconsideration argument, which is that courts must pay careful attention before admitting statistical evidence due to its "inherently slippery nature."  As noted, *Schwake* and *Doe* expressly contemplate the use of statistical evidence such as Dr. Kaufman's to prove bias in a Title IX case.  So does *Gay*, which is one of the cases on which ABOR relies heavily in its reconsideration motion.  In *Gay*, the plaintiffs brought claims alleging "discrimination on the basis of race in the hiring, promotion, and transfer of black male waiters and applicants by . . . several well-known San Francisco hotels and restaurants."  694 F.3d at 534.  Following a bench trial, the district court ruled in the defendants' favor.  *Id.*  On appeal, the plaintiffs limited their challenge to the district court's rejection of their claims under 42 U.S.C. § 1981.  *Id.* at 536.  As an initial matter, the Ninth Circuit clarified that such claims "require proof of intentional racial discrimination" and are analyzed similarly to disparate treatment claims under Title VII.  *Id.* at 537-38.[4]  On the merits, the court noted that that plaintiffs "were unable to produce any 'smoking gun' evidence of overt discrimination" but emphasized that "[t]his failure was not fatal to their case . . . since it is settled that a prima facie showing of disparate treatment may be made without any direct proof of discriminatory motivation."  *Id.* at 546.

---

[4]    As ABOR notes, Title IX claims such as Doe's are analyzed like Title VII disparate treatment claims.  (Doc.  227 at 6 nn.5-6.)  Thus, the analysis of the Title VII disparate treatment claim in *Gay* is instructive here.

The court also emphasized "that proof of the four *McDonnell Douglas* criteria is not the only way to establish a prima facie case of disparate treatment" and that, "if reliable, generalized statistical data is relevant and admissible at the prima facie case stage of a disparate treatment employment discrimination lawsuit." *Id.* at 550.  The court added: "This is true whether or not the statistical data introduced is sufficient of itself to establish a prima facie case.  Since the question is one of inferring discriminatory intent, the district court should make a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. . . .  [A]ll evidence, both direct and circumstantial, statistical and nonstatistical, relevant to that question should be assessed on a cumulative basis." *Id.* (citation omitted).  Later, the court elaborated: "[T]he best prima facie case utilizing statistical data, one allowing the strongest inference of intentional discrimination outside the *McDonnell Douglas* framework, is that in which the plaintiff's statistical proof is 'bolstered' by other circumstantial evidence of discrimination bringing the cold numbers convincingly to life." *Id.* at 553 (citation omitted).  Applying these standards, the court stated that the district court had properly considered the plaintiffs' statistical evidence, notwithstanding "the hotels' attempts to impeach the waiters' statistical evidence by demonstrating a lack of qualified blacks in the general labor pool and a relative lack of blacks in the 'applicant flow,'" but had also properly concluded that the statistical evidence was not, alone, sufficient to establish a prima facie case of discriminatory treatment because "the degree of disparate impact shown by the waiters' statistical data was insufficient . . . .  Although statistical data may, in a proper case, be sufficient *alone* to raise a prima facie case, the statistics must be considerably more stark than those involved here." *Id.* at 552 (emphasis added).  In support of this conclusion, the court noted that "[i]n order to establish a prima facie case of disparate treatment based *solely* on statistical evidence, the plaintiff must produce statistics showing a clear pattern, unexplainable on grounds other than race." *Id.* (citation omitted and emphasis added).  Finally, although the plaintiffs attempted to identify other circumstantial evidence, apart from their statistical evidence, to support their claim, the court concluded that "[t]his circumstantial evidence . . . does not

appreciably bolster the waiters' weak statistical proof." *Id.* at 554.

*Gay* tends to undermine, rather than support, ABOR's position for two reasons. First, contrary to ABOR's first reconsideration argument (*i.e.*, statistical evidence in a discrimination case should be viewed with disfavor due to its slippery nature), *Gay* recognizes that "reliable, generalized statistical data is relevant and admissible at the prima facie case stage of a disparate treatment employment discrimination lawsuit," "whether or not the statistical data introduced is sufficient of itself to establish a prima facie case." *Id.* at 550.  Indeed, *Gay* touts the potential value of statistical evidence in this context, noting that when it is combined with "other circumstantial evidence of discrimination," this combination can "bring[] the cold numbers convincingly to life." *Id.* at 553.  Second, contrary to ABOR's second reconsideration argument (*i.e.*, if the proponent of statistical evidence acknowledges that the disparities may be explained by non-discriminatory factors, the evidence is irrelevant and inadmissible), *Gay* merely holds that when a plaintiff seeks to prove disparate treatment based "solely" on statistical evidence or on statistical evidence "alone," the evidence is legally insufficient if the statistical disparities may be explained by reasons other than discrimination. *Id.* at 552.  But here, Doe does not rely solely on statistical evidence to prove his claim—as discussed in more detail in Part II below, he seeks to rely on the combined weight of Dr. Kaufman's statistical evidence and evidence of various irregularities.  At any rate, the passage from *Gay* that ABOR block-quotes in its motion (Doc. 227 at 3-4) and re-quotes in its reply (Doc. 247 at 5) is not a statement about the *relevance and admissibility* of statistical evidence—it is a statement about how to conduct a *sufficiency-of-the-evidence review* in an intentional discrimination case where (unlike here) the plaintiff seeks to rely "solely" on statistical evidence but cannot eliminate other possible explanations for statistical disparities.  The passage does not suggest that such evidence would be irrelevant or inadmissible, and indeed other portions of *Gay* suggest that the district court properly considered the plaintiffs' statistical evidence notwithstanding the fact that it was arguably impeachable and was ultimately deemed insufficient to support the plaintiffs' claims. *Id.* at 551-52 (noting that "[t]he

district judge undertook an exhaustive analysis of the statistical evidence introduced by the waiters" and "rejected the hotels' attempts to impeach the waiters' statistical evidence by demonstrating a lack of qualified blacks in the general labor pool and a relative lack of blacks in the 'applicant flow'").

*Aragon,* which is another case on which ABOR relies (Doc. 247 at 3), reinforces these points.  In *Aragon*, a white employee of a waste disposal company brought a Title VII race discrimination claim premised on the allegation that he and other "white or white-looking" employees were terminated, while similarly situated black employees were not, and the reasons given for his termination were pretextual.  292 F.3d at 657-58.  The plaintiff's sole evidence of pretext was that "three of the four [employees] singled out for lay off that night were white."  *Id.* at 663.  *See also id.* ("Aragon's statistics . . . stand precariously unsupported by other probative evidence of race discrimination.") (cleaned up).  Although the Ninth Circuit recognized in a footnote that this statistical evidence was relevant,[5] it held that the evidence was insufficient to create a triable issue of fact as to pretext for two reasons: (1) "the sample size is so small" that is fails to establish a "stark pattern"; and (2) "nor does it account for possible nondiscriminatory variables, such as job performance."  *Id.* (citations omitted).

Like *Gay*, *Aragon* undermines ABOR's broad relevance objection to Dr. Kaufman's statistical evidence as well as ABOR's first and second reconsideration arguments.  Although ABOR cites those cases for the proposition that "Ninth Circuit precedent" requires statistical evidence to "show a clear pattern, unexplainable on grounds other than gender," and "eliminate non-discriminatory explanations" (Doc. 247 at 2), this supposed admissibility requirement does not exist—ABOR creates it by lifting out-of-context passages from *Aragon* and *Gay* that address how to conduct a sufficiency-of-the-evidence review in an intentional discrimination case where (unlike here) the plaintiff seeks to rely solely on statistical evidence.  Additionally, whereas the statistical evidence in *Aragon* was

---

[5]     *Aragon*, 292 F.3d at 663 n.6 ("[S]tatistical evidence of a company's general hiring patterns, *although relevant*, carries less probative weight than it does in a disparate impact case.") (emphasis added).

based on an inadequate sample size, here Dr. Kaufman opines that the enforcement disparities he describes are statistically significant.[6]

Yet another case cited by ABOR, *Rose,* undermines rather than supports ABOR's position on these points for the same reasons. *Rose* was an age discrimination case where the plaintiff submitted "a statistical analysis of Wells Fargo's employment decisions [suggesting] that the single most important factor in predicting retention or termination . . . was age." 902 F.2d at 1423. The Ninth Circuit found "these statistics insufficient *in themselves* to create a triable issue of fact of intent to discriminate" because "to show a prima facie case of disparate treatment *based solely on statistics* [plaintiffs] must show a stark pattern of discrimination unexplainable on grounds other than age." *Id.* (citation omitted and emphases added). Again, this is a statement about sufficiency of the evidence in a discrimination case premised solely on statistical evidence, not a statement about the admissibility and relevance of that evidence (let alone the admissibility and relevance of that evidence where, as here, it simply forms one component of the plaintiff's proof).[7]

---

[6]    In a footnote in its reconsideration motion, ABOR suggests that Dr. Kaufman's sample sizes are too small. (Doc. 227 at 9 n.11.) Not only is this undeveloped argument forfeited—to the extent ABOR wished to seek exclusion on this ground, it needed to do so in its *Daubert* motion—but it also fails on the merits. Dr. Kaufman opines that at least some of the results he generated are statistically significant. *Freyd*, 990 F.3d 1225-26 ("Our prior cases stated a general principle about the reliability of small data sets, but it does not establish a firm rule about denominators. And although there must be some floor for the sample size a party must evaluate in order to reach statistical significance, this is not an appropriate case in which to set such a floor; at least not on this record, where the expert witnesses themselves disagree about sample size's relevance. . . . The number of data points surely goes to the probative value of [plaintiff's] evidence. But that is a matter for the experts to debate and the jury to resolve.") (citations omitted).

[7]    For similar reasons, the out-of-circuit decisions cited in ABOR's reply in support of its exclusion motion (Doc. 196 at 4 n.3) do not require exclusion here. In *Haidak v. University of Massachusetts-Amherst*, 933 F.3d 56 (1st Cir. 2019), the First Circuit held that the Title IX plaintiff's statistical evidence was alone insufficient to survive summary judgment due to his expert's "fail[ure] to address an array of alternative explanations" for the gender-based disparity in enforcement outcomes in assault cases, including the possibility that the "male students . . . committed more serious assaults." *Id.* at 75. *Haidak*, like the Ninth Circuit cases discussed above, is not a case about admissibility under Rule 702 and does not address whether statistical-disparity evidence may be used in conjunction with other circumstantial evidence of discriminatory intent (as Doe seeks to use it here) to survive summary judgment. Meanwhile, in *Doe v. University of Denver*, 952 F.3d 1182 (10th Cir. 2020), the statistical evidence did not address disparate enforcement outcomes but whether the school's "decisions regarding the *initiation* of sexual-misconduct proceedings were motivated by considerations of gender." *Id.* at 1195 (emphasis added). Additionally, the court was only addressing the legal sufficiency of the statistical evidence

1    Indeed, elsewhere in the opinion, the Ninth Circuit suggested that the statistical evidence

2    was relevant. *Id.* ("[E]ven if the statistical evidence and the evidence of replacement six

3    months following the merger arguably support an inference of discrimination with respect

4    to Reed, we find that evidence insufficient to support a jury verdict on the ultimate question

5    of discrimination.").[8]

6         Having addressed some of ABOR's broader objections to Dr. Kaufman's F-23

7    opinions, the Court now turns to Dr. Kaufman's failure to consider the factual

8    circumstances underlying each F-23 incident. ABOR's overarching contention—which it

9    identified as both a reliability and relevance problem in its motion to exclude and

10    developed in more depth in its third and fifth reconsideration arguments—is that because

11    "sexual misconduct" is defined so broadly under F-23, it is meaningless to compare the

12    outcomes in F-23 enforcement proceedings without more information about the specific

13    conduct giving rise to each proceeding.

14         Although this argument is not without force, it does not require the exclusion of Dr.

15    Kaufman's challenged opinions. ABOR may be correct that Dr. Kaufman's statistics

16    for purposes of surviving summary judgment, not the relevance and admissibility of the
evidence under Rule 702.

[8]    ABOR's reliance on *I.V. v. Wenatchee School District No. 246*, 342 F. Supp. 3d
1083 (E.D. Wash. 2018), is even more misplaced. There, the plaintiff (IV) was a middle-
school student who had been the victim of a series of bullying incidents over a period of
years committed by a fellow student (YAF). *Id.* at 1087-91. In an ensuing Title IX action
against the school district, the plaintiff's expert sought to offer "an opinion as to the
motivation behind YAF's conduct (*i.e.*, whether it was 'because of' sex)." *Id.* at 1091.
This expert "opine[d] that the bullying IV experienced was 'unquestionably sexually
driven.'" *Id.* at 1092. The district court excluded this opinion on a variety of grounds,
including that (1) it was "not based on adequate information" because the expert, among
other things, "did not know whether YAF pushed, kicked, or hit other kids in the class"
and thus did "not consider the full constellation of facts, as is required for the issue at
hand"; and (2) the expert "failed to set down an principles connecting the data and her
conclusion" and instead simply offered "her own *ipse dixit*." *Id.* at 1092-93. Here, in
contrast, Dr. Kaufman does not purport to offer the opinion that the decisionmakers in
Doe's case were, in fact, subjectively motivated by gender bias—an opinion that would
impermissible for a host of reasons, as recognized by the *I.V.* court. Instead, Dr. Kaufman
merely seeks to offer opinions about the statistical significance of certain data he compiled,
while leaving it to the factfinder to decide whether an inference of discriminatory intent
should be drawn from those statistics. (Doc. 159-1 at 6 ["Males receive severe sanctions
of expulsion and suspension at a higher rate than females charged with the same violations.
This different is statistically significant."].) Nothing in *I.V.* suggests that the use of
statistics in this fashion is improper, and the cases discussed elsewhere in this order suggest
this is a permissible use.

would have been *more* useful had he considered the factual circumstances giving rise to the F-23 cases he analyzed, but statistical evidence is not rendered irrelevant and inadmissible simply because other, even better statistics are available. *Cf. J.SH Sec. Indus. D.C.S., Ltd. v. Bartech Sys. Int'l, Inc.*, 2010 WL 11575538, *5 (D. Nev. 2010) ("Prior dealings involving refrigerators would be more relevant, but it cannot be said that JSH's prior dealings with safe orders from LVS are irrelevant.").   Thus, while again acknowledging that it would have been even more relevant for Dr. Kaufman to analyze the outcomes of F-23 cases involving the specific type of "sexual misconduct" that Doe was accused of (*i.e.*, sex by force and/or without consent), it remains relevant that gender-based disparities exist in ASU's enforcement of "sexual misconduct" cases more generally.   In *Austin v. University of Oregon*, 925 F.3d 1133 (9th Cir. 2019), the Ninth Circuit suggested that female students "accused of sexual misconduct" would qualify as "similarly situated students" who had "been accused of comparable misconduct" in a case involving a Title IX claim brought by a male student.   *Id.* at 1138.   As discussed in the summary judgment order, although this passage from *Austin* is not dispositive here (because the Ninth Circuit was not addressing the question of admissibility under Rule 702), it still "supports the conclusion that Dr. Kaufman's statistics qualify, at a minimum, as relevant evidence that a reasonable juror could construe as supporting Doe's Title IX claim."  (Doc. 155 at 55-57.) As also discussed in the summary judgment order, "this is not a situation where Dr. Kaufman made up his own definition of 'sexual misconduct' in an attempt to create some sort of cherry-picked statistic. . . .  [S]ection F-23's definition of 'sexual misconduct' is a definition both created and used by ASU, which suggests that ASU has already decided it unifies a population of similarly situated respondents in some material respect."  (*Id.* at 59.)

Given this backdrop, the Court is satisfied that Dr. Kaufman's challenged opinions fall within Rule 702's broad conception of relevance.   Female students found responsible for committing "sexual misconduct" in violation of F-23 are similar enough to Doe, who was also found responsible for committing "sexual misconduct" in violation of F-23, that a comparison of the two sets of cases (Dr. Kaufman's first challenged F-23 opinion) is

relevant here.   Similarly, male students found responsible for committing "sexual misconduct" in violation of F-23 against a male complainant are similar enough to Doe, who was found responsible for committing "sexual misconduct" in violation of F-23 against a female complainant, that a comparison of the two sets of cases (Dr. Kaufman's second challenged F-23 opinion) is also relevant here.

In the summary judgment order, the Court reached the same conclusion, holding that "[t]o the extent ABOR argues [Dr. Kaufman's first F-23] statistic is misleading because it involves a comparison of episodes of 'sexual misconduct' that may be factually dissimilar, and thus does not involve a comparison of similarly situated male and female students, this is an argument as to the weight of the evidence that ABOR can pursue at trial through cross-examination."  (Doc. 155 at 57.)  In its third reconsideration argument, ABOR contends that "[t]his approach violates the Court's role as gatekeeper" and cites *Freyd* as a case supporting its position.  (Doc. 227 at 4-6.)  Accordingly, before addressing the merits of ABOR's argument, it is helpful to summarize *Freyd*.

There, a female professor at the University of Oregon brought claims under the Equal Pay Act, Title VII, and Title IX after discovering that "the University pays [her] several thousand dollars less per year than it does four of [her] male colleagues, despite their being of equal rank and seniority."  990 F.3d at 1214.  The district court granted summary judgment in the university's favor on all of Freyd's claims but the Ninth Circuit reversed in part.  As for the Equal Pay Act claim, the analysis turned on whether Freyd and the four male professors held "substantially equal" jobs, such that the male professors could be considered relevant comparators.   The district court held "that Freyd and her comparators' jobs are rendered unequal by the differences in the research that they do, centers that they run, and funding that they obtain" but the Ninth Circuit reversed, holding that "the evidence here is not so one-sided as to mandate this conclusion as a matter of law" and that "[w]e do not have the tools to resolve the despite without intruding on the civil jury's function. . . .   [A] reasonable jury could find that Freyd and her comparators did substantially equal work.  Accordingly, the district court's grant of summary judgment on

this claim was in error." *Id.* at 1220-23.  Next, as for the Title VII disparate impact claim, the Ninth Circuit again reversed, holding that the district court erred by finding "as a matter of law that Freyd's statistical evidence was insufficient to sustain a claim of disparate impact" and that "[w]e do not think that we can resolve this dispute among the experts." *Id.* at 1225.  In contrast, the Ninth Circuit affirmed the district court's grant of summary judgment on Freyd's Title VII disparate treatment claim.  *Id.* at 1228-29.  As for that claim, Freyd's theory was that "similarly situated individuals outside her protected class were treated more favorably than her."  *Id.*  The Ninth Circuit held that Freyd's evidence was insufficient with respect to this theory because "Freyd's comparators engaged in retention negotiations with the University and were granted substantial salary increases as a result," whereas "Freyd has never engaged in retention negotiations," and thus Freyd had "not presented evidence sufficient to establish a prima facie case under the *McDonnell Douglas* framework because she has not shown that similarly situated individuals outside of her protected class were treated more favorably than her."  *Id.*  Finally, the court affirmed the district court's grant of summary judgment on Freyd's Title IX claim for the same reason, holding that "[a]s with her Title VII disparate treatment claim, because Freyd has presented no evidence of intentional discrimination, there is no genuine issue of material fact here." *Id.* at 1229.

In the Court's estimation, *Freyd* does not undermine (and, arguably, supports) the conclusion in the summary judgment order that the parties' dispute over whether the comparators selected by Dr. Kaufman were sufficiently similar to Doe is a question of fact that should be decided by the jury at trial.  Indeed, in *Freyd*, the Ninth Circuit reversed the district court's conclusion that the male professors were too dissimilar to qualify as relevant comparators for purposes of the plaintiff's Equal Pay Act claim, emphasizing that because "the evidence here is not so one-sided as to mandate this conclusion as a matter of law," the district court had "intrud[ed] on the civil jury's function" by concluding otherwise.  *Id.* at 1220-23.  This approach is consistent with Court's approach here.  *See also Alaska Rent-A-Car*, 738 F.3d at 968-70 (affirming district court's admission of expert testimony, where

the expert "compared Avis's . . . experience with [Alamo's] experience after Cerberus bought Alamo out of bankruptcy" and the opposing party objected on the ground "that differences between Alamo and Budget . . . made Alamo an invalid comparison," because the challenge to "using Alamo as the comparator" was a challenge that "go[es] to the weight of the testimony and its credibility, not its admissibility").  Finally, although it is true that *Freyd* affirmed the district court's grant of summary judgment on the plaintiff's intentional discrimination claims under Title VII and Title IX, on the ground that the plaintiff's comparators were not similarly situated for purposes of those claims, the Court agrees with Doe (Doc. 241 at 6) that this portion of the decision turned on fact-specific considerations that shed little light on the dispute here.  Even accepting that professors who engaged in retention negotiations are dissimilar to professors who never engaged in retention negotiations, it doesn't follow that ASU students accused of "sexual misconduct" as that term is defined in F-23 are too dissimilar from each other to provide a relevant basis for comparison.[9]  The Court also notes that the passages from *Freyd* on which ABOR relies, like the passages from *Gay*, *Aragon*, and *Rose* discussed above, do not address the relevance and admissibility of statistical evidence but the sufficiency of that evidence for purposes of surviving summary judgment.  This further undermines ABOR's reliance on *Freyd* as a basis for seeking the exclusion of Dr. Kaufman's statistics on relevance grounds under Rule 702.

Nor is there any merit to ABOR's fifth reconsideration argument, which attacks the portion of the summary judgment order noting that Dr. Kaufman did not make up his own

---

[9]     For similar reasons, ABOR's reliance on *Moran v. Selig*, 447 F.3d 748 (9th Cir. 2006) is misplaced.  There, the Ninth Circuit concluded that the members of a class of "virtually all Caucasian former MLB players who played in the Major Leagues for less than four years between 1947 and 1979 and were accordingly denied MLB pension and medical benefits" were not "similarly situated to . . . the former Negro League players who also played in the Major Leagues between 1947-79 but receive[d] medical and supplemental income benefits under the Negro League Plans" for the "basic" reason that "in order to qualify for the benefits under the Negro League Plans, the players to whom [plaintiffs] seek to equate themselves must have played in the Negro Leagues—a qualification that [plaintiffs] indisputably lack."  *Id.* at 751, 755-56.  This fact-specific ruling sheds little light on the comparability of ASU students accused of sexual misconduct in violation of F-23.

definition of "sexual misconduct" but instead utilized the definition created and utilized by ASU. To the extent ABOR accuses the Court of "creat[ing] this argument on behalf of" Doe, who "never made this argument" himself (Doc. 227 at 7), this accusation is belied by the record. In response to the motion to exclude, Doe argued as follows: "ABOR has not presented any evidence that the respondents reflected in the F-23 spreadsheets are not similarly situated. . . . The data produced by ABOR categorizes all F-23 charges into a single category of sexual misconduct. ABOR does not and cannot provide any support for its allegation that the various conduct constituting 'sexual misconduct' under its own Code is somehow 'less' serious than other harms." (Doc. 188 at 6.) Elsewhere, Doe argued: "ABOR argues that for purposes of a gender discrimination claim, 'similarly situated' means that the misconduct in which the comparators are alleged to have engaged must be of 'comparable seriousness.' This threshold is met—all violated F-23, the same sexual misconduct violation under the Code." (*Id.* at 8-9.) The analysis in the summary judgment order reflected the Court's acceptance and agreement with these arguments, albeit while using slightly different phrasing. It is disappointing that ABOR would accuse the Court of stepping outside the judicial role and acting as Doe's advocate under these circumstances.

Next, as for ABOR's contention that "[t]he Court also manifestly errs because the [summary judgment order] does not cite evidence supporting its supposition that ASU 'decided' all F-23 violations were comparable" (Doc. 227 at 7), the Court disagrees for the reasons stated in Doe's response: "[T]hat ASU grouped all F-23 conduct together by definition in its own student handbook is a fact established by evidence presented by ABOR [including the handbook]." (Doc. 241 at 7.)[10] As Doe further notes, "ABOR does not present any evidence supporting its conclusory argument that [the subsections within F-23] are grouped by severity. . . . ABOR still does not endeavor to rank the seriousness of the acts of sexual misconduct along these lines. Nor can it. Each subsection includes a

---

[10]   *See also Freyd*, 990 F.3d at 1222 ("The dissent's conclusion that two faculty members in the same department cannot be compared is inconsistent with the fact that the University's own administrators regularly make these comparisons for purposes of setting salaries. The question is not whether faculty members can be compared, but how they compare, and the latter comparison is one fraught with judgment, not law.").

range of behavior. . . .   For instance, persistent sexual harassment that creates a hostile environment (subsection B) could certainly rise to or past the level of seriousness of non-consensual sexual touch in subsection A."  (*Id.* at 8-9.)  Finally, as for ABOR's contention that the Court's approach may "incentivize universities to endure the unnecessary expense of redrafting their codes of conduct" (Doc. 227 at 8 n.9), such public policy arguments are unhelpful when evaluating questions of relevance and reliability under Rule 702.

Having determined that Dr. Kaufman's F-23 opinions are relevant despite his failure to consider the specific factual circumstances giving rise to the underlying proceedings, the Court next considers whether Dr. Kaufman followed a reliable methodology when forming those opinions.  ABOR's overarching argument on that issue, which it frames as a failure to consider "sufficient facts and data" in its motion to exclude and further elaborates upon in its fourth reconsideration argument, is Dr. Kaufman's approach was unreliable because he had access to data setting forth the factual circumstances of the underlying incidents (*i.e.*, the Title IX Case Tracking Report) and simply failed to consider it.  ABOR cites *Pottenger* as its best case supporting exclusion in this circumstance.

This argument presents a fairly close call.  Although it is not clear that Dr. Kaufman's failure to consider the Title IX Case Tracking Report poses a reliability problem, as opposed to some other type of flaw,[11] ABOR is correct that, under *Pottenger*, an expert's failure to consider a particularly critical set of data can undermine the evidentiary value of the expert's statistical analysis.  In *Pottenger*, a 60-year-old executive at a paper company asserted a claim of age discrimination after he was terminated and replaced by a 43-year-old.  329 F.3d at 744-45.  In support of this claim, Pottenger offered

---

[11]      The concept of reliability seems like a poor fit here because there was no need for Dr. Kaufman to consider the Title IX Case Tracking Report when formulating his challenged opinions, which simply track the outcomes in cases involving F-23 violations.  Because those opinions don't purport to control for the specific circumstances of the underlying incidents (beyond the fact that each incident involved conduct that fell within F-23's broad definition of "sexual misconduct"), it follows that the methodology Dr. Kaufman used when forming those opinions (*i.e.*, considering the SCC Charge Data) was reliable.  At bottom, ABOR's criticism is not that Dr. Kaufman used a flawed methodology when addressing the particular questions he chose to address.  Instead, the criticism is that he addressed the wrong questions.  That seems like an argument about relevance, not reliability.

statistical evidence suggesting that "the company's June 2000 reduction in force [RIF] disproportionately affected older employees." *Id.* at 747. Nevertheless, the district court granted summary judgment in the employer's favor and the Ninth Circuit affirmed, holding that the statistical evidence was insufficient to create a genuine issue of fact as to whether the employer's proffered reason for terminating Pottenger (*i.e.*, "he was not prepared to make the tough decisions necessary to turn around the Idaho Pulp and Paper Division") was pretextual. *Id.* at 745, 747-48. Although the court recognized that a plaintiff asserting a discrimination claim may, in general, "use statistics to show an intent to discriminate," it held that Pottenger's statistical analysis, which "t[ook] into account only two variables— the employee's age at the time of the RIF and whether the employee was terminated," should be "treated skeptically" because it "fail[ed] to account for other relevant variables." *Id.* at 747-48. In particular, the court noted that "the variable most likely to have offered a legally appropriate explanation of why certain employees were selected for lay-off [was] job performance." *Id.* at 748. The court further noted that Pottenger's expert was offered access to job-performance data before conducting his analysis but "specifically acquiesced in the suggestion that obtaining data about individual employees' performance reviews was unnecessary." *Id.* As a result, the court concluded: "If Pottenger had had access to only two variables, we would be presented with a different case. But here, where Pottenger had or had access to additional relevant data and chose not to use it, we conclude that Pottenger's statistical analysis is insufficient to raise a triable issue of fact regarding pretext." *Id.*

It is understandable why ABOR would view *Pottenger* as a case supporting its position. From ABOR's perspective, Dr. Kaufman is just like Pottenger's expert in that he had access to the variable that was most likely to explain any differences in F-23 enforcement (*i.e.*, the specific factual circumstances underlying each F-23 violation, which were set forth in the Title IX Case Tracking Report) yet chose not to consider that data and instead relied on other, less probative data (*i.e.*, the details set forth in the SCC Tracking Data, which were limited to the gender of the respondent/complainant, the outcome of the

proceeding, and the bare fact that the respondent was found to have committed an F-23 violation).  Nevertheless, the Court discerns two reasons why *Pottenger* does not do all of the work that ABOR wants it to do here.

First, *Pottenger* is not a case about relevance and admissibility under Rule 702— the Ninth Circuit's holding was that Pottenger's statistical evidence was not alone sufficient to create a triable issue of fact on the issue of pretext due to his expert's failure to consider the most important variable.  But it doesn't necessarily follow, from the fact that a particular piece of evidence is alone insufficient to avoid summary judgment, that the piece of evidence is also irrelevant and inadmissible.  Thus, to the extent ABOR seeks to rely on *Pottenger* as a basis for *excluding* Dr. Kaufman's statistical analysis (as contrasted with contesting the *weight* of that statistical analysis for purposes of evaluating ABOR's entitlement to summary judgment, which is an issue addressed in Part II below), that reliance is misplaced.[12]

Second, there are important differences between *Pottenger* and this case when it comes to the expert's explanation for not considering the additional data.  As noted, in *Pottenger*, the expert "specifically acquiesced in the suggestion" that job performance data was "unnecessary."  329 F.3d at 748.  Here, in contrast, Dr. Kaufman stated in his report that he attempted to obtain "a sample of case files to develop additional controls, but [ABOR] declined to provide such data."  (Doc. 159-1 at 14.)[13]  Additionally, in a declaration prepared several months later (in response to ABOR's contention that he had

---

[12]     During oral argument on the *Daubert* motions, which occurred shortly after ABOR filed its reconsideration motion and cited *Pottenger* for the first time, the Court suggested that *Pottenger* addresses the admissibility of statistical evidence. (Doc. 243 at 94.) Having now had a chance to more carefully review *Pottenger*, the Court concludes (as stated above) that *Pottenger* is a case about evidentiary weight, not admissibility.

[13]     Here, Dr. Kaufman appears to be referring to a discovery dispute that arose in mid-2021 over whether ABOR's Rule 30(b)(6) designee needed "to become knowledgeable about the details of hundreds, if not thousands, of individual discipline proceedings involving ASU students over a period of many years." (Doc. 143 at 7.) The Court ruled in ABOR's favor as to this dispute because "although the general subject area Doe wishes to explore . . . which Doe describes in his response as 'how ASU has treated others in the student disciplinary system, specifically those involving claims of sexual assault' . . . is relevant and ought to be fair game for examination, the verbiage he chose to use when formulating the deposition topics is vague, overbroad, and would place overly burdensome and disproportionate preparation demands on ABOR." (*Id.* at 9.)

overlooked key details), Dr. Kaufman stated that he had reviewed the Title IX Case Tracking Report before drafting his report but declined to rely on it for two reasons: (1) although the Title IX Case Tracking Report "include[s] high level descriptions of the charges," it "does not categorize the charges by relative seriousness" and contains a "level of detail" that is "unreliable and incomplete"; and (2) the Title IX Case Tracking Report does not cover the full range of years covered by the SCC Tracking Data[14] and the cases in the Title IX Case Tracking Report are not "randomly sampled from the full incidents reflected on the [SCC Tracking Data]." (Doc. 188-2 ¶¶ 4-6.)[15] Given these details, Doe argues that "[t]he data in the [Title IX Case Tracking Report] is a far cry from the reliable, complete, ranked, and usable data of *Pottenger*" and that "[i]n rejecting the use of the [Title IX Case Tracking Report] in favor of the complete data set sworn by ABOR to be accurate in its interrogatory responses, Kaufman preserved the reliability [of] his analysis." (Doc. 241 at 7.)

The Court agrees with Doe that these details distinguish this case from *Pottenger*. Dr. Kaufman did not *ignore* the Title IX Case Tracking Report but instead made a determination, after reviewing it, that it had various flaws that rendered it unhelpful in developing additional controls for his analysis. Although ABOR vigorously disputes Dr. Kaufman's determination on this point (and, the Court suspects, will be able to use the Title

---

[14] Dr. Kaufman stated in his declaration that the Title IX Case Tracking Report "only present[s] incidents of sexual misconduct reported to ASU from 2016-17." (Doc. 188-2 at 6.) Doe acknowledges that Dr. Kaufman was mistaken on this point—the Title IX Case Tracking Report actually covers the years 2013 through 2017. (Doc. 241 at 6 n.5.) Nevertheless, it is undisputed that the Title IX Case Tracking Report does not cover the full range of F-23 incidents summarized in the SCC Tracking Data, which cover the years 2012 through 2017. (Doc. 247 at 3 ["[T]he Report did not exist prior to the 2013-14 academic year."].)

[15] At times, Doe has suggested that the Title IX Case Tracking Report was produced in a confusing and/or indecipherable manner during discovery, such that ABOR should bear any blame for Dr. Kaufman's failure to consider it. (Doc. 243 at 87-89; Doc. 246 at 3 ["[T]he documents were not produced in a searchable format, yet ABOR's counsel claimed the opposite during Daubert oral arguments. Presenting the documents in searchable format would constitute a misrepresentation that would make the data within the TIX Spreadsheets appear more accessible than it truly is."].) In response, ABOR has provided a detailed timeline of its production efforts (Doc. 247 at 3-5) as well as a flash drive containing the Title IX Case Tracking Report itself (Doc. 248), which the Court has now reviewed. Based on those submissions, the Court rejects any claim that ABOR is responsible for Dr. Kaufman's decision not to consider the Title IX Case Tracking Report.

IX Case Tracking Report to great effect when cross-examining Dr. Kaufman), the appropriate way to resolve this dispute is to allow the parties to present their respective positions to the jury at trial. Put in the parlance of Rule 702, Dr. Kaufman's basis for declining to rely on the Title IX Case Tracking Report may be "impeachable," but it does not veer into the realm of "unreliable nonsense." *Alaska Rent-A-Car,* 738 F.3d at 969. And as noted elsewhere in this order, "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564.

This leaves ABOR's sixth and seventh reconsideration arguments, which the Court views as a matched pair. The former is that it would amount to impermissible burden-flipping to fault ABOR for failing to perform its own analysis of the specific factual circumstances of the underlying F-23 incidents because Doe bears the burden of establishing the admissibility of his expert's opinions. The latter is that ABOR has, at any rate, now conducted the very analysis that it shouldn't have been required to perform, which shows that the incidents in which female students were found responsible for F-23 violations involved much different (and less serious) forms of "sexual misconduct" than the incident at issue in this case.

These arguments fail to establish that Dr. Kaufman's F-23 opinions should be excluded. As for the former, ABOR is of course correct that it does not bear the burden of proof in this context, but this observation does nothing to detract from the Court's conclusion, as discussed in the paragraphs above, the Doe has met his burden of establishing the relevance and reliability of the challenged opinions. As for the latter, the initial problem is that ABOR did not conduct or disclose its new evidence during the discovery process or in support of its motion to exclude—instead, it presented this evidence for the first time as an attachment to its motion for reconsideration. This approach is impermissible for a host of reasons. *Kona Enterprises, Inc. v. Estate of Bishop*, 229 F.3d 877, 891 (9th Cir. 2000) ("[A] motion for reconsideration . . . may not be used to raise arguments or present evidence for the first time when they could reasonably have been

1    raised earlier in the litigation.") (citation and internal quotation marks omitted).  More

2    important, even if this new evidence had been timely disclosed to Doe and timely provided

3    to the Court, it would not necessitate the exclusion of Dr. Kaufman's opinions.  Instead, it

4    simply constitutes evidence that ABOR may present at trial in an attempt to impeach Dr.

5    Kaufman and/or persuade the jury that Dr. Kaufman's opinions do not support the

6    inferences that Doe hopes the jury will draw from them.

7                2.    F-23 Opinions—Failure To Control For Other Charges

8          Although most of ABOR's challenges to Dr. Kaufman's F-23 opinions turn on his

9    failure to consider the factual details of the underlying incidents, ABOR also raises a

10   distinct challenge in its motion to exclude—that "Dr. Kaufman's methodology is unreliable

11   because he does not account for the fact that many of the respondents charged with [F-23]

12   violations were also charged with other violations of the Code."  (Doc. 159 at 9.)  ABOR

13   acknowledges that Dr. Kaufman purported to control for this variable by relying on the

14   Mantel Haenszel peer group test but argues that, because Dr. Kaufman admits this test does

15   not eliminate the possibility that "non-gender factors [may] effect the severity of the

16   sanctions," it follows that his methodology is unreliable.  (*Id.* at 9-10.)  In response, Doe

17   argues that "[t]he Mantel Haenszel test[] is the most widely used method of testing the

18   statistical significance of disparities," cites other cases approving the use of this test, and

19   argues that ABOR's reliability challenge is therefore unavailing.  (Doc. 188 at 9-10.)

20         Exclusion is not warranted on this basis.  Dr. Kaufman sought to control for the

21   existence of other charged violations by applying the Mantel Haenszel test.  To the extent

22   ABOR's position is that the application of this test is insufficient because it does not

23   eliminate the possibility of non-discriminatory explanations for the statistical patterns, this

24   argument fails for the reasons set forth above.  Although *Gay*, *Aragon*, and *Rose* recognize

25   that statistical evidence that does not eliminate the possibility of non-discriminatory

26   explanations for the disparity may be legally insufficient to create a triable issue of fact in

27   a discrimination case where the plaintiff seeks to rely solely on that statistical evidence,

28   they do not hold that such statistical evidence is inadmissible and irrelevant.  Additionally,

1  and as discussed in more detail in Part II below, Doe does not rely solely on statistical

2  evidence in this case.

3         3.       Final F-23 Opinion—Failure To Consider Available Data

4         ABOR next raises a challenge that is specific to Dr. Kaufman's final F-23 opinion

5  (which, as noted above, compares the severity of sanctions imposed in F-23 cases involving

6  male complainants with the sanctions imposed in F-23 cases involving female

7  complainants).  ABOR contends this statistic is unreliable because, although Dr. Kaufman

8  stated that most of the data available to him did not identify a complainant's gender,

9  information *was* available to him that provided this information.  (Doc. 159 at 10.)

10 Specifically, ABOR points to Exhibit 5, row 250 of the Title IX Case Tracking Report.

11 (*Id.*)

12        In the tentative order issue before oral argument, the Court stated that this argument

13 was based on a false premise because row 250 of the cited document (Doc. 159-4 at 20-

14 22) does not identify the complainant's gender.  (Doc. 210 at 23.)  In response, ABOR

15 clarified during oral argument that its brief had a typo and that the reference should have

16 been to row 251 of the cited document.  (Doc. 243 at 82.)  ABOR explained that this row

17 reveals that the underlying incident was "an F-23 incident involving a male complainant

18 and the sanction was expulsion" and thus Dr. Kaufman's opinion that "incidents involving

19 male complainants never result in severe sanctions" is erroneous.  (*Id.*)

20        The Court appreciates this clarification but still concludes that ABOR's criticisms

21 are fodder for impeachment, not exclusion.  Dr. Kaufman's final challenged opinion is that

22 "F-23 charges involving male complainants result in expulsion and suspension at a lower

23 rate than charges involving female complainants."  (Doc. 159-1 at 14.)  The support for

24 this opinion is set forth in Table 5, which states that of the 11 F-23 cases involving a male

25 complainant, zero cases resulted in a severe sanction (0%), whereas of the 98 F-23 cases

26 involving a female complainant, 28 cases resulted in a severe sanction (29%).  (*Id.*)  If, per

27 row 251, there was actually one F-23 case with a male complainant that resulted in a severe

28 sanction (rather than zero), this would not undermine Dr. Kaufman's overall opinion that

- 30 -

1   severe sanctions are imposed less frequently in F-23 cases involving male complainants

2   than in F-23 cases involving female complainants.[16]

3          More broadly, and as discussed elsewhere in this order, to the extent ABOR believes

4   the information set forth in the Title IX Case Tracking Report is useful in impeaching Dr.

5   Kaufman or otherwise undermining the inferences that Doe intends to ask the jury to draw

6   from Dr. Kaufman's statistics and opinions, ABOR is free to make its case at trial.  The

7   potential for such impeachment does not undermine the Court's determination that Dr.

8   Kaufman's challenged opinions are sufficiently relevant and reliable to qualify for

9   admission under Rule 702.

10                    4.      Alcohol-Related Opinions

11         Although most of ABOR's challenges concern Dr. Kaufman's opinions related to

12  disparities in F-23 proceedings, ABOR's final challenge concerns Dr. Kaufman's opinion

13  regarding disparities in F-15 proceedings.[17]  As noted, Dr. Kaufman's opinion on that issue

14  is that "[m]ale respondents are found in violation of F-15 . . . charges more often than

15  female respondents."  (Doc. 159-1 at 14.)  In its motion to exclude, ABOR argues this

16  opinion is "unreliable and irrelevant" because (1) even though Dr. Kaufman attempted to

17  "control for the 'type' of violation by only including matters in which [F-15] was the sole

18  alleged violation," this attempt was unsuccessful because Dr. Kaufman failed to consider

19  the underlying factual circumstances of each incident and thus failed to "account for the

20  wide variety of conduct that could constitute an [F-15] violation"; and (2) alternatively, by

21  attempting to limit his opinion to disparities in proceedings involving only F-15 violations,

22  "Dr. Kaufman ensured his analysis has no relevance" because "Doe was not solely charged

23  with an [F-15] violation" and thus "[t]here is no issue in this lawsuit about whether the

24  _____

[16]      ABOR may be correct that, in light of this clarification, the title appearing above
25  Table 5, which is "Male Complainants Do Not Result In Severe Sanctions" (Doc. 159-1 at
14), is inaccurate.  But as discussed above, the opinion that Dr. Kaufman discloses in his
26  report is a *relative* comparison of the rates of severe sanctions imposed in F-23 cases
involving male and female complainants.

27  [17]      Section F-15 provides that the definition of "Prohibited Conduct" includes:
"Violation of the Board or university rules or applicable laws governing alcohol, including
28  consumption, distribution, unauthorized sale, or possession of alcoholic beverages."  (Doc.
155-2 at 55-56.)

sanctions imposed on students facing solely [F-15] violations are harsher for females than they are for males."  (Doc. 159 at 11-12.)  In response, Doe asserts that Dr. Kaufman's opinion about F-15 violations is reliable, for similar reasons as his opinions regarding F-23 violations, and relevant, because a juror can infer the presence of gender bias from the fact that men are sanctioned for alcohol violations at a higher rate than women.  (Doc. 188 at 12-13.)  Doe also contends that "the most granular data available on F-15 violations is that presented in the F-15 Spreadsheet created and produced by ABOR."  (*Id.*)

Again, ABOR demands too much at the motion-to-exclude stage.  If true, the conclusion that ASU sanctions men accused of alcohol violations more often than women accused of alcohol violations is relevant, both because (1) Doe was accused of an alcohol violation and (2) any statistical evidence showing that ASU is biased against men in disciplinary proceedings is at least some evidence supporting Doe's gender bias claim.  The fact that Doe was accused of multiple violations, and that ASU's record of enforcing alcohol violations may not be as probative of bias as ASU's record of enforcing sexual misconduct, is fertile territory for cross-examination, but it does not provide a basis for exclusion.  Finally, as for Dr. Kaufman's failure to account for the specific factual circumstances of each underlying alcohol violation, not only does this criticism merely go to whether Dr. Kaufman's opinion is impeachable (as opposed to inadmissible) for the reasons stated above with respect to Dr. Kaufman's F-23 opinions, but this criticism does not implicate *Pottenger* in the same way because there is no evidence that these details are tracked by ASU or were provided to Dr. Kaufman, only for him to ignore them.

> D.    **Economic Loss Opinions**

> > 1.    The Parties' Arguments

ABOR argues that Dr. Kaufman's assumptions about Doe's career progression are unfounded and unreliable because there is no evidence in the record to support those assumptions.  (Doc. 159 at 12-14.)  Relatedly, ABOR points to Dr. Kaufman's assertions that Doe "was a Division One wrestler on his way to earning the title of All-American at nationals" and that Doe's career plan was "consistent with the career paths of other college

wrestling coaches" and argues that Dr. Kaufman is not qualified to opine on those issues. (*Id.* at 13 n. 5.)  ABOR also asserts that Dr. Kaufman's assumptions about projected salary data are inaccurate and inapplicable to the facts in this case.  (*Id.* at 15-17.)

Doe responds that "there is no requirement that Doe unequivocally prove that he would have achieved any of these positions before an expert can opine on his lost earnings . . . .  The standard for assessing earning capacity is whether the plaintiff had a 'reasonable probability' of achieving that career path. . . .   Dr. Kaufman is permitted to make assumptions about Doe's career path so long as there is a reasonable probability that those paths would have . . . or are likely to occur." (Doc. 188 at 14-15.)  Doe also argues that Dr. Kaufman's sources for his salary projection are reliable and, to the extent there are factual disputes to be had, those issues are either scrivener's errors or may be addressed during cross-examination.  (*Id.* at 15-17.)

ABOR replies that Doe has mischaracterized its argument: ABOR argues that "Dr. Kaufman has no expertise or foundational facts to support his assumptions as to Doe's expected career path."  (Doc. 196 at 9.)  ABOR also objects to Dr. Kaufman's use of median, rather than entry-level, salary figures and contends that the inflated salary information caused Dr. Kaufman's opinion to be irrelevant.  (*Id.* at 10-11.)

2.   Analysis

ABOR's challenges to Dr. Kaufman's economic loss opinions lack merit.  ABOR's first objection is that Dr. Kaufman's assumptions about the trajectory of Doe's career are unfounded and inaccurate.  As for foundation, there is evidence in the record to support the assumption that Doe had a reasonable probability of achieving a wide range of professional outcomes within the wrestling profession.  Although the Court has excluded Owen from testifying that Doe would have been one of the nation's best wrestlers (Doc. 233 at 13-16), the fact that Doe won several wrestling competitions will still be before the jury. Additionally, both Doe's and ABOR's experts agree that Doe could have become a Division I coach and simply disagree on where, exactly, Doe's ceiling would be.  (Doc. 163-1 at 4, Doc. 165-1 at 10.)

As for accuracy, it is irrelevant—for threshold admissibility purposes—that Dr. Kaufman's assumptions may be proved inaccurate at trial. All that matters is that they have some basis in the record. An expert may, in appropriate circumstances, rely on assumptions when formulating opinions. Fed. R. Evid. 702, advisory committee notes to 2000 amendments ("The language 'facts or data' is broad enough to allow an expert to rely on hypothetical facts that are supported by the evidence."). Disagreement with an expert's assumptions does not, in general, provide a basis for excluding the expert's testimony. *See, e.g.*, *Marsteller v. MD Helicopter Inc.*, 2018 WL 3023284, *2 (D. Ariz. 2018) ("The challenges to Equals' opinions and the weaknesses in his assumptions are issues to be explored on cross-examination."). To be sure, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. Nevertheless, "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564. "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc.*, 738 F.3d at 969. *See also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("[P]roponents do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable . . . . The evidentiary requirement of reliability is lower than the merits standard of correctness." (alteration in original) (internal quotation marks omitted)).

Here, Dr. Kaufman takes core assumptions that have a reasonable basis in the record and stretches them to opposing extremes to establish a range of possible outcomes. If ABOR can discredit these assumptions at trial, that will also invalidate the opinion. *See generally United States v. Crabbe*, 556 F. Supp. 2d 1217, 1224 (D. Colo. 2008) ("An expert witness may often 'assume' a fact for purposes of applying the methodology. . . . If the

assumption is in error, the opinion may be entirely invalidated."). But because the assumptions about Doe's future employability do not veer into "unreliable nonsense," and ABOR does not dispute Dr. Kaufman's algebraic methodology of converting a range of assumptions into a range of potential economic loss, exclusion is not warranted.[18]

As for Dr. Kaufman's salary assumptions, largely the same analysis applies. ABOR objects to Dr. Kaufman's use of median wages that do not account for school size, stature, or a coach's experience, arguing that "Dr. Kaufman shows no connection between the salary he selected and the facts in this case." (Doc. 159 at 15-16.) Not so. Dr. Kaufman's choice of salary data and analysis thereof may not meet ABOR's standards for persuasiveness, but it has a foundation in the record. ABOR also points to actual errors in Dr. Kaufman's data, but Doe replies that these are scrivener's errors which have since been corrected and do not meaningfully affect Dr. Kaufman's overall analysis. Scrivener's errors that have already been corrected are not grounds for exclusion.

…

…

…

---

[18]    During oral argument, ABOR placed particular emphasis on Dr. Kaufman's assumption that Doe might pursue a coaching position at a Division II or Division III college. (Doc. 243 at 83-86.) However, ABOR's experts made the same assumption for purposes of their opinions and calculations. (Doc. 165-1 at 10 [Borrelli report: "In my opinion, Doe's likely career path (if he actually pursues it), both in the but-for and actual worlds, is limited to coaching for small DI schools or schools in DII or DIII (and would have been limited to small DI schools or schools in DII or DIII even if Doe had not been expelled from ASU). In my opinion, the disciplinary proceedings against Doe delayed, but did not preclude, his ability to obtain employment as a DI wrestling coach at one of the smaller DI schools."]; Doc. 165-1 at 154 [Duncan report: "[A]fter graduating from ASU, it is reasonable to assume that Mr. Doe would have secured a position as a Division II/III assistant coach, and would likely have remained there for approximately four years. Assuming success in that position, Mr. Doe could have then applied for a Division I assistant coach position."].) Additionally, another of Doe's experts, Owen, opined that Doe could have pursued a career as a "collegiate" coach. (Doc. 158-1 at 4 ["I believe the two years that Doe lost cost him many achievements and accolades that would have allowed him to increase his marketability (sponsorships and employment) and earning power down the road, should he choose to make a living as an athlete and then as a coach at the collegiate . . . level."].) The Court has now held that Owen may offer this particular opinion at trial. (Doc. 233 at 8-9 ["Owen is qualified to offer opinions about a collegiate wrestling coach's typical qualifications . . . [and] has adequately explained how his experiences informed his opinions regarding collegiate coaching qualifications."].) Accordingly, Dr. Kaufman's assumption has a sufficient enough basis to avoid exclusion.

II.     ABOR's Motion For Reconsideration (Doc. 227)

    A.     **Legal Standard**

    "The Court will ordinarily deny a motion for reconsideration of an Order absent a showing of manifest error or a showing of new facts or legal authority that could not have been brought to its attention earlier with reasonable diligence."   LRCiv. 7.2(g)(1). Reconsideration is an "extraordinary remedy" that is available only in "highly unusual circumstances."   *Kona Enters., Inc.*, 229 F.3d at 890 (internal quotation marks omitted). "Motions for reconsideration are disfavored . . . and are not the place for parties to make new arguments not raised in their original briefs.  Nor is reconsideration to be used to ask the Court to rethink what it has already thought."   *Motorola, Inc. v. J.B. Rodgers Mechanical Contractors*, 215 F.R.D. 581, 582 (D. Ariz. 2003) (citations omitted).

    B.     **Analysis**

    In the August 30, 2022 order, the Court concluded that ABOR's motion for summary judgment should be denied because "Doe's proffered evidence could lead a reasonable juror not only to conclude that his disciplinary proceeding was marred by an array of procedural irregularities, but also that ASU's disciplinary process generates statistical anomalies that raise an inference of gender bias."  (Doc. 209 at 60.)   ABOR challenges both of these conclusions in its motion for reconsideration.  In Part A, ABOR identifies reasons why it was improper to rely on the statistical anomalies identified by Dr. Kaufman.  (Doc. 227 at 2-10.)  In Part B, ABOR identifies reasons why it was improper to rely on the alleged irregularities.  (*Id.* at 10-17.)

        1.     Statistical Evidence

    ABOR's seven reconsideration arguments concerning Dr. Kaufman require little additional discussion because they are largely addressed in Part I above.  To the extent those arguments are not offered as relevance/admissibility objections but as evidentiary-weight objections, the Court is unpersuaded: (1) it was not manifestly erroneous to rely on Dr. Kaufman's opinions for purposes of evaluating ABOR's entitlement to summary judgment because the Ninth Circuit has repeatedly recognized that statistics such as Dr.

Kaufman's are useful and relevant (even if not dispositive) in cases involving allegations of intentional discrimination, including Title IX cases such as this one (*Schake; Doe; Gay*); (2) although Dr. Kaufman's acknowledgement that the statistical disparities may be explained by non-discriminatory factors suggests the statistics are alone insufficient to create a triable issue of fact (*Gay; Aragon; Rose*), that principle does not require reconsideration here because Doe does not rely solely on Dr. Kaufman's statistics; (3) the parties' dispute over whether the comparators chosen by Dr. Kaufman are similarly situated to Doe is a factual dispute to be resolved by the jury at trial, not a basis for disregarding Dr. Kaufman's statistics for summary judgment purposes (*Freyd; Alaska Rent-A-Car*); (4) although Dr. Kaufman's failure to consider the factual details set forth in the Title IX Case Tracking Report may render his F-23 analysis impeachable, the circumstances here are sufficiently distinguishable from *Pottenger* that his statistics retain evidentiary value at summary judgment; (5) there was no error, manifest or otherwise, in the Court's determination that it was reasonable for Dr. Kaufman to treat all F-23 violations as comparable in part because ASU has decided that all F-23 violations are unified by a population of similarly situated respondents in some material respect; (6) ABOR's burden-shifting arguments have no bearing on the summary judgment analysis; and (7) ABOR's new evidence does not provide a basis for reconsideration because ABOR did not provide it in support of its summary judgment motion or in support of its exclusion motion, and instead untimely provided it for the first time as an exhibit to its reconsideration request.

## 2.   Roe's December 11, 2016 Statement

This leaves ABOR's reconsideration arguments concerning irregularities.  The first procedural irregularity identified in the summary judgment order was as follows: "[A] reasonable juror could conclude that it was procedurally irregular for Davis not to share Roe's December 11, 2016 comments with Doe before submitting her final investigative report to the Committee and that it was also procedurally irregular for Davis to assure Doe's counsel that Roe 'did not offer any new evidence' during the December 11, 2016 interview. The former was procedurally irregular because, under § C(5) of the Procedures, '[b]efore

concluding the investigation, and upon request, the Dean of Students will provide the parties with an opportunity to respond to all investigative materials.'   The latter was procedurally irregular because, for the reasons discussed above, a reasonable juror could conclude that Roe did, in fact, provide important new evidence during the December 11, 2016 interview, by changing her account on several key points."   (Doc. 209 at 38-39.) ABOR now seeks reconsideration of this analysis for four reasons: (1) the Court stepped outside its judicial role by "go[ing] to lengths never attempted by Doe . . . to try to identify 'evidence' appearing to create a question of fact" on whether Roe's December 11, 2016 interview contained new information; (2) Roe's December 11, 2016 interview did not, in fact, contain any new information; (3) even assuming the interview contained new information, "Davis did not violate any Procedure in stating that Roe 'did not offer any new evidence'"; and (4) even assuming there was some procedural violation, it was harmless.  (Doc. 227 at 10-14.)

ABOR is not entitled to reconsideration based on these arguments.  First, ABOR's accusation of judicial overreach is, like its earlier accusation on this point, both unsupported by the record and disappointing.  In its summary judgment motion, ABOR argued that, to the extent Doe sought to rely on "Davis's statement to Doe that one of Ms. Roe's written submissions [from December 11, 2016] did not contain new evidence" as a procedural irregularity, this reliance was misplaced because "[a]t best, this assertion reflects a disagreement between Doe and Ms. Davis as to what constitutes 'new evidence'" and alternatively because "Doe received the opportunity to respond to all information provided by Ms. Roe and did provide lengthy responses, including on December 21, 2016." (Doc. 155 at 10.)  In response, Doe argued that one of the "egregious irregularities in the disciplinary proceedings" occurred when "[t]he University tried to keep Doe from responding to new evidence and ignored the response after receiving it." (Doc. 189 at 11, 14.)  Doe elaborated: "Parties have the right to 'respond to all investigative materials.' Here, Davis refused to grant Doe that right until he hired an attorney who secured the right. The University claimed no substantive new information was provided, but Doe's attorney

identified substantive, new information presented by Doe, and detail[ed] the egregious flaws, inconsistencies, baseless conclusions, and legal infirmities with the draft report. . . . A reasonable jury can infer gender bias based on the University's failure to give the male accused an opportunity to review and comment on evidence and granting the female accuser that right . . . ." (*Id.* at 14-15.) Doe also included, as an exhibit to his response, a copy of the December 21, 2016 letter from his attorney that purported to identify the new information provided by Roe during the December 11, 2016 interview. (Doc. 189-2 at 52-60.) Among other things, this letter stated that Roe provided new information when she "[d]enie[d] being aware of video/photo being taken" and identified earlier statements in which Roe purportedly made conflicting claims on that issue. (*Id.* at 54.)

The parties' dispute over whether Roe's December 11, 2016 interview contained new substantive information—and whether ASU engaged in procedural impropriety by not giving Doe a fair opportunity to address that new information—was also the subject of extensive discussion during oral argument. After ABOR's counsel argued that "Doe does not describe in his papers the supposedly new information in Roe's comments, or what makes Miss Davis's statement a misrepresentation at all" (Doc. 228 at 21), the Court posed the following question to Doe's counsel: "What's your best piece of new substantive information?" (*Id.* at 74.) Doe's counsel responded: "I have a list. But the best one is, that was the first time she said that she didn't know she was being filmed. . . . [J]uxtapose that with her [earlier] statements to the police, that not only did I know I was being filmed, but that I stopped it, and I had the capacity to stop it, is evidence that she wasn't incapacitated . . . . So it's substantive evidence that was never presented and it was the first time that she presented it." (*Id.* at 74-75.) In reply, ABOR's counsel stated: "[Doe's counsel] said that the biggest inconsistency was [Roe's] statement about not knowing she was being filmed. There's nothing in the record where she ever said that she knew she was being filmed and stopped it. The evidence of what she actually said is she saw a flash. That's been extrapolated—now video was taken. She didn't know. But once you see a video is taken, all of a sudden she was stopping them from filming. That's just not in the

record." (*Id.* at 82.)

Given this backdrop, the Court included, in the summary judgment order, a detailed description of the various statements that Roe made about her awareness of being filmed/videotaped, which included quotations from various documents in the summary judgment record. (Doc. 209 at 38 ["Roe stated on December 11, 2016 that 'she was not aware that a photo was taken.' However, during her April 2016 interview with the Tempe Police Department, Roe reported that 'she saw a camera flash and realized that [Witness 1] was taking pictures of her' . . . . Similarly, during Roe's initial meeting with Davis on September 19, 2016, Roe stated that '[d]uring the encounter, she stated to see flashes going off. She asked what it was and was told not to worry about it. She then responded that she did not want to be recorded.' And during her subsequent meeting with Davis on October 27, 2016, Roe stated that 'the camera was brought out after she said no.'"].) Based on this summary, the Court concluded that "a reasonable juror could conclude that Roe did, in fact, provide important new evidence during the December 11, 2016 interview, by changing her account on several key points." (*Id.* at 39.) It is difficult to see how ABOR could view this as an example of "assum[ing] Doe's burden," "act[ing] as a party's lawyer," and deciding "to venture outside the adversarial issues presented to the Court by the parties." (Doc. 227 at 11, 13, cleaned up.) The Court resolved a factual dispute that both parties expressly raised in their summary judgment papers and expressly raised again during oral argument. Analyzing an expressly disputed issue is not judicial advocacy, but the normal discharge of the judicial role.

To the extent ABOR's claim of judicial advocacy concerns the Court's identification in the summary judgment order of two other examples of new information provided by Roe during the December 11, 2016 interview—first, Roe's statement that she was too intoxicated to be aware of what was happening or to remember what happened; and second, Roe's statement that she did not say stop because she was too intoxicated (Doc. 209 at 37-38)—these examples were also identified in Doe's counsel's letter (Doc. 189-2 at 52-55, 59), which Doe cross-referenced in his summary judgment response (Doc. 189 at

14).  Accordingly, the inclusion of these examples in the summary judgment order was not, as ABOR argues, an improper attempt to identify evidence "for the first time . . . which Doe did <u>not</u> cite in response to ABOR's Motion" (Doc. 227 at 11), but the Court's best effort to fully and fairly address each side's arguments and proffered evidence.

ABOR has also failed to demonstrate that the Court's resolution of this dispute was, on the merits, manifestly erroneous.  A reasonable juror could find that Roe made statements during her December 11, 2016 interview that were inconsistent with her previous statements.  Although ABOR attempts in its reconsideration motion to show how all of Roe's statements can be reconciled with each other (Doc. 227 at 11-12), accepting these arguments would, at a minimum, require the Court to resolve various inferences in ABOR's favor (which is impermissible at summary judgment).

Because a reasonable juror could find that Roe's statements were inconsistent, a reasonable juror could also find that it was procedurally irregular for Davis to assure Doe's counsel that Roe "did not offer any new evidence" during the December 11, 2016 interview.  The Court fully agrees with Doe on this point: "[W]hile ABOR does not need to use any specific language when conveying to a party that no new information was received from the complainant, ASU cannot lie and say no new evidence was offered." (Doc. 241 at 14.)  Without belaboring the issue, Roe's account of the sexual encounter was perhaps the most important evidence in the proceeding against Doe.  Accordingly, evidence bearing on Roe's credibility—such as whether her description of the encounter varied over time, even if those descriptions were not flatly inconsistent with each other—was critical. *Cf. Doe v. Univ. of Conn.*, 2020 WL 406356, *4 (D. Conn. 2020) (noting that "in any case involving a 'he said/she said' dispute, . . . evidence bearing on credibility is critical").  *See generally Jencks v. United States*, 353 U.S. 657, 667 (1957) ("Every experienced trial judge and trial lawyer knows the value for impeaching purposes of statements of the witness recording the events before time dulls treacherous memory.  Flat contradiction between the witness' testimony and the version of the events given in his reports is not the only test of inconsistency.  The omission from the reports of facts related at the trial, or a contrast in

emphasis upon the same facts, even a different order of treatment, are also relevant to the cross-examining process of testing the credibility of a witness' trial testimony."). The Court thus finds no error, manifest or otherwise, in its determination in the summary judgment order that a reasonable juror could find that it was procedurally irregular for the lead investigator in a sexual misconduct investigation to falsely assure the respondent that the complainant had not offered any new evidence during her last pre-hearing interview and then provide a summary of the last interview to the decisionmakers without first giving the respondent an opportunity to review it.[19]

Finally, ABOR is not entitled to reconsideration based on its contention that any procedural irregularity can be disregarded on harmlessness grounds. First, and as noted in the summary judgment order, this argument is forfeited because it is a new theory that ABOR did not properly raise in the summary judgment motion. (Doc. 209 at 43.) The words "causation" and "harmless" do not appear anywhere in that motion (Doc. 155), which argued that ABOR was entitled to summary judgment because there was no evidence of external pressure to engage in gender bias (*id.* at 4-5), no evidence of comments reflecting gender bias (*id.* at 5-7), no evidence of any procedural irregularities (*id.* at 7-13), and no admissible expert evidence to support Doe's claim (*id.* at 13-17). The argument that no procedural irregularity occurred is very different from the argument that any procedural irregularity was harmless. Second, even if the argument weren't forfeited, Doe has identified various reasons why a reasonable juror could view the irregularity concerning Roe's December 11, 2016 statement as harmful. (Doc. 241 at 14-15.) Third, and more broadly, the Court is not persuaded that a procedural irregularity in a Title IX

---

[19]   In the summary judgment order, the Court concluded that a reasonable juror could find procedural impropriety not only for the reasons stated above, but also because Davis's approach violated § C(5) of the Code. In the motion for reconsideration, ABOR argues that it was manifestly erroneous to conclude that § C(5) was implicated here. (Doc. 227 at 13.) The Court is not necessarily persuaded. True, one of Davis's December 20, 2016 emails included the statement "I am happy to have you come in to view her responses" (Doc. 189-2 at 63), but Davis had already sent the final report to the Dean for review by the time she made this offer (*id.* at 64). Nevertheless, regardless of any error in the interpretation of § C(5), the summary judgment order's overall determination that a reasonable juror could find procedural irregularity as to Davis's treatment of Roe's December 11, 2016 statement was not manifestly erroneous.

case becomes irrelevant if the plaintiff cannot draw a direct causal link between that irregularity and the outcome of the underlying disciplinary proceeding.  Here, Doe seeks to rely on an array of circumstantial evidence, including statistical evidence of disparities, various procedural irregularities, and the fact that his expulsion was ultimately overturned based on insufficient evidence, in an attempt to prove the existence of gender bias.  As noted in *Gay*, "[s]ince the question is one of inferring discriminatory intent, the district court should make a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. . . .  [A]ll evidence, both direct and circumstantial, statistical and nonstatistical, relevant to that question should be assessed on a cumulative basis."  694 F.2d at 550.  Disregarding individual procedural irregularities on harmlessness grounds would, at least under the circumstances of this case, violate this directive to conduct a sensitive inquiry that considers the cumulative impact of all of Doe's evidence.

### 3.   Failure To Disclose "Sex By Force" Theory

The second procedural irregularity identified in the summary judgment order was as follows: "A reasonable juror could conclude that the UHB's decision to find Doe responsible under a sex-by-force theory constituted a procedural irregularity. . . .  [T]he summary of the charges provided at the outset of the letter [sent by Dr. Hunter on September 21, 2016] only accused Doe of engaging in sexual acts 'without her consent' and did not make any separate mention of sex by force.  Similarly, during later meetings with Doe, Davis made comments that can be reasonably construed as suggesting the sexual-misconduct investigation was only focused on incapacitation and the lack of consent, not on the presence of force."  (Doc. 209 at 42-43.)  ABOR now seeks reconsideration of this analysis for four reasons: (1) the "undisputed evidence" shows that ASU properly disclosed the sex-by-force theory; (2) alternatively, there is no requirement under the Procedures to provide "a detailed description of each theory of sexual misconduct"; (3) finding a disclosure violation under these circumstances would create an "inherent contradiction" with the Court's relevance and reliability determinations concerning Dr. Kaufman; and (4) any irregularity was harmless.  (Doc. 227 at 14-16.)

ABOR is not entitled to reconsideration based on these arguments.  The first and second arguments are improper because they essentially repeat the same arguments that ABOR made (and the Court rejected) during the summary judgment process.  *Motorola*, 215 F.R.D. at 582 ("Nor is reconsideration to be used to ask the Court to rethink what it has already thought.").  At any rate, even after considering ABOR's latest recitation of these arguments, the Court stands by its earlier conclusion.  As Doe correctly notes in his response, even though it is undisputed that "Doe was 'charged' with 'Sexual Misconduct' under F-23 . . . the Dean of Students was required to explain those charges, and she did: by explaining that Doe was being accused of engaging in sex with a person who was incapacitated. . . .  [T]here is sufficient evidence for a jury to find that the decision to find Doe responsible for sex by force without notice constituted a procedural irregularity." (Doc. 241 at 16-17; Doc. 209 at 42-43.)

Nor does the Court find any inherent contradiction between this conclusion and the analysis regarding Dr. Kaufman.  The issue here concerns notice and compliance with procedural regulations—specifically, whether it is procedurally irregular to inform a student that he is being charged with one specific form of "sexual misconduct" under F-23, only to find him responsible for committing an entirely different form of "sexual misconduct" under F-23.  The issue as to Dr. Kaufman was whether a statistical analysis of all "sexual misconduct" cases under F-23, irrespective of the underlying facts, would fall within Rule 702's broad conception of relevance.  Although both analyses touch, in a broad sense, on the same subject matter, they turn on very different considerations.

Finally, ABOR's harmlessness arguments as to the sex-by-force issue fail for the same reasons as its harmlessness arguments regarding Roe's December 11, 2016 statements—they are forfeited, factually unsupported for the reasons stated in Doe's response (Doc. 241 at 17), and legally misplaced.

### 4.  Arizona Court Of Appeals Decision

The final irregularity identified in the summary judgment order was as follows: "[T]he fact of reversal [by the Arizona Court of Appeals] helps support Doe's contention

that his disciplinary proceeding was infected by irregularities that may, in concert with other evidence, give rise to an inference of gender bias.  The clearest support for this conclusion comes from the Ninth Circuit's recent *Doe* decision, which identified 'the state court's ruling . . . in the writ proceeding . . . that the evidence did not support the Regents' findings' as one of the 'procedural irregularities' that could 'support an inference of gender bias, particularly when considered in combination with allegations of other specific instances of bias and background indicia of sex discrimination.'  That is essentially what happened here—although Dr. Hightower, the UHB, and Dr. Rund all determined that Doe had committed sexual misconduct in violation of section F-23, the appellate court held that no reasonable person could have reached that conclusion.  Although the Court agrees with ABOR that the fact of reversal does not, in itself, mean that Doe must prevail on his Title IX claim or even survive summary judgment—there must be other evidence from which a reasonable juror could conclude this irregularity was indicative of gender bias—it would be reasonable for a juror to find *irregularity* based on the reversal."  (Doc. 209 at 45, citations omitted).  ABOR now seeks reconsideration of this analysis for two reasons: (1) Doe never disclosed his intent to rely on the Arizona Court of Appeals' decision as evidence of a procedural irregularity; (2) on the merits, the decision does not qualify as evidence of an irregularity.  (Doc. 227 at 16-17.)

ABOR is not entitled to reconsideration based on these arguments.  First, these are essentially the same arguments that ABOR made (and the Court rejected) during the summary judgment process.  *Motorola*, 215 F.R.D. at 582.  Second, the Court agrees with Doe (Doc 241 at 18-19) that these arguments fail on the merits—Doe disclosed his intent to rely on the decision (Doc. 155-5 at 100-02) and a reasonable juror could find an irregularity based on the reversal, as recognized by the Ninth Circuit in *Doe*.

…

…

…

…

- 45 -

Accordingly,

**IT IS ORDERED** that:

1.     ABOR's motion to exclude Dr. Kaufman (Doc. 159) is **denied**.

2.     ABOR's motion for reconsideration (Doc. 227) is **denied**.

Dated this 18th day of November, 2022.

Dominic W. Lanza
United States District Judge